## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SHAWNA TANNER,**

> **Plaintiff,**

**v.**                                                       **No.  17-cv-876 ___-___**

**TIMOTHY I. MCMURRAY, M.D.,**
**ADRIANA LUNA, R.N., AUDREY LEBER, R.N.,**
**TAILEIGH SANCHEZ, R.N., ELISA MANQUERO, R.N.,**
**CORRECT CARE SOLUTIONS, LLC,**
**BOARD OF COUNTY COMMISSIONERS OF**
**BERNALILLO COUNTY, NEW MEXICO,**
**THOMAS J. RUIZ, JOHN AND JANE DOES 1-10,**

> **Defendants.**

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS,
## TORT CLAIMS, STATUTORY VIOLATIONS,
## DAMAGES, AND INJUNCTIVE RELIEF

Plaintiff Shawna Tanner, through her attorneys of record, Paul Kennedy & Associates, P.C. and the Law Office of Nicole W. Moss, LLC, brings this Complaint for violations of her civil rights under the Eighth and Fourteenth Amendments to the United States Constitution, professional negligence and gross negligence actionable under state law, and statutory violations of New Mexico's Inspection of Public Records Act.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, with supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

2.      Venue is proper in this District as Defendants are residents of New Mexico under 28 U.S.C. § 1391 and all of the acts complained of occurred in New Mexico.  The cause of action arose in New Mexico.

## PARTIES

3.      Plaintiff Shawna Tanner was at all relevant times a New Mexico resident.

4.     Defendant Timothy I. McMurray, M.D., was at all relevant times residing in New Mexico as the Site Medical Director at the Metropolitan Detention Center (MDC) in Bernalillo County responsible for providing medical services to MDC inmates, including Plaintiff Tanner, and exercising direct supervisory control over the other medical staff at MDC.  Dr. McMurray is sued in his individual capacity.  At all relevant times, he was acting under the color of law within the scope of his duties and employment as the Site Medical Director at MDC.

5.     Defendants Adriana Luna, R.N., Audrey Leber, R.N., Taleigh Sanchez, R.N., and Elisa Manquero, R.N., were at all relevant times residing in New Mexico as Registered Nurses at MDC responsible for providing health-care services to MDC inmates, including Plaintiff Tanner. Defendants Luna, Leber, Sanchez, and Manquero are sued in their individual capacities.  At all relevant times, they were acting under the color of law within the scope of their duties and employment as Registered Nurses at MDC.

6.     Defendant Correct Care Solutions LLC (CCS) is a Kansas Limited Liability Company doing business at several locations in New Mexico, with its home office in Nashville, Tennessee and a site office located at MDC in Bernalillo County, New Mexico.  At all relevant times, Defendant CCS employed, contracted with, and exercised direct supervisory control over Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-5, who were acting under the color of law within the scope of their duties and employment as agents of CCS.

7.     Defendant Thomas J. Ruiz was at all relevant times residing in New Mexico as the Administrator of the MDC in Bernalillo County, New Mexico who exercised direct supervisory control over the other Defendants during that period.  Defendant Ruiz is sued in his individual capacity.  At all relevant times, he was acting under the color of law and within the scope of his duties and employment as the Administrator of MDC.

8.     Defendant Board of County Commissioners of Bernalillo County, New Mexico

(BCC) is a governmental entity located in Bernalillo County, New Mexico, which contracted with CCS to fulfill its obligation to provide health-care services to inmates at MDC during the time period relevant to Plaintiff Tanner's Complaint. Defendant BCC employed, contracted with, and exercised direct supervisory control over the other Defendants during that time period.

9.     Defendant Does 1-5 are additional health-care personnel residing in New Mexico who were responsible for providing health care to inmates, including Plaintiff Tanner, during the time period relevant to this Complaint. Upon information and belief, Defendants Does 1-5 were employed by, acting as agents for, and under the direct supervisory control of Defendant CCS during that period. Defendant Does 1-5 are sued in their individual capacities. At all relevant times, they were acting under the color of law within the scope of their duties and employment as health-care personnel at MDC.

10.     Defendants Does 6-10 are additional corrections personnel, including corrections officers, residing in New Mexico, employed at MDC, and responsible for providing Plaintiff Tanner with timely access to health care during the time period relevant to this Complaint. Defendant Does 6-10 are sued in their individual capacities. At all relevant times, they were acting under the color of law within the scope of their duties and employment as corrections personnel at MDC.

**FACTUAL BASIS**

11.     On or about December 9, 2014, BCC selected, approved, and entered into a  written contract with CCS entitled "Agreement for Medical, Dental, Mental Health, Psychiatric and Methodone Services for the Metropolitan Detention Center" (hereinafter "Medical Services Agreement"). That agreement remains in effect, as amended, for a four-year term.

12.     Under the Medical Services Agreement, BCC and CCS represented that the health care provided to inmates at MDC would comply with all current and any future standards issued by the National Commission on Correctional Health Care (NCCHC) and the American Correctional

3

Association (ACA).  CCS further agreed to train MDC staff in accordance with these standards, including training on recognizing emergencies and procedures for referring inmates for care. Defendants Ruiz and BCC remained responsible for ensuring that CCS and its employees met their obligations under the Medical Services Agreement and the applicable law.

13.    The 2014 edition of the NCCHC Standards for Health Services in Jails in effect at the time CCS entered into the Medical Services Agreement with BCC contains an essential standard entitled "Counseling and Care of the Pregnant Inmate," which requires that:  "Pregnant inmates receive timely and appropriate prenatal care, specialized obstetrical services when indicated, and postpartum care.  Pregnant inmates are given comprehensive counseling and assistance in accordance with their expressed desires regarding their pregnancy."

14.    The Compliance Indicators for this NCCHC Standard specifically require that:

Counseling and assistance are provided in accordance with the pregnant inmate's expressed desires regarding her pregnancy, whether she elects to keep the child, use adoptive services, or have an abortion.

Prenatal care includes:  (a) Medical examinations by a clinician qualified to provide prenatal care; (b) Appropriate prenatal laboratory and diagnostic tests; (c) Advice on appropriate levels of activity, safety precautions, and alcohol and drug avoidance; (d) nutritional guidance and counseling.

Restraints are not used during active labor and delivery.

There is documentation of appropriate postpartum care.

A list is kept of all pregnancies and their outcomes.

All aspects of the standard are addressed by written policy and defined procedures.

15.    The "Discussion" section of the NCCHC Standard further explains that:

This standard intends that the health of the pregnant inmate and her fetus is protected and that pregnant inmates receive services as they would in the community.  The responsible health authority should ensure that pregnant inmates and their fetuses are provided every opportunity for healthy outcomes, and that the pregnant inmate is afforded supportive comprehensive counseling and is not coerced into making any decision contrary to her expressed desires.  An arrangement should be made with a

community facility as the site for delivery.  Documentation of the patient's prenatal history should accompany her to the hospital.

16.     The 2010 edition of the ACA Core Jail Standards similarly requires that:  "Pregnant inmates have access to obstetrical services by a qualified provider, including prenatal, peripartrum, and postpartum care."

17.     In its proposal for the Medical Services Agreement with BCC, CCS stated that it had "met with UNMH to discuss the potential of increasing on-site services at the MDC; initially via on-site orthopedic and OB/GYN clinics and upon a review and evaluation of provided statistical data regarding volume, potential additional clinics to assist in reducing transportation costs."

18.     A provision for "bi-weekly onsite OB/GYN clinics at 4 hours per clinic" was added to the Medical Services Agreement between CCS and BCC by means of a contract amendment dated on or about June 1, 2015.

19.     CCS's proposal for the Medical Services Agreement with BCC also stated that "CCS recently acquired Correctional Health Companies," BCC's former health-care provider, and that "CCS truly understands the complexities of McClendon" versus City of Albuquerque, No. CV 95-24 JAP/KBM, a longstanding class-action lawsuit involving conditions of confinement, inmate medical care and inmate mental health care at MDC and its predecessor facilities.

20.     The parties to the *McClendon* litigation entered into a settlement agreement, which was the subject of a preliminary approval hearing before the Honorable James A. Parker in the United States District Court for the District of New Mexico on December 14, 2015.  On March 22, 2016, Judge Parker entered a Memorandum Opinion and Order giving preliminary approval to the *McClendon* settlement agreement and providing for notice and an opportunity for the class members to be heard.

21.     The provisions of Judge Parker's Memorandum Opinion and Order entered on March

22, 2016, required that full notice of the *McClendon* settlement agreement and its terms be posted in both English and Spanish in every housing unit at MDC, as well as MDC's medical services unit; the reception, discharge, and transfer unit; and the law library, with provisions for inmates to review the full settlement agreement and its attachments upon request or through the kiosk system.

22.     Following a sixty-day period for notice, comment, and objections, Judge Parker issued a Memorandum Opinion and Order dated June 27, 2016, giving final approval for the *McClendon* settlement agreement.  Judge Parker's final approval order finds that staff at the MDC participated directly in the settlement negotiations, and the BCC itself approved the settlement agreement after being briefed by legal counsel.  The order also concludes that the settlement agreement does not bar inmates with individual claims from pursuing damages in separate lawsuits.

23.     Under the terms of the *McClendon* settlement agreement as approved on June 27, 2016, BCC is required to demonstrate compliance with standards outlined in three Check-Out Audit Agreements corresponding to areas evaluated by court-appointed experts:  (1) provision of medical services; (2) provision of mental health services; and (3) general conditions of confinement, including population management.  Check-Out Audit Agreement No. 1 (CAA No. 1) pertains to the provision of medical services at MDC and again specifically references compliance with ACA Standards for Adult Detention Centers and NCCHC Guidelines.  CAA No. 1 also requires the court-appointed medical expert to monitor and address "[w]hether MDC inmates who complain orally or in writing of serious acute illness or serious injury are given immediate medical attention," and "[w]hether all inmate requests for medical care are timely communicated to medical personnel for appropriate treatment."

24.     On or about October 4, 2016, while the Medical Services Agreement, *McClendon* Settlement Agreement, and CAA No. 1 described above were in effect, Plaintiff Tanner began a term of incarceration at MDC while in the last month of gestation of her pregnancy. Upon her intake

at the MDC facility and thereafter, Plaintiff Tanner disclosed her pregnancy, as well as her desire and intent to give birth and keep the child, to both corrections personnel and medical personnel at MDC, including Defendants.  Plaintiff Tanner also disclosed aspects of her medical history relevant to diagnosing risks associated with her pregnancy, including prior pregnancies, past substance abuse, and her age (33 years old).

25.     Apart from a brief emergency visit to Lovelace Women's Hospital on or about October 17, 2016, Plaintiff Tanner remained in custody at MDC from on or about October 4, 2016, until on or about October 20, 2016.  During her time in custody at MDC, she was dependent on MDC personnel and CCS personnel for access to timely and appropriate prenatal care, medical examinations by a clinician qualified to provide such care, appropriate prenatal laboratory and diagnostic tests, specialized obstetrical services and resources for her pregnancy, transport to an appropriate community facility for delivery and peripartum care, and all emergency medical care.

26.     Medical records produced to Plaintiff Tanner as of the date of this Complaint indicate that Defendant Manquero examined Plaintiff Tanner on or about Friday, October 14, 2016, and failed to state or provide an appropriate plan for prenatal or peripartum care, medical examinations by a clinician qualified to provide such care, appropriate prenatal laboratory or diagnostic tests, or specialized obstetrical services and resources for her pregnancy.  On Saturday, October 15, 2016, Defendant McMurray signed the "Medical History and Physical Assessment with Mental Health" form prepared by Defendant Manquero, again with no plan or instructions for addressing Plaintiff's pregnancy, even though Plaintiff Tanner was already in the last month of gestation.

27.     According to the medical records produced to Plaintiff Tanner as of the date of this Complaint, Plaintiff Tanner requested medical attention and was next seen by Defendant Luna on Sunday morning, October 16, 2016.  Defendant Luna charted Plaintiff Tanner's pregnancy as "normal" and failed to provide appropriate diagnosis, treatment, or referral despite Plaintiff Tanner's

complaints of abdominal pain, vaginal discharge, bleeding, and other symptoms of labor with a high risk of complications.  Plaintiff's symptoms were obvious and readily observable; they included a large amount of fluid from the discharge soaking through her pants.

28.    Throughout the rest of the day on October 16, 2016, and through the night and early morning hours of October 17, 2016, Plaintiff Tanner continued to experience and report her acute emotional and physical distress, as well as her urgent concerns about the life of her fetus, to medical and corrections personnel at MDC, including Defendants Luna, Leber, Sanchez, and Does 1-10. During this period, Plaintiff Tanner repeatedly complained of abdominal pain (cramping), vaginal discharge, and a strong feeling of pressure in her lower abdomen/vaginal area, which interfered with her urination and defecation, and caused great discomfort, fear, and anxiety.  She repeatedly informed medical and corrections personnel at MDC, including Defendants Luna, Leber, Sanchez, and Does 1-10 that she believed she was in labor and requested transport to a hospital for delivery of her child.

29.    Medical and corrections personnel at MDC, including Defendants Luna, Leber, Sanchez, and Does 1-10, refused Plaintiff Tanner's repeated requests for transport to a hospital and for referral to a clinician qualified to provide appropriate prenatal or peripartum care or obstetric services in accordance with her expressed desires and intent to give birth and to keep the child.  In response to these requests, medical and corrections personnel at MDC, including Defendants Luna, Leber, Sanchez, and Does 1-10 cruelly and maliciously accused Plaintiff Tanner of seeking drugs and had her secluded in a locked solitary cell in MDC's medical unit contrary to the NCCHC Standards on Restraint and Seclusion.  While isolated in the solitary cell,  Plaintiff Tanner continued to experience vaginal discharge, cramping, and pressure throughout the night and observed a strong odor coming from the discharge, which indicated an infection.

30.    It was not until Monday morning, October 17, 2016, at approximately 8:00 a.m., that

8

Plaintiff Tanner was finally given the opportunity to speak with a physician, Defendant McMurray. At that time, Plaintiff Tanner again reported her symptoms and requested that Defendant McMurray conduct a physical examination of her due to her exigent concerns that she was in prolonged labor with a high risk for complications.  Defendant McMurray refused to perform an examination to properly diagnose Plaintiff Tanner's pregnancy, refused to arrange for transport to a hospital so Plaintiff Tanner could deliver her baby safely, and refused to provide any referral to a clinician qualified to provide appropriate care under the circumstances.  Instead, Defendant McMurray cleared Plaintiff Tanner to return to her pod outside the medical unit, where the level of care required under the relevant ACA and NCCHC standards was completely lacking.

31.    Upon returning to her pod around 9:00 a.m. on October 17, 2016, Plaintiff Tanner's vaginal bleeding became even heavier and was accompanied by increased cramping and pressure that was so intense and severe that she was unable to walk.  According to medical records produced to Plaintiff Tanner as of the date of this Complaint, Anthony Spencer, R.N. came on shift during that period and had Plaintiff Tanner taken to the medical unit in a wheelchair.  Plaintiff Tanner told Nurse Spencer she could not feel any fetal movement and showed him a sanitary pad saturated with dark blood and brownish-tinged discharge.  Medical records produced to Plaintiff Tanner as of the date of this Complaint indicate that Nurse Spencer forwarded this information to Defendant McMurray.  Those medical records further indicate that at approximately 10:45 a.m. on or about October 17, 2017, Defendant McMurray finally authorized the call for an ambulance to transport Plaintiff Tanner to the emergency room at UNM Hospital almost 20 miles away from MDC.

32.    Apart from filling out paperwork, unsuccessfully attempting to locate a fetal heartbeat, and timing contractions, Defendants did essentially nothing to assist, prepare, or treat Plaintiff Tanner for the labor, complications, or delivery of her baby while awaiting the arrival of the ambulance.  Meanwhile, Plaintiff Tanner attempted to go to the bathroom to change out her

soiled sanitary pad, during which time she reported feeling a lot of pressure as if the baby was coming.  She then began having more frequent contractions.

33.     Medical records obtained by Plaintiff Tanner as of the date of this Complaint indicate that the ambulance arrived at approximately 11:12 a.m.  Upon the ambulance paramedic's arrival in MDC's medical unit, Plaintiff Tanner was already in active labor with positive crowning, such that there was no time left to transport her to the hospital before delivery.  The ambulance paramedics looked to Defendant McMurray for guidance as to the delivery of the baby.  But Dr. McMurray just stood back, threw his hands in the air, and nodded his head back and forth in a non-verbal expression of "no."

34.     The paramedics then delivered the baby themselves without any guidance from Dr. McMurray.  Upon delivery, the paramedics observed the baby had no signs of life, was pulseless, not breathing, and unresponsive to stimuli.  The umbilical cord was wrapped tightly around the baby's neck, and there was mucus and blood in the baby's airway.  According to medical records produced to Plaintiff Tanner as of the date of this Complaint, no CPR was attempted and the baby was pronounced dead in the medical unit at MDC.

35.     As Dr. McMurray failed to intervene or provide any directions to other personnel, the ambulance paramedics called the hospital and were directed to transport Plaintiff Tanner and her stillborn baby there.  After transport, Plaintiff Tanner spent part of the day at Lovelace Women's Hospital in Albuquerque for a brief period of postpartum care.  Defendants then had Plaintiff Tanner picked up and returned to MDC to continue her incarceration on the evening of October 17, 2016.

36.     Plaintiff Tanner's stillborn baby was sent to the Office of the Medical Investigator for an autopsy.  According to records produced by OMI as of the date of this Complaint, OMI's pathological diagnoses were stillbirth, preterm premature rupture of membranes for a prolonged period of more than 24 hours, with chorioamnionitis, chorionic vasculitis, funisitis, and a tight

nuchal cord.  In layperson's terms, these records indicate that the membrane holding the amniotic fluid around the fetus ruptured, causing the fluid to leak down through the mother's vagina, and providing a pathway for infection and inflammation of the placenta and umbilical cord, which was wrapped around the fetus's neck.  According to the OMI report, the gestational age of the fetus at the time of death was approximately 36 weeks (eight and a half months).

37.     Having the umbilical cord wrapped around the fetus's neck and having some degree of infection or inflammation within the placenta are common, treatable complications of pregnancy that do not result in stillbirth or neonatal death in the vast majority of cases.  Had Plaintiff Tanner received appropriate medical treatment while incarcerated at MDC in accordance with her expressed desire and intent to keep the child and give birth, she would not have lost her baby or been subjected to needless pain and suffering.

38.     Plaintiff Tanner's suffering did not end upon her return to MDC following the stillbirth of her baby.  She was again secluded in a solitary cell for the night in the same medical unit that had just denied her timely access to emergency medical care under the circumstances described above.  She was then sent back to her pod without adequate postpartum care.   Plaintiff Tanner remained incarcerated at MDC under these cruel and unusual conditions until she was released from MDC after a court hearing on October 20, 2016.

39.     During the period of Plaintiff Tanner's incarceration at MDC in October 2016, Defendant BCC's employees working at MDC were aware that she had a serious medical condition that rendered her unable to care for herself or her fetus, and that she was in severe pain.  Defendant BCC, by and through its principals, agents, and employees Defendants Ruiz and Does 6-10, acted with deliberate indifference to Plaintiff Tanner's serious medical needs, failed to require Defendant CCS to comply with its contractual obligations under the Medical Services Agreement, and failed to comply with BCC's own obligations under the *McClendon* settlement agreement under conditions

that were certain to result in constitutional violations and tort claims.

40.     During the period of Plaintiff Tanner's incarceration at MDC in October 2016, Defendant CCS's employees working at MDC were aware that Plaintiff Tanner had a serious medical condition that rendered her unable to care for herself or her fetus, and that she was in severe pain.  Defendant CCS, by and through its principals, agents, and employees Defendants McMurray, Manquero, Luna, Leber, Sanchez, and Does 1-5 acted with deliberate indifference to Plaintiff Tanner's medical needs, directed MDC employees and other medical personnel affiliated with CCS to disregard Plaintiff Tanner's serious medical needs, and failed to comply with CCS's contractual obligations under the Medical Services Agreement, as well as its own representations regarding compliance with the *McClendon* settlement agreement, under conditions that were certain to result in constitutional violations and tort claims.

41.     Defendants were all grossly negligent and deliberately indifferent in failing to provide timely access to medical services to Plaintiff Tanner.

42.     Plaintiff Tanner suffered damages and injuries from Defendants' refusal and failure to provide prompt, adequate medical treatment.  Her damages include pain and suffering, psychological and emotional distress, health-care expenses, and serious physical injuries, including the death of her fetus.

### COUNT I – CRUEL AND UNUSUAL PUNISHMENT CLAIMS UNDER THE EIGHTH AMENDMENT AGAINST DEFENDANTS MCMURRAY, LUNA, LEBER, SANCHEZ, MANQUERO, AND DOES 1-10

43.     Plaintiff Tanner incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

44.     The Eighth Amendment prohibits cruel and unusual punishment against persons in state custody serving a prison sentence.  This restriction encompasses a constitutional duty to provide such persons with timely access to necessary medical care and to refrain from unnecessary,

wanton infliction of pain.

45.     Plaintiff Tanner's medical needs as described above, as well as her pain and suffering, were sufficiently serious and obvious to warrant protection under the Eighth Amendment.

46.     Through their acts and omissions described above, Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10 were deliberately indifferent to Plaintiff Tanner's serious medical needs, and they unnecessarily and wantonly inflicted severe pain upon her.

47.     By engaging in the acts and omissions described above, Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10 violated Plaintiff Tanner's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.  The Eighth Amendment violations committed by these Defendants are clearly established and actionable under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

48.     The acts and omissions of Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10 described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and in reckless disregard of Plaintiff Tanner's Eighth Amendment rights.

49.     The acts and omissions of Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10 described above proximately caused Plaintiff Tanner's damages and injuries, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus.

WHEREFORE, Plaintiff Tanner prays for compensatory and punitive damages against Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10, together with an award of reasonable attorney's fees and costs.

### COUNT II - SUBSTANTIVE DUE PROCESS CLAIMS UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANTS MCMURRAY, LUNA, LEBER, SANCHEZ, MANQUERO, AND DOES 1-10

50.     Plaintiff Tanner incorporates by reference all other paragraphs of this Complaint as

if fully set forth herein.

51.     The substantive component of the Due Process Clause in the Fourteenth Amendment to the United States Constitution prohibits state actors from placing a substantial obstacle in the path of a person's choice whether to procreate and give birth to a child when pregnant.  Thus, state action which imposes an undue burden on a person's fundamental right to procreate and give birth to a child when pregnant violates the substantive component of the Fourteenth Amendment's Due Process Clause.

52.     Plaintiff Tanner desired and intended to exercise her fundamental right to procreate and give birth to a child, and she clearly expressed that desire and intent to medical and corrections personnel at BCC, including Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10, while she was pregnant during the time period relevant to this Complaint.

53.     Through their acts and omissions described above, Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10 placed a substantial obstacle in the path of Plaintiff Tanner's choice to carry her pregnancy to term and give birth to a child.  In so doing, these Defendants imposed an undue burden on Plaintiff Tanner's constitutional right to decide whether to carry her pregnancy to term and give birth to a child.

54.     By engaging in the acts and omissions described above, Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10 violated Plaintiff Tanner's fundamental right to procreate and give birth to a child while pregnant under the substantive component of the Fourteenth Amendment's Due Process Clause.  These violations are clearly established and actionable under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

55.     The acts and omissions of Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10 described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and in reckless disregard of Plaintiff Tanner's Fourteenth Amendment rights.

56.     The acts and omissions of Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10 described above proximately caused Plaintiff Tanner's damages and injuries, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus.

WHEREFORE, Plaintiff Tanner prays for compensatory and punitive damages against Defendants McMurray, Luna, Leber, Sanchez, Manquero, and Does 1-10, together with an award of reasonable attorney's fees and costs.

### COUNT III – STATE LAW CLAIM FOR PROFESSIONAL NEGLIGENCE AGAINST DEFENDANTS MCMURRAY, LUNA, LEBER, SANCHEZ, MANQUERO, CCS, AND DOES 1-5

57.     Plaintiff Tanner incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

58.     The New Mexico Tort Claims Act waives sovereign immunity for negligence of public employees licensed by the State or permitted by law to provide health-care services while acting within the scope of their duties in providing health-care services.

59.     With respect to addressing Plaintiff Tanner's serious medical needs, Defendants McMurray, Luna, Leber, Sanchez, Manquero, CCS, and Does 1-5 had a duty under the common law of the State of New Mexico, as well as relevant statutes, regulations, contracts, and other provisions of law, to possess and apply the standards of knowledge, skill, and care for their respective professional disciplines under the circumstances described above.

60.     Through the acts and omissions described above, Defendants McMurray, Luna, Leber, Sanchez, Manquero, CCS, and Does 1-5 breached these duties by failing to provide Plaintiff Tanner with timely and appropriate health care.

61.     The acts and omissions of Defendants McMurray, Luna, Leber, Sanchez, Manquero, CCS, and Does 1-5 described above were in willful, wanton, gross, and reckless disregard of their

duty to meet the standards of knowledge, skill, and care for their respective professional disciplines.

62.     The professional negligence of Defendants McMurray, Luna, Leber, Sanchez, Manquero, CCS, and Does 1-5 as set forth above proximately caused Plaintiff Tanner's damages and injuries as set forth above, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus.

WHEREFORE, Plaintiff Tanner prays for compensatory damages and punitive damages against Defendants McMurray, Luna, Leber, Sanchez, Manquero, CCS, and Does 1-5, together with an award of costs.

### COUNT IV – STATE LAW CLAIMS FOR NEGLIGENT OPERATION OF PUBLIC MEDICAL FACILITIES, BUILDINGS, EQUIPMENT, AND FURNISHINGS AGAINST ALL DEFENDANTS

63.     Plaintiff Tanner incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

64.     The New Mexico Tort Claims Act waives sovereign immunity for common-law negligence claims arising from public employees' operation of a hospital, infirmary, mental institution, clinic, dispensary, medical care home, like facilities, buildings, equipment, or furnishings.

65.     Plaintiff Tanner provided BCC with timely notice of her claims under the New Mexico Tort Claims Act by certified letter dated January 10, 2017.

66.      Under state law, each Defendant had a common-law duty to exercise reasonable care in the operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein.

67.     Through the acts and omissions described above, each Defendant breached this duty by failing to exercise reasonable care in the operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein.

16

68.     Defendants McMurray, CCS, BCC, and Ruiz also breached their duty to exercise reasonable care with respect to training and supervising the other Defendants, employees of BCC, and employees of CCS in the proper operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein.

69.     The acts and omissions of Defendants McMurray, Luna, Leber, Sanchez, Manquero, CCS, and Does 1-5 described above were in willful, wanton, gross, and reckless disregard of their duty to exercise reasonable care under the circumstances.

70.     The negligence of each Defendant as set forth above proximately caused Plaintiff Tanner's damages and injuries as set forth above, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus.

WHEREFORE, Plaintiff Tanner prays for compensatory damages against Defendants BCC, Ruiz, and Does 6-10, as well as compensatory and punitive damages against Defendants McMurray, Luna, Leber, Sanchez, Manquero, CCS, and Does 1-5, together with an award of costs against all Defendants.

### COUNT V – CLAIM FOR VIOLATION OF THE NEW MEXICO INSPECTION OF PUBLIC RECORDS ACT AGAINST DEFENDANT BCC

71.     Plaintiff Tanner incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

72.     On or about November 15, 2016, an attorney acting as an agent for Plaintiff Tanner submitted a request under New Mexico's Inspection of Public Records Act (IPRA) to inspect records, incident reports, surveillance videos, Securus videos, audio recordings, photographs, handwritten notes, memoranda, internal affairs investigation records, police reports, emails, correspondence, inmate transport records, and/or medical records, which were created, generated, or gathered as a result of Plaintiff Tanner's incarceration at MDC from October 15, 2016, through

17

October 17, 2016.  This IPRA request also included a form signed by Plaintiff Tanner authorizing the release of her medical records to her attorneys.

73.    Defendant BCC's records custodian received Plaintiff Tanner's IPRA request on November 15, 2016, but failed to produce all of the requested records or provide an explanation for withholding any of them within fifteen days of receiving Plaintiff Tanner's IPRA request.  Instead, Defendant BCC's records custodian produced only a portion of Plaintiff Tanner's medical records and claimed that the remainder of the requested records were "not ready for release."

74.    Plaintiff Tanner's attorney submitted follow-up correspondence to Defendant BCC's records custodian asking when the remainder of the requested records would be "ready for release," as well as a second IPRA request for those records dated on or about March 8, 2017.  In response to this correspondence, Defendant BCC's records custodian did not identify when the remainder of the requested records would be "ready for release," produce any additional records, or provide a privilege log or other justification for withholding any of the requested records under a recognized claim of privilege or exemption from disclosure under IPRA.

75.    In the *McClendon* litigation, Judge Parker has already ruled that the records and reports at issue in determining compliance with CAA No. 1 during the relevant time period are not privileged and are discoverable.  *See McClendon v. City of Albuquerque*, No. CV 95-00024 JAP-ACT, Doc. 1275 (D.N.M. memorandum opinion and order filed Mar. 20, 2017) (citing an earlier memorandum opinion and order in the same case, Doc. 1207, filed Oct. 13, 2015, and *Bravo v. Bd. of Comm'rs for the County of Dona Ana*, No. CV 08-00010, Doc. 214 (D.N.M. memorandum opinion and order filed Nov. 24, 2009).  Defendant BCC is well aware of this ruling, and the same principles apply here.

76.    Defendant BCC has failed to fully and completely respond to Plaintiff Tanner's IPRA requests, produce the requested records, or provide a lawful written explanation for withholding

them within a reasonable time as required under IPRA.

77.     Defendant BCC's IPRA violations may result in the spoliation of evidence that must be timely disclosed to prosecute this litigation.  These IPRA violations also subject BCC to statutory damages under IPRA and are causing Plaintiff Tanner to incur additional attorney fees for obtaining records that have been lawfully requested under IPRA more than nine months ago.

WHEREFORE, Plaintiff Tanner prays for statutory damages under IPRA as well as timely injunctive relief requiring Defendant BCC to preserve and produce all records responsive to her IPRA request, together with an award of reasonable attorney's fees and costs.

## JURY TRIAL DEMAND

78.     Plaintiff Tanner hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

PAUL KENNEDY & ASSOCIATES, P.C.

 /s/ Arne R. Leonard
Paul J. Kennedy
Arne R. Leonard
Elizabeth A. Harrison
201 Twelfth Street, N.W.
Albuquerque, NM  87102
Telephone: (505) 842-8662
pkennedy@paulkennedylaw.com
aleonard@paulkennedylaw.com
eharrison@paulkennedylaw.com

THE LAW OFFICE OF NICOLE W. MOSS, LLC
Nicole W. Moss
201 Twelfth Street, N.W.
Albuquerque, NM  87102
(505) 244-0950
nicole@nicolemosslaw.com

*Attorneys for Plaintiff Shawna Tanner*