**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**SHAWNA TANNER, individually and as
personal representative of JAY HINTON, JR.,**

      **Plaintiffs,**

**v.**                                       **No.  17-cv-876 JB-KBM**

**TIMOTHY I. MCMURRAY, M.D.,
ADRIANA LUNA, R.N., TAILEIGH SANCHEZ, R.N.,
ELISA MANQUERO, R.N., CHRISTOPHER MERCER, P.A.,
ED KOSSMAN, CORRECT CARE SOLUTIONS, LLC,
BOARD OF COUNTY COMMISSIONERS OF
BERNALILLO COUNTY, NEW MEXICO,
THOMAS J. RUIZ, CLAUDIA RODRIGUEZ-NUNEZ,
MARTINA SANCHEZ-FILFRED, and TINA M. MUNOZ,**

      **Defendants.**

**FIRST AMENDED COMPLAINT
FOR CIVIL RIGHTS VIOLATIONS, TORT CLAIMS,  WRONGFUL DEATH,
STATUTORY VIOLATIONS, DAMAGES, AND INJUNCTIVE RELIEF**

      Plaintiff Shawna Tanner, through her attorneys of record, Kennedy, Hernandez & Associates, P.C. and the Law Office of Nicole W. Moss, LLC, brings this First Amended Complaint for violations of her civil rights under the Eighth and Fourteenth Amendments to the United States Constitution, professional negligence and gross negligence actionable under state law, and statutory violations of New Mexico's Inspection of Public Records Act.  As personal representative of her deceased minor child, Jay Hinton, Jr., Plaintiff Tanner also brings a wrongful death claim actionable under state law.

**JURISDICTION AND VENUE**

      1.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, with supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

      2.     Venue is proper in this District as Defendants are residents of New Mexico under 28 U.S.C. § 1391 and all of the acts complained of occurred in New Mexico.  The cause of action arose

in New Mexico.

## PARTIES

3.      Plaintiff Shawna Tanner was at all relevant times a New Mexico resident.  She brings this lawsuit individually on her own behalf.  She also brings a wrongful death claim under state law on behalf of her deceased minor child, Jay Hinton, Jr., for whom she will serve as personal representative in this action under New Mexico's Wrongful Death Act.

4.      Plaintiff Tanner's decedent, Jay Hinton, Jr., was a viable fetus of at least 36 weeks of age at the time Defendants' wrongful conduct caused his death.  But for Defendants' wrongful conduct, Jay Hinton, Jr. had the capacity to survive outside his mother's uterus after a natural or induced birth supported by timely and appropriate medical care.   Jay Hinton, Jr.'s statutory beneficiaries therefore have a right of recovery under state law for his wrongful death pursuant to New Mexico's Wrongful Death Act and controlling precedent interpreting that statute.

5.      Defendant Timothy I. McMurray, M.D., was at all relevant times residing in New Mexico as the Site Medical Director at the Metropolitan Detention Center (MDC) in Bernalillo County responsible for providing medical services to MDC inmates, including Plaintiff Tanner, and exercising direct supervisory control over the other medical staff at MDC.  Dr. McMurray is sued in his individual capacity.  At all relevant times, he was acting under the color of law within the scope of his duties and employment as the Site Medical Director at MDC.

6.      Defendants Adriana Luna, R.N., Taleigh Sanchez, R.N., and Elisa Manquero, R.N., were at all relevant times residing in New Mexico as Registered Nurses at MDC responsible for providing health-care services to MDC inmates, including Plaintiff Tanner.  Defendants Luna, Sanchez, and Manquero are sued in their individual capacities.  At all relevant times, they were acting under the color of law within the scope of their duties and employment as Registered Nurses at MDC.

7. Defendant Christopher Mercer, P.A., was at all times residing in New Mexico as a Physician Assistant at MDC responsible for providing health-care services to MDC inmates, including Plaintiff Tanner. Defendant Mercer is sued in his individual capacity. At all relevant times, he was acting under the color of law within the scope of his duties as a Physician Assistant at MDC.

8. Defendant Ed Kossman was at all times residing in New Mexico as a Health Services Administrator (HSA) responsible for administration of health-care services to MDC inmates, including Plaintiff Tanner. Defendant Kossman is sued in his individual capacity. At all relevant times, he was acting under the color of law within the scope of his duties as a Health Services Administrator (HSA) at MDC.

9. Defendant Correct Care Solutions LLC (CCS) is a Kansas Limited Liability Company doing business at several locations in New Mexico, with its home office in Nashville, Tennessee and a site office located at MDC in Bernalillo County, New Mexico. At all relevant times, Defendant CCS employed, contracted with, and exercised direct supervisory control over Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman, who were acting under the color of law within the scope of their duties and employment as agents of CCS.

10. Defendant Thomas J. Ruiz was at all relevant times residing in New Mexico as the Administrator and Chief of Corrections of the MDC in Bernalillo County, New Mexico who exercised direct supervisory control over the other Defendants during that period. Defendant Ruiz is sued in his individual capacity. At all relevant times, he was acting under the color of law and within the scope of his duties and employment as the Administrator of MDC.

11. Defendant Board of County Commissioners of Bernalillo County, New Mexico (BCC) is a governmental entity located in Bernalillo County, New Mexico, which contracted with CCS to fulfill its obligation to provide health-care services to inmates at MDC during the time

period relevant to Plaintiff Tanner's Complaint.  Defendant BCC employed, contracted with, and exercised direct supervisory control over the other Defendants during that time period.

12.    Defendants Claudia Rodriguez-Nunez, Martina Sanchez-Filfred, and Tina M. Munoz were at all times residing in New Mexico and employed as corrections officers at MDC. Defendants Rodriguez-Nunez, Sanchez-Filfred, and Munoz are sued in their individual capacity.  At all relevant times, they were acting under the color of law and within the scope of their duties and employment as corrections officers at MDC.

## FACTUAL BASIS

13.    On or about December 9, 2014, Defendant BCC selected, approved, and entered into a written contract between Bernalillo County, New Mexico and Defendant CCS entitled "Medical, Dental, Mental Health, Psychiatric and Methodone Services Agreement" (hereinafter "Medical Services Agreement").  That agreement remains in effect, as amended, for a four-year term.

14.    Under the Medical Services Agreement, Defendants BCC and CCS represented that the health care provided to inmates at MDC would comply with all current and any future standards issued by the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA).  Defendant CCS further agreed to train MDC staff in accordance with these standards, including training on recognizing emergencies and procedures for referring inmates for care.  Defendants Ruiz and BCC remained responsible for ensuring that Defendant CCS and its employees (including those named as individual Defendants herein) met their obligations under the Medical Services Agreement and the applicable law.

15.    The 2014 edition of the NCCHC Standards for Health Services in Jails in effect at the time Defendant CCS entered into the Medical Services Agreement with Defendant BCC contains an essential standard entitled "Counseling and Care of the Pregnant Inmate," which requires that: "Pregnant inmates receive timely and appropriate prenatal care, specialized obstetrical services

4

when indicated, and postpartum care.  Pregnant inmates are given comprehensive counseling and

assistance in accordance with their expressed desires regarding their pregnancy."

16.     The Compliance Indicators for this NCCHC Standard specifically require that:

Counseling and assistance are provided in accordance with the pregnant inmate's expressed desires regarding her pregnancy, whether she elects to keep the child, use adoptive services, or have an abortion.

Prenatal care includes:  (a) Medical examinations by a clinician qualified to provide prenatal care; (b) Appropriate prenatal laboratory and diagnostic tests; (c) Advice on appropriate levels of activity, safety precautions, and alcohol and drug avoidance; (d) nutritional guidance and counseling.

Restraints are not used during active labor and delivery.

There is documentation of appropriate postpartum care.

A list is kept of all pregnancies and their outcomes.

All aspects of the standard are addressed by written policy and defined procedures.

17.     The "Discussion" section of the NCCHC Standard further explains that:

This standard intends that the health of the pregnant inmate and her fetus is protected and that pregnant inmates receive services as they would in the community.  The responsible health authority should ensure that pregnant inmates and their fetuses are provided every opportunity for healthy outcomes, and that the pregnant inmate is afforded supportive comprehensive counseling and is not coerced into making any decision contrary to her expressed desires.  An arrangement should be made with a community facility as the site for delivery.  Documentation of the patient's prenatal history should accompany her to the hospital.

18.      The 2010 edition of the ACA Core Jail Standards similarly requires that:  "Pregnant

inmates have access to obstetrical services by a qualified provider, including prenatal, peripartum,

and postpartum care."

19.     In its proposal for the Medical Services Agreement with Defendant BCC, Defendant

CCS stated that it had "met with UNMH to discuss the potential of increasing on-site services at the

MDC; initially via on-site orthopedic and OB/GYN clinics and upon a review and evaluation of

provided statistical data regarding volume, potential additional clinics to assist in reducing

transportation costs."

20.     A provision for "bi-weekly onsite OB/GYN clinics at 4 hours per clinic" was added to Bernalillo County's Medical Services Agreement with Defendants CCS by means of a contract amendment dated on or about June 1, 2015.

21.     In addition to the provision for bi-weekly onsite OB/GYN clinics stated in the contract amendment cited above, the Medical Services Agreement required a staffing pattern with at least two physicians, two physician assistants or other mid-level providers, as well as the site medical director, such that a physician was on-call and available for site visits twenty-four hours, seven days per week, and daily rounds of the facility's Sheltered Housing Unit (SHU) were conducted by a physician, physician assistant, or other mid-level provider seven days a week. (Sections 4.1, 4.1.4.4, 4.1.25, and Appendix H.)

22.     The Medical Services Agreement also contained specific provisions regarding referral of pregnant inmates for prenatal care as part of the inmate receiving and diagnosis function (Section 4.1.1.2.7), as well as identification of patients in need of hospitalization or other off-site services and the facilitation, prioritization, and coordination of such off-site services (Section 4.1.2.2), and making referral arrangements with specialists for the treatment of those inmates with health care problems that may extend beyond the urgent care threshold and specialty services provided on-site (Sections 4.1.3.1 and 4.1.4.7).  Upon information and belief, Defendant Christopher Mercer was charged with reviewing intake information regarding pregnant inmates, including Plaintiff Tanner, and ensuring that they were promptly charted, diagnosed, and referred for appropriate prenatal care, including hospitalization and other off-site services.

23.     Under the Medical Services Agreement, one of the responsibilities of the Site Medical Director, Defendant Timothy I. McMurray, M.D., is to develop special medical programs for inmates who require close medical supervision, special accommodations, and/or chronic and

6

convalescent care, including a plan of treatment with directions for health care staff and correctional staff regarding their roles in the care and supervision of such inmates.  (Section 4.1.5.1.)

24.     Under the Medical Services Agreement, one of the responsibilities of the Health Services Administrator, Defendant Ed Kossman, is to  monitor the performance of all health care personnel rendering patient care and advise the Chief of Corrections, Defendant Tom Ruiz, on specific clinical issues as appropriate.  (Section 4.1.25.7.)

25.     As the Chief of Corrections, Defendant Ruiz retained final authority under the Medical Services Agreement to decide the assignment and utilization of staff to maximize the efficiency of health care delivery at MDC, and to approve hiring of Defendant CCS's Health Services Administrator, as well as physicians and mid-level providers at MDC. (Section 4.1.25.6.) Defendant Ruiz was also kept informed of contract compliance and health care issues at MDC through a number of monthly reports, matrices, logs, corrective action plans, and committee meetings required under the Medical Services Agreement.  (Sections 4.1.16.5, 4.1.20.1, 4.1.25.27, 4.1.26.7, 4.1.27.4, 4.2.1, 4.2.2.)  The Medical Services Agreement specifically provided Defendants BCC and Ruiz with access for inspection of detailed records indicating the date, time and nature of services provided under the agreement.  (Section 4.3.2.1.)

26.     In its proposal incorporated in the Medical Services Agreement, Defendant CCS stated that  "CCS recently acquired Correctional Health Companies," BCC's former health-care provider, and that "CCS truly understands the complexities of McClendon" versus City of Albuquerque, No. CV 95-24 JAP/KBM, a longstanding class-action lawsuit involving conditions of confinement, inmate medical care and inmate mental health care at MDC and its predecessor facilities.

27.     The parties to the *McClendon* litigation entered into a settlement agreement, which was the subject of a preliminary approval hearing before the Honorable James A. Parker in the

United States District Court for the District of New Mexico on December 14, 2015.  On March 22, 2016, Judge Parker entered a Memorandum Opinion and Order giving preliminary approval to the *McClendon* settlement agreement and providing for notice and an opportunity for the class members to be heard.

28.     The provisions of Judge Parker's Memorandum Opinion and Order entered on March 22, 2016, required that full notice of the *McClendon* settlement agreement and its terms be posted in both English and Spanish in every housing unit at MDC, as well as MDC's medical services unit; the reception, discharge, and transfer unit; and the law library, with provisions for inmates to review the full settlement agreement and its attachments upon request or through the kiosk system.

29.     Following a sixty-day period for notice, comment, and objections, Judge Parker issued a Memorandum Opinion and Order dated June 27, 2016, giving final approval for the *McClendon* settlement agreement.  Judge Parker's final approval order finds that staff at the MDC participated directly in the settlement negotiations, and the BCC itself approved the settlement agreement after being briefed by legal counsel.  The order also concludes that the settlement agreement does not bar inmates with individual claims from pursuing damages in separate lawsuits.

30.     Under the terms of the *McClendon* settlement agreement as approved on June 27, 2016, BCC is required to demonstrate compliance with standards outlined in three Check-Out Audit Agreements corresponding to areas evaluated by court-appointed experts:  (1) provision of medical services;  (2) provision of mental health services;  and (3) general conditions of confinement, including population management.  Check-Out Audit Agreement No. 1 (CAA No. 1) pertains to the provision of medical services at MDC and again specifically references compliance with ACA Standards for Adult Detention Centers and NCCHC Guidelines.  CAA No. 1 also requires the court-appointed medical expert to monitor and address "[w]hether MDC inmates who complain orally or in writing of serious acute illness or serious injury are given immediate medical attention," and

"[w]hether all inmate requests for medical care are timely communicated to medical personnel for appropriate treatment."

31.     At the time the *McClendon* settlement agreement was approved, MDC staff had not yet achieved compliance with the standards referenced in CAA No. 1.  Several deficiencies were noted in the reports prepared by Dr. Robert G. Greifinger, M.D., who served as the court-appointed medical expert in the *McClendon* litigation.

32.     According to Dr. Greifinger's report dated November 21, 2016, practitioner staffing at MDC "was reduced to one physician and one physician assistant" due to several practitioner resignations in July 2016, and this "substantially reduced staffing continued for 3.5 months."   Dr. Greifinger also reported "no progress" with CCS's plans "to recruit a part-time OB/GYN to work on-site."   In his report, Dr. Greifinger found "the waiting time for access to practitioner care" increased, and there was "a substantial lag time to the practitioners for acute care" during the period from July 2016 to October 2016.  Dr. Greifinger opined in his report that:  "These staff vacancies put MDC patients at risk of serious harm."

33.     From July 2016 through October 2016, supervisory personnel at MDC, including Defendants McMurray, Kossman, and Ruiz, received notice and were aware that the quality management process, staff vacancies, lack of on-site OB/GYN clinic, lack of access to the level of prenatal care required under the NCCHC standards, level of compliance with the *McClendon* settlement agreement, and timely access to appropriate off-site medical care, were deficient during that period, thereby creating a risk of serious harm to MDC inmates, including Plaintiff Tanner. Upon information and belief, these Defendants received notice and became aware of these problems through the monthly reports, matrices, logs, corrective action plans, and committee meetings required under the Medical Services Agreement (Sections 4.1.16.5, 4.1.20.1, 4.1.25.27, 4.1.26.7, 4.1.27.4, 4.2.1, 4.2.2) and *McClendon* settlement agreement described above.

9

34.     On or about October 4, 2016, while the Medical Services Agreement, *McClendon* Settlement Agreement, and CAA No. 1 described above were in effect, Plaintiff Tanner began a term of incarceration at MDC while in the last month of gestation of her pregnancy with Jay Hinton, Jr.  Apart from a brief emergency visit to Lovelace Women's Hospital after the death of Jay Hinton, Jr. on or about October 17, 2016, Plaintiff Tanner remained in custody at MDC from on or about October 4, 2016, until on or about October 20, 2016.  During her time in custody at MDC, both she and Jay Hinton, Jr. were dependent on MDC personnel and CCS personnel for access to timely and appropriate prenatal care, medical examinations by a clinician qualified to provide such care, appropriate prenatal laboratory and diagnostic tests, specialized obstetrical services and resources for her pregnancy, transport to an appropriate community facility for delivery and peripartum care, and all emergency medical care.

35.     Upon her intake at the MDC facility and thereafter, Plaintiff Tanner disclosed her pregnancy, the fact that she had received prenatal care before her incarceration, and her desire and intent to give birth and keep the child, to both corrections personnel and medical personnel at MDC, including Defendants.  Plaintiff made a conscious choice to become a mother with her chosen partner and was developing a relationship with her baby before birth. She could feel him kicking, moving, and exhibiting other signs of life within her.  She made plans for raising the baby together with her family.  Those plans included setting up a nursery at home, informing the other minor child of the baby's father that a new baby would be arriving, and communicating on a regular basis to make arrangements for family members to be present at the hospital and take care of the baby after Plaintiff arrived there for labor and delivery.

36.     Upon her intake at the MDC and thereafter, Plaintiff Tanner also disclosed aspects of her medical history relevant to diagnosing risks associated with her pregnancy, including prior pregnancies, past substance abuse, and her age (33 years old).  The records of Plaintiff's prenatal

care before her incarceration also disclosed such aspects of her medical history.

37.     Medical records produced to Plaintiff Tanner as of the date of this pleading indicate that she filled out a "healthcare request" form upon her arrival on October 4, 2016, stating:  "I'm pregnant need meds."  (Tanner000165.)  The form was countersigned by Defendant Manquero on October 6, 2016.

38.     Medical records produced to Plaintiff Tanner as of the date of this pleading further indicate that Emergency Medical Technician (EMT) Roger Boydston filled out a "Receiving Screening" form on October 4, 2016, in which he noted that Plaintiff Tanner had been treated for her pregnancy before arriving at MDC, and checked a box for "RN Review/Plan," which stated: "CCC pregnancy entered Prenatals ordered; Pregnancy labs ordered per protocol, Off-site coordinator notified via e-mail, pregnancy diet started."  (Tanner000212-000217.)  The form also contained a box checked as "Noted by RN on 10/5/2016 at 5:20:58 PM" and was "e-signed" on that date by Anthony Spencer, RN, and Defendant Mercer.

39.     Following the "Receiving/Screening" form was a "Staff Referral Form" which listed the reason for referral as "7 months pregnant-meth"; the form was "e-signed" by Mr. Boydston on October 4, 2016, and by Mr. Spencer the following day.  (Tanner000218.)  In addition, Mr. Spencer filled out and signed a second "Staff Referral Form" dated October 5, 2016, in which he referred Plaintiff Tanner for "chronic care," checking a box for "pregnancy" and stating the reason for referral as "Per intake, 7 months pregnant."  (Tanner000083.)

40.     The medical records produced to Plaintiff Tanner as of the date of this pleading also include a form called "Medication Order" that was "e-signed" by Mr. Spencer and Defendant McMurray on October 5, 2016, which lists a "Prenatal Plus" vitamin tablet to be administered to Plaintiff Tanner for a duration of 90 days (Tanner000142), as well as a "Medical Diet Order" signed by Defendant McMurray on October 6, 2016, which calls for a "pregnancy diet (snack included)"

11

(Tanner000166).

41.     The above records indicate that Defendants McMurray, Manquero, and Mercer were aware of Plaintiff Tanner's serious medical needs as a pregnant inmate in the last trimester who was incarcerated at MDC and in their care as of October 4, 2016.

42.     Despite her own request for healthcare and the referral forms filled out by Mr. Boydston and Mr. Spencer, Plaintiff Tanner was never referred for an OB/GYN clinic or appropriate prenatal care in accordance with NCCHC and ACA standards upon her intake at MDC on or about October 4, 2016, or thereafter.  In addition, no one at MDC made any effort to obtain the medical records for the prenatal care she received before she was incarcerated on that date.

43.     Following her intake on or about October 4, 2016, Plaintiff Tanner was assigned to a "pod" or general housing unit within the MDC and required to undertake strenuous physical activities without due regard to her pregnancy or the risks associated with it.  Such activities included gathering her belongings and moving them from one tier of the pod to another.  None of the Defendants provided or followed advice on levels of activity and safety precautions appropriate for Plaintiff Tanner's pregnancy and the risks associated with it during her incarceration at MDC.

44.     Medical records produced to Plaintiff Tanner as of the date of this pleading indicate that Defendant Manquero saw Plaintiff Tanner on or about Friday, October 14, 2016, for the purpose of filling out a "Medical History and Physical Assessment with Mental Health" form.  Plaintiff Tanner again reported her pregnancy and requested appropriate prenatal care at that time.  On Saturday, October 15, 2016, Defendant McMurray signed the form prepared by Defendant Manquero, again indicating his awareness of Plaintiff Tanner's pregnancy while she was incarcerated at MDC.  Neither Defendant McMurray, nor Defendant Manquero, nor any other CCS personnel conducted appropriate follow up at that time to ensure that Plaintiff Tanner was provided with an appropriate plan for her prenatal or peripartum care, medical examinations by a clinician

qualified to provide such care, appropriate prenatal laboratory or diagnostic tests, specialized obstetrical services and resources for her pregnancy, or review of records of the prenatal care she received before her incarceration, even though Jay Hinton, Jr. was a viable fetus already in the last month of gestation at that time.

45.     According to records produced to Plaintiff Tanner as of the date of this pleading, Plaintiff Tanner again requested medical attention early on Sunday morning, October 16, 2016. Defendant Claudia Rodriguez-Nunez was the corrections officer who initially received Plaintiff Tanner's request while on duty in Pod F7 at that time.  Defendant Adriana Luna was staffing the MDC infirmary at that time, without a physician or mid-level provider present. Defendant Martina Sanchez-Filfred was a corrections officer posted to the front desk of the infirmary on that date. Upon information and belief, Defendants Rodriguez-Nunez, Luna, and Sanchez-Filfred lacked adequate training or supervision with regard to pregnant inmates such as Plaintiff Tanner, and the facility was understaffed at the time.

46.     Records indicate that Defendants Rodriguez-Nunez, Sanchez-Filfred, and Luna declined and delayed responding to Plaintiff Tanner's initial request for medical attention on October 16, 2016.  After a period of delay that morning, records indicate that Plaintiff Tanner encountered a roving corrections officer, Rebecca Macias, who escorted her to the medical unit, where she was eventually seen by Defendant Luna.

47.     Defendant Luna charted Plaintiff Tanner's pregnancy as "normal" even though she knew it was high-risk and failed to provide access to appropriate diagnosis, treatment, or referral despite Plaintiff Tanner's complaints of abdominal pain, vaginal discharge, bleeding, and other symptoms of labor with a high risk of complications, including premature rupture and infection. Plaintiff's symptoms were obvious and readily observable; they included a large amount of fluid from the discharge soaking through her pants.  Despite these symptoms of a serious medical

13

condition, Defendants Luna, Sanchez-Filfred, and Rodriguez-Nunez sent Plaintiff Tanner back to Pod F7 on Sunday morning, October 16, 2016, without providing timely or adequate medical care.

48.     According to records produced to Plaintiff Tanner as of the date of this pleading, corrections officer Rebecca Macias relieved Defendant Rodriguez-Nunez of her duties in Pod F7 for a 30-minute break at approximately 9:40 a.m. on Sunday, October 16, 2017.  Those records indicate that Officer Macias had just finished escorting Plaintiff Tanner from the medical unit back to the general housing pod and was aware that she was pregnant.  During the escort, Officer Macias saw that Plaintiff Tanner was in such pain that she had to stop a few times to lean against a wall and cross her legs as if she was holding something in.  Upon returning to the pod and hearing reports from other inmates that Plaintiff Tanner needed immediate medical attention, Officer Macias went to Plaintiff Tanner's cell and observed for herself that Plaintiff Tanner appeared to be in pain and that the trash can in her cell had several used sanitary pads in it.  Officer Macias observed blood on one of the sanitary pads in the trash can.  Officer Macias also observed a clear liquid along the floor of the F Unit hallway and on Plaintiff Tanner's pants.

49.     Records indicate that Officer Macias called the MDC's medical unit to report her observations, but no one answered her call.   Officer Macias then called a "Code 43" on her hand-held radio, which signifies an immediate medical emergency and notifies supervisory personnel at MDC, as well as the medical staff employed by CCS.  After calling the "Code 43," Officer Macias escorted Plaintiff Tanner to the front waiting area of the medical unit for a second time on the morning of October 16, 2016.  Plaintiff Tanner waited in that area for a lengthy period in the presence of Defendant Sanchez-Filfred before being seen a second time by Defendant Luna.

50.     Instead of responding to Officer Macias' "Code 43" as an immediate medical emergency and summoning emergency transport to a hospital capable of providing timely and appropriate medical care, records indicate that Defendant Luna summoned corrections officers to

place and hold Plaintiff Tanner in a locked, solitary segregation cell within the medical unit contrary to the NCCHC Standards on Restraint and Seclusion.  Defendant Sanchez-Filfred, who was posted to the infirmary's front desk, and Defendant Tina Munoz, who was posted to the back area of the infirmary, actively participated in placing and holding Plaintiff Tanner in the segregation cell under these circumstances.

51.    Defendant Luna cruelly and maliciously accused Plaintiff Tanner of seeking drugs, even though Plaintiff Tanner had not requested any medication.  Defendant Sanchez-Filred recklessly gave erroneous medical advice to Plaintiff Tanner and Defendant Luna,  to deny Plaintiff Tanner's serious medical needs regarding her pregnancy, even though Defendant Sanchez-Filfred was neither licensed nor qualified to give such advice.

52.    Acting in concert with Defendant Luna, Defendants Sanchez-Filfred and Munoz caused Plaintiff Tanner to be held in the segregation cell within MDC's medical unit for the rest of the day on October 16, 2016, and into the following day on October 17, 2016, without adequate or timely medical care for her serious medical needs.

53.    When placing and holding Plaintiff Tanner in the locked, isolated segregation cell on October 16, 2016, Defendants Luna, Sanchez-Filfred, and Munoz failed to provide Plaintiff Tanner with a blanket or a drinking cup, declined Plaintiff Tanner's requests for these items, and disregarded her requests for timely and appropriate medical care, as well as several clear and obvious symptoms of her serious medical needs and those of Jay Hinton, Jr., who was a viable fetus in the last month of gestation.  While isolated in the segregation cell, Plaintiff Tanner continued to experience vaginal discharge, cramping, and pressure, and she observed a strong odor coming from the discharge, which indicated an infection.   The discharge soaked through numerous sanitary pads while Plaintiff Tanner was in such extreme discomfort that she was unable to sit down or sit on the toilet.

54.     Upon information and belief, Neither Defendant McMurray nor Defendant Mercer nor any other physician or mid-level provider conducted daily rounds while Plaintiff Tanner was in the MDC's Sheltered Housing Unit or "SHU" on October 16, 2016, despite being on notice of her presence in the unit that day and knowing the infirmary was chronically understaffed at the time.

55.     Records produced to Plaintiff as of the date of this pleading indicate that Defendant Taleigh Sanchez took over for Defendant Luna as the night-shift nurse in the MDC's medical unit on the evening of October 16, 2016, and through the early morning hours of October 17, 2016. Defendant Sanchez was not properly trained and supervised with regard to pregnant inmates. Defendant Sanchez-Filfred also continued working as a corrections officer at the front desk of the MDC's medical unit on October 16 and 17, 2016, while Defendant Sanchez was on shift as the night nurse.  During that period, Defendant Sanchez and Sanchez-Filfred continued to isolate and hold Plaintiff Tanner in the segregation cell in MDC's medical unit, denied her access to timely and appropriate medical care for her serious medical needs and those of her fetus, and disregarded clear and obvious symptoms of those serious medical needs, as well as her requests for a timely examination by a competent medical provider and transport to a hospital emergency room. Defendant Sanchez-Filfred continued to recklessly give erroneous medical advice to Plaintiff Tanner and Defendant Sanchez without any medical training that qualified her to do so, in an effort to deny Plaintiff Tanner's serious medical needs.

56.     Upon information and belief, Defendants McMurray and Mercer ratified and approved the decision to cruelly and maliciously deprive Plaintiff Tanner of timely and appropriate medical care for her serious medical needs and those of her fetus, and to hold her in a locked, isolated segregation cell in the MDC's medical unit from the morning of October 16, 2016, until the morning of October 17, 2016.  Defendants McMurray and Mercer did so without even examining or speaking with Plaintiff Tanner, and with the knowledge that no physician or mid-level provider

was conducting daily rounds on October 16, 2016.

57.     Throughout the day on October 16, 2016, and through the night and early morning hours of October 17, 2016, Plaintiff Tanner continued to experience and report her acute emotional and physical distress, as well as her urgent concerns about the life of her fetus, to medical and corrections personnel at MDC, including Defendants Luna, Sanchez, Munoz, and Sanchez-Filfred. During this period, Plaintiff Tanner repeatedly complained of abdominal pain (cramping), vaginal discharge, and a strong feeling of pressure in her lower abdomen/vaginal area, which interfered with her urination and defecation, and caused great discomfort, fear, and anxiety.  She repeatedly informed medical and corrections personnel at MDC, including Defendants Luna, Sanchez, Munoz, and Sanchez-Filfred, that she believed she was in labor and requested transport to a hospital for delivery of her child.

58.     Medical and corrections personnel at MDC, including Defendants McMurray, Mercer, Luna, Sanchez, Munoz, and Sanchez-Filfred, refused and ignored Plaintiff Tanner's repeated requests for transport to a hospital and for referral to a clinician qualified to provide appropriate prenatal or peripartum care or obstetric services in accordance with her expressed desires and intent to give birth and to keep the child.  In response to these requests, medical and corrections personnel at MDC, including Defendants McMurray, Mercer, Luna, Sanchez, Munoz, and Sanchez-Filfred, repeatedly declined to provide Plaintiff Tanner with appropriate prenatal care in accordance with NCCHC and ACA standards.  Instead, they responded to her increasingly serious and life-threatening medical needs by cruelly and maliciously isolating her in a locked solitary segregation cell in MDC's Sheltered Housing Unit or (SHU), which had the effect of preventing other corrections officers and inmates in the general housing units from recognizing, witnessing, and seeking further attention for her serious medical needs and those of her fetus.

59.     According to medical records produced to Plaintiff Tanner as of the date of this

pleading, Jay Hinton, Jr. was a viable fetus whose heart was still beating on October 16, 2016, and proper medical intervention on that date could have saved his life.

60.     It was not until Monday morning, October 17, 2016, at approximately 8:00 a.m., that Plaintiff Tanner was finally given the opportunity to speak with Defendant McMurray. At that time, Plaintiff Tanner again reported her symptoms and requested that Defendant McMurray conduct a physical examination of her due to her exigent concerns that she was in prolonged labor with a high risk for complications. Defendant McMurray refused to perform an examination to properly diagnose Plaintiff Tanner's pregnancy, refused to arrange for transport to a hospital so Plaintiff Tanner could deliver her baby safely, and refused to provide any referral to a clinician qualified to provide appropriate care under the circumstances. Instead, Defendant McMurray cleared Plaintiff Tanner to return to her pod outside the medical unit, where the level of care required under the relevant ACA and NCCHC standards was completely lacking.

61.     Upon returning to Pod F7 around 9:00 a.m. on October 17, 2016, Plaintiff Tanner's vaginal bleeding became even heavier and was accompanied by increased cramping and pressure that was so intense and severe that she was unable to walk. Records indicate that other inmates in the pod requested medical attention for Plaintiff Tanner and waited with her until a medical rover arrived to escort her back to MDC's medical unit in a wheelchair. Upon returning to the medical unit for the third time in a 24-hour period, Plaintiff Tanner and other inmates acting on her behalf attempted to gain the attention of medical and corrections staff there, but were ignored. Plaintiff Tanner was left to wait in pain in the medical unit's front area for a lengthy period in the presence of Defendant Sanchez-Filfred without timely or adequate care for her serious medical needs or those of her fetus. Blood and fluid continued to flow down Plaintiff Tanner's legs soaking through her sanitary pad and the back of her uniform pants.

62.     According to medical records produced to Plaintiff Tanner as of this date, Anthony

Spencer, R.N. came on shift at some point during the morning of October 17, 2016, and was the male nurse who first attended Plaintiff Tanner after she returned to the MDC's medical unit that morning.   Plaintiff Tanner told Nurse Spencer she could not feel any fetal movement and showed him a sanitary pad saturated with dark blood and brownish-tinged discharge.   Medical records produced to Plaintiff Tanner as of this date indicate that Nurse Spencer forwarded this information to Defendant McMurray.   Those medical records further indicate that at approximately 10:45 a.m. on or about October 17, 2016, Defendant McMurray finally authorized the call for an ambulance to transport Plaintiff Tanner to the emergency room at UNM Hospital almost 20 miles away from MDC.

63.     Apart from filling out paperwork, unsuccessfully attempting to locate a fetal heartbeat, and timing contractions, Defendants did essentially nothing to assist, prepare, or treat Plaintiff Tanner for the labor, complications, or delivery of her baby while awaiting the arrival of the ambulance on the morning of October 17, 2016.   Meanwhile, Plaintiff Tanner attempted to go to the bathroom to change out her soiled sanitary pad, during which time she reported feeling a lot of pressure as if the baby was coming.   She then began having more frequent contractions. Defendant Sanchez-Fildred locked her inside the bathroom for a prolonged period of time, thereby depriving Plaintiff Tanner of appropriate medical attention and causing further distress.

64.     Medical records obtained by Plaintiff Tanner as of the date of this pleading indicate that the ambulance arrived at approximately 11:12 a.m. on October 17, 2016.   Upon the ambulance paramedic's arrival in MDC's medical unit, Plaintiff Tanner was already in active labor with positive crowning, such that there was no time left to transport her to the hospital before delivery. The ambulance paramedics looked to Defendant McMurray for guidance as to the delivery of the baby.   But Dr. McMurray just stood back, threw his hands in the air, and nodded his head back and forth in a non-verbal expression of "no."

65.     The paramedics then delivered the baby themselves without any guidance from Dr. McMurray.   Upon delivery, the paramedics observed the baby had no signs of life, was pulseless, not breathing, and unresponsive to stimuli.   The umbilical cord was wrapped tightly around the baby's neck, and there was mucus and blood in the baby's airway.   According to medical records produced to Plaintiff Tanner as of this date, no CPR was attempted and the baby was pronounced dead in the medical unit at MDC.

66.     As Dr. McMurray failed to intervene or provide any directions to other personnel, the ambulance paramedics called the hospital, and hospital personnel directed them to transport Plaintiff Tanner and her stillborn baby there.   After transport, Plaintiff Tanner spent part of the day at Lovelace Women's Hospital in Albuquerque for a brief period of postpartum care, during which she named the baby Jay Hinton, Jr.   Defendants then had Plaintiff Tanner picked up and returned to MDC to continue her incarceration on the evening of October 17, 2016.

67.     Plaintiff Tanner's stillborn baby, Jay Hinton, Jr., was sent to the Office of the Medical Investigator for an autopsy.   According to records produced by OMI as of this date, OMI's pathological diagnoses were stillbirth, preterm premature rupture of membranes for a prolonged period of more than 24 hours, with chorioamnionitis, chorionic vasculitis, funisitis, and a tight nuchal cord.   In layperson's terms, these records indicate that the membrane holding the amniotic fluid around the fetus ruptured, causing the fluid to leak down through the mother's vagina, and providing a pathway for infection and inflammation of the placenta and umbilical cord, which was wrapped around the fetus's neck.   According to the OMI report, the gestational age of baby Jay Hinton, Jr. at the time of death was approximately 36 weeks (eight and a half months).

68.     Having the umbilical cord wrapped around the fetus's neck and having some degree of infection or inflammation within the placenta are common, treatable complications of pregnancy that do not result in stillbirth or neonatal death in the vast majority of cases.   Had Plaintiff Tanner

received appropriate medical treatment while incarcerated at MDC in accordance with her expressed desire and intent to keep the child and give birth, she would not have lost her baby or been subjected to needless pain and suffering, and baby Jay Hinton, Jr. would have survived his mother's labor and childbirth.

69.     Plaintiff Tanner's suffering did not end upon her return to MDC following the stillbirth of her baby. She was again secluded in a solitary cell for the night in the same medical unit that had just denied her timely access to emergency medical care under the circumstances described above. She was then sent back to her pod without adequate postpartum care. Plaintiff Tanner remained incarcerated at MDC under these cruel and unusual conditions until she was released from MDC after a court hearing on October 20, 2016.

70.     During the period of Plaintiff Tanner's incarceration at MDC in October 2016, Defendant BCC's employees working at MDC were aware that she had a serious medical condition which rendered her unable to care for herself or her fetus, and that she was in severe pain. Defendant BCC, by and through its principals, agents, and employees Defendants Ruiz, Rodriguez-Nunez, Munoz, and Sanchez-Filfred, acted negligently and recklessly with respect to Plaintiff Tanner's serious medical needs and those of her fetus, failed to require Defendant CCS to comply with its contractual obligations under the Medical Services Agreement, and failed to comply with BCC's own obligations under the *McClendon* settlement agreement under conditions that were certain to result in constitutional violations and tort claims.

71.     During the period of Plaintiff Tanner's incarceration at MDC in October 2016, Defendant CCS's employees working at MDC were aware that Plaintiff Tanner had a serious medical condition that rendered her unable to care for herself or her fetus, and that she was in severe pain. Defendant CCS, by and through its principals, agents, and employees Defendants McMurray, Manquero, Luna, Sanchez, Mercer, and Kossman acted negligently and with deliberate indifference

to Plaintiff Tanner's medical needs and those of her fetus, directed MDC employees and other medical personnel affiliated with CCS to disregard Plaintiff Tanner's serious medical needs and those of her fetus, and failed to comply with CCS's contractual obligations under the Medical Services Agreement, as well as its own representations regarding compliance with the *McClendon* settlement agreement, under conditions that were certain to result in constitutional violations and tort claims.

72.     Defendants were all grossly negligent and reckless in failing to provide timely access to medical services to Plaintiff Tanner and Jay Hinton, Jr., who was a viable fetus at the time.

73.     Plaintiff Tanner suffered damages and injuries from Defendants' refusal and failure to provide prompt, adequate medical treatment for her serious medical needs.  Her damages include pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, including injury to her own reproductive system and the death of her fetus, and the loss of her decedent's affection, society, companionship, and support.

74.     Defendants' refusal and failure to provide prompt, adequate medical treatment also caused the wrongful death of Plaintiff's decedent, Jay Hinton, Jr.  Damages for the wrongful death of Jay Hinton, Jr. include funeral and burial expenses, lost earning capacity, and the value of his life apart from his earning capacity.

## COUNT I – PLAINTIFF TANNER'S CRUEL AND UNUSUAL PUNISHMENT CLAIMS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS AGAINST DEFENDANTS MCMURRAY, LUNA, SANCHEZ, MANQUERO, MERCER, AND KOSSMAN

75.     Plaintiff Tanner incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

76.     The Eighth Amendment prohibits cruel and unusual punishment against persons in state custody serving a prison sentence.  The substantive component of the Fourteenth Amendment's

Due Process Clause provides similar protections to pretrial detainees. These protections encompass a constitutional duty to provide such persons with timely access to necessary medical care and to refrain from unnecessary, wanton infliction of pain.

77.     Plaintiff Tanner's medical needs as described above, as well as her pain and suffering, were sufficiently serious and obvious to warrant protection under the Eighth Amendment, or under the Fourteenth Amendment's Due Process Clause if she is considered a pretrial detainee.

78.     Through their acts and omissions described above, Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman were deliberately indifferent to Plaintiff Tanner's serious medical needs, and they unnecessarily and wantonly inflicted severe pain upon her.

79.     By engaging in the acts and omissions described above, Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman violated Plaintiff Tanner's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution, or her right to substantive due process under the Fourteenth Amendment if she is considered a pretrial detainee. The constitutional violations committed by these Defendants are clearly established and actionable under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

80.     The acts and omissions of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and in reckless disregard of Plaintiff Tanner's constitutional rights as described above.

81.     The acts and omissions of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman described above proximately caused Plaintiff Tanner's damages and injuries, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus.

WHEREFORE, Plaintiff Tanner prays for compensatory and punitive damages against Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman, together with an award

of reasonable attorney's fees and costs.

## COUNT II - PLAINTIFF TANNER'S SUBSTANTIVE DUE PROCESS CLAIMS UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANTS MCMURRAY, LUNA, SANCHEZ, MANQUERO, MERCER, AND KOSSMAN

82.     Plaintiff Tanner incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

83.     The substantive component of the Due Process Clause in the Fourteenth Amendment to the United States Constitution prohibits state actors from placing a substantial obstacle in the path of a person's choice whether to procreate and give birth to a child when pregnant.  Thus, state action which imposes an undue burden on a person's fundamental right to procreate and give birth to a child when pregnant violates the substantive component of the Fourteenth Amendment's Due Process Clause.

84.     Plaintiff Tanner desired and intended to exercise her fundamental right to procreate and give birth to a child, and she clearly expressed that desire and intent to medical and corrections personnel at BCC, including Defendants McMurray, Luna, Sanchez, and Manquero while she was pregnant during the time period relevant to this Complaint.  Defendants Mercer and Kossman were also on notice of this clearly expressed intent of Plaintiff Tanner through their supervisory responsibilities as described above.

85.     Through their acts and omissions described above, Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman placed a substantial obstacle in the path of Plaintiff Tanner's choice to carry her pregnancy to term and give birth to a child.  In so doing, these Defendants imposed an undue burden on Plaintiff Tanner's constitutional right to decide whether to carry her pregnancy to term and give birth to a child.

86.     By engaging in the acts and omissions described above, Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman violated Plaintiff Tanner's fundamental right to

procreate and give birth to a child while pregnant under the substantive component of the Fourteenth Amendment's Due Process Clause.  These violations are clearly established and actionable under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

87.     The acts and omissions of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and in reckless disregard of Plaintiff Tanner's Fourteenth Amendment rights.

88.     The acts and omissions of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman described above proximately caused Plaintiff Tanner's damages and injuries, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus.

WHEREFORE, Plaintiff Tanner prays for compensatory and punitive damages against Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman, together with an award of reasonable attorney's fees and costs.

### COUNT III – PLAINTIFF TANNER'S STATE LAW CLAIM FOR PROFESSIONAL NEGLIGENCE AGAINST DEFENDANTS MCMURRAY, LUNA, SANCHEZ, MANQUERO, MERCER, AND CCS

89.     Plaintiff Tanner incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

90.     The New Mexico Tort Claims Act waives sovereign immunity for negligence of public employees licensed by the State or permitted by law to provide health-care services while acting within the scope of their duties in providing health-care services.

91.     With respect to addressing Plaintiff Tanner's serious medical needs, Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS had a duty under the common law of the State of New Mexico, as well as relevant statutes, regulations, contracts, and other provisions of law, to possess and apply the standards of knowledge, skill, and care for their respective professional

disciplines under the circumstances described above.

92.     Through the acts and omissions described above, Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS breached these duties by failing to provide Plaintiff Tanner with timely and appropriate health care.

93.     The acts and omissions of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS described above were in willful, wanton, gross, and reckless disregard of their duty to meet the standards of knowledge, skill, and care for their respective professional disciplines.

94.     The professional negligence of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS as set forth above proximately caused Plaintiff Tanner's damages and injuries as set forth above, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus.

WHEREFORE, Plaintiff Tanner prays for compensatory damages and punitive damages against Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS, together with an award of costs.

## COUNT IV – PLAINTIFF TANNER'S STATE LAW CLAIMS FOR NEGLIGENT OPERATION OF PUBLIC MEDICAL FACILITIES, BUILDINGS, EQUIPMENT, AND FURNISHINGS AGAINST ALL DEFENDANTS

95.     Plaintiff Tanner incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

96.     The New Mexico Tort Claims Act waives sovereign immunity for common-law negligence claims arising from public employees' operation of a hospital, infirmary, mental institution, clinic, dispensary, medical care home, like facilities, buildings, equipment, or furnishings.

97.     Plaintiff Tanner provided BCC with timely notice of her claims under the New Mexico Tort Claims Act by certified letter dated January 10, 2017.

98.     Under state law, each Defendant had a common-law duty to exercise reasonable care in the operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein.

99.     Through the acts and omissions described above, each Defendant breached this duty by failing to exercise reasonable care in the operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein.

100.    Defendants McMurray, CCS, BCC, Kossman, Mercer, and Ruiz also breached their duty to exercise reasonable care with respect to training and supervising the other Defendants, employees of BCC, and employees of CCS in the proper operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein.

101.    The acts and omissions of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, Kossman, and CCS described above were in willful, wanton, gross, and reckless disregard of their duty to exercise reasonable care under the circumstances.

102.    The negligence of each Defendant as set forth above proximately caused Plaintiff Tanner's damages and injuries as set forth above, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus.

WHEREFORE, Plaintiff Tanner prays for compensatory damages against Defendants BCC, Ruiz, Rodriguez-Nunez, Munoz, and Sanchez-Filfred, as well as compensatory and punitive damages against Defendants McMurray, Luna, Leber, Sanchez, Manquero, Mercer, Kossman, and CCS, together with an award of costs against all Defendants.

**COUNT V – PLAINTIFF TANNER'S CLAIM FOR VIOLATION OF THE NEW MEXICO INSPECTION OF PUBLIC RECORDS ACT AGAINST DEFENDANT BCC AND ITS RECORDS CUSTODIAN**

103.    Plaintiff Tanner incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

104.     On or about November 15, 2016, an attorney acting as an agent for Plaintiff Tanner submitted a request under New Mexico's Inspection of Public Records Act (IPRA) to inspect records, incident reports, surveillance videos, Securus videos, audio recordings, photographs, handwritten notes, memoranda, internal affairs investigation records, police reports, emails, correspondence, inmate transport records, and/or medical records, which were created, generated, or gathered as a result of Plaintiff Tanner's incarceration at MDC from October 15, 2016, through October 17, 2016.  This IPRA request also included a form signed by Plaintiff Tanner authorizing the release of her medical records to her attorneys.

105.     Defendant BCC's records custodian received Plaintiff Tanner's IPRA request on November 15, 2016, but failed to produce all of the requested records or provide an explanation for withholding any of them within fifteen days of receiving Plaintiff Tanner's IPRA request.  Instead, Defendant BCC's records custodian produced only a portion of Plaintiff Tanner's medical records and claimed that the remainder of the requested records were "not ready for release."

106.     Plaintiff Tanner's attorney submitted follow-up correspondence to Defendant BCC's records custodian asking when the remainder of the requested records would be "ready for release," as well as a second IPRA request for those records dated on or about March 8, 2017.  In response to this correspondence, Defendant BCC's records custodian did not identify when the remainder of the requested records would be "ready for release," produce any additional records, or provide a privilege log or other justification for withholding any of the requested records under a recognized claim of privilege or exemption from disclosure under IPRA.

107.     On August 25, 2017, Plaintiff Tanner's attorneys submitted a third IPRA request on her behalf to Defendant BCC's records custodian, which included a request for the records that officials or agents of the Metropolitan Detention Center provided to the court-appointed medical expert, Dr. Robert Greifinger, during his April 2016 and November 2016 site visits, including but

not limited to Continuous Quality Improvement (CQI) and Quality Assurance (QA) reports, Mortality Review Reports, matrices or reports regarding medical care prepared or signed by the County's contract compliance officer, and documents prepared or signed by Dr. Ron Shanksy and Dr. Kenneth Ray, the County's contract compliance officers.

108.    Defendant BCC's records custodian received Plaintiff Tanner's third IPRA request on August 25, 2017, but failed to produce all of the requested records or provide an explanation for withholding any of them within fifteen days of receiving that IPRA request.  Instead, Defendant BCC's records custodian produced only a portion of the requested records and claimed that reports by Dr. Ray and Dr. Shansky are "privileged from disclosed."  Defendant BCC did not provide a log identifying which records were withheld under a claim of privilege, the grounds for such a claim of privilege, or who was responsible for asserting it.

109.    In the *McClendon* litigation, Judge Parker has already ruled that the records and reports at issue in determining compliance with CAA No. 1 during the relevant time period are not privileged and are discoverable.  *See McClendon v. City of Albuquerque*, No. CV 95-00024 JAP-ACT, Doc. 1275 (D.N.M. memorandum opinion and order filed Mar. 20, 2017) (citing an earlier memorandum opinion and order in the same case, Doc. 1207, filed Oct. 13, 2015, and *Bravo v. Bd. of Comm'rs for the County of Dona Ana*, No. CV 08-00010, Doc. 214 (D.N.M. memorandum opinion and order filed Nov. 24, 2009).  Defendant BCC is well aware of this ruling, and the same principles apply here.

110.    On November 30, 2017, Plaintiff Tanner's attorneys submitted a fourth IPRA request on her behalf to Defendant BCC's records custodian, which included a request for:  (1) the records showing the names, job titles, employers, and addresses of each individual serving on the quality management committee for medical care at the Metropolitan Detention Center (MDC) during the calendar year 2016; (2) the records showing the meeting dates, meeting agendas, meeting minutes,

and committee reports for the quality management committee at the MDC during the calendar year 2016; (3) the records showing the names, job titles, employers, and addresses of each individual serving on the McClendon committee at the MDC during the calendar year 2016; and (4) the records showing the meeting dates, meeting agendas, meeting minutes, and committee reports for the McClendon committee at the MDC during the calendar year 2016.

111.   Defendant BCC's records custodian received Plaintiff Tanner's fourth IPRA request on November 30, 2017, but failed to produce all of the requested records or provide an explanation for withholding any of them within fifteen days of receiving that IPRA request.  Instead, Defendant BCC's records custodian sent an e-mail message on January 9, 2018, claiming that the MDC could not locate information on a "quality management committee for medical care" or a "McClendon Committee at the MDC," and asking Plaintiff Tanner's counsel to "[p]lease clarify what type of committee you are referring to or the exact name of the committee."

112.   By letter dated January 10, 2018, Plaintiff Tanner's counsel responded to the records custodian's request for clarification by providing highlighted copies of Dr. Greifinger's report dated November 21, 2016, which referred to both a "quality management committee" and "McClendon committees."   The letter from Plaintiff Tanner's counsel also referred to other reports by Dr. Greifinger which identified records he reviewed that could assist the records custodian in locating the committee records responsive to Plaintiff Tanner's fourth IPRA request.

113.   On February 14, 2018, the records custodian replied to Plaintiff Tanner's letter dated January 10, 2018, by stating that "the MDC does not have documents that specifically list individuals assigned to McClendon committees" and providing only "calendar invites sent to various individuals related to McClendon meetings."   The records custodian did not further respond to Plaintiff Tanner's fourth IPRA request.

114.   Defendant BCC and its records custodian have failed to fully and completely respond

to each of Plaintiff Tanner's IPRA requests, adequately search for and produce the requested records, or provide a lawful written explanation for withholding them within a reasonable time as required under IPRA.

115.    Defendant BCC's and its records custodian's IPRA violations may result in the spoliation of evidence that must be timely disclosed to prosecute this litigation.  These IPRA violations also subject BCC to statutory damages under IPRA and are causing Plaintiff Tanner to incur additional attorney fees for obtaining records that have been lawfully requested under IPRA, and for litigating the other claims at issue in this case without the benefit of those records.

WHEREFORE, Plaintiff Tanner prays for statutory and compensatory damages under IPRA as well as timely injunctive relief requiring Defendant BCC and its records custodian to preserve and produce all records responsive to her IPRA request, together with an award of reasonable attorney's fees and costs.

### COUNT VI - STATE LAW CLAIMS FOR PROFESSIONAL NEGLIGENCE RESULTING IN THE WRONGFUL DEATH OF JAY HINTON, JR. AGAINST DEFENDANTS MCMURRAY, LUNA, SANCHEZ, MANQUERO, MERCER, AND CCS

116.    As personal representative of her deceased minor child, Jay Hinton, Jr., Plaintiff Tanner incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

117.    With respect to addressing the serious medical needs of Jay Hinton, Jr., during the period when he was a viable fetus with the capacity to survive outside his mother's uterus after a natural or induced birth supported by timely and appropriate medical care, Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS had a duty under the common law of the State of New Mexico, as well as relevant statutes, regulations, contracts, and other provisions of law, to possess and apply the standards of knowledge, skill, and care for their respective professional disciplines under the circumstances described above.

118.    Through the acts and omissions described above, Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS breached these duties by failing to provide Jay Hinton, Jr. with timely and appropriate health care during the period when he was a viable fetus as described above.

119.    The acts and omissions of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS described above were in willful, wanton, gross, and reckless disregard of their duty to meet the standards of knowledge, skill, and care for their respective professional disciplines.

120.    The professional negligence of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS as set forth above proximately caused the wrongful death of Jay Hinton, Jr. during the period when he was a viable fetus as described above.

WHEREFORE, as personal representative of her deceased minor child, Jay Hinton, Jr., Plaintiff Tanner prays for compensatory damages and punitive damages for the wrongful death of Jay Hinton, Jr., against Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and CCS, together with an award of costs.

## COUNT VII – STATE LAW CLAIMS FOR NEGLIGENT OPERATION OF PUBLIC MEDICAL FACILITIES, BUILDINGS, EQUIPMENT, AND FURNISHINGS RESULTING IN THE WRONGFUL DEATH OF JAY HINTON, JR. AGAINST ALL DEFENDANTS

121.    As personal representative of her deceased minor child, Jay Hinton, Jr., Plaintiff Tanner incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

122.    Under state law, each Defendant had a common-law duty to exercise reasonable care in the operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein, during the period when Jay Hinton, Jr. was a viable fetus with the capacity to survive outside his mother's uterus after a natural or induced birth supported by timely and appropriate medical care.

123.     Through the acts and omissions described above, each Defendant breached this duty by failing to exercise reasonable care in the operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein, during the period when Jay Hinton, Jr. was a viable fetus as described above.

124.     Defendants McMurray, CCS, BCC, Kossman, and Ruiz also breached their duty to exercise reasonable care with respect to training and supervising the other Defendants, employees of BCC, and employees of CCS in the proper operation of MDC's medical facility and the MDC building, as well as the equipment and furnishings therein, during the period when Jay Hinton, Jr. was a viable fetus as described above.

125.     The acts and omissions of Defendants McMurray, Luna, Sanchez, Manquero, Mercer, Kossman, and CCS described above were in willful, wanton, gross, and reckless disregard of their duty to exercise reasonable care under the circumstances during the period when Jay Hinton, Jr. was a viable fetus as described above.

126.     The negligence of each Defendant as set forth above proximately caused the wrongful death of Jay Hinton, Jr., during the period when he was a viable fetus as described above.

WHEREFORE, as personal representative of her deceased minor child, Jay Hinton, Jr., Plaintiff Tanner prays for compensatory damages for the wrongful death of Jay Hinton, Jr. against Defendants BCC, Ruiz, Rodriguez-Nunez, Munoz, Sanchez-Filfred, as well as compensatory and punitive damages for the wrongful death of Jay Hinton, Jr. against Defendants McMurray, Luna, Sanchez, Manquero, Mercer, Kossman, and CCS, together with an award of costs against all Defendants.

## **JURY TRIAL DEMAND**

127.     Plaintiff Tanner hereby demands a trial by jury on all counts so triable.

33

Respectfully submitted,

KENNEDY, HERNANDEZ & ASSOCIATES, P.C.

  /s/ Arne R. Leonard
Paul J. Kennedy
Jessica M. Hernandez
Arne R. Leonard
Elizabeth A. Harrison
201 Twelfth Street, N.W.
Albuquerque, NM  87102
Telephone: (505) 842-8662
pkennedy@paulkennedylaw.com
aleonard@paulkennedylaw.com
eharrison@paulkennedylaw.com

THE LAW OFFICE OF NICOLE W. MOSS, LLC
Nicole W. Moss
201 Twelfth Street, N.W.
Albuquerque, NM  87102
(505) 244-0950
nicole@nicolemosslaw.com

*Attorneys for Plaintiff Shawna Tanner*

I hereby certify that a true copy of the foregoing was filed and served electronically to all counsel of record via CM/ECF on the date indicated on the notice of electronic filing.

  /s/ Arne R. Leonard