IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHAWNA TANNER,

    Plaintiff,

v.                                                                                      CIV 17-0876 JB/KBM

TIMOTHY I. MCMURRAY, M.D.,
ADRIANA LUNA, R.N., AUDREY LEBER, R.N.,
TAILEIGH SANCHEZ, R.N., ELISA MANQUERO, R.N.,
CORRECT CARE SOLUTIONS, LLC,
BOARD OF COUNTY COMMISSIONERS OF
BERNALILLO COUNTY, NEW MEXICO,
THOMAS J. RUIZ, and JOHN AND JANE DOES 1-10,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's Motion to Compel Defendant Bernalillo County's ("BCC") Response to Request for Production No. 5, filed April 9, 2018 (*Doc. 38*), and Plaintiff's Motion to Compel Defendant Correct Care Solution, LLC's ("CCS") Response to Plaintiff's Request for Production No. 12, filed June 4, 2018 (*Doc. 52*). Having reviewed the parties' submissions and all pertinent authority, the Court denies Plaintiff's Motions to Compel based upon the Stipulated Confidentiality Orders entered by the Honorable James A. Parker in *McClendon, et al. v City of Albuquerque, et al.* ("*McClendon*"), CIV 95-0024 JAP/KBM, *Doc. 1276* (April 4, 2017) and *Doc. 1285* (April 28, 2017).

    **I.**     **Background**

On October 4, 2016, Plaintiff Shawna Tanner, while in the last month of gestation of her pregnancy, was placed in the custody of the Bernalillo County Metropolitan

Detention Center ("MDC") based upon an alleged probation violation. In this action, she alleges that she was denied appropriate medical care at MDC leading to the stillbirth of her baby on October 17, 2016.

In the long existing *McClendon* class action lawsuit, Judge Parker gave preliminary approval on March 22, 2016 to a settlement agreement entered by the parties in that litigation. Final approval followed shortly thereafter on June 27, 2016. The *McClendon* settlement agreement requires BCC to demonstrate compliance with certain standards including those in the area of the provision of medical services. Accordingly, court-appointed medical expert, Dr. Robert Greifinger, visited MDC in April and November 2016 and produced reports regarding medical care provided at MDC.

In the present case, Plaintiff sent a request for production to both BCC and CCS, requesting copies of the documents that MDC provided to Dr. Greifinger during certain of his site visits for the *McClendon* case. Specifically, Plaintiff requested the BCC and CCS

> [p]roduce the records that officials or agents of the Metropolitan Detention Center provided to the court-appointed medical expert, Dr. Robert Greifinger, during his April 2016 and November 2016 site visits, including but not limited to Continuous Quality Improvement (CQI) and Quality Assurance (QA) reports, Mortality Reports, matrices or reports regarding medical care prepared or signed by the County's contract compliance officer, and documents prepared or signed by Dr. Ron Shansky and Dr. Kenneth Ray.

*Doc. 38-9* at 2 (Request for Production No. 5 to BCC); *see also Doc. 52-1* at 4 (Request for Production No. 12 to CCS). In response, BCC produced only Dr. Greifinger's reports (*Doc. 38-8* at 2) and asserted that it had "no additional materials to produce in response to RFP No. 5" (*Doc. 38-9* at 1). CCS provided this response:

> CCS, through counsel, objects to this Request and respectfully directs Plaintiff to General Objections Nos. 2, 4 through 6 above. [Objections based on proportionality, relevance, attorney-client privilege and/or work-product doctrine, and that the request is overly-broad.] CCS, through counsel, further objects to this Request because it seeks information that is not relevant to Plaintiff's claims or CCS's defenses. CCS, through counsel, further objects to this Request because the phrase "your agents or principles" is unclear and calls for a legal conclusion. Without waiving these or any other objection, CCS states that potential documents responsive to this Request may be contained in the reports on MDC that Plaintiff obtained from MDC by IPRA request. Documents submitted to Dr. Greifinger are subject to a confidentiality order in the McClendon case.

*Doc. 52-1* at 4-5.

Plaintiff now moves to compel the requested documents from both BCC and CCS. "When ruling upon a motion to compel, the court generally considers those objections which have been timely asserted and relied upon in response to the motion. It generally deems objections initially raised but not relied upon in response to the motion as abandoned." *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 622 (D. Kan. 1999). The Court finds that CCS has waived some of its objections because it did not address them in response to the Motion to Compel. Additionally, when ruling on a motion to compel, the court generally "deems objections not initially raised as waived." *Id.* BCC did not raise any objections in its discovery response because it maintains that the requested documents are not in its possession and "given that [BCC] was unable to review the documents in question, [BCC] was hardly in a position to assert any objections or privileges." *Doc. 39* at 4. The Court will therefore address only those objections Defendants initially raised in discovery responses and relied upon in their responses to the Motions to Compel.

## II. Analysis

Under Federal Rule of Civil Procedure 26(b)(1), the scope of discovery is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). The scope of discovery is broad, *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1520 (10th Cir. 1995), but a court is not "required to permit plaintiff to engage in a fishing expedition in the hope of supporting his claim," *Brown v. Montoya*, No. CIV 10-0081 JB/ACT, 2013 WL 1010390, at *16 (D.N.M. Mar. 8, 2013) (citing *McGee v. Hayes*, 43 F. App'x 214, 217 (10th Cir. 2002)).

For the reasons stated below, the Court finds that the while the requested documents are otherwise discoverable, they are subject to the protection based upon the confidentiality orders enter in the *McClendon* case.

### a. The requested documents are relevant.

The Court must first consider whether the requested documents are relevant to any of Plaintiff's claims. "A discovery request is considered relevant if there is 'any possibility' that the information sought may be relevant to the claims or defense of any party." *Zuniga v. Bernalillo Cty.*, No. CIV 11-877 RHS/ACT, 2013 WL 12333609, at *4 (D.N.M. Jan. 10, 2013) (citing *Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377, 382 (D. Kan. 2005)).

4

As noted above, Plaintiff alleges that MDC denied her access to adequate medical care for her pregnancy. *See Doc. 50*, ¶¶ 34-74. She contends that the requested documents are relevant to this claim because Dr. Greifinger's reports revealed staffing problems at MDC during the relevant time period. *Doc. 38* at 2. She further asserts that the documents Dr. Greifinger reviewed will show the factual basis for his finding. *Doc. 52* at 10. CCS, on the other hand, argues that the documents are not relevant because Dr. Greifinger found that MDC's healthcare met constitutional standards. *Doc. 61* at 12.

The Court agrees with Plaintiff and overrules any objection based upon relevance. Dr. Greifinger's April 2016 report found that MDC had opportunities for improvement with regard to pregnancy care (*Doc. 43-2* at 3), and his November 2016 report found that "staff vacancies put MDC patients at risk of serious harm," (*Doc. 38-1* at 2). Dr. Greifinger's reports for these site visits at MDC are temporally connected to Plaintiff's allegations. Thus, the documents Dr. Greifinger reviewed to make his findings may provide Plaintiff with information concerning the medical care, or lack of medical care, that was available to Plaintiff at the relevant time period. Moreover, those documents may be relevant to the awareness of officials of any problems with the delivery of medical care to inmates. Simply because Dr. Greifinger ultimately concluded the healthcare provided at MDC met constitutional standards does not remove the relevance of the requested materials in the instant litigation.

### b. The requested documents are within the scope of discovery.

CCS objects to production of the requested documents, arguing that they are outside the scope of discovery and overly broad. First, CCS asserts that Dr. Greifinger

was appointed to assist the *McClendon* Court, not to "help Plaintiff prosecute her case." *Doc. 61* at 12. But as Plaintiff explains, she is not requesting any additional work from Dr. Greifinger, only copies of the documents that were provided by Defendants to Dr. Greifinger for his review in preparation of his April and November 2016 Reports to the *McClendon* court. And Plaintiff seeks documents only for a specific time period that roughly overlaps with her incarceration, not all the discovery produced in *McClendon*.

For this same reason, Plaintiff's request is not unduly burdensome. Plaintiff has "limited [RFP No. 5 to BCC and RFP No. 12 to CCS] to a particular subset of materials already produced in the *McClendon* litigation." *Doc. 65* at 4-5; *see* Mem. Op. & Order Granting Pls.' & Pl. Intervenors' Joint Mot. for Enforcement of Interim Order Regarding Access to the MDC, *McClendon,* 2017 WL 3405588 (Mar. 20, 2017) ("*McClendon* MOO"). Thus, once again gathering and providing copies of those documents should not require undue effort.

CCS further argues that the requested documents are outside the scope of discovery because the instant is a medical malpractice case, not a class action case generally based on alleged deficiencies in MDC's conditions of confinement. *Doc. 61* at 4-5. However, Plaintiff not only asserts medical malpractice, but a Section 1983 claim based upon inadequate medical care while detained. She further argues, "the quality-control and compliance measures mandated by both the *McClendon* consent decree and CCS's public contract with the County were deficient in the months leading up to the incident." *Doc. 65* at 4. Though this is not a class action, documents concerning the medical care available at MDC are nonetheless relevant to Plaintiff's claims and within the scope of discovery.

6

### c. A self-critical analysis privilege from disclosure does not apply.

CCS also objects to disclosure of the requested documents on the ground that they are quality improvement documents that are protected by the federal common law privilege of self-critical analysis. *Doc. 61* at 8. Common law "governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court." Fed. R. Evid. 501. When determining federal common law privileges, "[t]he Supreme Court has cautioned that evidentiary privileges should not be recognized or applied unless it 'promotes sufficiently important interests to outweigh the need for probative evidence.'" *Weekoty v. United States*, 30 F. Supp. 2d 1343, 1345 (D.N.M. 1998) (citing *Jaffee v. Redmond*, 518 U.S. 1, 9-10 (1996)).

Plaintiff first argues that CCS waived this objection because CCS did not assert it in its initial response to discovery requests. *Doc. 65* at 10-11. The Court will nevertheless address the objection because it finds that the documents are not protected by the self-critical analysis privilege.

"The question of whether the self-critical analysis privilege should be recognized as a matter of federal law has not been settled by the Supreme Court." *Bravo v. Bd. of Cty. Comm'rs for Cty. of Doña Ana*, No. CIV 08-0010 WJ/ KBM, 2009 WL 10706756, at *2 (D.N.M. Nov. 24, 2009). In *Weekoty*, a decision from this District, the court recognized the self-critical analysis privilege in the context of morbidity and mortality conferences conducted by physicians for the purpose of peer review of the care and treatment of patients. 30 F. Supp. 2d at 1345. However, in *Bravo*, the undersigned declined to extend that privilege to self-evaluation records concerning medical care in a

prison. 2009 WL 10706756, at *2-3. There, the court examined four requirements a party asserting the self-analysis privilege must demonstrate: "(1) the information results from a critical self-analysis performed by the party seeking production; (2) the public has a strong interest in preserving the free flow of the type of information sought; . . . (3) the information is of the type whose flow would be curtailed if discovery were allowed" and (4) the document "was prepared with the expectation that it would be kept confidential, and has in fact been kept confidential." *Id.* at *2. Citing to a Ninth Circuit case, the court explained that the third requirement is not met in the prison context:

> Whereas in the ordinary hospital it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. In these circumstances, it is peculiarly important that the public have access to the assessment by peers of care provided. Given the demands for public accountability, which seem likely to guarantee that such review take place whether they are privileged or not, we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review privilege.

*Id.* at *3 (citing *Agster v. Maricopa Cty.,* 422 F.3d 836, 839 (9th Cir. 2005)).

CCS contends that "failure to protect CCS's [quality improvement] efforts will have a chilling effect on those efforts and could, in reality or in effect, terminate them." *Doc. 61* at 15. But as explained in *Agster*, the "demand for public accountability" will ensure that self-analysis continues, whether that information is kept confidential or not. Indeed, in the *McClendon* case, Judge Parker has twice determined that the exact same documents that Plaintiff now seeks are not protected by the self-analysis privilege. *See McClendon* MOO at 6 ("In the context of prison reform, however, these types of quality assurance reports are not protected by the self-critical analysis privilege.") (citing *McClendon v. City of Albuquerque*, No, 95-0024 JAP/KBM, 2015 WL

8

13667177, at *6 (D.N.M. Oct. 13, 2015)). For all these reasons, the Court finds that the self-critical privilege does not apply to the documents at issue and overrules CCS's objection on this ground.

### d. The *McClendon* Confidentiality Orders prohibit disclosure.

Finally, both BCC and CCS assert that they cannot produce the requested documents because they are protected by confidentiality orders entered in the *McClendon* case. The Court agrees.

In *McClendon*, Judge Parker ordered the County and its medical contractor to provide the plaintiffs and plaintiff-intervenors in that case with the same documents Plaintiff Tanner requests from BCC and CCS here: reports that officials at MDC provided to Dr. Greifinger during his April and November 2016 site visits, including the continuous quality improvement and quality assurance reports, the mortality review reports, a report prepared by the County's contract compliance officer ("Stellman Matrix"), and documents prepared by the County's compliance contractors, Dr. Shansky and Dr. Ray. *McClendon* MOO at 2-3.

Judge Parker authorized disclosure of these documents in *McClendon* because "[a] complete set of documents provided to the Court's experts is vital to counsel for Plaintiffs and Plaintiff Intervenors in monitoring compliance with the Court's extant orders as incorporated into a recently-approved SETTLEMENT AGREEMENT. . . ." *McClendon*, *Doc. 1275* at 3 (Mar. 20, 2017). To accommodate production, Judge Parker entered two Stipulated Confidentiality Orders. *See* Stipulated Confidentiality Orders, *McClendon, Doc. 1276* (Apr. 4, 2017) and *Doc. 1285* (Apr. 28, 2017). Both Confidentiality Orders identify the "Confidential Information" subject to the Orders as

9

including "all documents physically or electronically given to Dr. Robert Greifinger M.D., a court appointed expert, and documents referenced or relied upon him, prior to and in connection with the preparation of his compliance reports from his April and November 2016 visits. . . ." *McClendon, Docs. 1276 and 1285* at 2. The first Order also specifically makes clear that two documents at issue – Continuous Improvement and Quality Assurance Reports (Quality Reports) and reports on the deaths of class and subclass members (Mortality Review Documents) – fall within the reference to "Confidential Information." *McClendon, Doc. 1276* at 1-2). The second Order specifies that all documents prepared by Dr. Ray and Dr. Shansky also fall within "Confidential Information." *McClendon, Doc. 1285* at 1-2.

Both Orders contain substantially the same provisions for the accomplishing disclosure of the "Confidential Information" including:

- The confidential information may only be shared with counsel for a party to the *McClendon* action, court reporters transcribing a proceeding in *McClendon*, and independent experts retained by a party in the *McClendon* case for the purpose of addressing methodology used by Dr. Greifinger.

- No person granted access to the confidential information shall make copies, take notes, or otherwise summarize the contents of the information.

- "If a dispute arises as to whether a particular person should be granted access to Confidential Information, the party seeking disclosure may move the Court to permit the disclosure and must obtain an order of the Court before disclosing information."

- "Confidential Information may be used only for the purposes of [the *McClendon*] litigation."

CO *Doc. 1276* at 3-4; CO *Doc. 1285* at 3-4.

By these terms, the documents requested by Plaintiff Tanner are covered by the Confidentiality Orders and cannot be disclosed to her without a further order from the *McClendon* Court. Plaintiff suggests that the Confidentiality Orders are "limited in scope and subject to amendment." *Doc. 65* at 9. But this Court cannot make amendments to an Order entered by Judge Parker in a separate case. Plaintiff also offers to enter into the same type of confidentiality order in this case as the ones governing disclosure in the *McClendon* case. But again, this Court cannot order disclosure of documents protected in another case. Until the *McClendon* Court amends its Confidentiality Orders or makes a further order, neither BCC nor CCS is permitted to disclose the documents protected in the Orders. Therefore, Plaintiff's Motions to Compel (*Docs. 38 and 52*) must be denied.

**IT IS SO ORDERED.**

_____
UNITED STATES MAGISTRATE JUDGE