# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SHAWNA TANNER, individually and as
personal representative of JAY HINTON,
JR.,

      Plaintiffs,

vs.                                                                         No. CIV 17-0876 JB\KBM

TIMOTHY I. MCMURRAY, M.D.;
ADRIANA LUNA, R.N.; AUDREY
LEBER, R.N.; TAILEIGH SANCHEZ,
R.N.; ELISA MANQUERO, R.N.;
CORRECT CARE SOLUTIONS, LLC;
BOARD OF COUNTY COMMISSIONERS
OF BERNALILLO COUNTY, NEW
MEXICO; THOMAS J. RUIZ; JOHN AND
JANE DOES 1-10; CHRISTOPHER
MERCER; ED KOSSMAN; CLAUDIA
RODRIGUEZ-NUNEZ; MARTINA
SANCHEZ-FILFRED, and TINA M.
MUNOZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Claudia Rodriguez-Nuñez'
Motion to Dismiss and Brief in Support, filed July 9, 2018 (Doc. 63)("Rodriguez-Nuñez Motion");
and (ii) Defendant Tina Muñoz' Motion to Dismiss and Brief in Support, filed July 30, 2018
(Doc. 70)("Muñoz Motion"). The Court held a hearing on October 3, 2018. The primary issues
are: (i) whether the § 41-4-6 immunity waiver in the New Mexico Tort Claims Act, N.M. Stat.
Ann. §§ 41-4-1 through 41-4-27 ("NMTCA"), applies to Defendant Claudia Rodriguez-Nuñez
when her alleged delay in responding to Plaintiff Shawna Tanner's request for medical attention
affected only Tanner; (ii) whether the NMTCA § 41-4-9 immunity waiver applies to Rodriguez-

Nuñez when she was not present in the medical unit during the time in question; (iii) whether the NMTCA § 41-4-6 immunity waiver applies to Defendant Tina Muñoz when her alleged delay in responding to Tanner's requests for medical attention and refusal to provide Tanner with a blanket and drinking cup affected only Tanner; and (iv) whether the NMTCA § 41-4-9 immunity waiver applies to Muñoz when she was not involved in clinical decision-making or supervision of the medical unit. For the reasons explained below, the Court concludes that neither immunity waiver applies to either Defendant, and the Court will grant both Motions.

## FACTUAL BACKGROUND

Plaintiff Shawna Tanner, on behalf of herself and as personal representative of her deceased minor child, Jay Hinton Jr., (collectively, "Plaintiffs") filed the First Amended Complaint for Civil Rights Violations, Tort Claims, Wrongful Death, Statutory Violations, Damages, and Injunctive Relief, filed May 23, 2018 (Doc. 50)("Amended Complaint"). The Amended Complaint states that the Court "has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, with supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367." Amended Complaint ¶ 1, at 1. Plaintiff Shawna Tanner was at all relevant times a New Mexico resident. See Amended Complaint ¶ 3, at 2. All the known Defendants are individuals who resided in the State of New Mexico at all relevant times or are entities who are incorporated or are authorized to do business in New Mexico. See Amended Complaint ¶ 2, at 1 (stating that venue is proper "in this District as Defendants are residents of New Mexico under 28 U.S.C. § 1391 and all of the acts complained of occurred in New Mexico."). See also Amended Complaint ¶¶ 5-12, at 2-4 (describing the Defendants' residences).

Tanner first brought the Complaint for Civil Rights Violations, Tort Claims, Statutory Violations, Damages, and Injunctive Relief, filed August 25, 2017 (Doc. 1)("Complaint") in federal district court against the following Defendants: (i) Timothy I. McMurray, M.D., the Metropolitan Detention Center in the County of Bernalillo, New Mexico ("MDC")'s Site Medical Director; (ii) Adriana Luna, R.N., an MDC Registered Nurse; (iii) Audrey Leber, R.N., an MDC Registered Nurse; (iv) Taleigh Sanchez, R.N., an MDC Registered Nurse; (v) Elisa Manquero, R.N., an MDC Registered Nurse; (vi) Correct Care Solutions LLC ("CCS"), a Kansas Limited Liability Company with a site office at the MDC, which "employed, contracted with, and exercised direct supervisory control" over McMurray, Luna, Leber, Sanchez, and Manquero, <u>see</u> Complaint ¶ 6, at 2; (vii) Thomas J. Ruiz, the MDC's Administrator; (viii) Board of County Commissioners ("BCC") of Bernalillo County, which contracted with CCS to provide health-care services to MDC inmates; (viv) additional health-care personnel, identified as Does 1-5; and (x) additional corrections personnel, including corrections officers, employed at the MDC and identified as Does 6-10.  Complaint ¶¶ 4-9, at 2-3.  In the Amended Complaint, Tanner withdrew the Complaint against Leber, and added the following Defendants: (i) Christopher Mercer, P.A., an MDC Physician Assistant; (ii) Ed Kossman, an MDC Health Services Administrator ("HSA"); (iii) Claudia Rodriguez-Nuñez, an MDC corrections officer; (iv) Martina Sanchez-Filfred, an MDC corrections officer; and (v) Tina M. Muñoz, an MDC corrections officer.  <u>See</u> Amended Complaint ¶¶ 6-8 and 12, at 2-4.

According to the Amended Complaint, Tanner began a term of incarceration at the MDC on October 4, 2016, while in the last month of her pregnancy.  <u>See</u> Amended Complaint ¶ 34, at

10.  Upon intake, Tanner disclosed her pregnancy "as well as her desire and intent to give birth and keep the child" to the MDC and medical personnel.  Amended Complaint ¶ 35, at 10.  Tanner also disclosed her medical history relevant to diagnosing possible risks associated with her pregnancy, including "prior pregnancies, past substance abuse, and her age (33 years old)."  Amended Complaint ¶ 36, at 10-11.

Tanner remained in the MDC's custody from on or about October 4, 2016, until on or about October 20, 2016, aside from a brief emergency visit to Lovelace Women's Hospital in Albuquerque, New Mexico, on or about October 17, 2016.  See Amended Complaint ¶ 34, at 10.  The Amended Complaint alleges that, while at the MDC:

> [Tanner] was dependent on MDC personnel and CCS personnel for access to timely and appropriate prenatal care, medical examinations by a clinician qualified to provide such care, appropriate prenatal laboratory and diagnostic tests, specialized obstetrical services and resources for her pregnancy, transport to an appropriate community facility for delivery and peripartum care, and all emergency medical care.

Amended Complaint ¶ 34, at 10.  According to the Amended Complaint, Rodriguez-Nuñez and Muñoz were corrections officers at the MDC during the time that the Amended Complaint addresses, and at all relevant times "were acting under the color of law and within the scope of their duties and employment as corrections officers at MDC."  Amended Complaint ¶ 12, at 4.

Tanner alleges that:

> On or about December 9, 2014, Defendant BCC selected, approved, and entered into a written contract between Bernalillo County, New Mexico and Defendant CCS entitled "Medical, Dental, Mental Health, Psychiatric and Methodone Services Agreement" (hereinafter "Medical Services Agreement").  That agreement remains in effect, as amended, for a four-year term.

Amended Complaint ¶ 13, at 4.  Tanner alleges that, under the Medical Services Agreement, BCC

and CCS represented that healthcare for the MDC inmates would comply with all current and future standards issued by the National Commission on Correctional Health Care ("NCCHC") and the American Correctional Association ("ACA"). See Amended Complaint ¶ 14, at 4. Tanner alleges that, under the Medical Services Agreement, CCS agreed to train the MDC staff on NCCHC and ACA standards, "including training on recognizing emergencies and procedures for referring inmates for care." Amended Complaint ¶ 14, at 4. Tanner alleges that the NCCHC standards in effect when CCS and BCC entered into the Medical Services Agreement contain a standard entitled "Counseling and Care of the Pregnant Inmate," which requires that: "Pregnant inmates receive timely and appropriate prenatal care, specialized obstetrical services when indicated, and postpartum care. Pregnant inmates are given comprehensive counseling and assistance in accordance with their expressed desires regarding their pregnancy." Amended Complaint ¶ 15, at 4-5. Tanner alleges that CCS and BCC contracted to add a provision for "bi-weekly onsite OB/GYN clinics at 4 hours per clinic" to the Medical Services Agreement. Amended Complaint ¶ 20, at 6. Tanner alleges that, in addition to the provision for bi-weekly onsite OB/GYN clinics, the Medical Services Agreement

> required a staffing pattern with at least two physicians, two physician assistants or other mid-level providers, as well as the site medical director, such that a physician was on-call and available for site visits twenty-four hours, seven days per week, and daily rounds of the facility's Sheltered Housing Unit (SHU) were conducted by a physician, physician assistant, or other mid-level provider seven days a week.

Amended Complaint ¶ 21, at 6. Tanner alleges that the ACA standards in effect when CCS and BCC entered into the Medical Services Agreement require that "[p]regnant inmates have access to obstetrical services by a qualified provider, including prenatal, peripartum, and postpartum care."

Amended Complaint ¶ 18, at 5. Tanner alleges that the Medical Services Agreement contained specific provisions regarding referral of pregnant inmates for prenatal care, identification of patients in need of hospitalization or other off-site services, and other such responsibilities. See Amended Complaint ¶ 22, at 6. Tanner alleges that McMurray's responsibilities under the Medical Services Agreement include "develop[ing] special medical programs for inmates who require close medical supervision, special accommodations, and/or chronic and convalescent care, including a plan of treatment with directions for health care staff and correctional staff regarding their roles in the care and supervision of such inmates." Amended Complaint ¶ 23, at 6-7. Tanner alleges that Kossman's responsibility under the Medical Services Agreement "is to monitor the performance of all health care personnel rendering patient care and advise the Chief of Corrections, Defendant Tom Ruiz, on specific clinical issues as appropriate." Amended Complaint ¶ 24, at 7. Tanner alleges that, under the Medical Services Agreement, Ruiz

> retained final authority . . . to decide the assignment and utilization of staff to maximize the efficiency of health care delivery at MDC, and to approve hiring of Defendant CCS's Health Services Administrator, as well as physicians and mid-level providers at MDC. (Section 4.1.25.6). Defendant Ruiz was also kept informed of contract compliance and health care issues at MDC through a number of monthly reports, matrices, logs, corrective action plans, and committee meetings required under the Medical Services Agreement. (Sections 4.1.16.5, 4.1.20.1, 4.1.25.27, 4.1.26.7, 4.1.27.4, 4.2.1, 4.2.2.) The Medical Services Agreement specifically provided Defendants BCC and Ruiz with access for inspection of detailed records indicating the date, time and nature of services provided under the agreement. (Section 4.3.2.1.)

Amended Complaint ¶ 25, at 7.

Tanner alleges that CCS stated it recently acquired Correctional Health Companies, and that CCS "truly understands the complexities of McClendon [v. City of Albuquerque, No. CIV 95-24 JAP/KBM (Doc. 50, ¶¶ 26-30)("McClendon")]," a class-action lawsuit involving conditions of

inmate medical care and mental health care at the MDC and its predecessor facilities. Amended Complaint ¶ 26, at 7. Tanner alleges that, on March 22, 2016, the Honorable James A. Parker, United States District Judge for the District of New Mexico, entered a Memorandum Opinion and Order preliminarily approving the <u>McClendon</u> settlement agreement and requiring that notice of the agreement and its terms be posted in both English and Spanish in every MDC housing unit, the medical services unit, the reception, discharge, and transfer unit, and the law library. <u>See</u> Amended Complaint ¶¶ 27-28, at 7-8. Tanner alleges that Judge Parker also required that the MDC allow inmates to review the settlement agreement in full upon request or through a kiosk system. <u>See</u> Amended Complaint ¶ 28, at 8. Tanner alleges that, after allowing sixty days for notice, comment, and objections, Judge Parker gave final approval for the settlement agreement in a Memorandum Opinion and Order dated June 27, 2016. <u>See</u> Amended Complaint ¶ 29, at 8. Tanner asserts that Judge Parker concluded that the settlement agreement "does not bar inmates with individual claims from pursuing damages in separate lawsuits." Amended Complaint ¶ 29, at 8.

Tanner alleges that the Medical Services Agreement requires BCC to demonstrate compliance with three "Check-Out Audit Agreements corresponding to areas evaluated by court-appointed experts: (1) provision of medical services; (2) provision of mental health services; and (3) general conditions of confinement, including population management." Amended Complaint ¶ 30, at 8. Check-Out Audit Agreement No. 1 ("CAA No. 1"), pertaining to the MDC's provision of medical services to inmates, specifically references compliance with NCCHC and ACA standards, and requires the court-appointed medical expert to monitor and address "[w]hether MDC inmates who complain orally or in writing of serious acute illness or serious injury are given

immediate medical attention," and "[w]hether all inmate requests for medical care are timely communicated to medical personnel for appropriate treatment."  Amended Complaint ¶ 30, at 8-9. Tanner alleges that, by June 2016, the MDC staff had not yet achieved compliance with CAA No. 1.  See ¶¶ 31-32, at 9.  Tanner alleges that the MDC supervisory personnel, including McMurray, Kossman, and Ruiz, received notice and were aware of the facility's non-compliance with the McClendon settlement agreement and the Check-Out Audit Agreements.  See Amended Complaint ¶ 33, at 9.  Tanner alleges that the Medical Services Agreement, the McClendon settlement agreement, and CAA No. 1 were all in effect when she began her term of incarceration at MDC in the last month of gestation of her pregnancy.  See Amended Complaint ¶ 34, at 10.

Tanner alleges that, during her time in the MDC's custody, she and her fetus, Jay Hinton, Jr., were dependent on the MDC and CCS personnel for "access to timely and appropriate prenatal care, medical examinations by a clinician qualified to provide such care, appropriate prenatal laboratory and diagnostic tests, specialized obstetrical services and resources for her pregnancy, transport to an appropriate community facility for delivery and peripartum care, and all emergency medical care."  Amended Complaint ¶ 34, at 10.  Tanner alleges that she could feel Jay Hinton, Jr. "kicking, moving, and exhibiting other signs of life within her."  Amended Complaint ¶ 35, at 10. Tanner alleges that the records she provided to the MDC of her prenatal care pre-incarceration also disclosed the relevant aspects of her medical history.  See Amended Complaint ¶ 36, at 10-11.

Tanner alleges that she completed a healthcare request form, countersigned by Manqero two days later, upon her arrival to the MDC on October 4, 2016, stating: "I'm pregnant need meds." Amended Complaint ¶ 37, at 11.  Tanner alleges that Emergency Medical Technician Roger

Boydston completed a "Receiving Screening" form for Tanner upon her arrival to the MDC, indicating that she had been treated for her pregnancy before her incarceration, and checking a box for "RN Review/Plan," which stated: "CCC pregnancy entered Prenatals ordered; Pregnancy labs ordered per protocol, Off-site coordinator notified via e-mail, pregnancy diet started." Amended Complaint ¶ 38, at 11. Tanner alleges that Spencer and Mercer electronically signed the Receiving Screening form. See Amended Complaint ¶ 38, at 11. Tanner alleges that Boydston and Mercer signed another form regarding Tanner and referring to her pregnancy and her substance abuse. See Amended Complaint ¶ 39, at 11. Tanner alleges that Spencer and McMurray signed orders for medication, and for a medical diet for Tanner. See Amended Complaint ¶ 40, at 11. Tanner alleges, accordingly, that McMurray, Manquero, and Mercer, all knew of her "serious medical needs as a pregnant inmate in the last trimester who was incarcerated at MDC and in their care as of October 4, 2016." Amended Complaint ¶ 41, at 12.

Tanner alleges that the MDC personnel never referred her to an OB/GYN clinic or appropriate prenatal care, and that the MDC personnel never attempted to obtain her medical records for her pre-incarceration treatment, despite the mandates in the NCCHC and ACA standards to do so. See Amended Complaint ¶ 42, at 12. Tanner alleges that, upon intake, she was assigned to a housing unit in the MDC (a "pod") and was required to participate in strenuous physical activities "without due regard to her pregnancy or the risks associated with it. Such activities included gathering her belongings and moving them from one tier of the pod to another." Amended Complaint ¶ 43, at 12. Tanner alleges that none of the Defendants "provided or followed advice on levels of activity and safety precautions appropriate" for her pregnancy and its associated

risks. Amended Complaint ¶ 43, at 12. Tanner alleges that, on October 14, 2016, Manquero saw her and completed a "Medical History and Physical Assessment with Mental Health" form, and that Tanner reported her pregnancy to Manquero and requested prenatal care. Amended Complaint ¶ 44, at 12. Tanner alleges that, on October 15, 2016, McMurray signed the form Manquero had prepared the day before, but that neither McMurray, Manquero, nor any other CCS personnel conducted appropriate follow-up with Tanner regarding her pregnancy and a plan for medical care. See Amended Complaint ¶ 44, at 12-13.

Tanner alleges that she again requested medical attention early on October 16, 2016, while Rodriguez-Nuñez was on duty in Pod F7, a housing unit at the MDC. See Amended Complaint ¶ 45, at 13. Upon information and belief, Tanner alleges that Rodriguez-Nuñez "lacked adequate training or supervision with regard to pregnant inmates such as Plaintiff Tanner, and the facility was understaffed at the time." Amended Complaint ¶ 45, at 13. Tanner alleges that Rodriguez-Nuñez "declined and delayed responding to Plaintiff Tanner's initial request for medical attention on October 16, 2016." Amended Complaint ¶ 46, at 13. Tanner alleges that, after Rodriguez Nuñez' delay, she "encountered a roving corrections officer, Rebecca Macias, who escorted her to the medical unit, where she was eventually seen by Defendant Luna." Amended Complaint ¶ 46, at 13.

Tanner next contends that, after Luna saw her, Rodriguez-Nuñez, along with Luna and Sanchez-Filfred, "sent Plaintiff Tanner back to Pod F7 on Sunday morning, October 16, 2016, without providing timely or adequate medical care." Amended Complaint ¶ 47, at 13-14. Tanner then avers that, according to records produced to her as of the date she filed the Amended

Complaint, "corrections officer Rebecca Macias relieved Defendant Rodriguez-Nuñez of her duties in Pod F7 for a 30-minute break at approximately 9:40 a.m." on the same day. Amended Complaint ¶ 48, at 14. The records, Tanner asserts, "indicate that Officer Macias had just finished escorting Plaintiff Tanner from the medical unit back to the general housing pod and was aware that she was pregnant." Amended Complaint ¶ 48, at 14.

During the escort, Macias noticed that Tanner needed "immediate medical attention." Amended Complaint ¶ 48, at 14. After unsuccessfully calling the MDC's medical unit to "report her observations," Macias called a "Code 43" signifying an "immediate medical emergency" and then escorted Tanner to the "front waiting area of the medical unit" where she waited "in the presence of Defendant Sanchez-Filfred . . . ." Amended Complaint ¶ 49, at 14. Tanner contends that Luna "summoned corrections officers to place and hold Plaintiff Tanner in a locked, solitary segregation cell within the medical unit contrary to the NCCHC Standards on Restraint and Seclusion," and that Muñoz, "who was posted to the back area of the infirmary, actively participated in placing and holding Plaintiff Tanner in the segregation cell under these circumstances." Amended Complaint ¶ 50, at 14-15.

Tanner avers that, "in concert with Defendant Luna" and Sanchez-Filfred, Muñoz "caused Plaintiff Tanner to be held in the segregation cell within MDC's medical unit for the rest of the day on October 16, 2016, and into the following day on October 17, 2016, without adequate or timely medical care for her serious medical needs." Amended Complaint ¶ 52, at 15.

Tanner contends that, when Muñoz, Luna, and Sanchez-Filfred placed Tanner in the "locked, isolated segregation cell," they did not provide her with a blanket or drinking cup, despite

her requests for those items, and "disregarded her requests for timely and appropriate medical care, as well as several clear and obvious symptoms of her serious medical needs and those of Jay Hinton, Jr., who was a viable fetus in the last month of gestation." Amended Complaint ¶ 53, at 15. Tanner alleges that:

> [w]hile isolated in the segregation cell, [she] continued to experience vaginal discharge, cramping, and pressure, and she observed a strong odor coming from the discharge, which indicated an infection. The discharge soaked through numerous sanitary pads while Plaintiff Tanner was in such extreme discomfort that she was unable to sit down or sit on the toilet.

Amended Complaint ¶ 53, at 15.

Tanner alleges that, throughout the day on October 16, 2016, and continuing through the night and early morning hours of October 17, 2016, she "continued to experience and report her acute emotional and physical distress, as well as her urgent concerns about the life of her fetus, to medical and corrections personnel," including to Muñoz. Amended Complaint ¶ 57, at 17. Tanner asserts that, during this period, she "repeatedly complained of abdominal pain (cramping), vaginal discharge, and a strong feeling of pressure in her lower abdomen/vaginal area, which interfered with her urination and defecation, and caused great discomfort, fear, and anxiety." Amended Complaint ¶ 57, at 17. Tanner asserts that she repeatedly informed medical and corrections personnel -- including Muñoz -- that "she believed she was in labor and requested transport to a hospital for delivery of her child." Amended Complaint ¶ 57, at 17.

Tanner alleges that the personnel -- the named Defendants -- who she informed, including Muñoz, "refused or ignored" her repeated requests both for hospital transport, and "for referral to a clinician qualified to provide appropriate prenatal or peripartum care or obstetric services in accordance with her expressed desires and intent to give birth and to keep the child." Amended

Complaint ¶ 58, at 17.  Muñoz, along with other Defendants, "repeatedly declined to provide [her] with appropriate prenatal care in accordance with NCCHC and ACA standards."  Amended Complaint ¶ 58, at 17.  Instead, Tanner contends that:

> [T]hey responded to her increasingly serious and life-threatening medical needs by cruelly and maliciously isolating her in a locked solitary segregation cell in MDC's Sheltered Housing Unit or (SHU), which had the effect of preventing other corrections officers and inmates in the general housing units from recognizing, witnessing, and seeking further attention for her serious medical needs and those of her fetus.

Amended Complaint ¶ 58, at 17.  Tanner contends that, according to medical records produced to her as of May 23, 2018, her fetus, "Jay Hinton, Jr. was a viable fetus whose heart was still beating on October 16, 2016, and proper medical intervention on that date could have saved his life."  Amended Complaint ¶ 59, at 17-18.

Tanner alleges that, BCC, by and through its employees, including Rodriguez-Nuñez and Muñoz, was "aware that she had a serious medical condition which rendered her unable to care for herself or her fetus, and that she was in severe pain . . . [and that BCC, by and through its employees,] acted negligently and recklessly with respect" to Tanner's and her fetus' serious medical needs, "failed to require Defendant CCS to comply with its contractual obligations under the Medical Services Agreement, and failed to comply with BCC's own obligations under the McClendon[1] settlement agreement under conditions that were certain to result in constitutional

---

[1]Tanner's characterization of the McClendon v. City of Albuquerque class is not accurate. In McClendon v. City of Albuquerque,  Judge Parker certified "a class of persons presently confined in BCDC or who may/will be so confined in the future" in an Order at 1, filed August 23, 1995 (Doc. 106).  Then, Judge Parker certified "a subclass of all persons with mental and/or developmental disabilities who are, or in the future may be, detained at the [BCDC]," in an Order Certifying Sub-Class at 1, filed August 15, 1995 (Doc. 237).  Judge Parker did not certify a "class

violations and tort claims."  Amended Complaint ¶ 70, at 21.

Regarding her state law claims for "Negligent Operation of Public Medical Facilities, Buildings, Equipment, and Furnishings Against All Defendants,"[2] Amended Complaint at 26, Tanner also requests compensatory damages against Rodriguez-Nuñez and Muñoz, for their alleged negligence, which, Tanner contends, "proximately caused damages and injuries as set forth above, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus," Amended Complaint ¶ 102, at 27.  Regarding her state law claims for "Negligent Operation of Public Medical Facilities, Buildings, Equipment, and Furnishings Resulting in the Wrongful Death of Jay Hinton, Jr. Against All Defendants,"[3] Amended Complaint at 32, Tanner also requests compensatory damages against Rodriguez-Nuñez and Muñoz, for their alleged negligence which, Tanner contends, "proximately caused the wrongful death of Jay Hinton, Jr., during the period when he was a viable fetus as described above," Amended Complaint ¶ 126, at 33.

## PROCEDURAL BACKGROUND

The Amended Complaint raises claims against the Defendants under the Constitution of the United States of America -- specifically the Eighth and Fourteenth Amendments to the United States Constitution -- New Mexico state law, and the New Mexico Inspection of Public Records

[or subclass] of inmates at the MDC with medical issues in McClendon . . . ."  Response to Rodriguez-Nuñez Motion at 5.

[2]Capitalized, because the quoted text is a heading in the Amended Complaint.  See Amended Complaint at 26.

[3]Capitalized, because the quoted text is a heading in the Amended Complaint.  See Amended Complaint at 32.

Act, N.M. Stat. Ann. §§ 14-2-1 to 14-2-12 ("IPRA").  <u>See</u> Amended Complaint at 1.  The Amended Complaint raises two counts against Rodriguez-Nuñez and against Muñoz.  <u>See</u> Amended Complaint at 26, 32.  Count IV raises state law claims for negligent operation of public medical facilities, buildings, equipment, and furnishings against all Defendants, including against Rodriguez-Nuñez and Muñoz.  <u>See</u> Amended Complaint at 26.  Count VII raises state law claims for negligent operation of public medical facilities, buildings, equipment, and furnishings resulting in the wrongful death of Jay Hinton, Jr. against all the Defendants, including against Rodriguez-Nuñez and Muñoz.  <u>See</u> Amended Complaint at 32.  Both Rodriguez-Nuñez and Muñoz filed separate Motions to Dismiss.  <u>See</u> Rodriguez-Nuñez Motion; Muñoz Motion.  Tanner filed a Response to each Motion.  <u>See</u> Plaintiffs' Response in Opposition to Defendant Rodriguez-Nunez's Motion to Dismiss and Brief in Support, filed July 31, 2018 (Doc. 71)("Response to Rodriguez-Nuñez Motion"); Plaintiffs' Response in Opposition to Defendant Munoz's Motion to Dismiss and Brief in Support, filed July 31, 2018 (Doc. 72)("Response to Muñoz Motion").  Both Defendants filed Replies.  <u>See</u> Defendant Rodriguez-Nunez' Reply Memorandum in Support of her Motion to Dismiss, filed August 7, 2018 (Doc. 76)("Rodriguez-Nuñez Reply"); Defendant Muñoz' Reply Memorandum in Support of her Motion to Dismiss, filed August 15, 2018 (Doc. 78)("Muñoz Reply").

   **1.**  **<u>The Rodriguez-Nuñez Motion</u>.**

   On July 9, 2018, Rodriguez-Nuñez filed her Motion to Dismiss.  <u>See</u> Rodriguez-Nuñez Motion at 1.  In her Motion, Rodriguez-Nuñez recites the relevant facts from the Amended

Complaint against her.  See Rodriguez-Nuñez Motion at 1-2.  Rodriguez-Nuñez asserts that the only factual allegations pled against her are as follows:

> [T]hat she was a corrections officer at MDC, that on the morning of Sunday, October 16, 2017[4], the Plaintiff requested medical attention while being housed in Pod F7 which Defendant Rodriguez-Nuñez allegedly delayed or denied until later that morning.  The Plaintiff was then seen by medical and returned to Pod F7 around 9:40 a.m., at which time Defendant Rodriguez-Nuñez took her break.

Rodriguez-Nuñez Motion at 2.  Rodriguez-Nuñez asserts that there is no allegation, "nor could there be," that, as a corrections officer, Rodriguez-Nuñez was "made aware of the Plaintiff's medical condition and refused to provide her with medical care."  Rodriguez-Nuñez Motion at 2-3.  Rodriguez-Nuñez further asserts that there is no factual allegation that she was ever working in the medical unit at any time relevant to the allegations, nor that any delay "purportedly caused" by her caused either Tanner's or her fetus' alleged injuries or damages.  Rodriguez-Nuñez Motion at 2-3.  Rodriguez-Nuñez argues that, pursuant to the sufficient pleading standard required to overcome a rule 12(b)(6) of the Federal Rules of Civil Procedure motion to dismiss a complaint, the Court should dismiss Tanner's Amended Complaint against Rodriguez-Nuñez, because Tanner has presented "no factual allegations which would establish her claims against Defendant Rodriguez-Nuñez."  Rodriguez-Nuñez Motion at 4-5.

First, Rodriguez-Nuñez asserts that the New Mexico Legislature has declared that, because of New Mexico public policy, state governmental entities and public employees may not be sued unless it is within the limitations, and according to the principles of the NMTCA.  See Rodriguez-Nuñez Motion at 5.  Rodriguez-Nuñez cites to Begay v. State, 1985-NMCA-117 ¶ 8, 723 P.2d

---

[4]The Court concludes, based on the pleadings and the hearing, that Rodriguez-Nuñez intends to refer to October 16, 2016, and not to October 16, 2017.

252, 255, for the proposition that a plaintiff may sue a governmental entity or public employee of the state of New Mexico only if the plaintiff's "cause of action fits within one of the exceptions listed in the NMTCA." Rodriguez-Nuñez Motion at 5. Rodriguez-Nuñez avers that § 41-4-6 exempts from immunity "liability damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." Rodriguez-Nuñez Motion at 6 (quoting <u>Begay v. State</u>, 1985-NMCA-117 ¶ 8, 723 P.2d at 255 (citing N.M. Stat. Ann. § 41-4-6)). Rodriguez-Nuñez asserts that New Mexico courts have concluded that the § 41-4-6 immunity waiver does not extend to negligent supervision. <u>See</u> Rodriguez-Nuñez Motion at 6 (citing <u>Rivera v. King</u>, 1988-NMCA-093 ¶¶ 33-35, 765 P.2d 1187, 1194; <u>Martinez v. Kaune Corp.</u>, 1987-NMCA-131 ¶ 9, 745 P.2d 714, 716-17; and <u>Pemberton v. Cordova</u>, 1987-NMCA-020 ¶ 5, 734 P.2d 254, 256). For the waiver to apply, Rodriguez-Nuñez contends, "the negligent operation of maintenance must create a dangerous condition that threatens the general public or a class of building users and must not just be a claim of negligent supervision . . . ." Rodriguez-Nuñez Motion at 6 (citing <u>Espinoza v. Town of Taos</u>, 1995-NMSC-070 ¶¶ 11-12, 905 P.2d 718, 721).

Here, Rodriguez-Nuñez argues that she "did not engage in any negligent conduct with regard to the Plaintiff or her unborn child." Rodriguez-Nuñez Motion at 7. Rodriguez-Nuñez notes that Tanner alleges that Rodriguez-Nuñez "delayed sending her to the medical unit on the morning of October 16, [2016]." Rodriguez-Nuñez Motion at 8. Rodriguez-Nuñez then notes that Tanner admits that medical personnel saw her before 9:40 a.m. on October 16, 2016, and that

Tanner has not alleged "this delay, of possibly an hour, cause [sic] her alleged injury or damages." Rodriguez-Nuñez Motion at 8. Rodriguez-Nuñez argues that, while Tanner asked for medical attention, she did not inform Rodriguez-Nuñez that she was "suffering from a medical emergency that required immediate medical attention." Rodriguez-Nuñez Motion at 8.

Finally, Rodriguez-Nuñez argues that, while Tanner's claims against Rodriguez-Nuñez "appear to include a claim for the negligent operation of a medical facility," there is no factual allegation that Rodriguez-Nuñez either operated the medical unit in the MDC or that she was present in the medical unit at any relevant time. Rodriguez-Nuñez Motion at 8. Rodriguez-Nuñez argues that Tanner fails to state a claim for which relief can be granted against Rodriguez-Nuñez, and Rodriguez-Nuñez asks the Court to dismiss the claims against her with prejudice. See Rodriguez-Nuñez Motion at 8-9.

### 2.    The Response to the Rodriguez-Nuñez Motion.

Tanner notes that, in Rodriguez-Nuñez' Motion, Rodriguez-Nuñez "seeks to dismiss the claims that she was negligent under New Mexico state law as alleged in Counts IV and VII of Plaintiffs' First Amended Complaint." Response to Rodriguez-Nuñez Motion at 1. Tanner asserts that Rodriguez-Nuñez does not challenge that New Mexico tort law "recognizes a wrongful-death claim on behalf of an unborn but viable fetus." Response to Rodriguez-Nuñez Motion at 1. Nor does Rodriguez-Nuñez challenge -- Tanner asserts -- Tanner's allegations that she suffered bodily injury and that her fetus suffered a wrongful death "as those terms are used in the New Mexico Tort Claims Act (NMTCA), NMSA 1978, §§ 41-1-4 to -30." Response to Rodriguez-Nuñez Motion at 2.

Tanner contends that the crux of Rodriguez-Nuñez' argument is that Tanner's pleadings do not allege a "sufficient causal nexus" between Tanner's alleged bodily injury and her fetus' alleged wrongful death, and Rodriguez-Nuñez' negligence. Response to Rodriguez-Nuñez Motion at 2. Tanner notes that Rodriguez-Nuñez also "questions whether Plaintiffs' pleading alleges a sufficient nexus between her negligence and the operation of a medical facility, or the operation or maintenance of a building, machinery, equipment, or furnishings for the purposes of invoking a waiver of immunity under the NMTCA." Response to Rodriguez-Nuñez Motion at 2. Accordingly, Tanner notes that her Response will focus on "showing why the First Amended Complaint adequately pleads into a statutory waiver of immunity under the NMTCA and supports a reasonable inference that the negligent acts or omissions attributed to Defendant Rodriguez-Nuñez were a cause of Plaintiff Tanner's bodily injuries and the subsequent wrongful death of her unborn baby." Response to Rodriguez-Nuñez Motion at 2.

First, Tanner argues that she need not meet a heightened pleading standard and that she may plead her claims in the alternative. See Response to Rodriguez-Nuñez Motion at 2. Tanner argues that, because Tanner's Amended Complaint does not allege federal civil-rights claims against Rodriguez-Nuñez in her individual capacity, only the rule 12(b)(6) "federal plausibility standard" for a pleading applies, and not the "added burden of disproving a qualified-immunity defense for an individual Defendant or showing that Defendant Rodriguez-Nuñez' negligence rose to the level of a constitutional violation." Response to Rodriguez-Nuñez Motion at 2.

Tanner asserts that, under New Mexico law, she is required to plead only "enough facts to support a reasonable inference that [her] claims are plausible or sufficient when those facts are

reviewed in the light most favorable to [her]."  Response to Rodriguez-Nuñez Motion at 3 (quoting Rave v. Bd. of Comm'rs for the Cty. of Bernalillo, No. CIV 17-0636 RB/LF, 2017 WL 3600452, at *3 (D.N.M. Aug. 18, 2017)(Brack, J.)).  Tanner further asserts that the Federal Rules of Civil Procedure allow her to plead her claims in the alternative and that the NMTCA statutory waivers of immunity are not mutually exclusive.  See Response to Rodriguez-Nuñez Motion at 3 (citing Fed. R. Civ. P. 8(d); Archibeque v. Moya, 1993-NMSC-079 ¶ 13, 866 P.2d 344; Silva v. State, 1987-NMSC-107 ¶ 17, 745 P.2d 380.  Tanner argues that, therefore, "there is no requirement that Plaintiffs pick only one of the grounds for waiving immunity in the NMTCA to the exclusion of all others."  Response to Rodriguez-Nuñez Motion at 3.

Tanner argues that § 41-4-6 waives Rodriguez-Nuñez' immunity, because a jail is a building for the section's purposes, and because, pursuant to recent Supreme Court of New Mexico decisions, the negligent acts or omissions combined to "create a condition that is dangerous to a particular class of people that use the building or facility in question . . . ."  Response to Rodriguez-Nuñez Motion at 5.  Tanner cites to the class of inmates at the MDC with medical issues identified in McClendon, and asserts that, with respect to that class, the court-appointed expert in the McClendon litigation already found that the MDC patients were at risk of serious harm during the time period when Tanner was incarcerated at the MDC.  See Response to Rodriguez-Nuñez Motion at 5.

Tanner contends that there is a nexus between the risk to the MDC inmates, and the building's operation and maintenance, because:

> [I]nmates and medical personnel cannot physically move from one part of the building to another, to obtain transport to an outside medical facility such as a

hospital, without a public employee's operation and maintenance of specialized machinery, equipment, or furnishings such as the door locks, security systems, and communication devices which control ingress and egress from each part of the facility.

Response to Rodriguez-Nuñez Motion at 6. Tanner also contends that her pleadings detail "a whole chain of events leading to the injuries and wrongful death alleged," and not merely a single negligent act or omission. Response to Rodriguez-Nuñez Motion at 6. Tanner alleges that, including well before October 16, 2016, she repeatedly told the Defendants that she was pregnant, that she was required to perform strenuous physical activities as part of her housing unit, that the Defendants did not provide or follow advice on the appropriate level of activity or safety precautions required by Tanner's pregnancy and the risks associated with it, and that, on the morning of October 16, 2016, Tanner "was required to walk to and from the MDC infirmary while 'in such pain that she had to stop a few times to lean against a wall,' as a trail of clear liquid soaked through her pants and flowed down along the floor on which she walked." Response to Rodriguez-Nuñez Motion at 7 (quoting Amended Complaint ¶ 48, at 14).

Tanner contrasts Rodriguez-Nuñez' actions in response to Tanner's requests for attention and visible distress, with Macias' actions, noting that Macias is not named as a Defendant in the Amended Complaint. See Response to Rodriguez-Nuñez Motion at 7. Tanner contends that it is reasonable to infer that Rodriguez-Nuñez would have observed the same conditions that Macias observed "if she had taken the time to look." Response to Rodriguez-Nuñez Motion at 7-8. Tanner analogizes her situation to that of a special-needs student in Upton v. Clovis Municipal School District, 2006-NMSC-040, 141 P.3d 1259, who was "left in acute medical distress in a school hallway for about 15 minutes before anyone called 911." Response to Rodriguez-Nuñez Motion

- 21 -

at 8 (citing <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 ¶ 11, 141 P.3d at 1262).  Like in

<u>Upton v. Clovis Municipal School District</u>, Tanner contends that the delay in summoning medical

attention was the cause of her injuries and her fetus' wrongful death, and that she need not disprove

all other potential causes of injury or death.  <u>See</u> Rodriguez-Nuñez Motion at 8-9.

Tanner also analogizes her case to <u>Rave v. Board of Commissioners for the County of</u>

<u>Bernalillo</u>, in which an inmate also incarcerated at the MDC during the same year as Tanner

suffered bodily injury because of the MDC personnel's delays in responding to his requests for

medical attention.  <u>See</u> Response to Rodriguez-Nuñez Motion at 9 (citing <u>Rave v. Bd. of Comm'rs</u>

<u>for the Cty. of Bernalillo</u>, 2017 WL 3600452, at *10).  Tanner contends that, according to <u>Rave v.</u>

<u>Board of Commissioners for the County of Bernalillo</u>, the fact that "an inmate eventually was

transported to a hospital after her baby died does not defeat the reasonable inference that the inmate

suffered bodily injury which worsened her condition, gave rise to severe pain and suffering, and

caused her baby's death during the period of unreasonable delay preceding those events."

Response to Rodriguez-Nuñez Motion at 10 (citing <u>Rave v. Bd. of Comm'rs for the Cty. of</u>

<u>Bernalillo</u>, 2017 WL 3600452, at *10).

Tanner notes that the Amended Complaint details a set of requirements involving the MDC

personnel in "access to and provision of medical care for pregnant inmates and their unborn babies

while incarcerated at MDC, as well as training and supervision of those personnel on those topics."

Response to Rodriguez-Nuñez Motion at 10-11 (citing Amended Complaint ¶¶ 13-33, at 4-9).

Tanner alleges that

> it is reasonable to infer these extensive requirements give rise to a relationship
> with persons detained at MDC (including Plaintiff Tanner and her unborn baby)

that has a sufficient nexus with the operation or maintenance of a building, machinery, equipment, or furnishings to trigger the waiver provided in Section 41-4-6 of the NMTCA.

Response to Rodriguez-Nuñez Motion at 11.

Tanner next argues that immunity is waived under § 41-4-9, the NMTCA's medical-facility waiver section. See Response to Rodriguez-Nuñez Motion at 11. First, Tanner notes that Rodriguez-Nuñez cited to no authority to support her argument that there is no waiver under § 41-4-9 and that the Court should reject her argument for that reason. See Response to Rodriguez-Nuñez Motion at 11-12. Nevertheless, Tanner acknowledges that some courts have rejected application of § 41-4-9's waiver to "tort claims against the County or its corrections officers on the grounds that the County contracts with a private company to assist in operating the medical facility within MDC." Response to Rodriguez-Nuñez Motion at 12. Tanner asserts that the leading case "cited for this conclusion" is Lessen v. City of Albuquerque, 2008-NMCA-085 ¶ 13, 187 P.3d 179, but contends that Lessen v. City of Albuquerque is "factually, procedurally, and legally distinct" from the present case. Response to Rodriguez-Nuñez Motion at 12-13.

Tanner asserts that the Amended Complaint "contains specific allegations about the County Defendants' involvement in, and failure to adequately supervise, the day-to-day decision-making for the medical facility they operated with the assistance of their contractor." Response to Rodriguez-Nuñez Motion at 13. In addition to the allegations against the MDC supervisory personnel, the Amended Complaint, Tanner notes, also alleges that "lower-level County employees -- not just contractors -- were actually involved in staffing and operating the medical facility at MDC." Response to Rodriguez-Nuñez Motion at 13. Because corrections officers are "present in the MDC infirmary, control access to it, and play a significant role in how inmates are

handled there," Tanner asserts that there is no legally distinct separation of contractor personnel from Bernalillo County employees for the purposes of waiving immunity under § 41-4-9. Response to Rodriguez-Nuñez Motion at 14. Tanner contends that "actively participating in placing and holding Plaintiff Tanner in the segregation cell," "dispensing medical advice to the effect that Plaintiff Tanner was not in labor," and "denying access to basic necessities such as a drinking cup" all constitute "acts and omissions by correctional officers . . . involv[ing] day-to-day decision-making that falls within the plain meaning of 'operating' that medical facility under Section 41-4-9." Response to Rodriguez-Nuñez Motion at 15 (quoting Amended Complaint ¶¶ 46, 49-51, 55, at 13-16). Tanner argues that the New Mexico Legislature intends § 41-4-9's waiver to apply to more than licensed healthcare providers. See Response to Rodriguez-Nuñez Motion at 15.

Tanner acknowledges that Rodriguez-Nuñez was outside of the MDC infirmary during the events that transpired in the infirmary on October 16, 2016, and October 17, 2016, but Tanner contends that, despite Rodriguez-Nuñez' physical location outside of the infirmary, she was still acting within her duties' scope in the infirmary's operation. See Response to Rodriguez-Nuñez Motion at 16. Tanner contends that her allegations concerning Rodriguez-Nuñez involve events that occurred before she received a "medical diagnosis of her worsening condition." Response to Rodriguez-Nuñez Motion at 16-17. Tanner argues:

> Such a denial or delay in accessing the level of care required for a qualified medical diagnosis not only causes unnecessary pain and suffering, worsening of the patient's condition, and the death of her baby, it also deprives a qualified medical provider of evidence or data that otherwise could have been collected during that period, and which may be needed for an accurate and timely medical diagnosis.

Response to Rodriguez-Nuñez Motion at 17. Tanner alleges, for instance, that the Amended Complaint supports a reasonable inference that "none of [Tanner's] blood or fluid . . . was collected for sampling or analysis during the period of delay occasioned by Defendant Rodriguez-Nuñez's negligence, and no medical monitoring of her fetus occurred during that critical period." Response to Rodriguez-Nuñez Motion at 17. Tanner suggests that the evidence or data thereby lost could have contributed to errors in diagnosis that other infirmary personnel perhaps later made. See Response to Rodriguez-Nuñez Motion at 17.

While Tanner acknowledges that Rodriguez-Nuñez presents a closer case for the application of the medical-facility waiver in § 41-4-9 than Muñoz, she argues that any difficulties with applying § 41-4-9 "only strengthen the case for applying the building waiver in Section 41-4-6." Response to Rodriguez-Nuñez Motion at 17-18. Tanner asserts that "Rodriguez-Nuñez had to operate or maintain the MDC building, machinery, equipment, or furnishings to allow Plaintiff Tanner to move from her pod to the infirmary, prevent her from going there on her own, or summon medical personnel from the infirmary and allow them into her pod." Response to Rodriguez-Nuñez Motion at 18.

Next, Tanner turns to the argument that her pleadings do not support a reasonable inference of causation. See Response to Rodriguez-Nuñez Motion at 18. Tanner discusses successive tortfeasor liability and comparative fault among concurrent tortfeasors under New Mexico law. See Response to Rodriguez-Nuñez Motion at 19. Tanner clarifies that her Amended Complaint "alleges a concurrent tortfeasor theory against Defendant Rodriguez-Nuñez." Response to Rodriguez-Nuñez Motion at 21. In other words, Tanner alleges that other Defendants' additional

negligent acts and omissions preceded Rodriguez-Nuñez' alleged neglegence.  See Response to Rodriguez-Nuñez Motion at 21.  Tanner argues that the first tortfeasors' negligent acts obscured the next tortfeasors' understanding of Tanner's worsening condition, and deprived them of evidence, data, and records that would have helped them to understand her condition.  See Response to Rodriguez-Nuñez Motion at 22.  Tanner argues that the negligent acts or omissions of the next tortfeasors, operating with an obscured view, then affected the tortfeasors after them, and so on and so forth.  See Response to Rodriguez-Nuñez Motion at 22.  Accordingly, Tanner argues, she need not prove that Rodriguez-Nuñez' negligence "constituted a separate and divisible harm," but merely that it contributed to her single, indivisible injury as part of a chain of causation.  Response to Rodriguez-Nuñez Motion at 23.  Tanner argues that, if Rodriguez-Nuñez wishes to assert that the "Plaintiffs' negligence claims against her are not viable because of some other Defendant's negligence, wrongdoing, or intervention," she must do so through an affirmative defense she raises in an answer and not in a motion to dismiss.  Response to Rodriguez-Nuñez Motion at 23.

Finally, Tanner asserts that, if the Court finds any defect in her Amended Complaint, it should provide her with an opportunity to amend her pleading and cure any deficiency.  See Response to Rodriguez-Nuñez Motion at 24.

### 3.    The Rodriguez-Nuñez Reply.

Rodriguez-Nuñez begins her Reply by objecting to Tanner's assertion in the Response to Rodriguez-Nuñez Motion that the NMTCA immunity waivers are applicable.  See Rodriguez-Nuñez Reply at 1.  Rodriguez-Nuñez avers that "[t]here is not an applicable waiver in the present

case." Rodriguez-Nuñez Reply at 1. Rodriguez-Nuñez contends that neither the waiver in § 41-4-6 nor in § 41-4-9 applies to her alleged actions, because, as a corrections officer, Rodriguez-Nuñez has "nothing whatsoever to do with the medical unit, which indisputably had been contracted out to another entity which is also a Defendant herein." Rodriguez-Nuñez Reply at 3.

Regarding the application of the immunity waiver in § 41-4-6, Rodriguez-Nuñez contends that the factual allegations pled against her do not indicate any negligent conduct on her part, because Tanner admits Rodriguez-Nuñez "lacked adequate training or supervision with regard to pregnant inmates such as Plaintiff Tanner and the facility was understaffed at the time," and also admits that medical personnel saw Tanner before 9:40 a.m., when Rodriguez-Nuñez took her break. Rodriguez-Nuñez Reply at 3 (citing Amended Complaint ¶ 45-48, at 13-14). Rodriguez-Nuñez contends that the Supreme Court of New Mexico in Upton v. Clovis Municipal School District, to which Tanner cites, held that the NMTCA "does not waive immunity for a single, discrete administrative decision affecting only a single person, as opposed to a dangerous condition affecting the general public." Rodriguez-Nuñez Reply at 3 (quoting Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 17, 141 P.3d at 1263). Rodriguez-Nuñez argues that Tanner complains of a singular discrete act which necessarily affects only her. See Rodriguez-Nuñez Reply at 3.

Rodriguez-Nuñez contends that § 41-4-9's waiver is not applicable to a "detention facility where a third party contractor provides the medical services." Rodriguez-Nuñez Reply at 4 (citing Lessen v. City of Albuquerque, 2008-NMCA-085 ¶ 3, 187 P.3d at 180). Rodriguez-Nuñez notes that Tanner acknowledges in the Amended Complaint that CCS, with whom Bernalillo County contracts, runs the MDC's medical facilities. See Rodriguez-Nuñez Reply at 4 (citing Amended

Complaint ¶ 11, at 3). Rodriguez-Nuñez contends that Tanner's attempts to factually distinguish Lessen v. City of Albuquerque do not make a difference, considering similar conclusions in Rave v. Board of Commissioners for the County of Bernalillo and Kellum v. Bernalillo County, No. CIV 14-0163 RB/CG, 2015 WL 12859577, at *10 (D.N.M. June 9, 2015)(Brack, J.). See Rodriguez-Nuñez Reply at 5.

Rodriguez-Nuñez argues that she need not assert an affirmative defense, because the United States Court of Appeals for the Seventh Circuit case, to which Tanner cites, only holds that "[c]omplaints need not anticipate defenses and attempt to defeat them." Rodriguez-Nuñez Reply at 5 (quoting Richards v. Mitcheff, 696 F.3d 635, 637 (7th Cir. 2012)).

Rodriguez-Nuñez then addresses Tanner's request that, if the Court concludes that the Amended Complaint is deficient, it allow her to amend. See Rodriguez-Nuñez Reply at 6. Rodriguez-Nuñez argues that the cases Tanner cites in support of her request to amend if necessary, do not discuss Ashcroft v. Iqbal, 556 U.S. 662 (2009) or its progeny. See Rodriguez-Nuñez Reply at 5 (citing Response to Rodriguez-Nuñez Motion at 23-24). Rodriguez-Nuñez addresses Tanner's assertion that an additional amendment would not be futile, because:

> Specifically, Plaintiffs could allege a waiver under Section 41-4-12 of the kind found in *Kellum*, supra, 2015 WL 12859577, at 11. Or they could lengthen their 34-page complaint (Doc. 50) by pleading more evidence as it is slowly gleaned from discovery. Or they could spell out additional reasonable inferences that can be drawn in their favor from the facts already alleged.

Rodriguez-Nuñez Reply at 6 (quoting Response to Rodriguez-Nuñez Motion at 24). Rodriguez-Nuñez contends that what Tanner could allege is speculative and "expressly not grounds for amending a complaint in federal court." Rodriguez-Nuñez Reply at 6. Rodriguez-Nuñez asserts that, unlike in Kellum v. Bernalillo County, there is no constitutional claim nor any tort claim

relating to any negligence on Rodriguez-Nuñez' part.  <u>See</u> Rodriguez-Nuñez Reply at 6.

Rodriguez-Nuñez states: "It is well established that there is no waiver of immunity when law

enforcement officers are merely negligent, unless that negligence is the cause of one of the

enumerated intentional torts by a third party."  Rodriguez-Nuñez Reply at 7 (citing <u>Weinstein v.

City of Santa Fe ex rel. Santa Fe Police Dep't</u>, 1996-NMSC-021 ¶ 25, 916 P.2d 1313, 1320).

Rodriguez-Nuñez concludes that Tanner has asserted only state law claims under the NMTCA

against Rodriguez-Nuñez and there is no applicable NMTCA immunity waiver, so the Court

should dismiss her from this case with prejudice.  <u>See</u> Rodriguez-Nuñez Reply at 7.

### 4.    <u>The Muñoz Motion.</u>

On July 30, 2018, Muñoz filed her Motion to Dismiss.  <u>See</u> Muñoz Motion at 1.  The

Muñoz Motion states the same legal arguments as the Rodriguez-Nuñez Motion.[5]  <u>See</u> Muñoz

Motion at 3-8, <u>supra</u> at 15-18.  In her Motion, Muñoz recites the relevant facts from the Amended

Complaint against her.  <u>See</u> Muñoz Motion at 1-2.  Muñoz asserts that the only factual allegations

pled against her are that she was a corrections officer at the MDC posted to the infirmary's back

area.  <u>See</u> Muñoz Motion at 8.  Muñoz argues that, pursuant to the sufficient-pleading standard

required to overcome a rule 12(b)(6) of the Federal Rules of Civil Procedure motion to dismiss a

complaint, the Court should dismiss Tanner's complaint against Muñoz, because Tanner has

---

[5]The legal arguments that Muñoz advances in her Motion are identical to those which
Rodriguez-Nuñez advances in hers.  <u>See</u>, <u>e.g.</u>, Rodriguez-Nuñez Motion at 5-8; Muñoz Motion at
5-8.  The Court, accordingly, does not repeat the authorities cited and the legal propositions that
Muñoz asserts, which Rodriguez-Nuñez also asserts, as the Court has recited them <u>supra</u> at 15-18.
In this section, entitled "The Muñoz Motion," the Court recites only the arguments in the Muñoz
Motion specific to Muñoz.

presented "no factual allegations which would establish her claims against Defendant Muñoz." Muñoz Motion at 4-5.

First, Muñoz argues she "did not engage in any negligent conduct with regard to the Plaintiff or her unborn child." Muñoz Motion at 8. Muñoz notes that, under the definitions of "negligence" and "ordinary care" in the New Mexico Uniform Civil Jury Instructions, 1601 and 1603, N.M.R.A. U.J.I. Civ. 13-1601 and 13-1603, "the responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Muñoz Motion at 8. Muñoz argues that Tanner's allegation that Muñoz actively participated in placing and holding Tanner in the MDC's medical unit segregation cell without adequate or timely medical care, see Amended Complaint ¶ 58, at 17, is meritless, because "all cells within the medical unit are for one inmate with medical issue [sic] only," Muñoz Motion at 8.

Muñoz argues that Tanner fails to allege how Muñoz, as a corrections officer, could have directed Tanner's medical care. See Muñoz Motion at 8-9. Muñoz states: "Further, the Plaintiff fails to allege any facts that establish that Ms. Tanner had any contact with Defendant Muñoz on October 17, 2015[6] [sic], the date of the birth of his [sic] child." Muñoz Motion at 9. Muñoz contends, therefore, that Tanner's state-law claims against her are meritless and that the Court should dismiss them. See Muñoz Motion at 9.

---

[6]Tanner's child, named Jay Hinton, Jr., was born on October 17, 2016. See Amended Complaint ¶¶ 66-67, at 20.

Finally, Muñoz asserts that the Complaint contains no factual allegation that Muñoz operated the MDC medical unit or that she directed Tanner's treatment, and therefore, that the Court should dismiss Tanner's state-law claim against Muñoz for negligent operation of a medical facility.  See Muñoz Motion at 9.  Muñoz asserts that Tanner's claims against Muñoz in this regard "fail to state a claim for which relief can be granted."  Muñoz Motion at 9.  Muñoz asks the Court to dismiss Tanner's state-law claims against her with prejudice.  See Muñoz Motion at 9.

### 5.  The Response to the Muñoz Motion.

On July 31, 2018, Tanner filed a Response to the Muñoz Motion.[7]  See Response to Muñoz Motion at 1.  Tanner asserts, first, that the Amended Complaint "does not rely on a single negligent act or omission on the part of Defendant Munoz as the sole basis for Plaintiffs' claims against her.  Rather, Plaintiffs' pleading details a whole chain of events leading to the injuries and wrongful

---

[7]The legal arguments Tanner asserts in response to Muñoz' Motion are for the most part identical to those Tanner asserts in response to Rodriguez-Nuñez' Motion.  See generally, Response to Rodriguez-Nuñez Motion; Response to Muñoz Motion.  The Court, accordingly, does not repeat the authorities cited and the legal propositions that Tanner asserts against Rodriguez-Nuñez, as the Court has recited them supra at 18-26.  In this section, entitled "The Response to the Muñoz Motion," the Court recites the arguments in the Response to Muñoz Motion specific only to Defendant Muñoz.  Tanner acknowledges the similarity between the pleadings in the Response to Muñoz Motion at 1:

> Defendant Munoz's motion to dismiss (Doc. 70) is virtually identical to the motion to dismiss filed by Defendant Rodriguez-Nunez (Doc. 63), except for the factual allegations on Pages 1-3 and 8-9.  Accordingly, Plaintiffs' responses to each of these motions also repeat many of the same arguments, except for fact-specific contentions addressed on Pages 7-9, 11, 17-18, and 21-22.  To reduce the burden that such duplication imposes on the Court, Plaintiffs are filing their responses to both motions at the same time so that the Court can hear and decide them together.

Response to Muñoz Motion at 1 n.1.

death alleged therein."  Response to Muñoz Motion at 6-7.

Tanner alleges that, when Muñoz placed and held Tanner in the MDC infirmary's segregation cell on October 16, 2016, she

> failed to provide Plaintiff Tanner with a blanket or a drinking cup, declined Plaintiff Tanner's requests for these items, and disregarded her requests for timely and appropriate medical care, as well as several clear and obvious symptoms of her serious medical needs and those of Jay Hinton, Jr., who was a viable fetus in the last month of gestation.  While isolated in the segregation cell, Plaintiff Tanner continued to experience vaginal discharge, cramping, and pressure, and she observed a strong odor coming from the discharge, which indicated an infection.  The discharge soaked through numerous sanitary pads while Plaintiff Tanner was in such extreme discomfort that she was unable to sit down or sit on the toilet.

Response to Muñoz Motion at 7 (quoting Amended Complaint ¶ 53, at 15).  Tanner argues that Muñoz' only argument in response to these allegations is that, because there were other people in the MDC infirmary at the time who could have responded to Tanner's needs, Muñoz cannot be held responsible.  See Response to Muñoz Motion at 7.  Tanner asserts that Muñoz' argument "does not make sense."  Response to Muñoz Motion at 7.

Tanner asserts that the only defensible reason for holding her in the MDC infirmary segregation cell, instead of in a pod outside of the infirmary, is so that she could receive "*more* monitoring and medical attention, not *less*."  Response to Muñoz Motion at 7-8 (emphasis in original).  Tanner contends that it is "reasonable to infer" that Muñoz, because of her position as a corrections officer stationed in the back of the infirmary, was "responsible for alerting medical and/or supervisory personnel" to Tanner's worsening medical condition and for requesting medical attention while she was in the infirmary's segregation cell.  See Response to Muñoz Motion at 8.  Tanner further asserts that Muñoz had a duty to respond appropriately, that she did not respond

appropriately, and that, accordingly, Tanner's condition "worsened under her watch." Response to Muñoz Motion at 8.

Tanner also argues that, even if other staff members could have responded to her needs, "that fact alone does not necessarily defeat the inference that Defendant Muñoz may also be negligent." Response to Muñoz Motion at 8. Tanner compares Muñoz' actions to those of Macias, not named as a Defendant in the Amended Complaint. <u>See</u> Response to Muñoz Motion at 8. While Macias called a "Code 43" to advise personnel of Tanner's condition, Muñoz "essentially did nothing to monitor Plaintiff Tanner's condition [while in the MDC infirmary's segregation cell] and made it worse by denying such basic necessities as a blanket and a drinking cup." Response to Muñoz Motion at 8-9. Tanner analogizes to <u>Upton v. Clovis Municipal School District</u>, and argues that, similar to the delay at issue in <u>Upton v. Clovis Municipal School District</u>, "the delay in summoning appropriate medical attention -- including the delay while Defendant Munoz was on duty in the back of the MDC infirmary -- was a cause of her injuries and the wrongful death of her unborn baby." Response to Muñoz Motion at 9 (citing Amended Complaint ¶¶ 68, 70, 73, 74, 102, 126, at 18, 21-22, 27, 33). Tanner contends that Muñoz "refused and ignored" her requests for medical attention. Response to Muñoz Motion at 9 (citing Amended Complaint ¶ 58, at 17).

Tanner asserts that Muñoz does not dispute "that she was stationed in the MDC infirmary or that the segregation cell where Plaintiffs were held is part of that medical facility. She also does not dispute that her alleged acts and omissions occurred before the stillbirth occurred on October 17, 2016." Response to Muñoz Motion at 17. Tanner argues that, because Muñoz was stationed inside the infirmary, the Court need not, in deciding Muñoz' Motion, "reach the issue" whether

§ 41-4-9's medical-facility waiver applies to corrections officers stationed outside the infirmary. Response to Muñoz Motion at 17. Tanner contends that, unlike in <u>Lessen v. City of Albuquerque</u>, 2008-NMCA-085 at ¶ 4, 187 P.3d at 180, Tanner was not outside the facility when Muñoz' alleged negligence occurred, but rather in the MDC infirmary's segregation cell. <u>See</u> Response to Muñoz Motion at 17.

Tanner asserts that

> Defendant Munoz' role in denying or delaying access to the level of care required for qualified medical diagnosis and treatment not only caused unnecessary pain and suffering, worsening of Plaintiffs' condition, and the death of the baby, it also deprives a qualified medical provider of evidence or data that otherwise could have been collected during that period, and which may be needed for an accurate and timely medical diagnosis.

Response to Muñoz Motion at 17. Tanner argues that the Amended Complaint supports a reasonable inference that, during important periods on October 16, 2016, "when Defendant Munoz was operating and maintaining the back area of the MDC infirmary," medical personnel collected no medical data from Tanner and did not monitor Tanner's fetus. Response to Muñoz Motion at 18. Tanner argues that it is reasonable to infer this loss of data could have contributed to diagnostic errors made later by other personnel. <u>See</u> Response to Muñoz Motion at 18.

Tanner argues that, because Muñoz was positioned in the MDC infirmary on October 16, 2016, during Tanner's period of confinement in the infirmary's segregation cell, § 41-4-9's medical facility waiver "should present a simpler question with respect to Defendant Munoz" than it does for Rodriguez-Nuñez. Response to Muñoz Motion at 18. Tanner also asserts that the case for applying § 41-4-6's building waiver is strong, where

> Munoz had to operate or maintain the MDC building, machinery, equipment, or furnishings in order to allow Plaintiff Tanner to enter or exit the segregation cell,

summon medical personnel, or even obtain basic necessities such as a blanket or
a drinking cup, which qualify as equipment or furnishings under Section 41-4-6.

Response to Muñoz Motion at 18 (internal quotations omitted)(quoting N.M. Stat. Ann. § 41-4-6).

Tanner next addresses Muñoz' argument that, because Tanner did not deliver her stillborn baby until October 17, 2016, any delay or denial of care which occurred on October 16, 2016, could not have caused Tanner's bodily injuries or her fetus' wrongful death. See Response to Muñoz Motion at 19. Tanner clarifies that her Amended Complaint "alleges a concurrent tortfeasor theory against Defendant Munoz." Response to Muñoz Motion at 21. Tanner alleges that other Defendants' negligent acts or omission preceded any "divisible or distinct pain and suffering they experienced during the period of delay or denial occasioned by Defendant Munoz's negligence." Response to Muñoz Motion at 21. Tanner notes, for instance, the alleged failure to provide her with any "significant prenatal care" between the time she arrived at the MDC and the time personnel placed her in the infirmary's segregation cell on October 16, 2016. Response to Muñoz Motion at 21. Tanner further alleges that "the negligent acts and omissions occurring while Plaintiffs[8] were placed in the segregation cell on October 16, 2016, involved concurrent negligence by both Defendant Munoz and other Defendants." Response to Muñoz Motion at 21 (citing Amended Complaint ¶ 46, at 13).

Tanner asserts that the defects which Muñoz allegedly identifies in Tanner's pleading, that it "does not contain enough details about her alleged negligence or does not allege the right waiver provision under the NMTCA," are curable without undue prejudice or delay, and that the Court

---

[8]By "Plaintiffs," Tanner refers to Tanner and Jay Hinton, Jr., her unborn fetus.

should therefore allow Tanner leave to amend should the Court find any defect in Tanner's pleading. Response to Muñoz Motion at 24. Finally, as with the Rodriguez-Nuñez Motion, Tanner asks the Court to deny Muñoz' Motion in its entirety, or to grant Tanner leave to amend and to cure any deficiency in her pleading identified in ruling on the Muñoz Motion. <u>See</u> Response to Muñoz Motion at 24.

### 6. **The Muñoz Reply.**

Muñoz filed a Reply.[9] <u>See</u> Muñoz Reply at 1. Muñoz contends that whether Tanner received adequate medical attention while being housed in the infirmary's segregation cell is "obviously not something for which this Defendant could be deemed negligent, given that there is no allegation, nor could there be, that she has any training to make such an assessment." Muñoz Reply at 3 (internal citations omitted). Muñoz notes that she is a corrections officer and is not medical personnel, and, therefore, that she was not making medical determinations. <u>See</u> Muñoz Reply at 3. Muñoz reiterates all the arguments the Rodriguez-Nuñez Reply raises, <u>see</u> <u>supra</u> at 20-22, asserts that there is no applicable waiver of immunity for her, and asks the Court to dismiss her with prejudice, <u>see</u> Muñoz Reply at 8.

---

[9]The legal arguments that Muñoz asserts in her Reply to Tanner's Response to Muñoz Motion are for the most part identical to those which Rodriguez-Nuñez asserts in her Reply to Tanner's Response to Rodriguez-Nuñez Motion. <u>See generally</u>, Rodriguez-Nuñez Reply; Muñoz Reply. The Court, accordingly, does not repeat the authorities cited and the legal propositions that Rodriguez-Nuñez asserts, as the Court has recited them <u>supra</u> at 26-29. In this section, entitled "The Muñoz Reply," the Court recites the arguments in the Muñoz Reply specific only to Defendant Muñoz. Muñoz also notes that, "[a]s Plaintiffs note, their Respective Responses, Docs. Nos. 71 and 72 are practically identical, and thus there is great similarity in the respective Replies." Muñoz Reply at 1 n.1.

7.    **The Hearing.**

The Court held a hearing on both Motions on October 3, 2018.  See Draft Transcript of Motion Proceedings at 1 (taken October 3, 2018)(Court)("Tr.").[10]  The Court began by asking about the Rodriguez-Nuñez Motion.  See Tr. at 1:2-3 (Court).  Rodriguez-Nuñez asserted that, on October 16, 2016, Tanner asked Rodriguez-Nuñez if she could go to medical, and that Rodriguez-Nuñez then contacted medical "and was informed that they would let her know when they could see Ms. Tanner."  Tr. at 2:10-12 (Martinez).  Rodriguez-Nuñez asserted that an officer took Tanner to medical and then that Rodriguez-Nuñez took a break.  See Tr. at 2:12-18 (Martinez).  Tanner asserted that, while Rodriguez-Nuñez was on her break, about twenty minutes after Tanner returned from her initial visit to medical, Tanner and her cellmate informed Macias that Tanner needed additional medical screenings.  See Tr. at 2:19-22 (Martinez).  Rodriguez asserted that, when Tanner and her cellmate explained to Macias that Tanner was experiencing pain and that they could see her baby crowning, Macias attempted to reach medical and, failing, then made an emergency call, after which personnel brought Tanner back to medical. See Tr. at 2:23-3:3 (Martinez).  Rodriguez-Nuñez asserted that two other Bernalillo County employees were working in medical that day and that the medical unit is "sort of isolated from the rest of the facility.  It is sort of self-contained" and there is one detention officer working in the front of the unit, and another one working at the back of the unit.  See Tr. at 3:6-11 (Martinez). Muñoz was the officer stationed in the back of the infirmary unit.  See Tr. at 3:11-12 (Martinez).

---

[10]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Once medical personnel evaluated Tanner, at approximately 10:00 a.m. on October 16, 2016, they determined that she should be housed in the medical unit, and so she was kept in their "special housing unit" for the remainder of October 16, 2016, and into the morning of October 17, 2016. Tr. at 3:15-19 (Martinez). Rodriguez-Nuñez concedes that Tanner correctly alleges that she is a corrections officer. See Tr. at 3:24-25 (Martinez). Rodriguez-Nuñez asserts that, as a corrections officer, she is not tasked with providing medical care to inmates, does not have training in that regard, and is tasked only with providing security and safety to inmates. See Tr. at 4:1-4 (Martinez). Rodriguez-Nuñez argues that, after she received Tanner's request for medical attention in the morning of October 16, 2016, she contacted medical personnel, and they evaluated Tanner and returned her to the unit within an hour and a half of Rodriguez-Nuñez making that request. See Tr. at 4:5-8 (Martinez). The Court clarified that Tanner alleges that she spoke with Rodriguez-Nuñez only once on October 16, 2016. See Tr. at 4:13-21 (Court, Martinez). The Court asked Rodriguez-Nuñez whether the Complaint alleges how much time transpired between Tanner's conversation with Rodriguez-Nuñez and her transport to medical, but Rodriguez-Nuñez informed the Court that the Amended Complaint contains no specific timeframes. See Tr. at 4:22-5:1 (Court, Martinez). Rodriguez-Nuñez asserted that, because shift changes occur at 7:00 a.m., the earliest that Tanner could have requested medical assistance of Rodriguez-Nuñez would have been seven a.m., and then, based on the Complaint, she was returned to the unit from medical by 9:40 a.m., within two hours and forty minutes, although Rodriguez-Nuñez could not say how long the medical examination would have been. See Tr. at 5:2-12 (Martinez).

The Court asked whether Rodriguez-Nuñez is alleging that, upon receiving Tanner's

request for attention, she immediately contacted medical and had Tanner sent there. <u>See</u> Tr. at 5:13-16 (Court). Rodriguez-Nuñez responded that, when an officer receives an inmate request for medical attention which is not an emergency, the officer contacts medical, and medical sends someone for the inmate "when they can fit them into their schedule," which Rodriguez-Nuñez alleges happened here. Tr. at 5:17-23 (Martinez). Rodriguez-Nuñez asserted that no facts alleged in the Amended Complaint would have alerted Rodriguez-Nuñez that Tanner was suffering from a medical emergency; Rodriguez-Nuñez asserts that Tanner indicated that she wanted to go to medical and that she was spotting, but that there was no visible blood or discharge which Rodriguez-Nuñez could have seen. <u>See</u> Tr. at 6:2-11 (Martinez). The Court asked whether, in the Amended Complaint, Tanner alleges that Rodriguez-Nuñez characterized her situation as a non-emergency as opposed to an emergency. <u>See</u> Tr. at 6:12-15 (Court).

Rodriguez-Nuñez clarified that she is referring to Tanner's Response to Rodriguez-Nuñez Motion, in which she compares Rodriguez-Nuñez to Macias, and alleges that Rodriguez-Nuñez could have observed the same factors which Macias observed. <u>See</u> Tr. at 6:16-21 (Martinez). Rodriguez-Nuñez avers that this allegation is false. <u>See</u> Tr. at 6:21-22 (Martinez).

Rodriguez-Nuñez read the factual allegations from the Amended Complaint concerning Rodriguez-Nuñez, and argued that "there [are] no well pled factual allegations in the complaint that the plaintiff ever had contact with Rodriguez-Nuñez again following that initial interaction in the early morning . . . ." Tr. at 7:25-8:4 (Martinez). Rodriguez-Nuñez asserted that the only claims against her in this case are for negligent operation of a medical facility and for wrongful death arising out of the negligent operation of a medical facility. <u>See</u> Tr. at 8:5-10 (Martinez). As a

corrections officer, Rodriguez-Nuñez asserts, she does not operate or maintain any part of the medical facility, and there is no factual allegation that she was ever in the medical facility at any relevant time. See Tr. at 8:10-14 (Martinez). Rodriguez-Nuñez argues, accordingly, that Tanner fails to state a claim under the NMTCA against Rodriguez-Nuñez. See Tr. at 8:14-17 (Martinez).

The Court asked whether Tanner also attempted to fit a claim against Rodriguez-Nuñez under § 41-4-6, and Rodriguez-Nuñez responded that, in Tanner's Response to Rodriguez-Nuñez Motion, she attempts to squeeze her claim into that exception. See Tr. at 8:18-22 (Court, Martinez). Rodriguez-Nuñez asserts that Tanner alleges that she does not have to specify only one NMTCA waiver applies. See Tr. at 8:22-24 (Martinez).

The Court expressed that it appears to the Court that Tanner's primary ground for her claims against Rodriguez-Nuñez is negligent operation of a building under § 41-4-6 and that the secondary ground is the negligent operation of a medical facility under § 41-4-9. See Tr. at 8:25-9:4 (Court). Rodriguez-Nuñez responded that, to the extent that Tanner's primary ground is the negligent operation of a building under § 41-4-6, Rodriguez-Nuñez refers the Court to Upton v. Clovis Municipal School District. See Tr. at 9:5-7 (Martinez). Rodriguez-Nuñez asserted that, for the waiver in § 41-4-6 to apply, the negligence must create a dangerous condition that threatens the general population, whereas here, there is no allegation that Rodriguez-Nuñez' alleged negligence was widespread throughout the county or that it was Rodriguez-Nuñez' regular conduct. See Tr. at 9:7-18 (Martinez). Rodriguez-Nuñez avers, there is no allegation that Tanner experienced harm, because of Rodriguez-Nuñez' conduct; medical personnel evaluated Tanner immediately after her contact with Rodriguez-Nuñez. See Tr. at 9:20-23 (Martinez). Rodriguez-

Nuñez argues that, because there is no showing that Rodriguez-Nuñez' alleged negligent conduct created a dangerous condition for the MDC's general population, it does not fall within § 41-4-6's waiver. <u>See</u> Tr. at 9:25-10:4 (Martinez).

Turning next to Tanner's alleged application of § 41-4-9's waiver, Rodriguez-Nuñez contended that § 41-4-9 does not apply to Bernalillo County specifically when the allegation is negligence and a contractor is operating the medical facility. <u>See</u> Tr. at 10:5-8 (Martinez). In support of this proposition, Rodriguez-Nuñez cited <u>Lessen v. City of Albuquerque</u> and <u>Rave v. Board of Commissioners for the County of Bernalillo</u>. <u>See</u> Tr. at 10:8-13 (Martinez). Rodriguez-Nuñez argued, accordingly, that there is no § 41-4-9 waiver. <u>See</u> Tr. at 10:13-14 (Martinez). Rodriguez-Nuñez addressed Tanner's mention of a possible § 41-4-12 waiver and asserted that there is no intentional tort here and that this possible waiver was not well pled. <u>See</u> Tr. at 10:14-19 (Martinez).

The Court discussed the facts of <u>Upton v. Clovis Municipal School District</u> and stated that it seemed <u>Upton v. Clovis Municipal School District</u> is a case at the boundaries of the doctrine, and that, while factually it dealt with a single student, its analysis discussed how the conduct in question applied to a broader class. <u>See</u> Tr. at 10:20-11:2 (Court). Rodriguez-Nuñez responded that, in <u>Upton v. Clovis Municipal School District</u>, "[t]he school ignored information . . . that the plaintiff provided them about her medical condition [and] they failed to warn the [substitute] teacher about her medical condition and most significantly they failed to follow through with the proper emergency procedures when she did have an emergency." Tr. at 11:3-9 (Martinez). Rodriguez-Nuñez argued that, in <u>Upton v. Clovis Municipal School District</u>, the Supreme Court

of New Mexico concluded that the school's actions and omissions combined to create a dangerous condition, placing the student in a far worse position than would be reasonably expected of school life. See Tr. at 11:9-12 (Martinez). Rodriguez-Nuñez averred that in the present case, however, there is no "appealed delay of care," nor is there an allegation that Tanner suffered any harm because of the delay in care. Tr. at 11:13-15 (Martinez). Rodriguez-Nuñez argued that Tanner was taken to the infirmary within hours of her request and remained there until the following morning. See Tr. at 11:15-18 (Martinez). Rodriguez-Nuñez stated that "[t]here is just no showing that this alleged delay created a dangerous condition that was dangerous to the population" and that Upton v. Clovis Municipal School District requires the danger to be more widespread than a singular event. See Tr. at 11:19-23 (Martinez). Rodriguez-Nuñez argued that a detention officer who delays for an hour or two providing an inmate care, when the Amended Complaint does not allege that it was an emergency, "can't possibly rise to the level of creating a dangerous condition to the general population as a whole that's required under § 41-4-6." Tr. at 11:25-12:6 (Martinez).

Tanner began with reference to the standard of review and noted that there is no evidence before the Court, but merely the Amended Complaint's factual allegations, and facts which Rodriguez-Nuñez provided as "background" at the hearing. Tr. at 12:18-23 (Leonard). Tanner asserted that the relevant document is the Amended Complaint, because the Motions are a rule 12(b)(6) motions based on the pleadings, and that Tanner's pleading is reviewed in the light most favorable to her, with all reasonable inferences drawn in her favor. See Tr. at 12:23-13:6 (Leonard). Tanner stated that the pleading standard is the notice standard. See Tr. at 13:9-10 (Leonard). Tanner noted her belief that Rodriguez-Nuñez' and Muñoz' argument is that they are

both entitled to dismissal because "there is a way to read plaintiff's pleading as if it didn't state a plausible claim against them if you draw the inferences in favor of them and just kind of minimize what the allegations are." Tr. at 13:13-21 (Leonard). Tanner stated that the "issue was clearly a pregnant inmate in the last trimester of her pregnancy . . . complaining that she's, her water has broke and she thinks she's having contractions so they think . . . she's about to de[liver] this baby or that there are some kind of complications," and, construing the allegations in the light most favorable to her, Tanner asserted that these circumstances do constitute an emergency situation. Tr. at 13:22-14:5 (Leonard).

Tanner asserted that she would rely on her Response to Rodriguez-Nuñez Motion as to her causation and alternative pleading arguments, but that she wanted to focus on the § 41-4-6 issue. See Tr. at 14:11-18 (Leonard). Tanner asserted that corrections officers directly committed a tort by not providing Tanner with access to medical services, and that the Amended Complaint distinguishes between the counts for medical negligence and professional malpractice, alleged against CCS, the contractors, and the licensed providers, and the ordinary negligence claims against Rodriguez-Nuñez and Muñoz. See Tr. at 15:18-16:2 (Leonard). Tanner argues that, for medical personnel to know that there is an inmate who needs care, a corrections officer needs to inform them, and to transport that inmate to the infirmary or to get medical personnel from the infirmary to pick up the inmate from the housing unit -- and that this involvement provides a clear nexus to the operation of the building. See Tr. at 16:6-13 (Leonard).

The Court asked whether the core cases were struggling, not with whether a third party did the action in question, but whether New Mexico courts should allow a waiver that deals with

buildings when the actions in question have more to do with policies, personnel, and training than with the actual building.  See Tr. at 16:14-23 (Court).  The Court asked whether, reading the core cases as Tanner suggests, the building "sort of disappear[s] from the story."  Tr. at 16:25-17:1 (Court).  Tanner responded that, because of the unique situation of a prison, wherein inmates are entirely dependent on corrections officers to get from point A to point B, negligent failure to transport the inmates around the facility constitutes negligent operation or maintenance of a building.  See Tr. at 17:2-10 (Leonard).

Tanner asserts that negligence in the operation of public medical facilities, buildings, equipment, and furnishing, enough to justify a state law claim for negligent operation, includes negligence regarding communications equipment.  See Tr. at 17:11-15 (Leonard).  Tanner asserts that, in the jail, corrections officers have access to both a telephone and a two-way radio -- while the telephone is for routine calls, Code 43 sent over a two-way radio is equivalent to a 911 call.  See Tr. at 17:16-20 (Tanner).  Tanner argues that, if an officer uses their telephone instead of the two-way radio to make a Code 43 emergency call, such conduct would constitute enough of a nexus to equipment to justify a negligent operation claim under state law -- evincing that the statute is not strictly about buildings.  See Tr. at 17:20-23 (Leonard).

The Court asked whether Tanner would agree with the Court that the State of New Mexico has not adopted such a broad reading of this waiver of sovereign immunity under the NMTCA.  See Tr. at 17:24-18:3 (Court).  Tanner replied that, where some cases tend to follow Archibeque v. Moya, some of the cases after Archibeque v. Moya have returned to a plain language reading of the statute and that Upton v. Clovis Municipal School District is one such case.  See Tr. at 18:4-

10 (Leonard).  Tanner specifically cites to paragraph 24 of <u>Upton v. Clovis Municipal School</u> <u>District</u>:

> Failure to respond appropriately to an emergency medical situation is a potential threat to every student in school because such a situation can occur at any time, regardless of special health needs.  The school's indifference towards Sarah's special medical needs makes it more likely that all similarly situated students were at risk as well.  The same policies that led the Uptons to rely on the school's diligence were in place for other at-risk students.  This is not a case of action uniquely affecting only one student.  The school's failures, if proven, created a dangerous condition for all special-needs children, and with regard to emergency responsiveness, for every student at the school.

Tr. at 18:12-25 (Leonard)(quoting <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 at ¶ 24, 141 P.3d at 1265).  Tanner also cites to paragraph 14 of <u>Upton v. Clovis Municipal School District</u>, wherein the Supreme Court of New Mexico suggests that a failure to respond to a fire in a reasonable manner -- perhaps by neglecting to implement a fire plan -- would constitute negligent operation of the school building within the NMTCA's meaning.  <u>See</u> Tr. at 18:10-12 (Leonard)(citing <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 at ¶ 14, 141 P.3d at 1262-63).

Tanner then references <u>Rave v. Board of Commissioners for the County of Bernalillo</u> 2017 WL 3600452, in which Judge Brack applies <u>Upton v. Clovis Municipal School District</u> to MDC, noting: "Plaintiff alleges that the County's employees ignored information he gave them about his medical condition, failed to staff the facility or manage or train its employees to render aid to inmates with medical conditions, and failed to follow through with and/or enforce its policies related to inmates with medical issues." Tr. at 19:4-10 (Leonard)(quoting <u>Rave v. Bd. of Comm'rs</u> <u>for the Cty. of Bernalillo</u>, 2017 WL 3600452, at *10).  Tanner concludes that the facts alleged are in line with cases holding that municipalities can be liable under § 41-4-6.  <u>See</u> Tr. at 19:10-14 (Leonard).

The Court then stated that, setting aside Rave v. Board of Commissioners for the County of Bernalillo, and focusing just on Upton v. Clovis Municipal School District, it seemed that Tanner would need to allege that the MDC ignored information which Tanner provided. See Tr. at 19:21-20:3 (Court). The Court remarked that, in Upton v. Clovis Municipal School District, the school failed to inform the substitute teacher about the student's condition, and the Court asked Tanner whether there was a similar circumstance here. See Tr. at 20:4-7 (Court). The Court noted that the Amended Complaint cites to the McClendon litigation, and the Court asked whether, here, there is a "whole class of inmate with medical needs that are having issues with not getting access to care that they need from the jail." Tr. at 20:8-11 (Court).

Tanner asserted that the court-appointed expert in the McClendon litigation produced a report that alleges that the MDC does not provide adequate care for pregnant inmates, and Tanner noted that she would like additional discovery on this point. See Tr. at 20:14-20 (Leonard). Tanner noted that the expert report also discussed the MDC's understaffing problems, and that Tanner, although she reported her pregnancy upon her arrival to the MDC on October 4, 2016, did not receive any medical attention or prenatal care until her emergency situation on October 16, 2016. See Tr. at 20:23-21:2 (Leonard). Tanner referred the Court to her allegations in the Amended Complaint that she was forced to participate in strenuous exercise classes and physical activities inappropriate for her pregnant condition, and that no one at the MDC took any precautions on her behalf, despite Tanner having reported the risk factors associated with her pregnancy. See Tr. at 21:6-13 (Leonard). Tanner asserts that the two Defendants at issue, Rodriguez-Nuñez and Muñoz, followed their supervisors' advice on levels of activity and appropriate precautions for pregnant

- 46 -

inmates.  See Tr. at 21:14-17 (Leonard).  The Court then inquired whether Upton v. Clovis Municipal School District is a case involving claims of negligent supervision, and if so, how it could apply to a claim against an individual corrections officer about a specific incident. See Tr. at 21:24-22:10 (Court).  Tanner replied that corrections officers "are responsible for supervising inmates," and the Court then asked, if Tanner were to write the limiting principle for applying § 41-4-6, what that limiting principle would be.  Tr. at 22:16-17 (Court).  See id. at 22:25-23:2 (Leonard, Court).

Tanner argued that the Court should look at the statutory language and look at whether there was a condition involving operation or maintenance, versus something that "happened in a public building involving an inmate alone or between two inmates."  Tr. at 23:5-9 (Leonard). Tanner asserts that she alleges more than a single incident, see Tr. at 23:9-10 (Leonard), and that, based on the McClendon litigation report -- its allegations of understaffing, and of the procedures to call emergency medical attention for inmates -- this is a case involving negligent operation or maintenance, see Tr. at 23:15-20 (Leonard).  Tanner also asserts that she believes there is caselaw which suggests that she is not required to name a particular public employee in an NMTCA suit, but that she can name employees -- and the reason she names employees is to ensure that she meets the heightened plausibility standard in federal court.  See Tr. at 24:1-5 (Leonard).  Tanner argues that Rodriguez-Nuñez did not come on duty on October 16, 2016, not knowing anything about Tanner's condition.  See Tr. at 24:6-10 (Leonard).  Tanner argues that, construing the facts in the light most favorable to Tanner, there is enough of a factual allegation in the Amended Complaint that Rodriguez-Nuñez, as well as the other corrections officer working there, would know about

Tanner's condition.  See Tr. at 24:7-15 (Leonard).  Tanner asserts that cases after Archibeque v. Moya have followed the reasoning of the Honorable Richard Ransom, Chief Justice of the Supreme Court of New Mexico's concurring opinion, expanding the waiver beyond the Archibeque v. Moya fact pattern.  See Tr. at 24:15-20 (Leonard).  Tanner quotes from Chief Justice Ransom's concurrence, in which he states: "I am certain that if the operation or maintenance of a public building were to give rise to an unreasonable risk of harm for even a single individual, the immunity granted pursuant to the act would not apply."  Tr. at 24:22- 25:1 (Leonard)(quoting Archibeque v. Moya, 1993-NMSC-079 ¶ 16, 866 P.2d at 349-50 (Ransom, C.J., concurring)). Tanner then quotes from paragraph 18, in which Chief Justice Ransom says: "To focus on words such as 'security, custody, and classification' does not aid the analysis."  Tr. at 25:1-3 (Leonard)(quoting Archibeque v. Moya, 1993-NMSC-079 ¶ 18, 866 P.2d at 350 (Ransom, C.J., concurring)).  Tanner asserted that, although the building in these circumstances is a prison, it should be treated like a public building for the § 41-4-6 waiver's purposes -- without adding additional words into the statute.  See Tr. at 25:9-11 (Tanner).  Tanner argued that the limiting principle is operation or maintenance, and for the waiver to apply, a public employee must be operating or maintaining the building -- not merely present in the building at the time of the incident at issue.  See Tr. at 25:11-14 (Leonard).  Tanner also directed the Court to C.H. v. Los Lunas Schools Board of Education, 852 F. Supp. 2d 1344 (D.N.M.  2012)(Browning, J.), wherein the Court concluded that student-on-student tortious conduct fell within the § 41-4-6 waiver's bounds.  See Tr. at 25:16-21 (Leonard).  Tanner asserts that not any negligent conduct within a public building would qualify for the waiver -- rather, a specific nexus between the conduct and

the building must exist.  See Tr. at 25:24-26:1 (Leonard).  Tanner asserts, here, the specific nexus is that the corrections officers control how inmates receive access to medical attention and care, such that they can prevent a pregnant woman who is about to deliver a baby from receiving medical attention.  See Tr. at 26:1-7 (Leonard).  Tanner asserts, on the causation issue, that, while Tanner's fetus was still alive during the period of delay that the Defendants' conduct allegedly occasioned, the delay meant that medical professionals lost the "ability to gain evidence of the patient's symptoms during that period," which could have been important to determining what Tanner's discharge was and whether it was amniotic fluid.  Tr. at 26:8-16 (Leonard).

Tanner next refers to Quevedo v. New Mexico Children Youth & Families Department, 2016-NMCA-101, 385 P.3d 657, a Court of Appeals of New Mexico case, suggesting that the more a public employee can control a plaintiff's ability to obtain care, the more likely it is that the public employee's negligence would permit suit under § 41-4-6.  See Tr. at 26:18-27:8 (Leonard).

The Court stated that it did not see the limiting principle and that it sounded like Tanner was suggesting that every detainee or prisoner in New Mexico would have a malpractice claim against any corrections officer who occasioned any delay in providing medical care.  See Tr. at 27:9-15 (Court).  Tanner clarified that the special relationship between the corrections officer and the patient in relation to the patient's access to care could not be the only factor.  See Tr. at 16-17 (Leonard).  The Court responded that, once something is labeled as special, it sounds as if there is a cause of action individual to each one of the patients, and that the Court believed that is why Chief Justice Ransom is clear that the building exception requires alleging an effect on a class of people and not merely on an individual.  See Tr. at 18-25 (Court).  Tanner asserted that Chief

Justice Ransom's concurrence should be read considering <u>Quevedo v. New Mexico Children Youth & Families Department</u>.  <u>See</u> Tr. at 28:4-5 (Leonard).  Tanner asserted that the special relationship factor, only in combination with other factors, would suffice for the § 41-4-6 waiver to apply, and argued that <u>Upton v. Clovis Municipal School District</u> and <u>Rave v. Board of Commissioners for the County of Bernalillo</u> suggest that the class of individuals includes all inmates with medical needs at the MDC -- the same class which the <u>McClendon</u> litigation identifies.  <u>See</u> Tr. at 28:15-29:6 (Leonard).

The Court responded that there has been no New Mexico case that has said that everyone in a facility is a class and that, for class classifications, the courts generally look at how people are classified within facilities, and whether their classification is going to put everybody in the facility in danger.  <u>See</u> Tr. at 29:7-13 (Court).  The Court stated that, to say every prisoner constitutes a class would be like saying every student in the school constitutes a class, and the Court expressed its concern that <u>Upton v. Clovis Municipal School District</u> does not suggest every student in the school could bring a cause of action for negligent operation or maintenance.  <u>See</u> Tr. at 29:13-21 (Court).  Tanner responded that she believes <u>Upton v. Clovis Municipal School District</u> permits every student in the school to bring an action if the school's failures in emergency responsiveness endanger all students.  <u>See</u> Tr. at 29:22 (Leonard), <u>id.</u> at 30:1-6 (Leonard).  Tanner asserted that the limiting principle is that there must be facts which tie the specific public employee to the operation and maintenance of the building -- which includes getting people from one place to another in a medical emergency.  <u>See</u> Tr. at 30:10-14 (Leonard).  Tanner argues that <u>Upton v. Clovis Municipal School District</u> talks about the class as encompassing "everyone who needs an

emergency response," which could conceivably include every student and must be combined with facts against specific public employees. Tr. at 30:24-31:4 (Leonard).

The Court asked whether Tanner would agree that, given <u>Upton v. Clovis Municipal School District</u>, the stronger argument with respect to Rodriguez-Nuñez would be under § 41-4-6, because Rodriguez-Nuñez was outside of the infirmary during the events in question. <u>See</u> Tr. at 31:10-15 (Court). Tanner agreed with that observation, but also asserted that § 41-4-9 does not require that Rodriguez-Nuñez was physically inside the infirmary, and so either waiver applies. <u>See</u> Tr. at 31:19-32:10 (Leonard).

Rodriguez-Nuñez then argued that <u>Rave v. Board of Commissioners for the County of Bernalillo</u> is very different from this case, because Rave had been at the MDC on multiple occasions, and that, during each of his different stays at the MDC, he was denied dialysis by the MDC physicians -- whereas here, Tanner alleges only a single incident of misconduct. <u>See</u> Tr. at 33:12-25 (Martinez). The Court responded, however, that <u>Upton v. Clovis Municipal School District</u> also involves only a single incident of a child with asthma. <u>See</u> Tr. at 34:1-6 (Court). Rodriguez-Nuñez averred that the Supreme Court of New Mexico in <u>Upton v. Clovis Municipal School District</u> explained that it was not a single incident, by examining factors such as the school ignoring information which plaintiffs had provided them, failing to warn the substitute teacher about the student's condition, and failing to follow through with proper emergency procedures. <u>See</u> Tr. at 34:7-15 (Martinez). Rodriguez-Nuñez argued that those three factors combined to create a danger related to the premises, which is not like this case. <u>See</u> Tr. at 34:15-17 (Martinez). Rodriguez-Nuñez asserts that the fact that Tanner complained that she was going into labor is not

contained in the Amended Complaint and that the allegations in the Amended Complaint do not alert that Tanner was having a medical emergency.  See Tr. at 34:21-35:2 (Martinez).  Rodriguez-Nuñez asserts, accordingly, that there is no reason to believe that, as a corrections officer, she would have any medical information about Tanner which Tanner did not share with her. See Tr. at 35:2-13 (Martinez).  Rodriguez-Nuñez further argues that the Health Insurance Portability and Accountability Act, 110 Stat. 1936 ("HIPAA")[11] prohibits medical from sharing anything about Tanner with a third party and so could not have shared medical information with the corrections officers.  See Tr. at 35:16-19 (Martinez).  Rodriguez-Nuñez also contends that Tanner has made no showing that Bernalillo County did not have appropriate medical procedures -- and, in fact, that Tanner admits that she went to the infirmary within a short period of time after Rodriguez-Nuñez spoke to her.  See Tr. at 35:18-36:4 (Martinez).  Rodriguez-Nuñez contends that, based on the factual allegations, Tanner's claims against Rodriguez-Nuñez cannot withstand a rule 12(b)(6) motion.  See Tr. at 36:4-6 (Martinez).

The Court stated that it is inclined to grant Rodriguez-Nuñez' Motion, because it is not sure the medical facility waiver encompasses corrections officers, and that, for § 41-4-6, this circumstance falls outside of the Upton v. Clovis Municipal School District sphere, "into the area of law where the Supreme Court hasn't yet recognized that they're going to use this exception for that purpose."  Tr. at 36:10-37:6 (Court).  The Court informed the parties that it would give the

---

[11]HIPAA, enacted in 1996, "required the Secretary of the U.S. Department of Health and Human Services (HHS) to develop regulations protecting the privacy and security of certain health information."  U.S. Dep't of Health & Human Servs., Health Information Privacy, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last updated July 26, 2013).

Rodriguez-Nuñez Motion some thought before ruling on it, although it stated that the facts against Rodriguez-Nuñez are thin. See Tr. at 36:14-15 (Court), id. at 37:6-7 (Court).

Muñoz then addressed the Muñoz Motion and asserted that Muñoz was a security personnel stationed at the back of the MDC's medical unit. See Tr. at 37:12-15 (Martinez). The Court asked why the MDC stationed a corrections officer at the back of the medical unit. See Tr. at 37:16-18 (Court). Muñoz responded that the MDC stationed one corrections officer at the front of the medical unit and another at the back of the medical unit, for security. See Tr. at 37:19-22 (Martinez). The Court asked why the corrections officers were providing security, and Muñoz clarified that the corrections officers were ensuring inmates would not fight one another or get into physical altercations with the medical staff, and that the medical personnel would check on the inmates every thirty minutes during a routine walk through the medical facility. See Tr. at 37:23-38:3 (Court, Martinez). Muñoz asserted that, while Tanner was being housed in the infirmary's special housing unit, medical personnel would see her, and sometimes a corrections officer would be present inside or just outside the room for security purposes. See Tr. at 38:4-8 (Martinez). Muñoz asserted that the corrections officers have no medical training and provide no medical care. See Tr. at 38:9-11 (Martinez). Muñoz argued that the cell in which Tanner stayed was not for purposes of punishment, but rather to hold people suffering from medical conditions who require more supervision from medical personnel. See Tr. at 38:13-21 (Martinez).

The Court asked whether the segregation unit is within the medical unit, and Muñoz responded that the segregation cell is within the medical unit, that the nurses and doctors work inside a small confined area containing eight to ten cells, and that, because there are both male and

female inmates within the infirmary at any given time, cells are also isolated so that males and females are kept apart. See Tr. at 38:22-39:4 (Court, Martinez). Muñoz asserted that the cells are self-contained, and that they have a bed, a restroom, and a sink from which inmates can drink water. See Tr. at 39:5-8 (Martinez). Muñoz asserts that Tanner alleges that medical personnel routinely saw her, and that someone even came for the night shift -- contradicting Tanner's allegations that medical personnel ignored her requests for attention. See Tr. at 39:16-25 (Martinez). Muñoz asserts that she and Rodriguez-Nuñez are not medical professionals, that they have no information about inmates' medical needs, and that the medical professionals attended to Tanner. See Tr. at 40:2-5 (Martinez).

The Court asked whether Tanner's claim against Muñoz is that Muñoz kept her in a segregation cell, and Muñoz asserted that Tanner has alleged the same claims against Muñoz as against Rodriguez-Nuñez. See Tr. at 40:9-15 (Court, Martinez). The Court asked what Tanner alleges the corrections officers did or did not do. See Tr. at 40:16-17 (Court). Muñoz asserted that Tanner's allegations against her are that, in concert with the other Defendants, Muñoz held Tanner in a segregation cell within the medical unit for the rest of the day on October 16, 2016, and into October 17, 2016, without adequate or timely medical care for her serious medical needs. See Tr. at 40:18-25 (Martinez). Muñoz also asserts that Tanner alleges that Muñoz denied her a blanket or a drinking cup. See Tr. at 41:1-2 (Martinez).

Muñoz contends that, in ¶ 60 of the Amended Complaint, Tanner asserts that, at 8:00 a.m. on October 17, 2016, she was released from the special housing unit to the other part of the medical unit, where she saw McMurray, who physically examined her and cleared her to return to her pod,

and where "the level of care required under the relevant ACA and NCCHC standards was completely lacking." Tr. at 41:20-25 (Martinez)(quoting Amended Complaint ¶ 60, at 18). Muñoz reiterates that she was not operating the medical facility, but merely holding Tanner in custody pursuant to the instructions that she received from her supervisors. See Tr. at 42:7-9 (Martinez).

Tanner then asserted that she would like leave to amend her Amended Complaint if the Court has any problems with the allegations therein and referred the Court to Calloway v. New Mexico Department of Corrections, 1994-NMCA-049, 875 P.2d 393, for the proposition that an inmate need not be a current inmate to bring a claim based on § 41-4-6's waiver. See Tr. at 43:3-12 (Leonard). The Court clarified that it is "not quite buying the distinction that [the alleged negligence] doesn't have to [a]ffect a class." Tr. at 43:16-18 (Court). The Court noted that, even in Upton v. Clovis Municipal School District, the Supreme Court of New Mexico seemed to be looking for ways to satisfy Chief Justice Ransom's requirement that the alleged negligence affect more than a single individual. See Tr. at 43:18-21 (Court). The Court stated that it seems to the Court that Upton v. Clovis Municipal School District represents the outer limit, and, even there, the Supreme Court of New Mexico attempted to shoehorn the facts into Chief Justice Ransom's criteria. See Tr. at 44:1-4 (Court).

Tanner responded that there is more than one inmate here, because both Tanner and her unborn child are plaintiffs. See Tr. at 44:5-6 (Leonard). Tanner avers that there is a class of pregnant inmates and also that unborn children have "no way to protect [themselves] . . . ." Tr. at 44:6-8 (Leonard). Tanner asserts that, regarding Muñoz, the allegations against her are that she saw Tanner in severe pain and that, in the infirmary units, corrections officers -- not nurses --

watched the segregation cells, yet Muñoz did not bring Tanner's condition to the attention of any medical personnel in a timely manner. See Tr. at 44:18-25 (Leonard). Tanner further contends that Muñoz did not provide basic necessities such as a drinking cup, and that, although there is a sink in the segregation cell, it is not sufficient "if you can't get your mouth [around] the sink, especially while you're going in[to] labor and you're having cramping and you're [in] extreme discomfort and you don't have a blanket [to regulate your temperature] . . . ." Tr. at 45:4-7 (Leonard). Tanner contends that, although Muñoz is not a licensed provider, she is still supposed to provide the basic level of care and access to care. See Tr. at 45:9-10 (Leonard). Tanner argues that her allegation is that the facility is understaffed and that the medical personnel depend on the corrections officers as their eyes and ears in the segregation cells within the infirmary. See Tr. at 45:14-20 (Leonard). Tanner suggests that her allegations against Muñoz would be "more clearly dealt with on a motion for summary judgment" with evidence and that, at this stage, the parties are merely arguing about the sufficiency of the pleadings. Tr. at 46:6-10 (Leonard). Tanner asserts that the stage of the proceedings distinguishes the present case from Upton v. Clovis Municipal School District and the other cases to which Rodriquez-Nuñez and Muñoz cite. See Tr. at 46:10-11 (Leonard). Tanner also asserts that there are not many cases addressing the application of § 41-4-9's waiver, and the few cases that address it summarily state that it cannot apply in a prison context, because Lessen v. City of Albuquerque suggests that, when a governmental entity contracts with a third party to provide services, waivers of sovereign immunity do not apply just because of the entity's decision to contract for the services. See Tr. at 46:12-16 (Leonard). Tanner contends that, here, she is not suggesting that § 41-4-9's waiver is applicable to the facility because

of its contract with CCS; rather that Muñoz is liable as an individual, because, stationed at the infirmary's back, she is operating the infirmary with respect to conveying information back and forth between the segregation cells and the medical personnel, and providing basic equipment to inmates in the infirmary. See Tr. at 46:16-21 (Leonard).

The Court asked whether Tanner is primarily relying on § 41-4-9 for Muñoz, and on § 41-4-6 for Rodriguez-Nuñez. See Tr. at 47:2-7 (Court). Tanner responded that, for Muñoz, the medical facility waiver argument under § 41-4-9 is stronger, because it is more specific, and talks about the operation of a facility, but that she can plead in the alternative, so the operation of a building waiver under § 41-4-6 also applies. See Tr. at 47:8-14 (Leonard). The Court asked why Tanner needs a separate waiver if the analysis is going to be the same for both, because a medical facility is always going to be a building or premises. See Tr. at 47:15-20 (Court). Tanner responded that, while that observation is true, a medical facility is not always a public facility. See Tr. at 47:21-22 (Leonard). Tanner argues that the medical facility waiver talks about operation of a clinic or infirmary, whereas § 41-4-6's operation or maintenance of a building waiver is broader in scope, encompassing equipment, furnishings, and machinery. See Tr. at 48:1-4 (Leonard). Tanner asserts that, if the Court is more comfortable, the principle might be that § 41-4-6 applies if the alleged negligence is specifically related to equipment, furnishings, or machinery. See Tr. at 48:4-7 (Leonard). The Court responded by asking whether the analysis for § 41-4-6 is the same under either Upton v. Clovis Municipal School District or Archibeque v. Moya, and for the § 41-4-9 medical facility waiver, under whatever caselaw New Mexico applies regarding that waiver. See Tr. at 48:8-12 (Court). Tanner stated that she believes the two waivers

overlap.  See Tr. at 48:13 (Leonard).  Tanner asserts that there is no caselaw dealing with whether Archibeque v. Moya applies to an infirmary or clinic situation, and that, based on § 41-4-9's plain language, Archibeque v. Moya's restrictions do not necessarily apply to the § 41-4-9 context. See Tr. at 48:19-22 (Leonard).

Tanner asserted that, while perhaps § 41-4-9 provides the stronger argument in relation to Muñoz, there is less caselaw on that waiver than on the § 41-4-6 waiver.  See Tr. at 49:15-19 (Leonard).  Tanner suggested that the limiting principle for application of § 41-4-9's waiver might be that the conduct at issue must relate to the operation of a medical facility.  See Tr. at 50:11-12 (Leonard).  Tanner contends that, here, Tanner was in a segregation cell for medical monitoring, and corrections officers, including Muñoz, "participate in observing and monitoring [her and] determining when she has requests for attention and conveying those to the nurse . . . ."  Tr. at 50:1-6 (Leonard).  Tanner asserts that, in this context, the corrections officers' conduct is related to the operation of a medical facility -- by contrast, if a person slips and falls at the door of a hospital, that slip-and-fall is not related to the building being and operating as a medical facility. See Tr. at 49:21-25 (Leonard).

Tanner next asserted that § 41-4-12's waiver might also apply here and that she wants to raise it by means of an amended complaint.  See Tr. at 50:23-25 (Leonard).  Tanner clarified that § 41-4-12 provides an immunity waiver specific to law enforcement officers, and that the waiver applies if a law enforcement officer causes one of the listed torts in the NMTCA or one of the NMTCA's specified civil rights violations.  See Tr. at 51:6-17 (Leonard).  Tanner asserted, however, that the most straightforward path for the claims against both Defendants is through

§ 41-4-6.  See Tr. at 51:22-24 (Leonard).  Tanner also asserted that, because there is much less caselaw interpreting § 41-4-9, which Tanner asserts is applicable particularly to Muñoz, there is a "cleaner slate" with § 41-4-9, after distinguishing Lessen v. City of Albuquerque.  Tr. at 51:24-52:1 (Leonard).  Tanner reiterated that, if the Court is inclined to say that these Motions fall "slightly outside the box of Upton or Archibeque, then [Tanner] would request leave to amend."  Tr. at 52:13-16 (Leonard).

Tanner averred, regarding her suggestion that she amend her complaint to add a claim under § 41-4-12, that she would have to reallege that the corrections officers at the MDC count as law enforcement officers, because the MDC is a pretrial detention facility, and that there is a causal relationship between their conduct and the civil rights violations which are already in the Amended Complaint.  See Tr. at 53:23-54:3 (Leonard).  The Court asked whether the MDC is entirely pretrial detention or if some inmates are serving their sentences, while others are detained there pretrial.  See Tr. at 54:4-6 (Court).  Tanner replied that the MDC is a mixed bag, but that she could request more information from the MDC during discovery, and that she had hoped to get more written discovery before amending the Amended Complaint.  See Tr. at 54:8-16 (Leonard).

The Court then asked Muñoz to address the § 41-4-9 waiver's applicability to her.  See Tr. at 55:21-22 (Court).  The Court asked Muñoz whether the Court would have to construe § 41-4-9 more liberally than § 41-4-6, or otherwise risk writing it out of the statute.  See Tr. at 56:2-4 (Court).  Muñoz averred that operation meant more than simply performing tasks in the facility -- it signified an ability to control the way things are done in the facility.  See Tr. at 57:7-12 (Martinez).  Muñoz asserts that Tanner has not alleged that she was denied food or water, or that

- 59 -

she suffered any harm, because of not receiving the blanket.  See Tr. at 57:20-24 (Martinez).

Muñoz asserts that, under § 41-4-9, Tanner must show that Muñoz' alleged negligence somehow

damages her, and the Amended Complaint does not show that harm.  See Tr. at 58:2-5 (Martinez).

Muñoz asserts that, while Tanner argues in her Response that Muñoz failed to alert healthcare

providers within the MDC of Tanner's condition, Tanner alleges that she repeatedly informed

healthcare providers of her worsening condition.  See Tr. at 58:6-16 (Martinez).  Muñoz contends,

therefore, that Tanner suffered no harm from Muñoz' alleged failure to pass on her requests for

attention and that, if Tanner has a negligence claim, it is against the healthcare providers.  See Tr.

at 58:21-23 (Martinez).  Muñoz argues that the caselaw is clear that, under § 41-4-9, there is no

immunity waiver for independent contractors who operate a medical facility, because Bernalillo

County cannot be responsible for the independent contractors' actions.  See Tr. at 59:6-10

(Martinez).

Muñoz avers, accordingly, that Tanner must fit her claim against Muñoz under § 41-4-6,

and that "there is no evidence that she was engaging [in] any operation [or] maintenance of that

facility," based on the Amended Complaint's plain text.  Tr. at 59:11-14 (Martinez).  The Court

asked whether there is a case indicating that a state governmental entity could be held liable for an

independent contractor's actions, and Muñoz asserted that, according to Kellum v. Bernalillo

County and Rave v. Board of Commissioners for the County of Bernalillo, a governmental entity

may be held liable for an independent contractor's actions only for civil rights violations.  See Tr.

at 59:18-60:2 (Court, Martinez).  The Court then asked why the same principle allowing liability

for civil rights violations would not apply to negligent supervision claims against the governmental

entity.  See Tr. at 60:5-9 (Court).  Muñoz asserted that the NMTCA statutorily prohibits waivers for independent contractors' negligence.  See Tr. at 60:10-14 (Martinez).  The Court asked how Judge Brack arrived at the determination that immunity waivers are inapplicable to independent contractors, and Tanner responded that he could provide the Court with the relevant cases to read.  See Tr. at 60:15-19 (Court, Leonard).  The Court took copies of Kellum v. Bernalillo County, Rave v. Board of Commissioners for the County of Bernalillo and Lessen v. City of Albuquerque.  See Tr. at 61:16-22 (Leonard); id. at 62:13-14 (Court).

The Court then stated that it is not seeing § 41-4-6 as applying either to the Rodriguez-Muñoz Motion or to the Muñoz Motion.  See Tr. at 62:23-63:1 (Court).  The Court stated that § 41-4-9 should be a more liberal standard than § 41-4-6, for the Court to give § 41-4-9 some effect, but that the Court did not know whether it should apply to waive immunity as to Rodriguez-Nuñez and Muñoz.  See Tr. at 63:3-6 (Court).  The Court took the Motions under advisement.  See Tr. at 63:12 (Court).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  A complaint's sufficiency is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim for relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is

insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint.  See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations

period, then the defendant may move for dismissal under rule 12(b)(6). See Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.); Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945). The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion. Cf. Kincheloe v. Farmer, 214 F.2d 604, 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense). It appears, from caselaw in several Courts of Appeals, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV 08-0140-W, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted it, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1235-36 (D.N.M. 2014)(Browning, J.).

## NEW MEXICO NEGLIGENCE LAW UNDER THE NMTCA

The NMTCA is based on traditional tort concepts of duty and a reasonably prudent person's standard of care while performing that duty. See N.M. Stat. Ann. § 41-4-2(B). See also

Eckhardt v. Charter Hosp. of Albuquerque, Inc., 1998-NMCA-017 ¶ 36, 953 P.2d 722, 732

("Plaintiff's negligence claims must be premised on a duty that Charter owed to Plaintiff, and it is

for the court to determine as a matter of law whether such a duty exists." (citation omitted))[12];

Johnson v. Sch. Bd. of Albuquerque Pub. Sch. Sys., 1992-NMCA-125 ¶ 1, 845 P.2d 844 ("Duty

or responsibility is not provided in the Tort Claim Act; it must be found outside the Act either at

common law or by statute.").[13]  "Where there is no duty, there can be no negligence." Sw. Pub.

---

[12]The Court predicts that the Supreme Court of New Mexico would agree with Eckhardt v. Charter Hospital of Albuquerque, Inc. that the court determines whether a duty exists as a matter of law in negligence actions, based on the Court's read of the Supreme Court of New Mexico's opinion in Calkins v. Cox Estates, 1990-NMSC-044, 792 P.2d 36, stating that the "court must determine as a matter of law whether a particular defendant owes a duty to a particular plaintiff." Calkins v. Cox Estates, 1990-NMSC-044 ¶ 8, 792 P.2d at 39 (emphasis omitted)(citing Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty., 1984-NMSC-079 ¶ 4, 687 P.2d 728, 729("Whether a duty exists is a question of law for the courts to decide.")).

[13]The Court predicts that the Supreme Court of New Mexico would agree with Johnson v. School Board of Albuquerque Public School System that the NMTCA does not provide a duty, so the applicable duty derives either from common law or from statute.  The NMTCA's statutory text clearly states that "[l]iability for acts or omissions under the Tort Claims Act shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty."  N.M. Stat. Ann. § 41-4-2(B).  In Rutherford v. Chaves County, the Supreme Court of New Mexico affirmed the Court of Appeals of New Mexico's application of the common-law duty standard to a defendant's conduct evaluated under the NMTCA.  See Rutherford v. Chaves Cty., 2003-NMSC-010 ¶¶ 23-24, 69 P.3d 1199, 1205.  The Supreme Court of New Mexico stated: "If Chaves County is found to have breached its common-law duty of ordinary care . . . Chaves County may be held liable because such negligence falls within the waiver of sovereign immunity."  Rutherford v. Chaves Cty., 2003-NMSC-010 ¶ 24, 69 P.3d at 1205.  In California First Bank v. State, 1990-NMSC-106, 801 P.2d 646, the Supreme Court of New Mexico found that violation of a statutory duty may establish negligence under the NMTCA.  See California First Bank v. State, 1990-NMSC-106 ¶¶ 25-26, 801 P.2d at 653.  In Weinstein v. City of Santa Fe ex rel. Santa Fe Police Department, furthermore, the Supreme Court of New Mexico stated that the NMTCA waives immunity for the commission of enumerated common-law torts, the deprivation of a statutory right, and the deprivation of a constitutional right, and that common law or statutory duties may apply.  See Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't,

Serv. Co. v. Artesia Alfalfa Growers' Ass'n, 1960-NMSC-052 ¶ 21, 353 P.2d 62, 68 (1960).  See

Herrera v. Quality Pontiac, 2003-NMSC-018 ¶ 6, 73 P.3d 181, 185-86 ("Generally, a negligence

claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is

typically based upon a standard of reasonable care, and the breach being a proximate cause and

cause in fact of the plaintiff's damages."); Bierner v. City of Truth or Consequences, 2004-NMCA-

093 ¶ 18, 96 P.3d 322, 326 ("Consequently, the waiver of immunity in Section 41-4-4(A) of the

TCA does not apply to the City because it had no duty upon which negligence could be

premised.").[14]

Under New Mexico law, "negligence encompasses the concepts of foreseeability of harm

to the person injured and of a duty of care toward that person."  Herrera v. Quality Pontiac, 2003-

NMSC-018 ¶ 6, 73 P.3d at 186 (internal quotation marks omitted)(quoting Ramirez v. Armstrong,

1983-NMSC-104, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-

075, 797 P.2d 246, 249).  New Mexico follows the principle "that a negligent actor only owes a

duty to those whose injuries are a foreseeable result of the negligence."  Herrera v. Quality Pontiac,

2003-NMSC-018 ¶ 20, 73 P.3d at 190.

> The act of a third person in committing an intentional tort or crime is a
> superseding cause of harm to another resulting therefrom, although the actor's

---

1996-NMSC-021 ¶ 20, 916 P.2d at 1319.

[14]The Court predicts that the Supreme Court of New Mexico would agree with this assertion from Bierner v. City of Truth or Consequences, because of the Supreme Court of New Mexico's consistent reaffirmance of the principle that to establish negligence liability, the defendant must have owed a duty to the plaintiff.  See Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021 ¶ 18, 916 P.2d at 1319; Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty., 1984-NMSC-079 ¶ 4, 687 P.2d at 729 ("A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant.").

negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime <u>unless the actor at the time of his [or her] negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself [or herself] of the opportunity to commit such a tort or a crime.</u>

<u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018 ¶ 21, 73 P.3d at 191 (emphasis added)(internal quotation marks omitted)(quoting <u>Sarracino v. Martinez</u>, 1994-NMCA-013 ¶ 12, 870 P.2d 155, 157). "The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader zone of risk that poses a general threat of harm to others." <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018 ¶ 8, 73 P.3d at 186 (internal quotation marks omitted)(quoting <u>McCain v. Fla. Power Corp.</u>, 593 So.2d 500, 502 (Fla. 1992)(citation and footnote omitted)). The proximate-causation element of negligence "is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018 ¶ 8, 73 P.3d at 186 (quoting <u>McCain v. Fla. Power Corp.</u>, 593 So.2d at 502). The Supreme Court of New Mexico opined on the duty element and the proximate-causation element of negligence, stating: "[T]he former is a minimal threshold <u>legal</u> requirement for opening the courthouse doors, whereas the latter is part of the much more specific <u>factual</u> requirement that must be proved to win the case once the courthouse doors are open." <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018 ¶ 8, 73 P.3d at 186 (emphasis in original).

In <u>Herrera v. Quality Pontiac</u>, the plaintiffs sued the owner of a stolen vehicle for injuries caused by a collision with the owner's car when the owner left his keys in the car and the car unlocked at a garage. <u>See</u> 2003-NMSC-018 ¶ 2, 73 P.3d at 185. The plaintiffs provided an affidavit asserting that Albuquerque has a high rate of automobile thefts, that thieves are much more likely to steal unattended vehicles which have keys in the ignition, and that stolen cars are

much more likely to be involved in automobile accidents.  See Herrera v. Quality Pontiac, 2003-NMSC-018 ¶ 3, 73 P.3d at 191.  The Supreme Court of New Mexico held that the affidavit established that the "Defendant's acts foreseeably created a zone of danger, which included Plaintiffs."  Herrera v. Quality Pontiac, 2003-NMSC-018 ¶ 24, 73 P.3d at 192.  The Supreme Court of New Mexico found that the plaintiffs' injuries -- which a third-party car thief's dangerous driving caused -- were foreseeable and that the defendants owed a duty to the plaintiffs as a matter of law.  Herrera v. Quality Pontiac, 2003-NMSC-018 ¶ 25, 73 P.3d at 192.

In Bober v. New Mexico State Fair, a motorist was injured in a collision with a vehicle as it exited the state fairgrounds parking area onto abutting highway.  See 1991-NMSC-031 ¶ 1, 808 P.2d 614, 616.  The motorist sued the state fair, state fair commission, and state police, and appealed the district court's grant of summary judgment in favor of the defendants.  See Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 1, 808 P.2d at 616.  The Supreme Court of New Mexico analyzed the duty owed to Bober and the foreseeability of the harm to determine whether immunity was waived under § 41-4-6.  See Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 10, 808 P.2d at 618.

> Under the definitions of "negligence" and "ordinary care" in UJI Civil 1601 and 1603, the responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances . . . .  Every person has a duty to exercise ordinary care for the safety of others.  Whether or not defendant breached [that] dut[y] is a question of the reasonableness of its conduct, and thus a fact question.

Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 17, 808 P.2d at 621 (emphasis added)(citations and internal quotation marks omitted)(quoting Knapp v. Fraternal Order of Eagles, 1987-NMCA-064 ¶ 10, 738 P.2d 129, 131 (citation omitted)).  "What constitutes 'ordinary care' varies with the

nature of what is being done. . . . <u>As the risk of danger that should reasonably be foreseen increases,</u> <u>the amount of care required also increases.</u>" <u>Bober v. N.M. State Fair</u>, 1991-NMSC-031 ¶ 10, 808 P.2d at 618 (emphasis added)(citations and internal quotation marks omitted)(quoting N.M.R.A. U.J.I. Civ. 13-1603). The Supreme Court of New Mexico held that the state fair could not escape liability under the NMTCA, because it did not "adduce some evidence that it was unaware of the danger of an accident arising from a large number of cars exiting the Fairgound at one time following an event like the concert at Tingley Coliseum." <u>Bober v. N.M. State Fair</u>, 1991-NMSC-031 ¶ 23, 808 P.2d at 622.

In <u>Castillo v. County of Santa Fe</u>, 1988-NMSC-037 ¶ 1, 755 P.2d 48, the Supreme Court of New Mexico addressed whether to dismiss a complaint, because § 41-4-6 waived the defendants' immunity. In that case, the mother of an injured invitee sued the operator of county-owned public housing to recover damages for dog bite injuries. <u>See</u> <u>Castillo v. Cty. of Santa Fe</u>, 1988-NMSC-037 ¶ 2, 755 P.2d at 49. The Supreme Court of New Mexico noted that it, "assume[d] the truth of the facts alleged in the complaint" and held that Castillo pled that the housing authority "<u>was aware or should have been aware</u> of the continuing problem of loose-running dogs and the resulting danger this condition posed for the common area of Valle Vista which the Housing Authority had the duty to maintain in a safe condition." <u>Castillo v. Cty. of Santa Fe</u>, 1988-NMSC-037 ¶ 4, 755 P.2d at 50 (emphasis added). In finding that there was an unsafe condition, the Supreme Court of New Mexico held that the "existence of a duty [rested] upon whether dogs roaming loose upon the common grounds of a government-operated residential complex could represent an unsafe condition," and found that, given the potential safety hazard

for residents and their invitees, "loose-running dogs could represent an unsafe condition upon the land." Castillo v. Cty. of Santa Fe, 1988-NMSC-037 ¶ 9, 755 P.2d at 51. Ultimately, it held that "[t]he complaint sufficiently alleges facts that state a claim upon which relief could be granted." Castillo v. Cty. of Santa Fe, 1988-NMSC-037 ¶ 10, 755 P.2d at 51.

Roaming prisons gangs also present a danger to all inmates where the gang is known to be violent and has access to weapons. See Callaway v. N.M. Dep't of Corr., 1994-NMCA-049 ¶ 19, 875 P.2d 393, 399, cert. denied, Nos. 22,079, 22,081, 879 P.2d 91 (1994)(unpublished table opinion).[15] The Court of Appeals of New Mexico followed the reasoning of Castillo v. County of Santa Fe, stating:

> In Castillo, our Supreme Court determined that the plaintiff had adequately stated a claim under Section 41-4-6 by alleging in the complaint that loose-running dogs on the common grounds of the county-owned and county-operated public housing project represented an unsafe condition, provided the county knew or should have known of the danger and that the danger was foreseeable.

Callaway v. N.M. Dep't of Corr., 1994-NMCA-049 ¶ 15, 875 P.2d at 398 (emphasis added). The Court of Appeals of New Mexico held that the plaintiff had

> [s]tated a claim sufficient to waive immunity under Section 41-4-6 because Defendants knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of

---

[15]The Court predicts that the Supreme Court of New Mexico agrees with the reasoning in Callaway v. New Mexico Department of Corrections. In Callaway v. New Mexico Department of Corrections, the Court of Appeals for New Mexico interpreted the Supreme Court of New Mexico's decision in Castillo v. County of Santa Fe broadly, to permit liability under § 41-4-6 even where the injury resulted in no physical defect to the premises. See Callaway v. N.M. Dep't of Corr., 1994-NMCA-049 ¶ 17, 875 P.2d at 398. In Bober v. New Mexico State Fair, the Supreme Court of New Mexico cited to Castillo v. County of Santa Fe and stated that "[t]he broader view, which we continue to think is the correct view, was articulated by this Court in Castillo v. County of Santa Fe . . . ." Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 27, 808 P.2d at 623.

the penitentiary, and that the danger to other inmates was foreseeable.

Callaway v. N.M. Dep't of Corr., 1994-NMCA-049 ¶ 19, 875 P.2d at 399 (emphasis added).

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. Ann. § 41-4-2(A). The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2(A). As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. § 41-4-2(A). The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2(C). The NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).

A plaintiff may not sue a New Mexico governmental entity or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for governmental entities and public employees. See Begay v. State, 1985-NMCA-117 ¶ 10, 723 P.2d

at 256 ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."),[16] rev'd on other grounds by Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306. "A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1251 (D.N.M. 2010)(Browning, J.), aff'd, 499 Fed. App'x 771 (10th Cir. 2012)(unpublished). Accord Barreras v. State of N.M. Corr. Dep't, 2003-NMCA-027 ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act.");[17] Chavez v. City of Albuquerque, 1998-NMCA-004 ¶ 8, 952 P.2d 474, 477 (noting that a

---

[16]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Begay v. State, that, for a plaintiff to sue a governmental entity, the entity must come within one of the NMTCA's exceptions, and that a plaintiff may not imply the governmental entity's consent to suit. Section 41-4-2 provides in part: "[I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act." N.M. Stat. Ann. § 41-4-2. The NMTCA also states that governmental entities and public employees acting in the scope of their duties shall be immune from liability for torts except as the NMTCA waives. See N.M. Stat. Ann. § 41-4-4. The Supreme Court of New Mexico has consistently reaffirmed that, for a plaintiff to sue a governmental entity or public employee acting within the scope of his or her duties, an NMTCA immunity waiver must apply. See, e.g., Thompson v. City of Albuquerque, 2017-NMSC-021 ¶ 6, 397 P.3d 1279, 1281; Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021 ¶ 6, 916 P.2d at 1313.

[17]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Barreras v. State of New Mexico Corrections Department that, absent affirmative legislation, New Mexico courts do not permit private lawsuits to enforce New Mexico constitutional rights if no NMTCA immunity waiver applies. In Begay v. State, the Supreme Court

plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity);[18] Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127 ¶ 11, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board);[19] Begay v. State, 1985-NMCA-117 ¶ 14, 723 P.2d at 257 (finding that no waiver existed in NMTCA for suit for damages under Article II, § 11 of the New Mexico Constitution -- a provision that protects the "free exercise of religion"). The NMTCA does not limit the availability of many forms of equitable relief. See N.M. Stat. Ann. § 41-4-17(A) ("Nothing in this section shall be construed to prohibit any proceedings for mandamus, prohibition, habeas corpus, certiorari, injunction or quo warranto."); El Dorado Utils. Inc. v. Eldorado Area Water and Sanitation Dist.,

_____

of New Mexico dismissed plaintiff's state constitutional claims against a governmental entity, because no NMTCA waiver applied. See Begay v. State, 1985-NMCA-117 ¶ 14, 723 P.2d at 257 ("We have determined that plaintiffs may not sue the state without its consent and that there is no express waiver for the medical examiner under the Tort Claims Act."). The Court notes that in Begay v. State, as discussed supra n.16, clarifies that "[c]onsent to be sued may not be implied" under the NMTCA. Begay v. State, 1985-NMCA-117 ¶ 10, 723 P.2d 252, 256.

[18]For the reasons discussed supra n.16, the Court concludes that the Supreme Court of New Mexico would, if presented with the issue, agree with this assertion in Chavez v. City of Albuquerque.

[19]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in Rubio v. Carlsbad Municipal School District, because none of the express waivers under §§ 41-4-5 to -12 permit recovery for damages arising out of educational malpractice claims, and § 41-4-4(A) clearly exempts governmental entities and public employees acting within the scope of their duties from liability except as waived in sections 41-4-5 to -12. See N.M. Stat. Ann. §§ 41-4-5 to -12. As discussed supra n.16, the Supreme Court of New Mexico requires an express NMTCA immunity waiver to permit an NMTCA suit against a governmental entity or a public employee acting within the scope of his or her duties.

2005 NMCA 036 ¶ 28, 109 P.3d 305, 312 ("The Tort Claims Act would not bar a claim for injunctive relief.").[20]  Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees must be dismissed.  See Begay v. State, 1985-NMCA-117 ¶ 8, 723 P.2d at 255.

## LAW REGARDING NMTCA § 41-4-6

Section 41-4-6 exempts from immunity "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."  N.M. Stat. Ann. § 41-4-6.  Section 41-4-6's exemption balances the principle that "government should not have the duty to do everything that might be done" with the desire "to compensate those injured by the negligence of public employees and to impose duties of reasonable care."  Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049 ¶ 6, 970 P.2d 1143, 1145 (citations and internal quotation marks omitted).  To resolve the tension between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general immunity from tort liability, [and] waive[s] that immunity in certain defined circumstances."  Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049 ¶ 6, 970 P.2d at 1145.  Section 41-4-6

---

[20]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with El Dorado Utilities, Inc. v. Eldorado Area Water and Sanitation District, that nothing in the NMTCA bars a separate claim for injunctive relief.  While the Supreme Court of New Mexico has clarified that the NMTCA is "the exclusive remedy for any action for damages against the government," Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046 ¶ 14, 899 P.2d 1132, 1135, the Act only limits damages brought against the state or state employees acting within the scope of their duty and does not limit plaintiffs from seeking other forms of injunctive relief, see Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046 ¶ 14, 899 P.2d at 1135.

allows individual claims against governmental entities that are based on "the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment, or furnishings." [NMTCA § 41-4-6]. For the waiver to apply, the negligent "operation or maintenance" must create a dangerous condition that threatens the general public or a class of users of the building.

Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 8, 141 P.3d at 1261.

The Supreme Court of New Mexico has adopted a broad interpretation of what constitutes a "building, public park, machinery, equipment, or furnishings." N.M. Stat. Ann. § 41-4-6. Like common-law premises liability, the § 41-4-6 waiver may apply even when the negligence at issue occurred outside the boundaries of property owned and operated by the government. "[T]he duty of a landowner to exercise ordinary care to avoid creating, or permitting an unreasonable risk of harm to others is not determined by . . . the happenstance that the accident and resulting injury occur inside or outside the property boundary." Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 12, 808 P.2d at 618-19. The Supreme Court of New Mexico explained, furthermore, that "[w]hile [§] 41-4-6 may appropriately be termed a 'premises liability' statute, the liability envisioned by that section is not limited to claims caused by injuries occurring on or off certain 'premises,' as the words 'machinery' and 'equipment' reveal." Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049 ¶ 9, 970 P.2d at 1146 (quoting N.M. Stat. Ann. § 41-4-6). Also, like common-law premises liability, § 41-4-6 does not require that the negligence be related to a physical aspect of the building, machinery, or equipment. "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building.") Encinias v. Whitener Law Firm, P.A., 2013-NMCA-045 ¶ 10, 299 P.3d 424, 428 (quoting Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 9, 141

P.3d at 1261).  Section 41-4-6 instead "contemplates waiver of immunity where due to the alleged

negligence of public employees an injury arises from an unsafe, dangerous, or defective condition

on property owned and operated by the government."  Bober v. N.M. State Fair, 1991-NMSC-031

¶ 27, 808 P.2d at 623 (citations and internal quotation marks omitted).

The Supreme Court of New Mexico has also interpreted § 41-4-6's phrase "operation and

maintenance" somewhat broadly.  See N.M. Stat. Ann. § 41-4-6.  "[Operation and maintenance]

is not 'limited [in] its applicability strictly to defects in the physical building.'"  Johnson ex rel.

Estate of Cano v. Holmes, 455 F.3d 1133, 1139 (10th Cir. 2006)(quoting Upton v. Clovis Mun.

Sch. Dist., 2005-NMCA-085 ¶ 6, 141 P.3d at 1260-61).  New Mexico courts have, however, found

that § 41-4-6's waiver of immunity does not extend to negligent supervision, see Pemberton v.

Cordova, 1987-NMCA-020 ¶ 5, 734 P.2d at 256,[21] negligent design, see Rivera v. King, 1988-

_____

[21]The Court predicts that the Supreme Court of New Mexico would, if presented with the
issue, agree with Pemberton v. Cordova, that negligent supervision generally does not waive
immunity.  The Supreme Court of New Mexico clarified in Encinias v. Wheeler Law Firm, P.A.,
2013-NMSC-045 ¶ 14, 310 P.3d 611, 617, that while there is no waiver of immunity for negligent
supervision, "prisons cannot turn a blind eye to threats to their inmates' safety." 2013-NMSC-045
¶ 14, 310 P.3d at 617.  Although the Supreme Court of New Mexico clarified in Encinias v.
Wheeler Law Firm, P.A. that the Court of Appeals of New Mexico's narrow read of § 41-4-6(A)
has since been discredited, it acknowledged that "its central premise, when analyzed under a
premises liability theory, is still valid."  Encinias v. Wheeler Law Firm, P.A., 2013-NMSC-045
¶ 13, 310 P.3d at 617.  Negligent supervision alone is not enough to waive immunity under
§ 41-4-6(A), but allegations that a governmental entity was negligent "in failing to exercise
reasonable care to discover and prevent dangerous conditions caused by people on its premises,"
even where that care is supervisory in nature, might waive immunity under § 41-4-6(A).
See Encinias v. Wheeler Law Firm, P.A., 2013-NMSC-045 ¶ 13, 310 P.3d at 617.  In Espinoza v.
Town of Taos, 1995-NMSC-070, 905 P.2d 718, the Supreme Court of New Mexico stated:
"However, Section 41-4-6 does not grant a waiver for claims of negligent supervision. . . ."
Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (citing Pemberton v. Cordova,
1987-NMCA-020 ¶ 5, 734 P.2d at 256).

NMCA-093 ¶¶ 29-34, 765 P.2d 1187, 1194, <u>cert. denied</u>, No. 18,041, 765 P.2d 758 (1988)(unpublished table opinion),[22] negligent inspection, <u>see</u> <u>Martinez v. Kaune</u>, 1987-NMCA-131 ¶¶ 5-10, 745 P.2d 714, 716-17, <u>cert. denied</u>, No. 17,361, 744 P.2d 912 (1987)(unpublished table opinion),[23] negligent regulation and investigation of violations, <u>see</u> <u>Caillouette v. Hercules, Inc.</u>, 1992-NMCA-008 ¶ 31, 827 P.2d 1306, 1312;[24] or negligent

_____

[22]The Court predicts that the Supreme Court of New Mexico would, if presented with the issue, agree with <u>Rivera v. King</u> that negligent design does not fit within § 41-4-6's grounds for an immunity waiver, based on <u>Espinoza v. Town of Taos</u>, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (stating that § 41-4-6 does not grant a waiver for claims of negligent design)(citing <u>Rivera v. King</u>, 1988-NMCA-093 ¶¶ 29-34, 765 P.2d at 1194).

[23]The Court predicts that the Supreme Court of New Mexico would, if presented with the issue, agree with <u>Martinez v. Kaune</u> that negligent inspection does not fit within § 41-4-6's grounds for an immunity waiver, based on <u>Espinoza v. Town of Taos</u>, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (stating that § 41-4-6 does not grant a waiver for claims of negligent inspection)(citing <u>Martinez v. Kaune</u>, 1987-NMCA-131 ¶¶ 5-10, 745 P.2d at 716-17).

[24]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the Court of Appeals of New Mexico in <u>Caillouette v. Hercules, Inc.</u> that negligent regulation and investigation of violations alone does not fall within the scope of the § 41-4-6 waiver, based on the Supreme Court of New Mexico's decision in <u>Romero v. State</u>, 1991-NMSC-071, 851 P.2d 628, and its denial of certiorari after <u>Caillouette v. Hercules</u>. In <u>Romero v. State</u>, the Supreme Court of New Mexico concluded that the New Mexico State Highway Department's statutory responsibilities constituted supervision of "maintenance" and fell within the § 41-4-6 waiver's scope. 1991-NMSC-071 ¶ 6, 815 P.2d at 630. The Supreme Court of New Mexico stated that "the greater supervisory responsibilities contemplated by the 1986 law included more than issuing regulations. Those responsibilities could have included supervising the county's actual day-to-day maintenance of the roadway." <u>Romero v. State</u>, 1991-NMSC-071 ¶ 9, 815 P.2d at 630. In <u>Romero v. State</u>, the Supreme Court of New Mexico suggested that, if the Highway Department's only responsibility had been to issue regulations, its actions would not have constituted maintenance. <u>See</u> 1991-NMSC-071 ¶ 9, 815 P.2d at 630. Although the Court is reluctant to read too much into the denial of a petition for certiorari, the Supreme Court of New Mexico did deny certiorari in <u>Caillouette v. Hercules</u>, evincing a disinclination to reconsider the Court of Appeals of New Mexico's decision in <u>Caillouette v. Hercules</u>. <u>See</u> <u>Caillouette v. Archibeque</u>, No. 20,355, 826 P.2d 573 (1992)(unpublished table decision).

classification of a prison inmate, see Archibeque v. Moya, 1993-NMSC-079 ¶¶ 9-12, 866 P.2d at 348.

Although negligent supervision alone is not enough to trigger the § 41-4-6 waiver, "a claim that involves elements of negligent supervision can still fall under the waiver if that supervision is directly tied to the operation . . . of the building." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 16, 141 P.3d at 1263. See Leitheid v. City of Santa Fe, 1997-NMCA-041 ¶¶ 3-4, 940 P.2d 459, 467;[25] Romero v. State, 1991-NMSC-071 ¶ 9, 815 P.2d 628, 630 (the Highway Department's maintenance responsibilities included "supervising the county's actual day-to-day maintenance of the roadway."), receded from on other grounds by Dunleavy v. Miller, 1993-NMSC-059, 862 P.2d 1212. In Leitheid v. City of Santa Fe, city pool lifeguards failed to ask for childrens' ages and heights, although pool regulations required adult supervision for children younger than seven and shorter than forty-eight inches. See Leitheid v. City of Santa Fe,

---

[25]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the reasoning of the Court of Appeals of New Mexico in Leitheid v. City of Santa Fe, in which the Court of Appeals of New Mexico concluded that the City's failure to provide adequate lifeguard supervision constituted negligent operation of a swimming pool, because the City's negligence created a "dangerous condition on the physical premises which affects the swimming public at large." Leitheid v. City of Santa Fe, 1997-NMCA-041 ¶ 15, 940 P.2d at 463. In Seal v. Carlsbad Independent School District, 1993-NMSC-049 ¶¶ 10-11, 860 P.2d 743, 746, the Supreme Court of New Mexico suggested that, by not providing lifeguards, a school district may have waived immunity because its negligence caused an unsafe, dangerous, or defective condition on property owned and operated by the government. See 1993-NMSC-049 ¶¶ 10-11, 860 P.2d at 746. In Espinoza v. Town of Taos, the Supreme Court of New Mexico cited to Seal v. Carlsbad Independent School District as an example of a case under § 41-4-6 concerning negligent conduct that itself created an unsafe condition for the public, permitting a waiver of immunity. See Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 14, 905 P.2d at 722.

1997-NMCA-041 ¶ 2, 940 P.2d at 460-61.  The Court of Appeals of New Mexico found that when

the "lifeguards did not adequately perform duties that were essential to public safety, they

negligently operated the swimming pool and thereby created a condition on the premises that was

dangerous to [the child] and the general public."  Leitheid v. City of Santa Fe, 1997-NMCA-041

¶ 12, 940 P.2d at 462.  The school's conduct in Upton v. Clovis Municipal School District went

beyond negligent supervision, because: "(i) the school ignored information that the plaintiffs

provided them; (ii) the school failed to warn the substitute teacher about the student's condition;

and (iii) the school failed to follow through with the proper emergency procedures."  C.H. v. Los

Lunas Schools Bd. of Educ., 852 F. Supp. 2d at 1353 (citing Upton v. Clovis Mun. Sch. Dist.,

2006-NMSC-040 ¶ 18, 141 P.3d at 126).  In Rave v. Board of Commissioners for the County of

Bernalillo, 2017 WL 3600452, at *10, Judge Brack found that § 41-4-6's waiver applied where

"the County's employees ignored information [plaintiff] gave them about his medical condition,

failed to staff the facility or manage or train its employees to render aid to inmates with medical

conditions, and failed to follow through with and/or enforce its policies related to inmates with

medical issues."  Rave v. Bd. of Comm'rs for the Cty. of Bernalillo, 2017 WL 3600452, at *10.

 In the prison context, the Supreme Court of New Mexico has held that "[t]he 'operation'

and 'maintenance' of the penitentiary premises, as these terms are used in [§] 41-4-6, does not

include the security, custody, and classification of inmates. . . .  Section 41-4-6 does not waive

immunity when public employees negligently perform such administrative functions."

Archibeque v. Moya, 1993-NMSC-079 ¶ 8, 866 P.2d at 347 (citations omitted).  In Archibeque v.

Moya, Chris Archibeque, an inmate at the Central New Mexico Correction Facility, was

transferred to the New Mexico State Penitentiary in Santa Fe, New Mexico. See 1993-NMSC-079 ¶ 2, 866 P.2d at 346. Before being released into general population, a prison intake officer, Moya-Martinez, met with Archibeque to discuss whether he had any known enemies within the prison's general population. See 1993-NMSC-079 ¶ 2, 866 P.2d at 346. Archibeque informed Moya-Martinez that another inmate, Gallegos, was one of his enemies, and Moya-Martinez, without checking an available list of current inmates, informed Archibeque that Gallegos was no longer at the prison. See 1993-NMSC-079 ¶ 2, 866 P.2d at 346. Archibeque was released into general population, and Gallegos assaulted him that night. See 1993-NMSC-079 ¶ 2, 866 P.2d at 346. Archibeque sued Moya-Martinez, other corrections officers, and the New Mexico Department of Corrections in federal court for violations under 42 U.S.C. § 1983 and the NMTCA. See 1993-NMSC-079 ¶ 3, 866 P.2d at 346. The district court interpreted § 41-4-6 narrowly and held that the statute did not waive immunity for negligent security and custody of inmates at the penitentiary. See 1993-NMSC-079 ¶ 4, 866 P.2d at 346. Thereafter, Archibeque's § 1983 claims were resolved in favor of Moya-Martinez and the other corrections employees. See 1993-NMSC-079 ¶ 4, 866 P.2d at 346. The federal district court denied Archibeque's motion for reconsideration. See 1993-NMSC-079 ¶ 4, 866 P.2d at 346. Archibeque appealed, and the Tenth Circuit certified a question to the Supreme Court of New Mexico:

> Does [Section 41-4-6] of the New Mexico Tort Claims Act, [NMTCA Sections 41-4-1 to -29], provide immunity from tort liability to an employee of the state penitentiary whose alleged negligence in releasing a prisoner into the general prison population, which included known enemies of the prisoner, resulted in the prisoner being beaten and injured by one of his enemies?

See 1993-NMSC-079 ¶ 1, 866 P.2d at 345-46. Archibeque argued that Moya-Martinez was

participating in the operation of the penitentiary when she classified Archibeque as an inmate who could safely be released into the general prison population, and he argued that Moya-Martinez's alleged negligence in misclassifying him and releasing him into the general population constituted negligent operation of the penitentiary, thereby waiving immunity under § 41-4-6. See 1993-NMSC-079 ¶ 5, 866 P.2d at 346-47. The Supreme Court of New Mexico found that § 41-4-6 did not waive Moya-Martinez' immunity, stating: "The 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in Section 41-4-6, does not include the security, custody, and classification of inmates." See 1993-NMSC-079 ¶ 8, 866 P.2d at 347 (quoting N.M. Stat. Ann. § 41-4-6). The Supreme Court of New Mexico reasoned that Moya-Martinez was not operating and maintaining the prison's physical premises when she negligently classified Archibeque.

> Rather, she was performing an administrative function associated with the operation of the corrections system. Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions. To read Section 41-4-6 as waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute. See State v. Riddall, 112 N.M. 78, 80, 811 P.2d 576, 578 (Ct. App.)(stating that when interpreting a statute, an appellate court is required to consider the plain meaning of the words used and the intended purpose of the statute), cert. denied, 112 N.M. 21, 810 P.2d 1241 (1991).

1993-NMSC-079 ¶ 8, 866 P.2d at 347. The Supreme Court of New Mexico further explained:

> While Moya-Martinez's misclassification of Archibeque put him at risk, the negligence did not create an unsafe condition on the prison premises as to the general prison population. Reading Section 41-4-6 to waive immunity every time a public employee's negligence creates a risk of harm for a single individual would subvert the purpose of the Tort Claims Act, which recognizes that government, acting for the public good, "should not have the duty to do everything that might be done," and limits government liability accordingly. See Section 41-4-2(A).

1993-NMSC-079 ¶ 11, 866 P.2d at 348. According to the Supreme Court of New Mexico, to permit a waiver of immunity under § 41-4-6 whenever injury results from a negligently performed administrative task "would undermine the purpose of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate." 1993-NMSC-079 ¶ 14, 866 P.2d at 349. Chief Justice Ransom stated that, whereas a "discrete administrative decision" does not waive immunity, a "general condition of unreasonable risk from negligent security practices" could waive immunity. Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266 (quoting Archibeque v. Moya, 1993-NMSC-079 ¶ 16, 866 P.2d at 349 (Ransom, C.J., concurring)).

The Court has concluded that Chief Justice Ransom determined that § 41-4-6 applies when alleged negligence changes the condition of the premises in question, and when the plaintiff's injuries arise from the premises' condition. See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266. In the context of inmate misclassification claims, the Court has concluded that a conclusory allegation that one inmate's misclassification created a danger for the inmate population could not support finding a waiver under § 41-4-6, and found that, to come within Chief Justice Ransom's footnote, inmate misclassification -- allegedly performed negligently -- must raise security risks, not health risks. See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266. "The Court is reluctant to expand Chief Justice Ransom's possible exception to other areas beyond prison security." Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266-67.

New Mexico caselaw after Archibeque v. Moya suggests that, for negligent supervision, operation, or security practices to constitute negligent operation and maintenance, the negligent

condition created must threaten the safety of the public or of a class of users -- not merely one individual.  In Archibeque v. Moya, the Supreme Court of New Mexico noted that, "[w]hile a segment of the population at risk might justify waiver of immunity under Section 41-4-6, a situation in which a single inmate is put at risk is not comparable."  1993-NMSC-079 ¶ 14 n.3, 866 P.2d at 349 n.3.  Chief Justice Ransom's concurring opinion noted:

> I concur because there was no showing that the general prison population reflected anything but the reasonable and expected risks of prison life.  The classification of Archibeque did not change the condition of the premises.  I see Archibeque's injuries as having been proximately caused by a discrete administrative decision.  As an alternative to releasing Archibeque into the general population, he could have been placed in administrative segregation, a form of protective custody.  The risk arose not from a condition of the premises (as with the wild dogs in Castillo or, arguably, the inadequate health care facilities in Silva [v. State, 1987-NMSC-107, 745 P.2d 380]); it arose from the classification itself.

1993-NMSC-079 ¶ 17, 866 P.2d at 350 (Ransom, C.J., concurring).  After Archibeque v. Moya, the Supreme Court of New Mexico clarified that, for § 41-4-6's waiver to apply, the question is not whether the alleged negligence created an actual risk of harm for only a single individual, but rather whether the alleged negligence created a condition that poses a potential risk to the general public or to a class of people using the premises in question.  See Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 8, 141 P.3d at 1261.

In Leitheid v. City of Santa Fe, the Court of Appeals of New Mexico determined that the plaintiffs' claim was not merely negligent supervision, but rather negligent operation, creating a dangerous condition with a potential risk for more than just a single individual.  See Leitheid v. City of Santa Fe, 1997-NMCA-041 ¶ 5, 940 P.2d at 467.  In Upton v. Clovis Municipal School District, the Supreme Court of New Mexico held that, "[i]f the only alleged misconduct toward

Sarah had been the substitute P.E. teacher failing to watch her while she participated in physical exercise, the Upton's claim . . . would be practically identical to the single claim of negligent supervision we found inadequate in Espinoza." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040-¶ 21, 141 P.3d at 1264. In Espinoza v. Town of Taos, the Supreme Court of New Mexico concluded that, for § 41-4-6's waiver to apply, "the critical question is whether the condition creates a potential risk to the general public." 1995-NMSC-070 ¶ 9, 905 P.2d at 683. Section 41-4-6's waiver may also apply if the negligent operation or maintenance creates a dangerous condition that threaten "a class of users of the building." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 8, 141 P.3d at 1261. See Rave v. Bd. of Comm'rs for Cty. of Bernalillo, 2017 WL 3600452, at *10 (defining the class of building users as "incarcerated inmates with medical issues."); Castillo v. Cty. of Santa Fe, 1988-NMSC-037 ¶ 9, 755 P.2d at 51 (holding that, "[g]iven the potential for the safety of Valle Vista residents and invitees to be compromised by this situation, we find that, under the right circumstances, loose-running dogs could represent an unsafe condition upon the land").

New Mexico courts have also required that, for § 41-4-6's waiver to apply, the public employees knew or should have known of the danger posed by the condition. In Callaway v. New Mexico Department of Corrections, 1994-NMCA-049 ¶ 19, 875 P.2d at 399,[26] the Court of

---

[26]The Court predicts that the Supreme Court of New Mexico agrees with the Court of Appeals of New Mexico in Callaway v. New Mexico Department of Corrections that § 41-4-6's waiver applies where a prison knew certain inmates were dangerous and failed to supervise them, based on the Supreme Court of New Mexico's favorable citations to Callaway v. New Mexico Department of Corrections. See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045 ¶ 10, 310 P.3d at 616 ("A prison creates a dangerous condition by allowing known gang members to

Appeals of New Mexico held that the New Mexico Department of Corrections "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." 1994-NMCA-049 ¶ 19, 875 P.2d at 399. The Court of Appeals of New Mexico additionally noted, in "support for [its] holding[,]" that the "inmate assailant was unusually dangerous and the prison authorities had knowledge of the danger posed by the inmate." 1994-NMCA-049, ¶ 19, 875 P.2d at 399 (alterations added). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1251-56; C.H. v. Los Lunas Sch. Bd. of Educ., 852 F. Supp. 2d at 1358-59 (holding that allegations of negligence against the defendants fell within the § 41-4-6 waiver, in part, because the plaintiff "adequately allege[d] that the defendants knew or should have known of the dangerous condition").

The Court has also addressed waiver of NMTCA immunity under § 41-4-6 in several other opinions. In Stark-Romero v. National Railroad Passenger Co. (AMTRAK), 805 F. Supp. 2d 1145 (D.N.M. 2011)(Browning, J.), the Court held that immunity was not waived under § 41-4-6 for the plaintiffs' ingress and egress from a waste transfer facility, because, although New Mexico is liberal in protecting people traveling on public land, such a duty would be without limits. See 805

---

congregate in a recreation room that is shielded from observation by guards. *Callaway*, 1994-NMCA-049, ¶¶ 4, 19, 117 N.M. 637, 875 P.2d 393."); Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 23, 141 P.3d at 1264 (citing Callaway v. New Mexico Department of Corrections for the assertion that, for § 41-4-6's purposes, a condition must be at least potentially dangerous to the particular class of people using a building or facility in question, rather than actually dangerous to the entire public); Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 13, 905 P.2d at 722 (discussing Callaway v. New Mexico Department of Corrections and quoting the Court of Appeals of New Mexico's findings).

F. Supp. 2d at 1177.  The Court found that the plaintiffs' injuries, in that case, did not arise from an unsafe, dangerous, or defective condition of the defendant's property.  See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d at 1182.  In Trujillo v. Salazar, No. CIV 04-0689 JB/WDS, 2006 WL 1228827 (D.N.M. March 1, 2006)(Browning, J.), the Court found that immunity was not waived under § 41-4-6, because "the gravamen of the negligent operation claim against Salazar was not that Salazar himself ha[d] committed negligence by showing up to work every day, but that [the Central New Mexico Correctional Facility ("CNMCF")] negligently operated the facility by allowing Salazar to continue working at the facility."  2006 WL 1228827, at *9 (emphasis omitted).  The Court further held that, "[t]o the extent that Trujillo may be arguing that Salazar negligently operated CNMCF by carrying on his employment at CNMCF after the first two alleged incidents, his decision to persist in his job was not a condition on the premises." Trujillo v. Salazar, 2006 WL 1228827, at *9.  In Williams v. Board of Regents of University of New Mexico, 20 F. Supp. 3d 1177, 1195 (D.N.M. 2014)(Browning, J.), the Court concluded that a claim brought under § 41-4-6 on the basis of negligent misclassification of an inmate would likely fail if the alleged negligence only exposed a plaintiff to health risks, rather than security risks.  The Court cited to Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266, in which the Court stated that, to fall within Chief Justice Ransom's concurrence in Archibeque v. Moya, a misclassification "must raise security risks, not health risks."  Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266.

## LAW REGARDING NMTCA § 41-4-9

Section 41-4-9 of the NMTCA provides:

The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.

N.M. Stat. Ann. § 41-4-9. "Section 41-4-9 applies to the operation of facilities which provide medical care directly to people." Redding v. City of Truth or Consequences, 1984-NMCA-132 ¶ 8, 693 P.2d 594, 596.[27] The Court of Appeals of New Mexico found it significant that the New

---

[27]The Court believes that the Supreme Court of New Mexico is likely to agree with Redding v. City of Truth or Consequences, if presented with the issue. Section 41-4-9's text lists the applicable facilities as "any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities." N.M. Stat. Ann. § 41-4-9. The Supreme Court of New Mexico declines to

add words except where necessary to make the statute conform to the obvious intent of the legislature, or to prevent its being absurd. Morruzi v. Federal Life & Cas. Co., 42 N.M. 35, 75 P.2d 320, 115 A.L.R. 407. But where the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity, or contradiction, the statute will be construed according to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others. State v. Southern Pacific Co., 34 N.M. 306, 281 P.29; Janney v. Fullroe, 47 N.M. 423, 144 P.2d 145.

State v. Nance, 1966-NMSC-207 ¶ 16, 419 P.2d 242, 247, abrogated on other grounds by State v. Wilson, 2011-NMSC-001, 248 P.3d 315. In Begay v. State, the Court of Appeals of New Mexico cited to Redding v. City of Truth or Consequences to support its conclusion that Office of the Medical Investigator is not a like facility as contemplated by § 41-4-9. See Begay v. State, 1985-NMCA-117 ¶ 11, 723 P.2d at 256. The United States Court of Appeals for the Tenth Circuit noted that the Court of Appeals of New Mexico "refused in Begay to read 'the operation of the state medical investigator's office' into this exception. Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d 1114, 1117 (quoting Begay v. State, 1985-NMCA-117 ¶ 11, 723 P.2d at 256). Although this case was reversed by the New Mexico Supreme Court, the reversal was based on other grounds, and we believe that this decision provides sufficient evidence of how New Mexico's courts would rule on this issue." Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d at 1117. The Court agrees with the Tenth Circuit that the Supreme Court of New Mexico's reversal of Begay v. State on other grounds provides evidence of how it would rule on the issue of what facilities are "like facilities" pursuant to § 41-4-9, and considering Begay v. State adopted the

Mexico Legislature did not use the word "maintenance" in § 41-4-9 and concluded "that the legislature chose to provide a more limited waiver for the activities of public employees in connection with a mental institution or clinic than it provided for other activities of public employees." Armijo v. Dep't of Health and Env., 1989-NMCA-043, at ¶ 11, 775 P.2d at 1335.[28] The Court of Appeals of New Mexico stated that, for § 41-4-9's waiver to apply, the public employee in question must have been involved in clinical decision-making. See Armijo v. Dep't of Health and Env., 1989-NMCA-043, at ¶ 12, 775 P.2d at 1335.

New Mexico courts have generally denied the application of § 41-4-9 and found immunity for the state government entity and employees when medical contractors operate the medical unit in question. See Lee v. McKinley Cty. Adult Det. Ctr., No. CIV 12-1124 MCA/LAM, 2014 WL 12788056, at *10 (unpublished)(D.N.M. Sept. 9, 2014)(Armijo, C.J.)(citing Lessen v. City of Albuquerque, 2008-NMCA-085 ¶ 31, 187 P.3d at 185 (holding that § 41-4-9 did not waive sovereign immunity for the City of Albuquerque, because a medical contractor operates the medical unit at the MDC)); Celaya v. Hall, 2004-NMSC-005, 85 P.3d 239 (recognizing that a governmental entity could not be held liable under the NMTCA for the alleged acts of an

reasoning of Redding v. City of Truth or Consequences, the Court predicts that the Supreme Court of New Mexico would agree with Redding v. City of Truth or Consequences on this issue.

[28]While the Court is reluctant to read too much into a failure to comment, the Court predicts the Supreme Court of New Mexico would, if presented with the issue, find that the New Mexico Legislature intended to provide a more limited waiver in § 41-4-9 by omitting the word "maintenance", and the Court bases its prediction, at least in part, on the fact that in the twenty-nine years since the Court of Appeals of New Mexico decided Armijo v. Department of Health and Environment, numerous Courts of Appeals decisions have relied on it, and the Supreme Court of New Mexico has never issued an opinion challenging its reasoning or ruling.

independent contractor)).  See also Kellum v. Bernalillo Cty., 2015 WL 12859577, at *10 (holding that § 41-4-9 was inapplicable to Bernalillo County because an independent contractor operates the medical unit at the MDC).

In Lee v. McKinley County Adult Detention Center, the Honorable M. Christina Armijo, then-Chief District Judge for the District of New Mexico, stated that, under New Mexico law, "a 'public employee' means an officer, employee or servant of a governmental entity, excluding independent contractors except for individuals defined in Paragraphs (7), (8), (10), (14) and (17) of this subsection."  Lee v. McKinley Cty. Adult Det. Ctr., 2014 WL 12788056, at *10 (quoting N.M. Stat. Ann. § 41-4-3(F)).  Paragraph 7 of § 41-4-3(F) provides an exception to the definition of public employees for "licensed medical, psychological or dental arts practitioners providing services to the corrections department pursuant to contract."  N.M. Stat. Ann. § 41-4-3(F)(7).  In Lee v. McKinley County Adult Detention Center, Chief Judge Armijo concluded that the MDC "does not fall under the corrections department, and thus New Mexico has not waived immunity for the actions of [its medical contractor's] employees."  Lee v. McKinley Cty. Adult Det. Ctr., 2014 WL 12788056, at *10.  See N.M. Stat. Ann. § 33-3-1(A) ("The common jails shall be under the control of the respective sheriffs, independent contractors or jail administrators hired by the board of county commissioners or other local public body or combination thereof."); N.M. Stat. Ann. § 33-3-27(E) (requiring contractors "for the operation or provision and operation of jails" to assume all liability from the jails' provision and operation).

The Court of Appeals of New Mexico has also held, in the context of prison medical units, that "liability against a jail cannot be based on § 41-4-9 when the jail has contracted with a private

entity to provide medical services." Salazar v. San Juan Cty. Det. Ctr., No. CIV 15-0417 JB/LF, No. CIV 15-0439 JB/LF, No. CIV 15-0497 JB/LF, No. CIV 15-0526 JB/LF, 2016 WL 335447, at *49 (unpublished)(D.N.M. Jan. 15, 2016)(Browning, J.)(citing Lessen v. City of Albuquerque, 2008-NMCA-085, ¶¶ 28-30, 187 P.3d at 320).  The Court of Appeals of New Mexico explained:

> We agree with the general proposition stated in *Estelle* [v. Gamble, 429 U.S. 97 (1976)] and *Ancata* [v. Prison Health Servs., Inc., 769 F.2d 700 (11th Cir. 1985)] that governmental entities must provide appropriate medical care to persons they incarcerate.  *See Estelle*, 429 U.S. at 103; *Ancata*, 769 F.2d at 705. Such governmental entities cannot escape that duty by contracting with third parties to provide the medical care, and a governmental entity "remains liable for any constitutional deprivations caused by the policies or customs of the [third party]." *Ancata*, 769 F.2d at 705.  This is not to say, however, that a governmental entity's constitutional obligation equates with waiver of immunity for negligent operation of an infirmary under New Mexico's TCA.  If Plaintiff had alleged and could prove that the City's inadequate medical care deprived Decedent of a constitutional right, Plaintiff might be entitled to recover under the waiver of immunity provided in Section 41-4-12.  But, as discussed in the next section of this opinion, Plaintiff's allegations of conduct that is merely negligent are insufficient to establish such a constitutional violation.  *See Ancata*, 769 F.2d at 703 (indicating that claim of constitutional deprivation in the context of inadequate medical care requires a showing of "deliberate indifference to serious medical needs").

Lessen v. City of Albuquerque, 2008 NMCA-085 ¶¶ 30-31, 187 P.3d at 320. See Morrissey v. Ulibarri, 08-cv-246 WJ/RHS, 2010 WL 11470879, *5 & n.3 (D.N.M. April 28, 2010)(Johnson, J.)(concluding that a plaintiff cannot sue a correctional facility's wardens under § 41-4-9 for preventing an inmate from receiving medication, properly maintaining his colostomy bag, attending critical chemotherapy appointments, and receiving follow-up surgery in a timely manner -- without presenting some evidence at the summary judgment stage that the wardens had supervisory power over the privately-run medical facility).  No state or federal case in New Mexico has held that the § 41-4-9 immunity waiver applies when an independent contractor operates the

medical facility in question. See, e.g., Rave v. Bd. of Comm'rs for the Cty. of Bernalillo, 2017 WL 3600452, at *10-11; Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *49; Kellum v. Bernalillo Cty., 2015 WL 12859577, at *10.

That a contractor operates a medical facility is not necessarily dispositive of the immunity waiver issue as to all non-contractor entities and personnel who might be involved in the operation of that medical facility. See, e.g., Silva v. State, 1987-NMSC-107 ¶ 9, 745 P.2d at 385 (concluding that § 41-4-9's waiver is arguably applicable to the Secretary of Corrections, if the factfinder determines he failed to exercise ordinary care in the discharge of duties found to include the operation or maintenance of healthcare facilities inside the prison). For a non-contractor person or entity to be liable, the claims against them must relate to the actual medical care -- and specifically, to the clinical decision-making or supervision of clinical decision-making -- at the medical unit in question. See Armijo v. Dep't of Health and Env., 1989-NMCA-043, at ¶ 13, 775 P.2d at 1335 (determining that § 41-4-9 could not apply for the plaintiff's negligence claims against the Health and Environment Department ("HED"), because the HED did not regulate the clinical decision-making at the mental health facility, and therefore did not operate the facility within § 41-4-9's meaning); Reese v. Bd. of Cty. Comm'rs of the Cty. of Bernalillo, CIV No. 10-1247 LH/RHS, 2012 WL 13076227, at *7 (D.N.M. Sept. 18, 2012)(Hansen, J.)("Plaintiff's allegations against Defendant Torres and Defendant County relate to their management of the grievance system rather than the actual medical treatment received by inmates at the infirmary. As such, § 41-4-9 does not operate to waive immunity . . . ."); Gallegos v. Trujillo, 1992-NMCA-090 ¶ 18, 839 P.2d 645, 649 ("In *Armijo* we held that an agency's regulation of a

mental health facility was not "operation" of the mental health facility where the agency was not

involved in the actual clinical decision-making . . . .").[29]

## LAW REGARDING NMTCA § 41-4-12

Section 41-4-12 of the NMTCA provides a waiver of immunity for certain torts

committed by law enforcement officers and for negligence that causes a specified tort.

See Caillouette v. Hercules, Inc., 1992-NMSC-008 ¶ 18, 827 P.2d at 1311); Oliveros v. Mitchell,

449 F.3d 1091, 1096 (10th Cir. 2006)(citing Methola v. County of Eddy, 1980-NMSC-145 ¶ 23,

622 P.2d 234, 238;.  Section 41-4-12 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA
> 1978 does not apply to liability for personal injury, bodily injury, wrongful death
> or property damage resulting from assault, battery, false imprisonment, false
> arrest, malicious prosecution, abuse of process, libel, slander, defamation of
> character, violation of property rights or deprivation of any rights, privileges or
> immunities secured by the constitution and laws of the United States or New
> Mexico when caused by law enforcement officers while acting within the scope
> of their duties.

N.M. Stat. Ann. § 41-4-12.

> Thus, in order to state a tort claim under the waiver of immunity set out in
> Section 41-4-12, a plaintiff must demonstrate that the defendants were law
> enforcement officers acting within the scope of their duties, and that the plaintiff's
> injuries arose out of either a tort enumerated in this section or a deprivation of a
> right secured by law.

---

[29]The Court believes the Supreme Court of New Mexico, if presented with the issue, would agree with the Court of Appeals of New Mexico's decision in Gallegos v. Trujillo.  See supra n.27.

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021 ¶ 7, 916 P.2d at

1316.

A law enforcement officer is a "full-time salaried public employee of a governmental entity

whose principal duties under law are to hold in custody any person accused of a criminal offense,

to maintain public order or to make arrests for crimes, or members of the national guard when

called to active duty by the governor."  N.M. Stat. Ann. § 41-4-3.  "New Mexico courts have

construed this definition strictly."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-633,

2009 U.S. Dist. LEXIS 47154, at *10 (D.N.M. April 20, 2009)(Browning, J.).  See, e.g., Montes

v. Gallegos, 812 F. Supp. 1165, 1172 (D.N.M. 1992)(Parker, J.)(holding that the mayor is not a

law enforcement officer under the NMTCA, notwithstanding his statutory authority and obligation

to exercise law enforcement functions); Dunn v. McFeeley, 1999-NMCA-084 ¶ 25, 984 P.2d 760,

767 (holding that the Office of the Medical Investigator's Medical Investigator and the crime

laboratory technician are not law enforcement officers under the NMTCA), cert. denied,

No. 25,764, 981 P.2d 1207 (1999);[30] Coyazo v. State, 1995-NMCA-056 ¶ 20, 897 P.2d 234, 238

---

[30]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in Dunn v. McFeeley that the Office of the Medical Investigator's Medical Investigator and the crime laboratory technician in Dunn v. McFeeley are not law-enforcement officers under the NMTCA.  Section 41-4-3 states that a law-enforcement officer's principal duties under law are to hold persons accused of a criminal offense in custody, to maintain public order or make arrests, or are members of the national guard when the governor calls them to active duty.  See N.M. Stat. Ann. § 41-4-3.  In Chavez-Rodriguez v. City of Santa Fe, the Court stated that New Mexico courts construe the § 41-4-3 definition strictly.  See 2009 U.S. Dist. LEXIS 47154, at *10.  The Court of Appeals of New Mexico concluded that the complaint contained no allegations that the principal duties of the medical investigator and crime scene technician related to law enforcement.  See Dunn v. McFeeley, 1999-NMCA-084 ¶¶ 24-25, 984 P.2d 760, 767.  Furthermore, in Begay v. State, the Court of Appeals of New Mexico concluded that a medical

(holding that the public defender and his staff are not law enforcement officers under § 41-4-3(D));

Callaway v. N.M. Dep't of Corr., 1994-NMCA-049 ¶¶ 11-12, 875 P.2d at 397 (holding that correctional officers at a penitentiary are not law enforcement officers under the NMTCA, notwithstanding their statutory power to make arrests);[31] Vigil v. Martinez, 1992-NMCA-033 ¶

---

investigator is not a law-enforcement officer and the Supreme Court of New Mexico did not alter that determination when it reversed Begay v. State on other grounds. See Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306. Although the Court is reluctant to read too much into a denial of a petition for certiorari, the Supreme Court of New Mexico did deny the petition from Dunn v. McFeeley, suggesting a disinclination to reconsider the Court of Appeals of New Mexico's decision.

[31]While the Court is reluctant to read too much into a denial of a petition of certiorari, the Court predicts that the Supreme Court of New Mexico would, if presented with the issue, conclude that corrections officers are not law-enforcement officers under the NMTCA, and the Court bases its prediction, at least in part, on the fact that the Supreme Court of New Mexico denied the petition for certiorari in Callaway v. New Mexico Department of Corrections. See Callaway v. N.M. Dep't of Corr., 118 N.M. 90, 879 P.2d 91 (unpublished table decision)(denying certiorari). The Court discussed Callaway v. New Mexico Department of Corrections in Lymon v. Aramark Corp., 728 F. Supp. 2d at 1255-56.

In Anchondo v. Corrections Department, the Supreme Court of New Mexico received a certified question from the Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, asking; "Are the Secretary of Corrections and the Warden of the State Penitentiary in Santa Fe 'law enforcement officers within the meaning of Section 41-4-3(D), NMSA 1978?" 100 N.M. at 109, 666 P.2d at 1256. The Supreme Court of New Mexico found that the Secretary of Corrections and the Warden are not law-enforcement officers. See 100 N.M. at 109, 666 P.2d at 1256. The Supreme Court of New Mexico explained:

From looking at the statutes, we see that neither the Secretary of Corrections nor the Warden engage in any of the traditional duties of "law enforcement officers." They do not deal directly with the daily custodial care of prison inmates. Moreover, because they do not have commissions, they have no power to make arrests or to take people into custody should a violation of the public order occur. They are merely administrative officers appointed by the

20, 832 P.2d 405, 412 (holding that probation and parole officers are not law enforcement officers

under the NMTCA);[32] <u>Anchondo v. Corr. Dep't</u>, 1983-NMSC-051 ¶ 14, 666 P.2d 1255, 1258

---

> governor to oversee, administer, and supervise the state's corrections system.

> 100 N.M. at 109-10, 666 P.2d at 1256-57. "To determine whether positions are of a law enforcement nature, this Court will look at the character of the principal duties involved, those duties to which employees devote the majority of their time." <u>Anchondo v. Corr. Dep't</u>, 100 N.M. at 110, 555 P.2d at 1257.

<u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1255-56. In <u>Callaway v. New Mexico Department of Corrections</u>, the Court of Appeals of New Mexico referenced the statutory duties of prison guards as set forth in N.M. Stat. Ann. § 33-2-15:

> The employees of the penitentiary shall perform such duties in the charge and oversight of the penitentiary, care of the property belonging thereto, and in the custody, government, employment and discipline of the convicts as shall be required of them by the corrections division [corrections department] or the warden, in conformity with law and rules and regulations prescribed for the government of the penitentiary.

<u>Callaway v. N.M. Dep't of Corr.</u>, 1994-NMCA-049 ¶ 10, 875 P.2d at 397 (internal quotation marks omitted)(quoting N.M. Stat. Ann. § 33-2-15). The principal statutory duties of corrections officers, pursuant to § 33-2-15, are supervisory, administrative, and custodial, but they do not "hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor." N.M. Stat. Ann. § 41-4-3. Although corrections officers do hold in custody persons who have already been convicted, § 41-4-3 specifies that a law-enforcement officer "hold[s] in custody any person accused of a criminal offense." N.M. Stat. Ann. § 41-4-3.

[32]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with <u>Vigil v. Martinez</u> that probation and parole officers are not law-enforcement officers under the NMTCA. The Court of Appeals of New Mexico explained in <u>Rayos v. State ex rel. New Mexico Department of Corrections, Adult Probation and Parole Division</u>:

> In the more than twenty years since <u>Vigil</u> was decided, the New Mexico Legislature has not amended the statute to include probation and parole officers within the definition of law enforcement officers. Moreover, every subsequent

(holding that the Secretary of Corrections and the Warden of a state penitentiary are not law enforcement officers under the NMTCA).  See also Johnson v. Holmes, 377 F. Supp. 2d 1069, 1083 (D.N.M. 2004)(Browning, J.)("Akin to a law enforcement officer is, as a matter of law, insufficient to waive sovereign immunity under § 41-4-12 NMSA 1978."), aff'd, 455 F.3d 1133 (10th Cir. 2006).

The New Mexico Court of Appeals has held that corrections officers who hold convicted persons in custody are not law enforcement officers under § 41-4-3(D), which defines law enforcement officer as used in § 41-4-12.  See Callaway v. N.M. Dep't of Corr., 1994-NMSC-049 ¶ 12, 875 P.2d at 397 (stating "we affirm the trial court's determination that corrections officers

---

state and federal decision -- both published and unpublished -- on the "law enforcement officer" waiver has followed *Vigil*, albeit with little meaningful analysis or none at all.  See, e.g., *Limacher*, 2008-NMCA-163, ¶ 17, 145 N.M. 344, 198 P.3d 370; *Coyazo*, 1995-NMCA-056, ¶ 17, 120 N.M. 47, 897 P.2d 234; *Trask v. Franco*, 446 F.3d 1036, 1048 (10th Cir. 2006); *Ricks v. N.M. Adult Prob. & Parole Dep't*, No. CV-11-608, slip op. at 32-33 (D.N.M. Aug. 9, 2012); *Wells v. N.M. Adult Prob. & Parole*, No. CV-09-150, slip op. at 3 (D.N.M. Feb. 5, 2010); *Kenney v. New Mexico*, No. CV-07-0422, slip op. at 8 (D.N.M. Oct. 2, 2007).  Against this backdrop, there simply has been no change in the law to warrant a departure from *Vigil*.  See *Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 34, 125 N.M. 721, 965 P.2d 305 (noting, in relevant part, that before overturning precedent, we must consider "whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine" and "whether the facts have changed in the interval from the old rule to reconsideration so as to have robbed the old rule of justification" (internal quotation marks and citation omitted)).  Thus, our sole task here is to determine whether the facts have so changed that the principal duties of probation and parole officers now fall within one of the three relevant categories of principal duties of law enforcement officers enumerated in Section 41-4-3(D) of the TCA.

Rayos v. State ex rel. N.M. Dep't of Corr., Adult Prob. and Parole Div., 2014-NMCA-103 ¶ 11, 336 P.3d 428, 432, cert. denied, Rayos v. State, 2014-NMCERT-010, 339 P.3d 426 (Table), cert. quashed, Rayos v. State, 2015-NMCERT-007, 368 P.3d 2 (Table).

are not law enforcement officers under Section 41-4-3(D)"). In Anchondo v. Corrections Department, the Supreme Court of New Mexico received a certified question from the Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, asking: "Are the Secretary of Corrections and the Warden of the State Penitentiary in Santa Fe 'law enforcement officers' within the meaning of Section 41-4-3(D), NMSA 1978?" 1983-NMSC-051 ¶ 1, 666 P.2d at 1255. The Supreme Court of New Mexico found that the Secretary of Corrections and the Warden are not law enforcement officers. See 1983-NMSC-051 ¶ 7, 666 P.2d at 1256. The Supreme Court of New Mexico explained:

> From looking at the statutes, we see that neither the Secretary of Corrections nor the Warden engage in any of the traditional duties of "law enforcement officers." They do not deal directly with the daily custodial care of prison inmates. Moreover, because they do not have commissions, they have no power to make arrests or to take people into custody should a violation of the public order occur. They are merely administrative officers appointed by the governor to oversee, administer, and supervise the state's corrections system.

Anchondo v. Corr. Dep't, 1983-NMSC-051 ¶ 7, 666 P.2d at 1256.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics,

LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[33] If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that

---

[33]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing <u>Wade v. EMCASCO Ins.</u>, 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state"))).[34] The Court may also rely on

---

[34]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State. An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question. We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts. It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[35]  Ultimately, "the Court's task is to predict what the

---

who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."  (emphasis and title case omitted)).

[35]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit

precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered,

but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's Federal Practice § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to

consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent

- 103 -

state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.).

## ANALYSIS

Rodriguez-Nuñez and Muñoz move the Court to dismiss the state-law claims in Tanner's

---

decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc.,] 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

Amended Complaint asserted against them, which are the only claims Tanner asserts against them. The Court has carefully considered the claims in the Amended Complaint and, taking all well-pled factual allegations as true, the Court concludes that Tanner has not stated facts to support applying the § 41-4-6 and § 41-4-9 waivers against Rodriguez-Nuñez and Muñoz. Because the Defendants' immunity under the NMTCA is not waived, Tanner has stated no NMTCA claim against them in Counts IV and VII upon which the Court can grant relief. The Court will therefore dismiss those Counts as asserted against Rodriguez-Nuñez and Muñoz. Having dismissed all Counts asserted against Rodriguez-Nuñez and Muñoz, the Court will dismiss them from the case.

I.  **THE COURT WILL DISMISS TANNER'S ALLEGATIONS AGAINST RODRIGUEZ-NUÑEZ, BECAUSE THEY FALL OUTSIDE THE NMTCA'S WAIVERS OF IMMUNITY FOR STATE EMPLOYEES.**

Rodriguez-Nuñez argues that the Court should dismiss Counts IV and VII of the Amended Complaint, asserted against her, because the Counts' claims of negligence fall outside of the waivers of immunity in the NMTCA -- specifically, in § 41-4-6 and § 41-4-9. Tanner does not dispute that Rodriguez-Nuñez is a public employee acting within the scope of her duties and thus is "granted immunity from liability for any tort except as waived by Sections 41-4-5 through 41-4-12." Archibeque v. Moya, 1993-NMSC-079 ¶ 5, 866 P.2d at 346 (quoting § 41-4-4(A)). See Amended Complaint ¶ 12, at 4 ("At all relevant times, they were acting under the color of law and

within the scope of their duties and employment as corrections officers at MDC.").  Tanner argues that Rodriguez-Nuñez falls within the § 41-4-6 and § 41-4-9 waivers.

A.    **TANNER'S CLAIMS ASSERTED AGAINST RODRIGUEZ-NUÑEZ DO NOT ALLEGE NEGLIGENT OPERATION OR MAINTENANCE OF PREMISES, AND, THEREFORE, FALL OUTSIDE § 41-4-6's WAIVER.**

In Count IV of the Amended Complaint, Tanner alleges that Rodriguez-Nuñez denied or delayed responding to Tanner's initial request for medical attention during a medical emergency.  See Amended Complaint ¶ 46, at 13.  Tanner's claim of negligence against Rodriguez-Nuñez is based only on her alleged denial or delay in responding to Tanner's initial request for medical attention.  Section 41-4-6 exempts public employees from "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment, or furnishings."  N.M. Stat. Ann. § 41-4-6.  This waiver "may appropriately be termed a 'premises liability' statute."  Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 27, 808 P.2d at 614.  The Supreme Court of New Mexico interprets the waiver broadly to waive immunity "where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government."  Castillo v. Cty. Of Santa Fe, 1988-NMSC-037 ¶ 3, 755 P.2d at 48.  "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building."  Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 9, 141 P.3d at 1259.

The Supreme Court of New Mexico has held that "Section 41-4-6 does not waive immunity when public employees negligently perform . . . administrative functions."  Archibeque v. Moya,

1993-NMSC-079 ¶ 5, 866 P.2d at 347.  In <u>Archibeque v. Moya</u>, the Supreme Court of New Mexico concluded: "The 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in Section 41-4-6, does not include the security, custody, and classification of inmates." <u>Archibeque v. Moya</u>, 1993-NMSC-079 ¶ 5, 866 P.2d at 347 (quoting N.M. Stat. Ann. § 41-4-6). Tanner alleges that Rodriguez-Nuñez is involved in the MDC's operation and maintenance, because

> inmates and medical personnel cannot physically move from one part of the building to another, or obtain transport to an outside medical facility such as a hospital, without a public employee's operation and maintenance of specialized machinery, equipment, or furnishings such as the door locks, security systems, and communication devices which control ingress and egress from each part of the facility.

Response to Rodriguez-Nuñez Motion at 6.  Chief Justice Ransom, in his concurrence in <u>Archibeque v. Moya</u>, focused on the difference between a "discrete administrative decision," which does not waive immunity, and "a general condition of unreasonable risk from negligent security practices," which could waive immunity.  1993-NMSC-079 ¶ 5, 866 P.2d at 350 (Ransom, C.J., concurring).  Chief Justice Ransom suggested that the focus, in determining whether alleged negligence falls within "operation of a building,"

> must be on the unreasonable risk of injury arising from operation and maintenance of the premises, in which case there is waiver of immunity, as compared to an administrative act such as the classification of an inmate who is thereby put at risk on premises that are operated and maintained without risk beyond that which is reasonable and expected in prison life.

1993-NMSC-079 ¶ 18, 866 P.2d at 350 (Ransom, C.J., concurring).  New Mexico cases after <u>Archibeque v. Moya</u> have seized on Chief Justice Ransom's concurrence to broaden § 41-4-6's applicability, which reached its broadest form in <u>Upton v. Clovis Municipal School District</u>, in

which the Supreme Court of New Mexico applied a § 41-4-6 immunity waiver to a school district where its negligence created a dangerous condition for a single student.  Upton v. Clovis Mun. Sch. Dist, 2006-NMSC-040 ¶ 25, 141 P.3d at 1265.  Even in Upton v. Clovis Municipal School District, the Supreme Court of New Mexico shoehorned its analysis into the test from Chief Justice Ransom's concurrence and determined that the school district had created a condition "dangerous . . . at least potentially, to the particular class of people that use the building or facility in question." Upton v. Clovis Mun. Sch. Dist, 2006-NMSC-040 ¶ 23, 141 P.3d at 1264.  "The key point in Espinoza is that the negligence must be of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service or the users of the building, including the plaintiff."  2006-NMSC-040 ¶ 23, 141 P.3d at 1265.  The Supreme Court of New Mexico, in Upton v. Clovis Municipal School District, reasoned that in Leithead v. City of Santa Fe, 1997-NMCA-041, 940 P.2d 459, Baca v. State, 1996-NMCA-021, 911 P.2d 1199, Callaway v. New Mexico Department of Corrections, and Castillo v. Cty. Of Santa Fe, 1988-NMSC-037, 755 P.2d 48,

> only one person was injured but the risk posed was to a group of people using the park or building.  The same is true for Sarah.  Failure to respond appropriately to an emergency medical situation is a potential threat to every student in school because such a situation can occur at any time, regardless of special health needs.  The school's indifference towards Sarah's special medical needs makes it more likely that all similarly situated students were at risk as well.

Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 24, 141 P.3d at 1265.  Tanner relies heavily on Upton v. Clovis Municipal School District and Judge Brack's decision in Rave v. Board of Commissioners for the County of Bernalillo for the proposition that allegations of negligence affecting a single defendant can be used to extrapolate an effect on an entire group of defendants.

See Tr. at 28:15-29:6 (Leonard). Tanner argues that the Defendants' alleged negligence placed the "class of inmates at the MDC with medical issues identified in McClendon v. City of Albuquerque" at risk. Response to Rodriguez-Nuñez Motion at 5.[36] Tanner's purported read of the Supreme Court of New Mexico's analysis of § 41-4-6 leaves no limits to the waiver's applicability, and the Supreme Court of New Mexico cannot have so intended. At the hearing, the Court stated that it sounded like Tanner was suggesting that every detainee or prisoner in New Mexico would have a malpractice claim against any corrections officer who occasioned any delay in providing medical care, see Tr. at 27:9-15 (Court), because of the special relationship of control and care that exists between the correction officer and detainees, see Tr. at 16-17 (Leonard). Chief Justice Ransom's concurrence in Archibeque v. Moya suggests that he worried about this result, and he therefore stated that, for plaintiffs to use § 41-4-6, the negligence they allege must affect a class of people, rather than the Supreme Court of New Mexico risk turning § 41-4-6 into an individual right. In Upton v. Clovis Municipal School District, the Supreme Court of New Mexico distinguishes Archibeque v. Moya and states:

> If the only alleged misconduct toward Sarah had been the substitute PE teacher failing to watch her while she participated in physical exercise, the Uptons' claim would be much closer to the single administrative decision in Archibeque. It would be practically identical to the single claim of negligent supervision we found inadequate in Espinoza.

Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 21, 141 P.3d at 1264. Even in its broadest interpretation of § 41-4-6's applicability, the Supreme Court of New Mexico maintains that the waiver's application requires more than a single instance of misconduct. In Upton v. Clovis

---

[36]See supra n.1.

Municipal School District,

> [f]irst the school ignored the information it was given by the Uptons. This led to the school actively participating in causing the asthma attack by forcing Sarah to do more exercise than she was supposed to do. Actively forcing students, who are known to have health problems, creates a foreseeable risk that such a health emergency will occur. Then the school failed to follow through with proper emergency procedures, negligent omissions that exacerbated the problem caused by its previous negligent actions. These actions and omissions combined to create the dangerous condition, placing Sarah in a far worse position than "the reasonable and expected risks of [school] life.

2006-NMSC-040 ¶ 21, 141 P.3d at 1264. Tanner has alleged no facts to suggest that the delay which Rodriguez-Nuñez allegedly occasioned could potentially pose a risk for any inmate, present or future, other than Tanner herself. Whereas the school in Upton v. Clovis Municipal School District failed to respond appropriately to an emergency medical situation by declining to follow its own established emergency procedures, Tanner does not allege facts suggesting that Rodriguez-Nuñez' alleged conduct evinces a practice or informal policy that is potentially dangerous to other present or future inmates with medical needs. Tanner alleges only that Rodriguez-Nuñez delayed -- for an unspecified amount of time -- responding to Tanner's initial request for medical assistance, on one occasion. See Tr. at 4:13-21 (Court, Martinez)(noting that the Court clarified that Tanner alleges that she spoke with Rodriguez-Nuñez only once on October 16, 2016). See also Tr. at 4:22-5:1 (Court, Martinez)(noting that the Court asked Rodriguez-Nuñez whether the Amended Complaint alleges how much time transpired between Tanner's conversation with Rodriguez-Nuñez and her transport to medical, but Rodriguez-Nuñez informed the Court that the Amended Complaint contains no specific timeframes). Rodriguez-Nuñez' alleged conduct does not endanger more than a single individual, and at most, constitutes negligent supervision or administration, and not negligent operation or maintenance.

Rodriguez-Nuñez also contends that she "did not engage in any negligent conduct with regard to the Plaintiff or her unborn child." Rodriguez-Nuñez Motion at 7. The NMTCA is based on traditional tort concepts of duty and a reasonably prudent person standard of care while performing that duty. See N.M. Stat. Ann. 41-4-2(B).

> Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages. In New Mexico, negligence encompasses the concept of foreseeability of harm to the person injured and of a duty of care toward that person.

Herrera v. Quality Pontiac, 2003-NMSC-018 ¶ 6, 73 P.3d at 186. As the risk of the danger that should reasonably be foreseen increases, the amount of care required also increases. See Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 10, 808 P.2d at 618. To determine whether Tanner has stated a claim, the Court must answer the following questions: (i) whether Tanner alleges that Rodriguez-Nuñez knew or should have known about the danger; (ii) whether the danger was foreseeable; and (iii) whether Rodriguez-Nuñez exercised ordinary care for the safety of persons in Tanner's situation. See C.H. v. Los Lunas Bd. of Educ., 852 F. Supp. 2d at 1359.

The Court concludes that Tanner has pled sufficient facts to support a claim for negligence. The Tenth Circuit has stated:

> [T]he degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: "Context matters in notice pleading. Fair notice under Rule 8(a)(2) depends on the type of case . . . ." *Phillips* [v. Cty. of Allegheny, 515 F.3d 224,] 231-32 [(3d Cir. 2008)]. A simple negligence action based on an automobile accident may require little more than the allegation that the defendant negligently struck the plaintiff with his car while crossing a particular highway on a specified date and time. *See* Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Pro., 28 U.S.C. App., p. 829 (discussed in *Twombly*, 127 S.Ct. at 1970-71 n.10). The complaint in Twombly was inadequate because the plaintiff failed to plead any facts to show "contract,

combination . . . or conspiracy, in restraint of trade" beyond a bare allegation of parallel conduct that could be explained as identical but independent action. Sherman Act § 1, 15 U.S.C. § 1. Given that the complaint encompassed scenarios under which the defendants conspired to engage in parallel conduct and those in which they did not, the Court found that the likelihood that the plaintiff would be entitled to relief, even if all of the allegations were true, fell short.

Robbins v. Oklahoma, 519 F.3d at 1248. Tanner was in the final month of her pregnancy when she arrived at the MDC on October 4, 2016. See Amended Complaint ¶ 34, at 10. Tanner alleges that she "disclosed her pregnancy, the fact that she had received prenatal care before her incarceration, and her desire and intent to give birth and keep the child, to both corrections personnel and medical personnel at MDC, including Defendants." Amended Complaint ¶ 35, at 10. Tanner alleges that, upon intake, she disclosed aspects of her medical history relevant to identifying risks associated with her pregnancy. See Amended Complaint ¶ 36, at 10. While Tanner alleges that "Defendants McMurray, Manquero, and Mercer were aware of Plaintiff Tanner's serious medical needs as a pregnant inmate in the last trimester," Tanner does not allege that Rodriguez-Nuñez had the same information about her medical needs as the medical personnel. Amended Complaint ¶ 41, at 12.

Tanner alleges that, on the morning of October 16, 2016, she requested medical attention, and that Rodriguez-Nuñez received Tanner's request while on duty in Pod F7, the housing unit where Tanner resided. See Amended Complaint ¶¶ 45-46, at 13. Tanner alleges that Rodriguez-Nuñez "declined and delayed responding" to her request. Amended Complaint ¶ 46, at 13. Tanner alleges that her "symptoms were obvious and readily observable; they included a large amount of fluid from the discharge soaking through her pants," but she does not allege whether these symptoms were visible when she spoke with Rodriguez-Nuñez, or afterwards. Amended

Complaint ¶ 47, at 13. While Macias escorted Tanner to the housing unit after Tanner's first visit to the infirmary on October 16, 2016, "Macias saw that Plaintiff Tanner was in such pain that she had to stop a few times to lean against a wall and cross her legs as if she was holding something in." Amended Complaint ¶ 48, at 14. Tanner alleges that, following these observations, Macias entered Tanner's cell and

> observed for herself that Plaintiff Tanner appeared to be in pain and that the trash can in her cell had several used sanitary pads in it. Officer Macias observed blood on one of the sanitary pads in the trash can. Officer Macias also observed a clear liquid along the floor of the F Unit hallway and on Plaintiff Tanner's pants.

Amended Complaint ¶ 48, at 14. The Amended Complaint does not allege similar facts about Rodriguez-Nuñez.

Rodriguez-Nuñez asserts that, while Tanner alleges she asked for medical attention, she does not allege that she ever informed Rodriguez-Nuñez that she was suffering from an emergency requiring immediate attention. See Rodriguez-Nuñez Motion at 8. Tanner asserts that Rodriguez-Nuñez' negligence can be inferred by comparing her actions to Macias'. See Response to Rodriguez-Nuñez Motion at 7. Macias escorted Tanner to the medical unit upon receiving her initial request for assistance and then called a Code 43 to notify medical personnel of Tanner's emergency situation. See Response to Rodriguez-Nuñez Motion at 7. Tanner avers that

> it is reasonable to infer that the type of conditions which Officer Macias observed with respect to Plaintiff Tanner also could have been observed by Defendant Rodriguez-Nuñez if she had taken the time to look: "Plaintiff Tanner appeared to be in pain and . . . the trash can in her cell had several used sanitary pads in it," including one with blood on it. [Amended Complaint ¶ 48, at 14.] There was "a clear liquid along the floor of the F Unit hallway and on Plaintiff Tanner's pants." [Amended Complaint ¶ 48, at 14.]

Response to Rodriguez-Nuñez Motion at 7-8. At the hearing, Rodriguez-Nuñez averred that

nothing in Tanner's Amended Complaint alleges that Tanner showed visible signs of emergency or distress when she first spoke to Rodriguez-Nuñez and requested medical assistance. See Tr. at 6:22-25 (Martinez).

To adequately state a claim, Tanner need not assert that Rodriguez-Nuñez knew that she was suffering a medical emergency. See Herrera v. Quality Pontiac, 2003-NMSC-018 ¶ 22, 73 P.3d at 191 ("The present case presents a claim whereby Defendant, arguably, knew or should have known that a theft was likely to occur, and Defendant's actions may have enhanced or increased the risk of such criminal conduct."). Tanner does not allege that Rodriguez-Nuñez should have foreseen that Tanner would suffer injuries if she did not immediately go to the infirmary upon her request, but her allegations that she reported the high-risk nature of her pregnancy to all the Defendants upon her arrival to the MDC give rise to the inference that her emergency situation was a foreseeable risk. See Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 19, 808 P.2d at 621 ( "[T]he number of cars in the infield parking lot having to use the single exit into the heavily traveled street . . . [gave] rise to an inference that the State Fair could reasonably have foreseen the risk of an accident and that a reasonable landowner would have taken precautions to reduce the risk."). See also Amended Complaint ¶¶ 35-36, at 10-11.

When analyzing a motion to dismiss, the Court views the complaint's allegations in the light most favorable to the non-moving party and draws all reasonable inferences in the plaintiff's favor. See Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. Accordingly, the Court takes as true Tanner's allegations that she disclosed her pregnancy and its associated risks to corrections and medical personnel at the MDC upon intake. See Amended Complaint ¶¶ 35-36,

at 10-11. Tanner was in the final month of gestation upon her arrival at the MDC, and the Court can reasonably infer that she was visibly pregnant. The Court concludes that, pursuant to Herrera v. Quality Pontiac, 2003-NMSC-018, 73 P.3d at 191, the disclosed risks of Tanner's pregnancy rendered the danger of her situation foreseeable. High-risk pregnancies by their very nature pose a high risk of danger that something goes wrong with the pregnancy.[37] Tanner must allege facts which make it plausible that a jury could find in her favor and the Court need not decide what action Rodriguez-Nuñez should have taken -- which is a question of fact. A jury could reasonably find that Rodriguez-Nuñez had a minimum duty to take some action to respond to Tanner's request for immediate medical attention, knowing that hers was a high-risk pregnancy, and that Rodriguez-Nuñez breached that duty.

Rodriguez-Nuñez avers that Tanner has not alleged that the delay Rodriguez-Nuñez allegedly occasioned, of "possibly an hour," caused her injury or damages. Rodriguez-Nuñez Motion at 8. Tanner responds that "Defendant Rodriguez-Nuñez questions whether Plaintiffs' pleading alleges a sufficient causal nexus between their alleged bodily injury/wrongful death and Defendant Rodriguez-Nuñez' negligence." Response to Rodriguez-Nuñez Motion at 2. Tanner alleges that "[h]aving the umbilical cord wrapped around the fetus's neck and having some degree of infection or inflammation within the placenta are common, treatable complications of pregnancy that do not result in stillbirth or neonatal death in the vast majority of cases." Amended Complaint ¶ 68, at 20. Tanner further alleges that Rodriguez-Nuñez "acted negligently and recklessly with

---

[37]See, e.g., Mayo Clinic, High-Risk Pregnancy: Know What to Expect, https://www.mayoclinic.org/healthy-lifestyle/pregnancy-week-by-week/in-depth/high-risk-pregnancy/art-20047012 (last updated Feb. 21, 2018).

respect to Plaintiff Tanner's serious medical needs and those of her fetus," and that Rodriguez-Nuñez' negligence caused Tanner's injuries and her fetus' wrongful death. Amended Complaint ¶ 70, at 21. Tanner asserts that Plaintiffs

> allege that whatever divisible or distinct pain and suffering they experienced during the period of delay and denial occasioned by Defendant Rodriguez-Nuñez' negligence was preceded by additional negligent acts and omissions by other Defendants, including the failure to provide Plaintiff Tanner with any significant prenatal care between the time she first arrived at MDC and the time she requested medical attention on October 16, 2016. [Amended Complaint ¶¶ 34-44, at 10-13.] Moreover, the First Amended Complaint alleges that the denial or delay in promptly responding to Plaintiff Tanner's initial request for medical attention involved concurrent negligence by both Defendant Rodriguez-Nuñez and other Defendants. [Amended Complaint ¶ 46, at 13.].

Response to Rodriguez-Nuñez Motion at 21.

Tanner alleges that Rodriguez-Nuñez is liable as a concurrent tortfeasor-- that she may be held comparatively at fault for her percentage of Tanner's resulting damages occurring both before and after her role in the events as part of a chain reaction of negligence. See Response to Rodriguez-Nuñez Motion at 21-22. Tanner contends, furthermore, that, if Rodriguez-Nuñez wishes to assert that Tanner's negligence claims against her are not viable, "because of some other Defendant's negligence, wrongdoing, or intervention, she needs to do so by means of an affirmative defense in her answer, not by means of a motion to dismiss." Response to Rodriguez-Nuñez Motion at 23. In the Reply, Rodriguez-Nuñez does not address the applicability of the concurrent tortfeasor theory to her. Additionally, although Tanner's Amended Complaint alleges that the NCCHC and the ACA have each issued standards for health services in jail, in accordance with which CCS agreed to train the MDC staff, see Amended Complaint ¶ 14, at 4, Tanner does not allege whether Rodriguez-Nuñez received training in any particular protocol regarding how to

respond to inmate requests for medical attention.  The Court concludes that Tanner has sufficiently

pled that Rodriguez-Nuñez knew or should have known the dangers of her failure to immediately

respond to Tanner's request for medical attention, and that, under a concurrent tortfeasor theory,

Rodriguez-Nuñez' failure to respond contributed to Tanner's injuries.  While the negligence claim

may ultimately fail for a variety of problems and issues, the Court cannot confidently say that

Tanner has not, as a matter of law, stated a claim for negligence under New Mexico's liberal law

of comparative negligence.   However, even though Tanner has sufficiently pled negligence,

because no immunity waiver applies against Rodriguez-Nuñez, Tanner has not stated a claim upon

which the Court can grant relief.

### B. TANNER'S CLAIMS ASSERTED AGAINST RODRIGUEZ-NUÑEZ DO NOT ALLEGE NEGLIGENT OPERATION OF A MEDICAL FACILITY AND, THEREFORE, FALL OUTSIDE § 41-4-9's WAIVER.

In Count VII, Tanner alleges that the § 41-4-9 waiver for negligent operation of public

medical facilities, buildings, equipment, and furnishings applies to Rodriguez-Nuñez.   See

Amended Complaint ¶ 126, at 33.  Section 41-4-9 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.

N.M. Stat. Ann. § 41-4-9.  Rodriguez-Nuñez is correct, however, that the Court of Appeals of New

Mexico's decision in Lessen v. City of Albuquerque forecloses Tanner's reliance on § 41-4-9.  See

Rodriguez-Nuñez Reply at 4.  The Court considered Lessen v. City of Albuquerque in Salazar v.

San Juan County Detention Center, 2016 WL 335447:

> [In <u>Lessen v. City of Albuquerque</u>], an inmate was arrested and booked into the Metropolitan Detention Center ("MDC"). 2008-NMCA-085 ¶ 13, 187 P.3d at 180. He was then subjected to a medical and mental health intake by Correctional Medical Services, Inc. ("CMS"), which had contracted with the City of Albuquerque to provide medical services at the MDC. <u>See</u> 2008-NMCA-085 ¶ 3, 187 P.3d at 180. During the intake, the inmate disclosed that he was a heroin user, and that he had prescriptions for Valium and hydrocodone. <u>See</u> 2008-NMCA-085 ¶ 3, 187 P.3d at 180. He was referred to the MDC detoxification unit, where his vital signs were regularly monitored and he received several medications. <u>See</u> 2008-NMCA-085 ¶ 3, 187 P.3d at 180. "Over the ensuing eleven hours, medical personnel noted that Decedent exhibited tremors, nausea, vomiting, and muscle aches and that he complained of sleeplessness," symptoms consistent with heroin withdrawal. 2008-NMCA-085 ¶ 3, 187 P.3d at 180. Personnel also noted "bizarre behavior." 2008-NMCA-085 ¶ 3, 187 P.3d at 180. The inmate was subsequently released from jail, at which point he wandered off from the jail parking lot into the nearby desert where he died of hypothermia. <u>See</u> 2008-NMCA-085 ¶¶ 4-8, 187 P.3d at 180-81.

<u>Salazar v. San Juan Cty. Det. Ctr.</u>, 2016 WL 335447, at *48. The Court of Appeals of New Mexico concluded that liability against a jail cannot be based on § 41-4-9 when the jail has contracted with a private entity to provide medical services. <u>See</u> <u>Lessen v. City of Albuquerque</u>, 2008-NMCA-085 ¶¶ 28-30, 187 P.3d at 185. [38] <u>See also</u> <u>Celaya v. Hall</u>, 2004-NMSC-005 ¶ 2, 85 P.2d 239, 242 ("The TCA enumerates who qualifies as a 'public employee,' and excludes most categories of independent contractors." (citing N.M. Stat. Ann. § 41-4-3(F)(3))). Section 41-4-9 does not apply

---

[38]While the Court is reluctant to read too much into a denial of a petition of certiorari, the Court in <u>Salazar v. San Juan Cty. Detention Ctr.</u> predicted that the Supreme Court of New Mexico would, if presented with the issue, not find that § 41-4-9 would waive sovereign immunity for a jail where a private contractor operates a jail's medical facility, and the Court based its prediction, at least in part, on the fact that the Supreme Court of New Mexico denied the petition for certiorari in <u>Lessen v. City of Albuquerque</u>. <u>See</u> <u>Lessen v. City of Albuquerque</u>, 2008-NMCERT-005 (denying certiorari). <u>See also</u> <u>Salazar v. San Juan Cty. Detention Ctr.</u>, 2016 WL 5376320, at *12 n.9 ("The Supreme Court of New Mexico, as predicted by the Court, did not find that NMTCA § 41-4-9 would waive the County Defendants' sovereign immunity for the Plaintiffs' negligence and intentional infliction of emotional distress claims.").

exclusively to licensed health care providers.  See, e.g., Silva v. State, 1987-NMSC-107 ¶ 9, 745 P.2d at 385 (concluding that § 41-4-9's waiver is arguably applicable to the Secretary of Corrections, if the factfinder determines he failed to exercise ordinary care in the discharge of duties found to include the operation or maintenance of health care facilities inside the prison).

Rodriguez-Nuñez notes that CCS, with whom Bernalillo County contracts, runs the MDC's medical facilities.  See Rodriguez-Nuñez Reply at 4 (citing Amended Complaint ¶ 11, at 3). Rodriguez-Nuñez argues that, as a corrections officer, she had "nothing whatsoever to do with the medical unit, which indisputably had been contracted out to another entity which is also a Defendant herein."  Rodriguez-Nuñez Reply at 3.  Tanner argues that the leading case rejecting application of § 41-4-9 to "tort claims against the County or its corrections officers on the grounds that the County contracts with a private company to assist in operating the medical facility within MDC," Lessen v. City of Albuquerque, is "factually, procedurally, and legally distinct" from the present case.  Response to Rodriguez-Nuñez Motion at 12-13.  Tanner argues that Lessen v. City of Albuquerque is factually distinct, because Bernalillo County's alleged negligence concerned the failure to supervise Lessen after he was released from the MDC rather than negligence regarding his medical treatment while at the MDC.  See Response to Rodriguez-Nuñez Motion at 12.  Tanner argues that Lessen v. City of Albuquerque is procedurally distinct, because it was decided at the summary judgment stage, and the plaintiff's counsel did not argue waiver of immunity under § 41-4-9, so the record relevant to § 41-4-9's applicability was underdeveloped. See Response to Rodriguez-Nuñez Motion at 12-13.  Finally, Tanner argues that Lessen v. City of Albuquerque is legally distinct, because it concerned no "more than the bare allegation of a

contractual relationship in order to invoke Section 41-4-9." Response to Rodriguez-Nuñez Motion at 13.

Tanner argues that, in the MDC infirmary, there is no legally distinct separation of CCS employees from Bernalillo County employees, and that corrections officers -- who are not contractors -- are present in the infirmary, "control access to it, and play a significant role in how inmates are handled there." Response to Rodriguez-Nuñez Motion at 14. Tanner argues that her Amended Complaint "contains specific allegations about the County Defendants' involvement in, and failure to adequately supervise, the day-to-day decision-making for the medical facility they operated with the assistance of their contractor." Response to Rodriguez-Nuñez Motion at 13. Tanner argues that the New Mexico Legislature intends the § 41-4-9 waiver to apply to more than licensed health-care providers. <u>See</u> Response to Rodriguez-Nuñez Motion at 15. Tanner contended, at the hearing, that the limiting principle for application of § 41-4-9's waiver might be that the conduct at issue must relate to the medical facility's operation. <u>See</u> Tr. at 50:11-12 (Leonard). Tanner acknowledges that Rodriguez-Nuñez was outside of the MDC infirmary during the events at issue, but contends that she was still acting within her duties' scope in the infirmary's operation. <u>See</u> Rodriguez-Nuñez Motion at 16. Tanner argues, in support of this proposition, that Rodriguez-Nuñez' delay in responding to Tanner's request for medical attention deprived the infirmary's medical providers of valuable evidence or data, thereby resulting in possible diagnosis errors that infirmary personnel perhaps later made. <u>See</u> Response to Rodriguez-Nuñez Motion at 17. Tanner acknowledges, however, that applying § 41-4-9 to Rodriguez-Nuñez presents a close case, because Rodriguez-Nuñez was not in the infirmary at any relevant time. <u>See</u> Response to

Rodriguez-Nuñez Motion at 17-18; Tr. at 31:19-32:10 (Leonard).

New Mexico caselaw interpreting § 41-4-9 is sparse. The Court of Appeals of New Mexico suggests that, for § 41-4-9 to apply, the public employee or governmental entity at issue must have been involved in clinical decision-making or supervisory responsibilities at the medical facility. See Armijo v. Dep't of Health and Env., 1989-NMCA-043 ¶ 8, 775 P.2d at 1335 (determining that no § 41-4-9 waiver applied to the plaintiff's negligence claims against the HED, because the HED did not regulate the clinical decision-making at the mental health facility and, therefore, did not operate the facility within § 41-4-9's meaning). See also Reese v. Bd. of Cty. Comm'rs. of the Cty. of Bernalillo, 2012 WL 13076227 (concluding that § 41-4-9 does not apply to claims made against defendants who managed the grievance system for inmates rather than the medical treatment that inmates receive at the infirmary); Morrissey v. Ulibarri, 2010 WL 11470879 (concluding that a plaintiff cannot sue the wardens of a correctional facility under § 41-4-9 for preventing an inmate from receiving medications, properly maintaining his colostomy bag, attending critical chemotherapy appointments, and receiving timely follow-up surgery, without evidence at the summary judgment stage that the wardens had supervisory power over the medical facility). The Supreme Court of New Mexico has yet to comment on § 41-4-9's applicability in the jail context, when a private contractor runs the medical facility -- apart from denying certiorari in Lessen v. City of Albuquerque.

Considering Silva v. State, 1987-NMSC-107 ¶ 9, 745 P.2d at 385, in which the Supreme Court of New Mexico -- in an opinion by Chief Justice Ransom -- suggested that § 41-4-9 might waive the Secretary of Corrections' immunity from suit, the mere fact that a contractor operates a

medical facility within a jail does not preclude § 41-4-9's applicability to public employees who are involved in the operation of that medical facility. In <u>Silva v. State</u>, Chief Justice Ransom noted that the Secretary of Corrections' duties included exercising "general supervisory authority over all department employees," and "issu[ing] and enforc[ing] orders and instructions." 1987-NMSC-107 ¶ 17, 745 P.2d at 386. The Supreme Court of New Mexico concluded that § 41-4-9 might waive the Secretary of Corrections' immunity from suit, if the factfinder determines that he is involved in supervising and controlling the operations of the medical facility. <u>See</u> 1987-NMSC-107 ¶ 17, 745 P.2d at 386. Here, Rodriguez-Nuñez is not involved in clinical decision-making or medical treatment, nor does Tanner allege that she had any control or supervisory power over the infirmary or its medical personnel. Tanner suggests only that Rodriguez-Nuñez' alleged delay in responding to Tanner's request for medical attention might have impacted medical personnel's access to data about her condition; this attenuated alleged effect on Tanner's subsequent medical care does not constitute operation of a medical facility pursuant to § 41-4-9. The Court concludes that the § 41-4-9 waiver does not apply to Rodriguez-Nuñez, where she was not involved in clinical decision-making, or in the medical facility's supervision, and where she was not present in the infirmary during the relevant time.

**C.** **TANNER SETS FORTH NO ALLEGATIONS THAT RODRIGUEZ-NUÑEZ' PRINCIPAL DUTIES INVOLVE LAW ENFORCEMENT, AND, THEREFORE, THE § 41-4-12 WAIVER DOES NOT APPLY TO RODRIGUEZ-NUÑEZ, ABSENT ADDITIONAL ALLEGATIONS.**

In the Response to Rodriguez-Nuñez Motion, Tanner asserts that an additional amendment to the Amended Complaint would not be futile, because the "Plaintiffs could allege a waiver under Section 41-4-12 of the kind found in *Kellum*, supra, 2015 WL 12859577, at 11." Response to

Rodriguez-Nuñez Motion at 24. At the hearing, Rodriguez-Nuñez addressed Tanner's mention of a possible § 41-4-12 waiver and asserted that Tanner does not allege that Rodriguez-Nuñez committed any intentional tort and that Tanner does not adequately plead § 41-4-12's applicability. See Tr. at 10:14-19 (Martinez). Tanner clarified that § 41-4-12 provides an immunity waiver specific to law enforcement officers, and that the waiver applies if a law enforcement officer causes one of the listed torts in the NMTCA or one of the NMTCA's specified civil rights violations. See Tr. at 51:6-17 (Leonard). Tanner averred that, in a possible Second Amended Complaint, she would have to include allegations that the corrections officers at the MDC are law enforcement officers, because the MDC is a pretrial detention facility, and that there is a causal relationship between their conduct and the civil rights violations which are already in the Amended Complaint. See Tr. at 53:23-54:3 (Leonard). The Court asked whether the MDC is entirely pretrial detention or if some inmates are serving their sentences, while others are detained there pretrial. See Tr. at 54:4-6 (Court). Tanner replied that the MDC is a mixed bag, but that she could request more information from the MDC during discovery and that she had hoped to get more written discovery before amending the Complaint. See Tr. at 54:8-16 (Leonard).

Section 41-4-3 of the NMTCA defines a law enforcement officer as a "full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor." N.M. Stat. Ann. § 41-4-3. "New Mexico courts have construed this definition strictly." Chavez-Rodriguez v. City of Santa Fe, 2009 U.S. Dist. LEXIS 47154, at *10. In Callaway v. New Mexico Department of

Corrections, the Court of Appeals of New Mexico concluded that correctional officers at a penitentiary are not law enforcement officers under the NMTCA, notwithstanding their statutory power to make arrests. See Callaway v. N.M. Dep't of Corr., 1994-NMCA-049 ¶¶ 11-12, 875 P.2d at 397.[39] Tanner's Amended Complaint contains no allegations that Rodriguez-Nuñez participated in holding in custody any person accused of a criminal offense, maintaining public order, or making arrests for crimes, or that she was a member of the national guard. Tanner averred at the hearing that the MDC detains arrested individuals pretrial, as well as holding in custody persons already convicted of crimes, but Tanner does not allege whether Rodriguez-Nuñez held any responsibilities regarding persons detained pretrial. See Tr. at 53:23-54:3 (Leonard); id. at 54:8-16 (Leonard). In the Amended Complaint, Tanner alleges that corrections officers were on duty in housing units, see Amended Complaint ¶ 45, at 13, escorted inmates between the housing units and the infirmary, see Amended Complaint ¶ 46, at 13, held inmates in cells within the infirmary, see Amended Complaint ¶ 50, at 14-15, and worked at the front desk of the medical unit, see Amended Complaint ¶ 55, at 16. Tanner's allegations regarding the MDC corrections personnel, therefore, suggest that the corrections personnel named in her Amended Complaint were primarily responsible for custody, supervision, and transportation of inmates. Absent an allegation that Rodriguez-Nuñez, as a corrections officer, was primarily responsible for either detaining individuals accused of -- but not yet convicted of -- crimes, making arrests, or maintaining public order, the Court cannot soundly conclude that Rodriguez-Nuñez is a law

---

[39]The Court predicts that the Supreme Court of New Mexico would, if presented with the issue, agree with the reasoning and result in Callaway v. New Mexico Department of Corrections, for the reasons stated supra n.31.

enforcement officer.  Should Tanner request leave to amend her Amended Complaint to allege § 41-4-12's applicability, she would need to allege that Rodriguez-Nuñez' primary duties involved law enforcement activities as § 41-4-3 describes.  Tanner would also need to allege a causal connection between Rodriguez-Nuñez' actions and the civil rights violations alleged in her Amended Complaint.  Although Tanner is free to file a Motion to amend her complaint and attempt to add allegations under § 41-4-12 against Rodriguez-Nuñez, based on the allegations in the Amended Complaint, that waiver will not apply against Rodriguez-Nuñez.  The Amended Complaint currently asserts negligence claims under state law against Rodriguez-Nuñez, but does not assert intentional tort claims or civil rights violations claims against Rodriguez-Nuñez.  In her Response, Tanner states that her Amended Complaint "does not allege federal civil-rights claims against Defendant Rodriguez-Nuñez in her individual capacity."  Response to Rodriguez-Nuñez Motion at 2.  Tanner asserts, therefore, that she need not meet the added burden of disproving a qualified-immunity defense or showing that Rodriguez-Nuñez' negligence rose to the level of a constitutional violation.  <u>See</u> Response to Rodriguez-Nuñez Motion at 2-3.  If Tanner wants to amend her pleading to add allegations regarding § 41-4-12's applicability, however, she will need to meet that added burden, and the Court is not confident that she will be able to do so.  The Amended Complaint sets forth no allegations that Rodriguez-Nuñez committed any intentional tort, or violated Tanner's civil or constitutional rights.  The basis for Tanner's claim against Rodriguez-Nuñez is Rodriguez-Nuñez' allegedly negligent delay in responding to Tanner's request for medical attention.  The Court is not confident that, even with the opportunity to amend, Tanner can produce factual allegations sufficient to support an intentional tort or civil rights claim

as § 41-4-12 requires.  See N.M. Stat. Ann. § 41-4-12.

## II.   THE COURT WILL DISMISS TANNER'S ALLEGATIONS AGAINST MUÑOZ, BECAUSE THEY FALL OUTSIDE THE NMTCA'S WAIVERS OF IMMUNITY FOR STATE EMPLOYEES.

Muñoz argues that the Court should dismiss Counts IV and VII of the Amended Complaint asserted against her, because the Counts' claims of negligence fall outside of the NMTCA immunity waivers -- specifically, in § 41-4-6 and § 41-4-9.  Tanner does not dispute that Muñoz is a public employee acting within the scope of her duties and thus is "granted immunity from liability for any tort except as waived by Sections 41-4-5 through 41-4-12."  Archibeque v. Moya, 1993-NMSC-079 ¶ 5, 866 P.2d at 346 (quoting § 41-4-4(A)).  See Amended Complaint ¶ 12, at 4 ("At all relevant times, they were acting under the color of law and within the scope of their duties and employment as corrections officers at MDC.").  Tanner argues that Muñoz falls within the § 41-4-6 and § 41-4-9 waivers.

### A.   TANNER'S CLAIMS ASSERTED AGAINST MUÑOZ DO NOT ALLEGE NEGLIGENT OPERATION OR MAINTENANCE OF PREMISES, AND, THEREFORE, FALL OUTSIDE § 41-4-6's WAIVER.

In the Amended Complaint, Tanner alleges that Muñoz, who was posted at the back of the MDC infirmary, "actively participated in placing and holding Plaintiff Tanner in the segregation cell," without adequate or timely medical care for her serious medical needs.  Amended Complaint ¶¶ 50, 52, at 15.  Tanner alleges that Muñoz failed to provide her with a blanket or a drinking cup, declined her requests for these items, and "disregarded her requests for timely and appropriate medical care, as well as several clear and obvious symptoms of her serious medical needs and those of Jay Hinton, Jr., who was a viable fetus in the last month of gestation."  Amended Complaint ¶ 53, at 15.  Tanner alleges that she informed Muñoz that she believed she was in labor

and requested transport to a hospital to deliver her child, and that Muñoz refused and ignored her requests. See Amended Complaint ¶¶ 57-58, at 17. Tanner's claim of negligence against Muñoz is based on her failure to provide a blanket and drinking cup, and on her alleged denial or delay in responding to Tanner's requests for medical attention. See Tr. at 40:18-25 (Martinez); id. at 41:1-2 (Martinez); id. at 44:18-25 (Leonard); id. at 45:4-7 (Leonard). At the hearing, Tanner stated that, for Muñoz, the medical facility waiver argument under § 41-4-9 is stronger than the premises liability waiver under § 41-4-6, because § 41-4-9 is more specific, and talks about the operation of a medical facility, but that she can plead in the alternative, so the operation of a building waiver under § 41-4-6 also applies. See Tr. at 47:8-14 (Leonard).

Section 41-4-6 exempts public employees from "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment, or furnishings." N.M. Stat. Ann. § 41-4-6. This waiver "may appropriately be termed a 'premises liability' statute." Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 27, 808 P.2d at 614. The Supreme Court of New Mexico interprets the waiver broadly to waive immunity "where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." Castillo v. Cty. of Santa Fe, 1988-NMSC-037 ¶ 3, 755 P.2d at 48. "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 9, 141 P.3d at 1259.

The Supreme Court of New Mexico has held that "Section 41-4-6 does not waive immunity when public employees negligently perform . . . administrative functions." Archibeque v. Moya, 1993-NMSC-079 ¶ 5, 866 P.2d at 347. In Archibeque v. Moya, the Supreme Court of New Mexico concluded: "The 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in Section 41-4-6, does not include the security, custody, and classification of inmates." Archibeque v. Moya, 1993-NMSC-079 ¶ 5, 866 P.2d at 347 (quoting N.M. Stat. Ann. § 41-4-6). Tanner alleges that Muñoz is involved in the MDC's operation and maintenance, because

> inmates and medical personnel cannot physically move from one part of the building to another, or obtain transport to an outside medical facility such as a hospital, without a public employee's operation and maintenance of specialized machinery, equipment, or furnishings such as the door locks, security systems, and communication devices which control ingress and egress from each part of the facility.

Response to Rodriguez-Nuñez Motion at 6. Tanner also asserts that the case for applying § 41-4-6's building waiver is strong, where

> Munoz had to operate or maintain the MDC building, machinery, equipment, or furnishings in order to allow Plaintiff Tanner to enter or exit the segregation cell, summon medical personnel, or even obtain basic necessities such as a blanket or a drinking cup, which qualify as 'equipment' or 'furnishings' under Section 41-4-6.

Response to Muñoz Motion at 18 (quoting N.M. Stat. Ann. § 41-4-6).

Chief Justice Ransom, in his concurrence in Archibeque v. Moya, focuses on the difference between a "discrete administrative decision," which does not waive immunity, and "a general condition of unreasonable risk from negligent security practices," which could waive immunity. 1993-NMSC-079 ¶ 5, 866 P.2d at 350 (Ransom, C.J., concurring). Chief Justice Ransom suggests that the focus, in determining whether alleged negligence falls within "operation of a building,"

> must be on the unreasonable risk of injury arising from operation and maintenance of the premises, in which case there is waiver of immunity, as compared to an administrative act such as the classification of an inmate who is thereby put at risk on premises that are operated and maintained without risk beyond that which is reasonable and expected in prison life.

1993-NMSC-079 ¶ 18, 866 P.2d at 350 (Ransom, C.J., concurring). New Mexico cases after Archibeque v. Moya have seized on Chief Justice Ransom's concurrence to broaden § 41-4-6's applicability, which reaches its broadest form in Upton v. Clovis Municipal School District, in which the Supreme Court of New Mexico applies a § 41-4-6 immunity waiver to a school district where its negligence created a dangerous condition for a single student. See Upton v. Clovis Mun. Sch. Dist, 2006-NMSC-040 ¶ 25, 141 P.3d at 1265. Even in Upton v. Clovis Municipal School District, the Supreme Court of New Mexico shoehorned its analysis into the test from Chief Justice Ransom's concurrence, and determined that the school district had created a condition "dangerous . . . at least potentially, to the particular class of people that use the building or facility in question." 2006-NMSC-040 ¶ 23, 141 P.3d at 1264. "The key point in Espinoza is that the negligence must be of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service or the users of the building, including the plaintiff." 2006-NMSC-040 ¶ 23, 141 P.3d at 1265. The Supreme Court of New Mexico in Upton v. Clovis Municipal School District reasoned that in Leithead v. City of Santa Fe, 1997-NMCA-041, 940 P.2d 459, Baca v. State, 1996-NMCA-021, 911 P.2d 1199, Callaway v. New Mexico Department of Corrections, and Castillo v. County of Santa Fe, 1988-NMSC-037, 755 P.2d 48,

> only one person was injured but the risk posed was to a group of people using the park or building. The same is true for Sarah. Failure to respond appropriately to an emergency medical situation is a potential threat to every student in school because such a situation can occur at any time, regardless of special health needs. The school's indifference towards Sarah's special medical needs makes it more

likely that all similarly situated students were at risk as well.

Upton v. Clovis Municipal School District, 2006-NMSC-040 ¶ 24, 141 P.3d at 1265. Tanner relies heavily on Upton v. Clovis Municipal School District and Judge Brack's decision in Rave v. Board of Commissioners for the County of Bernalillo for the proposition that allegations of negligence affecting a single defendant can be used to extrapolate an effect on an entire group of defendants. See Tr. at 28:15-29:6 (Leonard). Tanner argues that the Defendants' alleged negligence placed the "class of inmates at the MDC with medical issues identified in McClendon v. City of Albuquerque" at risk. Response to Muñoz Motion at 5.[40] Tanner's reading of the Supreme Court of New Mexico's analysis of § 41-4-6 leaves no limits to the waiver's applicability, and the Court does not read the Supreme Court of New Mexico's opinions as intending no limits. At the hearing, the Court stated that it sounded like Tanner was suggesting that every detainee or prisoner in New Mexico would have a malpractice claim against any corrections officer who occasioned any delay in providing medical care, see Tr. at 27:9-15 (Court), because of the special relationship of control and care that exists between the correction officer and detainees, see Tr. at 16-17 (Leonard). Chief Justice Ransom's concurrence in Archibeque v. Moya suggests that he worried about this result, too, and he therefore stated that, for plaintiffs to use § 41-4-6, the negligence that they allege must affect a class of people, lest the Supreme Court of New Mexico risk turning § 41-4-6 into an individual right. In Upton v. Clovis Municipal School District, the Supreme Court of New Mexico distinguishes Archibeque v. Moya, but still requires Chief Judge Ransom's class analysis, and states:

---

[40]See supra n.1.

> If the only alleged misconduct toward Sarah had been the substitute PE teacher failing to watch her while she participated in physical exercise, the Uptons' claim would be much closer to the single administrative decision in <u>Archibeque</u>. It would be practically identical to the single claim of negligent supervision we found inadequate in <u>Espinoza</u>.

<u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 ¶ 21, 141 P.3d at 1264. Even in its broadest interpretation of § 41-4-6's applicability, the Supreme Court of New Mexico maintains that the waiver's application requires more than a single instance of misconduct. In <u>Upton v. Clovis Municipal School District</u>,

> [f]irst the school ignored the information it was given by the Uptons. This led to the school actively participating in causing the asthma attack by forcing Sarah to do more exercise than she was supposed to do. Actively forcing students, who are known to have health problems, creates a foreseeable risk that such a health emergency will occur. Then the school failed to follow through with proper emergency procedures, negligent omissions that exacerbated the problem caused by its previous negligent actions. These actions and omissions combined to create the dangerous condition, placing Sarah in a far worse position than the reasonable and expected risks of [school] life.

2006-NMSC-040 ¶ 21, 141 P.3d at 1264. Tanner has alleged no facts to suggest that the delay which Muñoz allegedly occasioned, or her alleged deprivation of a blanket and drinking cup, could potentially pose a risk for any inmate, present or future, other than Tanner herself. Whereas the school in <u>Upton v. Clovis Municipal School District</u> failed to respond appropriately to an emergency medical situation by declining to follow its own established emergency procedures, Tanner does not allege facts suggesting that Muñoz' alleged conduct evinces a practice or informal policy that is potentially dangerous to other present or future inmates with medical needs. Muñoz' alleged conduct does not endanger more than a single individual, and at most, constitutes negligent supervision or administration, and not negligent operation or maintenance.

Muñoz also contends that she "did not engage in any negligent conduct with regard to the

Plaintiff or her unborn child." Muñoz Motion at 8. The NMTCA is based on traditional tort concepts of duty and a reasonably prudent person standard of care while performing that duty. See N.M. Stat. Ann. 41-4-2(B).

> Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages. In New Mexico, negligence encompasses the concept of foreseeability of harm to the person injured and of a duty of care toward that person.

Herrera v. Quality Pontiac, 2003-NMSC-018 ¶ 6, 73 P.3d at 186. As the risk of the danger that should reasonably be foreseen increases, the amount of care required also increases. See Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 10, 808 P.2d at 618. To determine whether Tanner has stated a claim, the Court must answer the following questions: (i) whether Tanner alleges that Muñoz knew or should have known about the danger; (ii) whether the danger was foreseeable; and (iii) whether Muñoz exercised ordinary care for the safety of persons in Tanner's situation. See C.H. v. Los Lunas Bd. of Educ., 852 F. Supp. 2d at 1359.

The Court concludes that Tanner has pled sufficient facts to support a claim for negligence. The Tenth Circuit has stated:

> [T]he degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: "Context matters in notice pleading. Fair notice under Rule 8(a)(2) depends on the type of case . . . ." *Phillips* at 231-32. A simple negligence action based on an automobile accident may require little more than the allegation that the defendant negligently struck the plaintiff with his car while crossing a particular highway on a specified date and time. *See* Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Pro., 28 U.S.C. App., p. 829 (discussed in *Twombly*, 127 S.Ct. at 1970-71 n.10). The complaint in Twombly was inadequate because the plaintiff failed to plead any facts to show "contract, combination . . . or conspiracy, in restraint of trade" beyond a bare allegation of parallel conduct that could be explained as identical but independent action. Sherman Act § 1, 15 U.S.C. § 1.

Given that the complaint encompassed scenarios under which the defendants conspired to engage in parallel conduct and those in which they did not, the Court found that the likelihood that the plaintiff would be entitled to relief, even if all the allegations were true, fell short.

Robbins v. Oklahoma, 519 F.3d at 1248. Tanner was in the final month of her pregnancy when she arrived at the MDC on October 4, 2016. See Amended Complaint ¶ 34, at 10. Tanner alleges that she "disclosed her pregnancy, the fact that she had received prenatal care before her incarceration, and her desire and intent to give birth and keep the child, to both corrections personnel and medical personnel at MDC, including Defendants." Amended Complaint ¶ 35, at 10. Tanner alleges that, upon intake, she disclosed aspects of her medical history relevant to identifying risks associated with her pregnancy. See Amended Complaint ¶ 36, at 10. While Tanner alleges that "Defendants McMurray, Manquero, and Mercer were aware of Plaintiff Tanner's serious medical needs as a pregnant inmate in the last trimester," Tanner does not allege that Muñoz had the same information about her medical needs as the medical personnel. Amended Complaint ¶ 41, at 12.

Tanner alleges that, while in the medical infirmary's segregation cell on October 16, 2016, and during the morning of October 17, 2016, she requested medical attention from Muñoz, and that Muñoz disregarded her requests, as well as "several clear and obvious symptoms of her serious medical needs and those of Jay Hinton, Jr., who was a viable fetus in the last month of gestation." Amended Complaint ¶¶ 53, at 15. Tanner does not allege whether these symptoms were visible when she spoke with Muñoz or afterwards. See Amended Complaint ¶¶ 53, at 15. While Macias escorted Tanner to the housing unit after Tanner's first visit to the infirmary on October 16, 2016, "Macias saw that Plaintiff Tanner was in such pain that she had to stop a few times to lean against

a wall and cross her legs as if she was holding something in." Amended Complaint ¶ 48, at 14.

Tanner alleges that, following these observations, Macias entered Tanner's cell and

> observed for herself that Plaintiff Tanner appeared to be in pain and that the trash can in her cell had several used sanitary pads in it. Officer Macias observed blood on one of the sanitary pads in the trash can. Officer Macias also observed a clear liquid along the floor of the F Unit hallway and on Plaintiff Tanner's pants.

Amended Complaint ¶ 48, at 14. The Amended Complaint does not allege similar facts about Muñoz.

To adequately state a claim, Tanner need not assert that Muñoz knew that she was suffering a medical emergency. See Herrera v. Quality Pontiac, 2003-NMSC-018 ¶ 22, 73 P.3d at 191 ("The present case presents a claim whereby Defendant, arguably, knew or should have known that a theft was likely to occur, and Defendant's actions may have enhanced or increased the risk of such criminal conduct."). Tanner does not allege that Muñoz should have foreseen that Tanner would suffer injuries if she did not immediately relay her request to be transported to a hospital or to receive medical attention to medical personnel, but her allegations that she reported the high-risk nature of her pregnancy to all the Defendants upon her arrival to the MDC, and that she was in the medical unit when Muñoz interacted with her give rise to the inference that her emergency situation was a foreseeable risk.

> [T]he number of cars in the infield parking lot having to use the single exit into the heavily traveled street . . . [gave] rise to an inference that the State Fair could reasonably have foreseen the risk of an accident and that a reasonable landowner would have taken precautions to reduce the risk.

Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 19, 808 P.2d at 621. See Amended Complaint ¶¶ 35-36, at 10-11.

When analyzing a motion to dismiss, the Court views the complaint's allegations in the

light most favorable to the non-moving party and draws all reasonable inferences in the plaintiff's favor. See Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. Accordingly, the Court takes as true Tanner's allegations that she disclosed her pregnancy and its associated risks to corrections and medical personnel at the MDC upon intake. See Amended Complaint ¶¶ 35-36, at 10-11. Tanner was in the final month of gestation upon her arrival at the MDC, and the Court can reasonably infer that she was visibly pregnant. Tanner was in the medical unit's cell because of her need for medical attention. The Court concludes that, pursuant to Herrera v. Quality Pontiac, 2003-NMSC-018, 73 P.3d at 191, the disclosed risks of Tanner's pregnancy renders the danger of her situation foreseeable. High-risk pregnancies by their very nature pose a high risk of danger that something goes wrong with the pregnancy.[41] Tanner must allege facts which make it plausible that a jury could find in her favor and the Court need not decide what action Muñoz should have taken -- which is a question of fact. A jury could reasonably find that Muñoz had a minimum duty to take some action to respond to Tanner's requests for immediate medical attention, knowing that Tanner's was a high-risk pregnancy, and that Muñoz breached that duty.

Muñoz avers that Tanner has not alleged that the delay Muñoz allegedly occasioned, and her alleged refusal to provide Tanner with a blanket and drinking cup, caused her injury or damages. See Tr. at 57:20-24 (Martinez); id. at Tr. at 58:2-5 (Martinez). Tanner responds that Muñoz "questions whether Plaintiffs' pleading alleges a sufficient causal nexus between their alleged bodily injury/wrongful death and Defendant Muñoz' negligence." Response to Muñoz

---

[41]See, e.g., Mayo Clinic, High-Risk Pregnancy: Know What to Expect, https://www.mayoclinic.org/healthy-lifestyle/pregnancy-week-by-week/in-depth/high-risk-pregnancy/art-20047012 (last updated Feb. 21, 2018).

Motion at 2. Tanner alleges that "[h]aving the umbilical cord wrapped around the fetus's neck and having some degree of infection or inflammation within the placenta are common, treatable complications of pregnancy that do not result in stillbirth or neonatal death in the vast majority of cases." Amended Complaint ¶ 68, at 20. Tanner further alleges that Muñoz "acted negligently and recklessly with respect to Plaintiff Tanner's serious medical needs and those of her fetus," and that Muñoz' negligence caused Tanner's injuries and her fetus' wrongful death. Amended Complaint ¶¶ 70, 73-74, at 21-22. Tanner asserts that Plaintiffs

> allege that whatever divisible or distinct pain and suffering they experienced during the period of delay and denial occasioned by Defendant Munoz's negligence was preceded by additional negligent acts and omissions by other Defendants, including the failure to provide Plaintiff Tanner with any significant prenatal care between the time she first arrived at MDC and the time she requested medical attention on October 16, 2016. [Amended Complaint ¶¶ 34-44, at 10-13.] Moreover, the First Amended Complaint alleges that the denial or delay in promptly responding to Plaintiff Tanner's initial request for medical attention involved concurrent negligence by both Defendant Munoz and other Defendants. [Amended Complaint ¶ 46, at 13.].

Response to Muñoz Motion at 21.

Tanner alleges that Muñoz is liable as a concurrent tortfeasor -- that she may be held comparatively at fault for her percentage of Tanner's resulting damages occurring both before and after her role in the events as part of a chain reaction of negligence. See Response to Muñoz Motion at 21-23. Tanner contends, furthermore, that, if Muñoz wishes to assert that Tanner's negligence claims against her are not viable, "because of some other Defendant's negligence, wrongdoing, or intervention, she needs to do so by means of an affirmative defense in her answer, not by means of a motion to dismiss." Response to Muñoz Motion at 23. In the Reply, Muñoz does not address the applicability of the concurrent tortfeasor theory to her. Additionally, although

Tanner's Amended Complaint alleges that the NCCHC and the ACA have each issued standards for health services in jail, in accordance with which CCS agreed to train the MDC staff, see Amended Complaint ¶ 14, at 4, Tanner does not allege whether Muñoz received training in any particular protocol regarding how to respond to inmate requests for medical attention. The Court concludes, however, that Tanner has sufficiently pled that Muñoz knew or should have known the dangers of her failure to immediately respond to Tanner's request for medical attention, and that, under a concurrent tortfeasor theory, Muñoz' failure to respond contributed to Tanner's injuries. While the negligence claim may ultimately fail for a variety of problems and issues, the Court cannot confidently say that Tanner has not, as a matter of law, stated a claim for negligence under New Mexico's liberal law of comparative negligence. Even though Tanner has sufficiently pled negligence, because no immunity waiver applies against Muñoz, Tanner has not stated a claim upon which the Court can grant relief.

### B. TANNER'S CLAIMS ASSERTED AGAINST MUÑOZ DO NOT ALLEGE NEGLIGENT OPERATION OF A MEDICAL FACILITY AND, THEREFORE, FALL OUTSIDE § 41-4-9's WAIVER.

In Count VII, Tanner alleges that the § 41-4-9 waiver for negligent operation of public medical facilities, buildings, equipment, and furnishings applies to Muñoz. See Amended Complaint ¶ 126, at 33. Section 41-4-9 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.

N.M. Stat. Ann. § 41-4-9. Muñoz is correct, however, that the Court of Appeals of New Mexico's

decision in <u>Lessen v. City of Albuquerque</u> forecloses Tanner's reliance on § 41-4-9.  <u>See</u> Muñoz

Reply at 4.  The Court considered <u>Lessen v. City of Albuquerque</u> in <u>Salazar v. San Juan County</u>

<u>Detention Center</u>, 2016 WL 335447:

> [In <u>Lessen v. City of Albuquerque</u>], an inmate was arrested and booked into the Metropolitan Detention Center ("MDC").  2008-NMCA-085 ¶ 13, 187 P.3d at 180.  He was then subjected to a medical and mental health intake by Correctional Medical Services, Inc. ("CMS"), which had contracted with the City of Albuquerque to provide medical services at the MDC.  <u>See</u> 2008-NMCA-085 ¶ 3, 187 P.3d at 180.  During the intake, the inmate disclosed that he was a heroin user, and that he had prescriptions for Valium and hydrocodone.  <u>See</u> 2008-NMCA-085 ¶ 3, 187 P.3d at 180.  He was referred to the MDC detoxification unit, where his vital signs were regularly monitored and he received several medications.  <u>See</u> 2008-NMCA-085 ¶ 3, 187 P.3d at 180.  "Over the ensuing eleven hours, medical personnel noted that Decedent exhibited tremors, nausea, vomiting, and muscle aches and that he complained of sleeplessness," symptoms consistent with heroin withdrawal.  2008-NMCA-085 ¶ 3, 187 P.3d at 180.  Personnel also noted "bizarre behavior."  2008-NMCA-085 ¶ 3, 187 P.3d at 180.  The inmate was subsequently released from jail, at which point he wandered off from the jail parking lot into the nearby desert where he died of hypothermia.  <u>See</u> 2008-NMCA-085 ¶¶ 4-8, 187 P.3d at 180-81.

<u>Salazar v. San Juan Cty. Det. Ctr.</u>, 2016 WL 335447, at *48.  The Court of Appeals of New Mexico

concluded that liability against a jail cannot be based on § 41-4-9 when the jail has contracted with

a private entity to provide medical services.  <u>See</u> <u>Lessen v. City of Albuquerque</u>, 2008-NMCA-

085 ¶¶ 28-30, 187 P.3d at 185. [42]  <u>See also</u> <u>Celaya v. Hall</u>, 2004-NMSC-005 ¶ 2, 85 P.2d 239, 242

---

[42]While the Court is reluctant to read too much into a denial of a petition of certiorari, the Court in <u>Salazar v. San Juan Cty. Detention Center</u> predicted that the Supreme Court of New Mexico would, if presented with the issue, not conclude that § 41-4-9 waives sovereign immunity for a jail where a private contractor operates a jail's medical facility, and the Court based its prediction, at least in part, on the fact that the Supreme Court of New Mexico denied the petition for certiorari in <u>Lessen v. City of Albuquerque</u>, 2008-NMCERT-005 (denying certiorari).  <u>See also</u> <u>Salazar v. San Juan Cty. Det. Ctr.</u>, 2016 WL 5376320, at *12 n.9 ("The Supreme Court of New Mexico, as predicted by the Court, did not find

("The TCA enumerates who qualifies as a 'public employee,' and excludes most categories of independent contractors." (citing N.M. Stat. Ann. § 41-4-3(F)(3))). Section 41-4-9 does not apply exclusively to licensed health care providers. <u>See</u>, <u>e.g.</u>, <u>Silva v. State</u>, 1987-NMSC-107 ¶ 9, 745 P.2d at 385 (concluding that § 41-4-9's waiver is arguably applicable to the Secretary of Corrections, if the factfinder determines that he failed to exercise ordinary care in the discharge of duties found to include the operation or maintenance of health care facilities inside the prison).

Muñoz notes that CCS, with whom Bernalillo County contracts, runs the MDC's medical facilities. <u>See</u> Muñoz Reply at 4 (citing Amended Complaint ¶ 11, at 3). Muñoz argues that, as a corrections officer, she had "nothing whatsoever to do with the medical unit, which indisputably had been contracted out to another entity which is also a Defendant herein." Muñoz Reply at 3. Tanner argues that the leading case rejecting application of § 41-4-9 to "tort claims against the County or its corrections officers on the grounds that the County contracts with a private company to assist in operating the medical facility within MDC," <u>Lessen v. City of Albuquerque</u>, is "factually, procedurally, and legally distinct" from the present case. Response to Muñoz Motion at 13-14. Tanner argues that <u>Lessen v. City of Albuquerque</u> is factually distinct, because Bernalillo County's alleged negligence concerned the failure to supervise Lessen after he was released from the MDC rather than negligence regarding his medical treatment while at the MDC. <u>See</u> Response to Muñoz Motion at 13. Tanner argues that <u>Lessen v. City of Albuquerque</u> is procedurally distinct, because it was decided at the summary judgment stage, and the plaintiff's counsel did not argue

that NMTCA § 41-4-9 would waive the County Defendants' sovereign immunity for the Plaintiffs' negligence and intentional infliction of emotional distress claims.").

waiver of immunity under § 41-4-9, so the record relevant to § 41-4-9's applicability was underdeveloped.  See Response to Muñoz Motion at 14.  Finally, Tanner argues that Lessen v. City of Albuquerque is legally distinct, because it concerned no "more than the bare allegation of a contractual relationship in order to invoke Section 41-4-9."  Response to Muñoz Motion at 14.

Tanner argues that, in the MDC infirmary, there is no legally distinct separation of CCS employees from Bernalillo County employees, and that corrections officers -- who are not contractors -- are present in the infirmary, "control access to it, and play a significant role in how inmates are handled there."  Response to Muñoz Motion at 15.  Tanner argues that her Amended Complaint describes Muñoz' role in "causing Plaintiff Tanner to wait for a significant period after she arrived [to the infirmary]," "actively participating in placing and holding Plaintiff Tanner in the segregation cell," "dispensing medical advice to the effect that Plaintiff Tanner was not in labor," and "denying access to basic necessities such as a drinking cup to obtain water from the otherwise inaccessible tap within the infirmary's segregation cell."  Response to Muñoz Motion at 15-16.  Tanner argues that the New Mexico Legislature intends the § 41-4-9 waiver to apply to more than licensed health-care providers.  See Response to Muñoz Motion at 16.  Tanner contended, at the hearing, that the limiting principle for application of § 41-4-9's waiver might be that the conduct at issue must relate to the medical facility's operation.  See Tr. at 50:11-12 (Leonard).

At the hearing, Muñoz stated that the MDC stationed her at the back of the medical unit for security, and that she ensured inmates would not fight one another or get into physical altercations with the medical staff.  See Tr. at 37:19-22 (Martinez); id. at 37:23-38:3 (Court,

Martinez).  Muñoz asserted that, while Tanner was being housed in the infirmary's special housing

unit, medical personnel would see her, and sometimes a corrections officer would be present inside

or just outside the room for security purposes.  See Tr. at 38:4-8 (Martinez).  Muñoz asserted that

the corrections officers have no medical training and provide no medical care.  See Tr. at 38:9-11

(Martinez).  Muñoz reiterated that she was not operating the medical facility, but merely holding

Tanner in custody pursuant to the instructions that she received from her supervisors.  See Tr. at

42:7-9 (Martinez).  Tanner asserts that, regarding Muñoz, the allegations against her are that she

saw Tanner in severe pain and that, in the infirmary units, corrections officers -- not nurses --

watched the segregation cells, yet Muñoz did not bring Tanner's condition to the attention of any

medical personnel in a timely manner.  See Tr. at 44:18-25 (Leonard).  Tanner further contends

that Muñoz did not provide basic necessities such as a drinking cup, and that, although there is a

sink in the segregation cell, it is not sufficient "if you can't get your mouth [around] the sink,

especially while you're going in[to] labor and you're having cramping and you're [in] extreme

discomfort and you don't have a blanket [to regulate your temperature] . . . ."  Tr. at 45:4-7

(Leonard).  Tanner contends that, although Muñoz is not a licensed provider, she is still supposed

to provide the basic level of care and access to care.  See Tr. at 45:9-10 (Leonard).  Tanner argues

that her allegation is that the facility is understaffed, and that the medical personnel depend on the

corrections officers as their eyes and ears in the segregation cells within the infirmary.  See Tr. at

45:14-20 (Leonard).  Tanner contends that, here, she is not suggesting that § 41-4-9's waiver is

applicable to the facility because of its contract with CCS; rather, she contends that Muñoz is liable

as an individual, because, stationed at the infirmary's back, she is operating the infirmary with

respect to conveying information back and forth between the segregation cells and the medical personnel, and providing basic equipment. See Tr. at 46:16-21 (Leonard). Tanner suggested that the limiting principle for application of § 41-4-9's waiver might be that the conduct at issue must relate to a medical facility's operation. See Tr. at 50:11-12 (Leonard). Tanner contends that, here, Tanner was in a segregation cell for medical monitoring, and corrections officers, including Muñoz, "participate in observing and monitoring [her and] determining when she has requests for attention and conveying those to the nurse . . . ." Tr. at 50:1-6 (Leonard). Tanner asserts that, in this context, the corrections officers' conduct is related to the operation of a medical facility; by contrast, if a person slips and falls at a hospital's door, that slip-and-fall is not related to the building being and operating as a medical facility. See Tr. at 49:21-25 (Leonard).

New Mexico caselaw interpreting § 41-4-9 is sparse. The Court of Appeals of New Mexico suggests that, for § 41-4-9 to apply, the public employee or governmental entity at issue must have been involved in clinical decision-making or supervisory responsibilities at the medical facility. See Armijo v. Dep't of Health and Env., 1989-NMCA-043 ¶ 8, 775 P.2d at 1335 (determining that no § 41-4-9 waiver applied to the plaintiff's negligence claims against the HED, because the HED did not regulate the clinical decision-making at the mental health facility and, therefore, did not operate the facility within § 41-4-9's meaning). See also Reese v. Bd. of Cty. Comm'rs. of the Cty. Of Bernalillo, 2012 WL 13076227 (concluding that § 41-4-9 does not apply to claims made against defendants who managed the grievance system for inmates rather than the medical treatment that inmates receive at the infirmary); Morrissey v. Ulibarri, 2010 WL 11470879 (concluding that a plaintiff cannot sue the wardens of a correctional facility under § 41-4-9 for

preventing an inmate from receiving medications, properly maintaining his colostomy bag, attending critical chemotherapy appointments, and receiving timely follow-up surgery, without evidence at the summary judgment stage that the wardens had supervisory power over the medical facility).  The Supreme Court of New Mexico has yet to comment on § 41-4-9's applicability in the jail context, when a private contractor runs the medical facility -- apart from denying certiorari in Lessen v. City of Albuquerque.

Considering Silva v. State, 1987-NMSC-107 ¶ 9, 745 P.2d at 385, in which the Supreme Court of New Mexico -- in an opinion by Chief Justice Ransom -- suggested that § 41-4-9 might waive the Secretary of Corrections' immunity from suit, the mere fact that a contractor operates a medical facility within a jail does not preclude § 41-4-9's applicability to public employees who are involved in the operation of that medical facility.  In Silva v. State, Chief Justice Ransom noted that the Secretary of Corrections' duties included exercising "general supervisory authority over all department employees," and "issu[ing] and enforc[ing] orders and instructions."  1987-NMSC-107 ¶ 17, 745 P.2d at 386.  The Supreme Court of New Mexico concluded that § 41-4-9 might waive the Secretary of Corrections' immunity from suit, if the factfinder determines he is involved in supervising and controlling the medical facility's operations.  See 1987-NMSC-107 ¶ 17, 745 P.2d at 386.  Here, Muñoz is not involved in clinical decision-making or medical treatment, nor does Tanner allege that she had any control or supervisory power over the infirmary or its medical personnel.  Tanner suggests only that Muñoz' alleged delay in responding to Tanner's request for medical attention might have impacted medical personnel's access to data about her condition; this attenuated alleged effect on Tanner's subsequent medical care does not constitute operation of a

medical facility pursuant to § 41-4-9.  The Court concludes that the § 41-4-9 waiver does not apply

to Muñoz, where she was not involved in clinical decision-making or in the medical facility's

supervision.

### C. TANNER SETS FORTH NO ALLEGATIONS THAT MUÑOZ' PRINCIPAL DUTIES INVOLVED LAW ENFORCEMENT, AND, THEREFORE, THE § 41-4-12 WAIVER DOES NOT APPLY TO MUÑOZ ABSENT ADDITIONAL ALLEGATIONS.

In the Response to Muñoz Motion, Tanner asserts that an additional amendment to the

Amended Complaint would not be futile, because the "Plaintiffs could allege a waiver under

Section 41-4-12 of the kind found in *Kellum*, supra, 2015 WL 12859577, at 11."  Response to

Muñoz Motion at 24.  At the hearing, Tanner clarified that § 41-4-12 provides an immunity waiver

specific to law enforcement officers, and that the waiver applies if a law enforcement officer causes

one of the listed torts in the NMTCA or one of the NMTCA's specified civil rights violations.  See

Tr. at 51:6-17 (Leonard).  Tanner averred that, in a possible Second Amended Complaint, she

would have to include allegations that the corrections officers at the MDC are law enforcement

officers, because the MDC is a pretrial detention facility, and that there is a causal relationship

between their conduct and the civil rights violations which are already in the Amended Complaint.

See Tr. at 53:23-54:3 (Leonard).  The Court asked whether the MDC is entirely pretrial detention

or if some inmates are serving their sentences, while others are detained there pretrial.  See Tr. at

54:4-6 (Court).  Tanner replied that the MDC is a mixed bag, but that she could request more

information from the MDC during discovery, and that she had hoped to get more written discovery

before amending the Complaint.  See Tr. at 54:8-16 (Leonard).

Section 41-4-3 of the NMTCA defines a law enforcement officer as a "full-time salaried

public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor." N.M. Stat. Ann. § 41-4-3. "New Mexico courts have construed this definition strictly." Chavez-Rodriguez v. City of Santa Fe, 2009 U.S. Dist. LEXIS 47154, at *10. In Callaway v. New Mexico Department of Corrections, the Court of Appeals of New Mexico concluded that correctional officers at a penitentiary are not law enforcement officers under the NMTCA, notwithstanding their statutory power to make arrests. See Callaway v. N.M. Dep't of Corr., 1994-NMCA-049 ¶¶ 11-12, 875 P.2d at 397.[43] Tanner's Amended Complaint contains no allegations that Muñoz participated in holding in custody any person accused of a criminal offense, maintaining public order, making arrests for crimes, or that she was a member of the national guard. Tanner averred at the hearing that the MDC detains arrested individuals pretrial, as well as holding in custody persons already convicted of crimes, but Tanner does not allege whether Muñoz held any responsibilities regarding persons detained pretrial. See Tr. at 53:23-54:3 (Leonard); id. at 54:8-16 (Leonard). In the Amended Complaint, Tanner alleges that corrections officers were on duty in housing units, see Amended Complaint ¶ 45, at 13, escorted inmates between the housing units and the infirmary, see Amended Complaint ¶ 46, at 13, held inmates in cells within the infirmary, see Amended Complaint ¶ 50, at 14-15, and worked at the front desk of the medical unit, see Amended Complaint ¶ 55, at 16. Tanner's allegations regarding the MDC corrections personnel at issue suggest that

---

[43]The Court predicts that the Supreme Court of New Mexico would, if presented with the issue, agree with the reasoning and result in Callaway v. New Mexico Department of Corrections, for the reasons stated supra n.41.

the corrections personnel named in her Amended Complaint were primarily responsible for custody, supervision, and transportation of inmates. Absent an allegation that Muñoz, as a corrections officer, was primarily responsible for either detaining individuals accused of -- but not yet convicted of -- crimes, making arrests, or maintaining public order, the Court cannot soundly conclude that Muñoz is a law enforcement officer. Should Tanner request leave to amend her Amended Complaint to allege § 41-4-12's applicability, she would need to allege that Muñoz' primary duties involved law enforcement activities as described in § 41-4-3. Tanner would also need to allege a causal connection between Muñoz' actions and the civil rights violations alleged in her Amended Complaint. Although Tanner is free to file a Motion to amend her complaint, attach a proper pleading, and attempt to add allegations under § 41-4-12 against Muñoz, based on the Amended Complaint's allegations, that waiver will not apply against Muñoz. The Amended Complaint currently asserts negligence claims under state law against Muñoz, but does not assert intentional tort claims or civil rights violations claims against Muñoz. In her Response, Tanner states that her Amended Complaint "does not allege federal civil-rights claims against Defendant Muñoz in her individual capacity." Response to Muñoz Motion at 2. Tanner asserts, therefore, that she need not meet the added burden of disproving a qualified-immunity defense or showing that Muñoz' negligence rose to the level of a constitutional violation. See Response to Muñoz Motion at 2-3. If Tanner wants to amend her pleading to add allegations regarding § 41-4-12's applicability, however, she will need to meet that added burden of showing a constitutional violation or intentional tort, and the Court is not confident that she will be able to show a constitutional violation or an intentional tort. The Amended Complaint sets forth no allegations

that Muñoz committed any intentional tort, or violated Tanner's civil or constitutional rights. The basis for Tanner's claim against Muñoz is Muñoz' allegedly negligent delay in responding to Tanner's requests for medical attention, and her negligent failure to provide Tanner with a blanket and drinking cup while she was in the medical unit. The Court is not confident that, even with the opportunity to amend, Tanner can produce factual allegations sufficient to support an intentional tort, or civil rights claim as § 41-4-12 requires. See N.M. Stat. Ann. § 41-4-12.

Tanner argues that if Rodriguez-Nuñez and Muñoz wish to assert that Tanner's negligence claims against them are not viable because of another Defendant's wrongdoing, negligence, or intervention, they must do so through an affirmative defense and not in a motion to dismiss. See Response to Rodriguez-Nuñez Motion at 23; Response to Muñoz Motion at 23. Rodriguez-Nuñez and Muñoz argue that they need not assert an affirmative defense, because the United States Court of Appeals for the Seventh Circuit case, to which Tanner cites, holds only that "[c]omplaints need not anticipate defenses and attempt to defeat them." Rodriguez-Nuñez Reply at 5 (quoting Richards v. Mitcheff, 696 F.3d 635, 637 (7th Cir. 2012)(citation omitted)); Muñoz Reply at 5 (quoting Richards v. Mitcheff, 696 F.3d at 637). Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d at 1137-39, 1141 (citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant

may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  Rodriguez-Nuñez and Muñoz are asserting immunity defenses, and it is apparent from the Amended Complaint's face that their defense would be to attribute Tanner's and her fetus' harms to the other Defendants' actions.  Accordingly, Rodriguez-Nuñez and Muñoz need not raise their defenses in an Answer,[44] but may argue them in their Motions to Dismiss.

**IT IS ORDERED** that: (i) Defendant Claudia Rodriguez-Nuñez' Motion to Dismiss and Brief in Support filed July 9, 2018 (Doc. 63) is granted; and (ii) Defendant Tina Muñoz' Motion to Dismiss and Brief in Support, filed July 30, 2018 (Doc. 70) is granted.  Counts IV and VII of the Amended Complaint, filed May 23, 2018 (Doc. 50), against Defendant Claudia Rodriguez-Nuñez and Defendant Tina M. Muñoz are dismissed and Rodriguez-Nuñez and Muñoz are dismissed from the case.

_____
UNITED STATES DISTRICT JUDGE

---

[44]Neither Rodriguez-Nuñez nor Muñoz has filed an Answer, as of the date of this Memorandum Opinion and Order.

- 148 -

*Counsel*

Nicole Moss
The Law Office of Nicole W. Moss
Albuquerque, New Mexico

-and-

Paul J. Kennedy
Jessica M. Hernandez
Arne Leonard
Elizabeth Harrison
Kennedy, Hernandez & Associates, P.C.
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

Alfred A. Park
Geoffrey D. White
Park & Associates, L.L.C.
Albuquerque, New Mexico

> *Attorneys for Defendants Timothy I. McMurray, Adriana Luna, Audrey Leber, Taileigh Sanchez, Elisa Manquero, Correct Care Solutions, LLC, Christopher Mercer, Ed Kossman*

Jonlyn M. Martinez
Law Firm of Jonlyn M. Martinez
Albuquerque, New Mexico

> *Attorney for Defendants Board of County Commissioners of Bernalillo County, Thomas J. Ruiz, Claudia Rodriguez-Nuñez, Martina Sanchez-Filfred, Tina M. Muñoz*