# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SHAWNA TANNER, individually and as
personal representative of JAY HINTON, JR.,

     Plaintiff,

vs.                                                                                   No. CIV 17-0876 JB\KBM

TIMOTHY I. MCMURRAY, M.D.; ADRIANA
LUNA, R.N.; AUDREY LEBER, R.N.;
TAILEIGH SANCHEZ, R.N.; ELISA
MANQUERO, R.N.; CORRECT CARE
SOLUTIONS, LLC; BOARD OF COUNTY
COMMISSIONERS OF BERNALILLO
COUNTY, NEW MEXICO; THOMAS J.
RUIZ; JOHN AND JANE DOES 1-10;
CHRISTOPHER MERCER; ED KOSSMAN;
CLAUDIA RODRIGUEZ-NUNEZ; MARTINA
SANCHEZ-FILFRED, and TINA M. MUNOZ,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion to Compel

Defendant Bernalillo County's Response to Request for Production No. 5, filed April 9, 2018

(Doc. 38)("Motion to Compel RFP No. 5"); (ii) the Plaintiff's Motion to Compel Defendant

Correct Care Solution [sic], LLC's Response to Plaintiff's Request for Production No. 12, filed

June 4, 2018 (Doc. 52)("Motion to Compel RFP No. 12"); (iii) the Plaintiff's Motion to Compel

Defendant Correct Care Solution [sic], LLC's Answers and Responses to Plaintiff's First Set of

Interrogatories and Requests for Production, and for Sanctions Under Rules 16(F)(1)(C), 26(G)(3),

37(C), and 37(A)(5), filed June 4, 2018 (Doc. 53)("Motion to Compel Ans. and Resp."); (iv) the

Plaintiffs' Rule 72(A) Objections to Magistrate Judge's Memorandum Opinion and Order on

Plaintiff's Motion to Compel Defendant Correct Care Solutions, LLC's Answers and Responses to Plaintiff's First Set of Interrogatories and Requests for Production, and for Sanctions Under Rules 16(F)(1)(C), 26(G)(3), 37(C), and 37(A)(5), filed September 4, 2018 (Doc. 83)("Tanner's Obj. to Aug. 20, 2018 KBM MOO"); (v) the Opposed Motion for Protective Order, filed September 5, 2018 (Doc. 84)("Protective Order Motion"); (vi) the Plaintiffs' Rule 72(a) Objections to Magistrate Judge's Memorandum Opinion and Order on Plaintiffs' Motions to Compel Defendant Bernalillo County's Response to Request for Production No. 5 and Defendant Correct Care Solutions, LLC's Response to Request for Production No. 12, filed September 19, 2018 (Doc. 88)("Tanner's Obj. to Sept. 5, 2018 KBM MOO"); (vii) Correct Care Solutions, LLC's Partial Objections to Memorandum Opinion and Order, filed September 19, 2018 (Doc. 89)("CCS' Obj. to Sept. 5, 2018 KBM MOO"); and (viii) Correct Care Solutions, LLC's Notice of Objections to Production of <u>McClendon</u> Documents, filed March 12, 2019 (Doc. 159)("CCS' Obj. to Prod. <u>McClendon</u> Docs.").  The Court will, in this Memorandum Opinion and Order ("MOO"), address the following discovery issues: (i) whether the continuous quality improvement ("CQI"), quality improvement ("QI"), and quality assurance ("QA") records which Correct Care produced pursuant to its contract with Bernalillo County to provide health care services at Metropolitan Detention, in 2015 and 2016, (the "QI/QA Records"), are relevant to the present litigation and subject to discovery; (ii) whether the documents provided to Dr. Robert Greifinger, the court-appointed medical expert in the <u>McClendon v. City of Albuquerque</u>, Case No. 95-CV-0024 JAP/ACT ("<u>McClendon</u>") litigation, during his April, 2016, and November, 2016, site visits to the Metropolitan Detention Center in the County of Bernalillo, New Mexico ("Metropolitan Detention"), (the "Dr. Greifinger Documents"), are subject to discovery and relevant to the present

litigation, which involves Plaintiff Shawna Tanner's claims for violations of her civil rights under

the Eighth and Fourteenth Amendments to the Constitution of the United States of America, claims

for professional negligence and gross negligence under State of New Mexico law, and claims for

statutory violations of New Mexico's Inspection of Public Records Act, N.M. Stat. Ann. §§ 14-2-

1 to -12 ("IPRA"), all of which allegedly occurred while she was incarcerated at Metropolitan

Detention in October, 2016; (iii) whether the QI/QA Records or the Dr. Greifinger Documents are

subject to a viable common-law self-critical analysis privilege claim; (iv) whether the QI/QA

Records or the Dr. Greifinger Documents are subject to a viable Patient Safety and Quality

Improvement Act, 42 U.S.C. §§ 299b-21 to -26 ("PSQIA"), privilege; and (v) whether the QI/QA

Records or the Dr. Greifinger Documents are subject to a viable New Mexico Review Organization

Immunity Act, N.M. Stat. Ann. §§ 41-9-1 to -7 ("ROIA"), privilege.  The Court held a hearing on

February 4 and 5, 2019.  Bernalillo County provided "a copy of documents that were received by

counsel for Bernalillo County in the *McClendon* litigation that were produced to Dr. Greifinger,

the Court appointed expert in that matter."  Letter from Jonlyn M. Martinez to the Court at 1(dated

April 2, 2019), filed April 16, 2019 (Doc. 215)("April 2, 2019 Letter").  Defendant Board of

County Commissioners of Bernalillo County ("Bernalillo County"), attaches a log of the

Dr. Greifinger Documents and highlights the documents which Bernalillo County already has

provided to Tanner -- the Pregnant Woman Studies (dated March 7, 2016, April 7, 2016, and

August 16, 2016)(Bates Nos. D000018-20), the Mortality and Morbidity review for Shawna

Tanner (dated October 17, 2016)(Bates Nos. D000300-19), and the Report completed by

Dr. Kenneth Ray and Dr. Ronald Shansky regarding Shawna Tanner (undated)(Bates Nos.

D000341-48) -- as of April 16, 2019.  See Log of Documents Provided to Dr. Robert Greifinger,

filed April 16, 2019 (Doc. 214-1)("Dr. Greifinger Documents Log"). The Court has carefully reviewed the Court's Copy of Dr. Greifinger Documents. The Dr. Greifinger Documents include: (i) a CQI Calendar (undated)(Bates Nos. D000001-02); (ii) CQI Meeting Minutes (dated July 16, 2016)(Bates Nos. D000003-04); (iii) a Psychiatry Study (dated July 29, 2016)(Bates Nos. D000005-06); (iv) an HIV Study (dated July 21, 2016)(Bates No. D000007); (v) a Receiving Screen and Med. Verification Study (dated June, 2016)(Bates Nos. D000008-09); (vi) an Alcohol/Benzo Withdrawal Study, (dated June, 2016)(Bates Nos. D000010-11); (vii) a Mental Health Evaluation Study (dated February 15, 2016)(Bates Nos. D000012-14); (viii) Health Assessment Studies (dated February 15, 2016, August 25, 2016, and November 10, 2016)(Bates Nos. D000015-17); (ix) Pregnant Women Studies (dated March 7, 2016, April 7, 2016, and August 16, 2016)(Bates Nos. D000018-20); (x) Evaluations of Care prior to ER Visit (dated March 17, 2016, and May 25, 2016)(Bates Nos. D000021-22); (xi) an X-Rays Study (dated February 15, 2016)(Bates No. D000023); (xii) Chronic Disease Studies for Asthma, Diabetes, Seizure, and Hypertension (dated March 7, 2016, March 8, 2016, April 7, 2016, April 20, 2016, August 25, 2016, September 1, 2016, and November 8, 2016)(Bates Nos. D000024-38); (xiii) Anticoagulant Studies (dated April 19, 2016, August 25, 2016, and October 26, 2016)(Bates Nos. D000039-42); (xiv) a Continuity of Care Study (dated August 25, 2016)(Bates No. D000043); (xv) an Access to Dental Care Study (dated August 23, 2016)(Bates No. D000044); (xvi) Sexually-Transmitted Diseases Studies (dated March 7, 2016, April 7, 2016, August 8, 2016, and November 8, 2016)(Bates Nos. D000045-48); (xvii) Continuity of Medication on Intake Studies (dated February 15, 2016, September 12, 2016, and November 14, 2016)(Bates Nos. D000049-51); (xviii) a Medical Refusal Study (dated April 7, 2016)(Bates Nos. D000052-54); (xix) a January-

March 2016 Corrective Action Plan (Bates Nos. D000055-59); (xx) Mortality and Morbidity Reviews for B.G., L.D., M.A., J.O., D.T., and Shawna Tanner (dated May 11, 2016, June 22, 2016, June 24, 2016, July 14, 2016, September 20, 2016, October 17, 2016)(Bates Nos. D000060-319); and (xxi) Reports completed by Dr. Kenneth Ray and Dr. Ronald Shansky regarding K.A., M.S.J., Shawna Tanner, and D.T. (undated)(Bates Nos. D000320-48). Dr. Greifinger Documents Log at 1-4. The Court concludes that: (i) the QI/QA Records are relevant and subject to discovery; (ii) the Dr. Greifinger Documents are relevant and subject to discovery; (iii) the QI/QA Records and the Dr. Greifinger Documents are not subject to a viable common-law self-critical analysis privilege claim; (iv) the QI/QA Records and the Dr. Greifinger Documents are not subject to a viable PSQIA privilege claim; and (v) the QI/QA Records and the Dr. Greifinger Documents are not subject to a valid ROIA claim.

## FACTUAL BACKGROUND

The Court recited this case's facts and early procedural history in its Memorandum Opinion and Order, 2018 WL 6050675, filed November 19, 2018 (Doc. 115)("Nov. 19, 2018 MOO"). The Court incorporates that recitation here. The Court includes the Nov. 19, 2018 MOO's footnotes.

> Plaintiff Shawna Tanner, on behalf of herself and as personal representative of her deceased minor child, Jay Hinton Jr., (collectively, "Plaintiffs") filed the First Amended Complaint for Civil Rights Violations, Tort Claims, Wrongful Death, Statutory Violations, Damages, and Injunctive Relief, filed May 23, 2018 (Doc. 50)("Amended Complaint"). The Amended Complaint states that the Court "has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, with supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367." Amended Complaint ¶ 1, at 1. Plaintiff Shawna Tanner was at all relevant times a New Mexico resident. See Amended Complaint ¶ 3, at 2. All the known Defendants are individuals who resided in the State of New Mexico at all relevant times or are entities who are incorporated or are authorized to do business in New Mexico. See Amended Complaint ¶ 2, at 1 (stating that venue is proper "in this District as Defendants are residents of New Mexico under 28 U.S.C. § 1391 and all of the acts complained of occurred in New Mexico."). See also Amended

Complaint ¶¶ 5-12, at 2-4 (describing the Defendants' residences).

Tanner first brought the Complaint for Civil Rights Violations, Tort Claims, Statutory Violations, Damages, and Injunctive Relief, filed August 25, 2017 (Doc. 1)("Complaint") in federal district court against the following Defendants: (i) Timothy I. McMurray, M.D., the Metropolitan Detention Center in the County of Bernalillo, New Mexico ("MDC")'s Site Medical Director; (ii) Adriana Luna, R.N., an MDC Registered Nurse; (iii) Audrey Leber, R.N., an MDC Registered Nurse; (iv) Taleigh Sanchez, R.N., an MDC Registered Nurse; (v) Elisa Manquero, R.N., an MDC Registered Nurse; (vi) Correct Care Solutions LLC ("CCS"), a Kansas Limited Liability Company with a site office at the MDC, which "employed, contracted with, and exercised direct supervisory control" over McMurray, Luna, Leber, Sanchez, and Manquero, see Complaint ¶ 6, at 2; (vii) Thomas J. Ruiz, the MDC's Administrator; (viii) Board of County Commissioners ("BCC") of Bernalillo County, which contracted with CCS to provide health-care services to MDC inmates; (viv) additional health-care personnel, identified as Does 1-5; and (x) additional corrections personnel, including corrections officers, employed at the MDC and identified as Does 6-10. Complaint ¶¶ 4-9, at 2-3. In the Amended Complaint, Tanner withdrew the Complaint against Leber, and added the following Defendants: (i) Christopher Mercer, P.A., an MDC Physician Assistant; (ii) Ed Kossman, an MDC Health Services Administrator ("HSA"); (iii) Claudia Rodriguez-Nuñez, an MDC corrections officer; (iv) Martina Sanchez-Filfred, an MDC corrections officer; and (v) Tina M. Muñoz, an MDC corrections officer. See Amended Complaint ¶¶ 6-8 and 12, at 2-4.

According to the Amended Complaint, Tanner began a term of incarceration at the MDC on October 4, 2016, while in the last month of her pregnancy. See Amended Complaint ¶ 34, at 10. Upon intake, Tanner disclosed her pregnancy "as well as her desire and intent to give birth and keep the child" to the MDC and medical personnel. Amended Complaint ¶ 35, at 10. Tanner also disclosed her medical history relevant to diagnosing possible risks associated with her pregnancy, including "prior pregnancies, past substance abuse, and her age (33 years old)." Amended Complaint ¶ 36, at 10-11.

Tanner remained in the MDC's custody from on or about October 4, 2016, until on or about October 20, 2016, aside from a brief emergency visit to Lovelace Women's Hospital in Albuquerque, New Mexico, on or about October 17, 2016. See Amended Complaint ¶ 34, at 10. The Amended Complaint alleges that, while at the MDC:

> [Tanner] was dependent on MDC personnel and CCS personnel for access to timely and appropriate prenatal care, medical examinations by a clinician qualified to provide such care, appropriate prenatal laboratory and diagnostic tests, specialized

obstetrical services and resources for her pregnancy, transport to an appropriate community facility for delivery and peripartum care, and all emergency medical care.

Amended Complaint ¶ 34, at 10. According to the Amended Complaint, Rodriguez-Nuñez and Muñoz were corrections officers at the MDC during the time that the Amended Complaint addresses, and at all relevant times "were acting under the color of law and within the scope of their duties and employment as corrections officers at MDC." Amended Complaint ¶ 12, at 4.

Tanner alleges that:

On or about December 9, 2014, Defendant BCC selected, approved, and entered into a written contract between Bernalillo County, New Mexico and Defendant CCS entitled "Medical, Dental, Mental Health, Psychiatric and Methodone Services Agreement" (hereinafter "Medical Services Agreement"). That agreement remains in effect, as amended, for a four-year term.

Amended Complaint ¶ 13, at 4. Tanner alleges that, under the Medical Services Agreement, BCC and CCS represented that healthcare for the MDC inmates would comply with all current and future standards issued by the National Commission on Correctional Health Care ("NCCHC") and the American Correctional Association ("ACA"). See Amended Complaint ¶ 14, at 4. Tanner alleges that, under the Medical Services Agreement, CCS agreed to train the MDC staff on NCCHC and ACA standards, "including training on recognizing emergencies and procedures for referring inmates for care." Amended Complaint ¶ 14, at 4. Tanner alleges that the NCCHC standards in effect when CCS and BCC entered into the Medical Services Agreement contain a standard entitled "Counseling and Care of the Pregnant Inmate," which requires that: "Pregnant inmates receive timely and appropriate prenatal care, specialized obstetrical services when indicated, and postpartum care. Pregnant inmates are given comprehensive counseling and assistance in accordance with their expressed desires regarding their pregnancy." Amended Complaint ¶ 15, at 4-5. Tanner alleges that CCS and BCC contracted to add a provision for "bi-weekly onsite OB/GYN clinics at 4 hours per clinic" to the Medical Services Agreement. Amended Complaint ¶ 20, at 6. Tanner alleges that, in addition to the provision for bi-weekly onsite OB/GYN clinics, the Medical Services Agreement

required a staffing pattern with at least two physicians, two physician assistants or other mid-level providers, as well as the site medical director, such that a physician was on-call and available for site visits twenty-four hours, seven days per week, and daily rounds of the facility's Sheltered Housing Unit (SHU) were conducted by a physician, physician assistant, or other mid-level provider seven days a week.

Amended Complaint ¶ 21, at 6. Tanner alleges that the ACA standards in effect when CCS and BCC entered into the Medical Services Agreement require that "[p]regnant inmates have access to obstetrical services by a qualified provider, including prenatal, peripartum, and postpartum care." Amended Complaint ¶ 18, at 5. Tanner alleges that the Medical Services Agreement contained specific provisions regarding referral of pregnant inmates for prenatal care, identification of patients in need of hospitalization or other off-site services, and other such responsibilities. See Amended Complaint ¶ 22, at 6. Tanner alleges that McMurray's responsibilities under the Medical Services Agreement include "develop[ing] special medical programs for inmates who require close medical supervision, special accommodations, and/or chronic and convalescent care, including a plan of treatment with directions for health care staff and correctional staff regarding their roles in the care and supervision of such inmates." Amended Complaint ¶ 23, at 6-7. Tanner alleges that Kossman's responsibility under the Medical Services Agreement "is to monitor the performance of all health care personnel rendering patient care and advise the Chief of Corrections, Defendant Tom Ruiz, on specific clinical issues as appropriate." Amended Complaint ¶ 24, at 7. Tanner alleges that, under the Medical Services Agreement, Ruiz

> retained final authority . . . to decide the assignment and utilization of staff to maximize the efficiency of health care delivery at MDC, and to approve hiring of Defendant CCS's Health Services Administrator, as well as physicians and mid-level providers at MDC. (Section 4.1.25.6). Defendant Ruiz was also kept informed of contract compliance and health care issues at MDC through a number of monthly reports, matrices, logs, corrective action plans, and committee meetings required under the Medical Services Agreement. (Sections 4.1.16.5, 4.1.20.1, 4.1.25.27, 4.1.26.7, 4.1.27.4, 4.2.1, 4.2.2.) The Medical Services Agreement specifically provided Defendants BCC and Ruiz with access for inspection of detailed records indicating the date, time and nature of services provided under the agreement. (Section 4.3.2.1.)

Amended Complaint ¶ 25, at 7.

Tanner alleges that CCS stated it recently acquired Correctional Health Companies, and that CCS "truly understands the complexities of McClendon," a class-action lawsuit involving conditions of inmate medical care and mental health care at the MDC and its predecessor facilities. Amended Complaint ¶ 26, at 7. Tanner alleges that, on March 22, 2016, the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, entered a Memorandum Opinion and Order preliminarily approving the McClendon settlement agreement and requiring that notice of the agreement and its terms be posted in both English and Spanish in every MDC housing unit, the medical

services unit, the reception, discharge, and transfer unit, and the law library.  See Amended Complaint ¶¶ 27-28, at 7-8.  Tanner alleges that Judge Parker also required that the MDC allow inmates to review the settlement agreement in full upon request or through a kiosk system.  See Amended Complaint ¶ 28, at 8.  Tanner alleges that, after allowing sixty days for notice, comment, and objections, Judge Parker gave final approval for the settlement agreement in a Memorandum Opinion and Order dated June 27, 2016.  See Amended Complaint ¶ 29, at 8.  Tanner asserts that Judge Parker concluded that the settlement agreement "does not bar inmates with individual claims from pursuing damages in separate lawsuits."  Amended Complaint ¶ 29, at 8.

Tanner alleges that the Medical Services Agreement requires BCC to demonstrate compliance with three "Check-Out Audit Agreements corresponding to areas evaluated by court-appointed experts: (1) provision of medical services; (2) provision of mental health services; and (3) general conditions of confinement, including population management."  Amended Complaint ¶ 30, at 8.  Check-Out Audit Agreement No. 1 ("CAA No. 1"), pertaining to the MDC's provision of medical services to inmates, specifically references compliance with NCCHC and ACA standards, and requires the court-appointed medical expert to monitor and address "[w]hether MDC inmates who complain orally or in writing of serious acute illness or serious injury are given immediate medical attention," and "[w]hether all inmate requests for medical care are timely communicated to medical personnel for appropriate treatment."  Amended Complaint ¶ 30, at 8-9.  Tanner alleges that, by June 2016, the MDC staff had not yet achieved compliance with CAA No. 1.  See Amended Complaint ¶¶ 31-32, at 9.  Tanner alleges that the MDC supervisory personnel, including McMurray, Kossman, and Ruiz, received notice and were aware of the facility's non-compliance with the McClendon settlement agreement and the Check-Out Audit Agreements.  See Amended Complaint ¶ 33, at 9.  Tanner alleges that the Medical Services Agreement, the McClendon settlement agreement, and CAA No. 1 were all in effect when she began her term of incarceration at MDC in the last month of gestation of her pregnancy.  See Amended Complaint ¶ 34, at 10.

Tanner alleges that, during her time in the MDC's custody, she and her fetus, Jay Hinton, Jr., were dependent on the MDC and CCS personnel for "access to timely and appropriate prenatal care, medical examinations by a clinician qualified to provide such care, appropriate prenatal laboratory and diagnostic tests, specialized obstetrical services and resources for her pregnancy, transport to an appropriate community facility for delivery and peripartum care, and all emergency medical care."  Amended Complaint ¶ 34, at 10.  Tanner alleges that she could feel Jay Hinton, Jr. "kicking, moving, and exhibiting other signs of life within her."  Amended Complaint ¶ 35, at 10.  Tanner alleges that the records she provided to the MDC of her prenatal care pre-incarceration also disclosed the relevant aspects of her medical history.  See Amended Complaint ¶ 36, at 10-11.

Tanner alleges that she completed a healthcare request form, countersigned by Manqero two days later, upon her arrival to the MDC on October 4, 2016, stating: "I'm pregnant need meds." Amended Complaint ¶ 37, at 11. Tanner alleges that Emergency Medical Technician Roger Boydston completed a "Receiving Screening" form for Tanner upon her arrival to the MDC, indicating that she had been treated for her pregnancy before her incarceration, and checking a box for "RN Review/Plan," which stated: "CCC pregnancy entered Prenatals ordered; Pregnancy labs ordered per protocol, Off-site coordinator notified via e-mail, pregnancy diet started." Amended Complaint ¶ 38, at 11. Tanner alleges that Spencer and Mercer electronically signed the Receiving Screening form. See Amended Complaint ¶ 38, at 11. Tanner alleges that Boydston and Mercer signed another form regarding Tanner and referring to her pregnancy and her substance abuse. See Amended Complaint ¶ 39, at 11. Tanner alleges that Spencer and McMurray signed orders for medication, and for a medical diet for Tanner. See Amended Complaint ¶ 40, at 11. Tanner alleges, accordingly, that McMurray, Manquero, and Mercer, all knew of her "serious medical needs as a pregnant inmate in the last trimester who was incarcerated at MDC and in their care as of October 4, 2016." Amended Complaint ¶ 41, at 12.

Tanner alleges that the MDC personnel never referred her to an OB/GYN clinic or appropriate prenatal care, and that the MDC personnel never attempted to obtain her medical records for her pre-incarceration treatment, despite the mandates in the NCCHC and ACA standards to do so. See Amended Complaint ¶ 42, at 12. Tanner alleges that, upon intake, she was assigned to a housing unit in the MDC (a "pod") and was required to participate in strenuous physical activities "without due regard to her pregnancy or the risks associated with it. Such activities included gathering her belongings and moving them from one tier of the pod to another." Amended Complaint ¶ 43, at 12. Tanner alleges that none of the Defendants "provided or followed advice on levels of activity and safety precautions appropriate" for her pregnancy and its associated risks. Amended Complaint ¶ 43, at 12. Tanner alleges that, on October 14, 2016, Manquero saw her and completed a "Medical History and Physical Assessment with Mental Health" form, and that Tanner reported her pregnancy to Manquero and requested prenatal care. Amended Complaint ¶ 44, at 12. Tanner alleges that, on October 15, 2016, McMurray signed the form Manquero had prepared the day before, but that neither McMurray, Manquero, nor any other CCS personnel conducted appropriate follow-up with Tanner regarding her pregnancy and a plan for medical care. See Amended Complaint ¶ 44, at 12-13.

Tanner alleges that she again requested medical attention early on October 16, 2016, while Rodriguez-Nuñez was on duty in Pod F7, a housing unit at the MDC. See Amended Complaint ¶ 45, at 13. Upon information and belief, Tanner alleges that Rodriguez-Nuñez "lacked adequate training or supervision with regard to pregnant inmates such as Plaintiff Tanner, and the facility was understaffed at

- 10 -

the time." Amended Complaint ¶ 45, at 13. Tanner alleges that Rodriguez-Nuñez "declined and delayed responding to Plaintiff Tanner's initial request for medical attention on October 16, 2016." Amended Complaint ¶ 46, at 13. Tanner alleges that, after Rodriguez Nuñez' delay, she "encountered a roving corrections officer, Rebecca Macias, who escorted her to the medical unit, where she was eventually seen by Defendant Luna." Amended Complaint ¶ 46, at 13.

Tanner next contends that, after Luna saw her, Rodriguez-Nuñez, along with Luna and Sanchez-Filfred, "sent Plaintiff Tanner back to Pod F7 on Sunday morning, October 16, 2016, without providing timely or adequate medical care." Amended Complaint ¶ 47, at 13-14. Tanner then avers that, according to records produced to her as of the date she filed the Amended Complaint, "corrections officer Rebecca Macias relieved Defendant Rodriguez-Nuñez of her duties in Pod F7 for a 30-minute break at approximately 9:40 a.m." on the same day. Amended Complaint ¶ 48, at 14. The records, Tanner asserts, "indicate that Officer Macias had just finished escorting Plaintiff Tanner from the medical unit back to the general housing pod and was aware that she was pregnant." Amended Complaint ¶ 48, at 14.

During the escort, Macias noticed that Tanner needed "immediate medical attention." Amended Complaint ¶ 48, at 14. After unsuccessfully calling the MDC's medical unit to "report her observations," Macias called a "Code 43" signifying an "immediate medical emergency" and then escorted Tanner to the "front waiting area of the medical unit" where she waited "in the presence of Defendant Sanchez-Filfred . . . ." Amended Complaint ¶ 49, at 14. Tanner contends that Luna "summoned corrections officers to place and hold Plaintiff Tanner in a locked, solitary segregation cell within the medical unit contrary to the NCCHC Standards on Restraint and Seclusion," and that Muñoz, "who was posted to the back area of the infirmary, actively participated in placing and holding Plaintiff Tanner in the segregation cell under these circumstances." Amended Complaint ¶ 50, at 14-15.

Tanner avers that, "in concert with Defendant Luna" and Sanchez-Filfred, Muñoz "caused Plaintiff Tanner to be held in the segregation cell within MDC's medical unit for the rest of the day on October 16, 2016, and into the following day on October 17, 2016, without adequate or timely medical care for her serious medical needs." Amended Complaint ¶ 52, at 15.

Tanner contends that, when Muñoz, Luna, and Sanchez-Filfred placed Tanner in the "locked, isolated segregation cell," they did not provide her with a blanket or drinking cup, despite her requests for those items, and "disregarded her requests for timely and appropriate medical care, as well as several clear and obvious symptoms of her serious medical needs and those of Jay Hinton, Jr., who was a viable fetus in the last month of gestation." Amended Complaint ¶ 53, at 15. Tanner alleges that:

While isolated in the segregation cell, [she] continued to experience vaginal discharge, cramping, and pressure, and she observed a strong odor coming from the discharge, which indicated an infection. The discharge soaked through numerous sanitary pads while Plaintiff Tanner was in such extreme discomfort that she was unable to sit down or sit on the toilet.

Amended Complaint ¶ 53, at 15.

Tanner alleges that, throughout the day on October 16, 2016, and continuing through the night and early morning hours of October 17, 2016, she "continued to experience and report her acute emotional and physical distress, as well as her urgent concerns about the life of her fetus, to medical and corrections personnel," including to Muñoz. Amended Complaint ¶ 57, at 17. Tanner asserts that, during this period, she "repeatedly complained of abdominal pain (cramping), vaginal discharge, and a strong feeling of pressure in her lower abdomen/vaginal area, which interfered with her urination and defecation, and caused great discomfort, fear, and anxiety." Amended Complaint ¶ 57, at 17. Tanner asserts that she repeatedly informed medical and corrections personnel -- including Muñoz -- that "she believed she was in labor and requested transport to a hospital for delivery of her child." Amended Complaint ¶ 57, at 17.

Tanner alleges that the personnel -- the named Defendants -- who she informed, including Muñoz, "refused or ignored" her repeated requests both for hospital transport, and "for referral to a clinician qualified to provide appropriate prenatal or peripartum care or obstetric services in accordance with her expressed desires and intent to give birth and to keep the child." Amended Complaint ¶ 58, at 17. Muñoz, along with other Defendants, "repeatedly declined to provide [her] with appropriate prenatal care in accordance with NCCHC and ACA standards." Amended Complaint ¶ 58, at 17. Instead, Tanner contends that:

[T]hey responded to her increasingly serious and life-threatening medical needs by cruelly and maliciously isolating her in a locked solitary segregation cell in MDC's Sheltered Housing Unit or (SHU), which had the effect of preventing other corrections officers and inmates in the general housing units from recognizing, witnessing, and seeking further attention for her serious medical needs and those of her fetus.

Amended Complaint ¶ 58, at 17. Tanner contends that, according to medical records produced to her as of May 23, 2018, her fetus, "Jay Hinton, Jr. was a viable fetus whose heart was still beating on October 16, 2016, and proper medical intervention on that date could have saved his life." Amended Complaint ¶ 59, at 17-18.

Tanner alleges that, BCC, by and through its employees, including Rodriguez-Nuñez and Muñoz, was "aware that she had a serious medical condition which rendered her unable to care for herself or her fetus, and that she was in severe pain . . . [and that BCC, by and through its employees,] acted negligently and recklessly with respect" to Tanner's and her fetus' serious medical needs, "failed to require Defendant CCS to comply with its contractual obligations under the Medical Services Agreement, and failed to comply with BCC's own obligations under the McClendon[1] settlement agreement under conditions that were certain to result in constitutional violations and tort claims." Amended Complaint ¶ 70, at 21.

Regarding her state law claims for "Negligent Operation of Public Medical Facilities, Buildings, Equipment, and Furnishings Against All Defendants,"[2] Amended Complaint at 26, Tanner also requests compensatory damages against Rodriguez-Nuñez and Muñoz, for their alleged negligence, which, Tanner contends, "proximately caused damages and injuries as set forth above, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus," Amended Complaint ¶ 102, at 27. Regarding her state law claims for "Negligent Operation of Public Medical Facilities, Buildings, Equipment, and Furnishings Resulting in the Wrongful Death of Jay Hinton, Jr. Against All Defendants,"[3] Amended Complaint at 32, Tanner also requests compensatory damages against Rodriguez-Nuñez and Muñoz, for their alleged negligence which, Tanner contends, "proximately caused the wrongful death of Jay Hinton, Jr., during the period when he was a viable fetus as described above," Amended Complaint ¶ 126, at 33.

Nov. 19, 2018 MOO at 2-14, 2018 WL 6050675, at **1-7.

---

[1] Tanner's characterization of the McClendon v. City of Albuquerque class is not accurate. In McClendon v. City of Albuquerque, Judge Parker certified "a class of persons presently confined in BCDC or who may/will be so confined in the future" in an Order at 1, filed August 23, 1995 (Doc. 106). Then, Judge Parker certified "a subclass of all persons with mental and/or developmental disabilities who are, or in the future may be, detained at the [BCDC]," in an Order Certifying Sub-Class at 1, filed August 15, 1995 (Doc. 237). Judge Parker did not certify a "class [or subclass] of inmates at the MDC with medical issues in McClendon . . . ." Response to Rodriguez-Nuñez Motion at 5.

[2] Capitalized, because the quoted text is a heading in the Amended Complaint. See Amended Complaint at 26.

[3] Capitalized, because the quoted text is a heading in the Amended Complaint. See Amended Complaint at 32.

# PROCEDURAL BACKGROUND

The Court incorporates the early procedural background from the Nov. 19, 2018 MOO.

> The Amended Complaint raises claims against the Defendants under the Constitution of the United States of America -- specifically the Eighth and Fourteenth Amendments to the United States Constitution -- New Mexico state law, and the New Mexico Inspection of Public Records Act, N.M. Stat. Ann. §§ 14-2-1 to 14-2-12 ("IPRA"). See Amended Complaint at 1. The Amended Complaint raises two counts against Rodriguez-Nuñez and against Muñoz. See Amended Complaint at 26, 32. Count IV raises state law claims for negligent operation of public medical facilities, buildings, equipment, and furnishings against all Defendants, including against Rodriguez-Nuñez and Muñoz. See Amended Complaint at 26. Count VII raises state law claims for negligent operation of public medical facilities, buildings, equipment, and furnishings resulting in the wrongful death of Jay Hinton, Jr. against all the Defendants, including against Rodriguez-Nuñez and Muñoz. See Amended Complaint at 32. Both Rodriguez-Nuñez and Muñoz filed separate Motions to Dismiss. See Rodriguez-Nuñez Motion; Muñoz Motion. Tanner filed a Response to each Motion. See also Plaintiffs' Response in Opposition to Defendant Rodriguez-Nunez's Motion to Dismiss and Brief in Support, filed July 31, 2018 (Doc. 71)("Response to Rodriguez-Nuñez Motion"); Plaintiffs' Response in Opposition to Defendant Munoz's Motion to Dismiss and Brief in Support, filed July 31, 2018 (Doc. 72)("Response to Muñoz Motion"). Both Defendants filed Replies. See also Defendant Rodriguez-Nunez' Reply Memorandum in Support of her Motion to Dismiss, filed August 7, 2018 (Doc. 76)("Rodriguez-Nuñez Reply"); Defendant Muñoz' Reply Memorandum in Support of her Motion to Dismiss, filed August 15, 2018 (Doc. 78)("Muñoz Reply").

Nov. 19, 2018 MOO at 14-15, 2018 WL 6050675, at *7.

## 1.    The Motion to Compel RFP No. 5 Briefing.

On April 9, 2018, Tanner filed the Motion to Compel RFP No. 5, requesting that the Court compel Bernalillo County to timely produce known records responsive to Plaintiff's Request for Production ("RFP") No. 5. See Motion to Compel RFP 5 at 1. Tanner's RFP No. 5 states:

> Please produce the records that officials or agents of the Metropolitan Detention Center provided to the court-appointed medical expert, Dr. Robert Greifinger, during his April 2016 and November 2016 site visits, including but not limited to Continuous Quality Improvement (CQI) and Quality Assurance (QA) reports, Mortality Review Reports, matrices or reports regarding medical care

prepared or signed by the County's contract compliance officer and documents prepared or signed by Dr. Ron Shansky and Dr. Kenneth Ray.

Defendant Board of County Commissioners of Bernalillo County's Response to Plaintiff's First Set of Requests for Production at 2, filed April 9, 2018 (Doc. 38-8)("Bernalillo County RFP Resp. to Plaintiff's First Set"). Bernalillo County responded: "The following was produced on January 24, 2018: 000554-000566 Report on MDC and 000567-000578 Report on MDC." Bernalillo County RFP Resp. to Plaintiff's First Set at 2. Tanner contends that Bernalillo County's response is "not responsive" to her RFP No. 5, because Dr. Greifinger's reports "fail to include the records reviewed by Dr. Greifinger during his April 2016 and November 2016 site visits." Motion to Compel RFP No. 5 at 4-5. Tanner contends that the Bernalillo County RFP Resp. to Plaintiff's First Set are untimely, because Bernalillo County filed them more than 30 days after the Rule 26(f) discovery conference, held pursuant to rule 26(f) of the Federal Rules of Civil Procedure on February 6, 2018. See Motion to Compel RFP No. 5 at 4.

> ### a.     The Motion to Compel RFP No. 5.

Tanner contends that RFP No. 5 seeks the Dr. Greifinger Documents -- records which Dr. Greifinger reviewed during his April, 2016, and November, 2016, site visits as the court-appointed medical expert in the McClendon litigation -- and that the Dr. Greifinger Documents informed the written reports Dr. Greifinger prepared after each site visit, in which Tanner alleges that Dr. Greifinger documented "serious problems with medical care at MDC which are relevant to Plaintiff's claims in this litigation." Motion to Compel RFP No. 5 at 1-3. Tanner argues that

Judge Parker entered an order in <u>McClendon</u> granting the plaintiffs' class counsel access to the Dr. Greifinger Documents, subject to a confidentiality order.

> The records subject to the discovery order in the *McClendon* litigation include: "(1) the Continuous Quality Improvement and quality assurance reports; (2) the Mortality Review Reports; . . . (3) the Stellman Matrix,[4] a report prepared by the County's contract compliance officer, Dr. Roberta Stellman," and "several documents prepared by Dr. Ron Shansky and Dr. Kenneth Ray, the County's compliance contractors," *See McClendon v. City of Albuquerque et al.*, No. 95 CV 024 JAP/ACT, Doc. 1275, at 2-3 (D.N.M. memorandum opinion and order filed Mar. 20, 2017).

Motion to Compel RFP No. 5 at 3. Tanner contends that Judge Parker rejected Bernalillo County's "claim that such documents are privileged or exempt from disclosure." Motion to Compel RFP No. 5 at 3.

Tanner contends that the Dr. Greifinger Documents are relevant for a number of reasons. <u>See</u> Motion to Compel RFP No. 5 at 2-3. Tanner argues that Dr. Greifinger's reports and the Dr. Greifinger Documents "indicate that county officials were on notice of the problems with medical care at MDC and failed to take timely action to remedy them" before Tanner's incarceration while pregnant, and that Tanner alleges that "the stillbirth of her baby during delivery in the MDC infirmary resulted from her lack of access to adequate medical care during her incarceration." Motion to Compel RFP No. 5 at 2. Tanner also argues that the Bernalillo County officials' "awareness of the problems with medical care at MDC during the period from April 2016

---

[4]The Stellman Matrix refers to a set of spreadsheets called the "MDC PSU Quality Management Data Matrix," produced by Dr. Roberta Stellman, M.D., who served as Bernalillo County's contract compliance officer at the time of the <u>McClendon</u> litigation. <u>See</u> Memorandum Opinion and Order Granting in Part [And] Denying in Part Plaintiff-Intervenors' Renewed Objections to Memorandum Opinion and Order on Joint Motion for Enforcement of Interim Order Regarding Access to the MDC at 5, filed October 13, 2015 (Doc. 1207)("Order on Renewed Objections". PSU refers to Psychiatric Services Unit. <u>See</u> <u>McClendon</u>, Case No. 95 CV 024 JAP/ACT, 2010 WL 11619187, at *1 (D.N.M. Sept. 16, 2018)(Parker, J.).

to November 2016 is highly relevant to the claims Plaintiff asserts against the County Defendants in this litigation." Motion to Compel RFP No. 5 at 2. Tanner seeks further discovery on the subject of the officials' awareness, so that she "can properly identify each individual County Defendant with the requisite degree of culpability by the deadline for amending her pleadings," and so that she can "obtain records necessary to meet the deadline for her expert disclosures." Motion to Compel RFP No. 5 at 2-3.

Tanner avers that she has "repeatedly sought production" of the Dr. Greifinger Documents. Motion to Compel RFP No. 5 at 3. According to Tanner, her counsel submitted an IPRA request for the Dr. Greifinger Documents on August 25, 2017, and Bernalillo County provided no records, and responded that Dr. Kenneth Ray's and Dr. Ron Shansky's[5] reports, which comprise a subset of the Dr. Greifinger Documents, "were privileged from disclosure." Motion to Compel RFP No. 5 at 3. On November 30, 2017, Tanner submitted another IPRA request for records relating to "the quality management committee for medical care at the Metropolitan Detention Center (MDC) during the calendar year 2016" and "the *McClendon* Committee at MDC during the calendar year 2016." Motion to Compel RFP No. 5 at 3-4. Bernalillo County responded, on January 9, 2018, that Metropolitan Detention could not locate information on either a quality management committee or a McClendon committee. See Motion to Compel RFP No. 5 at 4. Tanner clarified to what types of committees her request referred, in a letter to Bernalillo County's record custodian and to all of the Defendants' counsel, on January 10, 2018, and also served, on September 22, 2017, an RFP for the records at issue. See Motion to Compel RFP No. 5 at 4.

---

[5]Judge Parker's opinion in McClendon indicates that Drs. Ray and Shansky were Bernalillo County's compliance contractors. See McClendon, Case No. 95 CV 024 JAP/ACT, 2017 WL 3405588, at *1 (D.N.M. March 20, 2017)(Parker, J.).

Tanner alleges that Bernalillo County has made conclusory assertions that "it does not have any responsive records to produce" in response to RFP No. 5. Motion to Compel RFP No. 5 at 5. Tanner contends that, before Bernalillo County can withstand discovery based solely on that contention, it must make "[d]iligent efforts to search all reasonable sources within" its "possession, custody, or control." Motion to Compel RFP No. 5 at 5. Here, Tanner contends, the records responsive to RFP No. 5 "do in fact exist" and "are in the County's possession, custody, or control, because those records were already identified and produced in the *McClendon* litigation within the past year." Motion to Compel RFP No. 5 at 5-6. Tanner contends, furthermore, that Bernalillo County knew of the records' relevance to this litigation, because of Tanner's "IPRA requests and her discovery requests at the outset of this case." Motion to Compel RFP No. 5 at 6. Tanner argues that the burden falls on Bernalillo County to show why it cannot timely produce the responsive records and moves to compel Bernalillo County to timely produce all responsive records. See Motion to Compel RFP No. 5 at 6.

### b. The Response to Motion to Compel RFP No. 5.

Bernalillo County and Defendant Thomas J. Ruiz[6] (the "County Defendants") responded. See The County Defendants' Response in Opposition to Plaintiff's Motion to Compel Defendant Bernalillo County's Response to Request for Production No. 5 [Doc. 38] at 1, filed April 23, 2018 (Doc. 39)("Response to Motion to Compel RFP No. 5"). The County Defendants contend that

---

[6]In the Amended Complaint, Tanner alleges that Ruiz served as Administrator and Chief of Corrections of Metropolitan Detention and "exercised direct supervisory control over the other Defendants" at all relevant times, and that at all relevant times, "he was acting under the color of law and within the scope of his duties and employment as" Metropolitan Detention's Administrator. Amended Complaint ¶ 10, at 3.

Bernalillo County did not provide the Dr. Greifinger Documents in <u>McClendon</u>, but that, instead, "they were provided by Defendant CCS,[7] and they were provided pursuant to the provisions of a Confidentiality Order." Response to Motion to Compel RFP No. 5 at 2. The County Defendants argue that, although, in <u>McClendon</u>, Bernalillo County's counsel "was provided a copy of materials produced by CCS during that litigation pursuant to the [Stipulated Confidentiality Order, No. CIV 95-0024 JAP/KBM, filed April 4, 2017 (Doc. 1276)("First Confidentiality Order")] in that case to view the records," producing the Dr. Greifinger Documents here would violate the First Confidentiality Order's terms prohibiting distribution of the documents other than as prescribed therein.[8] Response to Motion to Compel RFP No. 5 at 2. The County Defendants also inquire why Tanner does not seek "the relevant documents from CCS" directly. Response to

---

[7]In the briefing, the parties refer to the Defendant Correct Care Solutions, LLC, as "CCS". In the MOO, the Court refers to the Defendant Correct Care Solutions, LLC, as "Correct Care".

[8]The First Confidentiality Order describes its scope as follows:

> Information sought by the Plaintiffs and Plaintiff-Intervenors in the above-styled case involves the production of documents which Defendants assert contain information of a confidential, protected, privileged and proprietary nature about Quality Improvement and Quality Assurance and Mortality Review at the Bernalillo County Metropolitan Detention Center. Specifically, the documents at issue include: Continuous Quality Improvement and Quality Assurance reports (Quality Reports), and reports on deaths of class and subclass members (Mortality Review Documents). These documents will hereinafter be referred to as "Confidential Information." The Confidential Information consists of all documents physically or electronically given to Dr. Robert Greifinger M.D., a court-appointed expert, and documents referenced or relied upon by him, prior to and in connection with the preparation of his compliance reports from his April and November 2016 visits, and any documents which will be physically or electronically given to him and documents referenced or relied upon by him in the future.

First Confidentiality Order at 1-2.

Motion to Compel RFP No. 5 at 3. The County Defendants contend that, pursuant to the First Confidentiality Order, they are prohibited from reviewing the Dr. Greifinger Documents to effectively debate their relevance or the applicability of any privileges, and that Tanner should seek the Dr. Greifinger Documents directly from Defendant Correct Care Solutions, LLC ("Correct Care"). See Response to Motion to Compel RFP No. 5 at 3.

c.  **The Reply to the Motion to Compel RFP No. 5.**

Tanner replied. See Plaintiff's Reply to Defendant Bernalillo County's Response to Motion to Compel Regarding Request for Production No. 5 at 1, filed May 7, 2018 (Doc. 43)("Reply to Motion to Compel RFP No. 5"). Tanner argues that Bernalillo County has possession, custody, or control of at least some of the Dr. Greifinger Documents, although Correct Care may also have possession, custody or control over some. See Reply to Motion to Compel RFP No. 5 at 2. Tanner avers that she requests the Dr. Greifinger Documents from both Correct Care and the County Defendants, but that no Defendant has "provided a privilege log or other description identifying the types or categories of records involved or which Defendant has custody of which particular records." Reply to Motion to Compel RFP No. 5 at 2. Tanner argues that the Court may take judicial notice of some basic information from the McClendon court filings, including that Bernalillo County "is a party to the *McClendon* litigation, but CCS is not." Reply to Motion to Compel RFP No. 5 at 2. Tanner contends that Judge Parker entered an order in which

> the Court ordered the County and its medical contractor . . . to provide the following documents to Plaintiff Intervenors: (1) the Continuous Quality Improvement and quality assurance reports; (2) the Mortality Review Reports; and (3) the Stellman Matrix, a report prepared by the County's contract compliance officer, Dr. Roberta Stellman.

McClendon, No. 95 CV 024 JAP/ACT, 2017 WL 3405588, at *1 (D.N.M. March 20,

2017)(Parker, J.)(referencing the Order on Renewed Objections). Tanner contends that Judge

Parker concluded that the "same types of documents were reviewed by Dr. Greifinger for his April

2016 and November 2016 site visits." Reply to Motion to Compel RFP No. 5 at 2 (citing

McClendon, 2017 WL 3405588, at *1). Tanner notes that Judge Parker rejected Bernalillo

County's and its medical contractor at the time, Correctional Healthcare Companies', claim of

privilege for the Dr. Greifinger Documents. See Reply to Motion to Compel RFP No. 5 at 2.

Regarding the First Confidentiality Order and the Stipulated Confidentiality Order,

No. CIV 95-0024 JAP/KBM, filed April 28, 2017 (Doc. 1285)("Second Confidentiality

Order")(collectively, the "Confidentiality Orders"), Tanner contends that the Confidentiality

Orders do not cover all of the records which RFP No. 5 requests. Reply to Motion to Compel RFP

No. 5 at 3. The First Confidentiality Order covers "Continuous Quality Improvement and Quality

Assurance reports (Quality Reports), and reports on deaths of class and subclass members

(Mortality Review Documents)," First Confidentiality Order at 1, and the Second Confidentiality

Order covers "documents prepared by Drs. Ray and Shansky,"[9] Second Confidentiality Order at

---

[9]The Second Confidentiality Order describes its scope as follows:

Information sought by the Plaintiffs and Plaintiff-Intervenors in the above-styled case involves the production of documents which Defendants assert contain information of a confidential, protected, and privileged nature prepared by Bernalillo County's experts Dr. Kenneth Ray and Dr. Ronald Shansky regarding the Bernalillo County Metropolitan Detention Center. Defendants allege Drs. Ray and Shansky were retained by Bernalillo County as consulting experts in the instant litigation. All documents prepared by Dr. Ray and Shansky shall hereinafter be referred to as "Confidential Information." The Confidential Information consists of all documents physically or electronically given to Dr. Robert Greifinger M.D., a court appointed expert, for review and documents referenced or relied upon by him, prior to and in connection with the preparation of his compliance reports from his April and November 2016 visits, and any documents which will be physically

1.  See Reply to Motion to Compel RFP No. 5 at 3 (citing Confidentiality Orders).  Tanner notes that neither confidentiality order references the Stellman Matrix or any other record provided to Dr. Greifinger not encompassed by Confidential Information as each Confidentiality Order defines that term, but, Tanner avers, Dr. Greifinger must have reviewed records in addition to those covered by the Confidentiality Orders, based on the terms of the settlement agreement that preceded his November, 2016, site visit.  See Reply to Motion to Compel RFP No. 5 at 3.

Tanner then addresses the records specifically identified in the Confidentiality Orders.  See Reply to Motion to Compel RFP No. 5 at 4.  Tanner contends that, pursuant to its "Medical Services Agreement with the County, Defendant CCS is required to prepare and submit reports regarding staffing patterns and staffing vacancies to the County's contract compliance officer." Reply to Motion to Compel RFP No. 5 at 4.  See also Medical, Dental, Mental Health, Psychiatric, and Methadone Services Agreement §§ 4.1.26.1-.8, at 44-45, filed May 7, 2018 (Doc. 43-1)("Medical Services Agreement").[10]  Tanner notes that the Medical Services Agreement also

_____

or electronically given to him for review and documents referenced or relied upon by him in the future.  Such Confidential Information will also include documents meeting the description herein that may be physically or electronically given to him for review and documents referenced or relied upon by him in connection with future compliance reports or which will be provided to him in the future.

Second Confidentiality Order at 1-2.

[10]Tanner filed excerpts from the Medical Services Agreement as an exhibit attached to the Reply to Motion to Compel RFP No. 5.  See generally Medical Services Agreement.  Because the exhibit does not include a complete copy of the Medical Services Agreement, in some instances the Court is unable to determine a section number for the text referenced.  In those instances, the Court provides the page number of the Medical Services Agreement upon which the referenced text appears.

requires Correct Care to "provide a monthly staffing matrix report by the 15th of each month." Reply to Motion to Compel RFP No. 5 at 4. See Medical Services Agreement § 4.1.26.7, at 45. Tanner argues that the contract compliance officer is a Bernalillo County employee, and not a Correct Care employee. See Reply to Motion to Compel RFP 5 at 4. See also Medical Services Agreement at 5 (stating that the term "Contract Compliance Officer," for the Medical Services Agreement's purposes, means "the County employee who will provide contract oversight). Tanner argues that, pursuant to Bernalillo County's policy on administrative meetings and reports, Correct Care must also produce "monthly statistical reports," "data necessary to complete the HSU[11] data matrix," and "other records to be distributed" to Metropolitan Detention's upper-level administrative staff (collectively, the "Administrative Meetings and Reports Records"). Reply to Motion to Compel RFP No. 5 at 4. Tanner contends that Bernalillo County has possession, custody, or control of all the Administrative Meetings and Reports Records, because they are "specified in contractual requirements and County policies," and the Confidentiality Orders define none of the Administrative Meetings and Reports Records as Confidential Information. Reply to Motion to Compel RFP No. 5 at 4-5. Tanner contends that the Administrative Meetings and Reports Records are relevant, because they are "likely to reveal the basis for Dr. Greifinger's finding that" Metropolitan Detention staff vacancies put Metropolitan Detention patients at risk of serious harm during the period preceding and overlapping with Tanner's incarceration. Reply to Motion to Compel RFP No. 5 at 5. See Report on the Medical Care at the Bernalillo County Metropolitan Detention Center (MDC) at 2 (dated November 21, 2016), filed April 9, 2018

---

[11]The Medical Services Agreement defines HSU to mean the "Health Service Unit" at Metropolitan Detention. Medical Services Agreement at 5.

(Doc. 38-1)("Nov. 21, 2016 Dr. Greifinger Report")(stating that "staff vacancies" attributable to "several practitioner resignations in July 2016, . . . put MDC patients at risk of serious harm.").

Tanner contends that the Medical Services Agreement also requires Correct Care to produce the QI/QA Records, and, therefore, Correct Care's QI/QA Records produced pursuant to the Medical Services Agreement are subject to Bernalillo County's possession, custody, or control. Reply to Motion to Compel RFP No. 5 at 6. Tanner argues that the QI/QA Records "likely form the basis" for Dr. Greifinger's reports' findings that there was opportunity for improvement at Metropolitan Detention with respect to pregnancy, and that there were numerous deficiencies "with respect to pregnancy, mortality review, and failure to timely implement remedies for same." Reply to Motion to Compel RFP No. 5 at 6. Tanner contends that the QI/QA Records are "relevant to prove Defendants' negligence and deliberate indifference, as well as causation and the existence of unwritten customs or policies at MDC." Reply to Motion to Compel RFP No. 5 at 6.

Tanner contends that the Medical Services Agreement defines a contract monitor as "a health care professional hired by the County of Bernalillo to monitor the quality of clinical performance of the Contractor and review the systems of health care delivery," and that the contract monitor is not a Correct Care employee. Reply to Motion to Compel RFP No. 5 at 6-7. Tanner argues, therefore, that Bernalillo County has possession, custody, or control over the reports its contract monitor prepared or distributed. See Reply to Motion to Compel RFP No. 5 at 7. Tanner contends that Dr. Greifinger need not have relied on the documents which Drs. Ray and Shansky prepared; the fact that "they were provided to Dr. Greifinger for the site visits in question is enough to meet the threshold of relevance." Reply to Motion to Compel RFP No. 5 at 7. Tanner argues that the Defendants waive any claim to privilege by failing to timely assert one. See Reply

to Motion to Compel RFP No. 5 at 7.

Tanner avers that, by phrasing RFP No. 5 in terms of records already produced to Dr. Greifinger, Tanner focused the request on the records most likely to be relevant, the Dr. Greifinger Documents, and minimized the burden on the Defendants of producing those records in this litigation. See Reply to Motion to Compel RFP No. 5 at 7-8. Tanner argues that the Confidentiality Orders do not preclude Bernalillo County from producing records responsive to RFP No. 5, because the Confidentiality Orders do not cover all of the Dr. Greifinger Documents. See Reply to Motion to Compel RFP No. 5 at 9. Tanner contends that, to read the Confidentiality Orders as applying to every record which Dr. Greifinger received or on which he relied "would produce absurd results, because his reports already reference and rely upon several public records which the County has already produced in discovery or in its response to IPRA requests." Reply to Motion to Compel RFP No. 5 at 10. Tanner argues that "[i]f any document became 'confidential' merely because Dr. Greifinger received, reviewed, referenced, or relied upon it in preparing his reports, then everyone including the Court itself would already be in violation of the *McClendon* confidentiality orders due to past public disclosures of such documents." Reply to Motion to Compel RFP No. 5 at 10. Tanner argues that, even if the Court determines the Confidentiality Orders cover more than Tanner contends that they are intended to cover, "the logical response to such a mistake would be to amend the orders," rather than deny Tanner access to the records. Reply to Motion to Compel RFP No. 5 at 11. Tanner avers that nothing in the Confidentiality Orders precludes amendment. See Reply to Motion to Compel RFP No. 5 at 11.

Tanner next asserts that she will pursue any alternative remedies or procedural formalities necessary to obtain the records she requests. See Reply to Motion to Compel RFP No. 5 at 11.

Tanner avers that, without a privilege log, or specific and complete description of the records that are responsive to RFP No. 5 -- which the Defendants are unwilling to produce -- "she is unable to evaluate what type of confidentiality order, if any, is appropriate for those records."  Reply to Motion to Compel RFP No. 5 at 11.  Tanner therefore requests that the Court assist her in identifying which Defendant possesses the responsive records and in requiring that Defendant to provide a log or descriptive tool to identify the responsive records by category.  See Reply to Motion to Compel RFP No. 5 at 11.  Tanner also informs the Court that she stands ready to intervene in McClendon to amend the Confidentiality Orders as necessary, but that she has not intervened, so that the Court can address whether intervening is the most efficient avenue for resolving the issue.  See Reply to Motion to Compel RFP No. 5 at 12.

 2. **The Motion to Compel RFP No. 12 Briefing**.

On June 4, 2018, Tanner filed a second Motion to Compel, a companion motion to the Motion to Compel RFP No. 5.  See Motion to Compel RFP No. 12 at 1.  Tanner's RFP No. 12 states:

> Please produce the records in your possession, custody, or control that you or your agents or principals provided to the court-appointed medical expert in the *McLendon* [sic] litigation, Dr. Robert Greifinger, during his April 2016 and November 2016 site visits, including but not limited to Continuous Quality Improvement (CQI) and Quality Assurance (QA) reports, Mortality Review Reports, matrices or reports regarding medical care, and documents prepared or signed by Dr. Ron Shansky and Dr. Kenneth Ray.

Correct Care Solutions, LCC's [sic] Responses and Objections to Plaintiff's First Requests for Production at 11, filed June 4, 2018 (Doc. 53-2)("CCS' Resp. and Obj. to Plaintiff's First RFPs").

Correct Care responded:

> CCS, through counsel, objects to this Request and respectfully directs

Plaintiff to General Objections Nos. 2, 4 through 6[12] above. CCS, through counsel, further objects to this Request because it seeks information that is not relevant to Plaintiff's claim or CCS's defenses. CCS, through counsel, further objects to this Request because the phrase "your agents or principals" is unclear and calls for a legal conclusion.

CCS' Resp. and Obj. to Plaintiff's First RFPs at 11. In RFP No. 12, Tanner reiterates the same request for the Dr. Greifinger Documents but directs the request to Correct Care rather than to Bernalillo County. See Motion to Compel RFP No. 12 at 1. Tanner incorporates her prior briefing

---

[12]General Objections Nos. 2 and 4 through 6 are as follows:

2. CCS, through counsel, objects to Request for Production Nos. 4 through 9, 11 through 13, and 15 because each is an improper "fishing expedition" insofar as each seeks "any" or "all" documents. Murphy v. Deloitte & Touche Group Ins. Plan, 619 F.3d 1151, 1163 (10th Cir. 2010)("Rule 26(b), although broad, has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition"); Koch v. Koch Indus., Inc., 203 F.3d 1202, 1238 (10th Cir. 2000)(requests for "all documents" are facially overbroad). Accord, Marrujo v. N.M. State Highway Transp. Dep't, 1994-NMSC-116, ¶ 30, 118 N.M. 753, 887 P.2d 747 ("this discovery argument seems more like a 'fishing expedition' than a focused request for probative relevant evidence.").

4. CCS, through counsel, objects to Request for Production Nos. 1 through 4 and 12 through 14 to the extent that each Request seeks information that is protected by the attorney-client privilege and/or work-product doctrine or to the extent that each Request encompasses materials created in anticipation of litigation, and materials exempted from disclosure by the attorney work product immunity.

5. CCS, through counsel, objects to Request for Production Nos. 1 through 4, 6 through 9, 11 through 13, and 15 to the extent that each Request is overly broad, unduly burdensome, oppressive, and excessive in duration as to the time frame for which the records are requested and justifies a protective order.

6. CCS, through counsel, objects to Request for Production No. 4 to the extent that it calls for production of a privilege log for internal documents of CCS. A request for such a log is unreasonable and unduly burdensome in light of the work product doctrine and other privileges protecting such internal documents from discovery.

CCS' Resp. and Obj. to Plaintiff's First RFPs at 2-3.

on the Motion to Compel RFP No. 5 and states additional grounds for granting the Motion to Compel RFP No. 12.  See Motion to Compel RFP No. 12 at 2.

        a.        **The Motion to Compel RFP No. 12.**

First, Tanner states that she has "corresponded and conferred" with Correct Care several times "in an attempt to informally resolve" the issues in the Motion to Compel RFP No. 12 and in other discovery motions.  Motion to Compel RFP No. 12 at 2-5.  Tanner avers that, as "a result of the conferencing and correspondence to date," and because the issues are intertwined with those in the Motion to Compel RFP No. 5, she decided to separate the Motion to Compel RFP No. 12 from the Motion to Compel Ans. and Resp.  Motion to Compel RFP No. 12 at 5.  Tanner contends that there is or may be overlap between the records in Correct Care's possession, custody, or control responsive to RFP No. 12, the records in Bernalillo County's possession, custody, or control responsive to RFP No. 5, and the records subject to the Confidentiality Orders.  See Motion to Compel RFP No. 12 at 5.  Tanner argues that allowing Tanner to intervene in McClendon to amend the Confidentiality Orders would not disrupt the McClendon parties' efforts to achieve prospective relief at Metropolitan Detention pursuant to their settlement agreement.  See Motion to Compel RFP No. 12 at 6.  However, to mitigate any potentially disruptive impact that Tanner's intervention might have on the McClendon parties, Tanner asks the Court to first issue a threshold ruling regarding whether the records in question are relevant, nonprivileged, and subject to the Confidentiality Orders, before Tanner petitions for any relief in McClendon.  See Motion to Compel RFP No. 12 at 7.  Tanner proposes that, if the Court determines the requested records are relevant and nonprivileged, but determines that Tanner need not intervene in McClendon to secure access to them, the Court "can simply enter an appropriate confidentiality order in the present case

which directs both Defendant CCS and Defendant Bernalillo County to produce the records at issue to Plaintiff's counsel with sufficient protections for any subcategories of those records which are lawfully subject to restrictions on disclosure." Motion to Compel RFP No. 12 at 7. Tanner proposes that, if, however, the Court determines that the Confidentiality Orders require amendment, the Court first rule that the records are relevant to this case and that Correct Care's objections to their production are overruled, and second, that the Court refer the issue of amending the Confidentiality Orders to the McClendon court by means of a sua sponte order to show cause or that Tanner refer the issue to the McClendon court by a motion to intervene. See Motion to Compel RFP No. 12 at 8.

Turning to the relevance question, Tanner asserts that "generic, boilerplate objections" do not excuse Correct Care complying with Tanner's discovery request. Motion to Compel RFP No. 12 at 8. Tanner asserts that RFP No. 12 seeks information relevant to Tanner's claims "that she was denied access to necessary medical care for her serious medical needs due to inadequate staffing -- as well as inadequate training and supervision of existing staff -- during the period leading up to and including her incarceration at MDC." Motion to Compel RFP No. 12 at 9. Tanner also contends that the deficiencies Dr. Greifinger's report identified, which the Dr. Greifinger Documents likely substantiated, "are relevant to prove Defendants' negligence and deliberate indifference, as well as causation and the existence of unwritten customs or policies at MDC." Motion to Compel RFP No. 12 at 9.

Tanner next avers that RFP No. 12 "is not overbroad, unduly burdensome, oppressive, or excessive, and does not embark on an improper or speculative 'fishing expedition.'" Motion to Compel RFP No. 12 at 10. Tanner contends that RFP No. 12 imposes no undue burden on Correct

Care where it simply asks Correct Care "to reproduce the same set of records that were already compiled and produced to other counsel in the *McClendon* litigation." Motion to Compel RFP No. 12 at 10-11. Tanner argues RFP 12 is not overbroad, because "it is limited to the time period most likely to uncover evidence relating to Plaintiff's claims." Motion to Compel RFP No. 12 at 11. Tanner argues that, without a privilege log or specific description showing the volume or categories of records responsive to RFP No. 12, "there is no basis in the record to exclude any portion of the requested records as too voluminous or lacking in probative value," and there is no way to reasonably determine whether privileges apply to the specific records. Motion to Compel RFP No. 12 at 11. Regarding privilege, Tanner also argues that, under Judge Parker's reasoning in McClendon, "no viable claim of privilege could apply to the requested records, because any holder of that privilege has already waived it by disclosing the records at issue to Dr. Greifinger, who is a court-appointed expert and not a party representative in that case." Motion to Compel RFP No. 12 at 12. Tanner also contends that Correct Care waived any claim of privilege by failing to timely assert them in response to RFP No. 12, and that Judge Parker rejected application of the self-critical analysis privilege and similar statutory privileges in McClendon. See Motion to Compel RFP No. 12 at 12.

Tanner addresses Correct Care's objection to RFP No. 12 that the phrase "your agents or principals" is unclear and asks for a legal conclusion. Motion to Compel RFP No. 12 at 12. Tanner contends that she clarified the meaning of that phrase in a letter to CCS, see Letter from Arne R. Leonard to the Defendants' Counsel (dated May 7, 2018), filed June 4, 2018 (Doc. 52-2)("May 7 Letter"), and that RFP No. 12 "does not ask for a legal conclusion when it merely calls for the responding party to state its application of the law to a particular set of facts," Motion to Compel

RFP No. 12 at 13. Tanner avers that records responsive to RFP No. 12 are in part in Correct Care's possession and in part in Bernalillo County's possession, and that discovery requests are not objectionable "merely because they call for production of records which may be available from another source." Motion to Compel RFP No. 12 at 13-14. Tanner argues that not all responsive records are subject to the Confidentiality Orders and that Tanner offered to enter a confidentiality order for any subcategory of responsive records "that lawfully requires restrictions on disclosure." Motion to Compel RFP No. 12 at 15. Finally, Tanner requests that the Court impose sanctions if the records are not timely produced. See Motion to Compel RFP No. 12 at 15.

### b.    The Response to Motion to Compel RFP No. 12.

Correct Care responds. See Correct Care Solutions, LLC's Response in Opposition to Plaintiff's First Motion to Compel, filed July 2, 2018 (Doc. 61)("Response to Motion to Compel RFP No. 12"). Correct Care argues that the Dr. Greifinger Documents are outside discovery's scope, a court order protects them from discovery, and, even if they are within discovery's scope and a court order does not protect them from discovery, the Court should recognize Correct Care's self-critical analysis privilege and foreclose the Dr. Greifinger Documents' discovery. See Response to Motion to Compel RFP No. 12 at 1. Correct Care contends that court-appointed expert reports and the materials incorporated in them "are not automatically discoverable, if they are discoverable at all, by an individual litigant in separate litigation." Response to Motion to Compel RFP No. 12 at 1-2. Specifically, Correct Care contends that "discovery that might be permitted in a class action to ensure the safety of all inmates" may not be permitted in "an individual inmate's lawsuit seeking monetary damages for inadequate health care." Response to Motion to Compel RFP No. 12 at 2. Correct Care argues, furthermore, that where a non-class

plaintiff has access to underlying medical records, he or she does not need the healthcare providers'

QI documents.  See Response to Motion to Compel RFP No. 12 at 2.

> Correct Care contends:
>
> A stipulated confidentiality order in <u>McClendon, *et. al.* v. City of Albuquerque, *et. al.*</u>, No. 6:95-cv-00024-JAP-KBM, Document 1276, requires CCS, by virtue of its contract with Bernalillo County, to produce to a court-appointed expert information that otherwise would be immune from discovery or barred from evidence under the Patient Safety and Quality Improvement Act of 2005 (the "PSQIA"), 42 U.S.C. § 299b-21 *et. seq.*; the New Mexico Review Organization Immunity Act ("ROIA"), NMSA 1978, §§ 41-9-1 to -7, or the self-critical analysis privilege partially recognized in <u>Weekoty v. United States</u>, 30 F. Supp. 2d 1343, 1347-48 (D.N.M. 1998)[(Hansen, J.)].

Response to Motion to Compel RFP No. 12 at 6.  Correct Care argues the First Confidentiality

Order is narrowly drafted; does not waive any claim that the Dr. Greifinger Documents are

confidential, protected, privileged, and proprietary; permits disclosure only to "three narrow

categories of people" for limited purposes; does not permit persons granted access to make notes,

copies, or summaries of the documents; requires recipients to make reasonable efforts to safeguard

against accidental disclosure; and requires recipients to return all documents within 30 days of the

<u>McClendon</u> litigation's termination.   Response to Motion to Compel RFP No. 12 at 7.   In

summary, Correct Care argues that, "absent an order from the <u>McClendon</u> Court directing it to

produce documents, or an Order of this Court directing it to violate the <u>McClendon</u> order, CCS is

compelled to withhold documents because they are and continue to be subject to another court's

protection."  Response to Motion to Compel RFP No. 12 at 7-8.  Correct Care avers that the Court

should not negate the <u>McClendon</u> court's orders.  See Response to Motion to Compel RFP No. 12

at 14.

Correct Care requests that, based on public policy, congressional intent in enacting the PSQIA, and this case's particular circumstances, the Court should deny Tanner's motion and protect the Dr. Greifinger Documents from discovery. See Response to Motion to Compel RFP No. 12 at 14. Correct Care contends that the Court should recognize a "fuller version" of the self-critical analysis privilege than the Honorable C. LeRoy Hansen, then-United States District Judge for the United States District Court for the District of New Mexico recognized in Weekoty v. United States, 30 F. Supp. 2d 1343, 1347-48 (D.N.M. 1998)(Hansen, J.)("Weekoty"), because Tanner's lawsuit contains only individual claims, and no class claims, and "the public importance of protecting the QI process at the MDC outweighs" Tanner's private interest. Response to Motion to Compel RFP No. 12 at 15. Correct Care avers that every state has some evidentiary privilege for medical peer review information. See Response to Motion to Compel RFP No. 12 at 15. Correct Care asserts that if the Court fails to protect Correct Care's QI efforts from discovery, the threat of discovery will chill those efforts, and that harm outweighs the benefit of disclosure, because withholding QI information in an individual lawsuit alleging individual harm has no deleterious effect on the party seeking discovery. See Response to Motion to Compel RFP No. 12 at 15.

c.      **The Reply to Motion to Compel RFP No. 12.**

Tanner replies. See Plaintiff's Reply to Defendant Correct Care Solutions, LLC's Response to Plaintiff's First Motion to Compel Response to Plaintiff's Request for Production No. 12 (Doc. 61), filed July 16, 2018 (Doc. 65)("Reply to Motion to Compel RFP No. 12"). Tanner first asserts that Correct Care abandoned, waived, or forfeited certain issues "by failing to specifically support them with citation to relevant authority or evidence in its response." Reply to

Motion to Compel RFP No. 12 at 1. Tanner contends that Correct Care has thereby waived the following objections: that RFP No. 12 unduly burdens it; that the Dr. Greifinger Documents are subject to attorney-client privilege, work product privilege, or a privilege for materials created in anticipation of litigation; that RFP No. 12 is unclear; that RFP No. 12 asks for a legal conclusion; and that records responsive to RFP No. 12 are in Metropolitan Detention reports that Tanner already obtained from Metropolitan Detention by IPRA request. See Reply to Motion to Compel RFP No. 12 at 1-2. Tanner addresses Correct Care's self-critical analysis privilege but notes that she requests the Court deem it waived, because the privilege "was not specifically raised in Defendant's original objections served concurrently with its response to RFP No. 12." Reply to Motion to Compel RFP No. 12 at 2.

Tanner argues that the requested records are within discovery's scope, because, rather than asking for unfettered access to all of the McClendon litigation discovery, she requests only the Dr. Greifinger Documents, a "discrete category of records in a specific time period based on specific concerns raised in Dr. Greifinger's public reports for that time period." Reply to Motion to Compel RFP No. 12 at 2-3. Tanner argues that the caselaw which Correct Care cites in the Response to Motion to Compel RFP No. 12 is inapposite, because it addresses medical negligence tort claims that did not arise in a correctional facility subject to a federal civil-rights consent decree. See Reply to Motion to Compel RFP No. 12 at 3. Tanner argues that, in the context of federal civil-rights claims arising in a correctional facility, and where the peer-review process about which records are requested is at issue, courts have allowed discovery. See Reply to Motion to Compel RFP No. 12 at 4. Tanner contends that both circumstances are present in her litigation, because she raises federal civil-rights claims arising in a correctional facility, and because she alleges that

the peer-review process and QI measures which the McClendon consent decree and Correct Care's public contract with Bernalillo County mandated were deficient in the time period preceding and overlapping with Tanner's incarceration at Metropolitan Detention. See Reply to Motion to Compel RFP No. 12 at 4.

Tanner advances several reasons that federal civil-rights claims differ from ordinary medical negligence claims such as those that Correct Care's cited caselaw addresses. See Reply to Motion to Compel RFP No. 12 at 5. First, she contends that federal civil rights claims involve deliberate-indifference allegations and "not just negligence." Reply to Motion to Compel RFP No. 12 at 5. Because a plaintiff must make a more substantial showing to allege deliberate indifference than that required to show negligence, Tanner contends that more permissive discovery is appropriate where claims involve deliberate indifference. See Reply to Motion to Compel RFP No. 12 at 5. Tanner argues that correctional health care is a subset of medical care with particular records that are relevant to the litigation. See Reply to Motion to Compel RFP No. 12 at 5. Tanner argues that, in the caselaw which Correct Care cites, the parties resisting discovery provided privilege logs or affidavits specifically identifying privilege issues for each document or record requested, whereas here, Correct Care has not produced a privilege log identifying specific responsive records that are privileged or outside of discovery's scope. See Reply to Motion to Compel RFP No. 12 at 6. Tanner avers that, in contrast to Correct Care's general assertions, Tanner identified and attached the relevant portions of Dr. Greifinger's reports to her motions, and that the Dr. Greifinger Documents, which he used to prepare those reports, are not self-critical-analysis or peer-review materials. See Reply to Motion to Compel RFP No. 12 at 7. Tanner argues that, by disclosing the records to Dr. Greifinger in McClendon, Bernalillo County

already waived their confidentiality. See Reply to Motion to Compel RFP No. 12 at 7. Tanner also avers that, although portions of Dr. Greifinger's reports demonstrate Metropolitan Detention's compliance with constitutional standards, other portions of the reports demonstrate deficiencies. See Reply to Motion to Compel RFP No. 12 at 7.

Tanner contends that the Confidentiality Orders' existence is not dispositive, because they are limited in scope and subject to amendment. See Reply to Motion to Compel RFP No. 12 at 8. Tanner reasserts her suggestion that the parties enter into a confidentiality order in this case similar to that entered in McClendon, to resolve Correct Care's concerns by limiting the Dr. Greifinger Documents' disclosure. See Reply to Motion to Compel RFP No. 12 at 9. Regarding the self-critical analysis privilege, Tanner asserts that, in McClendon, Judge Parker rejected application of that privilege to the Dr. Greifinger Documents. See Reply to Motion to Compel RFP No. 12 at 10. Finally, Tanner avers that the parties informally conferred before filing the discovery motions. See Reply to Motion to Compel RFP No. 12 at 12.

**3.    The Motion to Compel Ans. and Resp. Briefing.**

On June 4, 2018, Tanner filed another motion to compel. See Plaintiff's Motion to Compel Ans. and Resp. at 1. In the Motion to Compel Ans. and Resp., Tanner moves the Court to compel Correct Care to timely answer and respond to Plaintiff's First Set of Requests for Admission, Interrogatories, and Requests for Production, filed March 6, 2018 (Doc. 30)("Plaintiff's First Set"), to overrule Correct Care's objections to Plaintiff's First Set, and to award sanctions as deemed appropriate. See Motion to Compel Ans. and Resp. at 1. The Motion to Compel Ans. and Resp. focuses on Correct Care's use of general objections and other problems that Tanner notes as common to several of Correct Care's discovery responses. See Motion to Compel Ans. and Resp.

at 2.  In this MOO, the Court focuses on the portions of the Motion to Compel Ans. and Resp. specific to the issues this MOO addresses.

> ### a.  The Motion to Compel Ans. and Resp.

Tanner notes that Interrogatory No. 4 and RFP No. 4 request "information and records regarding committee work which implicates the supervisory Defendants in this action and serves as a forum for identifying systemic or pre-existing problems regarding access to health care at MDC during the relevant time period."  Motion to Compel Ans. and Resp. at 7.  Tanner contends that, in the McClendon litigation, Judge Parker rejected Correct Care's contentions that a self-critical analysis privilege or PSQIA privilege protects these records from disclosure, and that the recent caselaw Tanner cites in the Motion to Compel RFP No. 5 rejects application of these privileges to the Dr. Greifinger Documents.  See Motion to Compel Ans. and Resp. at 7.  Tanner avers, furthermore, that, even if a privilege applies to a subset of the requested materials, it "could never blanket all committee work," or excuse Correct Care from producing a privilege log to enable the parties and the Court to properly evaluate its privilege claims for specific records. Motion to Compel Ans. and Resp. at 8.  Tanner argues, for instance, that her discovery requests ask for information from meetings other than CQI committee meetings -- at least some of which seem like policymaking body meetings subject to the Open Meetings Act, N.M. Stat. Ann. §§ 10-15-1 to -4, rather than private, self-critical analysis meetings -- at which "health care staff, other health care providers and the jail administration meet regularly to promote communication, information sharing, and to identify and resolve issues."  Motion to Compel Ans. and Resp. at 8. Tanner reiterates the relevance arguments and her willingness to enter into a confidentiality order in this litigation.  See Motion to Compel Ans. and Resp. at 8-9.  Tanner also reiterates that, because

Correct Care asserts different types of privilege which may not be co-extensive -- such as the PSQIA and the self-critical analysis privileges -- in response to the same discovery requests, they must "identify with particularity which specific privilege applies to which specific information or records." Motion to Compel Ans. and Resp. at 22. Tanner contends that, at the very least, Correct Care should identify meetings by date, subject, and participants, because these pieces of information "could not be subject to a colorable claim of privilege." Motion to Compel Ans. and Resp. at 22.

### b.    The Response to Motion to Compel Ans. and Resp.

This MOO focuses on the portions of Correct Care's Response to Motion to Compel Ans. and Resp. relevant to the issues that the MOO addresses. See Correct Care Solutions, LLC's Response in Opposition to Plaintiff's Second Motion to Compel at 10, 20-21, filed July 2, 2018 (Doc. 62)("Response to Motion to Compel Ans. and Resp."). Correct Care withdraws its objections to Interrogatory No. 4, which requests information and documents about Correct Care's patient safety and quality improvement practices at Metropolitan Detention and clarifies its assertion of the PSQIA privilege. See Response to Motion to Compel Ans. and Resp. at 10. Correct Care asks that the Court rule

> on whether it will recognize CCS's evidentiary privilege under the PSQIA; whether, if it does not recognize that privilege, it nonetheless will protect CCS's quality improvement process under the federal common law's self-critical analysis privilege; whether the Court will order CCS to produce in this litigation documents that are subject to a protective order in the McClendon litigation; and whether (and if so, how) the Court will order CCS to produce third-party medical records otherwise protected under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d to d-8, and its implementing regulations.

Response to Motion to Compel Ans. and Resp. at 21.

c.      **The Reply to the Motion to Compel Ans. and Resp.**

The MOO focuses on the portions of Tanner's Reply to Motion to Compel Ans. and Resp. relevant to the issues that the MOO addresses.  See Plaintiff's Reply to Defendant Correct Care Solutions, LLC's Response to Second Motion to Compel and for Sanctions (Doc. 62) at 6-8, filed July 16, 2018 (Doc. 66)("Reply to Motion to Compel Ans. and Resp.").  Tanner argues that, in addition to providing no privilege log, Correct Care presents no legal arguments to support applying a PSQIA privilege, a self-critical analysis privilege, the Confidentiality Orders' terms, or a Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d to d-8 ("HIPAA"), protective order to the records responsive to the discovery requests at issue.  See Reply to Motion to Compel Ans. and Resp. at 6-7.  Regarding the PSQIA privilege argument, Tanner argues that Correct Care has not met its burden of showing that PSQIA applies, because PSQIA is not a blanket protection for any information or communications created for quality control purposes.  See Reply to Motion to Compel Ans. and Resp. at 7.  Regarding the self-critical analysis privilege argument, Tanner contends that Correct Care attempts only to assert that privilege in response to RFP No. 12.  See Reply to Motion to Compel Ans. and Resp. at 7.  Tanner incorporates her arguments on the self-critical analysis privilege from the Motion to Compel RFP No. 5 and the Motion to Compel RFP No. 12 briefing.  See Reply to Motion to Compel Ans. and Resp. at 7-8.  Tanner contends that Correct Care has not responded to her attempts to establish an appropriate protective order for inmate medical records under HIPAA.  See Reply to Motion to Compel Ans. and Resp. at 8.

4.      **The Aug. 20, 2018 KBM MOO.**

The Honorable Karen B. Molzen, United States Magistrate Judge for the United States

District Court for the District of New Mexico, granted the Motion to Compel Ans. and Resp. in part. See Memorandum Opinion and Order at 1, 2018 WL 3972912, at *1, filed August 20, 2018 (Doc. 81)("Aug. 20, 2018 KBM MOO"). In the Aug. 20, 2018 KBM MOO, Magistrate Judge Molzen orders Correct Care to supplement its answers and responses to the Plaintiff's First Set within one week of the entry of the Aug. 20, 2018 KBM MOO. See Aug. 20, 2018 KBM MOO at 6. Magistrate Judge Molzen notes that Correct Care does not specify to which discovery requests its issues apply, and that Correct Care already agreed to supplement its answers and responses. See Aug. 20, 2018 KBM MOO at 5. Magistrate Judge Molzen reminds Correct Care, pursuant to rule 26(b)(5) of the Federal Rules of Civil Procedure, to include a privilege log specifically describing discoverable information that it believes is privileged or subject to protection. See Aug. 20, 2018 KBM MOO at 2. Magistrate Judge Molzen orders that, after Correct Care supplements its discovery responses, the parties confer on any actual remaining objections, and, if unable to resolve issues after conferring, the parties agree to seek informal resolution with the Court's help or to brief the remaining issues. See Aug. 20, 2018 KBM MOO at 3.

### a.  Tanner's Obj. to Aug. 20, 2018 KBM MOO.

Tanner filed objections to the Aug. 20, 2018 KBM MOO. See Tanner's Obj. to Aug. 20, 2018 KBM MOO. Tanner objects to the portions of the Aug. 20, 2018 KBM MOO "which declined to rule on the merits of Plaintiffs' [Motion to Compel Ans. and Resp.] on the grounds that doing so would constitute an advisory opinion, and which declined to impose the sanctions requested in Plaintiffs' motion at this juncture." Tanner's Obj. to Aug. 20, 2018 KBM MOO at 1. Tanner requests that the Court "modify and set aside" those portions of the Aug. 20, 2018 KBM MOO, and either rule on the merits of the Motion to Compel Ans. and Resp. and on the matter of

sanctions, or otherwise remand the matter to Magistrate Judge Molzen for rulings on those issues in light of the current record, which includes Correct Care's supplemental responses, see Correct Care Solutions, LLC's Second Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories, filed September 4, 2018 (Doc. 83-1)("CCS' Second Supp. Ans. and Obj. to Plaintiff's First Set"); Correct Care Solutions, LLC's First Supplemental Responses and Objections to Plaintiff's First Requests for Production, filed September 4, 2018 (Doc. 83-2)("CCS' First Supp. Resp. and Obj. to Plaintiff's First RFPs"); and its privilege log, see Correct Care Solutions, LLC's First Privilege Log, filed September 4, 2018 (Doc. 83-3)("First Privilege Log"), attached to Tanner's Obj. to Aug. 20, 2018 KBM MOO as exhibits, Tanner's Obj. to Aug. 20, 2018 KBM MOO at 1. Tanner also attached a Letter from Arne R. Leonard to Alfred A. Park and Geoffrey D. White (dated August 31, 2018), filed September 4, 2018 (Doc. 83-4)("Aug. 31, 2018 Letter"), and a Summary of Parties' Positions on Plaintiff's Discovery Requests to CCS as of August 31, 2018, filed September 4, 2018 (Doc. 83-4)("Aug. 31, 2018 Status Summary Table"). See Tanner's Obj. to Aug. 20, 2018 KBM MOO at 1. Tanner contends that the record is sufficient for Magistrate Judge Molzen to rule. See Tanner's Obj. to Aug. 20, 2018 KBM MOO at 1-3. Tanner contends that the First Privilege Log does not support its privilege claims or cover all of the records for which it asserts a privilege or protection from disclosure. See Tanner's Obj. to Aug. 20, 2018 KBM MOO at 9. Tanner notes that the First Privilege Log describes rosters, agendas, minutes, and notes for CQI meetings, QI meetings, Medical Advisory Committee meetings, team meetings, staff (team) meetings, use-of-force-policy-training attendance, and attendance. See Tanner's Obj. to Aug. 20, 2018 KBM MOO at 10. Tanner notes "there is no admissible evidence before the Court that these types of meetings were for purposes of reporting

to a [Patient Safety Organization ('PSO')] under the PSQIA or consist of deliberations or analysis of a patient safety evaluation system which qualifies under the PSQIA."  Tanner's Obj. to Aug. 20, 2018 KBM MOO at 10.  Tanner avers that the records which Correct Care describes do not meet the foundational requirements for records qualified for protection under the PSQIA privilege.  See Tanner's Obj. to Aug. 20, 2018 KBM MOO at 10.

### b.   CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO.

Correct Care responds to Tanner's Obj. to Aug. 20, 2018 KBM MOO.  See Correct Care Solutions, LLC's Response Opposing Plaintiff's Rule 72(A) Objections to Magistrate Judge's Memorandum Opinion and Order [Document 83], filed October 31, 2018 (Doc. 106)("CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO").  Correct Care argues that the Court should summarily deny Tanner's Obj. to Aug. 20, 2018 KBM MOO, because Tanner has not made a good-faith effort to meet and confer with the Defendants, pursuant to rule 37(a) of the Federal Rules of Civil Procedure and Local Rule 7.1.  See CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 5-6.  Correct Care notes that Tanner's repeated offer to enter into a qualified protective order under HIPAA is not sufficient evidence of Tanner's willingness to negotiate with the Defendants, because HIPAA "requires such a protective order before protected health information may be disclosed.  Thus, Plaintiff is merely 'offering' to comply with federal law." CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 5-6 (internal quotation marks in original, signifying emphasis and not quotation).  Correct Care contends that a good-faith effort to meet and confer pursuant to federal and local procedural rules requires more than "a single letter that restates a party's positions on the items of discovery."  CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 6.  Correct Care cites to Benavidez v. Sandia National Laboratories, 319

F.R.D. 696 (D.N.M. 2017)(Browning, J.)("Benavidez"), in which the Court held that, to satisfy

the good-faith meeting-and-conference requirement, "there must be some simultaneous, or

sufficiently detailed, comparison of views." CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM

MOO at 6 (internal quotation marks omitted)(quoting Benavidez, 319 F.R.D. at 724). Correct

Care contends that, in Benavidez, the Court concluded that the plaintiff did not confer in good faith

where the plaintiff "waited until near the end of the meet-and-confer deadline to raise discovery

issues," raised discovery issues in a single letter, and declined the defendant's suggestion to extend

the deadline so the parties could discuss discovery issues. CCS' Resp. to Tanner's Obj. to Aug.

20, 2018 KBM MOO at 6 (citing Benavidez, 319 F.R.D. at 724). Correct Care also cites to Zuniga

v. Bernalillo County, No. CIV 11-0877 RHS/ACT, 2013 WL 12333609 (D.N.M. Jan. 10,

2013)(Torgerson, M.J.)("Zuniga"), in which the Honorable Alan C. Torgerson, United States

Magistrate Judge for the United States District Court for the District of New Mexico, held that, in

the District of New Mexico, the meet-and-confer requirement "cannot be complied with by merely

exchanging letters setting forth each parties [sic] position." CCS' Resp. to Tanner's Obj. to Aug.

20, 2018 KBM MOO at 6-7 (internal quotation marks omitted)(alterations added by CCS' Resp.

to Tanner's Obj. to Aug. 20, 2018 KBM MOO)(quoting Zuniga, 2013 WL 12333609, at *2 n.1).

Here, Correct Care asserts that Tanner "wrote one (1) letter and agreed to extend the deadline to

file motions to compel one (1) time. Substantively, that is all she did." CCS' Resp. to Tanner's

Obj. to Aug. 20, 2018 KBM MOO at 11. Correct Care continues:

> Plaintiff did engage in one (1) discussion with CCS about supplementation, but
> Plaintiff took the hardline position that CCS's only recourse would be to produce
> everything Plaintiff demanded, after which Plaintiff would decide whether any
> privilege, immunity, or objection applied. CCS declined to let Plaintiff assume the
> Court's role but agreed to work with Plaintiff to try to craft a protective order.
> However, Plaintiff filed her [Motion to Compel Ans. and Resp.] three (3) days

before the deadline to file motions to compel was set to expire, and without checking back with CCS about the protective order.

CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 11. Correct Care argues that Tanner's efforts do not meet the <u>Benavidez</u> criteria, because Tanner "simply wrote a letter restating her position," and, although Tanner "met telephonically with CCS, Plaintiff simply maintained her position . . . . More is required." CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 12.

Correct Care avers that boilerplate discovery objections are permissible, and the Court should uphold them, "where the discovery at issue is facially objectionable." CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 10 (citing <u>Cotracom Commodity Trading Co. v. Seabord Corp.</u>, 189 F.R.D. 655, 666 (D. Kan. 1999)(Rushfelt, M.J.)(upholding objections to requests for "all documents relating to" and "all documents reflecting" various issues). Correct Care argues that, when faced with objections which a litigant finds overbroad or boilerplate, the proper approach is to meet and confer pursuant to the federal and local procedural rules, and not to file motions to compel. <u>See</u> CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 11. Correct Care also argues that Tanner relies on two cases "for her position that CCS' objections" are "wrongly asserted," and that these cases -- <u>Liguria Foods, Inc. v. Griffith Laboratories, Inc.</u>, 320 F.R.D. 168 (N.D. Iowa 2017)(Bennett, J.), and <u>Heller v. City of Dallas</u>, 303 F.R.D. 466 (N.D. Tex. 2014)(Horan, M.J.) -- are not authoritative, and "articulate approaches to discovery objections that do not appear consistent with Supreme Court precedent." CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 13.

Correct Care also requests that the Court overrule Tanner's Obj. to Aug. 20, 2018 KBM MOO, because Tanner "is using discovery motions as a tool of strategic gamesmanship," which

the fact that Tanner "would only consider an agreement not to pursue CCS's self-critical analysis if CCS showed her the self-critical analysis first" exemplifies. CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 16. Correct Care requests that the Court "overrule Plaintiff's Objections and uphold [the Aug. 20, 2018 KBM MOO] granting in part and denying in part Plaintiff's [Motion to Compel Ans. and Resp.] and sanctions request." CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 19. Correct Care also requests that the Court decline to "reward Plaintiff with additional discovery, or sanctions, where she persists in withholding relevant and discoverable information from CCS." CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 20.

<strong>c.       <u>Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO.</u></strong>

Tanner replies. <u>See</u> Plaintiffs' Reply to Correct Care Solutions, LLC's Response to Rule 72(A) Objections (Doc. 106), filed November 14, 2018 (Doc. 113)("Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO"). Tanner argues that, in the Aug. 20, 2018 KBM MOO, Magistrate Judge Molzen "did not sustain any of CCS's objections to the discovery requests at issue" and that Magistrate Judge Molzen "granted Plaintiff's motion to compel by ordering CCS to supplement its discovery responses." Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 2. Tanner contends that the portion of the Aug. 20, 2018 KBM MOO to which she objects "is the proposition that CCS can be excused from supplementing its discovery responses until after the Court ruled on Plaintiff's motion because issuing a ruling before such supplementation occurs would amount to an advisory opinion." Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 2. Tanner reiterates her argument that "requiring full briefing on a motion to compel and a ruling from the Court on every discovery request as a precondition for supplementation of

discovery responses" is inefficient.  Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 3.  Tanner avers that, although the parties informally conferenced before Tanner filed the Motion to Compel Ans. and Resp., Correct Care never withdrew any of its objections or supplemented its discovery responses; Tanner was, thus, justified in filing the Motion to Compel Ans. and Resp. See Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 3-4.

Tanner acknowledges that the general rule is that "a district court's review of a magistrate judge's ruling on Rule 72(a) objections is limited to the record presented to the magistrate judge at the time of her ruling."  Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 4. Tanner contends, however, that two unusual circumstances exist in her case that may counsel a different form of review.  See Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 4. First, Tanner asserts that Magistrate Judge Molzen, in the Aug. 20, 2018 KBM MOO, invited the parties to brief the remaining issues after Correct Care supplements its discovery responses, and Tanner contends that she accepted that invitation "by filing her Rule 72(a) objections within the requisite time period."  Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 4. Second, Tanner avers that the Court indicated a willingness to resume hearing discovery motions instead of delegating them to a Magistrate Judge.  See Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 4.  Tanner contends that the parties have conferenced and briefed the issues extensively, and yet Correct Care has not produced supplemental discovery responses or identified responsive records for Tanner's discovery requests.  See Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 6.  Tanner requests that the Court hold a hearing on the discovery issues, and that the Court issue a ruling on Tanner's Obj. to Aug. 20, 2018 KBM MOO. See Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 7.  Tanner also contends that

there is "no deficiency in Plaintiff's conferencing efforts which justifies the denial of Plaintiff's motion for discovery sanctions." Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 7. Regarding the self-critical analysis issue, Tanner asserts:

> [I]t appears that CCS is trying to expand some form of self-critical analysis privilege beyond its lawful boundaries to avoid disclosure of evidence documenting problems at MDC which are identified in public reports and contract-compliance records that Plaintiff obtained through IPRA. These efforts to avoid discovery cannot withstand judicial scrutiny for the reasons stated in prior briefing.

Tanner's Reply to Tanner's Obj. to Aug. 20, 2018 KBM MOO at 12.

**5.      The Protective Order Motion Briefing.**

Correct Care filed a motion for a protective order. See Opposed Motion for Protective Order, filed September 5, 2018 (Doc. 84)(" Protective Order Motion"). Correct Care contends that the Court "should enter a protective order forbidding Plaintiff from demanding third parties' medical records or other health information protected by federal or state law, including but not limited to HIPAA." Protective Order Motion at 18. Correct Care contends that the Court should not ask Correct Care to produce a privilege log, or to seek, review, and redact these documents, in response to Tanner's written discovery, because to do so would take a significant amount of time, and would render some of the documents incomprehensible, because of HIPAA's Privacy Rule's compliance requirements for de-identifying medical records. See Protective Order Motion at 18-19.

**a.      The Protective Order Motion.**

In the Protective Order Motion, Correct Care requests that the Court "enter a protective order forbidding Plaintiff from demanding information and documents Congress granted an evidentiary privilege through PSQIA." Protective Order Motion at 19. Correct Care contends that

it maintains a patient safety evaluation system pursuant to PSQIA and implemented through its integrated QI program. See Protective Order Motion at 19. Correct Care contends:

> The CQI program incorporates a variety of committees, studies, reports, educational materials, and other activities and documents. These activities and documents include clinical mortality reviews (also known as morbidity and mortality reviews); patient safety and error reporting systems, and subsequent analyses; and quality improvement studies. Clinical mortality reviews; patient safety and error reporting systems, and subsequent analyses; and quality improvement studies are generated as part of CCS's patient safety evaluation system.

Protective Order Motion at 19-20. Correct Care argues that these documents, generated through its QI initiatives, "are maintained as Patient Safety Work Product," and "are developed for the conduct of patient safety activities designed to improve patient safety, health care quality, and health care outcomes." Protective Order Motion at 20. Correct Care contends that "data, reports, records, memoranda, analyses, and statements concerning patient safety or quality of care" which Bernalillo County "requires CCS to provide" as part of promulgating various policies applicable to Correct Care's functions at Metropolitan Detention, are "generated initially through the CQI program (patient safety evaluation system) for reporting to Center for Patient Safety." Protective Order Motion at 20. Correct Care also contends that "information sought from experts, court-appointed monitors, or county employees," if generated pursuant to Correct Care's patient safety evaluation system under PSQIA, "would still be privileged despite its retention by someone outside CCS." Protective Order Motion at 20.

Correct Care also requests that the Court enter a protective order to forbid Tanner "from demanding information and documents unrelated to her claims or CCS's defenses, and further forbid[] Plaintiff from demanding CCS create documents." Protective Order Motion at 20-21. Finally, the Court "should protect CCS' quality improvement efforts from discovery," even if the

Court declines to recognize Correct Care's immunity under the PSQIA, because of "public policy, Congressional intent as demonstrated by PSQIA, the New Mexico Legislature's intent as demonstrated by ROIA, and the particular circumstances of this case."  Protective Order Motion at 21-22.  Tanner contends that the District of New Mexico recognized the self-critical analysis privilege in the past, and that the Court "should recognize a fuller version of it here," because the public importance of protecting Correct Care's QI efforts from discovery "outweighs Plaintiff's private interest in her lawsuit."  Protective Order Motion at 22.  Tanner argues that, like all other states, the State of New Mexico "enacted an evidentiary privilege for medical peer review information," recognizing the importance of protecting such information from discovery.  Protective Order Motion at 22.  Tanner argues that, if the Court does not protect Correct Care's quality improvement information from discovery, those efforts will be chilled or terminated, whereas, if they are protected from discovery, Tanner's lawsuit suffers no harm.  See Protective Order Motion at 22.

### b.      The Protective Order Motion Response.

Tanner responded.  See Plaintiff's Response to Defendant Correct Care Solutions, LLC's Motion for Protective Order (Doc. 84), filed October 31, 2018 (Doc. 105)("Protective Order Motion Response").  Tanner begins by arguing that the Court should deny the Protective Order Motion "because CCS failed to confer as required by Rule 26(c)(1) before filing it."  Protective Order Motion Response at 1.  Tanner contends that Correct Care's position "that it is not required to meet a conferencing requirement for its motion for protective order" is the opposite of the position it took in the CCS' Resp. to Tanner's Obj. to Aug. 20, 2018 KBM MOO.  Protective Order Motion Response at 3.  Tanner contends that judicial estoppel "precludes CCS from arguing one

version of the conferencing requirement to resist Plaintiff's discovery motion and then, having obtained the benefit of a favorable ruling on that argument," in the Aug. 20, 2018 KBM MOO, "arguing just the opposite with respect to CCS's own, subsequently filed motion." Protective Order Motion Response at 3.

Tanner also argues that the Protective Order Motion is untimely, because "CCS did not file its motion for protective order concurrently with its original objections to Plaintiff's discovery requests, or by the deadline for filing discovery motions regarding those requests under Local Rule 26.6, or by the deadline for responding to Plaintiff's discovery motion." Protective Order Motion Response at 5. Tanner contends that Correct Care did not file the Protective Order Motion until after the deadline that Magistrate Judge Molzen imposed for supplementing Correct Care's discovery responses and after Magistrate Judge Molzen issued her ruling in the Aug. 20, 2018 KBM MOO. See Protective Order Motion Response at 5. Tanner contends that, furthermore, the Protective Order Motion "attempts to raise new evidence and arguments which were not timely raised in earlier rounds of briefing," contrary to the Aug. 20, 2018 KBM MOO's express provisions. Protective Order Motion Response at 5-6.

Tanner reminds that she "has stated from the outset that she will agree to more limited confidentiality orders governing certain categories of documents which are disclosed in discovery, including those for which such an order is required under HIPAA." Protective Order Motion Response at 7. First, Tanner avers that it is less burdensome for Correct Care to produce a privilege log identifying which records pertaining to third parties' medical records or health information protected by federal or state law are at issue, than for the parties to litigate through several rounds of briefing over several months "just to find out what records and information CCS is talking

about." Protective Order Motion Response at 8.  Second, Tanner argues that Correct Care "admits that disclosure is permitted under HIPAA so long as satisfactory efforts have been made to secure a qualified protective order."  Protective Order Motion Response at 8.  Tanner contends that she circulated a revised draft of a proposed confidentiality agreement to all parties, but that Correct Care refuses to participate in crafting a confidentiality order to set terms upon which all parties agree.  See Protective Order Motion Response at 8-9.

Tanner contends that Correct Care "has already produced a privilege log of sorts which appears to list records responsive to Interrogatory No. 4 and RFP No. 4."  Protective Order Motion Response at 9 (citing First Privilege Log at 1).  Tanner contends that, of the records listed on the First Privilege Log, Correct Care raises a HIPAA confidentiality claim only for the CQI meeting agendas for August 27, 2015, September 24, 2015, October 22, 2015, April 26, 2016, and December 29, 2016, and for the QI committee meeting minutes for February 18, 2015, August 27, 2015, September 24, 2015, and April 26, 2016.  See Protective Order Motion Response at 9.  Tanner contends that it would not be unduly burdensome to either place these identified documents under a confidentiality order's terms or to redact patient information from them.  See Protective Order Motion Response at 9.  Tanner contends the same is true for the records responsive to RFP No. 12, which the Motion to Compel RFP No. 12 and related briefing previously discussed, and which Plaintiffs' Rule 72(a) Objections to Magistrate Judge Memorandum Opinion and Order on Plaintiffs' Motions to Compel Defendant Bernalillo County's Response to Request for Production No. 5 and Defendant Correct Care Solutions, LLC's Response to Request for Production No. 12, filed September 19, 2018 (Doc. 88)("Tanner's Obj. to Sept. 5, 2018 KBM MOO"), and related briefing, also discussed.  See Protective Order Motion Response at 9.  Tanner argues that, "[u]nless

CCS is withholding additional responsive records from both Plaintiff's counsel and the County

Defendants' litigation counsel in *McClendon*, the County's production of its existing compilation

of records pursuant to amended confidentiality orders in *McClendon* imposes no significant burden

on CCS."  Protective Order Motion Response at 9-10.

> Turning to RFP No. 13, Tanner avers:
>
> Plaintiffs' RFP No. 13 requests records which document communications from the court-appointed expert in the *McClendon* litigation, Dr. Robert Greifinger, to CCS or its agents or principals during the period from April 2016 to the present.  Plaintiff anticipates that records responsive to this request may include reports, findings, or testimony of the type that have already been produced in response to Plaintiff's IPRA requests, and that already appear in the record in this case.  [See Nov. 21, 2016 Dr. Greifinger Report; Report on the Medical Care at the Bernalillo County Metropolitan Detention Center (MDC) (dated April 22, 2016), filed May 7, 2018 (Doc. 43-2)("April 22, 2016 Dr. Greifinger Report").]  No one has claimed that these types of reports contain third-party health information protected by HIPAA. CCS's motion makes no specific allegation that records responsive to this request are particularly voluminous or that it would be unduly burdensome to prepare a log identifying which ones require a HIPAA confidentiality order or some form of redaction to de-identify patients.

Protective Order Motion Response at 10.  Tanner avers that Correct Care, in its supplemental

response to Tanner's RFP No. 15, "states that CCS keeps an internal log of pregnant inmates which

is responsive to this request and supplies the basis for its supplemental answer to Interrogatory

No. 12."  Protective Order Motion Response at 10.  Tanner contends that a HIPAA confidentiality

order would address Correct Care's concerns regarding redactions and de-identifying patients

listed on the log.  See Protective Order Motion Response at 10.

Next, Tanner argues that the records she seeks are not privileged from disclosure in this

litigation.  See Protective Order Motion Response at 10.  Tanner addresses Correct Care's federal

statutory peer-review privilege claim under PSQIA, Correct Care's New Mexico statutory peer-

review privilege assertion under ROIA, and Correct Care's proposed federal common-law self-

critical-analysis privilege assertion.  See Protective Order Motion Response at 10-11.  Tanner

argues that Correct Care has not adequately supported any of its three privilege claims, where:

> With respect to Interrogatory No. 4 and RFP No. 14, CCS's original objections only asserted these privilege claims in a conclusory manner, without supplying a privilege log or foundational materials necessary to evaluate whether any of the requirements for asserting a privilege were satisfied.  [See Correct Care Solutions, LCC's [sic] Answers and Objections to Plaintiff's First Set of Interrogatories, filed June 4, 2018 (Doc. 53-1)("CCS' Ans. and Obj. to Plaintiff's First Set"); CCS' Resp. and Obj. to Plaintiff's First RFPs.]  CCS did not supply any additional basis for asserting its privilege claims during the informal conferencing that preceded the filing of Plaintiff's discovery motion regarding those discovery requests, even though Plaintiff's counsel pointed out the absence of any basis for these claims in the letter of May 11, 2018.  [See Letter from Arne R. Leonard to Alfred A. Park and Geoffrey D. White at 6-7, 12-13, 15-16 (dated May 11, 2018), filed June 4, 2018 (Doc. 53-3)("May 11, 2018 Letter").]

Protective Order Motion Response at 11.  Tanner contends that, although Correct Care, in its

Response to Motion to Compel Ans. and Resp., stated that it would "clarify its assertion of

privilege under the PSQIA" as to Interrogatory No. 4 and RFP No. 4, Correct Care's Response to

Motion to Compel Ans. and Resp. provides no clarification.  Protective Order Motion Response

at 11 (internal quotation marks omitted)(quoting Response to Motion to Compel Ans. and Resp.

at 10, 13).  Tanner alleges that, in the Response to Motion to Compel Ans. and Resp., Correct Care

identified no specific discovery request to which it asserts its PSQIA or self-critical analysis

privilege.  See Protective Order Motion Response at 11 (citing Response to Motion to Compel

Ans. and Resp. at 21).  Tanner avers that Correct Care's discussion of RFP Nos. 13 and 14 similarly

does not discuss any privilege claims.  See Protective Order Motion Response at 11 (citing

Response to Motion to Compel Ans. and Resp. at 16-17).  Tanner argues that Magistrate Judge

Molzen ruled in the Memorandum Opinion and Order, 2018 WL 4222384, filed September 5, 2018

(Doc. 85)("Sept. 5, 2018 KBM MOO"), that records responsive to RFP No. 12 are not privileged.

See Protective Order Motion Response at 11.

Regarding timing, Tanner suggests that the deadline for Correct Care to file the Protective Order Motion "should have been" the deadline for Correct Care's responses to Tanner's discovery motions and that Correct Care exceeded that deadline when it reasserted privilege claims after Magistrate Judge Molzen issued the Aug. 20, 2018 KBM MOO and the Sept. 5, 2018 KBM MOO. Protective Order Motion Response at 11-12. Tanner argues that, in CCS' Second Supp. Ans. and Obj. to Plaintiff's First Set, and in Correct Care Solutions, LLC's First Supplemental Responses and Objections to Plaintiff's First Requests for Production (dated Aug. 27, 2018), filed September 4, 2018 (Doc. 83-2)("CCS' First Supp. Resp. to Plaintiff's First RFPs), Correct Care withdrew its objections to Interrogatory No. 4 and RFP No. 4, and asserted PSQIA privileges for both. See Protective Order Motion Response at 12 (citing CCS' Second Supp. Ans. and Obj. to Plaintiff's First Set at 5-6; CCS' First Supp. Responses to Plaintiff's First RFPs at 3-4). Tanner avers that, in support of Correct Care's supplemental answer to Interrogatory No. 4 and supplemental response to RFP No. 4, Correct Care provided the First Privilege Log, and the Federally-Listed PSOs, filed September 5, 2018 (Doc. 84-3)("PSO Listing")(an agency listing of PSOs). See Protective Order Motion Response at 12. Tanner avers that Correct Care raises no privilege claim in response to RFP No. 13, and that, in response to RFP No. 14, asserts a PSQIA privilege claim only as to "mortality reports and internal investigation records." Protective Order Motion Response at 12 (internal quotation marks omitted)(quoting CCS' First Supp. Resp. to Plaintiff's First RFPs at 12, 15).

Tanner contends that only Correct Care's PSQIA privilege claim remains and that Correct Care lacks good cause to excuse what Tanner argues is Correct Care's untimely assertion of

privilege claims in the Protective Order Motion.  See Protective Order Motion Response at 12.

Tanner avers that Correct Care's PSQIA privilege claim remains where Correct Care raised it in

its original discovery responses, referred to it in Response to Motion to Compel Ans. and Resp.,

and did not expressly waive it in either CCS' Second Supp. Ans. and Obj. to Plaintiff's First Set

or in CCS' First Supp. Resp. to Plaintiff's First RFPs.  See Protective Order Motion Response at

12.  Tanner argues that, in the Protective Order Motion, Correct Care "provides no authority or

evidence . . . to show good cause why it should be allowed to resurrect or add more privilege

claims, . . . or why it could not have stated the basis for asserting its privileges more fully in its

previous filings."  Protective Order Motion Response at 12.  Tanner argues, furthermore, that

Correct Care waived or forfeited all privilege claims aside from the PSQIA claim in response to

Interrogatory No. 4, where Tanner provided Correct Care with a rule 37 letter and with time

extensions in which to timely assert its privilege claims, and Correct Care did not do so.  See

Protective Order Motion Response at 12-13.

On the merits of the PSQIA privilege as asserted against Interrogatory No. 4, Tanner refers

to prior briefing on the subject.  See Protective Order Motion Response at 13.  Tanner also asserts

that in Plaintiff's Response to Defendant Correct Care Solutions, LLC's Partial Objections to

Memorandum Opinion and Order (Doc. 85) on Plaintiff's First Motion to Compel Response to

Plaintiff's Request for Production No. 12 (Doc. 61), filed October 19, 2018 (Doc. 100)("Tanner's

Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO"), Tanner "distinguished each of the

authorities CCS previously cited in support of its privilege claims and explained why this federal

civil-rights case against governmental defendants and a government contractor differs significantly

from state-law negligence cases against a private health-care provider."  Protective Order Motion

Response at 13.

Tanner addresses what the Protective Order Motion adds in support of Correct Care's PSQIA privilege assertion -- an affidavit from Dawn Ducote, CCS' Director of CQI.  See Protective Order Motion Response at 13 (citing Affidavit of Dawn Ducote in Support of Defendant Correct Care Solutions, LLC's Opposed Motion for Protective Order (executed August 30, 2018), filed September 5, 2018 (Doc. 84-2)("Ducote Aff.")).  Tanner states that the Ducote Aff. attests that Correct Care currently has a contract with the Center for Patient Safety, listed as a PSO, see PSO Listing at 2, and that Correct Care maintains a patient safety evaluation system pursuant to PSQIA, but neither the Ducote Aff. nor the PSO Listing demonstrate that Correct Care contracted with a listed PSO in the time period around 2016 which Tanner's Interrogatory No. 4 and RFP No. 4 cover, see Protective Order Motion Response at 13-14.  Tanner argues, accordingly, that documents such as the Ducote Aff., the First Privilege Log, and the PSO Listing do not satisfy the requirements for the PSQIA privilege to apply; for example, they do not indicate on which dates the documents they reference were entered into the patient safety evaluation system, and they do not expressly state that any particular document to which they refer was created for the express purpose of reporting to a PSO, both prerequisites to qualify for the PSQIA privilege.  See Protective Order Motion Response at 14.  Tanner argues that, by omitting important details regarding the timeline of the documents' submission to the PSO, the Ducote Aff. "gives rise to the reasonable inference that the documents in question were reported to the PSO at some later time, after they had already been utilized or commingled for other purposes such as contract compliance, use in the *McClendon* litigation, or preparation for other litigation."  Protective Order Motion Response at 14.  Tanner posits that various factors support the reasonable inference that the

documents in question were created for multiple or other purposes and are therefore outside the scope of the PSQIA privilege. See Protective Order Motion Response at 14. Tanner points to "the provisions in CCS's contract with the County, the ongoing monitoring activities in the *McClendon* case, and the apparent participation or collaboration between CCS's quality-assurance staff and a court-appointed expert, various County personnel including contract monitors, and alleged 'litigation consultants.'" Protective Order Motion Response at 13-14. Tanner also contends that this case is distinguishable from other cases in which courts have granted PSQIA privileges, because Correct Care has not identified any specific documents as candidates for the PSQIA privilege or provided documents to the Court for in camera review, and the First Privilege Log does not indicate whether the records and meetings at issue were for purposes other than those for which the PSQIA provides protection. See Protective Order Motion Response at 15. Tanner argues that a party may not raise the PSQIA privilege as a blanket privilege over a general category of documents. See Protective Order Motion Response at 16 (citing Quimbey v. Community Health Sys. Prof'l Servs. Corp., No. CIV 14-0559 KG/KBM, 2017 WL 5634111, at *4, *7 (D.N.M. Nov. 22, 2017)(Molzen, M.J.)("Quimbey")).

Turning to the ROIA privilege claim, Tanner avers that Quimbey's ROIA analysis is inapposite, because Quimbey applied ROIA "in the context of a diversity case involving negligence claims brought under state law." Protective Order Motion Response at 16. Tanner argues that, because federal civil-rights law provides the rule of decision for Tanner's claims, federal law preempts ROIA, a state statutory privilege, and that the state privilege does not apply. See CCS' Protective Order Motion Response at 16-17. Tanner avers that, to the extent that federal law does not preempt the ROIA, the ROIA still does not apply for the reasons Quimbey articulates.

See CCS' Protective Order Motion Response at 17.

Tanner also states that federal courts are reluctant to create federal common-law privileges such as Correct Care's purported self-critical analysis privilege, when Congress has expressly spoken on the subject, as it has done in the PSQIA. See Protective Order Motion Response at 17. Tanner contends that the Court should preclude Correct Care from simultaneously raising a PSQIA privilege and a self-critical analysis privilege. See Protective Order Motion Response at 18. Tanner contends that, where Correct Care limited its objections to the PSQIA privilege in prior briefing, the Court should not allow Correct Care to raise the self-critical analysis privilege again in the Protective Order Motion. See Protective Order Motion Response at 18. Tanner contends that the Court should not allow Correct Care to add a privilege log to the record presenting more specific arguments at this juncture, because to allow the addition of a privilege log now "would also be unfair and contrary to the discovery rules." Protective Order Motion Response at 18. Tanner requests that the Court deny the Protective Order Motion, award Tanner sanctions pursuant to rules 26(c)(3) and 37(a)(5) of the Federal Rules of Civil Procedure and grant such further relief as is fair and just, without prejudice to entry of limited and lawful confidentiality orders requiring production of records and information subject to lawful restrictions. See Protective Order Motion Response at 22.

c.      **The Protective Order Motion Reply.**

McMurray, Luna, Sanchez, Manquero, Mercer, Kossman, and Correct Care (the "Health Care Defendants") reply. See Reply in Support of Opposed Motion for Protective Order, filed November 14, 2018 (Doc. 111)("Protective Order Motion Reply"). The Health Care Defendants contend that, after Tanner filed the Protective Order Motion Response, another question arises:

"Did Plaintiff give the Court sufficient reason to deny the Health Care Defendants a protective order?" Protective Order Motion Reply at 1. The Health Care Defendants reiterate arguments from the Protective Order Motion that Correct Care attempted to discuss discovery with Tanner, but that Tanner refused to negotiate and instead demanded that Correct Care produce everything. See Protective Order Motion Reply at 2. The Health Care Defendants contend that Correct Care exceeded rule 26(c)'s requirements, by sending Tanner the Protective Order Motion for her review, although Tanner filed her Motion to Compel RFP No. 5 and Motion to Compel RFP No. 12 "unexpectedly before the end of the deadline for negotiations." Protective Order Motion Reply at 2. The Health Care Defendants also contend that the meet-and-confer requirement does not require litigants to engage in futile conference, where the opposing party seeks to change a party's clearly stated position regarding discovery. See Protective Order Motion Reply at 3. The Health Care Defendants argue, accordingly, that the Court should "reject the Plaintiff's assertion that the Healthcare Defendants failed to attempt to confer with her." Protective Order Motion Reply at 3. The Health Care Defendants also contend that Correct Care timely filed the Protective Order Motion, where rule 26(c) prescribes no deadline in which to file a protective order motion. See Protective Order Motion Reply at 3 (citing Fed. R. Civ. P. 26(c)). The Health Care Defendants argue that, even if the Court determines that the Protective Order Motion "should have been filed earlier," Correct Care showed good cause, because it filed the Protective Order Motion "after it was clear Plaintiff would reject the Court's advice to confer in good faith and seek informal resolution," and "after it was clear that Plaintiff was determined to perpetuate a discovery dispute." Protective Order Motion Reply at 4. The Health Care Defendants also contend that Tanner misapprehends judicial estoppel, which is inappropriate "where the party's change of position is

based on inadvertence or mistake." Protective Order Motion Reply at 4-5. The Health Care Defendants argue that none of the three factors to consider when applying judicial estoppel apply here. See Protective Order Motion Reply at 5. First, the Health Care Defendants argue there is no inconsistent later position issue, because only Correct Care took an earlier position, and the rest of the Health Care Defendants did not. See Protective Order Motion Reply at 5. The Health Care Defendants aver that Correct Care's position has consistently been that the "Plaintiff's discovery exceeds the bounds set out in Federal Rules of Civil Procedure 1, 11(b), and 26(b)(1)." Protective Order Motion Reply at 5. Second, the Health Care Defendants note that Magistrate Judge Molzen granted the Motion to Compel Ans. and Resp. "in part, thus rejecting, not accepting, CCS' earlier position." Protective Order Motion Reply at 5. Last, the Health Care Defendants argue that Tanner "does not show, and cannot show, harm to her should the Court limit her discovery to nonprivileged matter that is relevant to her claims and proportional to the needs of the case." Protective Order Motion Reply at 5.

The Health Care Defendants aver that the Court should reject Tanner's claim that she agrees to follow federal law, because, where parties do not agree to a HIPAA-qualified protective order, it is Tanner's obligation to ask the Court to enter one, and Tanner has not asked for such a protective order. See Protective Order Motion Reply at 6. The Health Care Defendants argue that Tanner's stated position that Correct Care must voluntarily waive its patients' HIPAA-protected health information is incorrect and, furthermore, that Tanner's statement that she will agree to entry of a HIPAA-qualified protective order is no more than Tanner agreeing to comply with federal law. See Protective Order Motion Reply at 5-6.

The Health Care Defendants argue that Tanner does not contest that a PSQIA evidentiary

privilege exists or that Correct Care qualifies for it:

> Plaintiff did not challenge, and therefore accepts, the Health Care Defendants' position that Plaintiff's Interrogatory No. 4 and her RFP Nos. 4, 12, 13, and 14 require CCS to produce documents and information PSQIA grants an evidentiary privilege. See, [Ducote Aff.], at ¶¶ 1-15. Plaintiff did not challenge, and therefore accepts, that CCS contracted with Center for Patient Safety to be CCS's patient safety organization ("PSO"). Id. at ¶ 3. Plaintiff did not challenge, and therefore accepts, that the Center for Patient Safety is a federally listed PSO. See, Exhibit 82-3.

> Plaintiff did not challenge, and therefore accepts, that CCS maintains a patient safety evaluation system pursuant to PSQIA. See, Exhibit 82-4,[13] Ducote Affidavit, at ¶ 4. Plaintiff did not challenge, and therefore accepts, that documents generated through CCS's QCI initiatives are maintained as Patient Safety Work Product. Id., ¶ 9. Plaintiff did not challenge, and therefore accepts, that if information sought from experts, court-appointed monitors, or county employees was generated pursuant to CCS's patient safety evaluation system under PSQIA, the information would still be privileged despite its retention by someone outside CCS. Id., ¶ 13. See, 42 U.S.C. § 299b-22(d).

Protective Order Motion Reply at 6-7.

The Health Care Defendants also argue that they are not required to create documents for Tanner and that Tanner may not rewrite her discovery requests "midstream." Protective Order Motion Reply at 7. The Health Care Defendants contend, accordingly, that Interrogatory Nos. 2, 3, 4, 6, 8, 9, 10, and 11, and RFP Nos. 2, 3, 4, 6, 8, 9, 11, 12, 13, 14, and 15, are impermissible, and that the Health Care Defendants are entitled to a protective order. See Protective Order Motion Reply at 8. The Health Care Defendants argue, furthermore, that Tanner demands "information

---

[13]The Court is unable to determine to which document Exhibit 82-4 refers, as entry 82 on the docket for the case is a Certificate of Service with no documents attached. See Certificate of Service, filed August 27, 2018 (Doc. 82).

and documents untethered to her original discovery requests." Protective Order Motion Reply at 8.

The Health Care Defendants aver, turning to the self-critical-analysis privilege argument, that Magistrate Judge Molzen rejected the privilege as applying to Correct Care, in the Sept. 5, 2018 KBM MOO. See Protective Order Motion Reply at 9. The Health Care Defendants ask that the Court reconsider Magistrate Judge Molzen's ruling on the self-critical analysis privilege's application. See Protective Order Motion Reply at 9-10. The Health Care Defendants assert that the Court may, pursuant to rule 54(b) of the Federal Rules of Civil Procedure, reconsider Magistrate Judge Molzen's ruling "any time before the termination of the litigation." Protective Order Motion Reply at 10. Last, the Health Care Defendants ask the Court to reject Tanner's sanctions request as improper, because Tanner includes the request in her response brief and not in an affirmative motion. See Protective Order Motion Reply at 10.

### 6. **The Sept. 5, 2018 KBM MOO.**

Magistrate Judge Molzen denied the Motion to Compel RFP No. 5 and the Motion to Compel RFP No. 12, based on the Confidentiality Orders. See Sept. 5, 2018 KBM MOO at 1, 2018 WL 4222384, at *1. In the Sept. 5, 2018 KBM MOO, Magistrate Judge Molzen addresses only the objections that the Defendants raise in initial discovery responses and rely on in their responses to the Motion to Compel RFP No. 5 and the Motion to Compel RFP No. 12. See Sept. 5, 2018 KBM MOO at 3, 2018 WL 4222384, at *2. Magistrate Judge Molzen deemed the Defendants' other objections waived. See Sept. 5, 2018 KBM MOO at 3, 2018 WL 4222384, at *2.

Magistrate Judge Molzen determined that, while the documents which the Motion to

Compel RFP No. 5 and the Motion to Compel RFP No. 12 request "are otherwise discoverable, they are subject to the protection based upon the confidentiality orders in the *McClendon* case." Sept. 5, 2018 KBM MOO at 4, 2018 WL 4222384, at *2. Regarding the documents' relevance, Magistrate Judge Molzen determined:

> Thus, the documents Dr. Greifinger reviewed to make his findings may provide Plaintiff with information concerning the medical care, or lack of medical care, that was available to Plaintiff at the relevant time period. Moreover, those documents may be relevant to the awareness of officials of any problems with the delivery of medical care to inmates.

Sept. 5, 2018 KBM MOO at 5, 2018 WL 4222384, at *3. Magistrate Judge Molzen rejected the Defendants' argument that, because Dr. Greifinger concluded that the Metropolitan Detention's health care met constitutional standards, the Dr. Greifinger Documents are not relevant. See Sept. 5, 2018 KBM MOO at 5, 2018 WL 4222384, at *3.

Magistrate Judge Molzen ruled that, because Tanner requests only the Dr. Greifinger Documents, which were already provided to him in McClendon, and which only cover a specific time period overlapping with Tanner's incarceration -- not all of the McClendon discovery -- Tanner's request is not unduly burdensome. See Sept. 5, 2018 KBM MOO at 5-6, 2018 WL 4222384, at *3. Magistrate Judge Molzen concluded, furthermore, that the requested documents are within discovery's scope, "because the instant is a medical malpractice case, not a class action case generally based on alleged deficiencies in MDC's conditions of confinement," and Tanner also raises "a Section 1983 claim based upon inadequate medical care while detained." Sept. 5, 2018 KBM MOO at 6, 2018 WL 4222384, at *3. Magistrate Judge Molzen concluded that, although this case is not a class action, "documents concerning the medical care available at MDC are nonetheless relevant to Plaintiff's claims and within the scope of discovery." Sept. 5, 2018

KBM MOO at 6, 2018 WL 4222384, at *3. Magistrate Judge Molzen concluded that, in Weekoty, Judge Hansen recognized a self-critical analysis privilege "in the context of morbidity and mortality conferences conducted by physicians for the purpose of peer review of the care and treatment of patients." Sept. 5, 2018 KBM MOO at 7, 2018 WL 4222384, at *4 (citing Weekoty, 30 F. Supp. 2d at 1345). Magistrate Judge Molzen stated, however, that in Bravo v. Board of County Commissioners for the County of Dona Ana, No. CIV 08-0010 WJ/KBM, 2009 WL 10706756, at *2 (D.N.M. Nov. 24, 2009)(Molzen, M.J.)("Bravo"), she "declined to extend that privilege to self-evaluation records concerning medical care in a prison." Sept. 5, 2018 KBM MOO at 7-8, 2018 WL 4222384, at *4 (citing Bravo, 2009 WL 10706756, at *2-3). Magistrate Judge Molzen explained that, in Bravo, she examined four requirements that a party asserting the self-critical analysis privilege must demonstrate:

> "(1) the information results from a critical self-analysis performed by the party seeking production; (2) the public has a strong interest in preserving the free flow of the type of information sought; . . . (3) the information is of the type whose flow would be curtailed if discovery were allowed"; and (4) the document "was prepared with the expectation that it would be kept confidential, and has in fact been kept confidential."

Sept. 5, 2018 KBM MOO at 8, 2018 WL 4222384, at *4 (quoting Bravo, 2009 WL 10706756, at *2). In Bravo, Magistrate Judge Molzen explained that the third requirement is not met in the prison context. See Bravo, 2009 WL 10706756, at *3. See also Sept. 5, 2018 KBM MOO at 8, 2018 WL 4222384, at *4 (stating the court's conclusion in Bravo that the third requirement is not met in the prison context). Magistrate Judge Molzen also notes that the demand for public accountability in the prison context "will ensure that self-analysis continues, whether that information is kept confidential or not," and that, in McClendon, Judge Parker twice determined that no self-critical-analysis privilege applies to "the exact same documents that Plaintiff now

- 64 -

seeks." Sept. 5, 2018 KBM MOO at 8, 2018 WL 4222384, at *4. For the foregoing reasons, Magistrate Judge Molzen determined that the self-critical analysis privilege does not apply to the Dr. Greifinger Documents, and Magistrate Judge Molzen overruled Correct Care's objection to producing the documents on the basis of an asserted self-critical analysis privilege. See Sept. 5, 2018 KBM MOO at 9, 2018 WL 4222384, at *4.

Last, Magistrate Judge Molzen has determined that the requested documents are subject to the Confidentiality Orders, because the Confidentiality Orders describe confidential information as including all of the Dr. Greifinger Documents, and the Confidentiality Orders encompass documents prepared by Drs. Ray and Shansky, as well as QI/QA Records and reports on the deaths of class and subclass members (Mortality Review Documents). See Sept. 5, 2018 KBM MOO at 10, 2018 WL 4222384, at *4. Magistrate Judge Molzen reviewed the disclosure provisions in the Confidentiality Orders:

- The confidential information may only be shared with counsel for a party to the *McClendon* action, court reporters transcribing a proceeding in *McClendon*, and independent experts retained by a party in the *McClendon* case for the purpose of addressing methodology used by Dr. Greifinger.

- No person granted access to the confidential information shall make copies, take notes, or otherwise summarize the contents of the information.

- "If a dispute arises as to whether a particular person should be granted access to Confidential Information, the party seeking disclosure may move the Court to permit the disclosure and must obtain an order of the Court before disclosing information."

- "Confidential Information may be used only for the purposes of [the *McClendon*] litigation."

Sept. 5, 2018 KBM MOO at 10, 2018 WL 4222384, at *4 (quoting First Confidentiality Order at 3-4; Second Confidentiality Order at 3-4). Magistrate Judge Molzen concluded that she "cannot

make amendments to an Order entered by Judge Parker in a separate case"; "cannot order disclosure of documents protected in another case"; and that the Defendants may not disclose the documents which the Confidentiality Orders protect, until "the *McClendon* Court amends its Confidentiality Orders or makes a further order." Sept. 5, 2018 KBM MOO at 11, 2018 WL 4222384, at *5. Accordingly, Magistrate Judge Molzen denied the Motion to Compel RFP No. 5 and the Motion to Compel RFP No. 12. See Sept. 5, 2018 KBM MOO at 11, 2018 WL 4222384, at *5.

### a. Tanner's Obj. to Sept. 5, 2018 KBM MOO.

Tanner objected to the Sept. 5, 2018 KBM MOO, asserting that Magistrate Judge Molzen erred as a matter of law to the extent the Sept. 5, 2018 KBM MOO "misinterpreted the *McClendon* confidentiality orders as applying to all of the records which are responsive to Plaintiff's requests for production." Tanner's Obj. to Sept. 5, 2018 KBM MOO at 1. Tanner asks that, to the extent Magistrate Judge Molzen "lacks authority to amend or determine the scope of the *McClendon* confidentiality orders," Magistrate Judge Molzen should have deferred ruling on the Motion to Compel RFP No. 5 and the Motion to Compel RFP No. 12, or denied the Motion to Compel RFP No. 5 and the Motion to Compel RFP No. 12 without prejudice "so that this Court can order disclosure of the requested records after Plaintiffs intervene and get a ruling from the *McClendon* court on the issue." Tanner's Obj. to Sept. 5, 2018 KBM MOO at 1. Tanner requests that the Court affirm the portions of the Sept. 5, 2018 KBM MOO "concerning the relevance, discoverability, and non-privileged nature of the requested records," and requests that the Court

modify or set aside the remaining portions of the Sept. 5, 2018 KBM MOO.  Tanner's Obj. to Sept. 5, 2018 KBM MOO at 1.

Tanner informs the Court that, concurrent with filing Tanner's Obj. to Sept. 5, 2018 KBM MOO, Tanner is filing a motion to intervene in <u>McClendon</u>, which Tanner avers is the proper procedure for accessing discovery materials covered by a confidentiality order.  <u>See</u> Tanner's Obj. to Sept. 5, 2018 KBM MOO at 2.  Tanner asserts that

> Plaintiffs are technically not required to obtain a ruling from this Court before moving to intervene in the *McClendon* litigation, [but that] Plaintiffs did so in order to make a preliminary showing that the requested records and information are relevant, discoverable, and not subject to a claim of privilege in the present case.

Tanner's Obj. to Sept. 5, 2018 KBM MOO at 3.  Tanner also contends that Tanner's motion to intervene in <u>McClendon</u> does not transfer to Judge Parker the authority to control ongoing discovery in this case and that the Court must decide "what to do next with that discovery after the issues concerning the protective order are resolved."  Tanner's Obj. to Sept. 5, 2018 KBM MOO at 4.  Tanner requests, therefore, that regardless whether intervention in <u>McClendon</u> is necessary, the Court should reconsider the portions of Magistrate Judge Molzen's ruling to which Tanner objects and should grant the Motion to Compel RFP No. 5 and Motion to Compel RFP No. 12. <u>See</u> Tanner's Obj. to Sept. 5, 2018 KBM MOO at 4.

### b.      **CCS' Resp. to Tanner's Obj. to Sept. 5, 2018 KBM MOO.**

Correct Care responded to Tanner's Obj. to Sept. 5, 2018 KBM MOO.  <u>See</u> Correct Care Solutions, LLC's Response in Opposition to Plaintiff's Rule 72(A) Objections to Magistrate Judge's Memorandum Opinion and Order on Plaintiff's Motions to Compel Defendant Bernalillo County's Response to Request for Production No. 5 and Defendant Correct Care Solutions, LLC's Response to Request for Production No. 12, filed October 19, 2018 (Doc. 101)("CCS' Resp. to

Tanner's Obj. to Sept. 5, 2018 KBM MOO").  First, Correct Care argues that the protective orders in McClendon protect the Dr. Greifinger Documents from discovery in this case, because the McClendon parties sealed the Dr. Greifinger Documents, the Dr. Greifinger Documents did not underpin a judicial decision in McClendon, and the Dr. Greifinger Documents "exist solely because of a lawsuit."  CCS' Resp. to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 5-7.  Second, Correct Care contends that Tanner's request for the Dr. Greifinger Documents evinces her intent to treat Dr. Greifinger as her own expert and that, when litigants treat court-appointed experts as party experts, they compromise the experts' perceived impartiality.  See CCS' Resp. to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 9.  Third, Correct Care contends that Magistrate Judge Torgerson's Memorandum Opinion and Order in McClendon, No. CIV 95-0024 JAP/ACT, 2012 WL 13076190 (D.N.M. Oct. 12, 2012)(Torgerson, M.J.)("Torgerson Order") governs what the McClendon plaintiffs and plaintiff-intervenors may demand from Bernalillo County's then-medical contractor, and that it now governs what Tanner may seek from Correct Care, "except insofar as Judge Parker has amended that Order."  CCS' Resp. to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 11.

Correct Care requests that the Court reject Tanner's contention that the Confidentiality Orders are unclear.  See CCS' Resp. to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 16.  Correct Care avers that the Torgerson Order entitles the McClendon plaintiffs and plaintiff-intervenors to review a limited subset of documents that Correct Care and Bernalillo County create -- the Dr. Greifinger Documents -- and that, according to the governing Torgerson Order, anything not specifically identified in the Confidentiality Orders but covered by their scope is confidential.  See CCS' Resp. to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 16-17.  Correct Care contends,

accordingly, that the Court should uphold Magistrate Judge Molzen's Sept. 5, 2018 KBM MOO to the extent it defers to the McClendon protective orders. See CCS' Resp. to Tanner's Obj. to Sept. 5, 2018 KBM MOO. Last, Correct Care posits that the reason the McClendon plaintiffs and plaintiff-intervenors have not opposed Tanner's proposed intervention in McClendon may be that these parties are engaged in a conspiracy to generate information helpful to counsel representing inmates or former inmates, and that, if purely a desire to reform Metropolitan Detention motivates the McClendon plaintiffs and plaintiff-intervenors, remaining silent regarding Tanner's intervention is irrational, because Tanner's intervention would undermine the reform efforts by disincentivizing Metropolitan Detention's and Correct Care's self-critical analysis. See CCS' Resp. to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 18-19.

### c.   Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO.

Tanner replied. See Plaintiffs' Reply in Response to Correct Care Solutions, LLC's Response to Plaintiffs' Rule 72(a) Objections (Doc. 101), filed November 2, 2018 (Doc. 109)("Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO"). Tanner begins by clarifying that the crux of her argument is that Correct Care has not identified "which specific documents are covered by those confidentiality orders and who has them. Answering those questions is a necessary prerequisite to complying with the lawful procedure for amending and determining the scope of the confidentiality orders." Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 1. Tanner also contends that her dispute over the Confidentiality Orders is with the County Defendants -- Bernalillo County and Ruiz -- and not with Correct Care. See Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 3. Tanner argues: "Unless CCS has additional records responsive to RFP No. 12 beyond those in the possession, custody, or

control of the County, CCS would appear to have no standing to object or further contest the County's production of records responsive to that request pursuant to amended confidentiality orders in <u>McClendon</u>." Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 3. Tanner argues there is no appearance of impropriety in her motion to intervene in <u>McClendon</u> and asserts that she is not engaged in a conspiracy with the <u>McClendon</u> plaintiffs and plaintiff-intervenors. <u>See</u> Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 3. Tanner argues that amending the Confidentiality Orders would appropriately avoid or mitigate future problems with respect to sealing or unsealing <u>McClendon</u> court records, because the amended confidentiality orders "will set the terms under which Plaintiffs' counsel can access and use the documents covered by it, and subject Plaintiffs' counsel to enforcement measures if they publicly file a confidential document as one attorney in <u>McClendon</u> is alleged to have done." Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 4. Tanner suggests that amended confidentiality orders could include a provision requiring "that documents designated as 'confidential' pursuant to those orders contain a prominent stamp on each page labeling them as such" to help avoid ambiguity about whether a particular document is confidential and to guard against inadvertent disclosure. Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 5.

Tanner avers that Judge Parker's recent ruling in <u>McClendon</u> granting a protective order motion, <u>see</u> <u>McClendon</u>, 328 F.R.D. 567, 569 (D.N.M. 2018)(Parker, J.), has no bearing on her requests, because the documents she requests do "not fall under the categories of *ex parte* communications or future deposition testimony covered by the ruling granting the recent motion for protective order in that case." Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 5. Tanner argues that, although one <u>McClendon</u> document was recently inadvertently unsealed,

her requests do not consider or involve that document, and, furthermore, the "Court can still review that document regardless of whether it is sealed or unsealed, or which counsel are presently authorized to access it." Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 6. Tanner also argues that, where Bernalillo County produced Dr. Greifinger's reports without objection in response to Tanner's August 25, 2017, IPRA request, and where Correct Care publicly filed excerpts from Dr. Greifinger's reports, "it is beyond dispute that those reports are publicly sourced documents, and Defendants have waived or forfeited any argument to the contrary at this point." Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 7. Tanner contends, furthermore, that, just as the fact a litigant files a particular document with the Court does not mean there is an absolute right of public access to that document, the fact that a litigant designates a particular document as confidential does not automatically mean there is an absolute prohibition on public access to that document. See Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 8. Tanner argues that, because the Confidentiality Orders were entered on stipulation rather than on a finding of good cause, the parties can designate whatever they want as confidential, can challenge confidentiality designations, can move to unseal documents at issue, or can allow the Confidentiality Orders' amendment. See Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 8.

Tanner clarifies that she does not seek to make all records responsive to RFP No. 12 into publicly accessible court filings. See Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 8. Tanner contends, rather, that she seeks to make responsive records discoverable under the terms applicable to the McClendon parties to the Confidentiality Orders. See Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 9. Tanner avers, however, that she does not know

what records are filed under seal in <u>McClendon</u>, so she cannot ask the Court to unseal particular records. <u>See</u> Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 9.

Tanner next argues that records responsive to RFP No. 12 exist independently of the <u>McClendon</u> consent decree and predate the Confidentiality Orders. <u>See</u> Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 10. Tanner contends, in response to Correct Care's argument, that granting Tanner access to the requested records does not affect Dr. Greifinger's status as a court-appointed expert in <u>McClendon</u>, and that rule 706 of the Federal Rules of Evidence allows similar discovery concerning a court-appointed expert to what Tanner requests. <u>See</u> Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 11. Tanner reiterates, furthermore, that she does not seek records or information exclusive to <u>McClendon</u> which other parties to <u>McClendon</u> are not authorized to receive. <u>See</u> Tanner's Reply to Tanner's Obj. to Sept. 5, 2018 KBM MOO at 12.

### d.      CCS' Partial Obj. to Sept. 5, 2018 KBM MOO.

Correct Care filed partial objections to the Sept. 5, 2018 KBM MOO. <u>See</u> CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 1. Correct Care first argues that Tanner, without Court approval, "impermissibly expanded the scope of discovery," by directing RFP No. 12 towards general health care at Metropolitan Detention, making it an overly broad inquiry not closely related to her pregnancy and prenatal care claims, or proportional to the case's needs. CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 12-13. Correct Care also argues that the Sept. 5, 2018 KBM MOO "rejects the federal common law privilege for self-critical analysis," relying primarily on two sources, and, "without considering New Mexico public policy, Congress's intent in passing the PSQIA, or the previous recognition of the privilege in the District of New Mexico." CCS' Partial

Obj. to Sept. 5, 2018 KBM MOO at 13-14. Correct Care argues that the need for a self-critical analysis privilege "has been recognized for at least two generations," as have the consequences of not recognizing the privilege. CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 15.

Correct Care contends that Magistrate Judge Molzen correctly ruled that the Confidentiality Orders protect Tanner's requested documents responsive to RFP No. 12 from disclosure, but that Magistrate Judge Molzen should have limited Tanner's ability to discover responsive documents, should not have compelled Correct Care to respond to RFP No. 12, and should have recognized the self-critical analysis privilege's applicability. See CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 16-17.

         e.    **Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO.**

Tanner responds to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO. See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 1. Tanner first contends that Bernalillo County did not timely object to the Sept. 5, 2018 KBM MOO, so Bernalillo County has not timely challenged Magistrate Judge Molzen's rulings as to relevance, discoverability, or privilege with respect to the records in Bernalillo County's possession. See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 1-2. Tanner avers that, in response to Magistrate Judge Molzen's rulings that the requested records are subject to the Confidentiality Orders, and that Magistrate Judge Molzen lacks authority to modify those orders, Tanner filed a motion to intervene in McClendon. See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 1-2. Tanner argues that, if the McClendon court grants Tanner's motion to intervene and Bernalillo County is obliged to produce all records responsive to RFP No. 12 under the terms of amended confidentiality orders in McClendon, CCS' Partial Obj. to Sept. 5, 2018 KBM MOO may become

moot.  See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 2.  "If Plaintiff receives a complete set of records responsive to RFP No. 12 from the County, then it would not be necessary for CCS to produce a second set of the exact same records, and CCS would lack standing to object to the County's production."  Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 2.  Tanner contends that, to avoid Correct Care and Bernalillo County producing duplicate records, the Court and the parties should "first determine which parties or which parties' litigation counsel in which case have possession, custody, or control of the records responsive to RFP No. 12, and then to determine which court is going to decide whether Plaintiff Tanner may access those records subject to a lawful confidentiality order."  Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 2.  Tanner contends that, to this end, the Court should compel Correct Care and the County Defendants and their counsel "to provide a complete, accurate, and timely answer" to the question of over which records each party or party's counsel has possession, custody, or control, and that the Court should "hold them accountable for any misrepresentations in their prior responses."  Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 3.

Tanner next argues that many of Correct Care's objections are new and were not timely raised, such as Correct Care's assertion of the self-critical analysis privilege, which Correct Care did not raise in its original objections to RFP No. 12.  See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 4.  Tanner argues that Correct Care has not timely raised its proportionality argument, and that its relevance argument has changed impermissibly over the course of discovery.  See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 4-6. Tanner also argues that Correct Care's court-appointed expert arguments are new.  See Tanner's

Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 5-6.

Tanner argues, regarding the relevance of the requested records, that Correct Care does not address Tanner's arguments demonstrating why the requested records are highly relevant. See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 6. Tanner reiterates that RFP No. 12 "targets a discrete category of records in a specific time period based on specific concerns in Dr. Greifinger's public reports for that time period" and that particular provisions of Dr. Greifinger's reports bear directly on Tanner's claims. Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 6. Tanner also notes that Correct Care asserted other portions of Dr. Greifinger's reports support its defenses, suggesting that the materials on which Dr. Greifinger bases his reports are relevant to evaluating the bases for his conclusions. See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 7. Tanner reiterates her arguments regarding relevance and proportionality. See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 7-9.

Regarding the self-critical analysis privilege, Tanner contends that she has thoroughly rebutted Correct Care's arguments regarding the privilege, Tanner reiterates her arguments that federal civil-rights cases are unlike the ordinary medical negligence cases at issue in the caselaw to which Correct Care cites in support of the privilege's application, and Tanner contends that Correct Care has not completed the prerequisite task of producing a privilege log, so as to enable the Court to evaluate its privilege claim in terms of specific records at issue. See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 13-14. Tanner argues, furthermore, that records gathered for and disclosed to "a court-appointed expert assigned to monitor compliance with a consent decree in federal civil-rights litigation" do not qualify as self-critical analysis

materials subject to the privilege. Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 15. Tanner argues that, because no privileges are at issue, the appropriate remedy for addressing Correct Care's privacy concerns "is to craft an appropriate confidentiality order which balances those concerns against the public's right to access judicial records and those of other government offices," but that Correct Care has been unwilling to enter into a lawful confidentiality order. Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 15. Tanner also avers that the discovery requests in this case will not disrupt the McClendon litigation. See Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 16. Tanner asks that the Court

> affirm the portion of Magistrate Judge Molzen's ruling which found that the records responsive to RFP No. 12 are relevant, discoverable, and not subject to a claim of privilege in this matter, cooperate with the McClendon Court in determining which Court is going to decide the issue of amending and determining the scope of the McClendon confidentiality orders, and once a decision on that issue is made in Plaintiff's favor, compel Defendants to provide complete, accurate, and timely responses to RFP No. 12 under the terms of any lawful confidentiality order deemed necessary, backed by appropriate sanctions for non-compliance, misrepresentation, or undue delay by Defendants or their counsel.

Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 20-21.

### f. **CCS' Reply to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO.**

Correct Care replies. See Correct Care Solutions, LLC's Reply Supporting its Partial Objections to Memorandum Opinion and Order, filed November 2, 2018 (Doc. 107)("CCS' Reply to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO"). Correct Care first argues that the Court should reject as improper Tanner's request in Tanner's Resp. to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO that the Court ask the parties to state which parties or counsel have which records, because Tanner should have put that request in a motion and not a response. See CCS' Reply to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 2. Correct Care also contends that its request for relief

and objections are timely.  See CCS' Reply to CCS' Partial Obj. to Sept. 15, 2018 KBM MOO at 2-3.  Correct Care argues that it does not rely on Dr. Greifinger's reports to bolster its defenses. See CCS' Reply to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 5.  Correct Care argues that Tanner concedes discovery must be proportional to a case's needs and argues that Tanner's requests are overly broad and irrelevant.  See CCS' Reply to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 5-6.  Correct Care also asserts that Tanner does not contest that Magistrate Judge Molzen should have considered New Mexico public policy or Congress' adoption of the PSQIA in her Sept. 5, 2018 KBM MOO.  See CCS' Reply to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 6.  Correct Care argues that the caselaw to which Tanner cites in support of her argument that the self-critical analysis privilege is inapplicable to the requested records, is inapposite.  See CCS' Reply to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 7-8.  Last, Correct Care avers that Tanner's credibility is at issue, because of her criminal history.  See CCS' Reply to CCS' Partial Obj. to Sept. 5, 2018 KBM MOO at 9.

**7.    The Feb. 4 and Feb. 5 Hearing.**

The Court held a hearing on February 4, and 5, 2019.  See Draft Transcript of Motion Proceedings at 1 (taken February 4, 2019)(Court)("Feb. 4 Tr."); Draft Transcript of Motion Proceedings at 1 (taken February 5, 2019)(Court)("Feb. 5 Tr.").[14]  The Court began the hearing by clarifying that the hearing would address a group of discovery motions and some scheduling issues. See Feb. 4 Tr. at 2:23-24 (Court).  The Court suggested beginning with the Protective Order Motion.  See Feb. 4 Tr. at 3:1-4 (Court).

---

[14]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

Correct Care stated its belief that the most important issue pertains to the self-critical analysis which Correct Care performed, and whether documents related to the self-critical analysis are discoverable. See Feb. 4 Tr. at 9:12-16 (White). The Court asked Correct Care to explain self-critical analysis. See Feb. 4 Tr. at 9:20-21 (Court). Correct Care responded that it invokes the privilege, because it is concerned and afraid of disclosing self-critical information to non-healthcare providers, such as litigation counsel, or to people to whom they are not contractually obligated to provide self-critical information. See Feb. 4 Tr. at 10:3-8 (White). Correct Care expressed concern that if it provides patient safety or QI information to those individuals, it will have forfeited or abandoned any privilege that the PSQIA confers. See Feb. 4 Tr. at 10:10-13 (White). Correct Care also expressed a fear that disclosing such information in litigation would violate the Confidentiality Orders. See Feb. 4 Tr. at 10:13-15 (White). Correct Care averred that Judge Parker and Magistrate Judge Torgerson would comment on the breadth or narrowness of the Confidentiality Orders over the next few days after the hearing. See Feb. 4 Tr. at 10:15-18 (White).

The Court inquired as to Magistrate Judge Torgerson's status, and Correct Care clarified that he is special master in McClendon on discovery issues. See Feb. 4 Tr. at 10:19-11:3 (Court, White). Correct Care informed the Court that when Tanner filed her motion to intervene in McClendon, Judge Parker directed Magistrate Judge Torgerson to set a mediation and to see if the parties could resolve discovery issues so that Judge Parker did not have to rule on Tanner's motion to intervene. See Feb. 4 Tr. at 11:4-9 (White). Correct Care expressed its belief that Magistrate Judge Torgerson would conduct the mediation within three weeks after the hearing. See Feb. 4 Tr. at 11:9-12 (White). The Court asked if Judge Parker was waiting to rule on the motion to intervene until the Court took some action. See Feb. 4 Tr. at 11:13-16 (Court). Correct Care

indicated it was not aware of any action from the Court on which Judge Parker was waiting.  See Feb. 4 Tr. at 11:19-12:11 (White, Court).  Correct Care suggested Judge Parker might have delayed ruling on the motion to intervene until Magistrate Judge Torgerson conducted his mediation, in the hopes that the case could settle.  See Feb. 4 Tr. at 12:19-24 (White).  Correct Care informed the Court that the settlement conference took place before Magistrate Judge Molzen, and that the case did not settle.  See Feb. 4 Tr. at 13:8-11 (Court, White).

Turning back to the self-critical analysis issue, the Court asked whether self-critical analysis is a term that is standard throughout the country, such that anyone would understand to what it referred.  See Feb. 4 Tr. at 13:12-18 (Court).  Correct Care responded that some documents qualifying as self-critical analysis, such as morbidity and mortality reports, are readily recognized, as are the meetings held in connection with those reports.  See Feb. 4 Tr. at 13:19-25 (White).  The Court asked Correct Care to clarify whether morbidity and mortality reports and self-critical analyses are one and the same.  See Feb. 4 Tr. at 14:1-4 (Court).  Correct Care responded that morbidity and mortality reports are prepared with respect to an individual incident, and that a limited number of individuals review those reports to determine whether mistakes were made in the course of the incident in question, and whether any changes in practice need to be implemented to ensure the same mistakes are not repeated.  See Feb. 4 Tr. at 14:5-12 (White).  Correct Care averred that morbidity and mortality processes -- referring to the reports and associated meetings -- are part of CQI, but that CQI involves regular meetings to discuss recurring issues.  See Feb. 4 Tr. at 14:13-21 (White).  Correct Care also averred that a lot of CQI is directed by court-appointed experts such as those in McClendon, one of whom is Dr. Greifinger.  See Feb. 4 Tr. at 14:21-15:5 (White).

The Court asked whether morbidity and mortality reports are reports which Judge Parker or the special master requires Correct Care to produce, or if Correct Care itself requires that the reports be produced. See Feb. 4 Tr. at 15:6-9 (Court). Correct Care clarified that, pursuant to Correct Care's contract with Bernalillo County, it must produce morbidity and mortality reports, and that Correct Care produces morbidity and mortality reports as part of its normal medical practice. See Feb. 4 Tr. at 15:10-13 (White). Correct Care informed the Court that the McClendon litigation and Dr. Greifinger's findings each give rise to issues which Correct Care addresses through the CQI process, and Correct Care clarified for the Court that Dr. Greifinger is the court-appointed medical expert in the McClendon litigation. See Feb. 4 Tr. at 15:16-22 (White). The Court asked why CQI documents are not discoverable, when, if Chevron has an oilfield accident and conducts safety work to prevent future accidents, documentation of that safety work would probably be producible. See Feb. 4 Tr. at 15:23-16:3 (Court). Correct Care argued that the difference is that the Chevron example arises in a non-medical context and is not part of an ongoing QI process. See Feb. 4 Tr. at 16:4-7 (White).

The Court asked why the self-critical reports in this case are not producible, and Correct Care argued that they are part of a CQI process that falls under the umbrella of the PSQIA's protection from discovery. See Feb. 4 Tr. at 16:8-14 (Court, White). Correct Care averred that PSQIA is a unique act, passed by Congress around 2005, to improve patient care, and which offers an evidentiary privilege for cases brought in either state or federal court, to protect health care providers or health care provider organizations who comply with PSQIA's requirements from having to turn over CQI process information in civil litigation. See Feb. 4 Tr. at 16:19-25 (White). The Court asked whether PSQIA protects CQI process information from admission in court or

from discovery, and Correct Care averred that it understands PSQIA to protect CQI process information from either admission or discovery, but that because PSQIA is relatively recent, little caselaw explains its bounds. See Feb. 4 Tr. at 17:4-15 (Court, White).

Correct Care next stated that the caselaw on the self-critical analysis privilege discusses weighing the public good of disclosure against private interests. See Feb. 4 Tr. at 17:18-23 (White). The Court asked why the two factors should be weighed if the privilege is absolute. See Feb. 4 Tr. at 17:24-18:1 (Court). Correct Care suggested that courts are unsure how broad an evidentiary privilege PSQIA grants, because the law is relatively new. See Feb. 4 Tr. at 18:1-8 (White). Correct Care, in response to the Court's question, indicated that PSQIA is a big act. See Feb. 4 Tr. at 18:9-12 (Court, White). Correct Care stated that some cases interpreting PSQIA's privilege take a functional approach and ask whether the organization seeking to invoke PSQIA's privilege is doing what PSQIA suggests it should do to obtain protection from turning self-critical analysis or quality improvement records over in litigation. See Feb. 4 Tr. at 18:13-17 (White). Correct Care stated that, on the other hand, other cases take a literal approach and ask that the organization produce an affidavit attesting that it followed every step that PSQIA requires for securing protection from discovery. See Feb. 4 Tr. at 18:18-21 (White). Correct Care contended that, in the PSQIA context, cases distinguish between an individual litigant pursuing a medical malpractice cause of action, and other types of civil rights actions. See Feb. 4 Tr. at 19:12-14 (White). Correct Care also contended that, in the PSQIA context, cases distinguish between individual deliberate indifference claims and deliberate indifference class actions. See Feb. 4 Tr. at 19:12-16 (White). Correct Care acknowledged that several cases suggest that, when the organization in question is a public jail or public prison, PSQIA does not protect health care quality

review from discovery, but Correct Care argued that those cases do not consider the difference between an individual action sought to protect individual rights and interests, and class actions brought to change unconstitutional practices. See Feb. 4 Tr. at 19:18-20:3 (White). Correct Care argues that, although some PSQIA cases distinguish between civil rights cases and medical malpractice actions, those cases are distinguishing specifically civil rights class actions, and that the cases do not address the individual-class action distinction. See Feb. 4 Tr. at 20:4-12 (White).

Correct Care averred that it filed the Protective Order Motion because it seeks guidance from the Court regarding the bounds of its required production and specifically regarding the self-critical analysis privilege's application. See Feb. 4 Tr. at 20:14-23 (White). Correct Care averred that it brought the self-critical analysis issue to the Court's attention both in the Protective Order Motion and in its objections to Magistrate Judge Molzen's opinions, because it wants the Court to make a determination "that takes all of the factors into account," including "the fact that New Mexico is one of all 50 states that" protects peer review and the sorts of documents Correct Care seeks to protect. Feb. 4 Tr. at 21:13-21 (White). Correct Care argued that caselaw in the area is unhelpful, because most cases were decided before PSQIA came into existence, and the cases decided after PSQIA "don't address how this change in health care policy on the part of Congress plays out in the federal courts." Feb. 4 Tr. at 22:1-8 (White).

Tanner responded that Correct Care has asserted three privileges: a PSQIA federal statutory privilege, a self-critical analysis privilege, and a state statutory privilege. See Feb. 4 Tr. at 28:22-29:13 (Leonard). Tanner argued that, in a case with federal civil rights claims, federal law preempts state law, only federal law and federal statutory privileges apply, and that, accordingly, the state statutory ROIA privilege would not apply. See Feb. 4 Tr. at 29:21-32:5 (Leonard).

Tanner contended that the Court's focus should be on the PSQIA federal statutory privilege.  See Feb. 4 Tr. at 32:13-15 (Leonard).  Tanner stated that the PSQIA is a "big statute and it has a very thick set of implementing regulation[s]" and that "there is also a guidance document that addresses," according to Tanner, "the exact issue that we have here, and that guidance document is published at 81 FR 32655."  Feb. 4 Tr. at 32:17-22 (Leonard).  Tanner contends that the 81 Fed. Reg. 32655 guidance document is a "good starting point" for the Court, as persuasive authority, because it attempts to "underline and clarify statutory language," is "a good starting point to understand the issue," and outlines the "specific elements that are required to meet the federal statutory privilege."  Feb. 4 Tr. at 32:24-34:6 (Leonard).  Tanner contended that the guidance document explains that healthcare providers should not be able to evade their regulatory obligations or to assert a PSQIA privilege for records which external recordkeeping or reporting requirements require.  See Feb. 4 Tr. at 34:14-35:3 (Leonard).  Tanner contends that the documents which she seeks from Correct Care are CQI committee and morbidity and mortality reports and documents that Correct Care's contract with Bernalillo County required Correct Care to produce and provide to Bernalillo County.  See Feb. 4 Tr. at 35:4-12 (Leonard).  Tanner contends that any concerns about discovery disclosures chilling healthcare providers' voluntary reporting do not apply, because "there is no chilling effect for mandatory reporting because you're required to do it anyway under the contract."  Feb. 4 Tr. at 36:9-11 (Leonard).  Tanner contends that Judge Parker and Magistrate Judge Molzen rejected the PSQIA privilege's application to the documents at issue, because they reasoned there would be no chilling effect on Correct Care's mandatory reporting to Bernalillo County.  See Feb. 4 Tr. at 36:14-17 (Leonard).

The Court asked whether Judge Parker and Magistrate Judge Molzen concluded that there

is no PSQIA privilege or that there is an applicable PSQIA privilege, but that Correct Care waived it by providing the documents at issue "to so many people." Feb. 4 Tr. at 36:18-22 (Court). Tanner contended that "there is a waiver element," but that the crux of Tanner's argument is that there is a distinction between voluntarily produced and reported documents, and mandatorily produced and reported documents. Feb. 4 Tr. at 36:23-37:8 (Leonard). The Court asked whether anyone else recognizes that distinction. See Feb. 4 Tr. at 37:10-11 (Court). Tanner contended that the caselaw interpreting the guidance document suggests that the requirements for asserting the PSQIA privilege are very strict. See Feb. 4 Tr. at 39:7-9 (Leonard).

Tanner argued that the privilege logs which Correct Care has produced to date do not contain sufficient information to determine whether the PSQIA privilege applies to each document or set of documents. See Feb. 4 Tr. at 39:24-40:11 (Leonard). Tanner argued that Correct Care may not correct the privilege log, because "it's too late to go back and do that." Feb. 4 Tr. at 40:12 (Leonard). Tanner cited to additional caselaw discussing the PSQIA privilege's requirements, its two exceptions, and "the mandatory reporting" issue. Feb. 4 Tr. at 40:12-21 (Leonard).

Regarding the federal common-law self-critical analysis privilege that Correct Care proposed, Tanner argued that caselaw suggests the Court should not recognize the common-law privilege when Congress spoke on the issue with the PSQUIA. See Feb. 4 Tr. at 44:8-11 (Leonard). Tanner contended that the great weight of authority indicates that federal courts reject the self-critical analysis privilege in the context of a jail medical contractor and a civil rights claim. See Feb. 4 Tr. at 45:10-13 (Leonard). Tanner next reiterated her argument that, in a case with both federal and state law claims, the federal rule favoring admissibility rather than any state law privilege controls, because of rule 501 of the Federal Rules of Evidence. See Feb. 4 Tr. at 45:15-

47-11 (Leonard). Tanner argued that the requested documents are relevant and critical for the reasons described in Tanner's briefing. See Feb. 4 Tr. at 48:1-25 (Leonard). Tanner reiterated her argument that the privileges were not timely raised. See Feb. 4 Tr. at 49:1-4 (Leonard). Tanner also reiterated her willingness to enter into a HIPAA confidentiality or protective order, or to redact patient information from the provided documents. See Feb. 4 Tr. at 49:8-22 (Leonard).

The Court asked whether Magistrate Judge Molzen's analysis was "more limited than what this is requiring." Feb. 4 Tr. at 50:4-5 (Court). Tanner averred that Magistrate Judge Molzen did not specifically rule on the privilege claims, except to tell Correct Care that they could not raise untimely objections without good cause and that they needed a privilege log for every objection. See Feb. 4 Tr. at 50:15-19 (Leonard). Tanner averred that Magistrate Judge Molzen separately ruled on the Dr. Greifinger Documents, which overlap with but are a distinct set from the documents which are CQI materials and committee materials "that exist independently of" McClendon. Feb. 4 Tr. at :50:23-51:6 (Leonard). Tanner contended that Magistrate Judge Molzen ruled on and rejected the federal common-law privilege as to Dr. Greifinger Documents. See Feb. 4 Tr. at 52:6-14 (Leonard). Tanner averred that the Dr. Greifinger Documents are a subset of the documents Tanner seeks and for which Correct Care asserts a self-critical analysis privilege, which are the documents that Correct Care has been generating "at the jail pursuant to its contract and pursuant to just operating the jail." Feb. 4 Tr. at 51:1-24 (Leonard). Tanner averred that only the Dr. Greifinger Documents were disclosed in the McClendon litigation, and that Magistrate Judge Molzen rejected the self-critical analysis privilege as applying to these documents. See Feb. 4 Tr. at 52:3-7 (Leonard). Tanner argued that Magistrate Judge Molzen rejected the common-law privilege's application by noting that Judge Parker had already rejected the privilege as applying

to the Dr. Greifinger Documents in the <u>McClendon</u> litigation, and had resolved any of the parties' concerns with disclosing the Dr. Greifinger Documents through a confidentiality order.  <u>See</u> Feb. 4 Tr. at 52:12-15 (Leonard).

Bernalillo County stated that Correct Care created the documents at issue, but that Bernalillo County "never retained any of the documents that are being argued about here today." Feb. 4 Tr. at 54:19-21 (Martinez).  Bernalillo County argued that, although Bernalillo County had meetings with Correct Care at which they discussed the QI/QA Records that Correct Care produced pursuant to its contract with Bernalillo County, "CCS always attempted to maintain the confidential nature of their internal documents even with Bernalillo County when they were sharing the information" at the meetings.  Feb. 4 Tr. at 55:1-19 (Martinez).  Bernalillo County stated that the meetings were to ensure that Bernalillo County got "the services that they contracted for," and not to improve the quality of care at the prison or make "sure that the care was appropriate under the circumstances."  Feb. 4 Tr. at 55:19-56:1 (Martinez).

Correct Care then argued that, once material qualifies as patient safety work product, entitling it to protection under the PSQIA privilege or the self-critical analysis privilege, it "can't lose that designation by then also being used elsewhere."  Feb. 4 Tr. at 57:25-58:3 (White).  Correct Care argued, therefore, that, although its QI documents may have been used in meetings with Bernalillo County solely to ensure that Bernalillo County was receiving the services for which they contracted with Correct Care, those documents, when originally produced, were patient safety work product, and so they retain their designation as patient safety work product.  <u>See</u> Feb. 4 Tr. at 57:7-24 (White).  Correct Care argued, regarding the preemption issue, that Magistrate Judge Molzen issued an opinion in a diversity case that the PSQIA preempted the ROIA "to the extent it

applied, and then if it didn't apply," she went through the ROIA analysis. Feb. 4 Tr. at 58:4-17 (White). Correct Care argued that, to the extent ROIA applies here, "the plaintiff has not met the criticality burden," where Correct Care deposed Tanner's experts, and the experts said that they did not need any other information to come to their opinions and conclusions, and that they did not ask for any further information, suggesting that the information which Tanner seeks to acquire from Correct Care is not critical for her to develop her case. Feb. 4 Tr. at 58:18-25 (White). Correct Care argued that congressional policy has shifted from the narrowly tailored medical self-critical analysis privilege to a "larger more broad privilege in the patient safety act." Feb. 4 Tr. at 59:8-11 (White). Correct Care also argued that "you're going to need to have broader discovery in a class action case" such as McClendon than in an individual case, "just looking at the care and treatment provided to one individual," and whether it was "below or above the threshold of deliberate indifference." Feb. 4 Tr. at 63:1-9 (White). Correct Care stated that Judge Hansen concluded that the self-critical analysis privilege applies to "morbidity and mortality reviews in a hospital context." Feb. 4 Tr. at 64:15-19 (White). Last, regarding waiver, Correct Care averred that it does not know whether a party can "waive the statutory privilege" in the PSQIA. Feb. 4 Tr. at 64:21-24 (White). The Court stated that it would think about the issues before issuing an opinion. See Feb. 4 Tr. at 65:10-11 (Court).

Correct Care also reiterated its arguments that Tanner's desired scope of discovery is "broader than necessary" and that Magistrate Judge Molzen's analysis "goes too far." Feb. 4 Tr. at 80:19-81:1 (White). The Court asked whether the "clearly erroneous or contrary to law standard" applies when the Court reviews Magistrate Judge Molzen's ruling. Feb. 4 Tr. at 82:3-5 (Court). Correct Care stated that the clearly-erroneous-or-contrary-to-law standard applies to the

Court's review of Magistrate Judge Molzen's "legal conclusions." Feb. 4 Tr. at 82:6-7 (White).

Tanner responded that she does not seek "just subject matter" discovery, but that the documents at issue go "to the elements of the claims that are at issue," because the documents could demonstrate that Correct Care and Bernalillo County were aware, even before Tanner's period of incarceration, that the healthcare facility at Metropolitan Detention was understaffed and that there were care problems that could create a danger for pregnant inmates; going to "deliberate indifference, to causation"; and going "to elements of municipal liability." Feb. 4 Tr. at 84:2-85:1 (Leonard). Tanner contends that she does not seek the same scope of discovery that she would seek in a class action, because she is "only asking for a historical snapshot, 2015 and 2016." Feb. 4 Tr. at 85:4-6 (Leonard). Tanner avers that she seeks more than just Dr. Greifinger's reports, because "the preceding report . . . shows that CCS and" Bernalillo County "had notice that there were these problems and didn't do anything to fix them." Feb. 4 Tr. at 85:7-20 (Leonard). Tanner also argued that Bernalillo County "does have possession custody or control" over the documents reviewed at its meetings with Correct Care and could access them if needed. Feb. 4 Tr. at 87:6-18 (Leonard). Tanner reiterated her argument that Correct Care's Protective Order Motion is untimely. See Feb. 4 Tr. at 92:1 (Leonard). Tanner contended that she wishes to intervene in the McClendon litigation to try to get the Dr. Greifinger Documents by amending the Confidentiality Orders and that, if she can intervene in McClendon and get the requested documents from Bernalillo County, she does not "need to get the same documents from CCS." Feb. 4 Tr. at 104:18-24 (Leonard). Tanner argued, however, that the Dr. Greifinger Documents are a subset of all of the documents at issue, so Tanner requests that the Court rule on the self-critical analysis privilege argument, because Correct Care is not a party in McClendon, and the scope of the McClendon

litigation will not moot out all discovery issues in this case. See Feb. 4 Tr. at 107:9-10 (Leonard), id. at 108:13-16 (Leonard); id. at 110:1-4 (Leonard).

The Court continued the hearing on February 5, 2019. See Feb. 5 Tr. at 1:22-23 (Court). The Court stated its inclination to find that the documents at issue are relevant, and to "not find that Judge Molzen was clearly erroneous or abused her discretion in any way [that] was clearly erroneous or was contrary to law," so the Court indicated it would probably "not set aside her order on that score," and would "plunge into the privileges issue." Feb. 5 Tr. at 8:1-9 (Court). The Court stated that it "probably will overrule the objection" to Magistrate Judge Molzen's rulings on relevance and discoverability grounds and would "take the other [privileges issue] under advisement." Feb. 5 Tr. at 8:11-13 (Court).

8.      **The Feb. 27 Hearing.**

The Court held a status conference on February 27, 2019. See Draft Transcript of Status Conference Proceedings at 1:22 (taken February 27, 2019)(Court)("Feb. 27 Tr.").[15] The Court began by stating that it was working on the self-critical analysis privilege opinion and that it made the determination that, without a more detailed privilege log, it cannot "make a document by document determination," so instead, the opinion "sets forth the law, and then" if the Court determines "these documents are discoverable," the parties and the Court would "have to do something else" for the Court "to make an informed decision as to whether the documents" are producible. Feb. 27 Tr. at 5:3-14 (Court). The Court clarified that it will not produce an opinion "that says this document has to be produced, this document has to be produced," and that, instead

---

[15]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

the opinion will outline "the law that's going to govern this case," in the hopes that the Court's statement of the law informs the parties in their attempted resolution of their discovery disputes. Feb. 27 Tr. at 5:14-24 (Court).

Tanner reported to the Court that, after the parties' mediation with Magistrate Judge Torgerson, they came to an agreement "that it seems most efficient to be able to address the issue entirely within the Tanner case," and not to intervene in <u>McClendon</u> and amend the Confidentiality Orders, so Tanner agreed to withdraw her motion to intervene in <u>McClendon</u>, and Bernalillo County agreed to produce a privilege log identifying all of the Dr. Greifinger Documents so that Tanner could identify which documents are relevant and which she seeks to discover. Feb. 27 Tr. at 9:6-10:7 (Hernandez). Tanner averred that she would "voluntarily narrow" her list of requested documents "based on the privilege log." Feb. 27 Tr. at 10:7-8 (Hernandez). In response to the Court's inquiry, Tanner clarified that the parties underwent a mediation in <u>McClendon</u> with Magistrate Judge Torgerson, because Magistrate Judge Molzen's ruling concluded that the documents at issue were relevant and discoverable, and that the Confidentiality Orders were the obstacle to Tanner obtaining the Dr. Greifinger Documents. <u>See</u> Feb. 27 Tr. at 15:11-20 (Hernandez).

### 9. **CCS' Obj. to Prod. <u>McClendon</u> Docs. Briefing.**

After the February 27, 2019, status conference, Correct Care filed Correct Care Solutions, LLC's Notice of Objections to Production of <u>McClendon</u> Documents, filed March 12, 2019 (Doc. 159)("CCS' Obj. to Prod. <u>McClendon</u> Docs."). Correct Care submitted notice of several objections to the production of specific documents exchanged in <u>McClendon</u> pursuant to the Confidentiality Orders. <u>See</u> CCS' Obj. to Prod. <u>McClendon</u> Docs. at 1. The Court reviews only

the objections relevant to the privilege issues that this MOO addresses.

### a. CCS' Obj. to Prod. McClendon Docs.

Correct Care objects to the production of CQI Meeting Minutes, a "Receiving Screen and Med Verification Study," three "Health Assessment Stud[ies]," two "Evaluation[s] of Care prior to ER Visit," three Chronic Disease Asthma Studies, four Chronic Disease Diabetes Studies, three Chronic Disease Seizure Studies, three Chronic Disease Hypertension Studies, a Continuity of Care Study, three "Continuity of Medication on Intake" studies, a medical refusal study, a "January - March 2016 Corrective Action Plan," a "Mortality and Morbidity review for B.G.," a "Mortality and Morbidity review for D.T.," a "Mortality and Morbidity review for J.O.," a "Mortality and Morbidity review for L.D.," and a "Mortality and Morbidity review for M.A.," asserting that the PSQIA privilege protects these documents from discovery. CCS' Obj. to Prod. McClendon Docs. at 1-9. Correct Care notes that, at the hearing, the Court indicated that it would overrule Correct Care's objection to producing the "Mortality and Morbidity Review for Shawna Tanner, dated October 17, 2016," and that Correct Care would "produce the report subject to this interpretation of [the Court's] comments from the bench," but that Correct Care "nonetheless asserts" its objection that the document is protected by the PSQIA privilege "here so as not to waive it for any purpose. CCS' Obj. to Prod. McClendon Docs. at 9.

### b. Tanner Resp. to CCS' Obj. to Prod. McClendon Docs.

Tanner responded. See Plaintiffs' Response to Correct Care Solutions, LLC's Notice of Objections to Production of McClendon Documents at 1, filed March 20, 2019 (Doc. 170)("Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs."). Tanner argues that the Court should overrule CCS' Obj. to Prod. McClendon Docs., because Correct Care seeks "to

relitigate arguments previously rejected by the Honorable Karen Molzen, the Honorable James A. Parker, and this Court," and because Correct Care does "not provide any document-specific basis for failing to produce the requested documents pursuant to the terms of the parties' mediation agreement." Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 1. Tanner avers that, during the February 4, 2019, and the February 5, 2019, hearing, the Court "indicated that it was inclined to agree with the portion of Judge Molzen's MOO that found the requested documents to be relevant and within the scope of discovery." Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 2.

Tanner avers that the parties reached an agreement during the McClendon mediation before Magistrate Judge Torgerson on February 25, 2019, for the process governing production of the documents at issue. Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 3. Tanner summarizes the agreed-upon process governing document production as follows:

> That process included Bernalillo County creating a log of documents provided to Dr. Robert Greifinger in the *McClendon* lawsuit in connection with his April 2016 and November 2016 site visits and reports. The Defendants informed Plaintiffs that all documents listed in that log were in the County's possession. Plaintiffs then identified from that log which documents they believe are relevant and should be produced to them in the Tanner case. In turn, CCS provided its objections to certain documents that Plaintiffs seek, which were filed as a notice in this case on March 12, 2019 (Doc. 159). The County, which actually possesses the documents at this point, filed no objections. Because Plaintiffs believe that CCS's objections are improper, Plaintiffs provide these responses for the Court's consideration prior to its ruling on the objections and requests that the Court overrule CCS's objections and order that the County produce the documents Plaintiffs have designated from the log of documents provided to Dr. Greifinger in the *McClendon* lawsuit.

Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 3.

Tanner contends that Correct Care has raised no valid objections to production. See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 4. Tanner remarks that Correct Care

objected to production of nearly all the requested documents "on the basis that they are beyond the scope of discovery under Rule 26(b)(1)." Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 4. Tanner avers that the Court indicated that it is inclined to agree with Magistrate Judge Molzen's prior rulings that the requested documents are relevant and discoverable, and Tanner argues that Correct Care "should not be allowed to relitigate these issues." Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 4. Tanner argues that, at the mediation before Magistrate Judge Torgerson, the parties agreed not to make general objections as to categories of documents, and Tanner argues that Correct Care's categorical relevance objections should be precluded. <u>See</u> Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 4. Tanner also avers that Correct Care "did not reserve any right to relitigate the privilege claims they have untimely asserted in response to Plaintiffs' other discovery requests." Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 4.

Tanner reiterates her argument that the Dr. Greifinger Documents are relevant because both Bernalillo County and Correct Care received Dr. Greifinger's reports, and also "participated in the committee meetings and other activities discussed in his reports," and the materials which Dr. Greifinger reviewed in preparing his reports "show that Defendants were aware of these findings and failed to take action to timely remedy them before or during Plaintiff Tanner's incarceration at MDC." Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 5. Tanner first addresses the records which fall under the umbrella of CQI -- including "CQI studies, reports, meeting minutes, and other designated records." Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 6. Tanner argues that these documents are relevant to her claims' elements, because they indicate that Correct Care and Bernalillo County knew of "problems in the operation of the medical

facility at MDC," and may not have taken effective measures "to correct those problems up to the time of the events at issue in this case in October 2016." Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 6. Tanner argues that Magistrate Judge Molzen already rejected the argument that these documents are immune from disclosure under the PSQIA or the self-critical analysis privilege. See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 6-7. Tanner argues that, because Correct Care's CQI process "was a *mandatory* program subject to external review by the county," a self-critical analysis privilege does not protect it, because any such privilege was waived when the documents were provided to Bernalillo County and to Dr. Greifinger. Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 7 (emphasis in Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs.). Tanner argues, accordingly, that the Court should reject Correct Care's privilege-based objection to producing "any document provided to Dr. Greifinger, including but not limited to" the CQI Calendar and CQI Meeting Minutes. Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 7.

Tanner next turns to Correct Care's objections to producing the Health Assessment Studies and Evaluation of Care Prior to ER Visit Studies. See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 7. Tanner argues that she should be allowed access to the Health Assessment Studies and Evaluation of Care Prior to ER Visit Studies, "to the extent that they include any discussion, review, or assessment of the adequacy of the medical care being provided by CCS to inmates at MDC during 2016." Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 7. Tanner argues that she "should be allowed to obtain discovery on whether there were systematic deficiencies in care (either due to understaffing or inadequate training) of a similar nature to the types of deficiencies that affected Plaintiff Tanner's individual care." Tanner's Resp. to CCS'

Obj. to Prod. <u>McClendon</u> Docs. at 8.  Tanner contends that, even if the studies relate to conditions

other than pregnancy, they are relevant to Tanner's claims where Tanner alleges that Correct Care

"failed to adequately evaluate Plaintiff Tanner's symptoms of preterm labor and premature rupture

of membranes in order to transport her to a hospital facility for further care and treatment," and

they are "germane to determining why Plaintiff Tanner did not receive proper care prior to her ER

visit on October 17, 2016," and they are relevant to "understanding Dr. Greifinger's finding that

there were problems with Correct Care's nursing evaluations' quality in 2016."  Tanner's Resp. to

CCS' Obj. to Prod. <u>McClendon</u> Docs. at 8.  For the foregoing reasons, Tanner requests that the

Court order production of the three Health Assessment studies and the two Evaluations of Care

Prior to ER Visit.  <u>See</u> Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 8-9.

Next, Tanner discusses Correct Care's objections to producing the Chronic Disease

Studies.  <u>See</u> Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 9.  Tanner contends that

she should be allowed discovery on how Correct Care handled chronic care referrals for conditions

other than pregnancy "to determine whether there were systematic deficiencies in how such

referrals were handled," or whether they were routinely well handled "but neglected with respect

to Plaintiff Tanner's individual care."  Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at

9.  Tanner requests that the Court order production of the three Chronic Disease Asthma Studies,

the four Chronic Disease Diabetes Studies, the three Chronic Disease Seizure Studies, and the

three Chronic Disease Hypertension Studies.  <u>See</u> Tanner's Resp. to CCS' Obj. to Prod.

<u>McClendon</u> Docs. at 9-10.

Tanner next requests that the Court order production of the Continuity of Care Studies and

Continuity of Medication on Intake Studies.  <u>See</u> Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u>

Docs. at 10.  Tanner avers that continuity of care is a key issue in this case.  See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 10.  Tanner contends that she should be allowed to obtain discovery on how Correct Care "handled continuity of care and other intake-related issues for other inmates to determine whether there were systemic deficiencies in how such care was handled." Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 10.  Tanner requests, therefore, that the Court order production of the Receiving Screen and Med Verification Study, the Continuity of Care Study, the three Continuity of Medication on Intake Studies, and the January-March 2016 Corrective Care Plan.  See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 11.

Next, Tanner requests that the Court order production of the Mortality and Morbidity Reviews and Reports by Drs. Ray and Shansky, because: (i) "they contain the information Dr. Greifinger relied upon to conclude that staff vacancies were placing MDC patients at risk of serious harm"; (ii) "they are relevant to Plaintiffs' specific claims to the extent that they involve similar circumstances or issues, such as any of the same Defendants, questions regarding the timeliness of medical care or transport to the hospital, or questions regarding the appropriateness of care given in the infirmary setting"; and (iii) "they are relevant to Dr. Greifinger's findings regarding deficiencies in the CQI process, under which Defendants failed to promptly take corrective action in response to past incidents," which occurred at Metropolitan Detention before Tanner's incarceration there.  Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 11. Tanner requests, therefore, that the Court order production of the Mortality and Morbidity Reviews, and of the Reports completed by Drs. Ray and Shansky.  See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 12.

Last, Tanner argues that Correct Care agreed to produce certain documents without further judicial review, including the Pregnant Women Studies, the Morbidity and Mortality Review for Shawna Tanner, and the Report completed by Drs. Ray and Shansky regarding Tanner.  See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 12.  Tanner avers that those documents should have been produced by March 19, 2019, and were not produced by that date.  See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 13.  Tanner avers that the parties "agreed on the form of a Stipulated Confidentiality Order," and that they submitted that order to the Court. Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 13.

**10.    March 21, 2019 Hearing.**

The Court held a status conference on March 21, 2019.  See Draft Transcript of Status Conference Proceedings at 1:1-2 (taken March 21, 2019)(Court)("March 21 Tr.").[16]  The Court began by asking whether CCS' Obj. to Prod. McClendon Docs. contains an exhaustive list of the McClendon documents on which the parties seek a ruling regarding relevance and privilege.  See March 21 Tr. at 3:18-21 (Court).  Tanner responded that CCS' Obj. to Prod. McClendon Docs. is not an exhaustive list, and Correct Care agreed.  See March 21 Tr. at 4:17-19 (Hernandez); id. at 4:22 (White).  Tanner averred that there are five documents that were disclosed in the McClendon litigation and to which Correct Care has not objected, so, once the Court enters the parties' stipulated confidentiality order as to those documents, Correct Care would produce them.  See

---

[16]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

March 21 Tr. at 7:15-9:1 (Hernandez).  After the March 21, 2019, status conference, the Court entered the parties' Stipulated Confidentiality Order, filed March 22, 2019 (Doc. 174).

## LAW REGARDING OBJECTIONS TO MAGISTRATE JUDGE DISCOVERY ORDERS

Rule 72(a) of the Federal Rules of Civil Procedure permits a party to file objections to a magistrate judge's non-dispositive order within fourteen days after being served with the order. See Fed. R. Civ. P. 72(a).  "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a).  See Hutchinson v. Pfeil, 105 F.3d 562, 566 (10th Cir. 1997), cert. denied, 522 U.S. 914 (1997). To overturn the magistrate judge's decision as clearly erroneous under rule 72(a), the district court must have "a definite and firm conviction that a mistake has been committed."  Ocelot Oil Corp. v. Sparrow Indus., 847 F.2d 1458, 1464 (10th Cir. 1988)(internal quotation omitted).[17] A district court is required to "defer to the magistrate judge's ruling unless it is clearly erroneous or contrary to law."  Hutchinson v. Pfeil, 105 F.3d at 566.

Under the "contrary to law" standard, the district court conducts a plenary review of the magistrate judge's legal determinations, setting aside the magistrate judge's order if it applied an incorrect legal standard.  See 12 Charles Alan Wright et al., Federal Practice & Procedure § 3069, at 350 (4th ed. 2018).  "In sum, it is extremely difficult to justify alteration of the magistrate judge's non-dispositive actions by the district judge."  12 Wright et al., supra, § 3069, at 350-51.  On the

---

[17]The United States Court of Appeals for the Seventh Circuit has stated that, to be clearly erroneous, "a decision must strike [the court] as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish."  Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988).  The Court does not believe that this standard uses appropriate judicial language and will not use or follow the standard. The Court can, in a dignified manner, apply the traditional standards for clearly erroneous review without resorting to garbage or dead animals.  28 U.S.C. § 636(b)(1)(A).

other hand, just "as the district judge should defer to the magistrate judge's decision . . . he or she should not be hamstrung by the clearly erroneous standard. At i[t]s broadest, it is limited to factual findings." 12 Wright et al., supra, § 3069, at 355.

## LAW REGARDING DISCOVERY

Discovery's proper scope is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. P. 26(b)(1). The factors that bear upon proportionality are: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26 (b)(1).

Discovery's scope under rule 26 is broad. See Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information."). The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947). A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished)[18](quoting Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160,

---

[18]McGee v. Hayes is an unpublished United States Court of Appeals for the Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has

1169 (10th Cir. 2000)). "Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." Rivera v. DJO, LLC, No. CIV 11-1119 JB/RHS, 2012 WL 3860744, at *1 (D.N.M. Aug. 27, 2012)(Browning, J.)(internal quotation marks omitted)(quoting Tottenham v. Trans World Gaming Corp., No. CIV 00-7697(WK), 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted)(quoting Scales v. J.C. Bradford & Co., 925 F.2d 901, 906 (6th Cir. 1991)).

The 2000 amendments to rule 26(b)(1) began narrowing the substantive scope of discovery and injected courts deeper into the discovery process. See Simon v. Taylor, No. CIV 12-0096 JB/WPL, 2015 WL 2225653, at *23 (D.N.M. April 30, 2015)(Browning, J.). Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that McGee v. Hayes has persuasive value with respect to a material issue and will assist the Court in its preparation of this Memorandum Opinion and Order.

Fed. R. Civ. P. 26(b)(1)(1996). The 2000 amendments made the following changes, shown here with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is relevant ~~to the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant</u> ~~The~~ information ~~sought~~ need not be admissible at the trial if discovery the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). Putting aside the last sentence's changes -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

> In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language. This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery. Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language. Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions. [Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D. Miletich, Discovery and Disclosure Practice, Problems, and Proposals for Change] 44–45 (1997). The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

> The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The

similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause. The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. See 8 Federal Practice & Procedure § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. Cf. Crawford-El v. Britton, [523 U.S. 574] (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone. The two effects of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on a relevance basis. The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to add teeth to the relevance standard instead of narrowing that standard. It is not surprising that the Supreme Court of the United States of America and Congress want to increase judicial presence: "relevance" is a liberal concept in the context of trial.

Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Of course, regardless of the Court's musings about the rules, courts should also seek to give substantive content to amendments. Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses. More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the United States Court of Appeals for the Tenth Circuit clarified that the 2000 amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action." 568 F.3d at 1188. The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (citations and footnote omitted)(alteration in <u>In re Cooper Tire & Rubber</u> <u>Co.</u>)(quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1)).

The 2015 amendments to rule 26(b)(1) continued this process of narrowing discovery's substantive scope and injecting courts further into the discovery process. The 2015 amendment made notable deletions and additions, both of which emphasized the need to make discovery proportional to the needs of the case. <u>See</u> Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1), provides:[19]

> *(1)*    *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ~~including the existence, description, nature, custody, condition and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C)~~ <u>and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.</u>

Fed. R. Civ. P. 26(b)(1)(alterations added).

The Committee Notes state that the first deletion does not make a substantive change. Rather, the deletion was made because "[d]iscovery of such matters is so deeply entrenched" in

---

[19]The deletions are stricken and the additions are underlined.

standard discovery that including it would be "clutter." Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.[20]

Regarding the second deletion, the Committee Notes explain that the former provision for discovery of relevant but inadmissible information that appears "reasonably calculated to lead to the discovery of admissible evidence" is also deleted.[21] Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

> The phrase has been used by some, incorrectly, to define the scope of discovery. As the Committee Note to the 2000 amendments observed, use of the "reasonably calculated" phrase to define the scope of discovery "might swallow any other limitation on the scope of discovery." The 2000 amendments sought to prevent such misuse by adding the word "Relevant" at the beginning of the sentence, making clear that "'relevant' means within the scope of discovery as defined in this subdivision. . . ." The "reasonably calculated" phrase has continued to create problems, however, and is removed by these amendments. It is replaced by the direct statement that "Information within this scope of discovery need not be admissible in evidence to be discoverable." Discovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise within the scope of discovery.

---

[20]The Court regrets this deletion. Moving things out of the statute's text often creates mischief, especially for courts that rely heavily on the text's plain language. The drafters might be astonished how often the Court sees objections to interrogatories and requests that seek basic information about documents. The rule is well-established because the deleted language was in the rule; now that the language is not in the rule, the rule may be eroded or, more likely, ignored or overlooked by those who do not spend time in advisory notes' thicket. What the advisory comments describe as "clutter" is a simple instruction to practitioners who do not practice in federal court every day for every case. This deletion might incrementally increase unnecessary litigation rather than shorten it. Some of the amendments seem more designed to help the nation's large corporations, represented by some of the nation's most expensive law firms, cut down expenses than they are to help courts and practitioners in more routine cases.

[21]Arguably, older lawyers will have to learn a new vocabulary and ignore the one they have used for decades. If the changes were not made to change the scope of discovery, it is unclear what the benefit of all this re-arrangement really is.

Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. The deletion, therefore, does not necessarily change discovery's scope, but clarifies it. Accordingly, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." State Farm Mut. Auto. Ins. v. Fayda, 14 Civ. 9792 (WHP)(JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)(Francis IV, M.J.)(internal quotation marks omitted)(quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

The most notable addition to rule 26(b) is the proportionality concept. Rule 26(b)(2)(C)(iii) has always limited overly burdensome discovery and required proportionality. See Fed. R. Civ. P. 26(b)(2)(C)(iii) (pre-2015 version). The proportionality requirement was relocated to rule 26(b)(1) to address the "explosion" of information that "has been exacerbated by the advent of e-discovery."[22] Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment. Describing how e-discovery is the driving factor in the 2015 amendment, the Committee Notes state:

---

[22]This relocation -- rather than substantive change -- is one reason that the Court is skeptical that the 2015 amendments will make a considerable difference in limiting discovery or cutting discovery costs. Courts have been bringing common sense and proportionality to their discovery decisions long before the 2015 amendments. See Aguayo v. AMCO Ins., 59 F. Supp. 3d 1225, 1275 (D.N.M. 2014)(Browning, J.)("[T]he Court expects that discovery and motion practice bear some proportionality to the case's worth."); Cabot v. Wal-Mart Stores, Inc., No. CIV 11-0260 JB/RHS, 2012 WL 592874, at *11-12 (D.N.M. Feb. 16, 2012)(Browning, J.)(limiting the scope of discovery because it was unduly burdensome in relation to the relevance and need). The real import of the rule is that it will likely lead to more "proportionality" objections and more disputes that the district courts will have to resolve, which is what the drafters apparently intended. It is unclear how more judicial involvement in discovery can be squared with a federal court docket that is at a breaking point already. It is also unclear what was wrong with the old goal of discovery being largely self-executing. The new rules also require attorneys to learn the new vocabulary of "proportionality," delete their old stock legal sections from their briefs and rewrite these new sections to use the correct language. Older lawyers must be particularly alert to read and learn the new rules, read the comments, and understand the drafting's thrust. Finally, given that

The burden or expense of proposed discovery should be determined in a realistic way. This includes the burden or expense of producing electronically stored information. Computer-based methods of searching such information continue to develop, particularly for cases involving large volumes of electronically stored information. Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

Chief Justice Roberts' 2015 Year-End Report on the Federal Judiciary indicates that the addition of proportionality to rule 26(b) "crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality."[23] Chief Justice John

---

"proportionality" is a very subjective standard, it will be hard for any court to sanction any attorney for raising this objection. In sum, the rules are just as likely to increase discovery's cost as to decrease it.

[23]The Rules Enabling Act, 28 U.S.C. §§ 2071 to -77, empowers the federal courts to prescribe rules for the conduct of their business. See 28 U.S.C. § 2071. The Judicial Conference -- the federal judiciary's policy-making body -- has overall responsibility for formulating those rules. See Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/ publicinfo/yearend/year-endreports.aspx (last visited May 1, 2019)("2015 Year-End Report"). The Chief Justice leads the Judicial Conference. The Judicial Conference's Committee on Rules of Practice and Procedure, known as the Standing Committee, solicits guidance from advisory committees and conferences to draft proposed rules and amendments for the Judicial Conference's consideration. See 2015 Year-End Report. Chief Justice Roberts, a former clerk for Chief Justice William Rehnquist, appointed the Honorable David Campbell, Senior United States District Judge for the United States District Court for the District of Arizona, also a former Chief Justice Rehnquist clerk and President George W. Bush appointee, to chair the Civil Rules Advisory Committee. Judge Campbell and David Levi, now Professor of Law at Duke University School of Law and Director of the Bolch Judicial Institute, former Dean of the Duke University School of Law, a former clerk to Justice Lewis Powell, and former chief judge of the United States District Court for the Eastern District of California, appointed as United States Attorney by President Ronald Reagan and appointed to the Eastern District of California by President George W. Bush, led the effort to increase proportionality and hands-on judicial case management in the 2015 amendments. See Report to the Standing Committee at 4, Advisory Committee on Civil Rules (May 8, 2013), available at http://www.uscourts.gov/rules-policies/archives/committeereports/advisory-committee-rules-civil-procedure-may-2013. After

Roberts, <u>2015 Year-End Report on the Federal Judiciary</u> at 6, available at http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx (last visited May 1, 2019)("2015 Year-End Report").  Chief Justice Roberts states that the proportionality concept seeks to "eliminate unnecessary or wasteful discovery," and to impose "careful and realistic assessment of actual need."  2015 Year-End Report at 7.  This assessment may, as a practical matter, "'encourage judges to be more aggressive in identifying and discouraging discovery overuse' by emphasizing the need to analyze proportionality before ordering production of relevant information."  <u>State Farm Mut. Auto. Ins. v. Fayda</u>, 2015 WL 7871037, at *2 (quoting Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment).  The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations."  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  <u>See</u> <u>Dao v. Liberty Life Assurance Co. of Boston</u>, Case No. 14-cv-04749-SI (EDL), 2016 WL 796095,

---

the Judicial Conference concurred on the 2015 amendments, it sent the proposed rules and amendments to the Supreme Court, which approved them.  Chief Justice Roberts submitted the proposed rules to Congress for its examination.  <u>See</u> 2015 Year-End Report at 6.  Because Congress did not intervene by December 1, 2015, the new rules took effect.  Some scholars have noted that the rules reflect the conservative nature of those who have participated in drafting the amendments. <u>See</u> Edward A. Purcell, Jr., <u>From the Particular to the General: Three Federal Rules and the Jurisprudence of the Rehnquist and Roberts Courts</u>, 162 U. Pa. L. Rev. 1731, 1742 (2014)(stating that the conservative "Rehnquist and Roberts Courts" issued decisions that "regularly burdened plaintiffs while protecting corporate" defendants).  In particular, the New Mexico Trial Lawyer published an article asserting that the amendments favored corporate defendants, which was partially the result of Chief Justice Roberts' appointment of "corporate-minded judges to the Rules Advisory Committee that drafted the amendments."  Ned Miltenberg & Stuart Ollanik, <u>The Chief Umpire is Changing the Strike Zone</u>, at 1, The New Mexico Trial Lawyer (Jan./Feb. 2016).  The Court shares some of the concerns with the new amendments being pro-business and giving corporations new tools to limit plaintiffs' discovery.

at *3 (N.D. Cal. Feb. 23, 2016)(LaPorte, M.J.)(observing that the 2015 amendment "reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses or objections"); Williams v. U.S. Envt'l Servs., LLC, CIVIL ACTION NO. 15-168-RLB, 2016 WL 617447, at *1 n.2 (M.D. La. Feb. 16, 2016)(Bourgeois, M.J.).  In general, "the parties' responsibilities . . . remain the same" as they were under the rule's earlier iteration so that the party resisting discovery has the burden of showing undue burden or expense.  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  See Dao v. Liberty Life Assurance Co. of Boston, 2016 WL 796095, at *3 (noting that, "while the language of the Rule has changed, the amended rule does not actually place a greater burden on the parties with respect to their discovery obligations").

Like with the 2000 amendments, it is unsurprising that the drafters are unable to articulate precise language narrowing the discovery's substantive scope.  Instead of being Aristotelian and trying to draft rules, the drafters largely opt to make federal judges Plato's enlightened guardians. They have decided that no single general rule can adequately consider the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, and other factors.  They have dropped all discovery disputes into judges' laps.  The drafters have decided that this determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers want when they: (i) encourage district judges to take a

firmer grasp on the discovery's scope; and (ii) put their thumbs on the scale in favor of narrower

discovery in the rule's definition of the scope of discovery.

## LAW REGARDING PRIVILEGE CHOICE OF LAW

In a diversity case, state law governs the availability of the various privileges.  <u>See</u> Fed. R.

Evid. 501; <u>Frontier Refining, Inc. v. Gorman-Rupp Co.</u>, 136 F.3d 695, 699 (10th Cir. 1998).

Pursuant to the Federal Rules of Evidence, however, "the principles of the common law as they

may be interpreted by the courts of the United States in the light of reason and experience"

normally govern the existence and scope of a privilege.  Fed. R. Evid. 501.

Rule 501 states:

> The common law -- as interpreted by United States courts in light of reason
> and experience -- governs a claim of privilege unless any of the following provides
> otherwise:
>
> - the United States Constitution;
> - a federal statute; or
> - rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense
> for which state law supplies the rule of decision.

Fed. R. Evid. 501.

Some cases involve both federal and state law claims.  Rule 501's text suggests that, where

there are both federal and state claims, federal privilege law should apply to federal claims and

state privilege law should apply to state law claims.  <u>See</u> <u>Motley v. Marathon Oil Co.</u>, 71 F.3d

1547, 1551 (10th Cir. 1995)("Motley asserted both federal and state causes of action. As to state

causes of action, a federal court should look to state law in deciding privilege questions."  (citing

<u>White v. Am. Airlines, Inc.</u>, 915 F.2d 1414, 1424 (10th Cir. 1990))).  Applying that rule, however,

is unhelpful in many instances where the privilege asserted goes to evidence that is relevant to

both a federal and a state law claim.

Where a privilege is asserted for evidence relevant both to federal and pendent state law claims, most circuit courts have either held that federal privilege law governs or approved of such an approach without explicitly adopting it.  See In re Sealed Case (Medical Records), 381 F.3d 1205, 1212-13 (D.C. Cir. 2004)("The usual solution by the courts' in such cases 'has been a preference for federal privilege law when it conflicts with state privilege law.")(footnote and internal quotation marks omitted)(quoting 3 J. McLaughlin, Weinstein's Federal Evidence § 501.02[2][c], at 501-14 (2d ed. 2004)); Virmani v. Novant Health Inc., 259 F.3d 284, 287 n.3 (4th Cir. 2001)("We agree with our sister circuits that in a case involving both federal and state law claims, the federal law of privilege applies."); Pearson v. Miller, 211 F.3d 57, 61 (3d Cir. 2000)(concluding that, where there is a conflict between federal and state privilege law because of the existence of federal and pendent state law claims, the United States Court of Appeals for the Third Circuit "has resolved this potential conflict in favor of federal privilege law," because "applying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable"  (internal quotation marks and citations omitted)); Hancock v. Dodson, 958 F.2d 1367, 1373 (6th Cir. 1992)("The existence of pendent state law claims does not relieve [courts] of [their] obligation to apply the federal law of privilege."); Hancock v. Hobbs, 967 F.2d 462, 466 (11th Cir. 1992)("Courts that have confronted this issue in the context of the discoverability of evidence have uniformly held that the federal law of privilege governs even where the evidence sought might be relevant to a pendent state claim."); Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 n.10 (9th Cir. 1992)(applying federal privilege law in a case involving both federal and pendent state law claims); von Bulow v. von Bulow, 811 F.2d 136, 141 (2d Cir.

1987)(declaring that, where the evidence sought "is relevant to both the federal and state claims," courts "consistently have held that the asserted privileges are governed by the principles of federal law"); Mem'l Hosp. for McHenry Cty. v. Shadur, 664 F.2d 1058, 1061 n.3 (7th Cir. 1981).

The Tenth Circuit has differed from the other Courts of Appeals to the extent that it has held that, where there are federal and state law claims, "[a]s to state causes of action, a federal court should look to state law in deciding privilege questions." Motley v. Marathon Oil Co., 71 F.3d at 1551. This rule would require a court considering evidence relevant only to state claims to apply state privilege law, even if there were other federal claims in the case. The Tenth Circuit has not confronted a situation in which evidence allegedly subject to a privilege is relevant to both the federal and state law claims in the case. The Court concluded in Vondrak v. City of Las Cruces, 760 F. Supp. 2d 1170 (D.N.M. April 8, 2009)(Browning, J.), that, "where there is a federal cause of action and pendent state-law claims, and where the asserted privilege relates to evidence that is relevant both to the federal and state-law claims . . . federal privilege law should apply[.]" 760 F. Supp. 2d at 1175. See also Dorato v. Smith, 163 F. Supp. 3d 837, 882 (D.N.M. 2015)(Browning, J.). At least one treatise has approved of this approach as the "majority view." Edward J. Imwinkelried, The New Wigmore: Evidentiary Privileges § 4.2.3 (citing Vondrak v. City of Las Cruces)("The majority view is that the federal law prevails and applies to the testimony relevant to both the federal and state claim."). The Court reaffirms that the weight of Courts of Appeals' authority, combined with the practical considerations involved with running discovery and trials, indicate that the better rule is the Vondrak v. City of Las Cruces rule and concludes that federal privilege law applies under such circumstances.

First, at the discovery phase, any attempt to bifurcate privileges along the border between

federal and state law claims is hollow if the allegedly privileged evidence impacts both sets of claims. If, for example, state law protects the evidence as privileged, but federal law does not protect the same evidence, a court would be in the conundrum of preventing the discovery of evidence as to the state law claims because of the state law privilege, while simultaneously ordering the disclosure of the same evidence as non-privileged as to the federal law claims. Thus, as a practical matter, the federal privilege law is going to determine discovery in federal court to avoid this problem.

Second, it would be difficult and impracticable -- although not impossible -- to apply two different bodies of privilege law in front of one jury. See Hancock v. Hobbs, 967 F.2d at 467. In this case, for example, if one privilege law dictated that some records were privileged, while the other body of privilege law dictated a contrary result, a court applying state law to the state claims and federal law to the federal claims would have to admit the same evidence for one set of claims and exclude the same evidence for the other claims. The Court would then give a limiting instruction to the jury, but such a limiting instruction would be of limited value, given that evidence which should have been privileged would have been heard, and the privilege effectively lost.

In many respects, privileges protect the disclosure of information, not the use of information already disclosed, for whatever reason -- voluntary waiver; inadvertent disclosure; waiver by a third party; compelled disclosure; Freedom of Information Act, 5 U.S.C. § 552, claims; or other methods. It does not make much sense to talk about "privileged" evidence once it is disclosed, for whatever reason. Once the evidence is floating around out there, there is often nothing of the privilege to protect; the confidentiality is lost. Once that loss occurs, the usual need to get to the truth, and the normal federal evidentiary rules of relevancy and materiality, take over.

Thus, once there is a federal claim, the federal court has an overriding need to allow the discovery of all evidence that is relevant and not privileged under federal law.

And once the federal court orders the production of that evidence for the federal claim, the evidence is really no longer "privileged," even under state law. The confidentiality has been lost or waived; it is no longer special evidence at all. The parties can use it if it is relevant and material, without regard to the fact that it was once privileged under state law.[24] The New Mexico physician-patient privilege, for example, provides that "[a] patient has a privilege to refuse to disclose, or to prevent any other person from disclosing," certain communications. N.M. R. Evid. 11-504. This privilege does not address whether a party who already possesses such information may use it at trial.

In light of such considerations, the Court concludes that the best course of action is to have federal privilege law control when there are federal claims and the evidence allegedly subject to a privilege is relevant to both the federal and state claims. In federal-question cases, the Court has supplemental jurisdiction over the state-law claims. "[W]here the primary source of the court's jurisdiction is the federal claim, to which the state claim is merely pendent (supplemental), it seems appropriate that the federal evidentiary interest -- whether in privilege or production -- should be primary as well." In re Sealed Case (Medical Records), 381 F.3d at 1213.

---

[24]The one exception might be that if the state law privilege is worded to require that evidence "cannot be used" rather than as evidence "shall not be compelled or disclosed." The State of Illinois's marital privilege, for example, does not ban the introduction of evidence, but it states: "Neither [husband nor wife], however, may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage . . . ." 725 Ill. Comp. Stat. Ann. 5/115-16.

The Court's opinion in Vondrak v. City of Las Cruces, provides an example of this approach. In that case, the defendant police officers and city sought a deposition and records on the plaintiff's injuries from his treating neurologist. See 760 F. Supp. 2d at 1172. The plaintiff opposed the defendants' attempt by asserting the attorney-client and physician-patient privileges. See 760 F. Supp. 2d at 1175. Because the Court determined that New Mexico and federal law on the relevant privileges would lead to different results, it had to determine "whether federal or state law governs the asserted privilege." 760 F. Supp. 2d at 1175. The Court concluded that federal privilege law would apply because the information on the plaintiff's injuries was relevant to his state and federal civil rights claims. See 760 F. Supp. 2d at 1177.

Although the Tenth Circuit has not addressed this issue since the Court decided Vondrak v. City of Las Cruces, the Court does not believe that it would hold to the contrary. The Tenth Circuit has stated the general rule that, where a case involves federal and state law claims, state privilege applies to the state law claims. It has not, however, held that state privilege law should preclude the use of evidence when federal law requires the production of the evidence and allows for its use. The Tenth Circuit in Motley v. Marathon Oil Co. did not discuss whether the evidence at issue would have been relevant to the federal claim. Nor did the Tenth Circuit suggest that any party contended that the evidence was relevant to the federal claim. While the Court must make its best effort to follow Tenth Circuit precedent, there is no Tenth Circuit law governing this question.

## LAW REGARDING SELF-CRITICAL ANALYSIS PRIVILEGE

Reason and experience provide the basis for a court's decision whether to recognize or reject an asserted privilege. See 3 B. Weinstein & M. Berger, Weinstein's Federal Evidence

§ 501.03 (J. McLaughlin ed., 2d ed. 2019).   Courts are tentative about accepting proposed

privileges that lack a historical basis.   See 3 Weinstein's Federal Evidence § 501.03(7).   See also

In re Grand Jury, 103 F.3d 1140, 1152 (3d Cir. 1997).   Federal common law recognizes privileges

only in rare situations.   See In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 918 (8th Cir.

1997)(citing numerous decisions rejecting proposed privileges).   The self-critical analysis

privilege, while not universally acknowledged, has been extended from its original medical peer

review committee context to several other areas.   See 3 Weinstein's Federal Evidence § 501.04(3).

In determining whether and when to recognize the self-critical analysis privilege, courts balance

the interests that non-disclosure protects against the benefits flowing from disclosure in the

particular litigation.   See 3 Weinstein's Federal Evidence § 501.04(3).

Although often described as protecting all self-critical evaluations, the self-critical analysis

privilege's application "has been limited to three very specific and very different types of

investigations: confidential evaluations of peer reviews, affirmative action studies, and internal

corporate investigations."   James F. Flanagan, Rejecting a General Privilege for Self-Critical

Analyses, 51 Geo. Wash. L. Rev. 551, 551 (1983).   The self-critical analysis privilege, where

recognized, generally protects from disclosure documents such as internal and confidential

performance evaluations, internal investigations records, and other documents containing an

employer's self-critical analyses.   See Hoffman v. United Telecomm., Inc., 117 F.R.D. 440, 442

(D. Kan. 1987)(Rushfelt, J.).   "It is grounded in a concern that disclosing these documents 'will

deter or suppress socially useful investigations and evaluations or compliance with the law or with

professional standards.'"   Dorato v. Smith, 163 F. Supp. 3d at 891 (quoting Aramburu v. Boeing

Co., 885 F. Supp. 1434, 1438 (D. Kan. 1995)(Crow, J.)).   The concern is that "absent this type of

privilege individuals and organizations will not candidly evaluate their compliance with regulatory or legal requirements out of fear of creating evidence that may be used against them in the future." Lund v. City of Rockford, No. 17 CV 50035, 2017 WL 5891186, at *4 (N.D. Ill. 2017)(Johnston, M.J.). The privilege was not historically recognized at common law, and Congress has not created a self-critical analysis privilege. See Zoom Imaging, LP v. St. Luke's Hosp. & Health Network, 513 F. Supp. 2d 411, 414 (E.D. Pa. 2007)(Sánchez, J.).

      **1.**       **The History and Background of the Self-Critical Analysis Privilege.**

In 1970, the Honorable Howard Francis Corcoran, then-United States District Judge for the United States District Court for the District of Columbia, first articulated the principles underlying a qualified self-critical analysis privilege. See Bredice v. Doctors Hosp., Inc., 50 F.R.D. 249, 250 (D.D.C. 1970)(Corcoran, J.)("Bredice"), aff'd, 479 F.2d 920 (D.C. Cir. 1973). The self-critical analysis privilege has no historical basis predating Bredice. See, e.g., Donald P. Vandegrift, Jr., The Privilege of Self-Critical Analysis: A Survey of the Law, 60 Alb. L. Rev. 171, 176 (1996)("The privilege has no historical basis, nor is it grounded in any statute or federal or state constitutional provision. It is strictly a creature of the common law."). In Bredice, the plaintiff brought a malpractice suit and moved, pursuant to rule 34 of the Federal Rules of Civil Procedure, for production and inspection of "minutes and reports of the boards or committees of the Hospital." 50 F.R.D. at 250. Judge Corcoran noted that the hospital's medical staff held mandatory meetings to review, analyze, and evaluate its members' clinical work, to improve hospital patients' care and treatment. See 50 F.R.D. at 250. Judge Corcoran concluded that "[c]onfidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients." 50 F.R.D. at

250.  "To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations."  50 F.R.D. at 250.  Judge Corcoran stated:

> The purpose of these staff meetings is the improvement, through self-analysis, of the efficiency of medical procedures and techniques.  They are not a part of current patient care but are in the nature of a retrospective review of the effectiveness of certain medical procedures.  The value of these discussions and reviews in the education of the doctors who participate, and the medical students who sit in, is undeniable.  This value would be destroyed if the meetings and the names of those participating were to be opened to the discovery process.

50 F.R.D. at 250.  Judge Corcoran concluded that the "committee meetings, being retrospective with the purpose of self-improvement, are entitled to a qualified privilege on the basis of this overwhelming public interest" in having the flow of ideas and advice between medical professionals continue unimpeded.  50 F.R.D. at 250-51.

Only a year after Bredice, the Honorable William Clark O'Kelley, then-United States District Judge for the United States District Court for the Northern District of Georgia, adopted Bredice's rationale to protect from discovery a corporate defendant's report studying the company's problems in the equal employment opportunity area and studying the progress of its affirmative action programs.  See Banks v. Lockheed-Georgia Co., 53 F.R.D. 283, 284 (N.D. Ga. 1971)(O'Kelley, J.)("Banks").  Judge O'Kelley, applying Bredice's approach and quoting its language regarding confidentiality's importance where self-critical analyses are concerned, "look[ed] on this as an important issue of public policy and" determined that "it would be contrary to that policy to discourage frank self-criticism and evaluation in the development of affirmative action programs of this kind."  53 F.R.D. at 285.  Judge O'Kelley also discussed the court's apprehension of discovery's chilling effect, expressing his concern that allowing the plaintiffs

access to the defendant company's research team's opinions and conclusions would discourage like companies from making beneficial investigations.  See 53 F.R.D. at 285.

Following <u>Bredice</u> and <u>Banks</u>, the self-critical analysis privilege has been widely adopted in the medical peer-review context, where it is often referred to as a peer review privilege.[25]  See, e.g., <u>Weekoty</u>, 30 F. Supp. 2d at 1348 (recognizing a self-critical analysis privilege in the context of morbidity and mortality conferences, given the public interest in allowing physicians a confidential forum in which to evaluate the effectiveness of techniques and procedures); <u>Reichhold Chems., Inc. v. Textron, Inc.</u>, 157 F.R.D. 522, 525 (N.D. Fla. 1994)(Vinson, J.)("The self-critical analysis in <u>Bredice</u> has been widely adopted in the medical peer review context, and most of the 50 states have statutorily protected medical peer reviews of patient care from discovery.").  Several courts have also extended the self-critical analysis privilege to numerous non-medical areas.  See, e.g., <u>In re Crazy Eddie Sec. Litig.</u>, 792 F. Supp. 197, 205 (E.D.N.Y. 1992)(Nickerson, J.)(protecting from discovery an internal review audit in a securities law action based on a self-critical analysis privilege); <u>Bradley v. Melroe Co.</u>, 141 F.R.D. 1, 3 (D.D.C. 1992)(Attridge, M.J.)(extending the privilege in a products liability action to protect from discovery manufacturer study reports of accidents involving their products); <u>Granger v. Nat'l R.R.</u>, 116 F.R.D. 507, 510 (E.D. Pa. 1987)(Broderick, J.)(protecting railroad accident investigations from discovery based on a self-critical analysis privilege).  Despite that several courts in various

---

[25]The self-critical privilege "has been discussed by many courts and tagged with many labels."  Vandegrift, Jr., <u>supra</u>, at 175 (providing examples of alternate labels for the self-critical analysis privilege, including but not limited to: the self-critical subjective analysis privilege, the peer review privilege, the self-evaluation privilege, the privilege for confidential self-evaluative analysis, and the self-examination privilege).  "Despite these differing names, the concept underlying the privilege has always been the same -- to protect from disclosure documents containing candid and potentially damaging self-criticism."  Vandegrift, Jr., <u>supra</u>, at 175.

contexts have accepted a self-critical analysis privilege, at least as many, if not the majority, of federal district courts to consider the privilege's existence have rejected parties' attempts to assert it. See, e.g., Burrow v. Forjas Taurus S.A., 334 F. Supp. 3d 1222, 1232-33 (S.D. Fla. 2018)(Torres, M.J.)(declining to recognize a self-critical analysis privilege and stating: "We have reviewed an abundance of cases both in and outside our Circuit and the overwhelming majority of decisions have rejected this privilege."); Robertson v. Neuromedical Ctr., 169 F.R.D. 80, 83 (M.D. La. 1996)(Riedlinger, M.J.)(declining to apply a peer review privilege to protect hospital peer review materials, stating that creation of new privileges is disfavored, and that the hospitals presented no evidence to support their claim that physicians would be less honest in their evaluations if they knew the evaluations might be discoverable); Swarthmore Radiation Oncology, Inc. v. Lapes, No. CIV. A. 92-3055, 1993 WL 517722, at *4 (E.D. Pa. Dec. 1, 1993)(Gawthrop, J.)(refusing to recognize the existence of a federal common-law peer review privilege in a medical context and stating that "[t]here is no existing federal common law privilege for confidential peer review materials"); Hardy v. N.Y. News, Inc., 114 F.R.D. 633, 640-43 (S.D.N.Y. 1987)(Roberts, M.J.)(refusing to apply a self-critical analysis privilege in an employment discrimination case).

### 2.      State Recognition of the Self-Critical Analysis Privilege.

Although most states have granted some form of statutory protection to medical peer reviews of patient care, see, e.g, Weekoty, 30 F. Supp. 2d at 1346 (stating that at least forty-six states and the District of Columbia have statutes protecting medical review committees' work from discovery or introduction into evidence at trial), "the self-critical analysis privilege lacks any uniform recognition among all the states," Spencer Sav. Bank, SLA v. Excell Mortg. Corp., 960

F. Supp. 835, 839 (D.N.J. 1997)(Hedges, M.J.). That states elect to statutorily protect certain medical peer review information from discovery, for example, does not necessarily indicate that they recognize a self-critical analysis privilege broader than the medical peer review privilege that the relevant statute or statutes describe. See, e.g., Harris v. One Hope United, Inc., 2015 IL 117200, ¶ 21, 810 (Ill. 2015)(declining to judicially extend the statutory privilege afforded by Illinois' Medical Studies Act, 735 ILCS 5/8-2101 (West 2012)("IL Medical Studies Act"), into an analogous self-critical analysis privilege and concluding that the self-critical analysis privilege is not recognized in Illinois). Section 2101 of Illinois' Medical Studies Act states:

> All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of the Illinois Department of Public Health, local health departments, the Department of Human Services (as successor to the Department of Mental Health and Developmental Disabilities), the Mental Health and Developmental Disabilities Medical Review Board, Illinois State Medical Society, allied medical societies, health maintenance organizations, medical organizations under contract with health maintenance organizations or with insurance or other health care delivery entities or facilities, tissue banks, organ procurement agencies, physician-owned inter-insurance exchanges and their agents, committees of ambulatory surgical treatment centers or post-surgical recovery centers or their medical staffs, or committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services, except that in any health maintenance organization proceeding to decide upon a physician's services or any hospital or ambulatory surgical treatment center proceeding to decide upon a physician's staff privileges, or in any judicial review of either, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based.

IL Medical Studies Act § 2101. Section 2102 of the IL Medical Studies Act provides:

Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person. The disclosure of any such information or data, whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility.

IL Medical Studies Act § 2102. In the State of New Jersey, the Patient Safety Act, N.J. Stat. Ann. §§ 26:2H-12.23 to -12.25(k)("NJ Patient Safety Act"), "guarantees that documents developed during a patient safety committee inquiry, such as interview notes, are privileged and not subject to discovery." C.A. ex rel. Applegrad v. Bentolila, 99 A.3d 317, 332 (N.J. 2014). The New Jersey Legislature's statutory enunciation of the "policies and procedures a healthcare facility must follow in order to claim a privilege with regard to the results of a self-critical analysis" results in a narrower, "carefully circumscribed self-critical analysis" protection than that articulated by the Illinois legislature, by applying the privilege in New Jersey only where the privilege's proponent strictly complied with statutory requirements such as "developing a patient safety plan, which must include a patient safety committee, ongoing patient safety training for facility personnel, and processes for conducting ongoing analysis of 'evidence-based patient safety practices' and 'near misses [or] serious preventable adverse events and adverse events.'" C.A. ex rel. Applegrad v. Bentolila, 99 A.3d at 335-36 (quoting N.J. Stat. Ann. § 26:2h-12:25(b)). Like Illinois, New Jersey "has refused to recognize a broad privilege for information generated by an organization engaged in self-critical analysis." C.A. ex rel. Applegrad v. Bentolila, 99 A.3d at 335. In Iowa, the Supreme Court of Iowa considered whether self-critical medical information sought to be protected "contain[ed] communications reflecting deliberative processes, [made] policy recommendations of any kind, [or] implicate[d] privacy interests of third parties." Hall v. Broadlawns Med. Ctr., 811 N.W.2d 478, 488 (Iowa 2012). Alabama's peer-review protection statute does not require that

a quality-assurance committee exist, nor does it limit the privilege to materials created "solely *at the direction of* such a committee." Ex parte Fairfield Nursing & Rehab. Ctr., L.L.C., 22 So.3d 445, 452 (Ala. 2009)(citing Ala. Code 1975 § 22-21-8)(emphasis in Ex parte Fairfield Nursing & Rehab. Ctr., L.L.C.).  In fact, Alabama expressly refused to adopt a self-critical analysis privilege in the medical peer-review context, stating that its Legislature had, by statute, already addressed the scope and bounds of any privileges that should apply in that context.  See Ex parte Cryer, 814 So.2d 239, 249 (Ala. 2001).  As the examples discussed above demonstrate, there is no uniform approach across all fifty states to protecting medical peer-review information, nor is there uniform express acceptance of a self-critical analysis privilege, even in a medical context.

     **3.**        **The Self-Critical Analysis Privilege in New Mexico.**

New Mexico courts have not commented whether New Mexico will or would recognize a self-critical analysis privilege.  New Mexico's statutory analogue is ROIA § 41-9-5(a), the statute's confidentiality provision, protecting peer review records from use in civil litigation.  See ROIA § 41-9-5(a).  Although the Court separately discusses ROIA, the Court analyzes it here, because the Supreme Court of New Mexico's commentary on New Mexico's statutory analogue to the self-critical analysis privilege is instructive for predicting whether the Supreme Court of New Mexico would recognize a self-critical analysis privilege and if so, in what contexts.  ROIA § 41-9-5(a) provides:

> All data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization or in a judicial appeal from the action of the review organization.

Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 30, 346 P.3d 1136, 1146 ("Yedidag"). In Yedidag, the Supreme Court of New Mexico stated that ROIA's confidentiality provision is intended to protect physician-reviewers from retaliation they may face from any source, including from employers, reviewed doctors, and the reviewed doctors' friends and families. See Yedidag, 2015-NMSC-012, ¶ 35, 346 P.3d at 1146-47. The Supreme Court of New Mexico referenced a fear that "employee-physician reviewers who provide negative review of their colleagues foreseeably risk retaliation from their employers because such reviews harm their employers' financial interests." Yedidag, 2015-NMSC-012, ¶ 36, 346 P.3d at 1147.

ROIA's § 41-9-5 permits disclosure of "what transpired" during a peer review meeting if disclosure would further the peer review's purposes or the judicial review of the peer review's purposes, or if the medical board subpoenas individuals regarding what transpired during a peer review. Yedidag, 2015-NMSC-012, ¶ 40, 346 P.3d at 1147. In Southwest Community Health Services v. Smith, 1988-NMSC-035, 755 P.2d 40, the Supreme Court of New Mexico stated: "We do not believe, however, that [ROIA] creates an evidentiary privilege, although statutes similar to Section 41-9-5 [in other states] have been labelled as such." 1988-NMSC-035, ¶ 9, 755 P.2d at 42. The Supreme Court of New Mexico further stated:

> While the legislative decision to prohibit notoriety of medical peer review proceedings is a constitutional exercise of the essential legislative function to promote the health and welfare of New Mexico's citizens, the Court cannot ignore an overbroad implementation of the confidentiality provision which would impinge upon the rights of litigants to have their disputes decided on relevant and material evidence. It is not a matter of the statute being unconstitutional but rather a recognition, *when litigation is at issue*, that conflicting constitutional powers by two separate and independent branches of government are being exercised. Which branch must yield to the other depends upon the circumstances of each individual case.

1988-NMSC-035, ¶ 15, 755 P.2d at 44 (emphasis in original). The Supreme Court of New Mexico concluded:

> Consequently, we hold that all data and information acquired by a review organization in the exercise of its duties and functions, and opinions formed as a result of the review organization's hearings, shall be governed by Section 41-9-5. When a party invokes Section 41-9-5 to immunize evidence from discovery, the burden rests upon that party to prove that the data or information was generated exclusively for peer review and for no other purpose, and that opinions were formed exclusively as a result of peer review deliberations. If the evidence was neither generated nor formed exclusively for or as a result of peer review, it shall not be immune from discovery unless it is shown to be otherwise available by the exercise of reasonable diligence. Of course, under SCRA 1986, 1-026(b)(1) and 1-037(A), the party seeking to compel discovery would have had the initial burden of proving relevance to the subject matter. The procedure will entail the trial court's *in camera* examination of the information and, perhaps, an evidentiary hearing to determine whether it properly falls within the parameters of Section 41-9-5 as announced by the Court today.

1988-NMSC-035, ¶ 17, 755 P.2d at 44. The Supreme Court of New Mexico declined to adopt a broad implementation of ROIA's confidentiality provision, instead prescribing several requirements for litigants to meet before asserting discovery protection for peer review materials -- namely, the materials must have been generated exclusively for peer review and for no other purpose, and opinions sought to be protected must have been formed exclusively as a result of peer review deliberations. See 1988-NMSC-035, ¶¶ 15-17, 755 P.2d at 44. The Supreme Court of New Mexico refused to expand the bounds of its discovery protection for peer-review materials beyond the scope that the ROIA provisions articulate. See 1988-NMSC-035, ¶¶ 15-17, 755 P.2d at 44. The Supreme Court of New Mexico cited its concern that litigants should have access to relevant and material evidence, and that the legislature should not create evidentiary rules that impinge on the judiciary's ability to oversee litigation proceedings. See 1988-NMSC-035, ¶¶ 15-17, 755 P.2d at 44. Furthermore, although the Supreme Court of New Mexico recognized the importance of

peer-review confidentiality in <u>Yedidag</u>, the Supreme Court of New Mexico also interpreted ROIA to permit disclosure if disclosure would further the peer review's purposes or the judicial review of the peer review's purposes, or if the medical board subpoenas individuals regarding what transpired during a peer review, suggesting that the Supreme Court of New Mexico balances disclosure interests with interests in protection from disclosure, in determining whether information merits discovery protection. <u>Yedidag</u>, 2015-NMSC-012, ¶ 40, 346 P.3d at 1147. The Court concludes that the Supreme Court of New Mexico, if presented with the issue, would not recognize the self-critical analysis privilege at all, and, if it recognized the privilege at common law, would not recognize a privilege in a form broader than the statutorily-described medical peer-review privilege in ROIA, based on the Supreme Court of New Mexico's: (i) unwillingness to broaden the ROIA confidentiality provision's scope, (ii) recognition of ROIA's provision of exceptions to protection, and (iii) enunciation of the benefit to litigants of having access to relevant and material evidence as an important interest.

### 4.    <u>Federal Recognition of the Self-Critical Analysis Privilege</u>.

"The self-critical analysis privilege 'has led a checkered existence in the federal courts.'" <u>Mitchell v. Fishbein</u>, 227 F.R.D. 239, 251 (S.D.N.Y. 2005)(Gorenstein, M.J.)(quoting <u>Wilmer v. Sealand Serv., Inc.</u>, No. 96 CIV. 8730 (KMW)MHD, 1997 WL 375661, at *1 (S.D.N.Y. July 3, 1997)(Dolinger, M.J.)). Most federal courts have declined to apply the self-critical analysis privilege, although many have been ambiguous regarding whether they recognize it. <u>See</u> Edward J. Imwinkelried, <u>The New Wigmore: Evidentiary Privileges</u> § 7.8.1; 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 5431 (3d ed.)("[T]here seems little justification for creating a new privilege if the matter sought to be protected falls outside the required reports

privilege.").  The Supreme Court has not settled the question whether federal law should recognize a self-critical analysis privilege, but, in University of Pennsylvania v. Equal Employment Opportunity Commission, 493 U.S. 182 (1990), the Supreme Court unanimously declined to recognize a proposed common-law privilege against the disclosure of peer review materials in a university context, stating that evidentiary privilege creation should be rare and carefully limited. See Univ. of Pa. v. E.E.O.C., 493 U.S. at 189 (stating that, while rule 501 of the Federal Rules of Evidence grants courts the flexibility to develop new rules of privilege on a case-by-case basis, the Supreme Court is "disinclined to exercise this authority expansively.").  The Supreme Court declined to recognize a peer review privilege, despite arguments that disclosure of academic peer evaluations would chill candid evaluations and discussions of candidates, resulting in "divisiveness and tension, placing strain on faculty relations, and impairing the free interchange of ideas that is a hallmark of academic freedom."  Univ. of Pa. v. E.E.O.C., 493 U.S. at 197.

The Courts of Appeals that have faced the question directly have not recognized the privilege.  See, e.g., Alaska Elec. Pension Fund v. Pharmacia Corp., 554 F.3d 342, 351 n.12 (3d Cir. 2009)(stating that the court is unpersuaded by the district court's reliance on the "so-called" self-critical analysis privilege, which the court stated "has never been recognized by this Court and we see no reason to recognize it now."); In re Quest Commc'ns Int'l Inc., 450 F.3d 1179, 1198 n.8 (10th Cir. 2006)(stopping short of declining to recognize the privilege, but stating that the Uniform Rules of Evidence are hostile to the creation of new common-law privileges, that the self-critical analysis privilege is not included in the Uniform Rules, and that it is recognized only for specified situations in a minority of states); Burden-Meeks v. Welch, 319 F.3d 897, 899 (7th Cir. 2003)(stating that the self-critical analysis privilege has "never [been] recognized in this circuit,

and [is] pointless if it too was waived" by knowing disclosure to a third party); <u>Union Pac. R.R. v. Mower</u>, 219 F.3d 1069 (9th Cir. 2000); <u>In re Kaiser Aluminum and Chem. Co. v. United States Dep't of Labor</u>, 214 F.3d 586 (5th Cir. 2000)(declining to recognize privilege in the context of a government agency seeking pre-accident documents); <u>F.T.C. v. TRW, Inc.</u>, 628 F.2d 207, 210 (D.C. Cir. 1980)(rejecting privilege, but limiting holding to documents which government agencies sought). <u>See also</u> <u>Freiermuth v. PPG Indus., Inc.</u>, 218 F.R.D. 694, 697 (N.D. Ala. 2003)(Smith, J.)(collecting cases in which federal courts have not protected from discovery certain critical self-appraisals); <u>Johnson v. United Parcel Serv., Inc.</u>, 206 F.R.D. 686, 689-90 (M.D. Fla. 2002)(Jones, J.)("In fact, no circuit court of appeals has explicitly recognized the self-critical analysis privilege."). The Tenth Circuit has not specifically commented on the self-critical analysis privilege, but, in <u>In re Quest Communications International Inc.</u>, the Tenth Circuit declined to recognize a privilege for materials produced in a government investigation, citing Supreme Court language counseling caution in creating new privileges. <u>See</u> <u>In re Quest Commc'ns Int'l, Inc.</u>, 450 F.3d at 1198. The Tenth Circuit cited several factors that counsel in favor of rejecting a proposed privilege: (i) the privilege is not recognized at common law; (ii) some states have adopted it, but the majority have not; (iii) no federal statute has adopted it; (iv) the evidence does not support the dire consequences that the privilege's proponents predict; (v) even if the evidence supports the need for the privilege, the public interest of disclosure outweighs the interest in protection of the disputed materials; and (vi) there are "daunting logistical difficulties in implementing the proposed privilege." <u>In re Quest Commc'ns Int'l Inc.</u>, 450 F.3d at 1197.

In <u>Dorato v. Smith</u>, a civil rights action that a police shooting victim's estate brought under federal and New Mexico law against the police officer and the city, federal, rather than state,

privilege law governed the police officer's assertion that a physician-patient privilege protected his medical records, where his medical ailments were relevant to the federal excessive force claim and also to the state-law negligent-hiring-and-retention claims, and his psychological ailments were relevant to his credibility as a witness. See 163 F. Supp. 3d at 882-83. The Court declined to recognize the self-critical analysis privilege in Dorato v. Smith, for several reasons. See 163 F. Supp. 3d at 891First, "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." United States v. Nixon, 418 U.S. 683, 710 (1974). "It is a 'venerable legal axiom that privileges are to be narrowly, not expansively, construed.'" Mason v. Stock, 869 F. Supp. 828, 833 (D. Kan. 1994)(Belot, J.)(quoting Hill v. Sandhu, 129 F.R.D. 548, 550 (D. Kan. 1990)(Wooley, M.J.)). Courts construe privileges particularly narrowly in § 1983 claims, "where an assertion of privilege must 'overcome the fundamental importance of a law meant to insure each citizen from unconstitutional state action.'" Mason v. Stock, 869 F. Supp. at 833 (quoting Skibo v. City of New York, 109 F.R.D. 58, 61 (S.D.N.Y. 1985)(Scheindlin, M.J.)). Second, the Tenth Circuit's only mention of the self-critical analysis privilege appears to disapprove of its use. See In re Qwest Commc'ns Int'l Inc., 450 F.3d at 1199 (describing this privilege as "recognized for specified situations in a minority of states"). The Tenth Circuit has also expressed some doubt about the privilege's underlying rationale. It addressed a similar assertion of the "executive or governmental" privilege in Denver Policemen's Protective Association v. Lichtenstein, 660 F.2d 432, 437 (10th Cir. 1981). The police in that case argued that, if they could not guarantee confidentiality, "citizens and police officers alike will be reluctant to make statements or likely fail to be completely candid in their statements." 660 F.2d at 437. The Tenth Circuit responded

that "it is doubtful that citizens and police officers will absolutely refuse to cooperate in investigations because of a few isolated instances of disclosure." 660 F.2d at 437. The Court shares the Tenth Circuit's doubt about the fatal consequences of disregarding this privilege, and for the reasons stated in Dorato v. Smith and the reasons presented here, the Court does not recognize a common-law self-critical analysis privilege in any context, not just not in a prison healthcare context.

Federal courts that have recognized a self-critical analysis privilege's existence in certain limited circumstances have generally required that the party asserting the privilege demonstrate that: (i) the party seeking protection produced the information pursuant to a critical self-analysis that party performed; (ii) there is a strong public interest in preserving the free flow of the information sought; and (iii) if discovery was allowed, the information "is of the type whose flow would be curtailed." Bravo, 2009 WL 10706756, at *2. To these three requirements, the United States Court of Appeals for the Ninth Circuit adds a fourth requirement, which other federal courts have adopted, that the document in question "was prepared with the expectation that it would be kept confidential and has in fact been kept confidential." Dowling v. Am. Haw. Cruises, Inc., 971 F.2d 423, 426 (9th Cir. 1992)(citations omitted).

No federal court has recognized the self-critical analysis privilege in a jail, prison, or detention facility setting. See, e.g., Williams v. City of Philadelphia, Civil Action No. 08-1979, 2014 WL 5697204, at *1 (E.D. Pa. Nov. 4, 2014)(Surrick, J.)(holding that self-critical analysis privilege may not be asserted to protect against discovery of mortality and sentinel event reviews for inmate deaths which Corizon Health, Inc., the jail's contracted medical service provider, produced); McClendon v. City of Albuquerque, Case No. 95 CV 024 JAP/ACT, 2015 WL

13667177, at *6 (D.N.M. Oct. 13, 2015)(Parker, J.)(stating that the self-critical analysis privilege

may not be asserted successfully in prison and jail condition cases to protect discovery of mortality

review documents, because those documents will be produced regardless whether they are

privileged, so there is no chilling effect at risk); Tortorici v. Goord, 216 F.R.D. 256, 258-59

(S.D.N.Y. June 10, 2003)(Pauley, J.)(holding that self-critical analysis privilege did not protect

against disclosure of quality assurance documents produced pursuant to statute requiring formal

review following inmate suicide); Laaman v. Powell, No. CIV. 75-258-SD, 1995 WL 54417, at *1

(D.N.H. Feb. 9, 1995)(Devine, J.)(declining to apply the self-critical analysis privilege in the

prison context to protect against discovery of documents produced pursuant to the Department of

Corrections' Quality Assurance Program). In Weekoty, Judge Hansen recognized a self-critical

analysis privilege for documents prepared for morbidity and mortality conferences as part of a

medical peer review process. See 30 F. Supp. 2d at 1344-48. Judge Hansen recognized the

privilege in that limited context, noting that "the privilege has generally been rejected in other

contexts." 30 F. Supp. 2d at 1345. Judge Hansen stated that, although the self-critical analysis

privilege is "of questionable necessity in many applications," it "is particularly pertinent in the

medical context as it promotes frank and honest discussions which protect lives and improve

patient care," and, because of "this unique role in preserving the public health, medical morbidity

and mortality reviews must be distinguished from other peer review cases." 30 F. Supp. 2d at

1345. Judge Hansen did not extend the self-critical analysis privilege to jail, prison, or detention

facility settings. See 30 F. Supp. 2d at 1345. See also Bravo, 2009 WL 10706756, at *2. The

Ninth Circuit stated that, "in the prison context[,] the safety and efficiency of the prison" render it

"peculiarly important that the public have access to the assessment by peers of the care provided."

Agster v. Maricopa Cty., 422 F.3d 836, 839 (9th Cir. 2005)(declining to apply peer-review privilege in context of prisoner civil-rights lawsuit). In Williams v. City of Philadelphia, a class action seeking equitable relief under the Eighth and Fourteenth Amendments for allegedly unconstitutional confinement conditions endangering inmate health and safety, the Honorable R. Barclay Surrick, Senior United States District Judge for the United States District Court for the Eastern District of Pennsylvania, noted that permitting the jail's medical services provider "to withhold the mortality and sentinel-event reviews does not promote sufficiently important interests to outweigh the need for probative evidence." 2014 WL 5697204, at *4. Judge Surrick agreed with the Ninth Circuit's statement in Agster v. Maricopa County that, in a prison context, it is particularly important that the public have access to peer assessments of care provided. See Williams v. City of Philadelphia, 2014 WL 5697204, at *4. Judge Surrick also considered that the parties proposed a protective order, which would limit "the chilling effect that some courts cite as a reason for invoking the peer-review privilege." 2014 WL 5697204, at *4.

The Court shares other federal courts' doubts that, in evaluating the applicability of a self-critical analysis privilege in prison and jail conditions cases, disclosure would create a chilling effect, rendering prison review committees less effective. Cases involving inmate deaths generate tremendous demand for public accountability, which "seem[s] likely to guarantee that such reviews [of prison care and conditions] take place whether they are privileged or not," belying arguments "that such reviews will cease unless kept confidential by a federal peer review privilege." Johnson v. Cook Cty., No. 15 CV 741, 2015 WL 5144365, at *4 (N.D. Ill. Aug. 31, 2015)(Gilbert, M.J.). In Agster v. Maricopa County, the parents of an inmate who died in custody sought mortality review documents that the prison's healthcare provider prepared, but the

healthcare provider asserted the self-critical analysis privilege. See 422 F.3d at 848. In upholding

the district court's denial of the privilege, the Ninth Circuit reasoned:

> Whereas in the ordinary hospital setting it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. . . . [I]t is particularly important that the public have access to the assessment by peers of the care provided. Given the demands for public accountability . . . , we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review privilege. Accordingly, we are unwilling to create the privilege in this case.

Agster v. Maricopa Cty., 422 F.3d at 839.

## LAW REGARDING ROIA PRIVILEGE

ROIA, the law regulating peer reviews in New Mexico, "establishes a medical peer review

process to promote the improvement of health care in New Mexico." Sw. Cmty. Health Servs. v.

Smith, 1988-NMSC-035, ¶ 7, 755 P.2d at 42. ROIA "regulate[s] peer review committees in

hospitals, health maintenance organizations, local associations of health care providers, nonprofit

health care plans, and emergency medical systems." Breanne M. Sheetz, N.M.: Supreme Court

Creates Additional Protections for Physicians Participating in Peer Review, SHRM, March 5,

2015), https://www.shrm.org/resourcesandtools/legal-and-compliance/state-and-local-

updates/pages/nm-physicians-peer-review.aspx (last viewed May 1, 2019). Although ROIA does

not expressly provide a private remedy for individuals whom a failure to maintain peer review

confidentiality harms, the Supreme Court of New Mexico implied one in Yedidag. See 2015-

NMSC-012, ¶ 43, 346 P.2d at 1148. ROIA "recognizes that candor and objectivity in the critical

evaluation of medical professionals by medical professionals is necessary for the efficacy of the

review process." Sw. Cmty. Health Servs. v. Smith, 1988-NMSC-035, ¶ 7, 755 P.2d at 42. ROIA

contains a confidentiality provision in § 41-9-5, which "withholds from discovery otherwise

relevant and admissible evidence." Sw. Cmty. Health Servs. v. Smith, 1988-NMSC-035, ¶ 8, 755

P.2d at 42. Section 41-9-5 protects peer review confidentiality and provides:

> All data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization or in a judicial appeal from the action of the review organization. . . . Information, documents or records otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization, nor shall any person who testified before a review organization or who is a member of a review organization be prevented from testifying as to matters within his knowledge, but a witness cannot be asked about opinions formed by him as a result of the review organizations hearings.

ROIA § 41-9-5.

The Supreme Court of New Mexico has stated that the statute does not create an evidentiary

privilege but rather establishes an immunity from discovery -- unlike a privilege, ROIA's

confidentiality provision establishes no opportunity for waiver through voluntary disclosure. See

Sw. Cmty. Health Servs. v. Smith, 1988-NMSC-035, ¶¶ 8-10, 755 P.2d at 42-43. Criminal

penalties attach for violation of ROIA's confidentiality provision, which "is intended to prevent

disclosure in situations extending far beyond the production of evidence in civil litigation." Sw.

Cmty. Health Servs. v. Smith, 1988-NMSC-035, ¶ 10,755 P.2d at 43. The Supreme Court of New

Mexico, in delineating ROIA's confidentiality provision's parameters, has stated:

> Consequently, we hold that all data and information acquired by a review organization in the exercise of its duties and functions, and opinions formed as a result of the review organization's hearings, shall be governed by Section 41-9-5. When a party invokes Section 41-9-5 to immunize evidence from discovery, the burden rests upon that party to prove that the data or information was generated exclusively for peer review and for no other purpose, and that opinions were formed exclusively as a result of peer review deliberations. If the evidence was neither generated nor formed exclusively for or as a result of peer review, it shall not be immune from discovery unless it is shown to be otherwise available by the exercise of reasonable diligence. . . . The procedure will entail the trial court's *in camera*

examination of the information and, perhaps, an evidentiary hearing to determine whether it properly falls within the parameters of Section 41-9-5 as announced by the Court today.

Sw. Cmty. Health Servs. v. Smith, 1988-NMSC-035, ¶ 17, 755 P.2d at 44 (emphasis in Sw. Cmty.

Health Servs. v. Smith).  The Supreme Court of New Mexico further held that,

> if the information is ruled to be confidential, the party seeking access must then satisfy the trial court that the information constitutes evidence which is critical to the cause of action or defense.  If the trial court determines that the success or failure of a litigant's cause of action or defense would likely turn on the evidence adjudged to fall within the scope of Section 41-9-5, then the trial court shall compel production of such evidence.  It is the trial judge who will be entrusted with balancing the need to ensure the confidentiality of peer review against the need of litigants to discover evidence essential to the merits of their case.

Sw. Cmty. Health Servs. v. Smith., 1988-NMSC-035, ¶ 18, 755 P.2d at 44-45 (citations omitted).

## LAW REGARDING PSQUIA PRIVILEGE

In 1986, Congress found the following:

**(1)**  The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.

**(2)**  There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.

**(3)**  This nationwide problem can be remedied through effective professional peer review.

**(4)**  The threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review.

**(5)**  There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.

42 U.S.C. § 11101.  In 1994, in light of these findings, Congress enacted the Health Care Quality

Improvement Act, 42 U.S.C. §§ 11101 to -52 ("HCQIA").

Congress designed the HCQIA to improve the quality of healthcare in two ways. First, it increased the effectiveness of peer review by providing review committees with immunity from lawsuits filed in response to professional review actions. Second, it authorized the Secretary of Health and Human Services ("HHS") to create the National Practitioner's Data Bank ("NPDB"). Any disciplinary action taken by a review condition must, as a condition to immunity, be reported for listing in the NPDB.

Guillermo A. Montero, If Roth Were a Doctor: Physician Reputation Under the HCQIA, 30 Am.

J.L. & Med. 85, 85 (2004). In its Part A, the HCQIA provides peer review members who have

acted in a way "that adversely affects clinical privileges of a practitioner, if such action is taken

with the reasonable belief that it is necessary to further quality of health care" with qualified

immunity from state or federal private suits. Susan L. Horner, The Health Care Quality

Improvement Act of 1986 (Its History, Provisions, Applications and Implications), 16 Am. J.L. &

Med. 453, 456 (1990). The HCQIA conditioned its grant of professional peer review immunity on

two factors:

First, a professional peer review group must provide adequate due process protection to the physician subjected to review. See 42 U.S.C. § 1112. The HCQIA details a number of procedures which Congress deemed to be adequate due process, and creates a rebuttable presumption that the professional peer review group met the due process requirements even if it did not follow the HCQIA's procedures. Id. Second, the peer review group must take any action it deems necessary with the reasonable belief that its action will further quality health care. Id. A professional peer review group that fails to fulfill either condition is not entitled to the immunity afforded it by the HCQIA. See Goldsmith v. Harding Hospitals, Inc., 762 F. Supp. 187, 188 (S.D. Ohio 1991); see also Austin v. McNamara, 979 F.2d 728, 733 (9th Cir. 1992).

Hancock v. Blue Cross-Blue Shield of Kan., Inc., 21 F.3d 373, 374 (10th Cir. 1994). The Tenth

Circuit concluded that Congress, in enacting the HCQIA, did not intend to "benefit physicians

subject to peer review," rather, Congress intended "to ensure effective professional peer review of

physician competence by providing immunity from damage suits to those professional peer review

groups that comply with the HCQIA." Hancock v. Blue Cross-Blue Shield of Kan., Inc., 21 F.3d at 374-75.

Unlike the HCQIA's focus on "restrict[ing] the ability of incompetent physicians to move from State to State without disclosure or discovery," and on "provid[ing] incentive and protection for physicians engaging in effective professional peer review," 42 U.S.C. § 11101, in enacting the PSQIA, Congress intended to tackle the "broader problem of systematic failures in the deliver[y] of health care that resulted in preventable adverse events." Brendan A. Sorg., Is Meaningful Peer Review Headed Back to Florida?, 46 Akron L. Rev. 799, 822 (2013). In enacting PSQIA, Congress noted that "[c]urrently, the State peer review protections are inadequate to allow the sharing of information to promote patient safety," S. Rep. No. 109-544, at 3 (2005), and that, in 1999, an Institute of Medicine report estimated that as many as 98,000 Americans die each year from preventable medical error. See S. Rep. No. 108-196, at 2 (2003)(stating that the 1999 report "emphasizes the need to make system improvements and advises that health care information reporting systems must develop and implement processes through which medical error information can be identified, analyzed and utilized to prevent further medical errors."). See also Comm. on Quality of Health Care in Am., Inst. of Med., To Err is Human: Building a Safer Health System (Linda T. Kohn et. al. eds., 2000).

> Much of the impetus for this legislation can be traced to the publication of the landmark report, "To Err is Human," by the Institute of Medicine in 1999 (Report). The Report cited studies that found that at least 44,000 people and potentially as many as 98,000 people die in U.S. hospitals each year as a result of preventable medical errors. Based on these studies and others, the Report estimated that the total national costs of preventable adverse events . . .[are] between $17 billion and $29 billion, of which health care costs represent one-half. One of the main conclusions was that the majority of medical errors do not result from individual recklessness or from the actions of a particular group; rather, most errors are caused by faulty systems, processes, and conditions that lead people to make mistakes or

fail to prevent adverse events.

Patient Safety and Quality Improvement; Notice of Proposed Rulemaking, 73 Fed. Reg. 8112, 8112-13 (Feb. 12, 2008).

Congress noted that the threat of malpractice litigation discourages healthcare professionals and healthcare organizations from disclosing, sharing, and discussing medical error information. See S. Rep. No. 108-196, at 2. The United States Senate articulated that its mission, in enacting PSQIA, was "promoting a learning environment . . . to move beyond the existing culture of blame and punishment . . . to a 'culture of safety' that focuses on . . . the prevention of future medical errors," to improve patient safety outcomes. S. Rep. No. 108-196, at 3. On July 29, 2005, former President George W. Bush signed the PSQIA into law. See Remarks on Signing the Patient Safety and Quality Improvement Act of 2005, 41 Weekly Comp. of Presidential Documents 1227 (July 29, 2005).

Although the PSQIA's text does not explicitly mention peer review, through the PSQIA, Congress announced "a more general approval of the medical peer review process and more sweeping evidentiary protections for materials used therein," than the previously enacted HCQIA accomplished. KD ex rel. Dieffenbach v. U.S., 715 F. Supp. 2d 587, 594 (D. Del. 2010)(Thynge, M.J.). The Notice of Proposed Rulemaking also states:

> These outcomes will be advanced, in large measure, through implementation of this proposed rule of strong Federal confidentiality and privilege protections for information that is patient safety work product under the Patient Safety Act. For the first time, there will now be a uniform set of Federal protections that will be available in all states and U.S. territories and that extend to all health care practitioners and institutional providers. These protections will enable all health care providers, including multi-facility health care systems, to share data within a protected legal environment, both within and across states, without the threat of information being used against the subject providers.

Notice of Proposed Rulemaking, 73 Fed. Reg. at 8113.  The Notice of Proposed Rulemaking

explains that, for PSQIA's purposes, patient safety work product includes

> any data, reports, records, memoranda, analyses (such as root cause analyses), or
> written or oral statements (or copies of any of this material) (A) which could result
> in improved patient safety, health care quality, or health care outcomes and either
> (i) is assembled or developed by a provider for reporting to a PSO and is reported
> to a PSO; or (ii) is developed by a PSO for the conduct of patient safety activities;
> or (B) which identifies and constitutes the deliberations or analysis of, or identifies
> the fact of reporting pursuant to, a patient safety evaluation system.

Notice of Proposed Rulemaking, 73 Fed. Reg. at 8120.  See 42 U.S.C. § 299b-21(7).  The PSQIA

protects all patient safety work product from disclosure, including in federal civil proceedings.

See 42 U.S.C. § 299b-22(a).  PSOs "include all organizations that collect and analyze patient

safety work product and provide feedback to providers on strategies to improve patient safety and

quality of care, and that have been listed by the Department of Health and Human Services as

such." KD ex rel. Dieffenbach v. U.S., 715 F. Supp. 2d at 596 (citing S. Rep. No. 108-196, at *5).

As of April, 2019, there are eighty-three listed PSOs.  See Federally-Listed PSOs, Agency for

Healthcare Research 7 Quality, https://www.pso.ahrq.gov/listed (last visited April 20, 2019).

Other federal district courts have recognized that the PSQIA's drafters made clear "the

statute was not intended to provide a blanket protection for all information and communications

generated for quality control purposes." Johnson v. Cook Cty., 2015 WL 5144365, at *6 (citation

omitted)(noting that the PSQIA emphasizes that information not developed for the purpose of

reporting to a PSO does not become privileged merely because it is in fact reported to a PSO).  The

PSQIA "is designed to incentivize a particular form of external quality-assurance review that

Congress deems optimal."  Dunn v. Dunn, 163 F. Supp. 3d 1196, 1210 (M.D. Ala.

2016)(Thompson, J.).  "Extending the privilege to other quality-assurance documents not

submitted to a certified organization would destroy this incentive and seriously undermine" Congress' purpose. <u>Dunn v. Dunn</u>, 163 F. Supp. 3d at 1210. <u>See</u>, <u>e.g.</u>, <u>Crawford v. Corizon Health, Inc.</u>, Civil Action No. 17-113, 2018 WL 3361147, at *2 (W.D. Pa. July 10, 2018)(Rothstein, J.)(holding that the documents at issue must have been assembled or developed for reporting to the PSO, to qualify for the PSQIA privilege's protection).

## ANALYSIS

The parties ask the Court to consider the following discovery issues: (i) whether the QI/QA Records -- continuous quality improvement and quality improvement documents related to QI processes and meetings which Correct Care produced in 2015, and 2016 -- are relevant to the present litigation and subject to discovery; (ii) whether the Dr. Greifinger Documents in Bernalillo County's possession are relevant to the present litigation and subject to discovery; (iii) whether the QI/QA Records are subject to a viable claim of privilege, such as a common-law self-critical analysis privilege, a state-law ROIA privilege, or a PSQIA privilege; and (ii) whether the Dr. Greifinger Documents are subject to a viable claim of privilege, such as a common-law self-critical analysis privilege, a state-law ROIA privilege, or a PSQIA privilege. At the February 27, 2019, status conference, the Court informed the parties it cannot "make a document by document determination," so, instead, this opinion "sets forth the law, and then" if the Court determines "these documents are discoverable," the parties and the Court would "have to do something else" for the Court "to make an informed decision as to whether the documents" are producible. Feb. 27 Tr. at 5:3-14 (Court). The Court clarified that it will not produce an opinion "that says this document has to be produced, this document has to be produced," and that instead the opinion will outline "the law that's going to govern this case," in the hopes that the Court's statement of the

law informs the parties in their attempted resolution of their discovery disputes. Feb. 27 Tr. at

5:14-24 (Court). Bernalillo County filed the Dr. Greifinger Documents under seal for the Court's

review on April 16, 2019. See Court's Copy of Dr. Greifinger Documents. The Court reviewed

those documents and will discuss their relevance and privilege. The Court has not received a copy

of the QI/QA Records for review and, therefore, provides guidance but does not provide a

document-by-document determination of their relevance and privilege. This MOO is the promised

opinion. For the reasons explained below, the Court concludes that: (i) the QI/QA Records are

relevant to the present litigation and subject to discovery; (ii) the Dr. Greifinger Documents are

relevant to the present litigation and subject to discovery; (iii) the QI/QA Records are not protected

by a federal self-critical analysis privilege, by ROIA, or by PSQIA; and (iv) the Dr. Greifinger

Documents are not protected by a federal self-critical analysis privilege, by ROIA, or by PSQIA.

## I.  THE DOCUMENTS AT ISSUE ARE RELEVANT TO THE PRESENT LITIGATION AND SUBJECT TO DISCOVERY.

In In re Cooper Tire & Rubber Co., the Tenth Circuit stated that,

> when a party objects that discovery goes beyond that relevant to the claims or
> defenses, "the court would become involved to determine whether the discovery is
> relevant to the claims or defenses and, if not, whether good cause exists for
> authorizing it so long as it is relevant to the subject matter of the action." This
> good-cause standard is intended to be flexible. When the district court does
> intervene in discovery, it has discretion in determining what the scope of discovery
> should be. "[T]he actual scope of discovery should be determined according to the
> reasonable needs of the action. The court may permit broader discovery in a
> particular case depending on the circumstances of the case, the nature of the claims
> and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (citations and footnote omitted)(alteration in In re Cooper Tire & Rubber

Co.)(quoting the advisory committee's notes). "Although disputed discovery may not be directly

tied to a claim or defense in the case, that discovery may still be relevant to issues that are likely

to arise in the case." Kennicott v. Sandia Corp., 327 F.R.D. 454, 471 (D.N.M. 2018)(Browning, J.). Relevance is to be construed broadly, to "'encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." State Farm Mut. Auto Ins. v. Fayda, 2015 WL 7871037, at *2 (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. at 351).

### A. THE QI/QA RECORDS ARE RELEVANT AND SUBJECT TO DISCOVERY.

Tanner avers that the Dr. Greifinger Documents are only a subset of all of the documents at issue and that the scope of the McClendon litigation will not moot out all discovery issues in this case. See Feb. 4 Tr. at 107:9-10 (Leonard); id. at 108:13-16 (Leonard); id. at 110:1-4 (Leonard). Tanner contends that, pursuant to its "Medical Services Agreement with the County, Defendant CCS is required to prepare and submit reports regarding staffing patterns and staffing vacancies to the County's contract compliance officer." Reply to Motion to Compel RFP No. 5 at 4. Tanner notes that the Medical Services Agreement also requires Correct Care to "provide a monthly staffing matrix report by the 15th of each month." Reply to Motion to Compel RFP No. 5 at 4. Tanner argues that, pursuant to Bernalillo County's policy on administrative meetings and reports, Correct Care must also produce "monthly statistical reports," "data necessary to complete the HSU data matrix," and "other records to be distributed" to the jail's upper level administrative staff. Reply to Motion to Compel RFP No. 5 at 4. Tanner contends that the Medical Services Agreement also requires QI/QA Records, and that these records are "relevant to prove Defendants' negligence and deliberate indifference, as well as causation and the existence of unwritten customs or policies at MDC." Reply to Motion to Compel RFP No. 5 at 6.

The Court concludes that, to the extent Magistrate Judge Molzen's order in the Sept. 5,

2018 KBM MOO does not cover the documents Tanner seeks, the documents at issue are relevant, pursuant to rule 26(b)'s delimited scope of discovery. Correct Care argues that Tanner, through discovery requests such as RFP No. 12, seeks information about general health care at Metropolitan Detention, an overly broad inquiry not closely related to her pregnancy and prenatal care claims, or proportional to the case's needs. See CCS' Obj. to Sept. 5, 2018 KBM MOO at 12-13. Tanner seeks, for example, "records identifying names, job titles or positions, duty stations or posts, and working hours for each of CCS's employees or contractors on duty during the 17-day period when Plaintiff was at the MDC in October 2016." Motion to Compel Ans. and Resp. at 2. Tanner also seeks "the name, job title or position, and business contact information of CCS employees or agents who were involved in providing health care to Plaintiff and responding to requests for health care by or on behalf of Plaintiff during the relevant time period." Motion to Compel Ans. and Resp. at 3-4. Tanner also requests "production of records and information regarding staff vacancies and absences during and in the time period leading up to Plaintiff Tanner's incarceration at MDC in October 2016." Motion to Compel Ans. and Resp. at 4. Tanner requests "information and records regarding committee work which implicates the supervisory Defendants in this action and serves as a forum for identifying systemic or pre-existing problems regarding access to health care at MDC during the relevant time period," noting that the "provisions of CCS's Medical Services Agreement with the County already identify the types of committees involved and the records CCS is required to keep and produce to the County regarding their committee work." Motion to Compel Ans. and Resp. at 7.

Tanner contends that the requested QI/QA Records -- documents which Correct Care has been producing pursuant to its contract with Bernalillo County and pursuant to its operation of the

healthcare facilities at Metropolitan Detention, are relevant "to determine the extent to which understaffing during the period Plaintiff Tanner was incarcerated played a causal role" in her allegedly deficient medical care and "to determining which Defendant(s) were responsible for allowing such understaffing to persist . . . ." Motion to Compel Ans. and Resp. at 5. Tanner argues that

> it is plausible in light of Dr. Greifinger's report and the other discovery produced to date that understaffing during that period adversely impacted the level of supervision and training given or received by Defendant CCS's employees, including those named as Defendants in this action, and created a backlog of work that took their attention away from the serious medical needs of Plaintiff Tanner and her baby. Such a lack of supervision and training or a backlog of work from months preceding Plaintiff Tanner's incarceration could leave Defendant CCS employees ill-equipped to handle her medical needs or conduct appropriate follow up when those needs first arose or were identified.

Motion to Compel Ans. and Resp. at 6. The Court agrees that the documents which Correct Care produced in connection with its provision of health care services at Metropolitan Detention and its contract with Bernalillo County are relevant to Tanner's claims. Tanner notes that Dr. Greifinger's reports

> indicate that during the relevant time period, there were serious flaws with the CQI and quality assurance process, and that process provided an avenue through which systemic problems relating to understaffing and inadequate access to care for pregnant inmates would be brought to the attention of personnel at higher levels in the chain of command, including the Medical Director, HAS, and Jail Administration.

Motion to Compel Ans. and Resp. at 8. The Court agrees that discovery of these documents is relevant to show whether supervisory personnel, including named Defendants, had knowledge or awareness of these problems, as well as to show the problems' existence and timing. The Court concludes that these documents are relevant to Tanner's claims.

## B. THE DR. GREIFINGER DOCUMENTS ARE RELEVANT AND SUBJECT TO DISCOVERY.

Rule 72(a) of the Federal Rules of Civil Procedure requires a district judge to consider timely objections to a magistrate judge's discovery order in a case "and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). See Hutchinson v. Pfeil, 105 F.3d at 566. A district court is required to "defer to the magistrate judge's ruling unless it is clearly erroneous or contrary to law." Hutchinson v. Pfeil, 105 F.3d at 566. "In sum, it is extremely difficult to justify alteration of the magistrate judge's non-dispositive actions by the district judge," although a district judge "should not be hamstrung by the clearly erroneous standard." Wright et al., supra, § 3069, at 350-55.

Correct Care asks that the Court review Magistrate Judge Molzen's relevance rulings regarding the Dr. Greifinger Documents, arguing that Tanner's desired scope of discovery is "broader than necessary" and that Magistrate Judge Molzen's relevance analysis "goes too far." Feb. 4 Tr. at 80:19-81:1 (White). Correct Care agrees that the "clearly erroneous or contrary to law" standard applies to the Court's review of Magistrate Judge Molzen's "legal conclusions." Feb. 4 Tr. at 82:6-7 (White). The Court stated at the February 5, 2019, hearing its inclination to conclude that the documents at issue are relevant, and to "not find that Judge Molzen was clearly erroneous or abused her discretion in any way [that] was clearly erroneous or was contrary to law," so the Court indicated it would probably "not set aside her order on that score," and would "plunge into the privileges issue." Feb. 5 Tr. at 8:1-9 (Court). The Court stated that it "probably will overrule the objection" to Magistrate Judge Molzen's rulings on relevance and discoverability grounds, and then it would "take the other [privileges issue] under advisement." Feb. 5 Tr. at 8:11-13 (Court).

Magistrate Judge Molzen specifically ruled on the Dr. Greifinger Documents:

> Thus, the documents Dr. Greifinger reviewed to make his findings may provide Plaintiff with information concerning the medical care, or lack of medical care, that was available to Plaintiff at the relevant time period. Moreover, those documents may be relevant to the awareness of officials of any problems with the delivery of medical care to inmates.

Sept. 5, 2018 KBM MOO at 5, 2018 WL 4222384, at *3. Magistrate Judge Molzen applied that standard when she concluded that the requested documents are relevant to Tanner's claim that Metropolitan Detention denied her access to adequate medical care, because Dr. Greifinger's "reports revealed staffing problems at MDC during the relevant time period." Sept. 5, 2018 KBM MOO at 5, 2018 WL 4222384, at *2. Magistrate Judge Molzen noted that the April 22, 2016 Dr. Greifinger Report "found that MDC had opportunities for improvement with regard to pregnancy care" and that the Nov. 21, 2016 Dr. Greifinger Report found that "staff vacancies put MDC patients at risk of serious harm." Sept. 5, 2018 KBM MOO at 5, 2018 WL 4222384, at *3. Magistrate Judge Molzen noted that "Dr. Greifinger's reports for these site visits at MDC are temporally connected to Plaintiff's allegations." Sept. 5, 2018 KBM MOO at 5, 2018 WL 4222384, at *3. Magistrate Judge Molzen averred that the Dr. Greifinger Documents may provide Tanner "with information concerning the medical care, or lack of medical care, that was available to Plaintiff at the relevant time period," and may also be relevant "to the awareness of officials of any problems with the delivery of medical care to inmates." Sept. 5, 2018 KBM MOO at 5, 2018 WL 4222384, at *3. Magistrate Judge Molzen's conclusion is apt in light of the Amended Complaint, which specifically alleges:

> 31. At the time the *McClendon* settlement agreement was approved, MDC staff had not yet achieved compliance with the standards referenced in CAA No. 1. Several deficiencies were noted in the reports prepared by Dr. Robert G. Greifinger, M.D., who served as the court-appointed medical expert in the *McClendon*

litigation.

32. According to Dr. Greifinger's report dated November 21, 2016, practitioner staffing at MDC "was reduced to one physician and one physician assistant" due to several practitioner resignations in July 2016, and this "substantially reduced staffing continued for 3.5 months." Dr. Greifinger also reported "no progress" with CCS's plans "to recruit a part-time OB/GYN to work on-site." In his report, Dr. Greifinger found "the waiting time for access to practitioner care" increased, and there was "a substantial lag time to the practitioners for acute care" during the period from July 2016 to October 2016. Dr. Greifinger opined in his report that "These staff vacancies put MDC patients at risk of serious harm."

33. From July 2016 through October 2016, supervisory personnel at MDC, including Defendants McMurray, Kossman, and Ruiz, received notice and were aware that the quality management process, staff vacancies, lack of on-site OB/GYN clinic, lack of access to the level of prenatal care required under the NCCHC standards, level of compliance with the *McClendon* settlement agreement, and timely access to appropriate off-site medical care, were deficient during the period, thereby creating a risk of harm to MDC inmates, including Plaintiff Tanner. Upon information and belief, these Defendants received and became aware of these problems through the monthly reports, matrices, logs, corrective action plans, and committee meetings required under the Medical Services Agreement (Sections 4.1.16.5, 4.1.20.1, 4.1.25.27, 4.1.26.7, 4.1.27.4, 4.2.1, 4.2.2) and the *McClendon* settlement agreement described above.

Amended Complaint ¶¶ 31-33, at 9.

The scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b). Magistrate Judge Molzen concludes that the Dr. Greifinger Documents, which Dr. Greifinger reviewed in preparing his reports which identified deficiencies such as staffing vacancies during the time period surrounding Tanner's incarceration, are relevant to Tanner's claims of deficient health care of which Metropolitan Detention officials had notice. See Sept. 5, 2018 KBM MOO at 5, 2018 WL 4222384, at *3. In other words, Magistrate Judge Molzen concludes that the discovery which Tanner seeks is relevant to her claims, the scope of discovery that rule 26(b) delimits. See Fed. R.

Civ. P. 26(b). The relevance standard that Magistrate Judge Molzen applies is, therefore, not contrary to law.

Bernalillo County provided "a copy of documents that were received by counsel for Bernalillo County in the *McClendon* litigation that were produced to Dr. Greifinger, the Court appointed expert in that matter." April 2, 2019 Letter at 1. Bernalillo County attaches a log of the Dr. Greifinger Documents and highlights the documents which Bernalillo County already provided to Tanner -- the Pregnant Woman Studies, and studies of Shawna Tanner's Case -- as of April 16, 2019. See Log of Documents Provided to Dr. Robert Greifinger, filed April 16, 2019 (Doc. 214-1)("Dr. Greifinger Documents Log"). The Court has carefully reviewed the Court's Copy of Dr. Greifinger Documents. See Sealed Notice, filed April 16, 2019 (Doc. 215)("Court's Copy of Dr. Greifinger Documents"). The Court agrees with Magistrate Judge Molzen's determination that these documents are relevant.[26] The Dr. Greifinger Documents include: (i) a CQI Calendar (undated)(Bates Nos. D000001-02); (ii) CQI Meeting Minutes (dated July 16, 2016)(Bates Nos. D000003-04); (iii) a Psychiatry Study (dated July 29, 2016)(Bates Nos. D000005-06); (iv) an HIV Study (dated July 21, 2016)(Bates No. D000007); (v) a Receiving Screen and Med. Verification Study (dated June, 2016)(Bates Nos. D000008-09); (vi) an Alcohol/Benzo Withdrawal Study, (dated June, 2016)(Bates Nos. D000010-11); (vii) a Mental Health Evaluation Study (dated February 15, 2016)(Bates Nos. D000012-14); (viii) Health Assessment Studies (dated February 15, 2016, August 25, 2016, and November 10, 2016)(Bates

---

[26]The Court considered redacting certain information, like inmate or patient names, but this redaction could prejudice Tanner. It is precisely that information that she may want to use to do more discovery, tracking down more information and leads. The Court's protective order will sufficiently protect patient information without harming Tanner's ability to follow up with discovery leads.

Nos. D000015-17); (ix) Pregnant Women Studies (dated March 7, 2016, April 7, 2016, and August 16, 2016)(Bates Nos. D000018-20); (x) Evaluations of Care prior to ER Visit (dated March 17, 2016, and May 25, 2016)(Bates Nos. D000021-22); (xi) an X-Rays Study (dated February 15, 2016)(Bates No. D000023); (xii) Chronic Disease Studies for Asthma, Diabetes, Seizure, and Hypertension (dated March 7, 2016, March 8, 2016, April 7, 2016, April 20, 2016, August 25, 2016, September 1, 2016, and November 8, 2016)(Bates Nos. D000024-38); (xiii) Anticoagulant Studies (dated April 19, 2016, August 25, 2016, and October 26, 2016)(Bates Nos. D000039-42); (xiv) a Continuity of Care Study (dated August 25, 2016)(Bates No. D000043); (xv) an Access to Dental Care Study (dated August 23, 2016)(Bates No. D000044); (xvi) Sexually-Transmitted Diseases Studies (dated March 7, 2016, April 7, 2016, August 8, 2016, and November 8, 2016)(Bates Nos. D000045-48); (xvii) Continuity of Medication on Intake Studies (dated February 15, 2016, September 12, 2016, and November 14, 2016)(Bates Nos. D000049-51); (xviii) a Medical Refusal Study (dated April 7, 2016)(Bates Nos. D000052-54); (xix) a January-March 2016 Corrective Action Plan (Bates Nos. D000055-59); (xx) Mortality and Morbidity Reviews for B.G., L.D., M.A., J.O., D.T., and Shawna Tanner (dated May 11, 2016, June 22, 2016, June 24, 2016, July 14, 2016, September 20, 2016, and October 17, 2016)(Bates Nos. D000060-319); and (xxi) Reports completed by Dr. Kenneth Ray and Dr. Ronald Shansky regarding K.A., M.S.J., Shawna Tanner, and D.T. (undated)(Bates Nos. D000320-348). Dr. Greifinger Documents Log at 1-4. The Court addresses the relevance of the Dr. Greifinger Documents by category, below.

1. **<u>The CQI Documents</u>.**

Included in the Dr. Greifinger Documents are a CQI Calendar (undated)(Bates Nos. D000001-02), the CQI Meeting Minutes (dated July 16, 2016)(Bates Nos. D000003-04), and the January-March 2016 Corrective Action Plan (undated)(Bates Nos. D000055-59). <u>See</u> Dr. Greifinger Documents Log at 2-4. Correct Care avers that the CQI Calendar is beyond rule 26(b)(1)'s scope, because the calendar's described schedule did not apply at Metropolitan Detention, because Metropolitan Detention was "directed to use Dr. Greifinger's toolkit." CCS' Obj. to Prod. <u>McClendon</u> Docs. at 1. Correct Care does not make a relevance argument specific to the CQI Meeting Minutes. <u>See</u> CCS' Obj. to Prod. <u>McClendon</u> Docs. at 1 (asserting only privilege-related objections as to the CQI Meeting Minutes' production).

The Court concludes that Magistrate Judge Molzen's finding that these documents are relevant is not clearly erroneous or contrary to law. The CQI Calendar outlines when a Correct Care facility should perform various screens to evaluate health care challenges such as refusal of services, controlled substance monitoring, or emergency services. <u>See</u> Court's Copy of Dr. Greifinger Docs. at 1. The Court agrees with Tanner that the CQI documents are relevant to her claims' elements, because these documents could indicate that Correct Care and Bernalillo County knew of problems in the operation of Metropolitan Detention's medical facility and could indicate whether the Defendants took effective measures to correct those problems up to the time of the events at issue, which occurred in October, 2016. <u>See</u> Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 6. The CQI documents indicate that Metropolitan Detention was excused from using the Correct Care CQI Studies on November 2, 2016, at which time Metropolitan Detention began using Dr. Greifinger's CQI tool kit. <u>See</u> Court's Copy of Dr. Greifinger Docs. at

2.  The CQI Calendar may have contributed to Dr. Greifinger's conclusion that there was opportunity for improvement at Metropolitan Detention and to his identification of deficiencies in health care delivery at Metropolitan Detention.  See Reply to Motion to Compel RFP No. 5 at 6. The Court also agrees with Tanner's assertion that the CQI Calendar and Meeting Minutes constitute evidence relevant to proving the Defendants' alleged negligence and deliberate indifference to inmate health care needs, as well as proving the existence of unwritten customs or policies at Metropolitan Detention.  See Reply to Motion to Compel RFP No. 5 at 6.  For instance, these documents could lead to the identification of pre-existing problems regarding access to or evaluation of health care at Metropolitan Detention preceding Tanner's incarceration.  See Motion to Compel Ans. and Resp. at 7.  Additionally, Tanner notes that the April 22, 2016 Dr. Greifinger Report concluded that "there are continuing problems with the quality of nursing evaluations, judgments, and nursing decisions for acute problems," and the Nov. 21, 2016 Dr. Greifinger Report concludes that "[t]here are corrective action plans, but they are non-specific, for example, 'train nurses,' with nothing said about measurement to document improvement within a specific timeframe."  Compare April 22, 2016 Dr. Greifinger Report at 4, with Nov. 21, 2016 Dr. Greifinger Report, at 4.  In the Amended Complaint, Tanner alleges that the Defendants became aware of health care deficiencies at Metropolitan Detention in part through the corrective action plans that Correct Care produced pursuant to its Medical Services Agreement with Bernalillo County.  See Amended Complaint ¶¶ 31-33, at 9.  The Corrective Action Plan also informed Dr. Greifinger's conclusion that there existed health care deficiencies at Metropolitan Detention.  Accordingly, the Corrective Action Plan is relevant to Tanner's claims of inadequate or negligent health care delivery at Metropolitan Detention, and of officials' awareness of existing

health care problems and failure to remedy those problems.

## 2.    The Health Care Studies.

Also included in the Dr. Greifinger Documents are various health care studies which Correct Care conducted at Metropolitan Detention in 2016, preceding and at the time of Tanner's incarceration.  See Dr. Greifinger Documents Log at 1-4.  These studies include: (i) a Psychiatry Study (dated July 29, 2016)(Bates Nos. D000005-06); (ii) an HIV Study (dated July 21, 2016)(Bates No. D000007); (iii) a Receiving Screen and Med. Verification Study (dated June 2016)(Bates Nos. D000008-09); (iv) an Alcohol/Benzo Withdrawal Study (dated June 2016)(Bates Nos. D000010-11); (v) a Mental Health Evaluation Study (dated February 15, 2016)(Bates Nos. D000012-14); (vi) Health Assessment Studies (dated February 15, 2016, August 25, 2016, and November 10, 2016)(Bates Nos. D000015-17); (vii) Pregnant Women Studies (dated March 7, 2016, April 7, 2016, and August 16, 2016)(Bates Nos. D000018-20); (viii) Evaluations of Care prior to ER Visit (dated March 17, 2016, and May 25, 2016)(Bates Nos. D000021-22); (ix) an X-Rays Study (dated February 15, 2016)(Bates No. D000023); (x) Chronic Disease Studies for Asthma, Diabetes, Seizure, and Hypertension (dated March 7, 2016, March 8, 2016, April 7, 2016, April 20, 2016, August 25, 2016, September 1, 2016, and November 8, 2016)(Bates Nos. D000024-38); (xi) Anticoagulant Studies (dated April 19, 2016, August 25, 2016, and October 26, 2016)(Bates Nos. D000039-42); (xii) a Continuity of Care Study (dated August 25, 2016)(Bates No. D000043); (xiii) an Access to Dental Care Study (dated August 23, 2016)(Bates No. D000044); (xiv) Sexually-Transmitted Diseases Studies (dated March 7, 2016, April 7, 2016, August 8, 2016, and November 8, 2016)(Bates Nos. D000045-48); (xv) Continuity of Medication on Intake Studies (dated February 15, 2016, September 12, 2016,

and November 14, 2016)(Bates Nos. D000049-51); and (xvi) a Medical Refusal Study (dated April 7, 2016)(Bates Nos. D000052-54).  See Dr. Greifinger Documents Log at 1-4.

Correct Care argues that Tanner seeks information about general health care at Metropolitan Detention, an overly broad inquiry not closely related to her pregnancy and prenatal care claims, or proportional to the case's needs.  See CCS' Obj. to Sept. 5, 2018 KBM MOO at 12-13.  Correct Care avers that the health care studies are not relevant to the litigation, because the diseases they address are not at issue, the studies are too remote in time, or they are limited to patients with conditions unlike those at issue in this case.  See CCS's Obj. to Prod. McClendon Docs. at 1-4.  Tanner contends that, even if the studies relate to conditions other than pregnancy, they are relevant to Tanner's claims where Tanner alleges that Correct Care "failed  to adequately evaluate Plaintiff Tanner's symptoms of preterm labor and premature rupture of membranes in order to transport her to a hospital facility for further care and treatment," they are "germane to determining why Plaintiff Tanner did not receive proper care prior to her ER visit on October 17, 2016," and they are relevant to "understanding Dr. Greifinger's finding that there were problems with Correct Care's nursing evaluations' quality in 2016."  Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 8.  Tanner contends that she should be allowed discovery on how Correct Care handled chronic care referrals for conditions other than pregnancy "to determine whether there were systematic deficiencies in how such referrals were handled," or whether they were routinely well handled "but neglected with respect to Plaintiff Tanner's individual care."  Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 9.  Tanner also avers that continuity of care is a key issue in this case.  See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 10.  Tanner contends that she should be allowed to obtain discovery on how Correct Care "handled continuity

of care and other intake-related issues for other inmates to determine whether there were systemic deficiencies in how such care was handled." Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 10.

The Court concludes that Magistrate Judge Molzen's determination that the health care studies documents are relevant is not clearly erroneous or contrary to law. The Court agrees with Magistrate Judge Molzen's determination that the health care studies documents are relevant to Tanner's claims, because, although the specific diseases or conditions which the studies address may not be at issue, health care delivery, continuity of care, Correct Care's and Metropolitan Detention's procedures and customs related to emergency care, evaluation of inmate needs, and response to those needs are all at issue. The health care studies are germane to Tanner's claims regarding allegedly negligent or deliberately indifferent health care practices by Correct Care at Metropolitan Detention. Studies regarding other health conditions may be considered in determining the pervasiveness or severity of the conduct of Correct Care's or Metropolitan Detention's officials and may establish the general environment surrounding health services at Metropolitan Detention preceding and at the time of Tanner's incarceration.

### 3. <u>The Mortality and Morbidity Reports.</u>

Tanner avers that the Mortality and Morbidity Reports are relevant, because some of the Defendants were involved in their production, and they bear on questions "regarding the timeliness of medical care or transport to the hospital, or questions regarding the appropriateness of care given in the infirmary setting." Tanner's Resp. to CCS' Obj. to Prod. <u>McClendon</u> Docs. at 11. Tanner contends that the documents contain information relevant to proving the elements of her claims, because they could indicate that the Defendants did not effectively remedy a known

problem revealed through past incidents regarding timely arrangement of emergency transport for inmates in need, and that Defendants' failure to remedy that problem resulted in Tanner's alleged harms. See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 11-12. Correct Care objects to the production of the Mortality and Morbidity Reviews, because the documents contain protected health information for patients other than Tanner, and because the documents pertain to conditions not at issue in this case. As mentioned in an earlier footnote in this MOO, the Court considered redacting certain information, like inmate or patient names, see supra n.26, but this redaction could prejudice Tanner. It is precisely that information that she may want to use to do more discovery, tracking down more information and leads. A protective order will sufficiently protect patient information without harming Tanner's ability to follow up with discovery leads. The Court agrees with Tanner that the documents are relevant to her claims, where they may indicate patterns in Correct Care's or Metropolitan Detention's responses to emergent health situations, their monitoring of inmate health, their reporting mechanisms, and their provision of care. The Court agrees with Magistrate Judge Molzen's determination that these documents are relevant to the litigation and concludes that Magistrate Judge Molzen's determination was neither clearly erroneous nor contrary to law.

4. **The Drs. Ray and Shansky Reports**.

Correct Care objects to the production of Drs. Ray and Shansky's reports regarding specific inmates other than Tanner, averring that the reports are not relevant because they pertain to conditions that are not at issue in this case. See CCS' Obj. to Prod. McClendon Docs. at 9. Tanner avers that, even if the specific conditions which the reports address are not at issue, the reports analyze factors that exist in this litigation, they contain information upon which Dr. Greifinger

relied in making his determination that Metropolitan Detention's inmate health care was deficient in certain respects, and the reports deal with inmates who died in Metropolitan Detention's emergency under the care of some of the individual Defendants in this case. See Tanner's Resp. to CCS' Obj. to Prod. McClendon Docs. at 11. The Court agrees with Tanner, because, although the reports are case reviews of specific inmates' situations, they present Drs. Ray and Shansky's findings with respect to Correct Care's compliance with health care protocol, and with the McClendon consent decree, and they address issues such as the length of time before an inmate received treatment or evaluation, and the accuracy of intake health screenings, referrals, and continuity of care, all of which are relevant to Tanner's claims. The Court agrees with Magistrate Judge Molzen's determination that the reports are relevant, and concludes that her determination is neither clearly erroneous nor contrary to law.

## II.    THE SELF-CRITICAL ANALYSIS PRIVILEGE, THE STATE-LAW ROIA PRIVILEGE, AND THE FEDERAL PSQIA PRIVILEGE DO NOT PROTECT THE DOCUMENTS AT ISSUE.

The Court predicts that the State of New Mexico would not recognize a common-law self-critical analysis privilege, because the concern that motivates recognition of the privilege, a possible chilling effect, is unlikely to materialize, in any context and, more specifically, in this context. The Court also concludes that federal law does not require a self-critical analysis privilege. Moreover, even if the self-critical analysis privilege exists in this context, the Court concludes that the privilege would not apply to the documents at issue, because Correct Care's voluntary disclosure of the documents to Bernalillo County and to Dr. Greifinger waived any such privilege. The Court concludes that federal privilege law applies to this case and that, because federal civil-rights law provides the rule of decision for Tanner's claims, federal privilege law and

not state privilege law applies, and ROIA, a state statutory privilege, does not apply. The Court concludes that the federal PSQIA privilege does not protect the documents at issue, because there is no evidence before the Court that the documents which Correct Care produced pursuant to its contract with Bernalillo County were produced for the purpose of reporting to a PSO, and the records which Correct Care describes do not meet the foundational requirements for records qualified for protection under the PSQIA privilege.

### A.  FEDERAL PRIVILEGE LAW APPLIES TO THIS CASE.

Before determining whether a particular privilege applies, the Court must decide whether federal or state law governs the asserted privilege or privileges. See Vondrak v. City of Las Cruces, 760 F. Supp. 2d at 1175. This case involves both federal and state law claims, and therefore presents the possibility that either or both federal or state privilege law should govern. Although federal and New Mexico privilege law are not identical, an examination of federal caselaw and New Mexico law pertinent to the three possible privileges asserted -- self-critical analysis, ROIA, and PSQIA -- assure the Court that the same result would obtain under either body of law.

The information that the Defendants request the Court find privileged is relevant to both Tanner's federal and state law claims. The Court believes that it is not prudent, therefore, to attempt to separate the federal and state law claims, and to attempt to apply state privilege law to the state law claims and federal privilege law to the federal law claims. Ultimately, where there is a federal cause of action and pendent state law claims, and where the asserted privilege relates to evidence relevant to both the federal and state law claims, the Court agrees with its previous decision in Vondrak v. City of Las Cruces, and concludes that federal privilege law should apply. See Vondrak v. City of Las Cruces, 760 F. Supp. 2d at 1175.

This case involves both federal- and state-law claims. Rule 501's text, as the Tenth Circuit interprets it, suggests that, in such situations, federal privilege law should apply to federal claims and state privilege law should apply to state-law claims. See Motley v. Marathon Oil Co., 71 F.3d at 1551. Applying that general rule, however, is unhelpful in some instances, such as in this case, where the privilege asserted goes to evidence relevant to both federal- and state-law claims. The extent of the Metropolitan Detention officials' awareness of health care deficiencies at Metropolitan Detention preceding and at the time of Tanner's incarceration, for example, is at issue in both Tanner's federal and state law claims.

The Tenth Circuit differs from the other Courts of Appeals to the extent that it has held that, where there are federal and state law claims, "[a]s to state causes of action, a federal court should look to state law in deciding privilege questions." Motley v. Marathon Oil Co., 71 F.3d at 1551. Nevertheless, the Tenth Circuit has not confronted the issue that this case presents, where evidence allegedly subject to a privilege is relevant to both the federal and state law claims in the case. The Court believes, however, that the weight of the Courts of Appeals authority, combined with the practical considerations involved with running discovery and trials, indicate that the Tenth Circuit would follow the majority and find that federal privilege law applies under such circumstances.

First, at the discovery phase, any attempt to bifurcate privileges along the border between federal and state law claims would be hollow if the allegedly privileged evidence impacted both sets of claims. If, for example, state law privileged the evidence, but federal law did not, a court would be in the conundrum of preventing the discovery of evidence as to the state law claims because of the state law privilege, while simultaneously ordering the same evidence disclosed as

non-privileged as to the federal claims. One privilege needs to be applied to a discovery determination to avoid such a problem.

Second, it would be impracticable to apply two different bodies of privilege law before one jury. See Hancock v. Hobbs, 967 F.2d at 467. In this case, for example, if one privilege law dictates that Dr. Greifinger's Documents are privileged, while the other body of privilege law dictates a contrary result, a court applying state law to the state claims and federal law to the federal claims would have to admit the Dr. Greifinger Documents for one set of claims and exclude the same documents from evidence for the other claims. The Court would then give a limiting instruction to the jury, but such a limiting instruction would be of limited value, given that the evidence which should have been privileged would have been heard, and the privilege effectively lost.

In light of such considerations, the Court concludes, and it has previously stated in Vondrak v. City of Las Cruces, that the best course of action is to apply a single body of privilege law. See 760 F. Supp. 2d at 1175-77. Moreover, it makes sense that the body of privilege law that the Court applies should be federal law. Jurisdiction in this case is based on a federal question rather than on diversity. Thus, the Court has supplemental jurisdiction over the state-law claims. "[W]here the primary source of the court's jurisdiction is the federal claim, to which the state claim is merely pendent (supplemental), it seems appropriate that the federal evidentiary interest -- whether in privilege or production -- should be primary as well." In re Sealed Case (Medical Records), 381 F.3d at 1213.

The Court does not believe that the Tenth Circuit would hold to the contrary. Although the Tenth Circuit has stated the general rule that, when a case involves federal and state law claims,

state privilege applies to the state law claims and federal privilege to the federal claims, the Tenth Circuit has not held that state privilege law should apply to evidence relevant to both federal and state claims. In <u>Motley v. Marathon Oil Co.</u>, the Tenth Circuit did not discuss whether the evidence at issue was relevant to the federal claim. While the Court must make its best effort to follow Tenth Circuit precedent, there is no Tenth Circuit precedent governing the question which privilege to apply where the evidence at issue is relevant to both federal and state law claims in the case. The weight of the authority and practical considerations leads the Court to believe it has adopted the right approach -- the approach which the Court originally articulated in <u>Vondrak v. City of Las Cruces</u> in 2009, and on which the Tenth Circuit has yet to comment.

**B.    A SELF-CRITICAL ANALYSIS PRIVILEGE, STATE OR FEDERAL, DOES NOT PROTECT THE DOCUMENTS.**

Correct Care urges the Court to recognize a self-critical analysis privilege in the context of inmate lawsuits alleging individual harm from inadequate health care. <u>See</u> Response to Motion to Compel RFP No. 12 at 10. Correct Care argues that medical peer-review privileges such as that which the PSQIA creates are subsets of a "self-critical analysis evidentiary privilege," the need for which has been recognized for "at least two generations" in the health care context and specifically in hospital settings. Response to Motion to Compel RFP No. 12 at 9. Correct Care contends that the Court should recognize a "fuller version" of the self-critical analysis privilege than Judge Hansen recognized in <u>Weekoty</u>, because Tanner's lawsuit contains only individual and no class claims, and "the public importance of protecting the QI process at Metropolitan Detention outweighs" Tanner's private interest. Response to Motion to Compel RFP No. 12 at 15. Tanner addresses Correct Care's self-critical analysis privilege argument, but notes that she requests the Court deem it waived, because the privilege "was not specifically raised in Defendant's original

objections served concurrently with its response to RFP No. 12." Reply to Motion to Compel RFP No. 12 at 2. Tanner contends that, in the <u>McClendon</u> litigation, Judge Parker rejected Correct Care's contentions that a self-critical analysis privilege protects the Dr. Greifinger Documents from disclosure and that the recent caselaw which Tanner cites in the Motion to Compel RFP No. 5 rejects application of these privileges to these records. <u>See</u> Motion to Compel Ans. and Resp. at 7. Tanner avers, furthermore, that, even if a privilege applies to a subset of the requested materials, it "could never blanket all committee work" or excuse Correct Care from producing a privilege log to enable the parties and the Court to properly evaluate its privilege claims for specific records. Motion to Compel Ans. and Resp. at 8. Tanner argues, for instance, that her discovery requests ask for information from meetings other than CQI committee meetings -- at least some of which seem like policymaking body meetings subject to the Open Meetings Act, rather than private, self-critical analysis meetings -- at which "health care staff, other health care providers and the jail administration meet regularly to promote communication, information sharing, and to identify and resolve issues." Motion to Compel Ans. and Resp. at 8. Tanner repeatedly reiterates her willingness to enter into a confidentiality order in this litigation. <u>See</u> Motion to Compel Ans. and Resp. at 8-9. Correct Care asks that the Court rule, in part, whether a self-critical analysis privilege will protect Correct Care's QI process. <u>See</u> Motion to Compel Ans. and Resp. at 21.

Magistrate Judge Molzen concluded that a self-critical analysis privilege that Judge Hansen recognized in <u>Weekoty</u> exists "in the context of morbidity and mortality conferences conducted by physicians for the purpose of peer review of the care and treatment of patients." Sept. 5, 2018 KBM MOO at 7, 2018 WL 4222384, at *4 (citing <u>Weekoty</u>, 30 F. Supp. 2d at 1345). Magistrate Judge Molzen stated, however, that in <u>Bravo</u>, she "declined to extend that privilege to self-

evaluation records concerning medical care in a prison." Sept. 5, 2018 KBM MOO at 7-8, 2018 WL 4222384, at *4 (citing <u>Bravo</u>, 2009 WL 10706756, at *2-3). Magistrate Judge Molzen explained that, in <u>Bravo</u>, the court examined four requirements a party asserting the self-critical analysis privilege must demonstrate:

> "(1) the information results from a critical self-analysis performed by the party seeking production; (2) the public has a strong interest in preserving the free flow of the type of information sought; . . . (3) the information is of the type whose flow would be curtailed if discovery were allowed"; and (4) the document "was prepared with the expectation that it would be kept confidential, and has in fact been kept confidential."

Sept. 5, 2018 KBM MOO at 8, 2018 WL 4222384, at *4 (quoting <u>Bravo</u>, 2009 WL 10706756, at *2 (alterations in Sept. 5, 2018 KBM MOO)). In <u>Bravo</u>, Magistrate Judge Molzen explained that the third requirement is not met in the prison context. <u>See</u> Sept. 5, 2018 KBM MOO at 8, 2018 WL 4222384, at *4. Magistrate Judge Molzen also notes that the demand for public accountability in the prison context "will ensure that self-analysis continues, whether that information is kept confidential or not," and that, in <u>McClendon</u>, Judge Parker twice determined that no self-critical-analysis privilege applies to the Dr. Greifinger Documents. Sept. 5, 2018 KBM MOO at 8, 2018 WL 4222384, at *4. For the foregoing reasons, Magistrate Judge Molzen determined that the self-critical analysis privilege does not apply to the Dr. Greifinger Documents, and Magistrate Judge Molzen overruled Correct Care's objection on this ground. <u>See</u> Sept. 5, 2018 KBM MOO at 9, 2018 WL 4222384, at *4.

Judge Hansen held in <u>Weekoty</u> that the self-critical analysis privilege would be recognized in the context of mortality and morbidity conferences. <u>See</u> 30 F. Supp. 2d at 1345. Judge Hansen concluded:

> Recognition of this privilege in the medical setting is supported by the same policy

considerations and Rule 501 analysis as the United States Supreme Court relied upon in <u>Jaffee v. Richmond</u>, when it recognized the psychotherapist-patient privilege. 518 U.S. at 15. In <u>Jaffee</u>, the Supreme Court observed that the psychotherapist-patient privilege, like the attorney-client and spousal privileges, is rooted in the imperative need for confidence and trust which promotes frank and complete disclosures. Similarly, applying the self-critical analysis privilege in this case will ensure the same level of confidence and trust which will promote the type of . . . open discussions necessary to accurately analyze medical procedures and decisions so that errors may be corrected and patient care can be improved. Just as the Court recognized in <u>Jaffee</u>, the mere possibility of disclosure would undermine this necessarily open and unconstrained self examination. Moreover, the public interest served by protecting medical peer review conferences from disclosure is perhaps greater than that served by the individual based spousal, attorney-client, and psychotherapist-patient privileges. A single conference in this context promotes knowledge and understanding among numerous physicians about life saving techniques and potentially life threatening decisions. Thus[,] public good is multiplied far beyond an individual patient's care, as the information promotes more effective patient care throughout a hospital.

<u>Weekoty</u>, 30 F. Supp. 2d at 1346 (internal quotation marks and citations omitted).

The privilege that Judge Hansen recognized in <u>Weekoty</u> is a qualified, not absolute, privilege. <u>See</u> 30 F. Supp. 2d at 1346. Additionally, Judge Hansen in <u>Weekoty</u> recognized the privilege as "supported by New Mexico's own statutory privilege." 30 F. Supp. 2d at 1347 (citing N.M. Stat. Ann. § 41-9-5 (precluding any party from using the confidential records of medical peer review proceedings in civil litigation)). Judge Hansen also noted that "out of comity, it is incumbent upon this Court to consider the New Mexico legislature's conclusion that the public interest in confidential morbidity and mortality conferences outweighs the interest of a single party to discovery of those discussions." 30 F. Supp. 2d at 1347.

Federal courts which have recognized a self-critical analysis privilege have done so only in limited contexts. <u>See</u> <u>Bravo</u>, 2009 WL 10706756, at *2. As Magistrate Judge Molzen noted in <u>Bravo</u>, the cases to which Judge Hansen cited in <u>Weekoty</u> "only apply the self-critical analysis privilege in the hospital setting, and not in jails, prisons, detention facilities, or the like." <u>Bravo</u>,

2009 WL 10706756, at *2 (citing <u>Weekoty</u>, 30 F. Supp. 2d at 1345).  In <u>Agster v. Maricopa</u>

<u>County</u>, the Ninth Circuit upheld the district court's denial of the self-critical analysis privilege in

a prison health care context, reasoning:

> Whereas in the ordinary hospital setting it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. . . . [I]t is particularly important that the public have access to the assessment by peers of the care provided.  Given the demands for public accountability . . . , we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review privilege.  Accordingly, we are unwilling to create the privilege in this case.

<u>Agster v. Maricopa Cty.</u>, 422 F.3d at 839.  In prison and jail conditions cases, federal courts "have

not been persuaded by the argument that without the privilege, review committees would not be

as effective." <u>McClendon v. City of Albuquerque</u>, 2015 WL 13667177, at *6.  Most federal district

courts have rejected the self-critical analysis privilege in a jail, prison, or detention facility setting.

<u>See</u>, <u>e.g.</u>, <u>Williams v. City of Philadelphia</u>, 2014 WL 5697204, at *1; <u>Tortorici v. Goord</u>, 216

F.R.D. at 258-59; <u>Laaman v. Powell</u>, 1995 WL 54417, at *1.  Because cases involving inmate

deaths generate tremendous demand for public accountability, "reviews [of prison care and

conditions] take place whether they are privileged or not." <u>Johnson v. Cook Cty.</u>, 2015 WL

5144365, at *4.

Some federal district courts, however, have recognized a self-critical analysis privilege, or

medical peer-review privilege, in a prison context.  <u>See</u>, <u>e.g.</u>, <u>Hadix v. Caruso</u>, No. 4:92-CV-110,

2006 WL 2925270 (W.D. Mich. Oct. 6, 2006)(Enslen, J.).  In <u>Hadix v. Caruso</u>, the Honorable

Richard Alan Enslen, Senior United States District Judge for the United States District Court for

the Western District of Michigan, reasoned that the peer review process' confidentiality "must be

preserved in order to facilitate the proper delivery of medical care" in prison facilities.  2006 WL

2925270, at *3.  Judge Enslen identified four grounds for recognizing a medical peer review privilege in a prison context: (i) prisoners' Eight Amendment rights "may be protected by an individualized review of the prisoners' own medical records," and keeping those records confidential would "facilitate candor in the peer review process," better protecting "prisoner life or health" than disclosure, Hadix v. Caruso, 2006 WL 2925270, at *3; (ii) protecting the peer review process' confidentiality facilitates the proper delivery of medical care; (iii) prison populations are particularly vulnerable, and "[p]eer review of medical performance . . . has added importance as to public health care of a vulnerable (prison) population," Hadix v. Caruso, 2006 WL 2925270, at *3; and (iv) in the prison context, "non-medical administrators lack the expertise to review the competence of medical directors and staff," necessitating a peer review process that the court should protect from discovery to facilitate its continuation.  Hadix v. Caruso, 2006 WL 2925270, at *3.

The Court agrees with Judge Enslen's reasoning that a peer review process in a prison is important, but the Court disagrees that confidentiality is necessary to protect that process.  The Court agrees with the federal courts which reject the privilege in a prison context, and that the same considerations which militate in favor of recognizing a self-critical analysis privilege in a hospital context[27] do not exist in a prison health care context, because the public accountability factor present in cases of inmate health and death protects against the chilling effect feared in a

---

[27]The Court also notes that every United States Court of Appeals that has addressed whether a federal medical peer review privilege exists has rejected its existence.  See, e.g., Agster v. Maricopa Cty., 422 F.3d at 839 (rejecting privilege in the context of a post-death prisoner mortality report at a county jail); Virmani v. Novant Health Inc., 259 F.3d 284, 292 (4th Cir. 2001)(rejecting privilege where peer review officials' conduct gave rise to discrimination allegations); Mem'l Hosp. for McHenry Cty. v. Shadur, 664 F.2d at 1063 (rejecting privilege in federal antitrust action).

civilian context. The Court also notes that, under these circumstances, Correct Care, pursuant to its contract with Bernalillo County to provide health care services at Metropolitan Detention, is obligated to conduct periodic reviews. At the February 4, 2019, hearing, Correct Care clarified that, pursuant to Correct Care's contract with Bernalillo County, it must produce morbidity and mortality reports. See Feb. 4 Tr. at 15:10-13 (White). Correct Care is contractually obligated to produce those reports, whether or not they are privileged. The Court declines to recognize a self-critical analysis privilege protecting the documents at issue. In Jenkins v. DeKalb County, Georgia, 242 F.R.D. 652 (N.D. Ga. 2007)(Thrash, J.), the Honorable Thomas W. Thrash, Jr., United States District Judge for the United States District Court for the Northern District of Georgia, reasoned:

> *Hadix*, however, is the only case to defend and recognize a medical peer review privilege in the context of prison litigation. The court argued that an evaluation of the prisoner's medical records was enough to satisfy the prisoner's discovery requests, and that discovery of peer review meetings was unnecessary. Given the extreme difficulty prison inmates often face in obtaining evidence of jail customs or policies, it is unlikely that access to a prisoner's medical records is enough. *See Lewis* [v. Cty. of Henry, No. 1:05-cv-0270-JDT-TAB], 2006 WL 1843336, at *2 [(S.D. Ind. 2006)(Baker, M.J.)]("To restrict a civil rights plaintiff's access to the type of evidence would seriously inhibit such plaintiff's ability to prosecute these types of important federal claims."). Access to peer review information is even more important in a case such as this where the Plaintiffs are alleging that jail officials disobeyed a state court order demanding that Jenkins be taken to a mental health facility. . . . To the extent that *Hadix* has any persuasive value, it disappears in the context of a section 1983 claim involving more than mere malpractice.

Jenkins v. DeKalb Cty., 242 F.R.D. at 660-61. Magistrate Judge Molzen's articulation of four requirements a party asserting the self-critical analysis privilege must demonstrate is the test most "frequently applied by district courts across the country," since 1980. In re Block Island Fishing, Inc., 323 F. Supp. 3d 158, 161 (D. Mass. 2018)(Burroughs, J.)(citing 2 McLaughlin on Class Actions § 11:11 (14th ed.)). The test,

based in part on factors identified by the Ninth Circuit in <u>Dowling v. Am. Haw. Cruises, Inc.</u>, 971 F.2d at 426, is: "(1) the information must result from a critical self-analysis undertaken by the party seeking protection; (2) the public must have a strong interest in preserving the free flow of the type of information sought," (3) the information must be of the type whose flow would be curtailed if discovery were allowed," and (4) the document at issue must have been "prepared with the expectation that it would be kept confidential."

<u>In re Block Island Fishing, Inc.</u>, 323 F. Supp. 3d at 161 (quoting <u>Dowling v. Am. Haw. Cruises, Inc.</u>, 971 F.2d at 426).

Regarding the test's first factor, Correct Care has not met its burden of demonstrating whether all of the documents at issue result from Correct Care's critical self-analysis and were prepared for that purpose, and Correct Care has not provided a set of its CQI and QI documents -- other than the CQI documents that are part of the Dr. Greifinger Documents set -- to the Court for its review. The Court's understanding is that all the documents in question were prepared pursuant to Correct Care's contract with Bernalillo County or for mandatory reporting purposes. To the extent that the documents were produced for Correct Care's critical self-analysis purposes, the first factor would be satisfied. The Court determines that the public has a strong interest in preserving the free flow of information relating to health care provision and standards in the context of a jail or prison's medical facility, particularly considering the difficulties prisoners have in securing information about jail customs or policies relevant to their civil rights claims. The Court also determines, however, that the information and documents at issue are not likely to be curtailed if discovery were allowed, because public accountability militates against any possible chilling effect from the threat of potential disclosure, and because Correct Care's contract with Bernalillo County as well as the <u>McClendon</u> consent decree require Correct Care and Bernalillo County to regularly monitor health care efforts and standards compliance, regardless whether their

monitoring is discoverable.  The Court also determines that at least some of the documents at issue were not prepared with the expectation that they would be kept confidential, because several have been disclosed to Bernalillo County, to a PSO, or to the parties in the McClendon litigation.  The test's third factor is not satisfied in the prison health care context, and the fourth factor is not satisfied for at least some of the documents at issue.

Correct Care also avers, as an argument in favor of recognizing the privilege, that every state has an evidentiary privilege for medical peer review information.  See Response to Motion to Compel RFP No. 12 at 15.  Every state's policies, however, do not warrant federal recognition of a privilege.  See Jenkins v. DeKalb Cty., 242 F.R.D. at 661 (rejecting the same argument).  Each state crafts its medical peer review privilege differently.  See Trinity Med. Ctr., Inc. v. Holum, 544 N.D.2d 148, 153 (N.D. 1996)("[A]lthough nearly every state has some form of statutory privilege for medical peer review, it appears that no two statutes, or courts' interpretations of them, are alike."); Susan O. Scheutzow & Sylvia Lynn Gillis, Confidentiality and Privilege of Peer Review Information: More Imagined Than Real, 7 J.L. & Health 169, 188 (1992-93)("Despite almost universal mention of peer review privilege, there is extremely wide variation in the privilege granted by the states.").  See also Jenkins v. DeKalb Cty., 242 F.R.D. at 661 ("Even if some form of the privilege is recognized [by every state], this does not mean that there is unanimity on the question of whether the privilege should apply in the unique context of post-death investigations of a jail.").  The Court agrees with Judge Thrash's pronouncement:

> In either event, while the policies of the 50 states bears on the wisdom of a particular privilege, an inquiry under Federal Rule of Evidence 501 is not a privilege popularity contest.  That a particular lobby has been influential at the state level is not necessarily evidence that the privilege should be recognized in federal court.

Johnson v. DeKalb Cty., 242 F.R.D. at 661. Furthermore, the Court concludes that New Mexico would not recognize a common-law self-critical analysis privilege, if presented with the issue, based on the Supreme Court of New Mexico's: (i) unwillingness to broaden the ROIA confidentiality provision's scope, (ii) recognition of ROIA's provision of exceptions to protection, and (iii) enunciation of the benefit to litigants of having access to relevant and material evidence as an important interest. In conclusion, the Court determines that federal law applies and the Court recognizes no federal self-critical analysis privilege, but, even if state law applied, the Court concludes that New Mexico would not recognize a common-law self-critical analysis privilege protecting from discovery either the Dr. Greifinger Documents or the separate QI/QA Records at issue.

### C. NO ROIA PRIVILEGE PROTECTS THE DOCUMENTS FROM DISCOVERY.

Correct Care also argues that a ROIA privilege protects its quality improvement efforts from discovery. See Protective Order Motion at 21-22. Tanner argues that Correct Care has not adequately supported its ROIA claim, or its other privilege claims:

> With respect to Interrogatory No. 4 and RFP No. 14, CCS's original objections only asserted these privilege claims in a conclusory manner, without supplying a privilege log or foundational materials necessary to evaluate whether any of the requirements for asserting a privilege were satisfied. [See CCS' Ans. and Obj. to Plaintiff's First Set; CCS' Resp. and Obj. to Plaintiff's First RFPs.] CCS did not supply any additional basis for asserting its privilege claims during the informal conferencing that preceded the filing of Plaintiff's discovery motion regarding those discovery requests, even though Plaintiff's counsel pointed out the absence of any basis for these claims in the letter of May 11, 2018. May 11, 2018 Letter at 6-7, 12-13, 15-16.

Protective Order Motion Response at 11. Turning to the ROIA privilege, Tanner avers that Magistrate Judge Molzen's Quimbey ROIA analysis is inapposite, because Quimbey applied

ROIA "in the context of a diversity case involving negligence claims brought under state law." Protective Order Motion Response at 16. Tanner argues that, because federal civil rights law provide the rule of decision for Tanner's claims, ROIA, a state statutory privilege, does not apply. See Protective Order Motion Response at 16-17. Tanner avers that, to the extent that ROIA applies, ROIA still does not protect the documents at issue, for the reasons Quimbey articulates. See Protective Order Motion Response at 17. Correct Care responds that, in Quimbey, Magistrate Judge Molzen still went through the ROIA analysis and that this Court should do the same. See Feb. 4 Tr. at 58:4-17 (White). Correct Care argued that, to the extent ROIA applies, "the plaintiff has not met the criticality burden," where Correct Care deposed Tanner's experts, and the experts said they did not need any other information to come to their opinions and conclusions, suggesting that the information which Tanner seeks to acquire from Correct Care is not necessary for her to develop her case. Feb. 4 Tr. at 58:18-25 (White).

The Supreme Court of New Mexico interpreted ROIA to require first that the party compelling discovery prove the relevance of the documents requested to the litigation's subject matter. See Sw. Cmty. Health Servs. v. Smith., 1988-NMSC-035, ¶ 18, 755 P.2d at 44-45. Next, the party resisting discovery must show that the data or information at issue was generated "exclusively for peer review and for no other purpose, and that opinions were formed exclusively as a result of peer review deliberations." Sw. Cmty. Health Servs. v. Smith., 1988-NMSC-035, ¶ 17, 755 P.2d at 44. Third, if the court determines that the information at issue is confidential under ROIA, the party compelling discovery must prove that the information "constitutes evidence which is critical to the cause of action or defense." Sw. Cmty. Health Servs. v. Smith., 1988-

NMSC-035, ¶ 18, 755 P.2d at 44-45.

> If the trial court determines that the success or failure of a litigant's cause of action or defense would likely turn on the evidence adjudged to fall within the scope of Section 41-9-5, then the trial court shall compel production of such evidence. It is the trial judge who will be entrusted with balancing the need to ensure the confidentiality of peer review against the need of litigants to discover evidence essential to the merits of their case.

Sw. Cmty. Health Servs. v. Smith., 1988-NMSC-035, ¶ 18, 755 P.2d at 44-45 (citations omitted).

To the extent that ROIA applies, the Court concludes that Tanner has demonstrated the relevance of the requested documents to the litigation's subject matter to the extent that the parties have described the documents at issue as bearing on prison officials' knowledge of, and on their alleged lack of correction of health care deficiencies at the jail before and at the time of Tanner's incarceration. See supra section I. The Court acknowledges that it does not have a complete list of documents about which the parties have asked the Court to make relevance and privilege determinations -- the Court has received and reviewed the Dr. Greifinger Documents, but not the QI/QA Records in Correct Care's possession.

ROIA requires that the party resisting discovery show that the information at issue was generated "exclusively for peer review and for no other purpose, and that opinions were formed exclusively as a result of peer review deliberations." Sw. Cmty. Health Servs. v. Smith., 1988-NMSC-035, ¶ 17, 755 P.2d at 44. The Court concludes that Correct Care has not borne its burden of showing that the requested documents were generated exclusively for peer review and no other purpose, where the documents were, in part, disclosed in the McClendon litigation, used to inform Dr. Greifinger's reports, and disclosed to Bernalillo County pursuant to Correct Care's contract with Bernalillo County. Correct Care's Ducote Aff., the First Privilege Log, and the PSO Listing do not indicate on which dates the documents they reference were entered into Correct Care's

patient safety evaluation system, and they do not expressly state that any particular document to which they refer was created for the express purpose of peer review and for no other purpose. See Protective Order Motion Response at 14. In fact, the QI/QA Records were produced pursuant to Correct Care's mandatory reporting requirements pursuant to its Medical Services Agreement with Bernalillo County and under the McClendon consent decree's terms. See Feb. 4 Tr. at 36:14-17 (Leonard). See also Reply to Motion to Compel RFP No. 12 at 4. Correct Care cannot satisfy its burden merely by alleging that the documents in question were generated only for peer review and for no other purpose, and that they were only disclosed to a review organization whose membership is limited to healthcare providers and staff, as ROIA requires. See, e.g., Maldonado v. Bio-Med. Applications of N. M., Inc., No. CIV 05-303 JH/ACT, 2005 WL 8163423, at *3 (D.N.M. Nov. 1, 2005)(Torgerson, M.J.)(concluding that, because the defendant failed to meet its burden that the documents in question were produced exclusively for peer review, the documents must be produced to the plaintiff).

The Court, therefore, determines that the information is not confidential under ROIA, so Tanner need not demonstrate that the information constitutes evidence necessary to supporting her claims or defenses, in order to receive the documents. The Court notes that Correct Care's argument against the information's importance to Tanner's claims is unpersuasive, because Correct Care points only to the fact that Tanner's experts' statements that they do not need additional information to come to their conclusions, and that fact alone is not dispositive. The Court and Magistrate Judge Molzen have both determined that the documents at issue are relevant to Tanner's claims, and ROIA does not protect against their discovery.

The Tenth Circuit has not confronted a situation in which evidence allegedly subject to a

- 173 -

privilege is relevant to both the federal and state law claims in the case, as is the case here.  See Protective Order Motion Response at 16-17.  Vondrak v. City of Las Cruces states that, "where there is a federal cause of action and pendent state-law claims, and where the asserted privilege relates to evidence that is relevant both to the federal and state-law claims . . . federal privilege law should apply[.]" 760 F. Supp. 2d 1175.  Because the information at issue bears on Tanner's federal § 1983 claims as well as on her state law claims, the Court concludes that federal privilege law applies and that PSQIA, and not ROIA, provides the applicable privilege law.  Here, however, both federal and state law support disclosing the documents in question, because to the extent ROIA applies, the Court concludes that it does not protect the documents at issue for the reasons stated above.

### D.   THE PSQIA PRIVILEGE DOES NOT PROTECT THE DOCUMENTS FROM DISCOVERY.

Regarding the PSQIA privilege's applicability, Tanner notes that the first privilege log that Correct Care submits describes rosters, agendas, minutes, and notes for CQI meetings, QI meetings, Medical Advisory Committee meetings, team meetings, staff (team) meetings, use of force policy training attendance, and attendance.  See Tanner's Obj. to Aug. 20, 2018 KBM MOO at 10.  Tanner notes "there is no admissible evidence before the Court that these types of meetings were for purposes of reporting to a PSO under the PSQIA or consist of deliberations or analysis of a patient safety evaluation system which qualifies under the PSQIA."  Tanner's Obj. to Aug. 20, 2018 KBM MOO at 10.  Tanner avers that the records which Correct Care describes do not meet the foundational requirements for records qualified for protection under the PSQIA privilege.  See Tanner's Obj. to Aug. 20, 2018 KBM MOO at 10.  Tanner states that the Ducote Aff. attests that Correct Care currently has a contract with a PSO, the Center for Patient Safety, and a patient safety

evaluation system which it maintains pursuant to the PSQIA, but neither the Ducote Aff. nor the PSO Listing demonstrate that Correct Care contracted with a listed PSO in the time period around 2016, which Tanner's Interrogatory No. 4 and RFP No. 4 cover. See Protective Order Motion Response at 13-14. Tanner argues, accordingly, that documents such as the Ducote Aff., the First Privilege Log, and the PSO Listing do not satisfy the requirements for the PSQIA privilege to apply; for example, they do not indicate on which dates the documents they reference were entered into the patient safety evaluation system, and they do not expressly state that any particular document to which they refer was created for the express purpose of reporting to a PSO, both prerequisites to qualify for the PSQIA privilege. See Protective Order Motion Response at 14. Tanner argues that, by omitting necessary details regarding the timeline of the documents' submission to the PSO, the Ducote Aff. "gives rise to the reasonable inference that the documents in question were reported to the PSO at some later time, after they had already been utilized or commingled for other purposes such as contract compliance, use in the *McClendon* litigation, or preparation for other litigation." Protective Order Motion Response at 14.

Tanner posits that various factors support the reasonable inference that the documents in question were created for multiple or other purposes and are therefore outside the scope of the PSQIA privilege. See Protective Order Motion Response at 14. Tanner points to "the provisions in CCS's contract with the County, the ongoing monitoring activities in the *McClendon* case, and the apparent participation or collaboration between CCS's quality-assurance staff and a court-appointed expert, various County personnel including contract monitors, and alleged 'litigation consultants.'" Protective Order Motion Response at 13-14. Tanner also contends that this case is distinguishable from other cases in which courts have granted PSQIA privileges, because Correct

Care has not identified any specific QI/QA Records as candidates for the PSQIA privilege or provided documents to the Court for in camera review, and the First Privilege Log does not indicate whether the records and meetings at issue were for purposes other than those protected by the PSQIA privilege. See Protective Order Motion Response at 15. Tanner argues the PSQIA privilege may not be raised as a blanket privilege over a general category of documents. See Protective Order Motion Response at 16 (citing Quimbey).

The Health Care Defendants respond that Tanner does not contest that a PSQIA evidentiary privilege exists or that Correct Care qualifies for it:

> Plaintiff did not challenge, and therefore accepts, the Health Care Defendants' position that Plaintiff's Interrogatory No. 4 and her RFP Nos. 4, 12, 13, and 14 require CCS to produce documents and information PSQIA grants an evidentiary privilege. See, Exhibit 82-4, Dawn Ducote Affidavit, at ¶¶ 1-15. Plaintiff did not challenge, and therefore accepts, that CCS contracted with Center for Patient Safety to be CCS's patient safety organization ("PSO"). Id. at ¶ 3. Plaintiff did not challenge, and therefore accepts, that the Center for Patient Safety is a federally listed PSO. See, [PSO Listing at 1].

> Plaintiff did not challenge, and therefore accepts, that CCS maintains a patient safety evaluation system pursuant to PSQIA. See, Exhibit 82-4, Ducote Affidavit, at ¶ 4. Plaintiff did not challenge, and therefore accepts, that documents generated through CCS's QCI initiatives are maintained as Patient Safety Work Product. Id., ¶ 9. Plaintiff did not challenge, and therefore accepts, that if information sought from experts, court-appointed monitors, or county employees was generated pursuant to CCS's patient safety evaluation system under PSQIA, the information would still be privileged despite its retention by someone outside CCS. Id., ¶ 13. See, 42 U.S.C. § 299b-22(d).

Protective Order Motion Reply at 6-7. The Court cannot determine, from the information available to it, whether all of the documents that Tanner seeks and which are responsive to the interrogatories at issue are documents that Correct Care generated pursuant to its patient safety evaluation system under the PSQIA. The Court is under the impression that Correct Care produced documents pursuant to its contract with Bernalillo County, and that Correct Care voluntarily disclosed these

documents, subject to a protective order, in the <u>McClendon</u> litigation, and that some of these documents were provided to the Court's expert, Dr. Greifinger. The Court notes that, to the extent that the documents at issue were assembled or developed for a purpose other than reporting to the PSO, they do not qualify for the PSQIA privilege's protection. <u>See</u> <u>Crawford v. Corizon Health, Inc.</u>, 2018 WL 3361147, at *2. The Court also agrees with Tanner that, because Correct Care does not specify when it provided the documents in question to the PSO, it is not possible to determine whether the documents were produced for reporting to the PSO, or for some other purpose, such as contract compliance, and later provided to the PSO. <u>See</u> Protective Order Motion Response at 14. To qualify as patient safety work product, meriting PSQIA protection, the information or documents at issue must have been reported to a PSO, developed by a PSO, or analyzed as part of a system for reporting to or by a PSO. <u>See</u> 42 U.S.C. § 299b-21. Although information may qualify as patient safety work product if it is documented as collected within the health care provider's patient safety evaluation system, before it is reported to a PSO, there is still an assumption that a provider "should only place information in its" patient safety evaluation system "if it intends to report that information to the PSO." <u>Patient Safety and Quality Improvement Act of 2005 -- HHS Guidance Regarding Patient Safety Work Product and Providers' External Obligations</u>, 81 Fed. Reg. 32655-01, at *32656 ("Patient Safety Act Guidance").

Correct Care contends that it maintains a patient safety evaluation system pursuant to PSQIA and implemented through its integrated QI program. <u>See</u> Protective Order Motion at 19. Correct Care contends:

> The CQI program incorporates a variety of committees, studies, reports, educational materials, and other activities and documents. These activities and documents include clinical mortality reviews (also known as morbidity and mortality reviews); patient safety and error reporting systems, and subsequent

analyses; and quality improvement studies. Clinical mortality reviews; patient safety and error reporting systems, and subsequent analyses; and quality improvement studies are generated as part of CCS's patient safety evaluation system.

Protective Order Motion at 19-20. Correct Care argues that these documents, generated through its QI initiatives, "are maintained as Patient Safety Work Product," and "are developed for the conduct of patient safety activities designed to improve patient safety, health care quality, and health care outcomes." Protective Order Motion at 20. Correct Care contends that "data, reports, records, memoranda, analyses, and statements concerning patient safety or quality of care" which Bernalillo County "requires CCS to provide" as part of promulgating various policies applicable to Correct Care's functions at the Metropolitan Detention, are "generated initially through the CQI program (patient safety evaluation system) for reporting to Center for Patient Safety." Protective Order Motion at 20. Correct Care does not, however, demonstrate whether it had a contract with the Center for Patient Safety and a patient safety evaluation system during the time period around 2016, that Tanner's Interrogatory No. 4 and RFP No. 4 cover. See Protective Order Motion Response at 13-14. If the patient safety evaluation system existed at the time the documents at issue were produced, and if they were produced through that system, they would merit PSQIA protection, even if they were not reported to the PSO until a later time. See 42 U.S.C. § 299b-21. To the extent that documents such as clinical mortality reviews, patient safety and error reporting systems, subsequent analyses, and quality improvement studies are among the documents of which Tanner seeks to compel discovery, and to the extent those documents were generated as part of Correct Care's patient safety evaluation system, they are subject the PSQIA privilege's protection. Correct Care has not met, however, its burden of demonstrating that the information at issue was in fact assembled or developed for reporting to the PSO. See Dunn v. Dunn, 163 F. Supp. 3d at

1210 ("[I]nformation that is not developed *for the purpose* of reporting to a patient safety organization does not become privileged merely because it is in fact reported to one.")(emphasis in Dunn v. Dunn). See also Patient Safety Act Guidance, 81 Fed. Reg. at 32,656 ("[T]he critical inquiry is the purpose of creating the information, and the information will only be considered patient safety work product if it is created 'for the purpose of reporting' to a patient safety organization."). Correct Care has not met its burden of demonstrating that it is entitled to its claimed PSQIA privilege and cannot therefore claim it.

Although the Court cannot make a document-by-document relevance and privilege determination, the Court has, in this MOO, outlined its position on the relevance inquiry and on the three privilege claims raised. The Court is inclined to conclude that all requested documents are relevant and are not subject to any of the asserted privileges. Should the parties need or seek a full document-by-document determination, the parties may need to submit a privilege log describing with particularity the documents at issue and, if the MOO does not address all of their questions, provide those documents for in camera inspection, so that the Court may determine with specificity whether and to which documents each privilege may apply.

**IT IS ORDERED** that: (i) the Plaintiff's Motion to Compel Defendant Bernalillo County's Response to Request for Production No. 5, filed April 9, 2018 (Doc. 38), is granted; (ii) the Plaintiff's Motion to Compel Defendant Correct Care Solution [sic], LLC's Response to Plaintiff's Request for Production No. 12, filed June 4, 2018 (Doc. 52), is granted; (iii) the Plaintiff's Motion to Compel Defendant Correct Care Solution [sic], LLC's Answers and Responses to Plaintiff's First Set of Interrogatories and Requests for Production, and for Sanctions Under Rules 16(F)(1)(C), 26(G)(3), 37(C), and 37(A)(5), filed June 4, 2018 (Doc. 53), is granted;

(iv) the Plaintiffs' Rule 72(A) Objections to Magistrate Judge's Memorandum Opinion and Order on Plaintiff's Motion to Compel Defendant Correct Care Solutions, LLC's Answers and Responses to Plaintiff's First Set of Interrogatories and Requests for Production, and for Sanctions Under Rules 16(F)(1)(C), 26(G)(3), 37(C), and 37(A)(5), filed September 4, 2018 (Doc. 83), are sustained in part and overruled in part[28]; (v) the Opposed Motion for Protective Order, filed September 5, 2018 (Doc. 84), is denied; (vi) the Plaintiffs' Rule 72(a) Objections to Magistrate Judge's Memorandum Opinion and Order on Plaintiffs' Motions to Compel Defendant Bernalillo County's Response to Request for Production No. 5 and Defendant Correct Care Solutions, LLC's Response to Request for Production No. 12, filed September 19, 2018 (Doc. 88), are sustained; (vii) Correct Care Solutions, LLC's Partial Objections to Memorandum Opinion and Order, filed September 19, 2018 (Doc. 89), are overruled, and (viii) Correct Care Solutions, LLC's Notice of Objections to Production of McClendon Documents, filed March 12, 2019 (Doc. 159), are overruled. The quality improvement and quality assurance records in Defendant Correct Care Solutions, LLC's possession are relevant and subject to discovery; the documents in Defendant Board of County Commissioners of Bernalillo County's possession which were produced to Dr. Robert Greifinger, the Court-appointed expert in the McClendon v. City of Albuquerque, Case No. 95-CV-0024 JAP/ACT litigation, during his April, 2016, and November, 2016, site visits to the Metropolitan Detention Center in the County of Bernalillo, New Mexico (the "Dr. Greifinger Documents"), are relevant and subject to discovery; a self-critical analysis privilege, a New Mexico Review Organization Immunity Act, N.M. Stat. Ann. §§ 41-9-1 to -7 ("ROIA"), privilege,

---

[28]The Plaintiff's request to impose sanctions is denied, and the Court concludes, for the reasons stated in the MOO, that Magistrate Judge Molzen's determination not to award sanctions was neither clearly erroneous nor contrary to law.

and a Patient Safety and Quality Improvement Act, 42 U.S.C. §§ 299b-21 to -26 ("PSQIA"), privilege do not protect the quality improvement and quality assurance records from discovery; and a self-critical analysis privilege, a ROIA privilege, and a PSQIA privilege do not protect the Dr. Greifinger Documents from discovery.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*

Nicole Moss
The Law Office of Nicole W. Moss
Albuquerque, New Mexico

--and--

Paul J. Kennedy
Jessica M. Hernandez
Arne Leonard
Elizabeth Harrison
Kennedy, Hernandez & Associates, P.C.
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Alfred A. Park
Geoffrey D. White
Park & Associates, L.L.C.
Albuquerque, New Mexico

   *Attorneys for Defendants Timothy I. McMurray, Adriana Luna, Audrey Leber, Taileigh Sanchez, Elisa Manquero, Correct Care Solutions, LLC, Christopher Mercer, and Ed Kossman*

Jonlyn M. Martinez
Law Firm of Jonlyn M. Martinez
Albuquerque, New Mexico

   *Attorney for Defendants Board of County Commissioners of Bernalillo County, Thomas J. Ruiz, Claudia Rodriguez-Nuñez, Martina Sanchez-Filfred, and Tina M. Muñoz*