IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SHAWNA TANNER, individually and as
personal representative of JAY HINTON, JR.,

    Plaintiffs,

v.                                                                 No.  17-cv-876 JB-KBM

TIMOTHY I. MCMURRAY, M.D., *et al.*,

    Defendants.

### DECLARATION OF C. HSIEN CHIANG, M.D.

I, C. Hsien Chiang, M.D., hereby submit the following declaration under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am retained as an expert witness by the Plaintiffs' attorneys in the above-captioned case. I make this declaration for the purpose of presenting my opinion testimony to the Court in an admissible form that can be used as an exhibit to court filings.

2.     Attached as Exhibit 1A to this Declaration is a true and correct copy of a report dated December 14, 2018, which I authored, signed, and submitted to Plaintiffs' counsel for use in their Rule 26(a)(2) expert disclosures on that date.

3.     Attached as Exhibit 1B to this Declaration is a true and correct copy of a supplemental report dated March 10, 2019, which I authored, signed, and submitted to Plaintiffs' counsel for use in supplementing their Rule 26(a)(2) expert disclosures on March 11, 2019.

4.     My background and education, professional experience, professional memberships, cases, and opinions as stated in the attached Exhibits 1A and 1B are true and correct to the best of my personal knowledge and accurately reflect the sworn testimony I would present in this matter if called to testify at trial based on the information available to me on this date.

EXHIBIT 3 TO PLAINTIFFS' RESPONSE

5.   In the attached Exhibits 1A and 1B, I have also listed the materials I reviewed in preparing each of my respective reports, and provided a narrative summary of those materials. These portions of my reports accurately disclose the factual basis for my opinions for purposes of satisfying the disclosure requirements of Rule 26(a)(2), as of the respective dates that each report was written; however, they are not intended to serve as sworn testimony about whether or to what extent the factual information contained in the materials I reviewed is true or credible.

6.   I understand that additional discovery occurred in this case after I wrote the reports attached as Exhibits 1A and 1B. To the extent I am permitted to do so by the Court at this juncture, I reserve the right to further supplement or amend my reports attached hereto if additional information regarding this case is provided to me and I am requested to do so.

7.   Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing statements are true and correct to the best of my personal knowledge on this date.

Executed this 3rd day of May, 2019, in Anaheim, California.

C. Hsien Chiang, M.D.

**C. Hsien Chiang, MD, FACCP, CCHP-P**
P.O. Box 27935 Anaheim, CA 92809
Phone: 949-625-0938 Fax: 949-625-1038

## I. INTRODUCTION

My name is C. Hsien Chiang, MD. My business address is P.O. Box 27935 Anaheim, California 92809. I was retained by plaintiff counsel Arne Leonard ESQ, on behalf of Ms. Shawna Tanner to consult in the case of *Tanner v. McMurray et. al.*

My rates for legal consultation are $500 per hour for review or $575 per hour for deposition and/or trial testimony plus travel expenses.

## II. BACKGROUND AND EDUCATION

I received my Doctorate of Medicine in 1999 from the Medical College of Wisconsin in Milwaukee, then completed my post-graduate residency training at Long Beach Memorial Family Medicine Residency program in Long Beach in 2002. I have been a licensed Physician and Surgeon in the State of California since 2001 and have maintained my board certification in Family Medicine since July 2002. I have worked in health care as a primary care physician for 18 years, and in the field of correctional health care for the last 12 years. Additionally, I have a Bachelor of Science degree from the University of California, Irvine.

### A. Professional Experience

I operated a full-time private practice from 2002-2006, while also working part-time in a busy urgent care clinic in Irvine and Newport Beach California. After leaving private practice, I was employed by the Health Care Agency in Orange County, California from 2006-2011 as a Staff physician in the County Jail system. In March 2011, I was promoted to the position of Medical Director for the Orange County Jail. In addition to direct patient care, I oversee the provision of medical and mental health services to the adult jail population with an average daily census of over 6000, of which 1000 are sentenced state prisoners housed in local county jails under California's Public Safety Realignment bill (AB109). Additionally, I regularly meet with jail administrators and medical directors from several jurisdictions in Northern and Southern California to discuss emerging legislative and health care topics that impact correctional populations and best practices. I also review medical records and provide expert witness testimony in the correctional healthcare field.

EXHIBIT 1A TO DR. CHIANG'S DECLARATION

### B. Professional Memberships

I am currently a member of the following organizations:

- Western American Correctional Health Services Association – Board member
- National Commission on Correctional Health Care (NCCHC)
- American College of Correctional Physicians (FACCP) – Fellow
- American Medical Association (AMA)
- American Society of Addiction Medicine (ASAM)
- California Society of Addiction Medicine (CSAM)

### III. CASES

I have testified as an expert in a deposition in the last four years for the following cases:

| | | |
|---|---|---|
| 1. | July 2017 | *Parenti et. al. vs CFMG* |
| 2. | March 2018 | *Matysik vs Santa Clara County., et. al.* |
| 3. | May 2018 | *Vela vs CFMG* |
| 4. | May 2018 | *Villareal vs CFMG* |
| 5. | October 2018 | *Triplett vs Prime Care Medical., Inc. et. al.* |
| 6. | November 2018 | *Nishimoto vs County of San Diego* |

I was designated as an expert in the following case in the past four years:

| | | |
|---|---|---|
| 1. | October 2015 | *Brueggemeyer vs. Corizon Health, Inc., et. al.* |
| 2. | July 2016 | *Resendiz et. al. vs County of Monterey, et. al.* |
| 3. | October 2016 | *Parenti et. al. vs CFMG* |
| 4. | August 2017 | *Raybourn vs Corizon Health, Inc., et. al.* |
| 5. | September 2017 | *Triplett vs Prime Care Medical., Inc. et. al.* |

2

|     |               |                                              |
| --- | ------------- | -------------------------------------------- |
| 6.  | December 2017 | *Cohen vs Corizon Health, Inc., et. al.*     |
| 7.  | January 2018  | *NeSmith vs County of San Diego., et. al.*   |
| 8.  | February 2018 | *Matysik vs Santa Clara County., et. al.*    |
| 9.  | March 2018    | *Vela vs CFMG*                               |
| 10. | March 2018    | *Thomas vs County of San Diego., et. al.*    |
| 11. | April 2018    | *Villareal vs CFMG*                          |
| 12. | May 2018      | *Young vs Maricopa County., et. al.*         |
| 13. | October 2018  | *Nishimoto vs County of San Diego., et. al.* |
| 14. | November 2018 | *Moriarty vs County of San Diego., et. al.*  |
| 15. | December 2018 | *Gasca vs CFMG*                              |

## IV.   **MATERIALS REVIEWED**

In preparation for forming the opinions expressed below, in addition to my experience in the correctional healthcare field, I have reviewed the following materials:

A. Tanner000001-000057 – Office of Medical Investigator Report

B. Tanner000386-000391 – Albuquerque Ambulance Report

C. Tanner000400-000427 – Sheriff's Investigation Report

D. 000554-566 Report by Dr. Greifinger – Nov. 2016

E. 000567-578 Report by Dr. Greifinger – April 2016

F. Plaintiff's Exhibit 1 - Contract with CCS (326 pages).

G. Plaintiff's Exhibit 4 - Contract Amendment #1 (for OB-GYN Clinic)

H. 000631-000646 Witness Statements (obtained by Sheriff's Department investigators for investigation report Bates-numbered Tanner000400-000427).

I. 000647-000654 Shift Logs (obtained by Sheriff's Department investigators).

J. County Policies hca12.00 to hca12.71 (Tanner v. Bernalillo County 000001-000335)

K. CCS Job Descriptions for Paramedic, Physician Assistant, Registered Nurse, Site Medical Director.

L. Ultrasound records numbered CCS - PINON 000001-000009

M. Medical records numbered Tanner000058-000220

3

N. Lovelace medical records numbered Tanner000221-000385

O. Patient referral form numbered Tanner000392

P. Lab report numbered Tanner000392

Q. Bernalillo County Fire & Rescue records numbered Tanner000394-000399

R. Plaintiff's Answers and Objections to Defendant CCS' 1st Interrogatories

S. First Amended Complaint in Tanner v. McMurray et al., No. 17cv876 JB-KBM (Doc. 50)

T. Document titled 2016 CCS Staffing Credits (numbered 000753-000840)

U. CCS 2nd Contract Amendment 2016-0592

V. Deposition Transcript of Elisa Manquero

W. Deposition Transcript of Adriana Trujillo (Luna)

X. Healthcare Deposition Exhibits 1-45 (referenced in nurse depositions)

Y. Medical records numbered ROWE000001-37

Z. Medical records numbered Tanner000608-666

AA. Deposition Transcript of Taleigh Sanchez

BB. Health Care Deposition Exhibits 46 (McMurray timesheet), 51 (statistical report), and 60 (monthly provider schedule for Oct. 2016)

CC. Letter from maternal fetal medicine expert, Dr. Hugh Ehrenberg, M.D., dated Dec. 4, 2018.

V. **SUMMARY OF DOCUMENTS REVIEWED**

On August 30th 2016, Ms. Shawna Tanner was 32 years old when she presented to Dr. Julian Rowe's office for prenatal care. Based on her last menstrual period (LMP), she was estimated to be approximately 28 weeks and 2 days gestation. Dr. Rowe ordered standard laboratory tests for obstetrical patients and scheduled for Ms. Tanner to be followed-up in just 3 days (Tanner 0638).

Ms. Tanner subsequently followed-up with Dr. Rowe for prenatal care on September 2nd and September 27th. During these appointments, her pregnancy appeared to be progressing without complications (Tanner 0623).

4

On October 4th 2016, Ms. Tanner was booked into Bernalillo County's Metropolitan Detention Center (MDC). Health care services at this facility are provided by Correct Care Solutions (CCS), a private company. During receiving health screening, Ms. Tanner informed CCS receiving screening staff that she was in her final trimester of pregnancy. CCS receiving staff noted Ms. Tanner's pregnancy in question number 2, under "Patient Problems" (Tanner 212), and on a Staff Referral Form (Tanner 218). The staff, however, failed to properly document question number 17 of the Receiving Screening Form, which explicitly asks the question of "Are you pregnant" (Tanner 213). According to this form, prenatal vitamins, pregnancy labs, and pregnancy diet were ordered and Ms. Tanner was cleared for general population housing, no jail accommodations were noted for her pregnancy.

Two days later, on October 6th, Dr. McMurray approved the medical diet order for Ms. Tanner to be started on the pregnancy diet, and she was also started on prenatal vitamins. Ms. Tanner was not evaluated or examined on this day.

On October 14th 2016, Ms. Tanner was assessed by Registered Nurse (RN) Elise Manquero for a "Medical History and Physical Assessment". From the documentation (Tanner 74), RN Manquero likely did not review any available history up to this point, and it is unclear whether she performed any physical examination, as she made no mention of Ms. Tanner's advanced stage of pregnancy, nor described her abdominal size. Dr. McMurray, subsequently signed this assessment form the next day, also without noting this discrepancy or acknowledging her advanced stage of pregnancy.

At approximately 8:20 am, on October 16th, Ms. Tanner was escorted by jail deputy to the medical area after reporting that she had contractions overnight, spotting, and that her water broke (Tanner v BC 647). She was evaluated by RN Adriana Luna. According to "Nursing Documentation Pathway" completed by RN Luna (Tanner 133- 140), rather than documenting the symptom of "Rupture of Membranes" or "Contractions" as was reported by Ms. Tanner, the only symptom RN Luna documented was "Spotting". Even though "Vaginal Inspection" was part of this nursing pathway, and is clearly indicated for a pregnant woman who is spotting, RN Luna disregarded this important section of the pathway and failed properly assess Ms. Tanner's presenting complaint. Seemingly reassured by the presence of fetal heart tones (FHT), RN Luna

5

dismissed several signs of serious pregnancy complications, and simply sent her back to her housing without consulting with a higher-level clinician.

Approximately one half-hour later, at 10:04 AM, while back in her housing, Ms. Tanner reported to deputies that she was continuing to have vaginal bleeding and that her contractions were getting closer (Tanner v BC 647). Deputies declared a medical emergency and Ms. Tanner was evaluated by RN Luna along with Emergency Medical Technician (EMT) Ruby Boyd in her cell. According to "Emergency Response Worksheet" (Tanner 77-81) completed by EMT Boyd, Ms. Tanner reported that she felt, what she believed was the baby's head, in her vagina. EMT Boyd also noted Ms. Tanner's pants to be "incontinent", and suspected possible amniotic fluid leak, as evidenced her testing of Ms. Tanner's wet pants with nitrazine paper. She also noted Mr. Tanner's concern of bleeding through a second pad from her earlier exam, just 30 minutes prior. RN Luna consulted with Dr. McMurray regarding Ms. Tanner's condition. Despite Ms. Tanner's reports of symptoms of preterm labor and premature rupture of membranes, Dr. McMurray did not perform a sterile speculum exam nor send Ms. Tanner to a hospital facility capable of performing obstetrical triage and assessment, even though Dr. McMurray's timesheet indicated that he was working at that time. Instead, Ms. Tanner was ordered to be housed in a sheltered housing unit (SHU), for "observation".

Soon after arriving at the SHU, at approximately 11 AM, RN Luna again performed an FHT, seemingly as a reassurance that Ms. Tanner's pregnancy was normal and no further evaluation was necessary (Tanner 156).

That evening, at approximately 11 PM, Ms. Tanner again expressed concerns of cramps or contractions and fullness in her vagina, to the night shift RN, Ms. Sanchez. She asked RN Sanchez to examine her. RN Sanchez did not act on the information provided by Ms. Tanner and conduct a pelvic examination as indicated at this time, nor did she inform the on-call physician. Instead, she simply provided verbal reassurance and allowed Ms. Tanner to return to her cell.

The next morning, at approximately 6 AM, Ms. Tanner was seen by Dr. McMurray. According to his progress note at 10 AM (Tanner 162), it appears Dr. McMurray did not perform an examination, including a pelvic examination during this visit. Dr. McMurray simply noted

6

cramping and bloody vaginal discharge the day before, along with observations of Ms. Tanner walking. The note did not acknowledge the possibility of premature rupture of membranes, vaginal fullness, or active labor. In his assessment, he indicated that Ms. Tanner's pregnancy was "stable", and discharged her back to her previous housing with an order to be re-evaluated in 1 week.

Just after 9 AM, back in her housing, Ms. Tanner experienced more bleeding and discharge. Her cellmate informed a jail deputy, and she was transported back to medical in a wheelchair with the aid of 2 other inmates. RN Spencer evaluated Ms. Tanner in the medical area. According to her charting later that day (Tanner 152), she noted Ms. Tanner no longer felt fetal movement, and FHT were unable to be obtained. It is unclear from the documentation, when Dr. McMurray was called or when he arrived on the scene. Additionally, it was unclear from all of the documentation, what intervention, if any, Dr. McMurray provided to Ms. Tanner. It appears that an ambulance was called at approximately 10:43 AM, more than 90 minutes after Ms. Tanner's sudden, increased vaginal bleeding began. Shortly after an ambulance was dispatched, Ms. Tanner began to deliver her baby. Minutes after the ambulance arrived on the scene, Ms. Tanner delivered her baby in the medical exam room, unresponsive. Resuscitation measures were unsuccessful and the baby was pronounced deceased at 11:28 AM. After Ms. Tanner delivered the placenta, she along with the deceased baby were transported to the hospital for evaluation.

## VI. OPINION

Based on my review of the documents provided, my education and training in primary care medicine, 18 years of clinical experience, of which over 12 years were spent in the correctional health care setting, it is my opinion that:

1. Bernalillo County (County) or MDC's administrators failed in their oversight of their contract with CCS to ensure adequate staffing or provide appropriate medical arrangements to ensure pregnant women received specialized care for their pregnancy, by obstetrical providers in a timely manner.

2. CCS and Dr. McMurray did not appear to have in place, a qualified obstetrical specialist readily available to provide timely prenatal care, as required by their

7

      contract with County.

3. CCS and MDC administrators failed to incorporate and reconcile existing inmate health care policies at MDC with CCS' policies and pathways and CCS failed to train its nursing staff on its own nursing documentation pathway applicable to pregnant patients.

4. On the morning of October 16th, when Dr. McMurray was informed by RN Luna of Ms. Tanner's condition, he should have known that Ms. Tanner's condition required, at a minimum, urgent or emergent evaluation by a health care professional qualified in the routine obstetrical examination to evaluate her symptoms. In addition, he failed to personally evaluate or refer Ms. Tanner for such evaluation. Similarly, he failed to evaluate Ms. Tanner the next morning prior to discharging her back to regular housing. Had Ms. Tanner been evaluated in a timely manner, baby Tanner would likely be alive.

### *Routine Prenatal Care*

Obstetrics is a specialized field which requires advanced training, knowledge and experienced clinicians, to look for and recognize subtle findings that raise concern for pregnancy complications, and manage them appropriately. Jails regularly receive women arrestees in various stages of pregnancy, from those who are at or near term, to those who may not even know that they are pregnant. Oftentimes, there is little or even no prenatal care prior to incarceration. Complicating a pregnant patient's care is the fact that outpatient medical records are either unavailable, fragmented, or often not available in a timely manner. This is why it is vitally important for jails to have an Obstetrician (OB) readily available to timely evaluate pregnant patients and manage pregnancies, many of which have complicated risk factors. Pregnant women without outward signs of complications should be seen by an OB for routine prenatal care, as soon as possible, after their incarceration to establish a prenatal plan based on the OB's findings. Based on my experience, those in early pregnancy should be seen by an OB within in 2 weeks, while those more advanced in pregnancy should be seen by an OB within 1 week of their incarceration. Therefore, jails need to have a plan in place to meet these clinical needs.

Based on the records available to me, there does not appear to be a standing, regularly occurring, OB clinic, either onsite or offsite, available for pregnant women. According to Dr. Greifinger's report from his monitoring visit in April 2016, CCS recognized the need to hire a part-time OB/Gyn physician to work in MDC, however, 7 months later when Dr. Greifinger returned to MDC for a follow-up monitoring visit, in November 2016, he noted "there has been no progress with this effort". Lacking this, CCS and Dr. McMurray, had the obligation to establish an agreement with a local, offsite OB specialist that would ensure the availability of, and access to, regular OB clinics that would take pregnant women from the jail for routine prenatal care within 1 week, if needed. After Ms. Tanner was incarcerated on October 4th 2016, she was flagged for chronic care clinic for management of her pregnancy. According to Dr. Greifinger's report from November 2016, CCS' staffing had reduced from 5 providers, down to only Dr. McMurray and Physician's Assistant (PA) Christopher Mercer, by the time Ms. Tanner was in MDC. Since CCS had not hired a part-time OB/Gyn specialist by this time, and the only providers on schedule for MDC were Dr. McMurray and PA Mercer, we can only assume pregnancy continuity care clinics were to be attended by either Dr. McMurray or PA Mercer. If CCS had previously recognized the need to hire a part-time OB/Gyn, to adequately provide prenatal care for pregnant women, yet continued to allow pregnant women to be managed by existing unqualified providers whom CCS tacitly acknowledged were inadequate, then this would suggest a willful neglect of their duty to provide adequate care for these women.

### *Training on Preterm Complications*

In the incarcerated setting, inmate-patients, including pregnant women, rely on jail health care staff to assess and triage their symptoms and determine whether those symptoms are signs of a more serious condition, which require a higher level of care or can be adequately managed in a jail setting. This triage system starts with RNs with proper training, experience, and rigorous clinical pathways which have been established to provide consistent medical care. The next level of care is escalation to higher level clinicians, or even emergent referral to a hospital setting when indicated. In the preterm pregnancy, this assessment and triage needs to be focused on not only the mother, but especially on the unborn fetus. Since the unborn fetus cannot be directly examined, the RN must be aware of possible signs of serious complications, to be able to

9

properly triage the pregnancy and determine the appropriate level of care.

Based on Ms. Tanner's records, and the testimonies of RN Adriana Trujillo (formerly Luna) and RN Elise Manquero, it appears CCS RNs working in MDC lack basic knowledge in pregnancy complications. And even though MDC's own policy on "Counseling and Care of the Pregnant Inmate" (HCA12.53) referenced a clinical protocol, "J05-Preterm Labor", for situations similar to Ms. Tanner's presentation on October 16th 2016, neither of these RNs could recall ever seeing this protocol or ever being trained on it. MDC's policy HCA12.53 was well-intentioned by including "Preterm Labor" as a consideration, however, there appears to be lack of effort in ensuring that its contractor, CCS, followed through with maintaining their health care staff's competency regarding this topic. Instead, RNs relied upon a different protocol, which CCS refers to as "Nursing Documentation Pathway" (Pathway), for any "Pregnancy 20 weeks or more". It is unclear what training, if any, RNs received on this Pathway. When asked about the "Vaginal Inspection" section of this pathway for nursing staff, RN Trujillo replied it was outside of her scope of practice. Furthermore, on the morning of October 16th 2016, when RN Trujillo used this Pathway to evaluate Ms. Tanner after she expressed that her water broke, along with cramping and spotting symptoms, RN Trujillo only documented "Spotting" on the subjective portion of this form, ignoring the other subjective symptoms reported by Ms. Tanner. She was apparently so unfamiliar with this form that she testified in order to document a subjective symptom such as "Rupture of Membranes", she had to confirm by objective examination. Subjective portion of a health care documentation, consist of patient reports, they do not require verification by objective findings. Her responses to questions regarding this Pathway suggest she received no training on it at all. This lack of familiarity with a basic understanding of CCS' own nursing documentation forms, raises serious concerns about CCS' nursing orientation and skills training process.

CCS had the responsibility to ensure that their RNs were competent to perform all of the functions outlined in their nursing documentation pathways. During initial training and orientation, all RNs must have at minimum, a basic familiarity with these forms and competency to perform the functions required in them. If a new or updated Pathway was introduced, CCS must have a mechanism to train their staff on them. Most health care delivery systems, including

10

hospitals and jails, conduct regularly occurring nursing training programs specific for their setting or facility, sometimes known as Nursing Skills Fair. Regular training help to maintain or improve health care knowledge and skills that ensure the nursing staff is capable of meeting their health care mandate. Skills fair is also an opportunity for administrators to provide in-depth or hands-on training for new nursing protocols or major protocol updates. According to the deposition testimony of RN Trujillo and RN Manquero, in October 2016, aside from the initial orientation, or on-the-job training, CCS does not conduct annual skills fairs for their nursing staff even when pathways have been updated or changed.

CCS was made aware of problems concerning "continuing problems with the quality of nursing evaluations, judgments, and nursing decisions for acute problems", as well as "continuing problems with nursing documentation" by Dr. Greifinger as noted on page 8 of his report from April 2016. Yet, as stated above, CCS still does not conduct annual skills fairs as of October 2016. CCS's failure to correct and improve the quality of nursing issues through ongoing or remedial training continues to put patients at risk.

### *Preterm, Premature Rupture of Membranes*

It remains to be determined what information was conveyed to Dr. McMurry when he was informed about Ms. Tanner's symptoms on the morning of October 16th 2016, however, any of Ms. Tanner's symptoms that morning, which included cramping, vaginal bleeding, suspicion of the baby's head in the vaginal canal and preterm, premature rupture of membranes, would have required Ms. Tanner to be evaluated. As a primary care physician, he had the obligation at that time, as well as during his brief visit with Ms. Tanner the next morning, to ensure Ms. Tanner was evaluated for preterm labor and premature rupture of membranes, on an emergent basis. By all appropriate medical standards, this evaluation must occur in a timely fashion and must include a pelvic examination. Neither of these criteria were met according to Dr. McMurray's documentation. If he felt that he was not qualified to conduct a pelvic examination for this purpose, he had the obligation to refer her to a facility with a qualified provider for that emergent evaluation. Dr. McMurry's order to simply house Ms. Tanner in SHU without such evaluation fell below the standard of care.

My opinion, in this case, is based on many years of education and experience in

correctional health care and based on the documents provided to me for review. I reserve the right to change this opinion in the event additional documentation is provided in this matter.

Dated December 14th, 2018, in Anaheim, California

_____
Chun Hsien Chiang, MD

**C. Hsien Chiang, MD, FACCP, CCHP-P**
P.O. Box 27935 Anaheim, CA 92809
Phone: 949-625-0938 Fax: 949-625-1038

March 10, 2019

Arne R. Leonard, Esq
Kennedy, Hernandez & Associates, P.C.
201 12th Street N.W.
Albuquerque, NM 87102


Dear Mr. Leonard,

This is my supplemental report in the case of <u>Tanner v McMurray</u> as requested by your office.   Additional materials reviewed for this report are:

a. Expert correctional medicine opinion by Dr. Peter Crum

b. Expert obstetric opinion by Dr. Charles Stoopack

c. Declaration of Ms. Tanner

d. Deposition transcript of Ms. Tanner

e. Declaration of Ashlee Custy

f. ACA standards 4-ALDF-4C-04/08/09/13/14/15/16/17/24/25/26; 4-ALDF-4D-03/08/09; 4-ALDF-7D-06/09

In his opinion, Dr. Crum acknowledged that medical staff held the suspicion that Ms. Tanner had possibly ruptured membranes as evidenced by their use of nitrazine paper and that "the presence of amniotic fluid would require further evaluation to determine whether to proceed with inducing labor or further observation with antibiotics".   However, he failed to mention that to properly evaluate for the presence or absence of amniotic fluid, a sterile speculum exam must be performed.   Performing pH testing using nitrazine paper on a wet sanitary pad or clothing is not the standard of care.   Even if we were to assume Dr. Crum's flawed assertion that testing a wet sanitary pad or item of clothing is somehow acceptable clinical practice, on the morning of October 16th, 2016, when one of the two tests demonstrated that the pH of the fluid to be 7.0, consistent with the pH of amniotic fluid, then medical staff has a duty at that point to send Ms. Tanner to the hospital for further evaluation and management of her pregnancy.   Instead, the jail medical staff selectively relied on a second nitrazine test that showed a pH of 6.5 to support

EXHIBIT 1B TO DR. CHIANG'S DECLARATION

Case 1:17-cv-00876-MIS-JFR   Document 286-3   Filed 06/03/19   Page 16 of 19

Tanner v McMurray
Page 2 of 5

keeping Ms. Tanner in the jail rather than sending her to the hospital. Furthermore, Dr. Crum also selectively quoted the 6.5 pH, while ignoring the 7.0 pH, to support his opinion. This debate, however, detracts from the main issue that Ms. Tanner presented with complaints and findings suspicious for ruptured membranes on the morning of October 16th, 2016, which no one disputes is a serious pregnancy complication that requires higher level of care to appropriately manage. Medical staff had the duty to have this potentially serious and catastrophic complication be evaluated definitively. Like most jails, Metropolitan Detention Center (MDC) was likely not equipped to perform this evaluation, and like most Internal Medicine physicians, Dr. McMurray was likely not formally trained to perform this evaluation. Even if a bedside biochemical test provides a negative or ambiguous result, medical staff must recognize that false negatives can and do occur and that a negative result is not definitive and may not correlate with the clinical situation. In this case, ruptured membranes and impending delivery was an obvious possibility despite the ambiguous nitrazine test results, and if medical staff either did not have the means or training to definitively rule this possibility out, then their duty was to send Ms. Tanner to an appropriate facility for such evaluation.

In his report, Dr. Crum opined that Ms. Tanner's pregnancy should not be considered "high risk" because she did not meet the definition or criteria of being "high risk". He supported this by stating that Ms. Tanner did not have "HIV, diabetes, hypertension, obesity, advanced age, multips, etc". This assertion fails to recognize fetal and placental abnormalities that places a pregnancy at risk, and insinuates that those conditions are the only conditions that place the health of the mother or the fetus at risk. It also ignores the serious perinatal risk factors that NCCHC standard (J-G-09), to which Dr. Crum suggested MDC as having met, in their care of Ms. Tanner, which specifically states: "Before incarceration, many female inmates have unhealthy lifestyles, including a history of […] drug use […]. Therefore, many pregnancies can be classified as high risk". By this standard, Ms. Tanner's history of substance use disorder with recent stimulant use, should have been regarded as "high risk". Furthermore, the medical staff made no attempt to obtain Ms. Tanner's prenatal records to ascertain whether she had any of the above conditions that Dr. Crum would accept as risk factors for a pregnancy. Therefore,

the medical staff were not even able to determine if Ms. Tanner even fit into Dr. Crum's narrow definition of "high risk". Notably, Dr. Crum did not comment on the lack of attempt by MDC's medical staff to request for Ms. Tanner's prenatal records throughout her stay at MDC, even though such records would provide valuable information to determine Ms. Tanner's pregnancy status and risks.

Dr. Crum further asserts that neither NCCHC, ACA, nor community standards of care required Ms. Tanner to be scheduled for a prenatal visit with an obstetrician urgently. Both NCCHC and the ACA standards, do not specify the appropriate timeframe in which pregnant women should be seen, because various clinical factors influence this standard of care. The fact is, pregnant women in the third trimester routinely have prenatal visits every 1-2 weeks with their obstetrician, just as Ms. Tanner's obstetrician had recommended. When pregnant women present to jails in the third trimester, the jail's health care staff frequently do not have prenatal records available to verify the gestational age, to indicate the patient's identified risk factors, or to establish her last prenatal visit. This is why it is vitally important for the jail medical staff to initiate the request for prenatal records upon intake, which MDC medical staff failed to do, throughout her stay. Some perinatal risk factors such as complete placenta previa, gestational diabetes, and preeclampsia, etc., require emergent referral to a Perinatology specialist or non-stress testing (NST). This is why for patients incarcerated in the third trimester, it is so important to request available prenatal records and schedule for prenatal care with an obstetrician, as soon as possible, upon incarceration. This way, urgent obstetrical risks or complications can be identified quickly and appropriate treatment plans established to ensure optimal outcomes.

Dr. Crum provided little support in his assertion that MDC met the two standards he referenced. The ACA standard on pregnancy (4-ALDF-4C-13), simply requires pregnancy management (routine and high-risk) be available, while the NCCHC's standard goes further by requiring timely "Prenatal […] Medical examinations by a clinician **qualified to provide prenatal care**" and "Appropriate prenatal laboratory and diagnostic tests". MDC did not have a clinician qualified to provide prenatal care, nor did they have any prenatal records to establish

Ms. Tanner's prenatal laboratory and diagnostic tests. These facts along with the deviation from the NCCHC standard with respect to Ms. Tanner's "high risk" pregnancy is clear evidence of their deviation from the NCCHC standard in this case. MDC's pattern or practice of failure to request for prenatal records upon learning of patient's prenatal care history, and failure to make any attempt to ensure pregnant women receive qualified obstetrical care in the appropriate timeframe is dangerous and suggest a disregard for the standard of care for pregnant women.

Dr. Crum also pointed out that a digital cervical exam is contraindicated in a patient without knowledge of the location of the placenta. Again, he conveniently leaves out the fact that if MDC's medical staff had bothered to obtain Ms. Tanner's prenatal records, they would have known her placenta location within the uterus. However, to be clear, when Ms. Tanner presented on the morning of October 16th, 2016, with complaints and findings suggesting ruptured membranes, the standard of care required that she receive a sterile speculum exam by someone qualified to do such exam, to definitively evaluate whether her membranes were ruptured. If this examination could not be performed at the current facility by existing personnel, then medical staff had the obligation to arrange for urgent and appropriate examination regardless of staffing or facility limitations.

Finally, Dr. Crum expressed that "Ms. Tanner repeatedly did well subjectively and objectively while in the medical unit as compared to her complaints […] in her housing pod", and suggests that Ms. Tanner deliberately caused her own preterm labor and complications in her housing, while minimizing her symptoms to medical staff. It is unclear what benefit or gain Ms. Tanner would have by minimizing her own symptoms and possibly placing her pregnancy at risk. However, this suggestion again selectively emphasizes crucial pieces of information from the poor and sometime contradictory documentation made by MDC's medical staff, while ignoring the clear overall picture painted by Ms. Tanner's repeated pleas for help and requests for medical treatment to the staff she had access to, her verbalized concerns of ruptured membranes, her obvious wet clothing, and her verbalized concern of contractions along with the baby's head descending. As stated earlier, even if we were to accept Dr. Crum's inaccurate portrayal of Ms. Tanner's presentation, as soon as medical staff suspected Ms. Tanner's

membranes being ruptured, they had the duty to urgently send her to a hospital for evaluation.

My opinion in this case is based on many years of education and experience in correctional health care and based on the documents provided to me for review. I reserve the right to change this opinion or supplement my opinion in the event additional documentation is provided in this matter.

Dated on March 10th, 2019, in Anaheim, California

Chun Hsien Chiang, MD