IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SHAWNA TANNER, individually and as
personal representative of JAY HINTON, JR.,

    Plaintiffs,

v.                                                  No. 17-cv-876 JB-KBM

TIMOTHY I. MCMURRAY, M.D., *et al.*,

    Defendants.

### DECLARATION OF HUGH M. EHRENBERG, M.D.

I, Hugh M. Ehrenberg, M.D., hereby submit the following declaration under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I am retained as an expert witness by the Plaintiffs' attorneys in the above-captioned case. I make this declaration for the purpose of presenting my opinion testimony to the Court in an admissible form that can be used as an exhibit to court filings.

2.    Attached as Exhibit 1A to this Declaration is a true and correct copy of a letter report dated December 4, 2018, which I authored, signed, and submitted to Plaintiffs' counsel for use in their Rule 26(a)(2) expert disclosures on December 14, 2018.

3.    Attached as Exhibit 1B to this Declaration is a true and correct copy of a supplemental letter report dated January 2, 2019, which I authored, signed, and submitted to Plaintiffs' counsel for use in supplementing their Rule 26(a)(2) expert disclosures on January 2, 2019.

4.    Attached as Exhibit 1C to this Declaration is a true and correct copy of a second supplemental letter report dated March 10, 2019, which I authored, signed, and submitted to Plaintiffs' counsel for use in supplementing their Rule 26(a)(2) expert disclosures on March 10, 2019.

EXHIBIT 4 TO PLAINTIFFS' RESPONSE

5. My qualifications, professional experience, and opinions as stated in the attached Exhibits 1A, 1B, and 1C are true and correct to the best of my personal knowledge and accurately reflect the sworn testimony I would present in this matter if called to testify at trial based on the information available to me on this date.

6. In the attached Exhibits 1A, 1B, and 1C, I have also listed the materials I reviewed in preparing each of my respective reports, as well as a factual summary of those materials. These portions of my reports accurately disclose the factual basis for my opinions for purposes of satisfying the disclosure requirements of Rule 26(a)(2), as of the respective dates that each report was written; however, they are not intended to serve as sworn testimony about whether or to what extent the factual information contained in the materials I reviewed is true or credible.

7. I understand that additional discovery occurred in this case after I wrote the reports attached as Exhibits 1A, 1B, and 1C. To the extent I am permitted to do so by the Court at this juncture, I reserve the right to further supplement or amend my reports attached hereto if additional information regarding this case is provided to me and I am requested to do so.

8. Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing statements are true and correct to the best of my personal knowledge on this date.

Executed this ___th day of May, 2019, in Penn Valley, Pennsylvania.

Hugh M. Ehrenberg, M.D.

# Hugh M Ehrenberg MD
Maternal Fetal Medicine
73 Righters Mill Road
Penn Valley, PA 19072
610-639-1701

Arne R. Leonard
Kennedy, Hernandez & Associates, P.C.
201 12th Street N.W.
Albuquerque, NM 87102

Re: Tanner vs McMurray et al

December 4, 2018

Dear Mr Leonard,

Thank you for contacting me with regard to the matter above.

I am an MD, Board-certified by ABOG in both OB/GYN and Maternal Fetal Medicine since 2006. I completed Fellowship training in Maternal Fetal Medicine in 2000 at MetroHealth Medical, Center-Case Western Reserve School of Medicine in Cleveland, Ohio, after having completed residency in OB/GYN at Cooper Hospital in Camden, New Jersey. I have served on the teaching faculty of University-affiliated OB/GYN residencies at MetroHealth-Case Western Reserve School of Medicine, The Ohio State University School of Medicine, and Crozer Chester Medical Center, where I am currently an Adjunct Associate Professor of OB/GYN with Drexel University School of Medicine. I have attached a CV for review. I currently serve as the Division Director for Maternal Fetal Medicine at two community-based teaching hospitals in suburban Philadelphia, where I continue to have a role in resident education, including labor and delivery management of laboring, non-laboring, medically complicated, term and preterm pregnancies to this day. I am by training and experience an expert in the management of pregnancies such as that which is the focus of this case.

In preparation for the production of this report, I have reviewed the following records, policies, recorded interviews, deposition transcripts, as well as other documents supplied by your office:

1. Plaintiff's Complaint filed August 25, 2017.

Ehrenberg                                                                                              1

EXHIBIT 1A TO DR. EHRENBERG'S DECLARATION

2. Autopsy records from the Office of the Medical Investigator, Health Sciences Center, Albuquerque, New Mexico 87131-5091, Phone: (505) 272-3053 (Bates-numbered Tanner 000001-Tanner000057).

3. Medical records for Plaintiff Tanner from Correct Care Solutions, LLC, (CCS), 100Deputy Dean Miera Dr. SW, Albuquerque, NM 87151, Phone: (800) 592-2974 (Bates numbered Tanner 000058-000220).

4. Medical records for Plaintiff Tanner from Lovelace Health Systems, Inc., Lovelace Women=s Hospital, 4701 Montgomery Blvd NE, Albuquerque, NM 87109, Phone: (505) 727-8196 (Bates-numbered Tanner000221-000385).

5. Ambulance records for Plaintiff Tanner from Albuquerque Ambulance Service, 4500 Montbel Pl NE, Albuquerque, NM 87107-6832, Phone: (505) 449-5700 (Bates-numbered Tanner 000386-000391).

6. Medical record for Plaintiff Tanner from Pinon Perinatal, 3741 Rutledge NE, Albuquerque, NM 87109, Phone: (505) 798-9300 (Bates-numbered Tanner000392).

7. Medical record for Plaintiff Tanner from Drs. Lui and Rowe Integrative Med Spa, 6801 Jefferson NE Suite 350, Albuquerque, NM 87109, Phone: (505) 884-8900 (Bates-numbered Tanner000393).

8. Records from Bernalillo County Fire & Rescue, 100 Deputy Dean Miera Dr. SW, Bernalillo (County), NM 87151, Phone: (505) 468-1310 (Bates-numbered Tanner 000394-000399).

9. Incident report from Bernalillo County Sheriff=s Department, 400 Roma NW, Albuquerque,
NM 87102, Phone: (505) 468-7100 (Bates-numbered Tanner000400-000427).

10. Medical records for Plaintiff Tanner from Pinon Perinatal, 3741 Rutledge NE, Albuquerque, NM 87109, Phone: (505) 798-9300 (Bates-numbered CCS - PINON 000001-000009).

11. Plaintiff's Answers and Objections to Defendant Correct Care Solutions, LLC=s First Set of Interrogatories dated March 12, 2018.

12. 000554-000566 Report on MDC (11.21.16) by Dr. Robert Greifinger, M.D.

13. 000567-000578 Report on MDC (04.22.16) by Dr. Robert Greifinger, M.D.

Ehrenberg                                                                                          2

14. 000631-000646 Witness Statements (obtained by Sheriff=s Department investigators for incident report Bates-numbered Tanner000400-000427 and referenced above).

15. 000647-000654 Shift Logs (obtained by Sheriff=s Department investigators for incident report referenced above).

16. Plaintiff's Exhibit 1 - Contract with CCS (326 pages).

17. Plaintiff's Exhibit 4 - Contract Amendment for OB-GYN Clinic.

18. Photos from Sheriff's Dept Investigation (.jpg image files).

19. Audio from Sheriff's Dept Interviews (.mp3 audio files) for the following witnesses: CO Claudia Rodriguez-Nunez, CO Martina Sanchez, CO Rebecca Macias, CO Toni Fastenau, Med Jacob Cassell, Med Sean Turner, RN Adriana Luna, RN Elisa Manquero, RN Taileigh Sanchez, and Plaintiff Shawna Tanner.

20. CCS job descriptions for the following positions: EMT, Paramedic, Physician Assistant, Registered Nurse, and Site Medical Director.

21. Document entitled AHCA 12.01 Access to Care@ dated Feb. 9, 2015.

22. Document entitled AHCA 12.02 Responsible Health Authority@ undated.

23. Document entitled AHCA 12.33 Initial Health Assessment@ dated Feb. 9, 2015.

24. Document entitled AHCA 12.37 Emergency Services@ undated.

25. Document entitled AHCA 12.41 Continuity of Coordination of Care During Incarceration@ dated Feb. 9, 2015.

26. Document entitled AHCA 12.53 Counseling and Care of the Pregnant Inmate dated Feb. 9, 2015.

27. Plaintiff's First Amended Complaint filed May 23, 2018.

28. Spreadsheet Bates-numbered Tanner v. Bernalillo County 000754-000840 depicting CCS Staffing Credits in 2016.

29. CCS Medical Service Agreement-2nd Amendment dated Sept. 1, 2016 (10 pages).

30. Medical records for Plaintiff Tanner from Drs. Lui and Rowe Integrative Med Spa, 6801 Jefferson NE Suite 350, Albuquerque, NM 87109, Phone: (505) 884-8900 (Bates-numbered ROWE000001-000037).

31. Transcript of Deposition of Adriana Luna (Trujillo) dated October 24, 2018.

32. Transcript of Deposition of Elisa Manquero dated October 25, 2018.

33. Transcript of Deposition of Taleigh Sanchez dated November 15, 2018.

34. Health Care Deposition Exhibits 1 through 45 (as referenced in depositions of Adriana Luna (Trujillo), Elisa Manquero, and Taleigh Sanchez listed above).

35. Medical records numbered Tanner 000608-Tanner 000666.

Case in Brief:

Ms Tanner was a 33 year old Gravida 7 Para 1051 with an estimated date of delivery 11/20/16. Her prenatal care started at 28 weeks 5 days, complicated only by tobacco use and a single episode of methamphetamine exposure. Prenatal records indicate an ultrasound performed at 30 weeks with appropriate fetal growth and normal fetal testing. She was incarcerated on 10/4/16, at which time she was 33 weeks and 2 days pregnant.

Ms Tanner states she reported her pregnancy to prison personnel. She also would have had to have been plainly in an advanced state of pregnancy to even a lay observer. To be clear, Ms Tanner was carrying a pregnancy that was 7 weeks from the due date. By all documented records reviewed, prenatal care is withheld from the moment Ms Tanner is incarcerated. There is no record of an obstetrical intake exam. She is finally examined on 10/14, with no reference to the pregnancy. There is no fetal assessment by fetal heart rate, non-stress testing, or ultrasound. The history and physical is dated 10/15, eleven days after incarceration, and makes no mention of an obstetrical plan. There is no record of even informal consultation with an obstetric provider for routine prenatal care. There is no record of consultation with Maternal Fetal Medicine as to what a pregnancy recently exposed to methamphetamine would have been required, such as follow-up ultrasound or nonstress testing, let alone prenatal care, all of which appear not to be available in the correctional setting. There is no plan for testing of fetal

wellbeing. There is no plan for assessment of fetal size. There is no plan for management of labor and delivery for the patient who is nearing term. There is no referral for prenatal care, despite policy and procedure for such planning in the event of inmates with "chronic conditions". In point of fact there is little recognition of Ms Tanner's pregnancy. These are the first of many examples of the reckless indifference to Ms Tanner and the wellbeing of her pregnancy that ends in the death of baby Tanner while under the care of Correct Care Solutions and the Metropolitan Detention Center operated by Bernalillo County, New Mexico.

Despite having prenatal care withheld by corrections, Ms Tanner's pregnancy while in custody was without event until 10/16, when she reported abdominal pain, vaginal bleeding, and fluid loss soaking her garments. She reports these symptoms after breakfast to a corrections officer, and is seen in what appears to be a general medical unit. There is no attempt to perform non-stress testing, at this point indicated based on Ms Tanner's complaints. There is no documentation of a fetal heart rate at all. There is no pelvic performed. There may have been communication of these complaints to a physician, but she is not evaluated by one. By her report, they diagnose her with loss of a mucous plug, but she does not undergo a pelvic exam. There is no documentation of an evaluation for the status of the fetal membranes (to see if she broke her water). Review of photographs, facilities policies, and nursing depositions shows that there was no ability to do basic obstetrical triage in the correctional settings. There is no NST monitor even available, only a handheld Doppler device designed only to take a fetal pulse rate. This device in trained hands can only determine the fetal heart rate, not make assessments as to fetal wellbeing. Ultrasound is not available, both because of lack of a machine and lack of personnel trained in its use. Despite being licensed RNs, each nurse deposed reports a basic pelvic exam to be beyond their scope of practice. As a result, evaluation of the patient's complaints, which included suspicion of rupture of the fetal membranes and bleeding either from early labor or a placental abruption, cannot be completed on-site.

It is at this moment that on-site nursing personnel should first have alerted the supervising on call physician to the patient in need of specialized evaluation and possible management at the University Health System, a mere phone call away. Instead, nursing abdicated their responsibility to the patient and her child, inserting their own judgment that a more thorough evaluation would not be needed onsite. In reviewed deposition testimony, each RN reports the ability to do only insufficient evaluation for rupture of membrane with nitrazine paper applied to perineal pads. No nurse reports being able to perform an actually pelvic exam or evaluation of cervical dilation, each of which is required to evaluate a patient with Ms Tanner's complaints. No nurse reports more than "on the job training" for assessment

Ehrenberg                                                                        5

of the pregnant woman with regard to labor complaints, and despite having a paucity of any such exposure for training, treating nurses' judgment not to call supervising physicians and not to call for transportation to a center properly staffed and equipped for obstetrical evaluation of routine third trimester pregnancy complaints was utilized as a guiding factor in patient care. This judgment was ultimately pivotal in allowing preventable fetal death to occur.

Some time later in the day, Ms Tanner is returned to her cell, but continues to complain of symptoms of labor and ruptured fetal membranes (broken water) that would have easily been recognized by trained personnel. These personnel are not available to her, and they are not called when it should have been recognized that they were needed. They instead accuse her of medication seeking when she continues to complain of abdominal pain. This indifference to the needs of mother and fetus directly endangered the health of them both. At some point during the night she is unable to urinate, with accelerated bleeding. She is able to feel a mass in her vagina, which may have been the fetal head. While records are unclear, it appears that Dr McMurray is made aware of Ms Tanner, and her evolving clinical picture. He fails to come in and properly evaluate the patient, instead depending on nursing judgment that is inexperienced and disengaged. Furthermore, it remains to be examined by deposition testimony at this point whether Dr McMurray has sufficient training or experience in obstetrics to properly offer evaluation of Ms Tanner and her routine OB complaints. Despite this lack of facilities equipped for evaluation, personnel trained or experienced in dealing with third trimester pregnancy complaints, nor willing to do basic evaluations, or physicians properly experienced or present for such evaluations, Ms Tanner is kept at the corrections facility, and not immediately sent to the properly staffed and equipped OB triage unit at the University hospital. She is instead sent back to the medical unit and "observed" though the night. She is not monitored for fetal wellbeing. She is not kept hydrated or monitored for ongoing blood loss. She is not evaluated for hemodynamic instability. She is not evaluated for advancing labor. She is kept alone, without fetal heart rate or contraction monitoring or medical attention, with no blankets, water, IV fluids, or any other intervention that would have been appropriate for a pregnant woman in labor.

The entirety of Ms Tanner's stay from the morning of 10/16 onward represents a deviation from the standard of medical care of the pregnant patient. This deviation results from the willful disregard of her routine complaints, the inability of those to whom she complained to recognize the need for more specialized attention, and the lack of facility to provide evaluation in a properly equipped and staffed ob triage center. But for this ongoing and flagrant negligence on the part of the nursing staff and

physician charged with her care and that of her baby, the fetal death that followed would not have occurred. This ongoing neglect in the care of Ms Tanner culminates in the events of the following morning, 10/17.

Ms Tanner is finally seen by a physician the next morning, Monday 10/17. There is a spot check of fetal heart rate that is normal. This represents the only example of fetal assessment performed during her entire stay in custody, and it is inadequate for this clinical scenario. Non-stress testing is indicated for women suspected of being in labor or with significant uterine activity near term to evaluate fetal wellbeing under these circumstances. It is also indicated in women who complain of loss of fluid per vagina with vaginal bleeding consistent with either early labor or mild placental abruption. There is no non-stress test performed, no pelvic exam to assess bleeding, status of the fetal membranes or cervical dilation. Each of these significant deviations from standard of reasonable OB care represents an opportunity to prevent the eventual death of baby Tanner. This patient is complaining of labor and/or rupture of the fetal membranes, and neither of these possibilities is considered. There is no call to a trained obstetrician, and no consideration of transfer to a facility where appropriate evaluation could have been performed.

Unbelievably, over the next several hours Ms Tanner is left to labor alone, without pain control, fetal monitoring, assessment of fetal position, cervical dilation or progress in labor. Her bleeding and fluid loss accelerate over this time to a point she needed fresh clothing due to soiling of her garments. Caregivers fail to recognize and manage rupture of the fetal membranes and labor, both of which should have obviously been suspected in this case. This is a clear deviation from standard of care, and represents the final and most significant opportunity to intervene on the behalf of Ms Tanner and her unborn baby. The inability to attend to the needs of a pregnant woman, the failure to recognize the need to assess a woman in labor, and prolonged lack of appropriate medical attention are direct contributors to the preventable death of Ms Tanner's baby.

Later in the day on 10/17, symptoms of pain, bleeding, and fluid loss increase significantly. She is finally examined at 10:05. There is no fetal heart rate obtained, and no NST performed. There is no assessment of cervical dilation, status of fetal membranes performed as would be routine for these complaints. Dr McMurray is first directly involved at 10:35, and a decision to transfer to the hospital is made and approved at 10:40. EMT arrives at 11:12, with Ms Tanner now apparently in second stage labor (pushing, which is many times involuntary), about to deliver her child. While documentation is unclear, it appears either the EMT or onsite medical personnel attempt to locate fetal heart tones, and are unable to, raising concern for fetal death.

Ehrenberg 7

At this point events appear to progress rapidly, with Ms Tanner beginning to push involuntarily. In a clear and shocking dereliction of duty to his patient, Dr McMurray defers to the EMTs to manage Ms Tanner's only two pushes, whereupon she delivers her stillborn baby. She does so in an evaluation room of a medical unit in a prison without pain control, fetal monitoring or the availability of any personnel familiar with or trained in the management of pregnancy or labor. She delivers in a location unable to manage routine expected complications of such a delivery, and is finally transported to such a properly equipped center. This is the culmination of over 18 hours careless indifference to the medical facts of Ms Tanner's that resulted in the death of her unborn child.

Opinion in Detail:

After review of available records, recorded interviews, depositions, photos and policies it is clear to me that:

1) The prison medical unit was not equipped for prenatal care or the assessment or management of women with routine pregnancies or pregnancy complications. There was no monitor with which to do non-stress testing, the easiest most cost efficient least complicated testing performed to assess fetal wellbeing. There was no ultrasound machine available with which to assess fetal wellbeing, position, or heart rate.

2) Corrections officers, available medical personnel were not comfortable, capable or qualified to take care of a pregnant woman or complications that could arise over the course of labor and delivery. They did not have the knowledge base to ask the most basic questions, nor were they experienced or trained in the most rudimentary obstetrical evaluations.

3) There was no effort made to obtain qualified care of Ms Tanner's pregnancy at any stage of her incarceration. The lack of continuity in prenatal care represents the most benign form of this neglect. The most egregious examples are on the 16th and 17th of October when she begins to experience symptoms of premature preterm rupture of the fetal membranes, vaginal bleeding, and labor that would have easily been recognized and treated by a basically trained minimally experienced obstetric provider.

4) The gestational age at which these events occurred was well after the lower limit of "viability", defined as the ability of the newborn child to survive outside the womb if delivered. This lower limit is currently

Ehrenberg                                                                 8

accepted to be anywhere between 22 and 23 weeks' gestational age. Gestational age on 10/16 was 35 weeks, beyond the period in which stopping labor to prevent prematurity would be appropriate. The only thing Ms Tanner needed was to be evaluated properly, and allowed to labor in a properly equipped setting cared for by appropriately trained and experienced personnel. She was denied that care, in a clear deviation from the standard of care. This resulted directly in the death of her baby.

5) There is no evidence of a fetal complication of pregnancy or maternal exposure in pregnancy that would have had a proximate cause to this fetal death. Furthermore, proper monitoring over the course of the remainder of her pregnancy and of this laboring pregnant woman would have allowed intervention on the behalf of the fetus that would have had any unforeseen risk for fetal compromise.

6) Fetal death occurred during labor that was not recognized or managed, due to fetal compromise that was not monitored for, recognized, or treated. But for the lack of appropriate medical attention and monitoring for this woman undergoing a rather routine complication of late pregnancy, she would have given birth to a liveborn child. It is this clear deviation from the standard of care that results in the death of Baby Tanner.

7) Lack of qualified or experienced OB care provider lead directly to inadequate evaluation for routine complaints encountered in pregnancy that subsequently went un-managed. It was this lack of competent properly trained ob providers that lead directly to the death of baby Tanner. There were no unusual complications for Ms Tanner's pregnancy. There were no rare diagnoses missed. People confining her failed to get her to people who would know what to look for or do in an otherwise rather ordinary state for a pregnant woman. She was neglected, and not afforded the most basic OB care. This neglect began on the day she was incarcerated, and culminated during the final 18-24 hours of her pregnancy.

   a. Had there been someone trained in or aware of the inability to do so, Ms Tanner would have had the proper vaginal examination. Lack of recognition of labor or rupture of membranes lead to everything thereafter.
   b. Had there been someone trained in or aware of the inability to do so, Ms Tanner would have been placed on a monitor to assess fetal status in labor, using an NST machine to watch a fetal heart rate. This testing was not available at the corrections

   facility, and should have mandated a change in care site to the hospital. Lack of monitoring of the fetus in labor lead to unrecognized compromise of fetal health in labor, preventing proper interventions such as utero resuscitative efforts or cesarean delivery.
  c. Had there been someone trained in or aware of the inability to do so, the patient would have been evaluated for preterm premature rupture of the fetal membranes. If done, Ms Tanner would have been treated with the antibiotics she and her baby needed for optimal outcomes in the setting of prematurity, and she would have been monitored properly for vaginal bleeding.
  d. Had there been someone trained in or aware of the need to evaluate for vaginal bleeding, the patient could have been assessed for possible abruption with fetal compromise. Lack of this monitoring prevented interventions such as in utero resuscitation or cesarean delivery.
  e. Institutional lack of oversight appears to have contributed to this negligence. There are protocols for emergent access to care that are ignored, no in-service education for the care of a pregnant inmate, and no mandate for attending physician oversight of care that is clearly out of scope for the facility.

The standard of obstetrical care does not modify with incarceration. There is clear neglect of the patient in this regard from the first day of Ms Tanner's stay forward. The death of baby Tanner is the direct result of the ongoing, pervasive, systematic ignorance of the needs of a pregnant woman, the lack of the ability to attend to these needs while in custody, the failure to recognize the need for specialized medical attention not available on-site for even the most rudimentary pregnancy assessment, the failure to obtain that care, and the resultant lack of any appropriate management in labor after rupture of fetal membranes and in the setting of vaginal bleeding in the third trimester. A similarly trained reasonably competent medical provider readily recognizes this standard.

I offer these opinions to a reasonable degree of medical certainty. The deviations from acceptable standards of medical care outlined in this report were substantial contributing factors in causing the death of baby Tanner, and increased the risk of harm to Ms Tanner.

I reserve the right to modify this opinion as more records are made available for review.

        Respectfully submitted,

        Hugh M Ehrenberg MD

From: Hugh Ehrenberg MD
To: Arne Leonard
Subject: Scan Jan 2, 2019 at 11.03 PM
Date: Wednesday, January 2, 2019 9:06:54 PM

Arne,

I have had the chance to review the McMurray depo and Chiang report.

Please see attached addition to my previously submitted report for the Tanner case.

I look forward to meeting up with your partner next week.

Thanks
Hugh

Created with Scanner Pro

## Hugh M Ehrenberg MD
## Maternal Fetal Medicine
73 Righters Mill Road
Penn Valley, PA 19072
610-639-1701

Arne R. Leonard
Kennedy, Hernandez & Associates, P.C.
201 12th Street N.W.
Albuquerque, NM 87102

Re: Tanner vs McMurray et al

January 2, 19

Dear Mr Leonard,

I am in receipt of additional material you recently sent to my attention in connection with the case captioned above. These include:

1) Deposition testimony for Dr McMurray
2) Report and CV from Dr Chiang, plaintiff's expert.
3) Supporting exhibits

After review and consideration I have the following to add to my previously submitted opinion letter concerning the management of Ms Tanner's pregnancy and eventual in utero death.

Dr McMurray's deposition is revealing for several reasons.

1) He admits in several places that he is untrained beyond medical school and inexperienced with regard to OB care.
2) He states a simple pelvic exam is beyond his scope of practice, and that of those in his supervision.
3) He admits the facility is lacking in equipment required in the evaluation of a woman suspected as having preterm labor, and that this is to be done at the hospital with which his company has routinely sent patients in the past.
4) He is unaware as to the CLIA certification of his office to use nitrazine paper, and to his recollection, the paper was used improperly to evaluate Ms Tanner for rupture of membranes by applying it to the pad pulled from the garbage rather than discharge collected from the vaginal vault.
5) He does not personally evaluate the patient himself until the day of delivery, and relies on similarly untrained and inexperience nurses onsite for evaluation of a patient with routine OB complaints. When he does see her, he is "reassured" about her from an interview, and does not perform the required pelvic examination.

EXHIBIT 1B TO DR. EHRENBERG'S DECLARATION

6) He leaves a patient in need of observation overnight in the care of corrections officers to monitor with no medial knowledge whatsoever
7) He makes judgments over the phone based on subjective observations of others as to whether patient's pain could be contractions or not. No NST is requested or conducted.
8) He states the decision to send Ms Tanner to the hospital could have been made by anyone over the course of the night.
9) He cannot state fetal heart tones were evaluated at all overnight into the day of delivery until just before the ambulance arrived with the patient in second stage labor.
10) Interestingly, while stated otherwise elsewhere, Dr McMurray states that a **release of information for medical records for Ms Tanner was finally processed** the day she delivered.
11) It appears that the care team did not have any idea how pregnant Ms Tanner was. Dr Mc Murray states he was awaiting an ultrasound to be performed at the OB office (to which she had yet to be referred.) for dating. Couple this with the lack of records, and I propose the care team did not know Ms Tanner was carrying a perfectly viable fetus.
12) He acknowledges that preterm labor is a reason for hospital transport, but has no training, experience or technical ability to make such a determination. Transport to hospital based evaluation should therefore have been made based on patient reports of complaints consistent with preterm labor, bleeding or rupture of membranes.

Dr Chiang's findings are in line with my own. Prenatal care should not be withheld during incarceration as it clearly was in this case. Access to trained, experienced care in Obstetrics in a properly equipped center should be made available when the condition of the pregnancy is not clearly normal or routine.

My opinion about this case is unchanged. Ms Tanner was made to labor unattended by qualified medical professionals trained, experienced and equipped to protect her fetus from routine complications of labor and delivery near term. Had she been free to do so, she would have obtained medical attention at an OB unit to evaluate for labor, and treat those complications that went un-noticed during the night of the 16th of October. These deviations in care resulted from the interruption of prenatal care precipitated by incarceration, and the lack of recognition of pregnancy or the gestational age of it by the physician charged my the correctional facility with her care.

I reserve the right to modify this opinion as more records are made available for review.

Kind regards,

Hugh M Ehrenberg MD

Sent from my iPhone

**Hugh M Ehrenberg MD**
**Maternal Fetal Medicine**
738 Righters Mill Road
Penn Valley, PA 19072
610-639-1701

Arne R. Leonard
Kennedy, Hernandez & Associates, P.C.
201 12th Street N.W.
Albuquerque, NM 87102

Re: Tanner vs McMurray et al

March 10, 19

Dear Mr Leonard,

I am in receipt of additional material you recently sent to my attention in connection with the case captioned above. These include:

    1) Declaration of Ashlee Custy, Ms. Tanner's cell mate;
    2) CV and report for Charles Stoopack, M.D., Defendant's Ob/Gyn expert;
    3) CV and report for Peter Crum, M.D., Defendant's Correctional Medicine expert.

After review and consideration of this new data, I do not change my opinions with regard to this case. Baby Tanner died in utero because routine complaints of pregnancy were ignored. Competent obstetrical care was withheld because of the negligence of her captors, who failed to prevent death during unattended labor after preterm premature rupture of the fetal membranes, culminating in a late abruption in labor. I have the following to add to my previously submitted opinion letter concerning the management of Ms Tanner's pregnancy and eventual in utero death.

1) Defense experts discuss the relevance of the high risk status of Ms Tanner's pregnancy. First, the "at risk" nature of any pregnancy is a predominantly subjective assignment, depending largely on the comfort of the provider taking care of the patient and insurance payment justifications. It is certain that had the defendants taken the time to review her medical records upon incarceration they would have had the required information to take precautions, acquire adequate care, and appropriately take over her care as an inmate patient. Nevertheless, any "high risk" status, known or unknown, is not at issue here. Not reviewing records, and therefore being ignorant of the facts of her case is not an excuse for evaluating her routine pregnancy complaints. She told them everything they needed to in order to care for her routine pregnancy complaints; she said she thought she broke her water, and was not evaluated for it. Whether she was "high

EXHIBIT 1C TO DR. EHRENBERG'S DECLARATION

risk" or not, she was made to labor without monitoring or trained attendants. That's why this baby died.

2) Similarly, defense experts state that Ms Tanner did not share with her captors and caregivers that she had a complicated pregnancy. This defense is similar to that above, in that if they didn't know, they could not have prevented the death of baby Tanner. Holding the patient solely responsible to inform the caregiver of her health and complications of pregnancy is at least irresponsible, and certainly a lazy version of victim blaming. Many patients do not have an adequate grasp of their conditions, and most do not have the ability to communicate the facts of the matter properly. It's the physician's responsibility to investigate possible conditions that complicate pregnancy, whether by review of records of previous care, or studies and a patient exam of their own. Neither happened in a timely manner here at all. Furthermore, regardless of what the patient understood as to her complications of pregnancy, she said all she needed to say the day before delivery; she said she thought she broke her water, and was not evaluated. She reported labor pains, and was not evaluated by anyone trained to assess labor. She was not given the opportunity to have interventions in labor on the behalf of her unborn child to avoid death for which she may or may not have been at increased risk. Whether she told her captors of the details of her pregnancy history or not, she was made to labor alone, without monitoring or trained attendants. That's why this baby died.

3) There is discussion in expert reports with regard to the possibility of the fetus being growth restricted. Review of the prenatal records and appointments for outpatient care reveal a plan to follow-up a previously performed ultrasound showing normal growth. This may have been due to provider suspicion of impending growth restriction or as a matter of routine. There may also have been suspicion of preeclampsia, since the patient was incarcerated prior to collecting what looked like a second 24-hour urine evaluation. This is typically done to rule in or out the condition. It is entirely plausible that the mild preeclampsia the patient may have been developing had an influence on the rate of growth for the fetus due to uteroplacental compromise not uncommon in this condition. Neonatal weight at autopsy appears consistent with it being small for gestational age. Of course, knowledge of this suspicion and review of the plan for follow-up while under their care would have been the competent and responsible course of action by Dr Murray after the patient transferred her care to CCS, however this responsibility was abrogated. Luckily for Ms Tanner, the fetus survived until natural labor despite the ignorance as to the possible growth restriction of her caregivers. Had they bothered to look, they might have obtained care with actual obstetricians who would have initiated testing of the undergrown fetus with intent to act on results and deliver earlier if indicated. It is possible that despite surviving prior to labor in a compromised state, that this fetus did not tolerate labor, presumably growth restricted in the setting of preeclampsia and uteroplacental insufficiency. This may or may not have been exacerbated by a reportedly tight nuchal cord. It is in this light that the death of baby Tanner is

most directly tied to the denial of adequate medical attention. They needed to know none of this to make sure to reduce the risk of death as much as possible, no matter what complications the pregnancy had. She told her captors and medical staff all they needed to hear; She said she thought her water broke. She complained of labor pains. She requested evaluation for the routine pregnancy complaints of possible labor and rupture of the fetal membranes and was denied. Labor happens every day for the growth restricted fetus, and in a hospital death is avoided because compromise is recognized on fetal heart rate monitoring, and resuscitation or cesarean delivery is available in the event of life threatening compromise. Whether the fetus was poorly grown or not, Ms Tanner was made to labor after breaking her water without life saving monitoring, trained personnel in attendance, or the facilities to act on abnormal findings on the behalf of the fetus. That's why this baby died.

4) There is an assertion that the apparent abruption suffered by Ms Tanner in the final stages of labor was somehow unavoidable, and ultimately fatal to baby Tanner in a way that was unpreventable. This is flatly false. First, we don't know when baby Tanner died, and whether the premature separation of the placenta was an antecedent event or not. The reason we don't know this, as it happens, is the pregnancy was allowed to undergo labor without monitoring at least intermittently, and without attendance by trained and capable caregivers which is in keeping with standard of care. Even in the initial stages of labor there was bleeding reported, and though that could have been due to labor itself, it could also have been sentinel bleeding signaling increased risk of wholesale abruption later, and reports of vaginal bleeding require detailed evaluation by trained personnel to diagnose and treat pathologic vaginal bleeding either in labor or prior to it. At the very least, assuming the eventually accelerated bleeding and presumed abruption was the ultimate pre-morbid event prior to death of the fetus, laboring in a hospital when it happens allows every opportunity to prevent death secondary to premature placental separation. But none of this matters. Whether the abruption she apparently had at the end of her labor was responsible for the death of her baby or not, Ms Tanner told her captors all she needed to prevent it; She said she thought she broker her water. She said she felt labor pains. She said she was bleeding. She said all these things and was not brought to people who would have been able to competently evaluate and treat these routine complaints of pregnancy. Whether the abruption cause the fetal death or not, Ms Tanner was made to labor alone without the benefit of any precautions that would have saved her baby from it, without the attention of physicians trained and equipped to come to the defense of her and her child and saving it from the risk of death associated labor, with or without premature separation of the placenta. That's why this baby died.

5) In a similar vein as all the rest, there are assertions that an intrauterine infection contributed to the death of baby Tanner. In the first place, death in utero due to exposure to chorioamnionitis is an EXTREMLY unlikely event. In addition, meaningful infections in utero rarely if ever happen in the absence of ruptured

membranes. Remember that symptoms of preterm premature rupture of the fetal membranes were the first things Ms Tanner reported to corrections officers. Delay in management forced by the lack of transfer to competent practitioners of obstetrics could certainly have made this fetus sicker than it would have been otherwise. Ms Tanner told her captors and the doctors all they needed to know to reduce the risk of this complication, or any other. She told them she thought she broker her water. She told them she had labor pains, and that she was bleeding, and was not brought to people trained and equipped to manage these complications after such routine complaints of pregnancy. Any proposed infection was made worse by this neglect.

The defense seems to want to justify their actions by asserting that they didn't see the details. They didn't know she was "high risk", they didn't hear her say she thought she was in labor with broken water for 18 hours, and they didn't see the abruption coming. All of this may be true. What is also true is they had all the information needed to decide to transfer her to a facility in which obstetrically trained individuals could evaluate her pregnancy for these routine obstetrical complaints. She said she thought she was in labor, and that she may have broken her water. They knew they were untrained and ill-equipped in the evaluation of these routine obstetrical complaints. They knew they could not provide a proper vaginal exam. They knew they could not evaluate for rupture of membranes. They knew they could not evaluate for contractions. But instead of getting the patient in front of people who could perform such evaluations in a properly equipped location, they substituted their own admittedly ill-informed and poorly experienced judgment. They withheld life-saving attention from her and her fetus. They claimed to know enough to know it was "Braxton-Hicks" contractions, and not really labor. They claimed to know enough to disprove rupture of membranes by evaluating a discarded perineal pad rather than the patient's actual vagina. They claimed that because her vital signs were "stable" and they heard what they thought was a fetal heart rate that the baby was fine. They want it both ways, when in fact neither are without negligence. They either actually knew enough to evaluate routine obstetrical complaints and got all that wrong, or they didn't know enough to evaluate routine obstetrical complaints and failed to get the patient to someone who could. This is why baby Tanner died.

I reserve the right to modify or expand on this opinion as more records are made available for review.

Kind regards,

Hugh M Ehrenberg MD