# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SHAWNA TANNER, individually and as
personal representative of JAY HINTON, JR.,

      Plaintiff,

vs.                                          No. CIV 17-0876 JB/KBM

TIMOTHY I. MCMURRAY, M.D.; ADRIANA
LUNA, R.N.; AUDREY LEBER, R.N.;
TAILEIGH SANCHEZ, R.N.; ELISA
MANQUERO, R.N.; CORRECT CARE
SOLUTIONS, LLC; BOARD OF COUNTY
COMMISSIONERS OF BERNALILLO
COUNTY, NEW MEXICO; THOMAS J.
RUIZ; JOHN AND JANE DOES 1-10;
CHRISTOPHER MERCER; ED KOSSMAN;
CLAUDIA RODRIGUEZ-NUNEZ; MARTINA
SANCHEZ-FILFRED, and TINA M. MUNOZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants Timothy I. McMurray, M.D.,

Adriana Luna, R.N., Taileigh Sanchez, R.N[.]'s Motion for Partial Summary Judgment and

Memorandum in Support, filed April 22, 2019 (Doc. 220)("Partial MSJ").  The Court held a

hearing on May 13, 2019.  See Transcript of Proceedings at 2:3-5 (Court)(taken May 13, 2019),

filed June 11, 2019 (Doc. 296)("Tr.").  The primary issues are: (i) whether McMurray, Luna, and

Sanchez, who are private parties working for Correct Care Solutions, LLC, a private contractor,

are legally entitled to assert governmental immunity; (ii) whether the Court should dismiss Count

I of Tanner's First Amended Complaint for Civil Rights Violations, Tort Claims, Wrongful Death,

Statutory Violations, Damages, and Injunctive Relief, filed May 23, 2018 (Doc. 50)("Complaint")[1]

as to Defendants Timothy I. McMurray, Adriana Luna, and Taileigh Sanchez (collectively, the

"Correct Care Defendants"), because the 42 U.S.C. § 1983 claims in the Complaint's Count I are

facially invalid where Tanner, as a detainee held pursuant to a probation violation, improperly

alleges rights under the Eighth Amendment to the Constitution of the United States of America

rather than exclusively under the Fourteenth Amendment to the Constitution of the United States

of America; (iii) whether the Court should grant summary judgment in favor of the Correct Care

Defendants on the Complaint's Count I, because the undisputed facts show the Correct Care

Defendants did not violate Tanner's Fourteenth Amendment right to timely and adequate medical

care; (iv) whether the Court should grant summary judgment in favor of the Correct Care

Defendants on the Complaint's Count II,[2] because the undisputed facts support that the Correct

Care Defendants did not unduly burden Tanner's reproductive rights, were not deliberately

indifferent, and did not commit acts that shocked the conscience when caring for and treating

---

[1] Tanner titles the Complaint's Count I as "Plaintiff Tanner's Cruel and Unusual Punishment Claims Under the Eighth and Fourteenth Amendments Against Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman." Complaint at 22. Pursuant to the Joint Motion to Dismiss With Prejudice Claims Against Christopher Mercer, P.A. in Count I and Count II, filed May 10, 2019 (Doc. 256), Defendant Christopher Mercer was terminated on May 13, 2019. See Stipulated Order Dismissing With Prejudice Claims Against Christopher Mercer, P.A., in Count I and Count II, filed May 13, 2019 (Doc. 264).

[2] Tanner titles the Complaint's Count II as "Plaintiff Tanner's Substantive Due Process Claims Under the Fourteenth Amendment Against Defendants McMurray, Luna, Sanchez, Manquero, Mercer, and Kossman." Complaint at 24.

Tanner; and (v) whether the Court should dismiss without prejudice the state law claims in the Complaint's Count III.[3] The Court concludes that: (i) McMurray, Luna, and Sanchez are legally entitled to assert governmental immunity; (ii) the 42 U.S.C. § 1983 claims in the Complaint's Count I are not facially invalid where Tanner, as a detainee held pursuant to a probation violation, properly alleged rights under the Eight and Fourteenth Amendments, in the alternative, consistent with rule 8(d); (iii) summary judgment in favor of the Correct Care Defendants on the Complaint's Count I is proper because the undisputed facts support that the Correct Care Defendants did not violate Tanner's Fourteenth Amendment right to timely and adequate medical care, and the right Tanner alleges was not clearly established; (iv) summary judgment in favor of the Correct Care Defendants on the Complaint's Count II is proper because the undisputed facts support that the Correct Care Defendants did not unduly burden Tanner's reproductive rights, were not deliberately indifferent, and did not commit acts that shocked the conscience when caring for and treating Tanner; and (v) dismissal without prejudice of the remaining state law claims found in the Complaint's Count III is proper. Accordingly, the Court grants the Partial MSJ.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in their summary judgment motion papers for the Partial MSJ. See Partial MSJ ¶¶ 1-41, at 4-12; Plaintiffs' Response in Opposition to Defendants McMurray, Luna, and Sanchez's Motion for Partial

---

[3] Tanner titles the Complaint's Count III as "State Law Claim for Professional Negligence Against Defendants McMurray, Luna, Leber, Sanchez, Manquero, CCS, and DOES 1-5."

Summary Judgment at 1-22,[4] filed June 3, 2019 (Doc. 286)("Response"), id., at ¶¶ A-Z, at 22-34;[5]

and Defendants Timothy I. McMurray, M.D., Adriana Luna, R.N., Taileigh Sanchez, R.N.'s Reply

in Support of their Motion for Partial Summary Judgment, filed June 19, 2019 (Doc.

316)("Reply"), at ¶¶ A-Z, at 2-20.

### 1. Tanner's Pregnancy and Healthcare History Before Her 2016 Arrest.

Tanner was thirty-two years old in 2016. See Partial MSJ ¶ 1, at 4 (asserting this fact);[6]

Response at 1.[7] Before 2016, Tanner was pregnant six times; four were terminated, one resulted

---

[4]The first 22 pages of the Response are contained under the heading "Plaintiffs' Response to the CCS Defendants' Statement of Facts," but are not organized in consecutively numbered paragraphs. Nevertheless, the Court cites to the pages and to the paragraphs.

[5]The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56.1(b).

[6]The portions of the Tanner Depo. to which the Correct Care Defendants cited do not support the proffered fact. The portions of the Tanner Depo. to which the Correct Care Defendants cite refer to the circumstances surrounding Tanner's prior pregnancies. The Court concludes that ACOG Antepartum Record at 1 (dated Sept. 2, 2016), filed June 14, 2019 (Doc. 303-3)("Relevant Integrative Med Spa Records")(listing Shawna Tanner's date of birth as September 21, 1983 and her age on September 2, 2016 as thirty-two years old), supports the proffered fact. The Court concludes that the record supports this sentence.

[7]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that Tanner was thirty-two years old in 2016. Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

in a miscarriage, and one resulted in a live birth.  <u>See</u> Partial MSJ ¶ 1, at 4 (asserting this fact)(citing

Deposition of Shawna Tanner at 56:8-19 (taken January 21, 2019), filed June 14, 2019 (Doc. 303-

2)("Tanner Depo.")); <u>id.</u> at 56:22-4; <u>id.</u> at 58:16-18; <u>id.</u> at 61:19-22; <u>id.</u> at 62:22-24; <u>id.</u> at 68:5-

12; <u>id.</u> at 69:14-20; <u>id.</u> at 70:17-71:6; <u>id.</u> at 73:3-5; <u>id.</u> at 81:14-18; Response at 1.[8]  Tanner's

seventh pregnancy, of which she learned in March, 2016, resulted in another stillbirth.  <u>See</u> Partial

MSJ ¶¶ 1-2, at 4 (citing Tanner Depo at 81:14-18; <u>id.</u> at 154:15-19);[9] Response at 1.[10]  On August

30, 2016, Tanner first sought pregnancy confirmation and prenatal care, and Dr. Rowe at

---

[8]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that before 2016, Tanner was pregnant six times; four were terminated, one resulted in a miscarriage, and one resulted in a live birth.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[9]The portions of the record to which the Correct Care Defendants cite cites do not support that Tanner's next pregnancy resulted in a stillbirth.  The portions of the Tanner Depo. to which the Correct Care Defendants cite support that Tanner became pregnant for a seventh time, <u>see</u> Tanner Depo. at 81:14-18, and that Tanner learned of the pregnancy in March or April of 2016, <u>see</u> Tanner Depo. at 154:15-19.  Other portions of the record support that the pregnancy resulted in a stillbirth, <u>see</u> Medical Investigator Summary and Opinion at 1, filed June 14, 2019 (Doc. 303-13)("OMI Report")(stating that the "premature infant, Jay Hinton, was stillborn via vaginal delivery at the Bernalillo County Metropolitan Detention Center" on October 17, 2016).  The Court concludes that the record supports this sentence.

[10]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that Tanner became pregnant for a seventh time, that she learned of the pregnancy in March, 2016, and that Tanner's seventh pregnancy resulted in a stillbirth.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

Integrative Medicine Spa[11] evaluated her.  <u>See</u> Partial MSJ ¶ 2, at 4 (asserting this fact)(citing Tanner Depo at 155:16-18; <u>id.</u> at 163:19-164:15);[12] Response at 1.[13]  Tanner reported that her last menstrual period occurred on February 14, 2016, six months before her appointment with Dr. Rowe.  <u>See</u> Partial MSJ ¶ 3, at 4 (asserting this fact)(citing Tanner Depo. at 163:19-164:15); Response ¶ 3 and 7,[14] at 1-2.[15]  Tanner informed Dr. Rowe that her 2016 pregnancy was her sixth pregnancy when it was her seventh.  <u>See</u> Partial MSJ ¶ 3, at 4 (asserting this fact)(citing Tanner

---

[11]Integrative Medicine Spa is also known as Lui and Rowe Integrative Medicine Spa for Health, Beauty & Wellness; it is located in Albuquerque, New Mexico, and Dr. Rowe's full name is Dr. Julian Rowe.  <u>See</u> Relevant Integrative Med Spa Records at 1, 3.  <u>See also</u> Lui & Rowe Integrative Medicine, Routine and High Risk Pregnancy Care, available at https://locu.com/places/lui-rowe-integrative-medicine-albuquerque-us/ (last visited June 13, 2019).  The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion.

[12]The portions of the deposition testimony to which the Correct Care Defendants cite do not support that Tanner sought care from Dr. Rowe, but the Court concludes that other portions of the record support this fact.  <u>See</u> Tanner Depo. at 163:16-18 (stating that the first time Tanner went to Dr. Rowe's office was August 30, 2016).

[13]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that she first sought pregnancy confirmation and prenatal care from Dr. Rowe at Integrative Medical Spa on August 30, 2016.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[14]In the Response, this paragraph is numbered "3 and 7," denoting that it provides Tanner's response to the Correct Care Defendants' proffered facts numbered 3 and 7.

[15]Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to it, so the Court deems this fact undisputed. <u>See</u> D.N.M.LR-Civ. 56.1(b).

Depo. at 155:19-25); Response at 1-2.[16]  Tanner reported that she smoked five cigarettes per day,

but that she quit in 2016, and that, as of the August 30, 2016, visit, she did not currently smoke.

See Partial MSJ ¶ 3, at 4 (asserting this fact)(citing Tanner Depo. at 155:19-25; id. at 162:8-12; id.

at 163:23-164:15); Response at 1 (objecting to the Correct Care Defendant's characterization that

Tanner told Dr. Rowe in 2016 that she was currently smoking five cigarettes per day).[17]  Dr. Rowe

determined that Tanner was twenty-eight weeks and two days pregnant, with a November 20,

2016, due date.  See Partial MSJ ¶ 4, at 5 (asserting this fact)(citing Tanner Depo. at 164:16-19);

---

[16]Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to it, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[17]The Correct Care Defendants proffered "Plaintiff reported that her last menstrual period was February 14, 2016, which was six months prior to her appointment with Dr. Rowe.  Plaintiff also informed Dr. Rowe that this was her sixth pregnancy, when it was actually her seventh. Plaintiff also reported that she smoked five cigarettes per day."  Partial MSJ ¶ 3, at 4 (citing Tanner Depo. at 155:19-25; id. at 162:8-12; id. at 163:23-164:15).  The Court alters the last sentence of the Correct Care Defendants' proffered fact, because the record does not support it.  The portion of the deposition testimony to which the Correct Care Defendants cite for the statement about the cigarettes indicates that, during Tanner's August 13, 2018, visit with Dr. Rowe, she stated that she smoked five cigarettes a day, and that she quit when she learned that she was pregnant.  See Tanner Depo. at 162:8-163:7.  Tanner testified that she was not a smoker in September, 2016, but that Pinon Perinatal, the health provider to which Dr. Rowe sent her to visit, marked her as a smoker in her third trimester, and Tanner believes they made that marking because she told them that she was smoking before she found out she was pregnant via pregnancy test.  See Tanner Depo. at 168:7-169:7.  Tanner's August 30, 2016, questionnaire completed at Integrative Medicine Spa indicates that she reported that she smoked five cigarettes a day but quit in 2016, and that she did not currently smoke.  See Relevant Integrative Med Spa Records at 14.  Tanner objects to the proffered fact to the extent that it reads as if Tanner told Dr. Rowe in 2016 that she smoked five cigarettes per day, arguing that the Correct Care Defendants provide "no admissible evidence that" Tanner smoked while pregnant in 2016.  The Court agrees that the record does not support that Tanner admitted smoking while pregnant in 2016, so the Court does not adopt this fact.

Response at 1.[18]  Dr. Rowe did not advise Tanner that hers was a high-risk pregnancy and placed no limitations on her, although he noted that she was receiving late prenatal care.  See Partial MSJ ¶ 5, at 5 (asserting this fact)(citing Tanner Depo. at 166:9-22; id. at 169:19-170:4); Response at 1.[19]

---

[18]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that Dr. Rowe estimated her at twenty-eight weeks and two days pregnant, with a November 20, 2016 due date.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

[19]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that Dr. Rowe did not advise Tanner that hers was a high-risk pregnancy and placed no limitations on her, and that he noted she was receiving late prenatal care.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

On September 2, 2016, Tanner returned to Dr. Rowe for an ultrasound and obstetric[20] visit appointment.  See Partial MSJ ¶ 6, at 5 (asserting this fact)(citing ACOG[21] Prenatal Antepartum Record at 1, filed June 14, 2019 (Doc. 303-3)("Relevant Integrative Med Spa Records")); Response at 1.[22]  At the September 2, 2016 appointment, Dr. Rowe detected fetal heart tones, and Tanner's ultrasound indicated good fluid, posterior placenta, and was consistent with dates.[23]  See

---

[20]An obstetrician

is a doctor with specialist qualifications in delivering babies and providing medical care to women during pregnancy (antenatal care) and after the birth (postnatal care). Obstetricians have the skills to manage complex or high-risk pregnancies and births, and can perform interventions and caesareans.  Many have also trained in women's reproductive health (gynaecology).

Pregnancy Birth and Baby, What is an Obstetrician?, available at https://www.pregnancybirthbaby.org.au/the-role-of-your-obstetrician (last visited September 19, 2019).  The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion.

[21] ACOG refers to the American College of Obstetricians and Gynecologists.  See Recommendations, American College of Obstetricians and Gynecologists (ACOG), available at https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Obstetric-Practice/Methods-for-Estimating-the-Due-Date?IsMobileSet=false (last visited September 19, 2019).

[22]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that she returned to Dr. Rowe on September 2, 2016, for an ultrasound and obstetric visit appointment.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

[23]"Consistent with dates" is a term common to medicine, indicating that a fetus' size is consistent with its gestational age and estimated due date, i.e., the fetus is growing normally.  See

Partial MSJ ¶ 6, at 5 (asserting this fact)(citing Relevant Integrative Med Spa Records at 2, 4).

Response at 1.[24]  On September 13, 2016, Tanner underwent another ultrasound showing good

fluid, normal fetal growth, and an estimated fetal weight in the thirty-ninth percentile.  See Partial

---

Performing Ultrasound Examinations by Certified Nurse-Midwives, UC San Diego Health at 2, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd= 6&ved=2ahUKEwijxtDeuuniAhUGpJ4KHUR7APAQFjAFegQIBBAC&url=https%3A%2F%2F health.ucsd.edu%2Fmedinfo%2Fmedical-staff%2Fapplication%2FDocuments%2FSP85%2520 Ultrasound%2520by%2520CNM-9-2016%2520.pdf&usg=AOvVaw1xOwE9RAEzr--6NcRkLjcj (last visited September 19, 2019)(directing that if ultrasound size is "consistent with dates," to document that in prenatal record, and if size is "less than or greater than expected age," to confirm that by formal ultrasound).  The American College of Obstetricians and Gynecologists, the American Institute of Ultrasound in Medicine, and the Society for Maternal-Fetal Medicine makes the following recommendation regarding estimating gestational age (a common term used during pregnancy to describe how advanced the pregnancy is, measured in weeks, see Gestational Age, MedicinePlus Medical Encyclopedia, available at https://medlineplus.gov/ency/article/002367.htm (last visited June 14, 2019)), and "[a]s soon as data from the last menstrual period (LMP), the first accurate ultrasound examination, or both are obtained, the gestational age and the [estimated due date (EDD)] should be determined, discussed with the patient, and documented clearly in the medical record."
Recommendations, American College of Obstetricians and Gynecologists (ACOG), available at https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Obstetric-Practice/Methods-for-Estimating-the-Due-Date?IsMobileSet=false (last visited September 18, 2019).  The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion.

[24]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that at the September 2, 2016 appointment, Dr. Rowe detected fetal heart tones, and Tanner's ultrasound indicated good fluid, posterior placenta, and was consistent with dates.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

MSJ ¶ 6, at 5 (asserting this fact)(citing Relevant Integrative Med Spa Records at 21, 22);[25] Response at 1 (not disputing this fact).[26] Tanner was ordered to follow up for an ultrasound in four weeks. See Partial MSJ ¶ 6, at 5 (asserting this fact)(citing Relevant Integrative Med Spa Records at 23); Response at 1.[27] On September 27, 2016, Tanner returned to Integrative Medicine Spa, her fetus' heart rate was recorded as 144, and Tanner was instructed to return in two weeks for a follow-up. See Partial MSJ ¶ 6, at 5 (asserting this fact)(citing Relevant Integrative Med Spa Records at 2); Response at 1.[28] On October 1, 2016, Tanner used methamphetamine while

---

[25]Pinon Perinatal, where Dr. Rowe referred Tanner for care, created the September 13, 2016, ultrasound report, and Hilda Avila performed the ultrasound. See Relevant Integrative Med Spa Records at 21. The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion.

[26]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that, on September 13, 2016, Tanner underwent another ultrasound showing good fluid, normal fetal growth, and an estimated fetal weight in the thirty-ninth percentile. Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[27]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that she was ordered to follow up for an ultrasound in four weeks. Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[28]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that, on September 27, 2016, Tanner returned to Integrative Medicine Spa, her fetus' heart rate

pregnant.[29]  <u>See</u> Partial MSJ ¶ 7, at 5 (asserting this fact)(citing Tanner Depo. at 27:23-25);

Response at 1.[30]

---

was recorded as 144, and Tanner was instructed to return in two weeks for a follow-up, so the Court deems this fact undisputed.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[29]For the reasons stated supra n.17, the Court does not adopt the first sentence of the Correct Care Defendants' proffered fact that Tanner "smoked during her pregnancy."  Partial MSJ ¶ 7, at 5.  <u>See</u> <u>supra</u> n.17.  The portion of the deposition testimony to which the Correct Care Defendants cite in support of this proffered fact, Tanner Depo. 162:8-12, does not support the proffered fact, so the Court does not adopt it.

[30]Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to it, so the Court deems this fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

## 2.    Tanner's Probation Violation and Subsequent Arrest.

On October 3, 2016, Tanner went to Lovelace Medical Center to evaluate her fetus.  See

Partial MSJ ¶ 8, at 5 (asserting this fact)(citing Tanner Depo. at 148:18-21);[31] Response at 1.[32]  At

the October 3, 2016, visit, Tanner did not report her methamphetamine use on October 1, 2016.

---

[31]The Correct Care Defendants provide a single deposition testimony range for the entire proffered fact, which reads:

> Plaintiff went to Lovelace Medical Center on October 3, 2016 to evaluate her fetus. However, she did not report that she had used methamphetamine two days earlier. There were no abnormalities noted in the tests performed other than protein was found in Plaintiff's urine.  She was asked to collect her urine for 24 hours and return the next business day.  [Tanner Depo.] at 148:20-149:25.

Partial MSJ ¶ 8, at 5.  For precision's sake, the Court notes that the portion of the deposition testimony which supports the first sentence of this proffered fact is located at 148:18-21, and the Court cites in the text to the precise place in the record where support for the fact can be found rather than adopting the Correct Care Defendants' broader citation to Tanner Depo. at 148:20-149:25, for the entirety of the Correct Care Defendants' proffered fact number 8, which states in full:

> Plaintiff went to Lovelace Medical Center on October 3, 2016 to evaluate her fetus.  However, she did not report that she used methamphetamine two days earlier.  There were no abnormalities noted in the tests performed other than protein was found in Plaintiff's urine.  She was asked to collect her urine for 24 hours and return the next business day.  Id. at 148:20-149:25.

Partial MSJ ¶ 8, at 5.

[32]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that, on October 3, 2016, Tanner went to Lovelace Medical Center to evaluate her fetus.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

<u>See</u> Partial MSJ ¶ 8, at 5 (asserting this fact)(citing Tanner Depo. at 148:25-149:4);[33] Response at 1.[34] Lovelace Medical Center noted no abnormalities in the tests that Tanner underwent on October 3, 2016, other than protein found in Tanner's urine. <u>See</u> Partial MSJ ¶ 8, at 5 (asserting this fact)(citing Tanner Depo. at 149:19-24);[35] Response at 1.[36] Lovelace Medical Center ordered Tanner to collect her urine for twenty-four hours and to return the next business day. <u>See</u> Partial

---

[33]For precision's sake, the Court notes that the portion of the deposition testimony which supports the second sentence of the proffered fact, that Tanner did not report her two-days-earlier methamphetamine use, is located at 148:24-149:4, and the Court cites in the text to the precise place in the record where support for the fact can be found rather than adopting the Correct Care Defendants' broader citation to Tanner Depo. at 148:20-149:25, <u>see</u> <u>supra</u> n.31.

[34]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that, on October 3, 2016, Tanner did not report her October 1, 2016 methamphetamine use to Lovelace Medical Center. Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. <u>See</u> D.N.M.LR-Civ. 56.1(b).

[35]For precision's sake, the Court notes that the portion of the deposition testimony which supports the third sentence of the proffered fact, that the tests yielded no abnormalities apart from protein in Tanner's urine, is located at 149:19-24, and the Court cites in the text to the precise place in the record where support for the fact can be found rather than adopting the Correct Care Defendants' broader citation, to Tanner Depo. at 148:20-149:25. <u>See</u> <u>supra</u> n.31.

[36]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that the tests yielded no abnormalities apart from protein in Tanner's urine. Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. <u>See</u> D.N.M.LR-Civ. 56.1(b).

MSJ ¶ 8, at 5 (asserting this fact)(citing Tanner Depo. at 149:14-25);[37] Response at 1 (not disputing this fact).[38]

---

[37]For precision's sake, the Court notes that the portion of the deposition testimony which supports the third sentence of the proffered fact, that Lovelace Medical Center ordered Tanner to collect her urine for twenty-four hours and to return the next business day, is located at 149:14-25, and the Court cites in the text to the precise place in the record where support for the fact can be found rather than adopting the Correct Care Defendants' broader citation to Tanner Depo. at 148:20-149:25, see supra n.31.

[38]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that Lovelace Medical Center ordered Tanner to collect her urine for twenty-four hours and to return the next business day. Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

On October 4, 2016, Tanner reported to her parole officer and submitted a urine sample.

See Partial MSJ ¶ 9, at 5 (asserting this fact)(citing Tanner Depo. at 153:1-15);[39] Response at 1.[40]

Before giving her sample, Tanner inserted a plastic bottle covered in tape, which Tanner believed

to contain another individual's urine,[41] into herself. See Partial MSJ ¶ 9, at 5 (asserting this

---

[39]For precision's sake, the Court notes that the portion of the deposition testimony which supports this fact, that Tanner submitted a urine sample to her parole officer on October 4, 2016, is located at 153:1-15, and the Court cites in the text to the precise place in the record where support for the fact can be found rather than adopting the Correct Care Defendants' broader citation to Tanner Depo. at 150:1-151:4; id. at 191:22-192:15; id. at 197:13-25, for the entirety of the Correct Care Defendants' proffered fact number 9, which states in full:

> Plaintiff reported to her parole officer on October 4, 2016 and gave a urine sample. Prior to giving her sample she inserted into her vagina a plastic bottle covered in tape filled with another individual's urine. However, the bottle "went sideways" so Plaintiff was unable to use it during her urine test. Plaintiff's urine sample was positive for methamphetamine and she was arrested on October 4, 2016 for violating her probation. Id. at 150:1-151:4, 191:22-192:15; 197:13-25.

Partial MSJ ¶ 9, at 5-6.

[40]Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to it, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[41]Tanner disputes the Correct Care Defendants' characterization of the bottle as "filled with another individual's urine." Partial MSJ ¶ 9, at 5. See Response at 2. Tanner contends that the Correct Care Defendants do not cite any evidence "to show that the contents of the plastic bottle were tested and found to contain another individual's urine," Response at 2, and the Court agrees that the record does not support the proffered fact as stated. At the deposition, Ms. Martinez asks Tanner, "And you've already testified that it was someone else's urine, correct?" to which Tanner responds: "I believe so, yes." Tanner Depo. at 197:18-20. Ms. Martinez then asks Tanner, "And you don't recall whose it was?" and Tanner responds: "No." Tanner Depo. at 197:21-22. The Court altered the proffered fact to more accurately reflect the record, that Tanner subjectively believed the bottle to contain another individual's urine. Tanner also objects to the proffered fact as "immaterial." Response at 2. The Court will therefore consider this fact undisputed. See

- 16 -

fact)(citing Tanner Depo. at 197:13-25), Response at 2.[42]  The bottle "went sideways," so Tanner

was unable to use it during her urine test, and her sample tested positive for methamphetamine.

Partial MSJ ¶ 9, at 5-6 (asserting this fact)(citing Tanner Depo. at 191:22-24).[43]  See Response at

1-2.[44]  On October 4, 2016, pursuant to the positive urine sample drug test, Tanner was arrested

---

D.N.M.LR-Civ. 56.1(b).  The Court has previously held that a "relevance argument . . . does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

[42]Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to it, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[43]For precision's sake, the Court notes that the portion of the deposition testimony which supports this fact, that the bottle went sideways and that Tanner was unable to use it for the urine test, is located at 191:22-24, and the Court cites in the text to the precise place in the record where support for the fact can be found rather than adopting the Correct Care Defendants' broader citation to Tanner Depo. at 150:1-151:4; id. at 191:22-192:15; id. at 197:13-25, see supra n.39.

[44]Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to it, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

for violating her probation, pending a full probation violation hearing.  See Partial MSJ ¶ 9, at 6

(asserting this fact)(citing Tanner Depo. at 153:1-5)[45]; Response at 1-2.[46]

### 3.    Correct Care's Intake and Screening of Tanner at Metropolitan Detention.

Upon her arrival at the Metropolitan Detention Center in the County of Bernalillo, New

Mexico ("Metropolitan Detention"), Tanner received an initial medical screening interview, at

which a Receiving Screening Form was at least partially completed.  See Partial MSJ ¶ 10, at 6

(asserting this fact)(citing Receiving Screening at 1 (dated October 4, 2016)), filed June 14, 2019

(Doc. 303-4)("Oct. 4, 2016 Receiving Screening Form");[47] Response at 1.[48]  Medical staff from

Correct Care Solutions LLC ("Correct Care"), a Kansas Limited Liability Company with a site

---

[45]For precision's sake, the Court notes that the portion of the deposition testimony which supports this fact, that Tanner was arrested for violating her probation pursuant to the positive drug test, is located at 153:1-5, and the Court cites in the text to the precise place in the record where support for the fact can be found rather than adopting the Correct Care Defendants' broader citation to Tanner Depo. at 150:1-151:4; id. at 191:22-192:15; id. at 197:13-25, see supra n.39.

[46]Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to it, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[47]The Correct Care Defendants denote this exhibit as "Common Deposition Exhibit 15" and attach it as "Exhibit D."  Partial MSJ ¶ 10, at 6.  The Court denotes it as Oct. 4, 2016 Receiving Screening Form for clarity.

[48]Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to the fact that, on October 4, 2016, she underwent an initial screening interview at Metropolitan Detention at which the Oct. 4, 2016 Receiving Screening Form was at least partially filled out.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

office at Metropolitan Detention, Complaint ¶ 6, at 2, noted that "CCC pregnancy entered Prenatals ordered, Pregnancy labs ordered per protocol, Off-site coordinator notified via e-mails, pregnancy diet started," Partial MSJ ¶ 10, at 6 (asserting this fact)(citing Oct. 4, 2016 Receiving Screening Form at 3), Response at 2.[49]  Tanner disclosed that she was pregnant at the initial intake on October 4, 2016, Tanner was in the third trimester of her pregnancy, and her pregnancy was obvious from the size of her abdomen.  See Partial MSJ ¶ 10, at 6 (asserting this fact)(citing Oct. 4, 2016 Receiving Screening Form at 1); Response at 2.[50]  The Oct. 4, 2016 Receiving Screening Form

_____

[49]Tanner "dispute[s] the account of Ms. Tanner's intake screening at MDC provided in [the Correct Care Defendants' Statements of Fact] No. 10."  Response at 2.  Tanner does not dispute, however, that the Oct. 4, 2016 receiving form includes the text "CCS pregnancy entered Prenatals ordered, Pregnancy labs ordered per protocol, Off-site coordinator notified via e-mail. pregnancy diet started," on page 3, and, upon reviewing the Oct. 4, 2016 Receiving Screening Form, the Court concludes that it contains the proffered text, and, therefore, that the record supports the fact. Although Tanner does not say explicitly that she does not dispute this proffered fact, Tanner does not controvert it or assert any objection to the fact that Correct Care medical staff made this note on the form, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[50]Although the Oct. 4, 2016 Receiving Screening Form indicates that the intake staff observed Tanner's pregnancy, it does not indicate that Tanner herself disclosed her pregnancy. Tanner, in the Response, states only that "[h]er pregnancy was obvious from the size of her abdomen, and MDC staff knew about it at the time of her intake."  Response at 2.  Although Tanner does not say explicitly that she does not dispute that she told intake staff about her pregnancy, Tanner does not controvert it or assert any objection to it, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  In the Reply, the Correct Care Defendants do not specifically controvert Tanner's assertion in the Response that her pregnancy was obvious from the size of her abdomen, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

does not mention that Lovelace Hospital asked Tanner to provide a twenty-four hour urine sample.

See Partial MSJ ¶ 10, at 6 (stating that Tanner did not disclose that "she had been asked to provide a 24 [hour] urine sample to Lovelace Hospital" (citing Oct. 4, 2016 Receiving Screening Form at 1-6 (not stating this information))), Response at 2 (not disputing that the form does not include this information).[51]   The Oct. 4, 2016 Receiving Screening Form does not indicate that Tanner was

_____

In the Declaration of Shawna Tanner ¶ 2, at 1 (executed Jan. 17, 2019), filed June 3, 2019 (Doc. 286-1)("Tanner Decl."), however, Tanner states that she "told the intake staff that [she] was pregnant" on October 4, 2016.  Tanner Decl. ¶ 2, at 1.  The Court concludes that the record supports the text's fact.

[51]The Oct. 4, 2016 Receiving Screening Form does not indicate that intake staff asked Tanner whether she was asked to provide a urine sample anywhere, and it does not indicate that Tanner "had been asked to provide a 24 [hour] urine sample to Lovelace Hospital."  Partial MSJ ¶ 10, at 6.  The Correct Care Defendants aver that Tanner did not disclose this fact, but Tanner notes that the fact's omission from the Oct. 4, 2016 Receiving Screening Form is not dispositive where the form "was completed by EMT Roger Boydston, not by Ms. Tanner herself, and the form contains an obvious inaccuracy," referring to the form's notations that Tanner was pregnant and had her last period 9 months ago, as well as the form's notation in response to another question that Tanner was not currently pregnant.  Response at 2 (citing Oct. 4, 2016 Receiving Screening Form at 1-6).  Tanner notes that she went to Lovelace the day before her intake and that providers there ordered twenty-four-hour urine collection.  See Response at 2 (citing Tanner Decl. ¶ 2, at 1). In the Tanner Decl., Tanner states:

> I even had the lab sheet with me that I was supposed to take to Lovelace the next day for a protein test my prenatal care providers had ordered when I saw them at Lovelace the day before.  During my intake screening interview at MDC, no one asked me to sign a release so they could get the medical records documenting my prenatal care before I arrived there; no one looked at the lab sheet I brought with me; and no one did any kind of examination to find out more about my pregnancy.

Tanner Decl. ¶ 2, at 1.  Tanner avers that she "informed MDC staff of [the fact that she had been to Lovelace the day before intake, and that providers there ordered a twenty-four-hour urine collection for her] and had the lab form with her when she arrived at MDC . . . ."  Response at 2-3 (citing Tanner Decl. ¶ 2, at 1; Laboratory Downtime Requisition, filed June 3, 2019 (Doc. 287-2)("Lab Form")).  Although Tanner attests in the Tanner Decl. that she had the lab form with her,

receiving prenatal care or that she had a follow up appointment with Dr. Rowe on October 11, 2016, but the intake form does contain additional inaccuracies or omissions by the Correct Care Defendants' staff.  See Partial MSJ ¶ 10, at 6 (stating that Tanner did not disclose that "she had a follow-up appointment with Dr. Rowe on October 11, 2016" (citing Oct. 4, 2016 Receiving Screening Form at 1-6 (not stating this information))); Response at 2 (not disputing that the form does not include this information, but noting that the form does not indicate the Tanner was pregnant, which is "an obvious inaccuracy").[52]  On October 4, 2016, Tanner "filled out a sick call

---

neither her declaration nor the Lab Form evidences that Tanner told the Metropolitan Detention intake staff about the form or its contents, or that Metropolitan Detention intake staff knew Tanner had the form in her possession.  The Court cannot determine from the record whether Tanner did or did not disclose the form's contents, namely, the request from Lovelace Hospital for a twenty-four-hour urine sample, during her intake proceedings.  The Court, therefore, alters the fact to better reflect the record -- that the Oct. 4, 2016 Receiving Screening Form did not reflect this information, which neither party disputes.

[52]The Oct. 4, 2016 Receiving Screening Form does not indicate that Tanner was receiving prenatal care or that she had a follow-up appointment with Dr. Rowe on September 11, 2016, but includes notations that Tanner was not pregnant.  See Partial MSJ ¶ 10, at 6; Response at 2.  Tanner avers that she "informed MDC staff during her intake that she was receiving prenatal care," and that the facts' omission from the Oct. 4, 2016, Receiving Screening Form is not dispositive where the form "was completed by EMT Roger Boydston, not by Ms. Tanner herself, and the form contains an obvious inaccuracy," referring to the form's notations that Tanner was pregnant and had her last period 9 months ago, as well as the form's notation in response to another question that Tanner was not currently pregnant.  Response at 2 (citing Oct. 4, 2016 Receiving Screening Form at 1-6).  Tanner notes that the Metropolitan Detention intake staff "did not contact her doctors, ask her to sign any release, request her medical records, or arrange for her to be taken to her previously-scheduled October 11, 2016 appointment."  Response at 2 (citing Videotaped Deposition of Steffen Brown at 43:25-44:5 (taken April 10, 2019), filed June 3, 2019 (Doc. 286-6)("Brown Depo.")(stating that Tanner had a recorded appointment on October 11, 2016, at 11:00 a.m.); Tanner Decl. ¶ 2, at 1 ("During my intake screening interview at MDC, no one asked me to sign a release so they could get the medical records documenting my prenatal care before I arrived there . . . ."); McMurray Depo. at 218:25-219:7 (stating that Dr. McMurray did not have

- 21 -

request form requesting prenatal vitamins," which the Correct Care medical team provided, and Tanner also received a "pregnancy diet consisting of an extra meal and milk." Partial MSJ ¶ 12, at 6 (stating this fact)(citing Tanner Depo. at 178:17-179:15; id. at 180:7-181:11), Response at 1 (not disputing this fact).[53] Every day, Tanner received her prenatal vitamins from a "med pass" nurse, a nurse responsible for distributing medications or vitamins, and Tanner never communicated to the "med pass" nurse that she was having issues related to her pregnancy. Partial MSJ ¶ 13, at 6 (stating this fact)(citing Tanner Depo. at 190:10-13, id. at 191:1-4), Response at 1 (not disputing this fact).[54]

---

information about Tanner's prenatal care before her October, 2016 incarceration)). The record reflects that Tanner was receiving prenatal care and had an October 11, 2016 follow-up appointment, and that Dr. McMurray did not know about either the care or the appointment, because that information was not captured, but the Court cannot determine from the record whether Tanner attempted to or disclosed her prenatal care or follow-up appointment during intake. Therefore, the Court alters the fact to better reflect the record -- that the Oct. 4, 2016 Receiving Screening Form did not reflect this information, which neither party disputes.

[53]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that, on October 4, 2016, she completed a sick call request form requesting prenatal vitamins and that the Correct Care medical team provided her with the vitamins and a pregnancy diet consisting of an extra meal and milk. Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[54]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that she received her prenatal vitamins from a nurse every day, and that she never communicated to that nurse that she was having issues related to her pregnancy. Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

**4.      Correct Care and Its Staffing on October 16 and 17, 2016.**

Dr. McMurray was the only physician working at Metropolitan Detention on the weekend of October 14-16, 2016.  See Response ¶ S, at 31 (citing Deposition of Christopher Mercer, at 14:21-15:12 (taken March 20, 2019), filed June 3, 2019 (Doc. 286-18 ("Mercer Depo.")); Deposition of Adriana Trujillo [formerly Luna], at 120:2-24 (taken October 24, 2018), filed June 3, 2019 (Doc. 286-12)("Luna Depo.").[55]  During the weekend of October 14-16, Luna was the only "Med One"[56] nurse working the day shift, and Sanchez was the only Med One nurse working

―――――――――――――

[55] The Correct Care Defendants do not specifically state whether they admit or dispute this fact, but state the "Plaintiff's brief account of who was, was not, or (in Plaintiff's view) should have been working during October 14 through 17, 2017, is immaterial to the matter at bar[.]" Reply ¶ S, at 15.  A materiality issue is not a factual dispute.  The Court will address materiality in this opinion's Analysis section.  See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  The Court concludes that the record to which Tanner cites in support of the text's fact supports the text's fact, as Mercer was away from work at a wedding on the weekend of October 14-16.  See Luna Depo. at 120:2-24; Mercer Depo. at 14:21-15:12.  The Court concludes that the Correct Care Defendants do not assert a genuine dispute to the text's fact, and the Court has no independent reason to doubt its accuracy, because the record to which Tanner cites supports the fact, so the Court adopts it as undisputed for this motion's purposes.  See D.N.M.LR-Civ. 56.1(b).

[56] Med One nurses were nurses stationed in the infirmary at Metropolitan Detention unless there was an emergency requiring them to perform services elsewhere in the prison.  See Luna Depo. at 32:11-16.  Unlike sick call nurses who make rounds in the housing pods, Med 1 nurses doing inmate assessments had the inmates brought to them.  See Luna Depo. at 32:17-21.  Med One nurses are now referred to as charge nurses at Metropolitan Detention.  See Deposition of Taleigh [sic] Sanchez, R.N., at 17:9-11 (taken Nov. 15, 2018), filed June 19, 2019 (Doc. 317-9)("Sanchez Depo.).  Charge nurses, in addition to their nursing responsibilities, provide guidance or supervision for more urgent medical interventions, and perform administrative duties such as obtaining nursing coverage, solving problems within departments such as the detoxification unit or with the individuals distributing medications.  See Sanchez Depo. at 17:25-19:7.  The Court

the night shift.  See Response ¶ T, at 31 (stating this fact)(citing Luna Depo. at 86:9-12, 120:2-8;

Sanchez Depo. at 69:14-20).[57]  The only other medical professionals on site during the night shift

were the Med 3 staff, who are paramedics and EMTs.  See Reply ¶ T, at 16 (stating this fact)(citing

Sanchez Depo. at 52:24-53:19; Luna Depo. at 83:23-84:16.  Both Sanchez and Luna had the

authority to order off-site transportation to emergency care on the weekend of October 14-16,

2016.  See Response ¶ T, at 31 (stating this fact)(citing Jordan Depo. at 121:2-19).[58]

---

offers this information solely as background for the reader's edification, and does not present these
facts as the truth or as facts material to the issues in this opinion.

    [57] The Correct Care Defendants do not specifically state whether they admit or dispute the
text's fact, but add that "'Med One' nurses were not the only medical personnel on staff on October
16 and 17, 2017, even during the overnight hours."  Reply ¶ T, at 16 (stating this fact)(citing
Sanchez Depo. at 52:24-53:19; Luna Depo. at 83:23-84:16).  The Court deems this fact undisputed,
because the Surreply does not specifically controvert it, and because the Court has no independent
reason to doubt the accuracy of the record to which Tanner cites.  See Fed. R. Civ. P. 56(e)(2);
N.M. Consol. Constr. LLC v. City Council of the City of Santa Fe, 97 F. Supp. 3d 1287, 1292 n.6
(D.N.M. 2015)(Browning, J.)(accepting a fact as undisputed pursuant to Rule 56(e)(2), because it
was not disputed, and the Court had no independent reason to doubt its accuracy).  There is also
no genuine dispute regarding Sanchez' position as the only oncoming Med 1 nurse, because both
Tanner and the Correct Care Defendants propose this fact.  See Partial MSJ ¶ 28, at 9 (citing
Sanchez Depo. at 126:1-6); Response at 15 (citing Luna Depo. at 187:21-23).  The Court, therefore,
adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b).

    [58] The Correct Care Defendants do not specifically state whether they admit or dispute the
text's fact.  The Court concludes the record supports this fact and deems it undisputed, because the
Reply does not specifically controvert it, and because the Court has not independent reason to
doubt the accuracy of the record to which Tanner cites.  See Jordan Depo. at 121:2-19 (stating that,
"in an emergency case . . . [e]veryone is empowered to get a person, that's in a true emergency,
out of the site and get care for them").

**5.      Tanner's Treatment and Health During Her Incarceration.**

Tanner stated that she was having leg cramps every morning during her incarceration in 2016.  See Partial MSJ ¶ 13, at 6 (stating this fact)(citing Tanner Depo. at 206:17-207:8), Response at 1.[59]  Michelle Bouyer, a Correct Care employee responsible for scheduling off-site visits for inmates at the Correct Care providers' direction, maintained a spreadsheet tracking pregnancy off-site appointments, and one version of that spreadsheet indicated that Tanner was scheduled for an off-site prenatal appointment at Milagro[60] on October 27, 2016.  See Partial MSJ ¶ 11, at 6 (stating that "CCS personnel also scheduled plaintiff to be sent to the off-site OB clinic on October 27, 2016")(citing Deposition of Michelle Bouyer at 55:24-5 (taken March 26, 2019), filed June 14, 2019 (Doc. 303-5)("Bouyer Depo. CCS Excerpts")); [61] Response at 3 (not disputing that a

---

[59]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that she was experiencing daily leg cramps.  Tanner's argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

[60]Milagro refers to the Milagro Clinic at the University of New Mexico School of Medicine, which "was started in 1989 as the first program in the state of New Mexico for pregnant women with substance abuse/addiction issues."  Milagro Clinic, UNM School of Medicine, https://fcm.unm.edu/for%20patients/milagro_clinic.html (last accessed September 19, 2019).  The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion.

[61]Tanner filed an exhibit containing different excerpts from the same deposition.  See Deposition of Michelle Bouyer (taken March 25, 2019), filed June 3, 2019 (Doc. 286-5)("Bouyer Depo. Tanner Excerpts").

spreadsheet which Correct Care disclosed states that Tanner was scheduled for an October 27, 2016 prenatal appointment at Milagro).[62]

On October 12, 2016, Tanner underwent a urinalysis and urine pregnancy test, and signed an Informed Consent for HIV (dated Oct. 12, 2016), filed June 3, 2019 (Doc. 287-4)("HIV Test Consent Form"), although Tanner later refused an HIV test, see Partial MSJ ¶ 14, at 6 (stating this fact)(citing Medical History and Physical Assessment with Mental Health (dated October 14, 2016), filed June 14, 2019 (Doc. 303-6)("Oct. 14, 2016 Screening Form")); Response at 3-5.[63] On

---

[62]Tanner disputes that "CCS personnel scheduled a prenatal appointment for Ms. Tanner at 'the off-site OB clinic' for October 27, 2016." Response at 3 (quoting Partial MSJ ¶ 11, at 6). Tanner contends that the Correct Care Defendants cite only to Bouyer's deposition testimony, and that Bouyer is a Correct Care administrative employee and not a member of the medical staff. See Response at 3. Tanner also contends that the spreadsheet on which Tanner's alleged appointment is recorded "contains discrepancies in dates and was not a version of the spreadsheet that Ms. Bouyer created or printed herself." Response at 3. Further, Tanner avers that Bouyer testified "that additional documentation from a provider was necessary to initiate and complete the off-site referral process, and that if such documents existed, they were not retained and were probably shredded . . . ." Response at 3 (citing Bouyer Depo. Tanner Excerpts at 28:2-5, id. at 32:22-34:20, id. at 35:9-13, id. at 36:10-20; id. at 45:1-46:12, id. at 58:20-59:6, id. at 59:10-21, id. at 60:9-62:22, id. at 63:3-5). Having reviewed the record, the Court concludes that neither party disputes that Bouyer was responsible for scheduling inmates for off-site prenatal and pregnancy-related appointments based on provider referrals, and that at least one version of a spreadsheet which Bouyer kept -- although Bouyer could not verify that the version of the spreadsheet at issue had not been altered by another individual -- included reference to an off-site prenatal appointment scheduled for Tanner on October 27, 2016 at Milagro. The Court adopts the undisputed portion of the proposed fact, which the record reflects.

[63]The Correct Care Defendants aver that medical staff performed a urinalysis and urine pregnancy test for Tanner on October 12, 2016. See Partial MSJ ¶ 14, at 6. In support of this proposed fact, the Correct Care Defendants cite to the Oct. 14, 2016 Receiving Screening Form. The Court notes that the Oct. 14, 2016 Receiving Screening Form contains no mention of either a urinalysis or urine pregnancy test, and, further, it documents a screening performed on October 14, 2016, rather than on October 12, 2016. See Oct. 14, 2016 Screening Form at 1-3. Although

October 16, 2016, Luna worked as the "Med 1" nurse at Metropolitan Detention.  See Partial MSJ

¶ 15, at 7 (stating this fact)(citing Deposition of Adriana Trujillo [formerly Luna], at 119:24-120:1

(taken October 24, 2018), filed June 3, 2019 (Doc. 286-12)("Luna Depo.")); Response at 1.[64]

---

Tanner does not say explicitly that she does not dispute that she underwent a urinalysis and urine
pregnancy test on October 12, 2016, Tanner does not controvert this fact or assert any objection to
it, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").  The
Correct Care Defendants' cited portion of the record does not properly support their assertion of
fact, where the Oct. 14, 2016 Receiving Screening Form contains no mention of either a urinalysis
or urine pregnancy test, and, further, it documents a screening performed on October 14, 2016,
rather than on October 12, 2016, and Tanner's response does not specifically address that fact as
rule 56(c) of the Federal Rules of Civil Procedure requires.  Pursuant to rule 56(e) of the Federal
Rules of Civil Procedure, however, the Court may, but need not, consider facts improperly
supported undisputed, and the Court does so here.  See Fed. R. Civ. P. 56(e)(2).

Tanner also sets forth context for her refusal of an HIV test:

Ms. Tanner initially signed a consent form for the HIV test and only signed the
refusal form after the CCS employee attempting to draw blood for the test made
several unsuccessful attempts and was hurting Ms. Tanner's arm.  [HIV Test
Consent Form].  Ms. Tanner also told the CCS employee that she had been
receiving prenatal care before she got to MDC and already had taken an HIV test.
In addition, Ms. Tanner asked the CCS employee questions like: How do I receive
my prenatal care?  When can I see a doctor?  The CCS employee said they would
get back to Ms. Tanner on that, but no one ever did.  [Tanner Decl. ¶ 7; Tanner
Depo. at 189:8-189:21].

Response at 3-4.  The Court concludes that the record supports that Tanner initially signed an HIV
testing consent form and that the parties do not dispute that she later refused an HIV test.  In the
Reply, the Correct Care Defendants do not specifically controvert Tanner's additional facts
surrounding her HIV test refusal.  See D.N.M.LR-Civ. 56.1(b).

[64]Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact,
"except to the extent [that it is] incomplete or misleading because [it] does not include the
additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however,
that Luna worked at Metropolitan Detention as the Med 1 nurse on October 16, 2016.  Tanner's

Early on October 16, 2016, when Tanner was still locked in her cell, "fluid began gushing from Ms. Tanner's vagina." Response at 4 (stating this fact)(citing Tanner Decl. ¶¶ 9-11, at 3; Declaration of Ashlee Custy ¶¶ 10-11, at 3 (taken Feb. 18, 2019), filed June 3, 2019 (Doc. 286-2)("Custy Decl.").[65] Tanner attempted to inform corrections officers of her condition, but could not leave her cell until after med pass, sometime between 7:08 and 7:30 a.m. See Response at 4 (stating this fact)(citing Tanner Decl. ¶¶ 10-11, at 3; Custy Decl. ¶ 11, at 3.[66] Tanner "inserted

---

argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[65] In the Reply, the Correct Care Defendants do not dispute these facts. The Court, therefore, adopts these facts as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). Further, the Court notes that the Lt. Jackson Pod Log at 1, filed June 3, 2019 (Doc. 287-17)("Jackson Pod Log"), and to which Tanner cites in the Response, see Response at 4, notes at 8:20 a.m. on October 16, 2016 that Tanner "claims her water broke on grave and she has been having contractions all night. Inmate is 34 weeks and spotting also . . . ," Jackson Pod Log at 1. The Jackson Pod Log also includes notes from the graveyard, or overnight shift for the night of October 15, 2016, but contains no mention of Tanner in the overnight notes. See Jackson Pod Log at 1.

[66] The Tanner Decl. does not mention Tanner attempting to inform a corrections officer while she was locked in her cell. It states:

> 10. After talking with my cellmate about what happened earlier that morning, October 16, 2016, we both laid back down in our cell. I still felt like my body was trying to tell me something, and then I noticed my legs were cramping. Around 8:00 a.m., when the corrections officers let us out of our cells for med pass, I also noticed some light red spotting.

> 11. When the corrections officers allowed me to leave my cell that morning, I walked up to the corrections officer stationed at the desk in my pod, told her what was happening, and asked to go to medical for an examination . . . .

her fingers into her vagina and attempted to feel for her cervix and the fetus," because she felt pressure, cramping, and discharge, and wanted to check if the baby was coming out, because she was concerned that she would not receive medical attention in time and that it was her only option. See Partial MSJ ¶ 18, at 7 (stating that Tanner inserted her fingers into her vagina and attempted

---

Tanner Decl. ¶¶ 10-11, at 3. Tanner's cellmate, Ashlee Custy, mentions an interaction she had with Tanner and a corrections officer while Custy and Tanner were locked in their cell. See Custy Decl. ¶¶ 11-12, at 3. Custy states:

> 11. At the time Ms. Tanner was having the discharge I described above, we were confined to our cells. Ms. Tanner and I talked with each other about the discharge to try to figure out what was happening to her. I had been pregnant before, and to me it seemed like her water broke and she was going into labor. We told a corrections officer who walked by our cell that Ms. Tanner was bleeding and it looked like her water broke and she was going into labor.

> 12. The corrections officers did not seem to take Ms. Tanner's condition seriously or respond appropriately to her requests for medical attention. At one point, a corrections officer threatened Ms. Tanner by telling her that she would have to deliver her baby in the jail. A corrections officer also warned her not to fake it, or they would just take her to the infirmary and put her in a segregation cell.

Custy Decl. ¶¶ 11-12, at 3. The Court notes that Tanner does not set forth these facts as additional material facts, but rather asserts them in disputing the Correct Care Defendants' proposed facts outlining "the reasons for the delay in bringing Ms. Tanner to the medical unit on the morning of October 16, 2016 . . . ." Response at 4. In the Reply, the Correct Care Defendants do not dispute these facts. The Court, therefore, adopts these facts as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court, drawing reasonable inferences in Tanner's favor, includes as fact for the purposes of this Memorandum Opinion and Order, that Tanner was unable to leave her cell until after med pass and that she attempted to inform an unnamed corrections officer of her condition. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).

to feel for her cervix and the fetus because she felt pressure, cramping, and liquid coming out)(citing Tanner Depo. at 219:19-220:10); Response at 6 (not disputing that Tanner felt the need to "touch her vagina on the morning of October 16, 2016," but adding that she felt that it was her only option because everyone was too busy to see her, after she requested medical attention).[67]

---

[67]Tanner does not dispute that she inserted her fingers into her vagina and attempted to feel for her cervix and the fetus, or that she felt pressure, cramping, and liquid coming out. See Response at 6. The Court, therefore, adopts these facts as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). Tanner adds that she was told everyone was too "busy" to see her after she requested medical attention, Response at 6 (quoting Rodriguez-Nunez Depo. at 106:25-107:11), and that she and her cellmate felt they were being ignored and that it was their only option, see Custy Decl. ¶¶ 15-16, at 4. The Rodriguez-Nunez Depo. portion to which Tanner cites in support of her proffered fact that she felt everyone was too busy to see her refers to Rodriguez-Nunez' call with Luna during which Luna told Rodriguez-Nunez that she was busy and could not attend to Tanner immediately. See Rodriguez-Nunez Depo. at 106:25-107:11. The call during which Luna told Rodriguez-Nunez she was busy took place around 7:36 a.m., after Tanner could leave her cell, and after she inserted her fingers into her vagina to attempt to feel her cervix and the fetus. See supra n.65. The portion of the Rodriguez-Nunez Depo. to which Tanner cites does not, therefore, support her assertion that her feeling that medical personnel were too busy to see her motivated her to check her cervix herself while locked in her cell. Pursuant to rule 56(e), the Court may, but need not, consider undisputed facts that are improperly supported, see Fed. R. Civ. P. 56(e)(2), and the Court does not consider this improperly-supported, but undisputed, fact, because the record cannot support it. The Court does, however, consider as fact that Tanner was concerned she would not receive medical attention in time and that checking her cervix herself was her only option, because the Correct Care Defendants do not dispute this fact in their Reply, see D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."), the Custy Decl. supports it, see Custy Decl. at ¶¶ 15-16, at 4 ("Because we were in lockdown in our cells and the corrections officers were ignoring our pleas for help, . . . our only option was to figure out how to handle the delivery ourselves . . . ."), and, although Tanner does not herself state that she felt it to be her only option, the Court draws all reasonable inferences in Tanner's favor. See Hunt v. Cromartie, 526 U.S. at 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).

On October 16, 2016 at or around 7:36 a.m., Claudia Rodriguez-Nunez, the day-shift officer stationed in Tanner's housing pod, called Luna and informed her that Tanner was not feeling well, that she was pregnant, and that she was spotting. See Partial MSJ ¶ 16, at 7 (stating this fact)(citing Luna Depo. at 122:8-123:22), Response at 4.[68] Luna responded that she was unable to see Tanner immediately, because she was busy, and indicated that she would call Rodriguez-Nunez back when she could see Tanner. See Partial MSJ ¶ 16, at 7 (stating this fact)(citing Luna Depo. at 122:8-123:22); Response at 5.[69] Luna called Rodriguez-Nunez back and told Rodriguez-Nunez that

_____

[68]The portion of the Luna Depo. to which the Correct Care Defendants cite in support of this proposed fact refers only to Rodriguez-Nunez as a pod officer and does not mention her by name. See Luna Depo. at 122:8-9. Tanner disputes "the account of the reasons for the delay in bringing Ms. Tanner to the medical unit on the morning of October 16, 2016," but does not dispute that her pod officer, whom she names as Rodriguez-Nunez, called Luna on her behalf. Response at 4. Tanner accounts that "Rodriguez-Nunez called medical at about 7:36am [sic] that morning and told Defendant Luna that a pregnant inmate was reporting bleeding and other symptoms." Response at 4 (citing Housing Pod Shift Log at 2, filed June 3, 2019 (Doc. 287-18)("Housing Pod Shift Log"); Deposition of Claudia Rodriguez-Nunez at 134:4-12 (taken Oct. 10, 2018), filed June 3, 2019 (Doc. 286-19)("Rodriguez-Nunez Depo.")). The Correct Care Defendants, in their proposed fact, state that Tanner asked a corrections officer to be seen for medical care and that officer then informed Luna of Tanner's request. See Partial MSJ ¶ 16, at 7. The Correct Care Defendants do not state the time that the request was made or what information was relayed. See Partial MSJ ¶ 16, at 7. Tanner, in her Response, provides the request's time as 7:36 a.m., and states that Rodriguez-Nunez informed Luna that Tanner was pregnant and spotting. See Response at 4 (citing Housing Pod Shift Log at 2, Rodriguez-Nunez Depo. at 134:4-12). In the Reply, the Correct Care Defendants do not dispute these facts. The Court, therefore, adopts these facts as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[69]The Court concludes that it is undisputed only that Luna was unable to see Tanner immediately, because she was busy, and that she stated she would call Rodriguez-Nunez back when she was able to see Tanner. The Court, therefore, alters the fact from the Correct Care Defendants' proposed fact, which states that Luna could not evaluate Tanner immediately because she was decontaminating male inmates who had been pepper-sprayed and that Luna would call

Rodriguez-Nunez when it was appropriate for a female to be in the medical unit.  <u>See</u> Partial MSJ ¶ 16, at 7.  The Correct Care Defendants proffer:

> Nurse Luna was unable to immediately evaluate Plaintiff as she was in the process of decontaminating a group of male inmates who had been sprayed with pepper spray.  Nurse Luna told the officer she would call her back when it was appropriate for a female inmate to be in the medical unit.

Partial MSJ ¶ 16, at 7.  The portions of the Luna Depo. to which the Correct Care Defendants cite offer support for the fact as the Correct Care Defendants state it.  <u>See</u> Luna Depo. at 122:8-123:22. Tanner disputes this characterization, stating:

> Defendant Luna responded [to Rodriguez-Nunez' call regarding Tanner] that she was "busy" and did not call back for nearly an hour.  Defendant Luna was not decontaminating inmates during that time, because the first two inmates were not in the infirmary for that purpose until around 8:36 a.m.  Video recordings show that Ms. Tanner had already left Pod F7 at 8:32 a.m. and was in the infirmary's waiting area until 8:56 a.m., after which Defendant Luna saw her for only five minutes.  In any event, decontaminating inmates exposed to pepper spray did not require a registered nurse, as it simply involved changing their uniforms and rinsing their eyes and face with water in an eye-rinsing station, if necessary, which "anybody can do."  [The Correct Care Defendants' proffered fact number 16] cites no admissible evidence of  policy against having male and female inmates in the medical facilities at MDC simultaneously.  The front of the medical unit is not gender-segregated but has separate halls and rooms allowing inmates to be segregated by gender when necessary while they are there . . . .  Two other male inmates were brought to the infirmary for pepper spray exposure at 10:05 a.m. when Defendant Luna was responding to the "Code 43" medical emergency regarding Ms. Tanner, and those inmates' presence in the infirmary did not preclude Ms. Tanner from being brought there during the same period of time.  The OPS report . . . contains a statement from one of the inmates who was in the infirmary for pepper spray exposure at the time Defendant Luna was interacting with Ms Tanner in response to the "Code 43".  Defendant Luna did not want other inmates in the infirmary at the same time in order to prevent them from witnessing and reporting her mistreatment of Ms. Tanner, as the inmate referenced in the OPS report did.

Response at 5-6 (quoting Luna Depo. at 124:5-124:12)(citations omitted).  Tanner cites to other portions of the record supporting her characterization of events -- that Luna said she was busy and

that Luna could not have been decontaminating inmates at the time when Rodriguez-Nunez called her, because the first two inmates were not in the infirmary for that purpose until around 8:36 a.m. See Response at 5 (citing Rodriguez-Nunez Depo. at 106:25-107:11; HSU Front Pod Log, filed June 3, 2019 (Doc. 287-19)("HSU Front Pod Log")(including a note entered by Martina L. Sanchez at 8:36 a.m. on October 16, 2016, stating "2 inmates for clearance arion Thomas [sic] and eddilberto [sic] alderete from code 32 echo 8"). The Court concludes that the record supports that two inmates were in the medical unit at 8:36 a.m., but also notes that the record does not indicate when those inmates arrived in the medical unit. The HSU Front Pod Log to which Tanner cites states that the inmates were in the unit "for clearance" at 8:36 a.m. HSU Front Pod Log at 2. Luna testified in her deposition that the procedure after an inmate fight is for the inmates to be brought to the medical unit to be decontaminated, then cleared, and then sent to segregation. See Luna Depo. at 124:1-4.

The Court notes that it is possible that the HSU Front Pod Log only logged the inmates after decontamination and once they were ready to be cleared. The HSU Front Pod Log contains no entry indicating when the inmates were decontaminated, and the Court is not able to determine whether the absence of such an entry indicates that the 8:36 a.m. entry encompassed both decontamination and clearing, or whether decontamination occurred before 8:36 a.m., which would suggest that Luna could have been decontaminating inmates when Rodriguez-Nunez called her at 7:36 a.m. Nothing in the record indicates how long decontamination usually takes or how long Luna avers that it took her on October 16, 2016. Further, the Court recognizes that the Housing Pod Shift Log states that, at 7:36 a.m., Rodriguez-Nunez "SPOKE WITH ADRIANNA [LUNA] IN MEDICAL IN REGARDS TO PREGNANT INMATE SHAWNA TANNER NOT FEELING WELL. ADRIANNA SAID SHE WAS BUSY AND WILL BE CALLING ME BACK AS SOON AS SHE HAS TIME TO SEE INMATE." Housing Pod Shift Log at 2 (capitalization in original). Therefore, the HSU Front Pod Shift Log alone does not support that the inmates arrived in the infirmary only at 8:36 a.m.

The Court also notes that, although neither party objects to the HSU Front Pod Shift Log or the Housing Pod Shift Log's admission into evidence, both logs constitute hearsay. Hearsay is a statement, other than one the declarant made while testifying at the trial or hearing, offered for the truth of the matter asserted. See Fed. R. Evid. 801. "Hearsay testimony is generally inadmissible." United States v. Christy, No. CR 10-1534, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). The Court recognizes that it cannot rely on evidence that will not be admissible at trial. See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment. Hearsay testimony cannot be considered because '[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill.'" (alterations in original)(citations omitted)(quoting Thomas v. IBM, 48 F.3d 478, 485 (10th Cir. 1995)). The Court can rely, however, on evidence submitted

in a form that would be inadmissible at trial as long as the Court determines that evidence will be presented in an admissible form:

> This does not mean that evidence must be submitted in "a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, . . . (1986). Indeed, parties may submit affidavits even though affidavits are often inadmissible hearsay at trial on the theory that the same facts may ultimately be presented at trial in an admissible form. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). However, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury" in some form. *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)(citing *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004)(affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence")).

Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006)(alterations in original). Here, the HSU Front Pod Shift Log and the Housing Pod Shift Log upon which Tanner relies is hearsay, because Rodriguez-Nunez and Sanchez did not make the statements that each log contains "while testifying at the current trial or hearing," Fed. R. Evid. 801(c)(1), and Tanner relies on the logs for the truth of what they assert -- that Rodriguez-Nunez spoke with Luna at 7:36 a.m., that Luna told Rodriguez-Nunez she was busy, and that the pepper-spray-fight inmates were in the infirmary at 8:36 a.m. While these logs are part of Correct Care's routine practice and could be admissible hearsay under the business exception, Tanner has not laid the foundation for this exception. See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)("The proponent of the document must also lay this foundation for its admission."). Tanner can establish this fact with evidence admissible at trial, however, as Rodriguez-Nunez discusses her call with Luna in the Rodriguez-Nunez Depo. at 106:25-107:11, and in the Deposition of Martina Sanchez at 109:5-20 (taken Oct. 4, 2018), filed June 7, 2019 (Doc. 290-2)("Sanchez Depo."), Sanchez discusses that she made entries on the HSU Front Pod Log every half an hour, and that her 8:36 a.m. entry denoted that two inmates had to come in for medical clearances because of a fight. The Court relies on the logs for the purposes of this Memorandum Opinion and Order, because they can be supported with admissible evidence at trial, and because neither party objects to their admission, but the Court nevertheless notes that Tanner has not laid a business-record-exception foundation.

The Court concludes that the record supports that Luna indicated to Rodriguez-Nunez that she was busy, although the Court concludes that the record does not indicate whether Rodriguez-Nunez logged the exact words Luna used to communicate her preoccupation -- the log does not indicate whether Luna told Rodriguez-Nunez only that she was busy, or whether Luna provided further details indicating why and with what she was busy. Rather than adopt the fact that Luna

Tanner could be transported to the medical unit.  See Partial MSJ ¶ 17, at 7 (stating this fact)(citing

Luna Depo. at 110:10-119:9; id. at 125:16-126:24).[70]  Tanner told Kerry Palmer in a telephone

---

told Rodriguez Nunez that she was "busy," as Tanner suggests, the Court adopts the fact that Luna indicated to Rodriguez-Nunez that she was unable to see Tanner immediately, because she was busy.  This alteration recognizes that there is some dispute regarding what, specifically, Luna told Rodriguez-Nunez.  The Court adopts only the undisputed portion of the fact.

[70]The Correct Care Defendants proffer that, in addition to returning Rodriguez-Nunez' call, Luna obtained more information from Rodriguez-Nunez about Tanner, and Luna reviewed Tanner's chart.  See Partial MSJ ¶ 17, at 7.  Tanner does not specifically dispute these facts in the Response.  See Response at 4-5 (disputing the Correct Care Defendants' account of the reasons for the delay in providing Tanner care, but not disputing that Luna obtained information about Tanner from Rodriguez-Nunez or that Luna reviewed Tanner's chart).  These facts, therefore, are undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

The portions of the Luna Depo. to which the Correct Care Defendants cite in support of their proposed facts, however,  do not support the facts proposed.  The Correct Care Defendants suggest in their factual presentation that Luna reviewed Tanner's chart before Tanner's arrival to the medical unit:

> 17.  After the other inmates were decontaminated, Nurse Luna called the corrections officer in Plaintiff's housing pod back, got more information about Plaintiff, and informed the officer that Plaintiff could be transported to the medical unit.  She also reviewed Plaintiff's chart.  [Luna Depo.] at pp. 110:10-119:9; 125:16-126:24.

Partial MSJ ¶ 17, at 7.  The Luna Depo. at 110:10-119:9 states only that Luna looked at Tanner's chart on October 16, 2016, but does not indicate whether Luna looked at the chart before Tanner arrived at the medical unit.  See Luna Depo. at 110:10-119:9.  The Luna Depo. at 125:16-126:24 states that when Luna called Rodriguez-Nunez back, she told Rodriguez-Nunez that she could send Tanner to the medical unit and that Luna would see her.  See Luna Depo. at 126:13-16.  The Luna Depo. then states that "[g]enerally," Luna would obtain an inmate's name and inmate number and look them up prior to their arrival, but she did not recall whether she obtained this information for Tanner in this instance.  Luna Depo. at 126:17-127:2.  Luna also stated that she would "[g]enerally" try to look up an inmate's chart before their arrival, but she did not recall if she did that in this instance.  Luna Depo. at 128:8-15.  Although the portions of the Luna Depo. to which the Correct Care Defendants cite support that Luna testified to a general practice of obtaining

conversation that she checked her cervix and was dilated, but that she did not know exactly how to check her cervix. See Partial MSJ ¶ 18, at 7 (stating this fact)(citing Tanner Depo. at 219:19-220:10).[71]

### 6. **Tanner's First Visit to the Medical Unit.**

A corrections officer escorted Tanner to Metropolitan Detention's medical unit, where Luna took her medical history and assessed Tanner, but Luna did not perform a vaginal inspection or a urine dipstick, or test fluid from Tanner's vagina. See Partial MSJ ¶ 19, at 7 (stating these facts but describing Luna's assessment as "head to toe," and not mentioning that Luna did not perform a vaginal inspection or a urine dipstick)(citing Luna Depo. at 127:22-129:24); Response at 6-7 (citing Luna Depo. at 136:18, id. at 139:6, id. at 154:3-9)(disputing that Luna took Tanner's medical history and performed a head to toe assessment, but stating that Luna did not perform a

_____

information about an inmate and reviewing their chart before meeting them in the medical unit, the cited deposition excerpts do not support that Luna recalls having undertaken these actions with respect to Tanner on October 16, 2016. Pursuant to rule 56(e), the Court may, but need not, consider facts improperly supported undisputed, see Fed. R. Civ. P. 56(e)(2), and the Court does not consider these the improperly supported undisputed facts, because the record, even outside of the portions to which the Correct Care Defendants cite, does not support their proffered facts that Luna obtained additional information from Rodriguez-Nunez and reviewed Tanner's chart prior to Tanner's arrival in the medical unit. See Luna Depo. at 110:10-119:9; id. at 125:16-126:24, id. at 126:25-127:2, id. at 128:8-15.

[71]Tanner does not specifically controvert this fact in her Response. See Response at 6. The Court, therefore, considers it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

vaginal inspection or urine dipstick, or test fluid from Tanner's vagina).[72]  Luna spent five minutes

in the examination room with Tanner on that occasion.  See Response at 7 (stating this fact)(citing

Exam. Dental Video at 8:56 a.m., id. at 9:02 a.m.).[73]  Tanner reported spotting, which Luna did

---

[72]Tanner first contends that Luna did not obtain Tanner's medical history.  See Response at 7 (citing Office of Professional Standards Report of Investigation at 34, filed June 3, 2019 (Doc. 287-30)("OPS Report")).  The portion of the OPS report to which Tanner cites does not indicate that Luna did not conduct a medical history and instead is a memorandum detailing Luna's actions later in the day, when she responded to Tanner's request for medical attention in the housing unit.  See OPS Report at 34.  The Luna Depo. indicates that Luna obtained a medical history using the Pregnancy 20 Weeks or More Nursing Documentation Pathway, filed June 3, 2019 (Doc. 287-7)("Nursing Pathway").  See Luna Depo. at 128:23-130:14.  The Nursing Pathway also indicates that Luna collected Tanner's medical history, because the Nursing Pathway's medical history questions are completed.  See Nursing Pathway at 1-2.  The portion of the record to which Tanner cites to controvert that Luna collected her medical history, therefore, does not support Tanner's statement that Luna did not obtain her medical history.  Tanner does not properly address the Correct Care Defendants' assertion of this fact as rule 56(c) requires, so the court may consider the fact undisputed for purposes of the motion, and the Court, finding that the record supports the Correct Care Defendants' proffered fact that Luna collected Tanner's medical history, considers the fact undisputed for the purposes of the motion.  See Fed. R. Civ. P. 56(e).

Tanner states that Luna performed neither a vaginal inspection nor a urine dipstick, nor tested fluid from Tanner's vagina.  See Response at 7 (citing Luna Depo. at 136:18, id. at 139:6, id. at 154:3-9).  The Court concludes that the portions of the record to which Tanner cites support her proffered fact.  The Correct Care Defendants do not specifically controvert these facts in their Reply, so the Court considers them undisputed for the purposes of this motion.   See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[73]The Court notes that Tanner does not set forth this fact as an additional material fact, but rather asserts it in disputing the Correct Care Defendants' proposed facts outlining "the account of Ms. Tanner's first visit to the medical unit on the morning of October 16, 2016 . . . ."  Response at 6.  In the Reply, the Correct Care Defendants do not dispute the fact that Luna spent five minutes in the examination room with Tanner on this occasion.  The Court, therefore, adopts this fact as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Tanner also disputes the Correct Care Defendants' proffered fact that Luna "kept Plaintiff in the medical unit under observation for about an hour."  Partial MSJ ¶ 21, at 8.  See Response at

not observe while Tanner was in the medical unit. See Partial MSJ ¶ 20, at 8 (stating this fact)(citing Tanner Depo. at 228:8-10; Luna Depo. at 134:2-135:7).[74] Tanner informed Luna that she could feel fetal movement at this time. See Partial MSJ ¶ 20, at 8 (stating this fact)(citing Tanner Depo. at 228:8-10; Luna Depo. at 134:2-135:7).[75] Luna charted Tanner's medical complaints, interactions, and observations in Tanner's medical record. See Partial MSJ ¶ 20, at 8 (stating this fact)(citing Luna Depo. at 130:8-131:9).[76] Because the medical unit's examination room contained no computer, and Luna brought no hard copies of the form with her into the

---

7 (citing Med. Waiting Video at 8:35 a.m.; Exam Dental Video at 8:56 a.m.; id. at 9:02 a.m.; OPS Report at 1, 8). The Court notes that the portions of the record to which Tanner cites support that Luna and Tanner spent only five minutes in the examination room together, but that Luna may have kept Tanner under observation in another part of the medical unit, which Tanner's citations do not address. However, the Correct Care Defendants do not address Tanner's response to this fact in their Reply, and the Court must draw all reasonable inferences in Tanner's favor, so the Court concludes that there is a genuine dispute of material fact as to whether Luna observed Tanner in the medical unit for an hour, and the Court does not consider the fact for the purposes of this motion.

[74] Tanner does not specifically controvert these facts in her Response, so the Court considers them undisputed for the purposes of this motion. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[75] Tanner does not specifically controvert these facts in her Response, so the Court considers them undisputed for the purposes of this motion. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[76] Tanner does not specifically controvert these facts in her Response, so the Court considers them undisputed for the purposes of this motion. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). Tanner avers that Luna did not complete the charting process correctly but does not dispute that she undertook the process. See Response at 7-8.

examination room, Luna completed the Nursing Pathway at her nurse's station computer, from memory, twenty minutes after examining Tanner. See Response at 8 (stating this fact)(citing Luna Depo. at 129:19-24; id. at 132:9-14; Exam Dental Video at 9:02 a.m.; Nursing Pathway at 8).[77] On the Nursing Pathway, Luna checked "drug use" and wrote "meth 10.13.16." Response at 8 (stating this fact)(citing Pathway Form at 2).[78] Luna marked Tanner's reported issues as

---

[77]The Correct Care Defendants do not specifically controvert these facts in their Reply, so the Court considers them undisputed for the purposes of this motion. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The Court notes that Tanner does not set forth these facts as additional material facts, but rather asserts them in disputing the Correct Care Defendants' proposed facts outlining "the account of Ms. Tanner's first visit to the medical unit on the morning of October 16, 2016 . . . ." Response at 6. In the Reply, the Correct Care Defendants do not dispute the fact that Luna completed the Nursing Pathway from memory twenty minutes after examining Tanner. The Court, therefore, adopts this fact as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The Court also notes that the record supports these facts. The Luna Depo. at 129:19-24 indicates that Luna testified she asks her patients questions and then returns to her computer to complete the Nursing Pathway. See Luna Depo. at 129:19-24. The Luna Depo. at 132:9-14 indicates that Luna completed the Nursing Pathway at 9:22 a.m., about twenty minutes after Tanner left the examination room. See Luna Depo. at 132:9-14. The Court notes that the record does not reflect at what time Luna began the Nursing Pathway, but the record supports the fact as stated, that Luna completed the questionnaire twenty minutes after examining Tanner. See Luna Depo. at 132:9-14; Exam Dental Video at 9:02 a.m.

Tanner states that "Defendant Luna did not fill out the "pathway" form correctly. The Court does not consider this an undisputed fact, although the Correct Care Defendants do not address it in their Reply, because Tanner does not cite to any part of the record in support of this statement. See Fed. R. Civ. P. 56(e).

[78]The Correct Care Defendants do not specifically controvert this fact in their Reply, so the Court considers it undisputed for the purposes of this motion. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

"Routine," and not as "Emergent" or "Urgent," despite Tanner reporting symptoms consistent with either an "Emergent" or "Urgent" pathway. Response at 8 (stating this fact)(citing Nursing Pathway at 2, 5-6; Tanner Decl. ¶¶ 2, 12; Luna Depo. at 139:6; id. at 143:2-4; id. at 154:14-21; Urinalysis Dip and Urine Pregnancy Test Form (dated Oct. 12, 2016), filed June 3, 2019 (Doc. 287-5)("UA Dip Test Form")).[79] Luna never obtained a release of information nor requested

---

The Court notes that Tanner does not set forth this fact as an additional material fact, but rather asserts it in disputing the Correct Care Defendants' proposed facts outlining "the account of Ms. Tanner's first visit to the medical unit on the morning of October 16, 2016 . . . ." Response at 6. In the Reply, the Correct Care Defendants do not dispute the fact that, on the Nursing Pathway, Luna checked "drug use" and wrote "meth 10.13.16." Response at 8. The Court, therefore, adopts this fact as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court also notes that the record supports this fact. The Nursing Pathway indicates that Luna checked "drug use" and wrote "meth 10.13.16." Nursing Pathway at 2. The Luna Depo. also supports that Luna checked "drug use" and "meth 10.13.16." Luna Depo. at 133:17-23.

Tanner also states that Luna "ignored the bold type at the bottom of the pathway section: 'NOTE: with any reported history of drug and/or alcohol use during pregnancy or treatment with methadone a provider must be notified Immediately [sic].' Defendant Luna did not notify either of MDC's two providers of that fact." Response at 8 (quoting Nursing Pathway at 2)(citations omitted)(citing Nursing Pathway at 2; Luna Depo. at 154:14-21). The portions of the record to which Tanner cites do not, however, support that Luna ignored the bold type directing her to report a history of drug and alcohol use during pregnancy to a provider. Tanner does not dispute that the Metropolitan Detention and Correct Care staff knew of her drug use, at least some of which occurred while she was pregnant, and that it had been recorded -- and the record which Tanner provides supports this fact. See Oct. 4, 2016 Receiving Screening Form at 2 (stating that Tanner smoked meth occasionally and had last used it recently). Tanner's drug use had been reported to providers, and the bold type does not suggest that every time a pregnant inmate undergoes a medical evaluation and reports the same, known, drug use, a provider must be notified -- that inference is not reasonable, and the Court does not make it in Tanner's favor.

[79]The Correct Care Defendants do not specifically controvert these facts in their Reply, so the Court considers them undisputed for the purposes of this motion. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The Court notes that Tanner does not set forth these facts as additional material facts, but rather asserts them in disputing the Correct Care Defendants' proposed facts outlining "the account of Ms. Tanner's first visit to the medical unit on the morning of October 16, 2016 . . . ." Response at 6. In the Reply, the Correct Care Defendants do not dispute the fact that Luna completed the Nursing Pathway from memory twenty minutes after examining Tanner. The Court, therefore, adopts this fact as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Tanner states:

> The following scenario is listed on the form as "Emergent": "Multigravida [i.e., second pregnancy or more] with any associated symptoms or event such as loss of mucous plug or bloody show, pain or cramping, any evidence of amniotic fluid (water breaking)." If a situation is "Emergent," the "pathway" form requires "Immediate evaluation by the [healthcare provider]; if not available activate EMS." Ms. Tanner had bleeding, pain, cramping, and was leaking an unidentified fluid, and it was not her first pregnancy. But Defendant Luna neither arranged for an evaluation by a provider nor activated EMS. Under "Urgent," the "pathway" form describes: "Presenting with bleeding, pain and/or cramping," "Last fetal movement >4 hours," and "Protein in urine." Ms. Tanner had bleeding, pain, and cramping. Defendant Luna had checked "Fetal Movement >4 hours." And though Luna took no urine test, Ms. Tanner's last two tests had indicated protein in her urine. Defendant Luna nonetheless marked the issues "Routine" and sent Ms. Tanner back to her pod.

Response at 8-9 (alterations in Response)(citations omitted)(quoting Nursing Pathway at 2, 5-6). Tanner does not contend, however, that she informed Luna that she had been pregnant before her current pregnancy, and the Nursing Pathway marked Tanner as pregnant for the first time, suggesting that Luna did not consider Tanner's situation to be "multigravida." Nursing Pathway at 3, 5. Although Tanner contends that she reported bleeding, pain, and cramping, she does not contend that she presented with those symptoms (as required for an "Urgent" categorization) while she was in the medical unit undergoing evaluation. See Response at 8-9. Similarly, Tanner does not contend that she had not experienced fetal movement by the time she left the medical unit, and Tanner did not dispute the Correct Care Defendants' proffered fact that Tanner felt fetal movement at that time. See supra at 40. Tanner does not contend that Luna noted protein in her urine at the time of her evaluation, and although her last two tests indicated that there was protein in her urine, that fact alone does not indicate that Luna erred in not designating Tanner "Urgent". Nursing Pathway at 6. Although the Court draws all reasonable inferences in Tanner's favor, the Court will not make arguments on Tanner's behalf. The Court does not adopt Tanner's proffered facts as stated, because the Court concludes that Tanner does not provide adequate support for the facts

Tanner's medical records.  See Response at 9 (stating this fact)(citing Luna Depo. at 132:23-133:1, id. at 149:12-16).[80]  While Tanner was in the medical unit undergoing evaluation, Luna gave her fluids to drink.  See Partial MSJ ¶ 22, at 8 (stating this fact)(citing Luna Depo. at 154:22-157:22).[81]

_____

that (i) she reported that her pregnancy was not her first, when the Nursing Pathway indicates otherwise; (ii) she presented with bleeding, pain, and/or cramping at the conclusion of her evaluation; (iii) she had not experienced fetal movement by the end of her evaluation; and (iv) her urine contained protein at the time of her evaluation.  See Response at 8-9.  The Court therefore adopts as fact that Luna marked Tanner as "Routine" and that Tanner reported symptoms consistent with a higher-urgency categorization, because Tanner contends, and it is undisputed, that she reported spotting and pain, but the Court does not adopt as undisputed the facts Tanner proffers suggesting that Luna ignored symptoms or incorrectly completed the Nursing Pathway in marking Tanner as "Routine."

[80]Tanner asserts this fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 19, 20, and 21.  In disputing those facts, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, see D.N.M.LR-Civ. 56.1(b) ("The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies."), the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not controvert Tanner's assertion in the Response that Luna never obtained a release of information nor requested any of Tanner's medical records, so the Court deems these facts undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  The Court also concludes that the record supports Tanner's proffered facts, because the Luna Depo. at 132:23-133:1 indicates that Luna did not, during Tanner's first visit to the medical unit on October 16, 2016, have Tanner complete any kind of release form to allow medical staff to obtain her medical records before her incarceration, and the Luna Depo. at 149:12-16 indicates that Luna did not obtain release of information records and records from Tanner's OB/GYN.  See Luna Depo. at 132:23-133:1, id. at 149:12-16.  Accordingly, the Court considers the proffered facts as undisputed and supported by the record.

[81]In the Response, Tanner does not address this fact either to admit or dispute it, so the Court deems it undisputed, because it is not specifically controverted, and the Court notes that the portions of the Luna Depo. to which the Correct Care Defendants cite support that Luna provided Tanner fluids while Tanner was in the medical unit on October 16, 2016.  See D.N.M.LR-Civ.

- 42 -

Luna listened to Tanner's fetus' heart rate before and after Tanner drank fluids. See Partial MSJ ¶ 22, at 8 (stating this fact)(citing Luna Depo. at 150:19-152:5).[82] Luna used a temporary amplified audio tone fetal heart rate monitor -- the use of which she received training on in one session conducted by a physician's assistant in August or September of 2014 -- which required her to manually count the heart rate. See Response at 9 (citing Luna Depo. at 27:6-27:24, id. at 28:21-30:19; id. at 150:25-151:10).[83] Luna offered Tylenol to address Tanner's cramping, which Tanner

_____

56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). See also Luna Depo. at 150:9-152:5.

[82]Tanner does not state whether she admits or disputes this fact. Tanner states, in response to this fact, that:

> With respect to listening for fetal heart tones, Defendant Luna used a type of monitor that provides a temporary amplified audio tone indicating a heartbeat and requires the nurse to manually count the heart rate in her head and write it down. Defendant Luna's training on the use of this monitor was limited to a single instance of "in-the-moment teaching" by a physician assistant in August or September 2014. . . . Luna Dep. at 27:6-27:24, 28:21-30:19, 150:25-151:10. Any listening for fetal heart tones or other activities during this period occurred during a total of less than five minutes, per the evidence cited in response to [the Correct Care Defendants' proposed fact number 21] above.

Response at 9. The Court concludes that Tanner's assertions that Luna used a certain type of monitor which she was not trained to use and that she listened to the heart rate for less than five minutes do not specifically controvert the fact that Luna listened to the fetus' heart rate and, in fact, suggest that Tanner admits that Luna listened to her fetus' heart rate. In her response to the Correct Care Defendants' proposed fact, Tanner does not specifically controvert that Luna listened to her fetus' heart rate before and after administering her fluids, and, accordingly, the Court adopts this fact as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[83]Tanner asserts this fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 22. In disputing that fact, Tanner lists several additional facts. Although

initially declined but later accepted shortly before returning to her housing pod.  See Partial MSJ

¶ 23, at 8 (stating this fact)(citing Luna Depo. at 154:22-157:22).[84]  Luna also provided Tanner

---

Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address Tanner's facts regarding the type of monitor Luna used, the extent of her training on the monitor, and for how long she listened to fetal heart tones, so the Court considers these facts undisputed.  See Response at 9.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  The portions of the Luna Depo. to which Tanner cites support her facts.  See Luna Depo. at 27:6-27:24, id. at 28:21-30:19; id. at 150:25-151:10.  Accordingly, the Court considers as undisputed that Luna used a temporary amplified audio tone monitor and that her training occurred in a single session.  See Response at 9.  The Court does not adopt as undisputed Tanner's assertion that Luna's listening to fetal heart tones must have occurred in less than five minutes, because the Court concluded, supra n.69, that although Luna and Tanner spent only five minutes in the examination room, they may have spent additional time in other rooms within the medical unit, and Tanner does not provide support for the assertion that Luna's listening to the fetal heart tones occurred in the examination room.  In fact, the Luna Depo. at 145:15-146:19 suggests that Luna gave Tanner water when she and Tanner were speaking with the officer stationed at the front of the medical unit after the examination, and the Luna Depo. at 150:19-151:10 suggests that at this time, Luna used the fetal heart monitor.  The Court, therefore, does not consider as undisputed Tanner's fact that Luna listened to the fetal heartrate for less than five minutes, because Tanner's argument in support of this fact, that Luna only examined Tanner in the examination room for five minutes, does not support a reasonable inference that Luna listened to the fetal heart rate for less than five minutes where the record establishes that the medical unit consisted of more than the examination room, and that Luna listened to the fetal heart rate when she and Tanner were speaking to an officer stationed at the front of the medical unit.  See Luna Depo. at 145:15-146:19; id. at 150:19-151:10.

[84]Tanner does not unequivocally state that she does not dispute this fact.  Instead, Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that Luna offered Tylenol to address Tanner's cramping, which Tanner initially declined but later accepted shortly before returning to her housing pod.  Tanner does not, therefore, specifically controvert the proffered fact, and the record supports the proffered fact so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).  See also Luna Depo. at 154:22-157:22.

with a water pitcher and sanitary pads, and asked Tanner to save the pads if she experienced

spotting again.  See Partial MSJ ¶ 23, at 8 (stating this fact)(citing Luna Depo. at 154:22-157:22).[85]

### 7.    Tanner's Return to the Housing Unit and the Code 43.

As corrections officer Rebecca Macias walked Tanner from the medical unit back to her

housing pod after her first visit with Luna, they stopped walking more than once because Tanner

complained of pain, and said she felt "'pressure down there.'"  Response at 9 (quoting Corrections

Officer Rebecca Macias Interview (dated Nov. 6, 2016), filed June 4, 2019 (Doc. 288)("Macias

Interview Audio")).[86]  Less than half an hour after Tanner returned to her housing pod, Macias

---

[85]Tanner does not unequivocally state that she does not dispute this fact.  Instead, Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]."  Response at 1.  Tanner does not dispute, however, that Luna also provided Tanner with a water pitcher and sanitary pads, and asked Tanner to save the pads if she experienced spotting again.  Tanner does not, therefore, specifically controvert the proffered fact, and the record supports the proffered fact so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).  See also Luna Depo. at 154:22-157:22.

[86]Tanner asserts these facts not as an additional material facts, but in response to the Partial MSJ's proposed fact 24.  In disputing that fact, Tanner lists several additional facts.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address Tanner's facts regarding what she told Macias during the walk from the medical unit to her housing pod on October 16, 2016.  See Response at 9.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Although Tanner asserts that she complained to Macias of labor pains and bleeding during the walk from the medical unit back to her housing pod, see Response at 9, the Court concludes that the record does not support this fact, see Transcript of Corrections Officer Rebecca Macias Interview at 3:18-20 (stating that Tanner had gone to the medical unit complaining of labor pains and bleeding)(dated Nov. 6, 2016), filed June 4, 2019 (Doc. 288)("Macias Interview Tr."); id. at 3:22-24 (stating that Tanner and Macias stopped a few times on the way back to the housing unit

checked on her, noticed blood on sanitary napkins in Tanner's cell's trash can, and that Tanner

looked to be in pain and complained to Macias of "contractions." Response at 10 (stating these

facts)(citing F7 Dayroom Video at 10:03 a.m. (dated October 16, 2016), filed June 4, 2019

(Doc. 288)("F7 Dayroom Video")); Macias Interview at 14:19-23; 11:15-17).[87]  Macias called the

---

because Tanner was in pain, but not mentioning labor pains or bleeding); id. at 8:6-15 (stating that as they walked back to the housing unit, Tanner told Macias she felt pain and that she felt "pressure down there"). Tanner also contends that "'[they] would stop against the wall and [would] just kind of wait for a little bit until she was able to walk again.'"  Response at 9-10 (alterations in Response)(quoting Macias Interview Tr. at 8:23-25).

The Court concludes that the record supports that Tanner and Macias stopped walking more than once on the way back to the housing unit, and that Tanner reported feeling pain, and "pressure down there."  Macias Interview Tr. at 3:18-20; id. at 3:22-24; id. at 8:6-15; id. at 8:23-25.  The Court concludes that the record does not support that Tanner reported labor pains and bleeding occurring on the walk back to the housing unit.  See Macias Interview Tr. at 3:18-20; id. at 3:22-24.  The Court, accordingly, adopts as undisputed those portions of Tanner's proposed facts which the record supports -- that as Macias walked Tanner from the medical unit back to her housing pod after her first visit with Luna, they stopped walking more than once because Tanner complained of pain, and said she felt "pressure down there."  Macias Interview Tr. at 8:6-15.  See Fed. R. Civ. P. 56(e)(2); N.M. Consol. Constr. LLC v. City Council of the City of Santa Fe, 97 F. Supp. 3d 1287, 1292 n.6 (D.N.M. 2015)(Browning, J.)(accepting a fact as undisputed pursuant to Rule 56(e)(2), because it was not disputed, and the Court had no independent reason to doubt its accuracy).

[87]Tanner asserts these facts not as an additional material facts, but in response to the Partial MSJ's proposed fact 24.  In disputing that fact, Tanner lists several additional facts.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address Tanner's facts regarding what she told Macias and what Macias noticed when Macias checked up on her after her return to the housing unit.  See Response at 10.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Tanner cites to Macias Interview Tr. at 14:19-23; 11:15-17 in support of her facts, and the Court concludes that, although these portions of the record do not sufficiently support Tanner's facts, other portions of the record do support them.  The Macias Interview Tr. at 14:19-23 states only that Tanner said she was having contractions, and the Macias Interview Tr. at 11:15-17 states

medical unit, but no one answered, which Macias described as "standard, typical," but Macias did not wait for a call back -- rather, she called a Code 43 for a medical emergency.  See Response (stating these facts)(citing Macias Interview Tr. at 12:5-17 (stating that Macias called medical and they did not answer, which she considered standard and typical)); Macias Interview Tr. at 12:24-13:19 (stating that Macias decided not to wait for the call back, but to call a Code 43); Deposition of Rebecca Macias at 102:17-103:9 (dated October 5, 2018), filed June 3, 2019 (Doc. 286-13)("Macias Depo.")(stating that Macias called medical and received no answer, and then called a Code 43 for a medical emergency); Housing Pod Shift Log at 4 (noting: "called code 43 for inmate Tanner, Shawna.  Inmate complaining of bleeding and cramping.  Inmate is pregnant.").[88]

---

that it looked to Macias visually like Tanner was in pain.  See Macias Interview Tr. at 14:19-23; id. at 11:15-17.  The Court concludes, nevertheless, that the record as a whole supports Tanner's facts, because the Macias Interview Tr. at 7:16-11:17; id. at 14:11-23, adequately supports Tanner's facts, because those portions of the Macias Interview Tr. indicate that Macias checked on Tanner again, noticed a light pink pad in her trash can, and that Tanner complained of contractions.  See Macias Interview Tr. at 14:19-23; id. at 11:15-17.  Having concluded that the record supports Tanner's facts, and that the Correct Care Defendants do not address or specifically controvert them in their Reply, the Court considers them undisputed for the purposes of this motion.  See Fed. R. Civ. P. 56(e)(2); N.M. Consol. Constr. LLC v. City Council of the City of Santa Fe, 97 F. Supp. 3d at 1292 n.6.

[88]Tanner asserts these facts not as an additional material facts, but in response to the Partial MSJ's proposed fact 24.  In disputing that fact, Tanner lists several additional facts.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address Tanner's facts regarding what she told Macias and what Macias noticed when Macias checked up on her after her return to the housing unit.  See Response at 10.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Tanner states that Macias notified her supervisor, Lieutenant Jackson, before calling a Code 43.  See Response at 10.  The Court did not find mention of Lieutenant Jackson or of Macias

Luna responded to the Code 43, along with Emergency Medical Technician-Paramedic Ruby Boyd, at 10:07 a.m., after Tanner reported pain, bleeding, and anxiety -- the second time Luna saw Tanner on October 16, 2016. See Partial MSJ ¶ 24, at 8 (stating this fact)(citing Luna Depo. at 165:15-169:25), Response at 9-10 (admitting this fact and adding the time, and that Boyd also responded to the Code 43)(citing F7 Dayroom Video at 10:07 a.m. (dated October 16, 2016)).[89]

_____

notifying a supervisor in the portions of the record to which Tanner cites, and the Court did not find mention of this fact elsewhere in the record. Accordingly, the Court does not adopt this as undisputed fact. The cited portions of the record support the rest of Tanner's proposed facts, so the Court considers those undisputed for the purposes of this motion. See Macias Interview Tr. at 12:5-17 (stating that Macias called medical and they did not answer, which she considered standard, typical); id. at 12:24-13:19 (stating that Macias decided not to wait for the call back, but to call a Code 43); Macias Depo. at 102:17-103:9 (stating that Macias called medical and received no answer, and then called a Code 43 for a medical emergency); Housing Pod Shift Log at 4 (noting: "called code 43 for inmate Tanner, Shawna. Inmate complaining of bleeding and cramping. Inmate is pregnant.").

[89]In the response, Tanner states: "Plaintiffs dispute the account given in CCS SOF No. 24 of the second time Defendant Luna saw Ms. Tanner on the morning of October 16, 2016, when Officer Macias called a "Code 43" medical emergency." Response at 9. Although Tanner subsequently adds facts which she alleges are important to the narrative of Luna's second encounter with Tanner, Tanner admits that Luna saw Tanner a second time that day, and that it was in response to a Code 43 emergency, and that Tanner had reported pain, pleading, and anxiety. See Response at 9. The Court, therefore, considers the fact that Luna saw Tanner for a second time on October 16, 2016, in response to a Code 43, undisputed, because Tanner does not specifically controvert it in the Response. See D.N.M.LR-Civ. 56.1(b).

The Court also considers as undisputed that Boyd also responded to the Code 43, and that Boyd and Luna responded at 10:07 a.m., facts which the Partial MSJ does not assert, but which Tanner states in her Response. Tanner asserts these facts not as an additional material facts, but in response to the Partial MSJ's proposed fact 24. In disputing that fact, Tanner lists several additional facts. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. In the Reply, the Correct Care Defendants do not address Tanner's facts regarding Luna's and Boyd's arrival in response to the Code 43. See Response at 10. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless

- 48 -

Luna noticed a pad in Tanner's trash can with light pink fluid on it,[90] and noted that Tanner was

hyperventilating, and that Tanner stated: "I don't want to have this baby here." Response at 10

(stating this fact)(citing Progress Notes at 1 (dated Oct. 16, 2016), filed June 3, 2019 (Doc. 287-

8)("Luna Progress Note")).[91] Luna asked Tanner, "'Is this your pad, is this the bleeding?'" and

_____

specifically controverted."). The Court concludes that the F7 Dayroom Video supports that a
second individual responded with Luna to the Code 43 at 10:07 a.m., and, although the video alone
is not sufficient support for the assertion that the responding individuals were Luna and Boyd, the
Court deems the facts undisputed, because the Reply did not specifically controvert them, and
because the Court has no independent reason to doubt their accuracy. See Fed. R. Civ. P. 56(e)(2);
N.M. Consol. Constr. LLC v. City Council of the City of Santa Fe, 97 F. Supp. 3d at 1292 n.6
(accepting a fact as undisputed pursuant to Rule 56(e)(2), because it was not disputed, and the
Court had no independent reason to doubt its accuracy).

[90]The Correct Care Defendants states in part: "A light pink fluid was visible on Plaintiff's
discarded sanitary pad." Partial MSJ ¶ 24, at 8. For the reasons stated infra n.87, the Court adopts
this fact as undisputed.

[91]Tanner asserts these facts not as an additional material facts, but in response to the Partial
MSJ's proposed fact 24. In disputing that fact, Tanner lists several additional facts. Although
Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to
Tanner, construes them as additional material facts for the purposes of this motion. In the Reply,
the Correct Care Defendants do not address Tanner's facts regarding Luna's and Boyd's arrival in
response to the Code 43. See Response at 10. See also D.N.M.LR-Civ. 56.1(b) ("All material
facts set forth in the Response will be deemed undisputed unless specifically controverted.").
Tanner states that when Luna and Boyd entered her cell in response to the Code 43,

> there were "multiple large blood clots in the toilet" and "a blood soaked pad" in the
> trash. . . . [OPS Report at 34]. Ms. Tanner complained of abdominal pain and was
> "hyperventilating," saying, "I don't want to have this baby here." [Luna Progress
> Note at 1; Emergency Response Worksheet (dated Oct. 16, 2016), filed June 3,
> 2019 (Doc. 287-9)("Boyd Emergency Response Worksheet")]. Defendant Luna did
> not simply observe "light pink fluid." Ms. Tanner had passed "multiple large blood
> clots in the toilet," and the sanitary napkin was "blood soaked." [OPS Report at
> 34; Custy Decl. ¶ 18, at 5].

Tanner reported that she had "'been soaking a couple of pads an hour,'" to which Luna replied by

calling Tanner "'a drug addict.'"   Response at 10 (quoting OPS Report at 34)(citing Custy Decl.

---

Response at 10.  With the exception of the facts that Luna noticed a pad in Tanner's trash can with some blood on it, and noted that Tanner was hyperventilating, and stated "I don't want to have this baby here," all supported by the Luna Progress Note at 1, the Court does not adopt these facts as undisputed, because the record does not support them.  The Luna Progress Note states: "Pt. notes a pad in the trash w/ approx. 5ml of very light pink tinged fluid."  Luna Progress Note at 1.  The Luna Progress Note also states that after Tanner returned to the medical unit, she removed the pad she was wearing and "no blood [was] noted."  Luna Progress Note at 1.  Tanner does not cite to the Luna Progress Note in support of her characterization of what blood Luna observed.  See Response at 10.  Rather, Tanner cites to the OPS Report, the Boyd Emergency Response Worksheet, and the Custy Decl.  See Response at 10.  The OPS Report indicates that Jackson observed multiple large blood clots in the toilet and saw a blood-soaked pad on top of the trash can when he entered Tanner's cell at approximately 10:04 a.m.  See OPS Report at 34.  The OPS Report does not state, however, whether Luna noted the blood clots, or whether the blood on the pad which Luna noticed was dark or light -- yet Tanner proposes as fact that Luna observed both, not that Jackson did.  See OPS Report at 34.  The OPS Report, furthermore, details Jackson's observations, but not Luna's subjective observations.  See OPS Report at 34.  The Body Emergency Response Worksheet states that Tanner's "pad appeared to show bright red blood approx. 5 cc.  code 43 was called," and Boyd's note is ambiguous whether Boyd intended to note that Tanner reported seeing bright red blood and therefore called a code 43, or whether Luna and Boyd noted bright red blood themselves.  Boyd Emergency Response Worksheet at 5.  The Boyd Emergency Worksheet later notes that, after Tanner returned to the medical unit, Tanner examined her pad and "there was no blood on [that] pad."  Boyd Emergency Response Worksheet at 5.  The Custy Decl. notes that, early in the morning, before Tanner's first visit to the medical unit, Custy observed red and dark bloody discharge on a pad which Tanner kept, and what looked like clotting.  Custy Decl. ¶ 18, at 5.  The Custy Decl. does not note what Luna observed when she responded to the Code 43.  The Court concludes, therefore, that none of the evidence to which Tanner cites supports her contentions regarding what Luna observed, or whether Luna simply observed light pink fluid, and that the Luna Progress Note controverts Tanner's characterization of these facts.  See Luna Progress Note at 1.  The Court, therefore, does not adopt these facts as undisputed, because the Court has an independent reason to doubt their accuracy.  See Fed. R. Civ. P. 56(e)(2); N.M. Consol. Constr. LLC v. City Council of the City of Santa Fe, 97 F. Supp. 3d at 1292 n.6 (accepting a fact as undisputed pursuant to Rule 56(e)(2), because it was not disputed, and the Court had no independent reason to doubt its accuracy).

¶ 20, at 5).[92]  Tanner's vital signs were stable at the time, and Luna spoke to Tanner about her

symptoms.  See Partial MSJ ¶ 24, at 8 (stating this fact)(citing Luna Depo. at 165:15-169:25).[93]

---

[92]Tanner asserts these facts not as additional material facts, but in response to the Partial MSJ's proposed fact 24.  In disputing that fact, Tanner lists several additional facts.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address Tanner's facts regarding Luna's and Boyd's arrival in response to the Code 43, and therefore do not dispute it.  See Response at 10.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The Court, drawing all reasonable inferences in Tanner's favor, adopts these facts as undisputed, because the OPS Report supports them.  See OPS Report at 34 (Jackson stating that Luna asked Tanner: "Is this your pad, is this the bleeding?", that Tanner replied: "Yes, I've been soaking a couple of pads an hour," and that Luna then stated: "It is normal to bleed during pregnancy when you are a drug addict."  OPS Report at 34.  The Court has no independent reason to doubt these facts' accuracy, and, therefore, considers them undisputed for this motion's purposes.  See Fed. R. Civ. P. 56(e)(2); N.M. Consol. Constr. LLC v. City Council of the City of Santa Fe, 97 F. Supp. 3d at 1292 n.6 (accepting a fact as undisputed pursuant to rule 56(e)(2), because it was not disputed, and the Court had no independent reason to doubt its accuracy).

The Court notes that the Custy Decl. ¶ 20 does not provide support for these facts.  The Custy Decl. ¶ 20 states:

> At some point while Ms. Tanner and I were in our cell, a squad of medical staff who looked like nurses came into the cell to see her.  They dismissed her complaints.  One of them accused her of faking and told her she didn't care about her baby because she was a drug addict.  Ms. Tanner was eventually taken to the infirmary.

Custy Decl. ¶ 20, at 5.  Custy's characterization of a statement regarding Tanner's status as a drug addict differs from Jackson's characterization of Luna's statement offering a possible explanation for Tanner's bleeding while pregnant.  See OPS Report at 34.  Because the Custy Decl. does not indicate who made the statements which Custy reports having heard, or when the conversation occurred, the Court cannot determine whether Custy refers to the same statement Jackson does.  The portion of the Custy Decl. to which Tanner cites does not provide additional support for these proffered facts, but the Court notes, as discussed above, that the OPS Report does provide support for the facts, and so the Court considers them supported by the record and undisputed.

**8.      Tanner's Second Visit to the Medical Unit.**

Luna took Tanner to the medical unit for further evaluation and observation. See Partial

MSJ ¶ 25, at 8 (stating this fact)(citing Luna Depo. at 169:25-176:21; id. at 182:2-182:13).[94] While

walking to the medical unit, Tanner "grabbed at her stomach, bent over in pain, and held onto the

wall in the sallyport." Response at 11 (citing F7 Dayroom Video at 10:12 a.m.; F7 Sallyport Video

---

Tanner also states: "Based on this reported and observed blood loss, Ms. Tanner should have been sent to the hospital." Response at 10-11 (citing Deposition Upon Oral Examination of Hugh M. Ehrenberg, M.D. at 49:11-12 (dated Jan. 14, 2019), filed June 3, 2019 (Doc. 286-9)("Ehrenberg Depo.")). The Court does not consider this fact undisputed, although the Correct Care Defendants do not address it in their Reply, because the portion of the record to which Tanner cites does not support this fact. See Ehrenberg Depo. at 49:11-12 (stating that in this case there was enough blood loss that jail medical staff should have sent Tanner to the hospital, but not referring to the reported and observed blood loss at the Code 43's time). The cited portion of the Ehrenberg Depo. indicates that Dr. Ehrenberg opined that the blood loss in Tanner's case merited sending Tanner to the hospital, but it does not indicate whether Dr. Ehrenberg is, as Tanner suggests, referring to the blood loss at the time Luna observed Tanner in her cell at around 10:07 a.m. on October 16, 2016. See Ehrenberg Depo. at 49:11-12. Considering the Luna Progress Note's statements that the observed blood was light pink, and the Luna Progress Note's and the Boyd Emergency Response Worksheet's notes that upon Tanner's return to the medical unit she was not bleeding, the Court has independent reason to doubt the accuracy of Tanner's statement that Tanner's reported and observed blood loss at the Code 43's time was enough to send her to the hospital -- accordingly, the Court does not accept this fact as undisputed. See Fed. R. Civ. P. 56(e)(2); N.M. Consol. Constr. LLC v. City Council of the City of Santa Fe, 97 F. Supp. 3d at 1292 n.6 (accepting a fact as undisputed pursuant to Rule 56(e)(2), because it was not disputed, and the Court had no independent reason to doubt its accuracy).

[93]Tanner does not address this fact in her Response, and, because she does not specifically controvert it, the Court accepts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[94]Tanner does not address this fact in her Response, and, because she does not specifically controvert it, the Court accepts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

at 10:13 a.m. (dated Oct. 16, 2016), filed June 4, 2019 (Doc. 288)("F7 Sallyport Video")).[95] During the walk, Macias saw Tanner leaking clear fluid "like water" through her pants and onto the ground, and Macias did not smell urine in the short time that she stood near the liquid. Response at 11 (stating this fact)(quoting Corrections Officer Rebecca Macias Interview at 18:1-9 (dated November 6, 2016), filed June 4, 2019 (Doc. 288)("Macias Interview")).[96] Tanner arrived

---

[95]Tanner asserts these facts not as an additional material facts, but in response to the Partial MSJ's proposed fact 25. In disputing that fact, Tanner lists several additional facts. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. In the Reply, the Correct Care Defendants do not address Tanner's facts regarding Tanner's return to the medical unit, and therefore do not dispute it, so the Court accepts them as undisputed, having no independent reason to doubt their accuracy. See Response at 10. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court notes that although it adopts Tanner's characterization of her as "bent over in pain," -- because the Court adopts all reasonable inferences in Tanner's favor, and, having reviewed the videos and the evidence leading up to Tanner's return to the medical unit, the Court concludes it is reasonable to infer that Tanner bent over in pain -- the portion of the record to which Tanner cites, the F7 Dayroom Video and F7 Sallyport Video, indicate that Tanner bends over, but do not indicate why she bent over. The Court, therefore, adopts the text's fact as undisputed.

[96]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 25. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy, and having verified that it is supported by the record. See Response at 10. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court notes that it altered Tanner's proposed fact to better reflect the record -- Tanner proposes as fact that the liquid which Macias noticed did not smell like urine, see Response at 11, but the Court, having reviewed the record, concludes, rather, that Macias stated that she did not smell urine, stating "[b]ut I mean, and we weren't standing there long enough either," and then stating "You know what I mean, it was like really quick." Macias Interview at 18:2-19 (stating that Macias did not smell urine but noticed clear fluid

in the medical unit, and spent six minutes in the examination room.  See Response at 11 (stating

this fact)(citing Exam Dental Video at 10:26-10:32 a.m. (dated Oct. 16, 2016), filed June 4, 2019

(Doc. 288)("Exam Dental Video"); id. at 10:34 a.m.).[97]  Luna took Tanner's vital signs and

listened to the fetus' heart rate, which resulted in a normal reading, in the 130s.  See Partial MSJ

---

like water).  The Court notes a distinction between the statement that the liquid did not smell like
urine, and the fact as the record supports it, that Macias herself did not detect a urine smell in the
short time she stood nearby and, accordingly, the Court alters Tanner's proposed fact to accurately
reflect the record.  The Court adopts the text's fact as undisputed, having verified that the record
supports it, and considering that the Correct Care Defendants did not address it in the Reply.  See
Fed. R. Civ. P. 56(e)(2).

[97]Tanner asserts this fact not as an additional material fact, but in response to the Partial
MSJ's proposed fact 25.  In disputing that fact, Tanner lists several additional facts.  Although
Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to
Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply,
the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the
Court accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response
at 10.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be
deemed undisputed unless specifically controverted.").  See also Exam Dental Video at 10:26-
10:32 a.m.; id. at 10:34 a.m.

The Court notes that the portions of the record to which Tanner cites support that Luna and
Tanner spent only six minutes in the examination room together.  Luna may, however, have kept
Tanner under observation in another part of the medical unit, which Tanner's citations do not
address.  Although the Court must draw all reasonable inferences in Tanner's favor, the record as
a whole supports that Luna performed testing on Tanner in other parts of the medical unit.  See
Luna Depo. at 171:18-19 (noting that Luna administered the amniotic fluid test in the "medical
front" area of the medical unit).  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the
cited materials, but it may consider other materials in the record.").  Although Tanner appears to
invite the inference that Luna only examined her for six minutes, the Court cautions that the record
does not support that inference.  The record supports the text's fact as stated, and the Correct Care
Defendants do not address it in their Reply, so the Court adopts the fact as undisputed.  See Fed.
R. Civ. P. 56(e)(2).

¶ 25, at 8 (stating this fact)(citing Luna Depo. at 169:25-176:21; id. at 182:2-182:13).[98] During

Tanner's second visit to the medical unit, no one collected clear fluid from Tanner's vagina or

performed a vaginal inspection.  Response at 11 (stating this fact)(citing Nursing Pathway at 4-5;

Luna Depo. at 136:18; Custy Decl. at 14).[99] Luna, concerned that the fluid on Tanner's sanitary

pad and on Tanner's clothing was amniotic fluid, performed a Nitrazine paper test on the pads and

clothing, which Luna read to produce a negative result.  See Partial MSJ ¶ 25, at 8-9 (stating that

---

[98]Tanner does not address this fact in her Response, and, because she does not specifically controvert it, the Court accepts it as undisputed, having reviewed the record and concluding that the record supports the text's fact.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  See Luna Depo. at 169:25-176:21; id. at 182:2-182:13.

[99]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 25.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 10.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The record supports the fact as articulated in the text, because the Nursing Pathway indicates that Luna did not provide a vaginal exam or collect fluid from Tanner's vagina during her first visit to medical, before 9:00 a.m. on October 16, 2016.  See Nursing Pathway at 1.  Tanner also proposes as fact that, during her second visit, she again requested that someone collect clear fluid from her vagina or perform a vaginal inspection, see Response at 11, but the Court does not adopt this portion of the fact as undisputed, because Tanner's cited portions of the record do not indicate that, during her second visit to the medical unit, Tanner requested that anyone test fluid from inside her vagina or perform a vaginal examination.  The Court concludes that the record as a whole supports the text's fact, omitting the portion of the fact unsupported by the record, so the Court adopts the text's fact as undisputed, having no independent reason to doubt its accuracy, and because the Correct Care Defendants do not address it in the Reply.  See Fed. R. Civ. P. 56(e)(2).

Luna performed a Nitrazine paper test, concerned that the fluid on Tanner's pads and clothing was amniotic, and that she noted a negative result)(citing Luna Depo. at 169:25-176:21; id. at 182:2-182:13; McMurray Depo. at 148:23-149:3); Response at 11 (stating that Luna performed the Nitrazine test on Tanner's pads and clothing)(citing Luna Depo. at 173:5-10).[100] Applying the

_____

[100]Tanner does not specifically admit or dispute this fact, but, instead, asserts additional facts in response to it. See Response at 11. The Court notes that the Luna Depo. at 171:16-173:24 indicates that Luna tested Tanner's pads and her uniform for amniotic fluid using a Nitrazine paper test. See Luna Depo. at 171:16-173:24. Although Tanner purports to generally "dispute the account given in CCS SOF No. 25," in her response to the Correct Care Defendants' proposed fact, Tanner states: "Seeing that Ms. Tanner had fluid soaking her clothes, Defendant Luna placed a piece of Nitrazine paper on the soiled uniform or a discarded sanitary napkin in an attempt to test the pH of the fluid on them." Response at 11. The Court concludes that, notwithstanding the narrative differences between Tanner's and the Correct Care Defendants' depictions, there is no genuine dispute that Luna performed a Nitrazine test on Tanner's uniform or a sanitary pad.

The Court notes, however, that Tanner purports to dispute that the Nitrazine test's result was negative, contending that "the test was not 'negative' -- it was consistent with amniotic fluid from Ms. Tanner's 'water breaking,' a vernacular term for a rupture of the membranes separating the amniotic sac from the vagina." Response at 11. In support of her purported dispute, Tanner cites to the Boyd Emergency Response Worksheet at 5 (stating that Luna tested Tanner's fluid's pH and obtained a result of 7.0 on the pH scale); Luna Progress Note at 1 (stating that the fluid tested negative for amniotic fluid with a pH of 6.5); Deposition of Chun Hsien Chiang, M.D. at 63:10-14 (taken Jan. 18, 2019), filed June 3, 2019 (Doc. 286-8)("Chiang Depo.")(stating that a higher pH test result indicates that the fluid is more likely amniotic fluid, because amniotic fluid's pH is higher than the vaginal canal's normal pH); Chiang Depo. at 63:19-22 (stating that urine's pH is higher than natural vaginal canal pH); Ehrenberg Depo. at 77:25-78:4 (stating that at least from one record, the Nitrazine test's result was consistent with amniotic fluid); id. at 86:10-87:3 (stating that it stands to reason there is more error in testing Nitrazine fluid from a pad than directly from the vagina); Videotaped Deposition of Stephanie Levy at 40:6-41:8 (taken April 23, 2019), filed June 3, 2019 (Doc. 286-11)("Levy Depo.")(stating that blood and urine can make a pH amniotic fluid test unreliable, that the standard of care is to collect from the vagina, and that nitrazine paper turns blue if amniotic fluid is a possibility).

The Court concludes that Tanner's cited sources do not present a genuine dispute as to the test having produced a negative result, where none of Tanner's cited sources dispute the color of the pH strip after Luna performed the test -- as the Levy Depo. notes, a bright blue result indicates amniotic fluid as a possibility, and none of Tanner's sources contend that the Nitrazine strip was

Nitrazine paper test to objects such as a soiled uniform or a discarded sanitary napkin is not a reliable way of testing the pH of a bodily fluid. See Response at 11 (stating this fact)(citing Ehrenberg Depo. at 86:10-87:3; Levy Depo. at 40:6-41:8; Chiang Depo. at 63:19-22).[101] Luna

blue in color after Luna performed the test. Although there is a discrepancy between Luna's notation of the pH level as 6.5 and Boyd's notation of the pH level as 7.0, the Nitrazine test's indicator is color, as the Levy Depo. notes, and, despite an apparent disagreement about the pH level to which the test's color corresponded, Tanner presents no facts in the record to dispute that Luna read the test to produce a result indicating that the fluid was not amniotic. See McMurray Depo. at 146:7-9 (indicating that the liquid came back negative on the Nitrazine test). Although Tanner cites to portions of the record which contend that Luna's method in performing the test may have produced an inaccurate result, Tanner does not present evidence suggesting that the possible contamination would necessarily have produced a false negative. See, e.g., Healthline, Test for Premature Rupture of Membranes, https://www.healthline.com/health/pregnancy/premature-rupture-tests (last visited July 3, 2019)(noting that blood or an infection could elevate the vaginal fluid's pH, producing a false positive, thereby inaccurately indicating that amniotic fluid is present). The Court does not adopt Tanner's proposed fact that the Nitrazine test "was consistent with amniotic fluid from Ms. Tanner's" water breaking, because the record does not indicate with clarity what the test's result was. Response at 11. Because the record does not indicate what color the strip was, the Court alters the proposed fact to better reflect what the record can support -- that Luna read the Nitrazine test's result as negative for the presence of amniotic fluid. The fact as stated in the text is supported by the record, and the Correct Care Defendants do not address it in their Reply, so the Court adopts it as undisputed. See Fed. R. Civ. P. 56(e)(2).

[101]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 25. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy. See Response at 11. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The text's fact is altered slightly from Tanner's proposed fact, which stated: "Though applying the Nitrazine paper to such objects is not a reliable way of testing the pH of a bodily fluid . . . ," because the Court notes a distinction between Tanner's inference that applying the Nitrazine paper to Tanner's uniform and pad was not a reliable method, and the statement that

applying a Nitrazine test to a "soiled" uniform or a "discarded" sanitary pad is unreliable. Response at 11. Tanner presents no facts indicating that Tanner's uniform was "soiled" by anything other than the possibly-amniotic fluid. Tanner also implies that Luna tested Tanner's pad which she extracted from the waste bin in Tanner's cell, but the Court, having reviewed the record, concludes that Luna stated that Tanner went into the restroom in the medical unit, changed out her pad, and gave Luna the pad she had been wearing, for Luna to then test. See Luna Depo. at 172:8-10. Tanner cites to the Ehrenberg Depo. at 86:10-87:3, but the Court notes that Dr. Ehrenberg was not commenting on the reliability of testing Tanner's pad which she had been wearing, but rather on the inherent unreliability of testing a pad in the garbage can. See Ehrenberg Depo. at 80:13-15 (stating that a Nitrazine test is not performed on a "pad that's in the garbage, the way they do in prison."); id. at 86:21-24 (stating that it stands to reason there would be more error in testing something indirectly, "[p]articularly after that pad has been placed in proximity to other things of other pH values in the garbage can); id. at 87:1-3 (stating, "it's just not done. You just don't Nitrazine a pad that's in the garbage."); id. at 88:2-4 (explaining that testing a pad from the garbage is unreliable because the pad will collect "urine, stool, vaginal fluid, vaginal secretions and then whatever was in the garbage."). Tanner also cites to the Levy Depo. at 40:6-41:8, but the Court notes that this portion of the Levy Depo. states only that blood and urine can render a Nitrazine test unreliable, and states in general that Nitrazine tests "are not always reliable, because there are multitudes of different pHs that can exist in that area." Levy Depo. at 40:6-41:8. The Levy Depo. does not state that testing fluid from a pad which the patient was wearing, and from which no urine smell was detected and no blood was visible, is significantly more likely to produce a false negative result. Tanner also cites to the Chiang Depo. at 63:19-22, but the Court notes that the Chiang Depo. merely states that when performing a Nitrazine test, the tester should check fluid from the vaginal canal, to avoid contamination with urine. See Chiang Depo. at 63:19-22. The Court also notes that the Chiang Depo. goes on to state that urine would result in a higher pH reading -- a false positive result. See Chiang Depo. at 63:9-24. None of Tanner's cited sources address Tanner's situation -- where Luna tested fluid from the uniform and pad which Tanner was wearing, which Tanner contends did not smell of urine, and which the record does not indicate displayed blood. None of Tanner's cited sources contend that the type of contamination possible if fluid from an object is tested rather than fluid from inside the vagina, risks a false negative result -- in fact, the Chiang Depo. suggests the opposite. The Court alters the proposed fact to better reflect the record, concluding that the record does not support that Luna's method of testing Tanner's uniform and pad was unreliable, but that the record supports that testing a soiled uniform or a discarded sanitary napkin is not a reliable way to test a body fluid's pH. In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy as articulated in the text. See Response at 11. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

relied on her nursing school training on pH testing, in order to perform the Nitrazine paper test.

See Response at 11-12 (stating this fact)(citing Luna Depo. at 172:21-24).[102]

---

[102]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 25. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy. See Response at 11. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The text's fact is altered slightly from Tanner's proposed fact, which states: "Luna relied on her own subjective reading of the Nitrazine paper despite knowing that she had not received any training on pH testing since nursing school, and without consulting EMT Boyd or reviewing her worksheet, which indicated a different result more consistent with amniotic fluid." Response at 11-12 (citations omitted)(citing Luna Depo. at 172:21-24; Boyd Emergency Response Worksheet at 5). The Court does not adopt Tanner's proposed fact as she articulates it, because the record to which Tanner cites does not support that Luna did not consult Boyd, and because Luna could not have consulted Boyd's worksheet, because the Boyd Emergency Response Worksheet was prepared after Luna administered the Nitrazine test. See Boyd Emergency Response Worksheet at 1 (stating that the Med 1 nurse, Luna, performed an amniotic fluid test). Although the Boyd Emergency Response Worksheet notes that the Nitrazine test's result was a pH of 7.0, which is inconsistent with Luna's notation that the test's result was a pH of 6.5, see Luna Progress Note at 1, the Boyd Emergency Response Worksheet indicates that Boyd did not intend to refer to a second Nitrazine test with an inconsistent result, as Tanner implies, but rather that Boyd referred to the test which Luna performed. See Boyd Emergency Response Worksheet at 5. Although the Court makes all reasonable inferences in Tanner's favor, the Court concludes that it is not reasonable to infer that Luna should have consulted Boyd based on a worksheet that Boyd prepared after Luna administered the Nitrazine test, where the worksheet refers to the test Luna performed, and refers to the same result. Further, the Court does not adopt as fact that Luna did not consult Boyd prior to administering the Nitrazine test, because nothing in the record indicates that she did not speak to or strategize with Boyd prior to administering the test. The Court altered the proposed fact to better reflect the record, and that altered fact is the text's fact. In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy. See Response at 11. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

### 9. **Luna's Call to Dr. McMurray.**

Luna called Dr. McMurray, the on-call physician, at 10:28 a.m. on October 16, 2016. See

Partial MSJ ¶ 26, at 9 (stating this fact)(citing Luna Depo. Excerpts at 160:9-161:2, filed June 14,

2019 (Doc. 303-7)("Luna Depo. Excerpts")); id. at 181:13-18.[103]  Luna told Dr. McMurray that

---

[103]Tanner purports to dispute the text's fact, stating: "Plaintiffs dispute the account of communications with Dr. McMurray on October 16, 2016, provided in CCS SOF No. 26.  No provider was present at the facility on October 16, 2016, and no recording of any phone call between Defendant Luna and Defendant McMurray has ever been produced."  Response at 11. Rule 56 states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).  Although Tanner purports to dispute the text's fact, she does not meet rule 56(c)'s requirements to genuinely dispute a fact, because she cites to no part of the record in support of her dispute, she does not show that the Correct Care Defendants' cited materials -- the Luna Depo. and the McMurray Depo. do not establish the absence of a genuine dispute, and she does not show that the Correct Care Defendants cannot produce admissible evidence to support the fact of the call.  See Luna Depo. at 181:13-18 (Luna attesting that she called Dr. McMurray at 10:28 a.m. on October 16, 2016 and that she noted that time in the Luna Progress Note); Luna Progress Note at 1 (noting that Luna called Dr. McMurray at 10:28 a.m.); McMurray Depo. at 141:23-153:25 (describing Dr. McMurray's call with Luna and detailing the information Luna provided him on the phone call).  Tanner does not contest the Luna Depo.'s, the McMurray Depo.'s, or the Luna Progress Note's admissibility at trial, and Luna and Dr. McMurray would presumably testify at a trial regarding their recollection of the call.  In her response to the text's fact, Tanner indicates her awareness of the portions of the record supporting that a call was made,

she had evaluated Tanner twice that morning, and she reported to him Tanner's complaints, medical history, positive fetal heart tones, and negative Nitrazine paper test. Partial MSJ ¶ 26, at 9 (stating this fact)(citing Luna Depo. Excerpts at 181:13-18).[104] Dr. McMurray ordered that Tanner be held for medical observation in the Sheltered Housing Unit ("SHU"), where corrections officers would make rounds approximately every 15 minutes. See Partial MSJ ¶ 26, at 9 (stating this fact)(citing McMurray Depo. Excerpts at 182:2-184:24, filed June 14, 2019 (Doc. 303-

---

and states: "On her progress note from that date, Defendant Luna claimed she called Defendant McMurray on his cellphone at about 10:28 am that morning," and later, Tanner states that Dr. McMurray attested in his deposition that "he was relying exclusively upon the information Luna gave him over the phone." Response at 12. That the call was not recorded does not militate against the fact that it occurred, which Tanner does not dispute with any citation to the record. The Court concludes that, pursuant to rule 56(c), Tanner has not asserted a genuine dispute to the text's fact, so the Court adopts it as undisputed. See Fed. R. Civ. P. 56(c).

[104]Tanner does not state whether she admits or denies this fact, but states: "Plaintiffs dispute the account of communications with Dr. McMurray on October 16, 2016, provided in CCS SOF No. 26." Response at 11. Tanner does not, however, address whether Luna told Dr. McMurray that she had evaluated Tanner twice that morning, and whether Luna reported to him Tanner's complaints, medical history, positive fetal heart tones and negative Nitrazine paper test. Although the Correct Care Defendants cite to the Luna Depo. Excerpts at 181:13-18 in support of the text's fact, the Court, having reviewed the record, notes that the Luna Depo. Excerpts at 181:13-18 establish only that Luna called Dr. McMurray at 10:28 a.m. and that she listed the call on the Luna Progress Report, but that other portions of the Luna Depo. Excerpts better support the text's facts. See Luna Depo. Excerpts at 182:2-183:5 (establishing that Luna reported the pH testing, fetal heart monitor, and vital signs to Dr. McMurray, that Luna mentioned she had seen Tanner twice, and that Luna reported to Dr. McMurray her findings and Tanner's history, to the extent that Luna was able to obtain it from Tanner). The Court, having reviewed the whole record and concluding that the record supports the text's fact, adopts it as undisputed, because Tanner does not address it and the Court has no independent reason to doubt its accuracy. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

8)("McMurray Depo. Excerpts")).[105]   On October 16, 2016, Dr. McMurray did not request or review any records about Tanner's medical history, although Dr. McMurray signed electronically the Boyd Emergency Response Worksheet at 6:53 p.m. Mountain Standard Time.  See Response at 12 (stating this fact)(citing McMurray Depo. at 146:22-147:6).[106]

---

[105]Tanner does not state whether she admits or denies this fact, but states: "Plaintiffs dispute the account of communications with Dr. McMurray on October 16, 2016, provided in CCS SOF No. 26."  Response at 11.  In her response to the text's fact, Tanner states that Luna claims that Dr. McMurray told her: "'We don't know much about [Ms. Tanner] as far as medical history.  Put her in the SHU, observe, keep me updated.  I'll see you in the morning."  Response at 12 (alterations in Response)(citing Transcript of Recorded Interview: Interview of Adriana Luna at 8:9-10 (dated March 1, 2017), filed June 4, 2019 (Doc. 288)("Luna Interview Tr.")).  Tanner does not cite to any portion of the record disputing the Luna Interview Tr.'s recounting, that Dr. McMurray ordered staff to put Tanner in the SHU and observe her.  Tanner does not cite to any portion of the record disputing the Correct Care Defendants' assertion that corrections officers would conduct rounds every fifteen minutes in the SHU.  Pursuant to rule 56(c), Tanner has not asserted a genuine dispute as to the text's fact.  The Court concludes that the record supports the text's fact, where the McMurray Depo. Excerpts at 146:11-19 state that corrections officers observe inmates housed in the SHU every fifteen minutes, and that Dr. McMurray told Luna to put Tanner in the SHU.  See McMurray Depo. Excerpts at 146:11-19.  See also Luna Depo. Excerpts at 160:15-161:2 (stating that Dr. McMurray provided verbal authorization to house Tanner in the SHU, the medical unit's back area).  The Court, having reviewed the whole record and concluding that the record supports the text's fact, adopts it as undisputed, because Tanner does not address it and the Court has no independent reason to doubt its accuracy.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[106]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 26.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 11.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  Tanner provides additional context for the text's fact, stating:

Defendant McMurray did not request or review any records about Ms. Tanner's medical history.  In particular, there is no record that Dr. McMurray ever reviewed the results of Defendant Luna's Nitrazine paper test or compared it to the different results reported by EMT Boyd.  At his deposition, he claimed he was relying exclusively upon the information Luna gave him over the phone. . . . McMurray Dep. at 146:22-147:6.  Defendant McMurray had occasion to review records from his home on the evening of October 16, 2016, while Ms. Tanner was housed in the Sheltered Housing Unit (SHU).  *See id.* at 29:13-17.  At that time, he saw and signed EMT Boyd's emergency response worksheet for the Code 43 call earlier that day, which reported "bright red blood" on the sanitary pad, and a pH reading of 7.0.  See [Boyd Emergency Response Worksheet] at 5 (showing his e-signature at 6:53pm).  He did not review or sign the "pathway" form Defendant Luna had completed earlier in the day, and Defendant Luna never informed him of it as instructed on the "pathway" itself. . . . McMurray Dep. at 159:7-21.  He did not review Luna's progress note regarding the Code 43 call because he viewed it as "not an emergency." *Id.* at 172:1-8.  The records available to Dr. McMurray on October 16, 2016, which he declined to review at that time, were rife with conspicuous errors, omissions, and inconsistencies, as noted above, but McMurray took no action.  *See*, *e.g.*, [Boyd Emergency Response Worksheet] (noting that the fluid tested at a pH of 7.0); [Luna Progress Note] (listing instead a pH of 6.5), [Nursing Pathway] (pathway form), [Health Assessment Form, filed June 3, 2019 (Doc. 287-6)("Health Assessment Form")] (health assessment form signed by Dr. McMurray on October 15, 2016, which failed to indicate review of receiving screening form on Oct. 4, 2016, did not acknowledge Ms. Tanner's pregnancy or refer her to a chronic care clinic, and contained no treatment plan).

Response at 12.

The Court does not adopt Tanner's statement that there is no record Dr. McMurray reviewed Luna's Nitrazine test results or compared them with Boyd's reported results, as fact, because Tanner does not support this statement with any citation to the record.  See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . .").  The Court also reiterates its conclusions supra n.100, that the Boyd Emergency Response Worksheet reported the test Luna performed, and not a second test with which to compare Luna's test.  See supra n.100.  Tanner implies that Boyd witnessed a different result, either from the same test or a different test, but there is nothing in the record to support that Boyd herself witnessed the test and

drew a different conclusion, as opposed to simply recorded incorrectly what Luna relayed to her. There is no basis in the record to conclude or suggest that it was error not to "compare[]" Luna's Nitrazine test results "to the different results reported by EMT Boyd." Response at 12. The Court does not adopt Tanner's statement, that Dr. McMurray never reviewed the Nitrazine test results or compared them to Boyd's results, as undisputed fact, because Tanner does not support her statement with citation to the record as rule 56(c)(1)(A) requires. See Fed. R. Civ. P. 56(c)(1)(A).

The Court does not adopt Tanner's statements that Dr. McMurray claimed he relied exclusively on the information Luna provided, or that he had occasion to review records from his home, as separate material facts, because to do so would be redundant, because the text's fact encompasses them with the broader statement that Dr. McMurray did not review Tanner's medical history records on October 16, 2016. The Court does not adopt as fact Tanner's statements that: (i) Dr. McMurray did not review or sign Luna's Nursing Pathway, (ii) Luna never informed him of it as instructed on the pathway, and (iii) Dr. McMurray did not review the Luna Progress Note, because he viewed it as not an emergency, because Tanner mischaracterizes the facts in an argumentative form, as explained below.

Dr. McMurray testified that it was not common practice for a provider to review or sign a Nursing Pathway, because the Nursing Pathway is a Correct Care corporate protocol document, and not a document intended for physician review. See McMurray Depo. at 156:9-157:7. Dr. McMurray also testified that Luna prepared a "SOAP" note, and, while he did not review the Nursing Pathway in particular, he may have reviewed the SOAP note. See McMurray Depo. at 159:12-13 (stating "This particular pathway, no. I think this was created the same time that she wrote a SOAP note."). The Court notes, for the reader's edification and for background information, that a SOAP note "is a method of documentation employed by health care providers to write out notes in a patient's chart," and that SOAP is an acronym for subjective, objective, assessment, and plan. SOAP note, Wikipedia, https://en.wikipedia.org/wiki/SOAP_note (last visited July 5, 2019). Tanner implies that Luna should have informed Dr. McMurray that she completed the pathway but does not cite to anything on the record requiring Luna to inform Dr. McMurray when she completes a pathway, so the Court does not adopt it as fact. See Fed. R. Civ. P. 56(c)(1)(A). Tanner also implies that Dr. McMurray did not view the situation Luna described in her progress note regarding the Code 43 as an emergency, when, in fact and in context, Dr. McMurray stated that progress notes are not emergency documents which he is typically tasked with reviewing in evening hours after the day's shift is over. See McMurray Depo. at 172:1-8.

Tanner next states that the records available to Dr. McMurray were "rife with conspicuous errors, omissions, and inconsistencies," but the Court does not adopt this as undisputed fact, because the Court has already adopted as fact the inconsistencies and omissions earlier in the factual background, and because "rife with" is a characterization, and not a fact. The Court adopts, however, Tanner's statement that Dr. McMurray signed electronically the Boyd Emergency Response Worksheet, because the Boyd Emergency Response Worksheet at 6 indicates that it was "E-Signed by Timothy McMurray, Provider, on 10/16/2016 06:53 PM MST". Boyd Emergency

**10.     Tanner's Placement in the SHU and Luna's Observation of Tanner.**

Tanner initially wanted to go to the hospital, and after Luna consulted with Dr. McMurray

and received his orders to move her to the SHU, Tanner asked to return instead to her housing pod

and forgo care, but Luna told her she had to stay in the SHU, or "we'd just be going back and forth

with code[ 43s]."  Response at 13 (stating this fact)(citing Luna Depo. at 183:17-23; id. at 184:12-

14; Boyd Emergency Response Worksheet at 5; Luna Interview Tr. at 8:13-18)(quoting Luna

Interview Tr. at 8:14-15).[107]  Tanner, after her placement in the SHU at 10:38 a.m., complained of

───────────────

Response Worksheet at 5.  The Court concludes that the text's fact encompasses the assertions
which Tanner makes that are supported by the record, and the Court declines to adopt Tanner's
characterizations of and emphases on certain facts, in favor of adopting only the undisputed,
supported fact that Dr. McMurray did not request or review any records about Tanner's medical
history, on October 16, 2016.

[107]Tanner asserts the text's fact not as an additional material fact, but in response to the
Partial MSJ's proposed fact 27, stating that she "dispute[s] the account of Ms. Tanner's placement
in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27."  Response at 13.  In disputing
that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did
not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner,
construes them as additional material facts for the purposes of this motion.  In the Reply, the
Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court
accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 13.
See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed
undisputed unless specifically controverted.").
        The Court adopts the text's fact, altered from Tanner's proposed facts, because Tanner's
proposed facts are unsupported by the record.  Tanner contends first that "Defendant Luna
informed Ms. Tanner that she would be housed alone in the SHU until Defendant McMurray could
see her, which wouldn't be until the next day."  Response at 13 (citing Luna Depo. at 183:17-23).
The Luna Depo. at 183:17-23 states that Dr. McMurray told Luna to move and house Tanner in
the SHU and that he would see her in the morning but does not state that Luna conveyed that
information to Tanner in those words.  See Luna Depo. at 183:17-23.  Further, Tanner was not
alone in the SHU.  See, e.g., Luna Depo. at 184:22-23 (Luna stating that the first hour Tanner was
in the SHU, Luna was back there with her a lot).  Concluding that Tanner's statement is

unsupported by the record to which she cites, the Court does not adopt the statement as Tanner articulates it.

Tanner next states that she asked not to be placed in the SHU, and that she wanted to go to the hospital, but her request was denied, so she asked to return to Pod F-7. <u>See</u> Response at 13. The Court concludes that this statement is supported by the record. <u>See</u> Boyd Emergency Response Worksheet at 5 (stating that "pt is wanting to go to the hospital, Med 1 Nurse advised doctor of pt condition and pt was to remain in SHU until morning."); <u>id.</u> at 5 (then stating that Tanner stated "well what if I refused and go back to my pod," and that Luna advised Tanner "she is staying in SHU."); Luna Depo. at 184:12-14 (stating that Tanner "at first, was refusing to go back to the SHU. Did not want any care, wanted to go back to her pod."); <u>id.</u> at 184:17-18 (Luna stating that she told Tanner "she had to go to the SHU."); Luna Interview Tr. at 8:13-18 (stating that Luna overrode Tanner's request to go back to the housing pod because she and the medical staff felt that they risked Tanner going back and forth between the medical unit and the housing pod with code 43 emergencies).

anxiety to the officer on duty around 11:13 a.m.  See Response at 13 (stating this fact)(citing Luna

Progress Note at 1).[108]  Luna went to check on Tanner[109] and listened to Tanner's fetus' heart

---

[108]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 27, stating that she "dispute[s] the account of Ms. Tanner's placement in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27."  Response at 13.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 13.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The Court concludes that the text's fact is supported by the record.  See Luna Progress Note at 1 (stating that at 11:13 a.m. the officer in the back of the medical unit -- in the SHU -- informed Luna that Tanner was having a lot of anxiety).  The Court altered the text's fact from Tanner's proposed fact, which states that Tanner "began complaining of pain and anxiety," because the portion of the record to which Tanner cites in support of her proposed fact, the Luna Progress Note, only registers a complaint of anxiety, and not of pain.  Response at 13.  See Luna Progress Note at 1.  The Court adopts as fact only the portion of Tanner's proposed fact which is supported by the record.  See Fed. R. Civ. P. 56(c)(1)(A).  Tanner also states that her complaints began "[a]lmost immediately after Ms. Tanner had been placed in the SHU," but the Court does not adopt this statement as fact, because "almost immediately" is a characterization, and not a fact.  Response at 13 (citing Luna Progress Note; Infirmary Corridor Video, 10:38 a.m., filed June 4, 2019 (Doc. 288)("Infirmary Corridor Video")).  The Court adopts the time Tanner entered the SHU, 10:38 a.m., and the time her first complaint was entered, 11:13 a.m., as undisputed fact, because the Correct Care Defendants do not address the times in their Reply and because the Court has no independent reason to doubt their accuracy, as both are supported by the record.  See Luna Progress Note; Infirmary Corridor Video, at 10:38 a.m.  In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 13.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[109]In the Response, Tanner purports to "dispute that [Luna] 'checked on' Ms. Tanner in any medical sense,"  Response at 13 (quoting Partial MSJ ¶ 27, at 9).  Tanner cites to no part of the record in support of her dispute regarding the phrase "checked on."  Partial MSJ ¶ 27, at 9.  Although Tanner avers that Luna did not check on Tanner in any medical sense, the Correct Care

tones.  See Partial MSJ ¶ 27, at 9 (citing Luna Depo. at 186:1-23; id. at 188:25-189:15).[110]  Tanner

asked Luna to let her go to the hospital, but Luna declined.  See Response at 14 (citing Tanner

_____

Defendants do not frame their proposed fact to suggest that they imply Luna's check up was strictly medical.  See Partial MSJ ¶ 27, at 9 (stating in part that "Nurse Luna also checked on Plaintiff shortly before the end of her shift.").  The Court concludes that the Correct Care Defendants do not contend that Luna's checkups were in any medical sense, and that, although the Court makes all reasonable inferences in Tanner's favor, Tanner cites to no part of the record in support of her dispute and, therefore, the Court concludes that she does not raise a genuine dispute as to the use of the phrase "checked on."  See Fed. R. Civ. P. 56(c)(1)(A).

    [110]Tanner does not specifically state whether she admits or disputes this fact, but she states that she "dispute[s] the account of Ms. Tanner's placement in the Sheltered Housing Unit (SHU) provided in CCS SOF No. 27."  Response at 13.  In her response to the text's fact, however, Tanner states that to "placate [Tanner], Defendant Luna went to her cell with a fetal heart monitor and allowed her to hear her baby's heart tones but did not measure them for any clinical purpose."  Response at 14 (citing Tanner Decl. ¶ 20, at 6-7; Luna Progress Note at 1; Luna Depo. at 188:14-16).  Tanner's statement admits that Luna went to her cell and listened to her fetus' heart tones.  Further, the Court, having reviewed the record, concludes that the record supports the text's fact.  See Luna Depo. at 188:25-189:15 (stating that Luna monitored fetal heart tones on Tanner, and that Tanner heard the fetal heart tones); Luna Progress Note at 1 (stating that, at or around 11:13 a.m., Luna "[p]erformed [a fetal heart tones monitor] on [patient] and [patient] states she feels more relieved after hearing heart beat again."); Tanner Decl. ¶ 20, at 6-7 (stating that Luna came back with the equipment to listen to the fetus' heart tones and let Tanner listen to the fetus' heartbeat).  The Court does not adopt the portion of the fact which Tanner proposes, that Luna did not measure the fetal heart tones for any clinical purpose, because, while the record supports that Luna did not record the fetal heart tones, the record does not support that Luna did not measure them in the moment for any clinical purpose.  See Luna Depo. at 189:6-8.  Further, Tanner does not protest that observing whether fetal heart tones are present at all is a clinical purpose.  Concluding that the record does not support this portion of the proposed fact, the Court does not adopt it.  See Fed. R. Civ. P. 56(c)(1)(A).

    Tanner asserts, not as an additional material fact, but in response to the Partial MSJ's proposed fact 27, that "Luna saw Ms. Tanner in her cell because she was 'having a lot of anxiety,' as well as ongoing cramping, pressure, and leaking fluid."  Response at 13-14 (quoting Luna Progress Note at 1, Tanner Decl. ¶¶ 18-20, at 6-7.  Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court does not adopt as undisputed fact that Luna went to see Tanner because of

- 68 -

the record to which Tanner cites in support of this fact do not support that Luna responded to Tanner's cell with an awareness of Tanner's cramping, pressure, and leaking fluid.  <u>See</u> Luna Progress Note at 1; Tanner Decl. ¶¶ 18-20, at 6-7.  The Luna Progress Note indicates that Luna responded to Tanner's cell because of her reported anxiety.  <u>See</u> Luna Progress Note at 1.  The Tanner Decl. states that, while Tanner was in the SHU, she was still feeling the symptoms she reported earlier, but Tanner does not contend in her declaration that she reported those symptoms again, or that Luna came to check on her because of a new report of those symptoms.  <u>See</u> Tanner Decl. ¶¶ 18-20, at 6-7.  The Court, having reviewed the whole record, concludes that the record does not support that Luna went back to check on Tanner because of ongoing cramping, pressure, and leaking fluid, so the Court does not adopt this portion of the fact as undisputed.  <u>See</u> Fed. R. Civ. P. 56(c)(1)(A).

Decl. ¶ 20, at 7).[111]  Luna did not vaginally examine Tanner.  See Response at 14 (citing Tanner

Decl. ¶ 20, at 7).[112]  Luna checked on Tanner once more, shortly before the end of her shift between

[111]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 27, stating that she "dispute[s] the account of Ms. Tanner's placement in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27."  Response at 13.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 13.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The Court concludes that the text's fact is supported by the record.  See Tanner Decl. ¶ 20, at 7 (stating "I asked her again to let me go to the hospital.  She said I would have to wait in the segregation cell in the SHU until the doctor came to clear me the next day.").  Tanner proposes as fact that Luna "ignored Ms. Tanner's repeated requests to go to the hospital or see a doctor," Response at 14 (citing Tanner Decl. ¶ 20, at 7), but the Court does not adopt this as fact, although the Correct Care Defendants do not address it in their reply, because the record does not support it.  See Tanner Decl. ¶ 20, at 7 (stating that, in response to Tanner's request to go to the hospital, Luna responded that she would remain in the SHU until the next day, when a doctor came to clear her).  The Court concludes that the Tanner Decl., to which Tanner herself cites, suggests that Luna responded to -- and did not ignore -- Tanner's request to go to the hospital, and that Luna did not ignore or decline Tanner's alleged request to see a doctor -- in fact, Luna informed Tanner that she would see a doctor the next day.  See Tanner Decl. ¶ 20, at 7.  The Court, having reviewed the whole record, concludes that the record does not support that Luna ignored Tanner's requests to go to the hospital or to see a doctor, so the Court does not adopt this portion of the fact as undisputed.  See Fed. R. Civ. P. 56(c)(1)(A).

[112]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 27, stating that she "dispute[s] the account of Ms. Tanner's placement in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27."  Response at 13.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.

The Court concludes that the text's fact is supported by the record.  See Tanner Decl. ¶ 20, at 7 (stating that Tanner asked Luna "to examine [her] or at least just look at [her] vaginal area to make sure what [Tanner] was feeling wasn't something abnormal.  But the nurse said she couldn't

approximately 5:15 p.m., and 5:50 p.m., and Tanner was on the telephone at the time. Partial MSJ

¶ 27, at 9 (stating that Luna checked on Tanner before the end of her shift)(citing Luna Depo. at

186:1-23; id. at 188:25-189:15).[113]  When Luna saw her, Tanner was anxious, crying, leaking fluid,

do that.").  In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 13.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  Tanner also proposes as fact that Luna "did not give Ms. Tanner any pain medication or sanitary napkins (though Ms. Tanner had run out of pads," but the Court does not adopt this as fact, concluding that the record does not support it.  Response at 14.  See Fed. R. Civ. P. 56(c)(1)(A).  The Tanner Decl., to which Tanner cites in support of this proposed fact, states that Tanner asked the corrections officer for more sanitary pads to soak up her discharge but does not state whether Tanner was provided those pads, and Tanner does not declare that she was not provided with additional sanitary pads. See Tanner Decl. ¶ 19, at 6.  Although Tanner states "I had already went through all the sanitary pads they gave me before the day shift ended for the corrections officer in the SHU," Tanner Decl. ¶ 21, at 7, Tanner does not contend when the day shift ended, when she was last provided with sanitary pads, or whether Luna provided some to her.  Nor does Tanner contend that she was not provided with pain medications.  See Tanner Decl. ¶¶ 18-20, at 6-7.  Although the Court draws all reasonable inferences in Tanner's favor, the Court does not adopt Tanner's proposed fact that Luna did not give Tanner any pain medications or sanitary pads, because the record does not support that fact.  See Fed. R. Civ. P. 56(c)(1)(A).  The Court, having reviewed the whole record and concluding that the record supports the text's fact, adopts it as undisputed, considering that the Correct Care Defendants do not address it, and therefore do not dispute it, in the Reply.  See D.N.M.LR-Civ. 56.1(b).

[113]Although Tanner does not specifically state that she admits or disputes the text's fact, and states that she "dispute[s] the account of Ms. Tanner's placement in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27," Response at 13, in her response to the fact, Tanner also states that "Defendant Luna saw Ms. Tanner 'once again' several hours later, between approximately 5:15 and 5:50 pm when Ms. Tanner 'was on the phone.'"  Response at 14 (quoting Luna Depo. at 186:11-18; id. at 187:18-20)(citing Index of Securus Telephone Calls at 1, filed June 3, 2019 (Doc. 287-31)("Securus Call Index")(stating that Tanner made two telephone calls from the medical unit on October 16, 2016, at 5:14 p.m., and at 5:33 p.m.).  The Court concludes that there is no genuine dispute regarding the text's fact, because Tanner does not address, either to admit or dispute, that Luna's shift ended at 6:00 p.m., and that Luna checked on Tanner shortly before the end of her shift, and the record supports these facts.  See Luna Depo. at 186:16-18

bleeding, and in pain.[114]  Luna provided Tanner with no further care, but when she went back to

check on Tanner, she stated that "we did kind of a wave good luck; see ya next time," and then

_____

(stating that Luna went back to check on Tanner before her shift ended and found Tanner on the phone); id. at 187:18-20 (stating that Luna's shift ended at 6:00 p.m.).  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  The Court, having reviewed the record, concludes that the record supports the text's fact, and the Court adopts it as undisputed, considering that the Correct Care Defendants do not address it, and therefore do not dispute it, in the Reply.  See D.N.M.LR-Civ. 56.1(b).


[114]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 27, stating that she "dispute[s] the account of Ms. Tanner's placement in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27."  Response at 13.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.

    Tanner proposes as fact that, "[w]hen Defendant Luna saw her, Ms. Tanner was anxious, crying, bleeding, leaking fluid, and in pain."  Response at 14 (citing MP3 30 MDC 10-16-2016 17.14.18 at 5:14 p.m., filed June 4, 2019 (Doc. 288)("Palmer Call")); MP3 31 MDC 10-16-2016 17.33.24, filed June 4, 2019 (Doc. 288)("Hinton Call").  Three minutes into the Palmer Call, Tanner states that while she was leaking earlier, she is not currently leaking.  See Palmer Call at 03:00-03:05.  Tanner then states that she is not currently having contractions.  See Palmer Call at 03:05-03:13.  Tanner says she is feeling something heavy "down there", and that she is unable to use the restroom.  See Palmer Call at 03:45-04:45.  She also says that the baby is moving.  See Palmer Call at 04:45-05:00.  Tanner then states that she is cramping.  See Palmer Call at 06:00-06:05.  Tanner states that she is in pain.  See Palmer Call at 08:30.  Tanner later sniffles and appears to be crying on the phone call.  See Palmer Call at 10:00.  Between 5:14 p.m., and some time before 5:33 p.m., when the Hinton Call began, Tanner was anxious, crying, and in pain.  Nothing on the Palmer Call indicates that Tanner was bleeding or leaking fluid, and in fact, she states that she is not currently leaking fluid.  See generally Palmer Call.  Tanner's call to Jay Hinton began at 5:33 p.m.  See Hinton Call at 00:00.  Tanner states that she was bleeding earlier in the day.  See Hinton Call at 02:30-02:40.  Tanner states that she was bleeding on pads, but that it was "not like bad, it's like light blood."  Hinton Call at 03:45-04:00.  Tanner then states that she leaked all over the floor before she was brought to the medical unit.  See Hinton Call at 04:05-04:20.  Tanner Tanner states that while in the medical unit's cell, she used "like ten pads" "full of like, bloody, watery stuff."  Hinton Call at 05:00-05:20.  Tanner states that she then heard the baby's heart beat and that the baby was okay.  See Hinton Call at 05:25-05:45.  Tanner then states that now she

Luna went home.  Response at 14 (stating this fact)(citing Luna Depo. at 186:18-19).[115]  Tanner

asked to see a doctor or go to the hospital multiple times during the day on October 16, 2016, and

---

cannot use the bathroom, and it "hurts so bad."  Hinton Call at 05:58-06:10.  Tanner states that "it
hurts so bad."  Hinton Call at 08:26.

      The Court adopts Tanner's proposed fact -- the text's fact -- as undisputed, because the
Correct Care Defendants do not address it in their Reply, and the Court concludes that the record
supports the text's fact, because it is undisputed that Luna saw Tanner while she was on the phone,
see supra n.111, it is undisputed that Tanner made phone calls before Luna's shift ended to Palmer
and Hinton, see Securus Call Index, and during those phone calls, Tanner states at various points
that she is anxious, crying, and in pain.  See, e.g., Palmer Call at 08:30; id. at 10:00.  See also
Hinton Call at 08:26.  Although Tanner states during the Palmer Call that she is not currently
leaking, see Palmer Call at 03:00-03:05, Tanner states during the Hinton Call that, while in the
medical unit cell, she soaked ten pads with bloody, watery fluid, see Hinton Call at 05:00-05:20.
It is not clear from the Palmer Call and the Hinton Call whether Tanner is currently bleeding or
leaking fluid, but, making all reasonable inferences in Tanner's favor, the Court adopts the fact as
Tanner proposes it, because nothing in the record controverts it, and the Correct Care Defendants
do not address it.

      [115]Tanner asserts the text's fact not as an additional material fact, but in response to the
Partial MSJ's proposed fact 27, stating that she "dispute[s] the account of Ms. Tanner's placement
in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27."  Response at 13.  In disputing
that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did
not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner,
construes them as additional material facts for the purposes of this motion.  In the Reply, the
Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court
accepts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 13.
See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed
undisputed unless specifically controverted.").  The Court also notes that the record supports the
text's fact.  See Luna Depo. at 186:18-19 (stating that when she went back to check on Tanner
before her shift's end, Tanner was on the phone, "[s]o, we did kind of a wave good luck; see ya
next time.").  Tanner proposes as fact that Luna "kind of wave[d] good luck, see ya next time,"
Response at 14 (citing Luna Depo. at 186:18-19), but the Court alters the proposed fact to better
reflect the record, which indicates that Luna stated that "we" waved, suggesting that Luna referred
to herself and Tanner waving at one another, as opposed to Tanner's implication that Luna alone
waved at Tanner.  Luna Depo. at 186:18-19.  Even drawing all reasonable inferences in Tanner's
favor, the Court does not adopt Tanner's fact as she proposes it, because Tanner states: "as [Luna]
described the interaction, she 'kind of wave[d] good luck, see ya next time,' and went home,"

her requests were denied, including by Luna. See Response at 14 (stating this fact)(citing Tanner

Decl. ¶ 16, at 5-6; id. at ¶ 20, at 7; OPS Report at 34).[116]  Luna told Taileigh Sanchez, the only

oncoming Med One nurse, about Tanner's condition, and mentioned that listening to Tanner's

fetus' heart rate helped ease Tanner's anxiety. See Partial MSJ ¶ 28, at 9 (stating this fact)(citing

Luna Depo. at 187:21-188:17; Sanchez Depo. at 126:1-6.[117]  Luna had no more direct involvement

---

Response at 14 (quoting Luna Depo. at 186:18-19), which does not accurately quote from the Luna Depo. or accurately reflect how Luna described the interaction. The Court, having reviewed the whole record and concluding that the record supports the fact as the text articulates it, adopts it as undisputed, considering that the Correct Care Defendants do not address it, and therefore do not dispute it, in the Reply. See D.N.M.LR-Civ. 56.1(b).

[116]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 27, stating that she "dispute[s] the account of Ms. Tanner's placement in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27." Response at 13. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court also notes that the record supports the text's fact. See OPS Report at 34 (Melik Swayne stating that Tanner asked to go to the hospital or see a doctor when she arrived at the infirmary at 9:00 a.m. on October 16, 2016, and was told she would need to wait until the following morning to see a doctor); Tanner Decl. ¶ 16, at 5-6 (stating that Tanner asked to go to the hospital when she arrived in the infirmary for her second visit later in the morning on October 16, 2016, but the nurse told her the doctor would have to approve transport to a hospital); Tanner Decl. ¶ 20, at 7 (stating that before Luna's shift change, slightly before 6:00 p.m., see supra n.111, Tanner asked to go to the hospital, but the nurse informed her the doctor would have to clear her the next day). In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy. See Response at 13. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[117]Tanner does not unequivocally state that she does not dispute this fact. Instead, Tanner states: "For purposes of this motion only, Plaintiffs do not dispute" this fact, "except to the extent [that it is] incomplete or misleading because [it] does not include the additional facts set forth [in the Response]." Response at 1. Tanner does not dispute, however, that Luna told Taileigh

with Tanner's care after Luna's shift ended on October 16, 2016. See Partial MSJ ¶ 29, at 9 (stating

this fact)(citing Luna Depo. at 192:24-193:2).[118] Luna later reported that she would have wanted

---

Sanchez, the oncoming Med One nurse, about Tanner's condition, and mentioned that listening to Tanner's fetus' heart rate helped ease Tanner's anxiety. Tanner does not, therefore, specifically controvert the proffered fact, and the record supports the proffered fact so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b). See also Luna Depo. at 187:21-188:17 (stating that Luna gave Sanchez a rundown on what Luna knew about Tanner and let her know that Tanner benefits from hearing fetal heart tones); Sanchez Depo. at 126:1-6 (stating that she was the oncoming Med One nurse who took over from Luna at 6:00 p.m.). Tanner reiterates, in her response to the Correct Care Defendants' proposed fact 30, that "[a]fter Defendant Luna's shift ended, Defendant Sanchez took over as the only 'Med One' nurse on duty." Response at 15 (quoting Luna Depo. at 187:21-23). There is no genuine dispute regarding Sanchez' position as the only oncoming Med One nurse, because both Tanner and the Correct Care Defendants propose this fact. See Partial MSJ ¶ 28, at 9 (citing Sanchez Depo. at 126:1-6); Response at 15 (citing Luna Depo. at 187:21-23). The Court, therefore, adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b).

[118]Tanner purports to dispute this fact, stating that "[a]lthough Defendant Luna had no more interaction with Ms. Tanner after finishing her day shift on October 16, 2016, she later had a debriefing about the matter with Dr. McMurray." Response at 14 (citing Luna Depo. at 201:16-23). The portion of the Luna Depo. to which Tanner cites in support of this statement, however, indicates that Luna's debriefing with Dr. McMurray took place after Tanner's fetus' stillbirth, and, therefore, was not part of Luna's care of Tanner. See Luna Depo. at 201:16-23. The Court, concludes that Tanner has not asserted a genuine dispute to the text's fact, because Tanner has not cited to particular materials in the record establishing the presence of a genuine dispute. See Fed. R. Civ. P. 56(c)(1)(A). Tanner also states in support of her purported dispute, that "Defendant Luna admitted there was something she would have wanted a provider to do that day which she could not do herself: 'a pelvic exam,' which 'probably would have been the determining factor right there.'" Response at 14-15 (citing Luna Depo. at 205:23-206:7; Ehrenberg Depo. at 95:16-97:20). The Court concludes that this statement does not assert a genuine dispute to the text's fact, because although the cited record indicates that Luna stated she would have done something differently during her care of Tanner, it does not indicate that Luna's care of Tanner did not end when Luna's shift ended on October 16, 2016. See Luna Depo. at 205:23-206:7 (stating that Luna would have wanted a provider to perform a pelvic exam, had a provider been there and stating in retrospect that it "probably be the determining factor right there."); Ehrenberg Depo. at 95:17-97:20 (commenting on what Dr. Ehrenberg opined was medically appropriate care).

a provider to perform a pelvic exam, opining that it "'probably would have been the determining factor right there.'" Response at 14-15 (stating this fact)(citing Luna Depo. at 205:23-206:7).[119]

## 11. **Sanchez' Observation of Tanner.**

Sanchez saw Tanner for medication pass and vital signs at 7:28 p.m. on October 16, 2016. See Partial MSJ ¶ 30, at 9 (stating this fact)(citing Sanchez Depo. at 134:12-13).[120] When Sanchez first saw Tanner, Tanner's vital signs were normal, she reported fetal movement, expressed no

---

[119]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 29. See Response at 14-15. In disputing that proposed fact, Tanner proposes multiple facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court notes that the record supports the text's fact. See Luna Depo. at 205:23-206:7 (stating that Luna would have wanted a provider to perform a pelvic exam, had a provider been there and stating in retrospect that it "probably be the determining factor right there."). In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court accepts it as undisputed, having no independent reason to doubt its accuracy. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[120]Tanner does not state whether she admits or disputes this fact, but states that she "dispute[s] the account of Defendant Taleigh [sic] Sanchez's first visit with Ms. Tanner provided in CCS SOF No. 30." Response at 15. In her Response, Tanner states that "Sanchez briefly saw her for medication pass and vital signs on October 16, 2016. Defendant Sanchez saw Ms. Tanner in her SHU cell at about 7:28 p.m." Response at 15 (citing Progress Notes at 1, filed June 3, 2019 (Doc. 287-10)("Sanchez Progress Note")). Although Tanner does not state whether she admits or disputes the text's fact, in her response to the Correct Care Defendants' proposed fact, Tanner proposes the same fact, albeit citing to the Sanchez Progress Note rather than to the Sanchez Depo. See Partial MSJ ¶ 30, at 9; Response at 15. The Court concludes that, because the Correct Care Defendants and Tanner assert identical facts to the text's fact, Tanner does not specifically controvert the Correct Care Defendants' fact, so the text's fact is undisputed and the Court adopts it. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

concerns, and her bleeding had improved -- Sanchez conducted a pad check, which revealed an amount of pink tinged discharge, not enough to saturate the pad, but Sanchez did not inform a health-care provider of Tanner's condition or conduct any examination or testing. See Partial MSJ ¶ 30, at 9 (citing Sanchez Depo. at 134:12-13; id. at 134:18-137:6; id. at 170:13-21; Sanchez Progress Note at 1).[121]

At 8:57 p.m. on October 16, 2016, Sanchez received a call from a medical back officer reporting that Tanner stated she was experiencing cramping episodes. See Partial MSJ ¶ 31, at 10

_____

[121]Tanner purports to dispute the text's fact, stating that she "dispute[s] that Defendant Sanchez did not know of Ms. Tanner's 'concerns' or that her condition had 'improved' when Defendant Sanchez briefly saw her." Response at 15. Although Tanner claims to dispute the text's fact, Tanner does not properly support her assertion of genuine dispute, as shown in this footnote, so the Court considers the text's fact undisputed for purposes of this motion. See Fed. R. Civ. P. 56(e). In support of her dispute, Tanner states the following:

> There were no providers on duty at that time. See . . . Sanchez Dep. at 132:1-8. If a provider had been available, Defendant Sanchez "would have wanted them to look at her," but she "didn't have one available." Id. at 190:17-190:22. At that time, Ms. Tanner continued bleeding and leaking fluid, which had now begun to smell "weird," see Ex. 58 (Phone Call to Kerry Palmer, 5:14 pm, Oct. 16, 2016), accompanied by intense and painful abdominal cramps and pelvic pressure that made it impossible to sit normally or to use the bathroom, see . . . Tanner Decl. ¶¶ 18, 21[, at 6-7]. She felt "a round, hard thing" that she feared was her baby's head. Id. ¶ 18[, at 6]. Sanchez took her vital signs and did a "pad check," which revealed a bloody discharge of fluid covering Ms. Tanner's sanitary napkin. See [Sanchez Progress Note at 1]. Ms. Tanner had been bleeding and leaking fluid for over twelve hours at that point. See . . . Tanner Decl. ¶¶ 9-10, 21. But Defendant Sanchez asked no follow-up questions, informed no provider, and performed no examination or testing. See . . . Sanchez Dep. at 137:7-15, 147:12-17.

Response at 15 (footnote omitted).

The Court addresses each portion of Tanner's response to the Correct Care Defendants' proposed fact in turn. First, Tanner misconstrues the first part of the Correct Care Defendants'

proposed fact -- the Correct Care Defendants do not contend that Sanchez was unaware of any of Tanner's concerns. See Partial MSJ ¶ 30, at 9. In fact, it is undisputed that Luna informed Sanchez of Tanner's condition during their shift change. See supra n.117. Rather, the Correct Care Defendants contend that Tanner did not express any concerns to Sanchez when Sanchez checked on Tanner at 7:28 p.m. on October 16, 2016. See Partial MSJ ¶ 30, at 9. Tanner does not address this proposed fact and does not cite to any portion of the record which specifically controverts it, so the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Second, Tanner misconstrues the second part of the Correct Care Defendants' proposed fact -- the Correct Care Defendants do not contend that Tanner's condition improved, but only that she reported that her bleeding had improved. See Partial MSJ ¶ 30, at 9. Although Tanner points to Tanner's statements during the Palmer Call that her leaked fluid had begun to smell strange, and that she was having painful and intense pressure making it impossible for her to sit normally or use the bathroom, see Response at 15, the Palmer Call took place before Sanchez' shift began, see supra n.113, and the symptoms Tanner reported experiencing during the Palmer Call cannot specifically controvert the symptoms Tanner reported at least two hours later, at 7:28 p.m. See Partial MSJ ¶ 30, at 9. Nor can Tanner's statements that she felt "a round, hard thing" which she feared was her baby's head, controvert the Correct Care Defendants' contention that Tanner reported improved bleeding -- a report concerning a separate symptom. Response at 15. Tanner cites to no portion of the record specifically controverting the statement that Tanner reported improved bleeding at 7:28 p.m., and the Court concludes that the Sanchez Progress Note at 1 supports this statement, so the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Third, Tanner describes the "pad check" as "reveal[ing] a bloody discharge of fluid covering Ms. Tanner's sanitary napkin," as compared to the Correct Care Defendants' description of a "minimal amount of pink tinged discharge." Response at 15; Partial MSJ ¶ 30, at 9-10. Both Tanner and the Correct Care Defendants cite to the same piece of evidence in support -- the Sanchez Progress Note. The Sanchez Progress Note states: "A pad check was done, and it appears to have a very light pink discharge spread out on the pad, unable to confirm how much. The pad does not appear to be saturated." Sanchez Progress Note at 1. The Court concludes that, by citing to the Sanchez Progress Note alone, Tanner does not support her assertion of genuine dispute regarding the Correct Care Defendants' description of a "minimal amount of pink tinged discharge," where the Sanchez Progress Note indicates that the pad was not saturated, and does not describe the discharge as bloody. Sanchez Progress Note at 1. Drawing all reasonable inferences in Tanner's favor, however, the Court alters the proposed fact to remove the descriptor "minimal," because the Sanchez Progress Note states that Sanchez was unable to confirm how much discharge was on the pad. The Court alters the proposed fact to better reflect the record. See Sanchez Progress Note at 1. The Court adopts the fact stated in the text as undisputed, because

Tanner does not cite to any portion of the record specifically controverting it, and the Court concludes that the record supports the fact.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Fourth, Tanner does not specifically address the Correct Care Defendants' contention that Tanner's vital signs were normal at 7:28 p.m., or that she reported fetal movement.  See Partial MSJ ¶ 30, at 9.  The Court concludes that the record supports this statement,  see Sanchez Depo. at 134:18-135:18 (describing Sanchez taking Tanner's vital signs); id. at 142:5-6 (Sanchez stating that she felt Tanner's fetal movement, not typical for a normal contraction).  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Fifth, Tanner contends that "Defendant Sanchez asked no follow-up questions, informed no provider, and performed no examination or testing."  Response at 15 (citing Sanchez Depo. at 137:7-15; id. at 147:12-17).  Tanner asserts this statement in support of her contention that the text's fact is disputed, but the Court concludes it is more akin to an additional material fact, because it does not directly dispute or admit any aspect of the Correct Care Defendants' proposed fact regarding Sanchez' check up on Tanner.  See Response at 15.  The portion of the record to which Tanner cites in support of the statement indicates only that Sanchez did not do additional testing on the pad or discharge, and that Sanchez did not contact a provider after checking on Tanner at 7:28 p.m.  See Sanchez Depo. at 137:7-15; id. at 147:12-17.  Tanner cites to no portion of the record suggesting that Sanchez asked no follow-up questions, and the Court, having reviewed the record, concludes that it does not support that statement.  See, e.g., Sanchez Depo. at 134:10-17 (indicating that Sanchez asked Tanner if she had any concerns regarding her pregnancy, then asked her how her bleeding was doing, then asked her if she had any other concerns).  Tanner does not cite to any portion of the record supporting her assertion that Sanchez asked no follow-up questions, and the Court does not adopt it as undisputed.  See Fed. R. Civ. P. 56(c)(1)(A).  See also Fed. R. Civ. P. 56(e).

Sixth, the Court concludes that, drawing all reasonable inferences in Tanner's favor, it is undisputed that Sanchez did not inform a provider, because Tanner cites to a portion of the record indicating that Sanchez did not immediately inform a provider and, even though Sanchez completed the Sanchez Progress Note recording her observations, Dr. McMurray stated that progress notes are not emergency documents which he is typically tasked with reviewing in evening hours after the day's shift is over.  See McMurray Depo. at 172:1-8.  The Court adopts as undisputed the statement that Sanchez did not inform a provider after her check up on Tanner, because the Correct Care Defendants do not address it in their Reply, and the Court has no independent reason to doubt its accuracy.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Seventh, the Court also concludes that, drawing all reasonable inferences in Tanner's favor, it is not reasonable to infer that Sanchez conducted no examination or testing, where Sanchez tested all of Tanner's vital signs, see, e.g., Sanchez Progress Note at 1, and examined Tanner's pad

(stating this fact)(citing Sanchez Progress Note at 1).[122]  Tanner stated that she did not believe she

was having contractions and Sanchez reported that Tanner's abdomen did not harden during the

cramping episodes, and that there was continued fetal movement, although Tanner was having and

---

[122]for discharge, see Sanchez Progress Note at 1.  The portion of the record to which Tanner cites in support of this contention states only that Sanchez conducted no additional testing on the pad or the discharge, because she did not feel it was warranted, because Tanner did not report "a large amount of discharge," or feeling "like there was a lot of fluid coming out," Sanchez Depo. at 137:12-20, and that Sanchez provided Tanner with Tylenol to ease her cramping, see Sanchez Depo. at 142:10-23.  The Court adopts as undisputed the statement that Sanchez did not conduct any examination or testing, because the Correct Care Defendants do not address it in their Reply, and the Court has no independent reason to doubt its accuracy.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[122]Tanner purports to dispute the text's fact, stating that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez on the evening of October 16, 2016," but Tanner also states that "[a]t about 8:57 pm, she was permitted to see Defendant Sanchez in the exam room," Response at 16 (citing Deposition of Veena Singh, M.D. (taken April 9, 2019), filed June 3, 2019 (Doc. 286-22)("Singh Depo.")).  The Court notes that the Singh Depo. contains no reference to Sanchez' 8:57 p.m. examination of Tanner, and that Tanner provides no precise citation within the Singh Depo.  See Response at 16.  Regardless, the Sanchez Progress Note supports that Sanchez received a call from a medical back officer at 8:57 p.m. indicating that Tanner reported feeling cramping.  See Sanchez Progress Note at 1.  Although Tanner does not specifically state that she admits or disputes this statement, and generally states that she disputes the account of the interaction, Tanner does not specifically controvert the text's fact, and in fact, states it herself.  See Response at 16 (stating that at 8:57 p.m., Tanner was permitted to see Sanchez and reported experiencing intense cramping).  Tanner also states that she "kept asking for medical care that evening," Response at 16 (citing Tanner Decl. ¶ 19, at 6).  The Court does not adopt this fact here, however, because the Tanner Decl.'s ¶ 19, to which Tanner now cites, refers to Tanner's request for medical attention, to which Luna responded before her shift change, and the Court has already adopted and discussed this fact, see supra n.115.  Because Tanner does not specifically controvert the text's fact, the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

- 80 -

reporting a lot of anxiety. See Partial MSJ ¶ 31, at 10 (stating this fact)(citing Sanchez Progress Note at 1).[123] Sanchez later stated that Tanner said she "felt like something was coming on," reported feeling cramping, and expressed that she believed her uterus was "'hanging out.'" Response at 16 (stating this fact)(quoting Sanchez Progress Note at 1)(citing Sanchez Depo. at 142:3-4).[124] Tanner asked Sanchez to check if her uterus was hanging out, but Sanchez declined.

---

[123]Tanner does not specifically state whether she admits or disputes the text's fact, but she states that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez on the evening of October 16, 2016." Response at 16. Tanner does not address, however, whether she stated that she did not believe she was having contractions and Sanchez reported that Tanner's abdomen did not harden during the cramping episodes, and that there was continued fetal movement, although Tanner was having and reporting a lot of anxiety. See Response at 16. Tanner states that "[w]hether or not she understood it herself," her cramping episodes were labor contractions, but Tanner does not dispute that she stated to Sanchez that she did not believe she was having contractions. Response at 16. Tanner does not address, either to admit or dispute, that her abdomen did not harden during the episodes or that there was continued fetal movement at 8:57 p.m., nor does she address whether she was experiencing and reporting anxiety. See Response at 16. Because Tanner does not specifically controvert the text's fact and the record supports it, see Sanchez Progress Note at 1 (stating that Tanner said to Sanchez: "I don't think I am having contractions," and that Tanner's abdomen did not harden and the baby was moving around), the Court has no independent reason to doubt the text's fact's accuracy, and the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[124]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 31 and 32, stating that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez on the evening of October 16, 2016 . . . ." Response at 16. In disputing these proposed facts, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-CIV. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court alters Tanner's proposed fact slightly, because although Tanner contends that "[s]he told Defendant Sanchez that she was experiencing intense cramping and pressure," the record does not support this description. See Sanchez Depo. at 142:3-4 (stating only that Tanner felt like something was coming on); Sanchez Progress Note at 1 (stating that Tanner felt she was cramping and felt like her uterus was hanging out). The Court, having reviewed the record, concludes that

- 81 -

<u>See</u> Response at 16 (stating this fact)(citing Sanchez Depo. at 144:16-145:3).[125]  Sanchez did not

check for fetal heart tones or contact a provider.  <u>See</u> Response at 16 (stating this fact)(citing

there is no evidence within the record supporting that Tanner indicated to Sanchez that she was experiencing "intense cramping and pressure," see Response at 16, and, even drawing all reasonable inferences in Tanner's favor, the Court does not adopt Tanner's proposed description, because the Sanchez Progress Note indicates that Tanner also stated: "I don't think I am having contractions," and the Sanchez Depo. states that Tanner "didn't really know whether it was cramping or anxiety that she was having." Sanchez Depo. at 142:8-10. Pursuant to rule 56(e), the Court may, but need not, consider facts improperly supported undisputed, <u>see</u> Fed. R. Civ. P. 56(e)(2), and the Court does not consider these the improperly supported as undisputed, because the record, even outside of the portions to which Tanner cites, does not support that Tanner expressed even certainty that she was cramping, let alone that she was experiencing intense cramping and pressure. The Court adopts the fact as stated in the text, because the record supports the text's fact, the Court has no independent reason to doubt its accuracy and the Correct Care Defendants do not address it in their Reply. <u>See</u> Response at 13. <u>See</u> <u>also</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[125]Tanner asserts several facts, not as additional material facts, but in response to the Partial MSJ's proposed facts 31 and 32, stating that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez on the evening of October 16, 2016 . . . ." Response at 16. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. Tanner asserts, in part, that: "She begged Defendant Sanchez to perform a vaginal examination to see if her 'uterus [was] hanging out.' *See* [Sanchez Progress Note]. Sanchez refused because it was 'not within [her] scope of practice' to perform such an exam. *See* . . . Sanchez Dep. at 144:16-145:3." Response at 16. The Court, having reviewed the record, concludes that the record does not support Tanner's fact as proposed, for two reasons. First, the Sanchez Depo. indicates that Tanner did not specifically request a vaginal exam. <u>See</u> Sanchez Depo. at 144:9-15 (asking Sanchez whether Tanner asked for her to perform a pelvic or vaginal examination, and Sanchez responding that Tanner "just pretty much said can you look. She wasn't really specific as to what type of exam she wanted me to perform, and I didn't elaborate or ask her."). <u>See</u> <u>also</u> Sanchez Progress Note at 1 (reporting that Tanner stated: "I think it's my uterus hanging out. Can you take a quick look?"). The Court does not adopt Tanner's proposed fact that Tanner "begged Defendant Sanchez to perform a vaginal examination," when the portion of the record to which Tanner cites indicates only that Tanner asked Sanchez to check whether her uterus was hanging out, and other portions of the record indicate that, in response to a direct question regarding whether Tanner asked

Tanner Decl. ¶ 23, at 7; Sanchez Progress Note at 1; Sanchez Depo. at 147:12-17).[126]  Sanchez

asked Tanner to time her cramps.  See Response at 16 (stating this fact)(citing Tanner Decl. ¶ 23,

---

her to perform a vaginal examination, Sanchez responded that Tanner did not indicate which type
of exam she wanted performed, but asked only for Sanchez to take a quick look.  Response at 16.

      Second, Tanner proposes that "Sanchez refused because it was 'not within [her] scope of
practice' to perform such an exam."  Response at 16 (quoting Sanchez Depo. at 144:16-145:3).
The Court, having reviewed the record, and drawing all reasonable inferences in Tanner's favor,
concludes that the record does not support Tanner's fact as proposed, because in the Sanchez
Depo., Sanchez states: "She did ask me to check her, but I -- I didn't feel it was indicated at that
time to do so."  Sanchez Depo. at 143:25-144:1.  Sanchez then states: "And at that time, I didn't
feel it was within my -- it was safe for me to do that, because I don't really feel how she presented
would indicate that type of assessment."  Sanchez Depo. at 144:5-8.  The Court concludes that
Sanchez stated her reason for not checking Tanner as her belief that how Tanner's symptoms
presented did not indicate that an examination was warranted, and not that Sanchez believed an
examination was warranted but that it was not within her scope of practice.  Although Sanchez
later stated that a pelvic or vaginal examination is not within her scope of practice at the jail, she
did not cite the fact that such an exam was outside of her scope of practice as the reason she did
not perform the exam on Tanner.  See Sanchez Depo. at 145:1-3.  Rather, the record supports that
Sanchez declined, because she did not feel that Tanner's symptoms warranted an examination, and
because Sanchez did not feel it would be safe for her to perform an examination.  Sanchez Depo.
at 143:25-144:8.  Therefore, the Court concludes that the record does not support Tanner's
proposed fact that "Sanchez refused because" a vaginal or pelvic exam was not within her scope
of practice.  The Court also notes that while Tanner cites to Sanchez Depo. at 144:16-145:3 in
support of the text's fact, see Response at 16, the Sanchez Depo. at 145:4-12 better supports the
text's fact.  The Court alters the proposed fact to better reflect the record, and adopts it as
undisputed, because the record supports it and the Correct Care Defendants do not address it in
their Reply.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be
deemed undisputed unless specifically controverted.").

      [126]Tanner asserts this fact, not as an additional material fact, but in response to the Partial
MSJ's proposed facts 31 and 32, stating that she "dispute[s] the account of Ms. Tanner's second
interaction with Defendant Sanchez on the evening of October 16, 2016 . . . ."  Response at 16.
Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be
generous to Tanner, construes them as additional material facts for the purposes of this motion.
The Court concludes that the record supports Tanner's proposed fact.  See Tanner Decl. ¶ 23, at 7
(stating that Sanchez did not check the baby's heart tones); Sanchez Progress Note at 1 (not
mentioning fetal heart tones or attempts to contact a provider); Sanchez Depo. at 147:12-17 (stating

at 7).[127]  Sanchez informed Tanner that she could remain in the front of the medical unit for

observation, but Tanner elected to return to her cell in the SHU.  See Partial MSJ ¶ 31, at 10 (stating

_____

that Sanchez did not feel there was any clinical indication to call a provider, although one was available to contact via telephone).  See also Sanchez Depo. at 146:5-7 (stating that Sanchez did not conduct fetal heart tone monitoring because she noted active baby movement).  The Correct Care Defendants do not address the fact in their Reply, and the Court has no independent reason to doubt its accuracy, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[127]Tanner asserts this fact, not as an additional material fact, but in response to the Partial MSJ's proposed facts 31 and 32, stating that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez on the evening of October 16, 2016 . . . ."  Response at 16.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court concludes that the record supports Tanner's proposed fact.  See Tanner Decl. ¶ 23, at 7.  See also Sanchez Progress Note at 1 (stating: "She was asked to keep track of her 'cramping episodes.'  @ 2058 she marked one that lasted approximately 36 sec, per her report.").  In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court adopts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 13.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").
        Tanner also contends that "Ms. Tanner's 'cramping episodes' on October 16, 2016 were labor contractions," Response at 16 (quoting Sanchez Depo. at 142:3-4)(citing Sanchez Depo. at 142:3-4; Ehrenberg Depo. at 104:10-105:14; Levy Depo. at 39:15-25), and that Sanchez "did not have the training to recognize whether Ms. Tanner was having contractions or not," Response at 16 (citing Ehrenberg Depo. at 104:24-105:12).  The Court does not adopt these proposed facts as undisputed, because Tanner does not properly support them with citations to the record, where the portions of the record to which Tanner cites in support, do not support the fact as Tanner proposes it.  In the Ehrenberg Depo., Dr. Ehrenberg states: "I don't know how [Sanchez] would have had the basis to [judge whether Tanner was having contractions] given her admitted lack of training and experience of obstetrics.  Feeling a contraction is not an easy thing to do."  Ehrenberg Depo. at 105:9-14.  Dr. Ehrenberg does not state that he has knowledge that Sanchez could not feel a contraction, given her level of training and experience.  Dr. Ehrenberg does not dispute Sanchez' statement that she determined Tanner was not having a contraction because she "felt her stomach, felt active baby movement, wasn't typical for a normal contraction,"  Sanchez Depo. at 142:5-6.  The Levy Depo. indicates that when Dr. Levy interacted with Tanner at the hospital, Levy was

this fact)(citing Sanchez Progress Note at 1).[128]   Sanchez advised Tanner to inform the staff

regarding any concerns.  See Partial MSJ ¶ 32, at 10 (stating this fact)(citing Sanchez Progress

---

"getting the impression that for whatever reason she was probably having some sort of contractions," but Levy does not comment on whether what Sanchez noted at 8:57 p.m. was a contraction or simply cramping. Levy Depo. at 39:23-24.  See id. at 11:8-15 (stating that the first time Dr. Levy interacted with Tanner was in a hospital unit, where she had been brought via ambulance from the jail, after the baby was delivered stillborn).  Even drawing all reasonable inferences in Tanner's favor, the Court cannot reasonably infer that the cramping episodes were labor contractions, when no part of the record suggests unequivocally that they were, and when no part of the record disputes Sanchez' reasoning that the cramping she felt was not a contraction because it concurred with fetal movement, see Sanchez Depo. at 142:5-6, and that Tanner's "abdomen did not harden, the baby was moving around, and [the cramp] lasted <10 sec," Sanchez Progress Note at 1.  Nor does any part of the record indicate that Sanchez did not have the training to recognize whether Tanner was having contractions or not, because, although Tanner cites to the Ehrenberg Depo. in support of this statement, Dr. Ehrenberg stated only that he "think[s] it's something that comes with time and experience in labor nurses," and that doctors "that don't sit there with hands on peoples' bellies in labor may be less [good] at it," not that Dr. Ehrenberg believed or knew that Sanchez' level of training would not have equipped her to detect a contraction with any certainty.  Ehrenberg Depo. at 106:5-12.  Pursuant to rule 56(e), the Court may, but need not, consider facts improperly supported undisputed, see Fed. R. Civ. P. 56(e)(2), and the Court does not consider these the improperly-supported undisputed facts, because the record, even outside of the portions to which Tanner cites, does not support that Tanner's cramping episodes were labor contractions.

[128]Tanner does not explicitly say whether she admits or disputes the text's fact, and although Tanner states that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez," Response at 16, she does not assert a dispute to the text's fact that Sanchez offered Tanner the opportunity to remain in the medical unit's front area for observation and that Tanner elected to return to her cell.  See Response at 16.  The Court concludes that Tanner has not asserted a genuine dispute to the text's fact, because Tanner has not cited to particular materials in the record establishing the presence of a genuine dispute.  See Fed. R. Civ. P. 56(c)(1)(A).  The Court adopts the text's fact as undisputed, having no independent reason to doubt its accuracy. See Sanchez Progress Note at 1.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Note at 1).[129]  Sanchez gave Tanner Tylenol for the pain and did not interact with her again.  See

Response at 16 (stating this fact)(citing Sanchez Progress Note at 1; Sanchez Depo. at 174:2-4).[130]

_____

[129]Tanner does not explicitly say whether she admits or disputes the text's fact, and although Tanner states that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez," Response at 16, she does not assert a dispute to the text's fact that Sanchez advised Tanner to inform the staff regarding any concerns.  See Response at 16-17.  The Court concludes that Tanner has not asserted a genuine dispute to the text's fact, because Tanner has not cited to particular materials in the record establishing the presence of a genuine dispute.  See Fed. R. Civ. P. 56(c)(1)(A).  The Court adopts the text's fact as undisputed, having no independent reason to doubt its accuracy.  See Sanchez Progress Note at 1 (stating that Tanner was advised to notify staff of any concerns).  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[130]Tanner asserts this fact, not as an additional material fact, but in response to the Partial MSJ's proposed facts 31 and 32, stating that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez on the evening of October 16, 2016 . . . ."  Response at 16. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court concludes that the record supports Tanner's proposed fact.  See Sanchez Progress Note at 1 (stating that Sanchez gave Tanner Tylenol); Sanchez Depo. at 142:10-12; id. at 142:18-23 (stating that Tanner asked for medication, Sanchez informed her she could only provide her with medication for the cramping, and then that Sanchez provided Tanner an over-the-counter dose of Tylenol).  See also Sanchez Depo. at 174:2-4 (stating that Sanchez did not hear from Tanner again after this interaction).  In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court adopts it as undisputed, having no independent reason to doubt its accuracy.  See Response at 13.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Tanner proposes as fact that: "Nevertheless, Defendant Sanchez was aware that Ms. Tanner continued to complain of "abdominal pain and cramping and having some vaginal bleeding," and reported those concerns when the next nurse took over in the morning."  Response at 16-17 (citing Deposition of Anthony Wayne Spencer, R.N. at 74:11-12 (taken February 28, 2019), filed June 3, 2019 (Doc. 286-24)("Spencer Depo.")).  The Court was unable to verify this fact, because the Spencer Depo. which Tanner filed does not include a page 74.  See generally Spencer Depo. Because Tanner "fails to properly support an assertion of fact," the Court may and does disregard this fact, because the "court need consider only the cited materials . . . ."  Fed. R. Civ. P. 56(c)-(e). The Court has, to be generous to Tanner, construed her additional facts -- not asserted as additional lettered material facts as Local Rule 56.1(b) requires -- in her favor, but the Court will not consider

Sanchez was not notified of any concerns Tanner had after she returned to her cell. See Partial MSJ ¶ 32, at 10 (stating this fact)(citing Tanner Depo. at 257:5-10).[131] Tanner later reported that her symptoms persisted throughout the night without treatment. See Response at 14 (citing Ambulance Report at 5, filed June 3, 2019 (Doc. 287-12)("Ambulance Report")).[132]

### 12.  Dr. McMurray's Examination of Tanner.

After arriving at Metropolitan Detention in the morning of October 17, 2016, Dr. McMurray rounded on Tanner with Nurse Anthony Spencer in the SHU and conducted a visual

---

a fact not properly supported by the record, and which Tanner asserts ostensibly in support of her purported dispute regarding another fact. See Response at 16-17.

[131]Tanner does not explicitly say whether she admits or disputes the text's fact, and although Tanner states that she "dispute[s] the account of Ms. Tanner's second interaction with Defendant Sanchez," Response at 16, she does not assert a dispute to the text's fact that Sanchez was not notified of any concerns Tanner had after she returned to her cell. See Response at 16-17. The Court concludes that Tanner has not asserted a genuine dispute to the text's fact, because Tanner has not cited to particular materials in the record establishing the presence of a genuine dispute. See Fed. R. Civ. P. 56(c)(1)(A). The Court adopts the text's fact as undisputed, having no independent reason to doubt its accuracy. See Tanner Depo. at 257:5-10 (stating that Tanner did not ask for any assistance after she returned to her cell). See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[132]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 27, stating that she "dispute[s] the account of Ms. Tanner's placement in the Sheltered Housing Unit (SHU) provided in CCS SOF NO. 27." Response at 13. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court also notes that the record supports the text's fact. See Ambulance Report at 5 (stating that "during transport when speaking to the mother she advised . . . her symptoms continued through the night," and that Tanner reported "she advised staff but was told that there was no provider on scene to evaluate her.") Tanner proposes as fact that "her symptoms 'continued through the night' without

- 87 -

examination of Tanner in her cell. Partial MSJ ¶ 33, at 10 (stating this fact)(citing McMurray Depo. at 185:2-13; id. at 188:20-189:2).[133] Dr. McMurray pressed Tanner about cramping in her

---

treatment," Response at 14 (citing Ambulance Report at 5), but the Court alters the proposed fact slightly, to better reflect the record to which Tanner cites -- the Court adopts that Tanner reported that her symptoms continued through the night. The portion of the record to which Tanner cites is a report of what Tanner reported to EMS personnel, and not what EMS personnel observed, so, for accuracy, the Court adopts that the Ambulance Report supports that Tanner reported this statement, rather than that the Ambulance Report supports the truth of the statement. In the Reply, the Correct Care Defendants do not address the text's fact and therefore do not dispute it, so the Court adopts it as undisputed, having no independent reason to doubt its accuracy. See Response at 13. See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[133]Tanner does not specifically state whether she admits or denies this fact, although she states that she "dispute[s] the account provided in CCS SOF 33 and 34 of the medical rounds conducted by Defendant McMurray and Nurse Anthony Spencer on the morning of October 17, 2016." Response at 17. Tanner, in her response to the proposed fact, states: "That morning Defendant McMurray saw Ms. Tanner during his rapid med-pass rounds with Nurse Spencer." Response at 17 (citing Progress Notes at 1, filed June 3, 2019 (Doc. 287-11)("McMurray Progress Note"); Spencer Depo. at 93:5-8). Because Tanner states the same fact as the text's fact, albeit with different citations, the Court concludes that the fact is undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

As shown below, Tanner specifically controverts the other portion of the Correct Care Defendants' proposed fact, that "Dr. McMurray noted that Plaintiff was cheerful and cooperative. She denied any complaints, which eased his mind about this being an urgent or emergent situation," and so the Court does not adopt this statement as fact. Partial MSJ ¶ 33, at 10. Tanner disputes that Tanner denied any complaints to Dr. McMurray on October 17, 2016, and states:

Ms. Tanner had a substantial discharge of fluid from her vagina with an unfamiliar odor through the night of October 16, 2016, and into the morning of October 17, 2016. When she briefly saw Defendant McMurray on that occasion, she told him so. Her uniform was soiled with fluid, and even Defendant McMurray acknowledged that she was still "cramping." Ms. Tanner tried to tell him about her other ongoing symptoms as well. He stood at the cell door and did not enter.

Response at 17 (citations omitted). The Court, having reviewed the record, concludes that there is a genuine dispute whether Tanner reported complaints to Dr. McMurray on the morning of October 17, 2016. Although the McMurray Depo. indicates that Tanner denied any complaints at first and then when pressed indicated that she had cramping but was handling it, see McMurray Depo. at 189:1-25, Tanner describes a very different interaction in the Tanner Decl.:

> When they came to my cell, the doctor talked with me very briefly and said he was clearing me so I could go back to the pod where I had been staying earlier. I agreed that I wanted to get out of the segregation cell in the SHU, but I also wanted the doctor to examine me. I told the doctor about my cramping and pressure and that I couldn't urinate. I told him that I had gone through all of the sanitary pads I had and was almost through the toilet paper as well because of the discharge, which had a weird smell.

Tanner Decl. ¶ 25, at 8. Tanner also states that she explained to Dr. McMurray that she felt pressure down there, could not use the restroom or sit normally, that she had pain throughout the night and could not sleep, and that she needed someone to examine her because what she felt "'wasn't normal and [she] was afraid that it was [her] baby.'" Response at 17 (stating this fact)(quoting Tanner Depo. at 259:4-5). Tanner states that it was obvious she was in distress, that she wasn't walking normally and was suffering constant cramping and discomfort, in direct contradiction to the McMurray Depo.'s and Spencer Depo.'s accounts that she appeared to be feeling good. Compare Tanner Depo. at 259:21-260:5 with McMurray Depo. at 189:19-189:25 and Spencer Depo. at 83:22-24. Because conflicting testimony appears in Tanner's deposition and in the McMurray and Spencer Depositions -- the Spencer Depo. also indicates that when asked, Tanner reported no complaints, see Spencer Depo. at 83:22-24 -- the issue depends on the witness' credibility, and the Court concludes there is a genuine dispute, so the Court does not adopt either the Correct Care Defendants' or Tanner's proposed fact on this issue as undisputed, and the Court will consider the fact's materiality in the Analysis section. See Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2726 (2d ed. 1987).

The Court does not adopt Tanner' statement that her uniform was soiled with fluid, because the record does not support it. See Fed. R. Civ. P. 56(c)(1)(A). Tanner cites to the Fastenau Statement, see OPS Reports at 4, as evidence that her "uniform was soiled with fluid," Response at 17, when Dr. McMurray saw her. The Fastenau Statement states that after Tanner was medically cleared to return to her housing pod, she "asked for a clean Uniform [sic], which was ordered. The inmate went to her cell, then went to watch T.V." OPS Reports at 4. The Fastenau Statement does not indicate whether Tanner returned to her cell with a uniform soiled with fluid, Tanner's uniform became soiled after she left the SHU, or whether she requested a clean uniform for some other reason. See OPS Reports at 4. The Fastenau Statement, therefore, does not support Tanner's proposed fact that Tanner's uniform was "soiled with fluid" when Dr. McMurray saw her,

upper abdomen.  See Partial MSJ ¶ 34, at 10 (stating this fact)(citing McMurray Depo. at 189:21-22).[134]  Dr. McMurray determined that Tanner was stable, would be seen in the medical services unit later in the week, and sent Tanner back to her pod.  See Partial MSJ ¶ 34, at 10 (stating this fact)(citing McMurray Depo. at 190:1-3; McMurray Progress Note at 1).[135]

---

Response at 17, and none of the portions of the record describing Dr. McMurray's interaction with Tanner in the SHU in the morning on October 17, 2016, mention her uniform soiled with fluid. Concluding that the record, including the portion to which Tanner cites, does not support this fact, the Court does not adopt it.  See Fed. R. Civ. P. 56(c)(1)(A).

Tanner also proposes as fact that she tried to tell Dr. McMurray about her other ongoing symptoms, and that he stood at the cell door and did not enter.  See Response at 17.  The Court does not adopt this proposed fact as undisputed, because the portion of the record to which Tanner cites as the source for this fact does not support the fact.  See Spencer Depo. at 82:4-14 (stating that Spencer stood at the cell door and did not enter, not mentioning whether Dr. McMurray entered, and stating that Tanner came to the cell door for the physical exam.  See Spencer Depo. at 82:4-14.  There is no dispute that Dr. McMurray interacted with Tanner and took her vitals, see Spencer Depo. at 82:19-20, and although Tanner suggests with her proposed fact that Dr. McMurray did not enter Tanner's cell to examine her, the Spencer Depo. indicates that examinations are typically performed at the threshold of the cell.  See 82:7-10.  Regardless, the Spencer Depo. makes no mention whether Dr. McMurray remained at the cell door or entered the cell at some point, so the Court concludes that the Spencer Depo. is not adequate support for Tanner's statement that Dr. McMurray stood at the cell door and did not enter the cell.  The Court, therefore, does not adopt this fact as undisputed.  See Fed. R. Civ. P. 56(c)(1)(A).

[134]Tanner does not specifically state whether she admits or denies this fact, although she states that she "dispute[s] the account provided in CCS SOF 33 and 34 of the medical rounds conducted by Defendant McMurray and Nurse Anthony Spencer on the morning of October 17, 2016."  Response at 17.  In her Response, however, Tanner states that "Defendant McMurray acknowledged that she was still 'cramping,'" Response at 17 (quoting McMurray Progress Note at 1).  Because Tanner does not specifically controvert the text's fact, and states that Tanner reported her cramping to Dr. McMurray, the Court adopts the text's fact as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted").

[135]Tanner does not specifically state whether she admits or denies this fact, although she states that she "dispute[s] the account provided in CCS SOF 33 and 34 of the medical rounds

## 13. Tanner's Return to the Housing Unit on October 17, 2016.

At 9:07 a.m., Tanner was escorted from the SHU back to her housing pod. See Response at 18 (stating this fact)(citing Med. Waiting Video at 9:07 a.m. (dated Oct. 17, 2016), filed June 3, 2019 (Doc. 288)).[136] When she returned to her cell, Tanner requested a clean uniform. See

_____

conducted by Defendant McMurray and Nurse Anthony Spencer on the morning of October 17, 2016." Response at 17. In her Response, however, Tanner states that when she asked Dr. McMurray to examine her, he said he would set up a time to see all of the pregnant inmates the next day, and he cleared her to return to her pod. See Response at 17-18 (citing Tanner Decl. ¶ 25, at 8). Tanner does not specifically controvert the text's fact, and in fact, states the same in her Response. Although Tanner contends that Dr. McMurray's determination that Tanner should return to the pod was erroneous, Tanner does not comment on, either to admit or dispute, the fact that Dr. McMurray made the determination that Tanner was stable enough to return to her pod, and the record supports that he made this determination. See, e.g., McMurray Progress Note at 1. The Court does not adopt Tanner's statement that Dr. McMurray cleared her without any examination or objective testing as undisputed fact, however, because the record does not support it, where the record indicates and Tanner does not controvert that Dr. McMurray and Spencer measured her vital signs. See, e.g., McMurray Progress Note at 1 (stating that Tanner is stable, would be transferred back to her pod and re-evaluated in the medical unit that week); Spencer Depo. 84:7-8 (stating that Spencer and Dr. McMurray took Tanner's vital signs); Tanner Depo. at 261:16-17 (stating that her vital signs, when Dr. McMurray checked them, were fine).

[136]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court also notes that the record supports the text's fact. See Med. Waiting Video at 9:07 a.m. The Correct Care Defendants do not address Tanner's fact in their Reply, and the Court has no independent reason to doubt its accuracy, so the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Response at 18 (stating this fact)(citing OPS Reports at 4).[137]  Tanner noted she was experiencing

cramping, pressure, and an absence of fetal movement.  See Partial MSJ ¶ 35, at 11 (stating this

fact)(citing Tanner Depo. at 261:20-263:6).[138]  Tanner had not reported to Dr. McMurray or the

_____

[137]For the reasons stated supra n.129, the Court does not adopt as undisputed that Tanner arrived at the pod with her pants soaked with fluid, because the record does not support it.  As stated supra n.129, Tanner cites to the Fastenau Statement, see OPS Reports at 4, as evidence that her "uniform was soiled with fluid," Response at 17, but the Fastenau Statement merely states that after Tanner was medically cleared to return to her housing pod, she "asked for a clean Uniform [sic], which was ordered.  The inmate went to her cell, then went to watch T.V."  OPS Reports at 4.  The Fastenau Statement does not indicate whether Tanner returned to her cell with a uniform soiled with fluid, Tanner's uniform became soiled after she left the SHU, or whether she requested a clean uniform for some other reason.  See OPS Reports at 4.  The Fastenau Statement, therefore, does not support Tanner's proposed fact that Tanner's uniform was "soiled with fluid" when Dr. McMurray saw her or when she returned to the pod, Response at 17.  Concluding that the record, including the portion to which Tanner cites, does not support this fact, the Court does not adopt it.  See Fed. R. Civ. P. 56(c)(1)(A).
      The Court adopts the text's fact, that Tanner requested a clean uniform, because the record supports this fact, the Correct Care Defendants do not address it in their Reply, and the Court has no independent reason to doubt its accuracy.  See OPS Reports at 4.  See also D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[138]Tanner does not specifically state whether she admits or denies this fact, but states that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016."  Response at 18.  Tanner does not specifically controvert this fact with any citation to the record, but states as an additional statement that she "first noticed the absence of fetal movement sometime between 9:12 am and 9:51 am that morning."  Response at 18 (citing Tanner Decl. ¶ 26, at 8; Housing Pod Shift Log at 1, filed June 3, 2019 (Doc. 287-21)("F7 Pod Log 10-17-16"); OPS Reports at 4).  Tanner contends that she arrived back to the housing pod from the SHU at 9:12 a.m., and that she returned to the SHU at 9:51 a.m.  See Response at 18 (citing F7 Pod Log 10-17-16 at 1; OPS Reports at 4).  Tanner's additional statement, therefore, accords with the text's fact that, upon returning to the pod, Tanner noted cramping, pressure, and an absence of fetal movement.  Because Tanner does not specifically controvert the text's fact and the Court has no independent reason to doubt its accuracy, the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

medical team before leaving the SHU that she could not feel fetal movement. <u>See</u> Partial MSJ

¶ 35, at 11 (stating this fact)(citing Tanner Depo. at 261:20-263:6).[139] No members of the medical

team were present in Tanner's housing pod at that time. <u>See</u> Response at 18 (stating this

fact)(citing Tanner Decl. ¶ 26, at 8; F7 pod log 10-17-16; OPS Reports at 4).[140] Tanner walked

---

[139]Tanner does not explicitly state whether she admits or disputes the text's fact, but she purports to dispute the fact that "Plaintiff did not report to Dr. McMurray or the medical team that morning that she could not feel fetal movement," by stating that she first noted the lack of fetal movement after returning to the housing pod, where no medical personnel were present to inform. Partial MSJ ¶ 35, at 11. <u>See</u> Response at 18. The Court concludes that, although Tanner additionally contends that she first felt fetal movement upon returning to the housing pod where no medical personnel were present, this fact does not specifically controvert the text's fact that, before returning to the housing pod, Tanner did not report a lack of fetal movement. <u>See</u> Partial MSJ ¶ 35, at 11. Because Tanner does not specifically controvert this fact and the record supports it, <u>see</u> Tanner Depo. at 261:20-263, the Court has no independent reason to doubt its accuracy and adopts it as undisputed. <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[140]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court also notes that, drawing all reasonable inferences in Tanner's favor, the record supports the text's fact. <u>See</u> Tanner Decl. ¶ 26, at 8-9 (stating that Tanner's cellmate and another inmate told the corrections officer to call medical); OPS Reports at 4 (stating that Fastenau called medical and they advised that Fastenau send Tanner back to medical, at 9:51 a.m.). Although the record portions to which Tanner cites do not explicitly state that no medical personnel were available in the housing unit, the Court draws the reasonable inference in Tanner's favor that, if a corrections officer called medical on Tanner's behalf so that a medical personnel could see Tanner, there was likely no medical person available in the unit. The Correct Care Defendants do not address the text's fact in their Reply and the Court has no independent reason to doubt its accuracy, so the Court adopts it as undisputed. <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All

around, showered, and drank coffee.  See Partial MSJ ¶ 35, at 11 (stating this fact)(citing Tanner Depo. at 261:20-263:6).[141]  After getting dressed, Tanner felt a wet sensation and noted bright red bleeding with a "'huge clot that passed from my vagina.'"  Partial MSJ ¶ 35, at 11 (stating this fact)(quoting Tanner Depo. at 261:20-263:6).[142]  Tanner's cellmate, Custy, requested more sanitary napkins for Tanner.  See Response at 18 (stating this fact)(citing OPS Reports at 4).[143]

---

material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[141]Tanner does not explicitly state whether she admits or disputes the text's fact, because she does not address it at all.  See Response at 18.  The Court concludes that the record supports the text's fact.  See Tanner Depo. at 262:10-11 (stating that Tanner drank some coffee and tried to walk around); id. at 262:18 (stating that Tanner took a shower).  Tanner does not address the text's fact in her Response, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[142]Tanner does not explicitly state whether she admits or disputes the text's fact, because she does not address it at all.  See Response at 18.  The Court concludes that the record supports the text's fact.  See Tanner Depo. at 262:21-23.  Tanner does not address the text's fact in her Response, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[143]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016."  Response at 18.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court also notes that the record supports the text's fact.  See OPS Reports at 4.  The Correct Care Defendants do not address the text's fact in their Reply and the Court has no independent reason to doubt its accuracy, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Tanner was saturating pads and her clothing with blood. See Response at 18 (stating this fact)(citing Tanner Decl. ¶¶ 26, 28, at 8-9).[144] Tanner told Fastenau that she was bleeding a lot and having contractions. See Response at 18 (stating this fact)(citing OPS Reports at 4).[145] Fastenau called for medical help at 9:51 a.m. See Response at 18 (stating this fact)(citing F7 pod log 10-17-16 at 2).[146] Medical staff told Fastenau to send Tanner to medical. See Response at 18

---

[144]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court also notes that the record supports the text's fact. See Tanner Decl. ¶¶ 26-28, at 8-9 (stating that Tanner's blood soaked through her pants and pads). The Correct Care Defendants do not address the text's fact in their Reply and the Court has no independent reason to doubt its accuracy, so the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[145]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court also notes that the record supports the text's fact. See OPS Reports at 4. The Correct Care Defendants do not address the text's fact in their Reply and the Court has no independent reason to doubt its accuracy, so the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[146]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18. In disputing that proposed fact, Tanner lists several additional

(stating this fact)(citing OPS Reports at 4).[147]  Tanner waited in the housing unit's sallyport for five to ten minutes, bleeding heavily.  See Response at 18 (stating this fact)(citing OPS Reports at 4; Corrections Officer Toni Fastenau Interview at 10:25-11:17 (dated Nov. 6, 2016), filed June 3, 2019 (Doc. 288)("Fastenau Interview")).[148]  Someone brought a wheelchair, and Tanner,

---

facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court also notes that the record supports the text's fact.  See F7 log log 10-17-16 at 2.  The Correct Care Defendants do not address the text's fact in their Reply and the Court has no independent reason to doubt its accuracy, so the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[147]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court also notes that the record supports the text's fact.  See OPS Reports at 4.  The Correct Care Defendants do not address the text's fact in their Reply and the Court has no independent reason to doubt its accuracy, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Tanner also contends that Correct Care medical personnel did not immediately respond in the manner of a Code 43 or medical emergency, but rather told Fastenau to send Tanner to medical. See Response at 18.  The Court does not adopt this statement as an undisputed fact, however, because nothing in the record suggests that the Correct Care medical personnel's response to Fastenau to send Tanner to medical was not an immediate response appropriate for a medical emergency.  See F7 pod log 10-17-16 at 2 (logging that Fastenau called medical, who told her to send Tanner to medical).  Concluding that the record does not support the fact that medical personnel did not immediately respond, and that Tanner does not specify to what sort of immediate response she refers, the Court does not adopt this statement as undisputed fact.

[148]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS

accompanied by Custy and another inmate, returned to the medical unit in a wheelchair. See Partial

MSJ ¶ 36, at 11 (stating this fact)(citing Tanner Depo. at 263:7-264:12; Progress Notes, filed June

14, 2019 (Doc. 303-12)("Spencer Progress Note")); Response at 19 (stating that Custy and

"Sigwerth" accompanied Tanner to the medical unit)(citing Med. Waiting Video at 10:03 a.m.;

Exam. Dental Video at 10:13 a.m.).[149]

_____

SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court also notes that the record supports the text's fact. See OPS Reports at 4 (stating that Fastenau called medical at 9:51 a.m., and an EMT picked Tanner up from the sallyport at 10:00 a.m.); Fastenau Interview at 10:25-11:17 (stating that Tanner and the other inmates being sent to medical waited in the housing unit's sallyport for five or ten minutes, which Fastenau felt was a reasonable amount of time for the EMTs to come and pick up the inmates). Although Tanner contends that she waited in the sallyport for "several" minutes, Response at 18, the Court alters the proposed fact to state "five or ten minutes," which the record supports, see Fastenau Interview at 10:25-11:17, because the Court's altered fact is an objective statement of the record and not a judgment implying that Tanner waited an unreasonable amount of time -- the Court notes that Fastenau states that he did not believe that the amount of time for which Tanner waited was unreasonable. See Fastenau Interview at 10:25-11:17. The Correct Care Defendants do not address the text's fact, and, having concluded that the record supports it, the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted").

[149]Tanner does not specifically state whether she admits or disputes the Correct Care Defendants' proposed fact that an EMT wheeled Tanner to the medical unit in a wheelchair, although Tanner states generally that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18. Tanner does not cite to any portion of the record which specifically controverts the text's fact. See Response at 17-18. Tanner states, in her response to the proposed fact, that "a rover retrieved a wheelchair from the medical unit," but Tanner does not explain whether by "rover" she refers to an EMT or some other category of personnel. Response at 18. The Court concludes, however, that there is a genuine dispute whether an EMT or some other personnel brought Tanner to the medical unit, because the record does not state anywhere that the

- 97 -

## 14.    Tanner's Oct. 17, 2016, Loss of Fetal Movement.

Tanner waited approximately 18 minutes before being examined.  See Response at 19

(stating this fact)(citing Exam Dental Video at 10:13 a.m.; id. at 10:27-10:30 a.m.).[150]  In the

---

person who brought Tanner to the medical unit was an EMT.  See Spencer Progress Note at 1
(stating that Tanner was "brought to medical via wheelchair"); Tanner Decl. ¶ 27, at 9 (stating that
"someone" brought a wheelchair to take Tanner to the infirmary; Custy Decl. ¶ 20, at 5 (stating
that "Ms. Tanner was eventually taken to the infirmary," but not stating who took her); OPS
Reports at 4 (Fastenau stating that "medical" showed up with a wheelchair).  Concluding that the
records does not incontrovertibly indicate that an EMT brought Tanner the wheelchair, and
drawing all reasonable inferences in Tanner's favor, the Court does not adopt the Correct Care
Defendants' fact that an EMT brought the wheelchair as undisputed.  The Court does not adopt
Tanner's suggestion that a rover brought the wheelchair, because Tanner does not define what she
means by rover, and the Court is unable to determine to what position Tanner intended to refer.
    Tanner asserts the fact that Custy and another inmate accompanied her to the medical unit
not as an additional material fact, but in response to the Partial MSJ's proposed facts 35 and 36,
stating that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened
after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016."  Response at 18.  In
disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although
Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to
Tanner, construes them as additional material facts for the purposes of this motion.  The Court also
notes that the record supports the text's fact.  See Tanner Decl. ¶ 27, at 9 (stating that Custy and
another inmate, who both had appointments to get their teeth pulled, went to the infirmary at the
same time as Tanner).  The Correct Care Defendants do not address this fact in their Reply, and,
concluding that the record supports it, the Court adopts it as undisputed.  See D.N.M.LR-Civ.
56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically
controverted.").

    [150]Tanner asserts the text's fact not as an additional material fact, but in response to the
Partial MSJ's proposed facts 35 and 36, stating that she "dispute[s] the account provided in CCS
SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of
October 17, 2016."  Response at 18.  In disputing that proposed fact, Tanner lists several additional
facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b)
requires, the Court, to be generous to Tanner, construes them as additional material facts for the
purposes of this motion.  The Court also notes that, drawing all reasonable inferences in Tanner's
favor, the record supports the text's fact.  See Exam Dental Video at 10:13:10-24 a.m. (showing
two female inmates wheeling a third female inmate in a wheelchair into the medical unit and

examination room, Tanner noted contraction-like sensations and she reported that the fetus was not moving, and, although Spencer and Nurse Elisa Manquero attempted to obtain fetal heart tones, neither could detect fetal heart tones. See Partial MSJ ¶ 36, at 11 (stating this fact)(citing Tanner Depo. at 263:7-264:12; Spencer Progress Note at 1).[151] Tanner felt increased pressure after going

---

leaving her in the waiting area); id. at 10:27:27 (showing a female inmate walking into a room at the end of the hall with its door propped open, farthest from the camera, escorted by a staff member); id. at 10:29:20 a.m. (showing a staff member walking into the same room, door still propped open); id. at 10:30:20 a.m. (showing a staff member moving the trash-can-like-object propping the door open and closing the door to the same exam room). The Court notes that, from the video, it is difficult to determine whether the inmate who walked into the exam room at 10:27:27 a.m. was Tanner -- particularly as Tanner was wheeled into the medical unit in a wheelchair, but the inmate who entered the exam room walked -- and it is difficult to determine from the video whether there was already a provider in the room when Tanner entered, or whether the first provider or staff person entered the room at 10:29:20 a.m. See Exam Dental Video at 10:27:27 a.m.; id. at 10:29:20 a.m. Drawing all reasonable inferences in Tanner's favor, however, the Court infers that the inmate seen walking into the room was Tanner, and that the first provider or staff person entered the room at 10:29:20 a.m. The Court also notes that it is impossible to determine with precision, from the video, when Tanner's examination began, because although the door remained propped open until 10:30:20 a.m., the examination might have begun before the door was closed. Again drawing all reasonable inferences in Tanner's favor, however, considering the short amount of time for which Tanner was in the examination room before the door closed, even if the examination began after the provider entered but before the door closed, the time estimate between Tanner entering the medical unit and Tanner undergoing examination does not change much, so the Court adopts Tanner's estimate that she waited 18 minutes to be seen. See Response at 19. The Correct Care Defendants do not address this fact in their Reply, so it is undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[151]Tanner does not specifically state whether she admits or disputes the Correct Care Defendants' proposed fact, although Tanner states generally that she "dispute[s] the account provided in CCS SOF Nos. 35 and 36 of what happened after Ms. Tanner returned to Pod F7 on the morning of October 17, 2016." Response at 18. Tanner states that: "Contrary to what is stated in COS [sic] SOF No. 36, Ms. Tanner did not 'start[] having contractions' on the morning of October 17, 2016; she had been having contractions since the previous day." Response at 19 (quoting Partial MSJ ¶ 36, at 11 and citing Ehrenberg Depo. at 104:10-105:14). The Court

to the bathroom to change her pad, and Spencer noted that he did not observe crowning at this time, but shortly thereafter, Tanner began having regular contractions and crowning was noted -- the ambulance team then arrived and decided to deliver the baby in the medical unit. See Partial MSJ ¶ 38, at 11 (stating this fact)(citing Spencer Progress Note at 1).[152]

_____

concludes that there is a genuine dispute regarding whether Tanner was actually experiencing contractions for the first time on October 17, 2016, or whether what she felt on October 16, 2016 was contractions. See supra n.123 (stating that Tanner, on October 16, 2016, did not believe she was feeling contractions); supra n.127 (stating that the record does not support that Tanner's cramping episodes on October 16, 2016 were labor contractions). Although the Court discussed in note 123 of this Memorandum Opinion and Order that the Ehrenberg Depo. does not indicate dispositively that Tanner was experiencing contractions on October 16, 2016, the Court concludes that it cannot determine from the record before it when Tanner's contractions began. The Court concludes, however, that Tanner reported experiencing more intense pains which she associated with contractions, on October 17, 2016, than what she experienced on October 16, 2016, when she did not believe she was experiencing contractions. See Tanner Depo. at 263:7-264:12. The Court alters the proposed fact to better reflect what the record can support -- that Tanner experienced contraction-like symptoms on October 17, 2016. See Tanner Depo. at 264:9-15. Tanner does not specifically controvert that Tanner reported a loss of fetal movement or that two nurses attempted to detect fetal heart tones to no avail. See Partial MSJ ¶ 36, at 11. The Court concludes that the record supports these facts. See Spencer Progress Note at 1 (stating that two nurses attempted to obtain fetal heart tones but were unsuccessful, and that Tanner "reported that she felt the baby move this morning and now doesn't feel it.") Because Tanner does not specifically controvert these facts in her Response and the Court has no independent reason to doubt their accuracy, the Court adopts them as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Tanner also states that Spencer attempted to find fetal heart tones for five or ten minutes using the same heart rate monitor which Luna used the previous day, and that he could not hear any. See Response at 19 (citing Spencer Depo. at 109:4-21). Tanner also notes in response to the text's fact, that later that morning, Manquero checked. See Response at 19 (citing OPS Reports at 26; Deposition of Elisa Manquero, R.N. at 141:5-7 (taken October 25, 2018), filed June 3, 2019 (Doc. 286-15)("Manquero Depo.")). The Court concludes that nothing to which Tanner cites specifically controverts the text's fact, and the Court adopts it as undisputed.

[152]Tanner does not specifically state whether she admits or disputes the text's fact, but she objects to the Spencer Progress Note's admission into evidence, contending that:

The cited portions of [the Spencer Progress Note] consist of inadmissible, self-serving hearsay and lack the necessary foundation to qualify for a hearsay exception under Fed. R. Evid. 803(4) or (6). Ms. Tanner gave a more complete, sworn statement of the events referenced in those progress notes in her declaration and deposition.

Response at 19. Hearsay is a statement, other than one the declarant made while testifying at the trial or hearing, offered for the truth of the matter asserted. See Fed. R. Evid. 801. "Hearsay testimony is generally inadmissible." United States v. Christy, 2011 WL 5223024, at *5 (citing Fed. R. Evid. 802). The Court recognizes that it cannot rely on evidence that will not be admissible at trial. See Gross v. Burggraf Constr. Co., 53 F.3d at 1541. The Court can rely, however, on evidence submitted in a form that would be inadmissible at trial as long as the Court determines that evidence will be presented in an admissible form. See Trevizo v. Adams, 455 F.3d at 1160. Here, the Spencer Progress Note upon which the Correct Care Defendants rely is hearsay, because Spencer did not make the statements that the Spencer Progress Note contains "while testifying at the current trial or hearing," Fed. R. Evid. 801(c)(1), and the Correct Care Defendants rely on the Spencer Progress Note for the truth of what it asserts -- its description of Spencer's treatment of and response to Tanner in the medical unit, and the medical staff's treatment of Tanner up to the ambulance's arrival. While these progress notes appear to be part of Correct Care's routine practice -- see Luna Progress Note; Spencer Progress Note; Sanchez Progress Note; McMurray Progress Note -- and could be admissible hearsay under the business records exception, the Correct Care Defendants have not laid the foundation for this exception. See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)("The proponent of the document must also lay this foundation for its admission.").

Specifically, Tanner objects to the following content as the Correct Care Defendants describe it:

> Plaintiff felt increased pressure after going to the bathroom to change her pad. Nurse Spencer noted that he did not observe crowning at this time. Shortly thereafter, Plaintiff began having regular contractions and crowning was noted. The ambulance team arrived and decided to deliver the baby in the medical unit.

Partial MSJ ¶ 38, at 11. See Response at 19 (stating that Tanner disputes the progress note cited in support of the Partial MSJ's ¶ 38, the Spencer Progress Note, because it was "entered at 2:31 p.m. on October 17, 2016, which was several hours after Ms. Tanner was transported to the hospital," and because it "consists of inadmissible, self-serving hearsay," and does not qualify for an 803(4) or 803(6) exception. Response at 19. The Correct Care Defendants can, however, establish the account of events which the Spencer Progress Note describes with evidence

admissible at trial.  See Spencer Depo. at 127:5-9 (stating that Tanner wanted to change her pad and reported feeling pressure); id. at 127:19-25 (stating that Spencer and one of the other nurses assisted Tanner to the bathroom to change her pad); id. at 127:25-128:2 (stating that Tanner complained of more pressure when she sat on the toilet); id. at 128:4-6 (stating that the nurses asked Tanner if she wanted them to check for crowning, that Tanner assented, and that Spencer and the other nurses looked and confirmed there was no crowning); id. at 149:23-150:22 (stating that Tanner began having regularly spaced contractions); id. at 152:1-14 (stating that Spencer lowered Tanner's pants enough to observe whether she was crowning and noted that she was crowning); id. at 153:5-7 (noting that the ambulance then arrived); id. at 153:8-18 (noting that the ambulance team decided to deliver the baby in the medical unit's treatment room).  The Correct Care Defendants can establish every fact proposed in the Partial MSJ's ¶ 38 with the Spencer Depo., which is evidence admissible at trial.  The Court nevertheless notes that the Correct Care Defendants have not laid a foundation for the Spencer Progress Note's admissibility under either the medical records exception or the business records exception.  The Court also notes, however, that Tanner also filed as exhibits progress notes -- the same form as the Spencer Progress Note -- also without laying the foundation for the progress notes' admissibility.  See Luna Progress Note; Sanchez Progress Note; McMurray Progress Note.  Both Tanner and the Correct Care Defendants rely on the Progress Notes in support of their proposed facts, and, until this point, neither party objects to their admissibility.  In response to the Partial MSJ's ¶ 38, for the first time, Tanner objects to the admissibility of the cited portions of the Sanchez Progress Note.  See Response ¶ 38, at 19.  The Court notes, however, that the same information is contained in the admissible Sanchez Depo., Tanner relies on the same form of document for at least three of her exhibits, and the only asserted difference between the Sanchez Progress Note and the other progress notes is that the Sanchez Progress Note was entered hours after Tanner's transport to the hospital.  See Response, ¶ 38, at 19.  Tanner does not dispute that none of the progress notes were entered contemporaneously with the treatment they describe.  See Response ¶ 38, at 19.  See, e.g., Luna Progress Note at 1 (note added at 10:56 a.m. describing action taken at 10:28 a.m.); McMurray Progress Note at 1 (describing Dr. McMurray's evaluation of Tanner in the medical unit before Tanner transferred back to her housing pod, note entered after Tanner transferred back to her housing pod); Sanchez Progress Note at 1 (note entered at 11:01 p.m. describing events which occurred at 7:28 p.m., 8:57 p.m., and 8:58 p.m.).  Because neither party asserts objections to the admissibility of any of the other Progress Notes and both parties rely on them, the Court considers them for the purposes of this motion and, the Spencer Progress Note being no different, the Court considers it as well.  The Court notes, however, that the Correct Care Defendants have not laid an appropriate foundation for a hearsay exception under which the Spencer Progress Note could come in, but the content within the Spencer Progress Note to which Tanner objects is also contained in the Spencer Depo., and therefore is available in an admissible form.

Tanner contends that she gave a more complete, sworn statement of the events referenced in the Spencer Progress Note, and cites to the Tanner Decl. at ¶¶ 26-33, but Tanner does not

contend that the account she provides contradicts the Spencer Progress Note's account -- merely that it is more complete and sworn statement. See Response at 19. The Court concludes that the Spencer Progress Note's account is repeated in the Spencer Depo., which is also sworn and contains additional details. See Spencer Depo. at 127:5-153:18. Further, the Court notes that the Tanner Decl. also states that Tanner went to the bathroom to change her bloody pad, that she was in pain, that Spencer examined her and said the baby was not crowning yet, that the nurses tried to listen for fetal heart tones and did not hear any, and that an ambulance was called. See Spencer Depo. ¶¶ 26-31, at 8-10. Tanner also cites to the Tanner Depo. in support, and the Court notes that the portions of the Tanner Depo. to which Tanner cites repeat the Tanner Decl.'s statements. See Tanner Depo. at 260:20-271:25 and does not specifically contradict the Spencer Progress Note's or Spencer Depo.'s account of events. Tanner also states that Spencer looked at her vagina and did not detect any crowning. See Response at 20 (citing Spencer Depo. at 15:8-12; id. at 15:21-24; id. at 152:7-14; id. at 152:18-21). Tanner goes on to say that she asked to go to the bathroom and two nurses assisted her. See Response at 20 (citing OPS Reports at 26). Tanner then states that Spencer called the ambulance "again" to inform them that her delivery was imminent. Response at 20 (citing Spencer Depo. at 149:18-20). Although Tanner purports to object to the Spencer Progress Note's admissibility, she proposes the same facts in her response to the text's facts, with a different citation to the record. The Court, therefore, adopts the text's fact as undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Tanner asserts as fact that neither Spencer nor Manquero had any formal training on finding fetal heart tones, not as an additional material fact, but in response to the Partial MSJ's proposed fact 38. Response at 19. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. Even drawing all reasonable inferences in Tanner's favor, the Court does not adopt as fact that neither Spencer nor Manquero had any formal training on finding fetal heart tones, because Tanner does not adequately support this fact with citation to the record as Fed. R. Civ. P. 56(c) requires. See Fed. R. Civ. P. 56(c)(1)(A). Tanner cites to the Spencer Depo. at 111:25-112:5 and the Manquero Depo. at 26:25-27:1 in support of this fact. See Response at 20. The portion of the Spencer Depo. to which Tanner cites states only that Spencer received training on the specific fetal heart tone monitor that Correct Care used from previous staff members. See 110:10-112:2. Spencer's statement that the only training he received was from previous staff members was specifically in reference to one type of fetal heart monitor, and not to finding fetal heart tones in general. See Spencer Depo. at 111:25-112:5. Spencer states that he is familiar with at least one other form of fetal heart tone monitoring. See Spencer Depo. at 110:8-9. Spencer also states that he had used the Correct Care's fetal heart tone monitor on pregnant patients at Metropolitan Detention before using it on Tanner. See Spencer Depo. at 109:22-110:4. The record to which Tanner cites does not support that Spencer had no formal training on finding fetal heart

tones, so the Court does not adopt Tanner's fact as undisputed.  See Fed. R. Civ. P. 56(c)(1)(A). Regarding Manquero, the Manquero Depo. indicates that Manquero did not receive training on fetal heart tones from Correct Care, but Manquero does not comment on whether she received training on fetal heart tones in nursing school or through another employer.  See Manquero Depo. at 26:25-27:1.  Because Manquero indicates that she received training other than that which Correct Care provided her, the Court cannot conclude, even drawing all reasonable inferences in Tanner's favor, that Manquero's statement that Correct Care did not provide fetal heart tones training reasonably indicates that Manquero had no training on fetal heart tones.  See Manquero Depo. at 27:19-22.  The Court, therefore, does not adopt as undisputed Tanner's proposed fact that neither Spencer nor Manquero had any formal training on finding fetal heart tones.  See Response at 19-20.

Tanner also states that: "At this point, not a single medical staff member had looked at Ms. Tanner's vagina."  Response at 20 (citing Tanner Decl. ¶¶ 20, 25, at 6-8).  The Court does not adopt this statement, asserted in response to the Correct Care Defendant's proposed fact 38, as fact, because the record does not support it.  The Tanner Decl.'s paragraph 20 refers to October 16, 2016, and paragraph 25 refers to Dr. McMurray's morning examination of Tanner -- both circumstances have been addressed, and the Court has adopted the undisputed facts therefrom, including that on none of these occasions did a staff member examine Tanner's vagina.  See supra nn. 72, 112, 133.  Tanner's statement that "[a]t this point," not a single staff member had looked at Tanner's vagina directly follows Tanner's statement that neither Spencer nor Manquero could detect fetal heart tones, and the Court is unable to determine what Tanner refers to with her statement "this point."  Response at 20.  Tanner does not dispute that Spencer looked at her vagina and did not detect crowning.  See Response at 20.  The Spencer Depo. indicates that he performed this examination before Manquero attempted to detect fetal heart tones.  See Spencer Depo. at 148:6-13.  Tanner does not comment on the order or events, or specify at what point she contends that no one had yet looked at her vagina, so the Court does not adopt her ambiguous statement as undisputed fact, because it is not supported by the record to which she cites.  See Fed. R. Civ. P. 56(c)(1)(A).

The Court does not adopt Tanner's proposed fact, stated in response to the text's fact, that Spencer "had no training in labor or delivery and did not take her pants off to check her," Response at 20 (citing Spencer Depo. at 15:8-12; id. at 15:21-24; id. at 152:7-14; id. at 152:18-21), because the record to which she cites does not support this statement.  See Spencer Depo. at 15:8-12; id. at 15:21-24; id. at 152:7-14; id. at 152:18-21.  In the Spencer Depo., Spencer states that he received no specialized training on pregnancy or childbirth apart from what he received in medical school, but he states that he received some kind of training on obstetrics in medical school.  See Spencer Depo. at 15:10-24.  Tanner does not suggest that the training Spencer received in medical school is inadequate training for him to have learned how to detect crowning, and the Spencer Depo. does not specifically address Spencer's ability to detect crowning based on his nursing school obstetrics training.  Additionally, Tanner states that Spencer "had no training" in labor and delivery, whereas

**15.** **The Delivery**.

When Albuquerque Ambulance Paramedic Alfonso Martinez arrived at Metropolitan

Detention at approximately 11:10 a.m., he saw Tanner on a table "'in pain'" and that she "'looked

like she was in labor.'" Response at 20 (stating this fact)(quoting Deposition of Alfonso Jesus

---

the Spencer Depo. suggests only that Spencer had no specialized training on pregnancy or childbirth -- not that he had no training at all. See Spencer Depo. at 15:10-12. In fact, the Spencer Depo. directly controverts Tanner's statement, because Spencer states that he received some kind of obstetrics training in nursing school. See Spencer Depo. at 15:13-15. Concluding that the record as cited cannot support Tanner's proposed fact, even drawing all reasonable inferences in Tanner's favor, the Court does not adopt the fact that Spencer had no training in labor and delivery as undisputed. See Fed. R. Civ. P. 56(c)(1)(A). The Court also does not adopt that Spencer did not take Tanner's pants off to check her, because the portion of the Spencer Depo. to which Tanner cites in support of that statement indicates that Spencer had to remove Tanner's pants to check her and had to "kind of lower that to visually be able to see the area." Spencer Depo. at 152:11-14. Although the Spencer Depo. then states that Tanner's pants were not pulled down to her ankles, the Court concludes that the cited portion of the record indicates that Spencer removed Tanner's pants from covering the relevant area in order to examine her, and therefore was able to make his determination that she was not crowning. See Spencer Depo. at 152:13-24. The Court does not adopt Tanner's fact that Spencer did not remove Tanner's pants as undisputed, concluding that the record cannot support it, even drawing all reasonable inferences in Tanner's favor. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Nor does the Court adopt Tanner's proposed fact, stated in response to the text's fact, that although "no one told Ms. Tanner that they could not find fetal heart tones, she 'kind of kn[ew] something[ wa]s going on," and became "distraught." Response at 20 (quoting Spencer Interview at 10:18-21). Tanner cites only to the Spencer Interview in support of her statement, but the Spencer Interview does not indicate that no one told Tanner that they could not find fetal heart tones. See Spencer Interview at 10:18-21. In the Tanner Decl., Tanner states that the "nurses tried to listen for fetal heart tones but could not find any," suggesting that Tanner was aware that the nurses could not find fetal heart tones. Tanner Decl. ¶ 30, at 10. The Court, having reviewed the record, concludes that the record contains no support for the statement that no one told Tanner that they could not find fetal heart tones, so the Court does not adopt it, having independent reason to doubt its accuracy, where Tanner states her awareness that the nurses could not find fetal heart tones in the Tanner Decl. See Tanner Decl. ¶ 30, at 10. See also Fed. R. Civ. P. 56(c)(1)(A).

- 105 -

Martinez at 16:4-6 (dated Feb. 28, 2019), filed June 3, 2019 (Doc. 286-16)("Martinez Depo.")).[153]

Several people were in the room, and the medical personnel were gathered around Tanner while, as Martinez described, "she was, obviously, having contractions." See Response at 20 (stating this fact)(citing Martinez Depo. at 22:22-23).[154]  Tanner's pants were on and when they were removed,

_____

[153]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 38, stating that she "dispute[s] the account of the events described in CCS SOF No. 38 and the progress notes cited as CCS Exhibit L."  Response at 19.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court also notes that, drawing all reasonable inferences in Tanner's favor, the record supports the text's fact. Tanner cites only to the Martinez Depo. in support of the text's fact, but the Court notes that the Martinez Depo. does not contain information regarding what time Martinez arrived on scene at Metropolitan Detention.  See generally Martinez Depo.  The Martinez Depo. states that Tanner looked like she was in pain and in labor when Martinez arrived, so the Court adopts that portion of Tanner's fact as undisputed, because the Correct Care Defendants do not address it in their Reply, and the Court has no independent reason to doubt its accuracy.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  The Court also adopts that Martinez arrived at Metropolitan Detention at 11:10 a.m., because another portion of the record supports that fact, the Correct Care Defendants do not address it in their Reply, and the Court has no independent reason to doubt its accuracy.  See Patient Care Report at 1, filed June 3, 2019 (Doc. 287-12)("Ambulance Report")(stating the time of arrival at scene as 11:10 a.m. on October 17, 2016).  See also D.N.M.LR-Civ. 56.1(b).

[154]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 38, stating that she "dispute[s] the account of the events described in CCS SOF No. 38 and the progress notes cited as CCS Exhibit L."  Response at 19.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court also notes that, drawing all reasonable inferences in Tanner's favor, the record supports the text's fact.  See Martinez Depo. at 22:22-23 (stating: "And they were kind of just around here while she was, obviously, having contractions.").  Tanner states: "Several people were in the room, but MDC personnel 'were kind of just around her while she was, obviously, having contractions.'"  Response at 20 (quoting Martinez Depo. at 22:22-23).  The Court alters the proposed fact slightly, because

her baby was already crowning.  See Response at 20 (stating this fact)(citing Martinez Depo. at 16:4-6; id. at 22:22-23; Ambulance Report at 3).[155]

Dr. McMurray did not observe or interact with Tanner herself when she returned to the infirmary on the morning of October 17, 2016.  Response at 20 (stating this fact)(citing Spencer Depo. at 118:9-118:15; id. at 118:18-22; id. at 172:6-172:18).[156]  Spencer went to Dr. McMurray's

---

the Martinez Depo. states that the people to whom Martinez refers are nurses, see Martinez Depo. at 22:16, who were likely Correct Care employees, and, for clarity's purpose, the Court does not refer to them as Metropolitan Detention personnel.  The Court also alters the proposed fact so that it no longer suggests that the Correct Care personnel were not doing anything other than standing around, because the record reflects that Martinez "can't remember exactly what they were doing," and, when pressed about specific actions the nurses may have been taking, he stated, "I'm not positive," and reiterated that he could not recall.  Martinez Depo. at 23:11-17.  The Court alters the proposed fact to reflect what the record can support -- that the Correct Care personnel were standing around Tanner, but not that they were only standing around Tanner and doing nothing else, because, when directly asked, Martinez declined to affirmatively state that fact.  The Court concludes that the record supports the text's fact, and the Correct Care Defendants do not address it in their Reply, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b).

[155]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 38, stating that she "dispute[s] the account of the events described in CCS SOF No. 38 and the progress notes cited as CCS Exhibit L."  Response at 19.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court also notes that, drawing all reasonable inferences in Tanner's favor, the record supports the text's fact.  See Martinez Depo. at 22:22-23 (stating that Tanner's pants were on).  See also Ambulance Report at 3 (stating that Tanner was in active labor with positive crowning).  The Court concludes that the record supports the text's fact, and the Correct Care Defendants do not address it in their Reply, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b).

[156]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 37, stating that she "dispute[s] the account of Dr. McMurray's and EMT Drummond's involvement set forth in CCS SOF No. 37 and 39."  Response at 20.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to

- 107 -

office and told him that "Shawna's back down complaining of the same issues that the night nurse reported, even though we just saw her in the SHU, she complained -- voiced that all those symptoms and everything were gone away, she wanted to go back to her pod, feeling good," that she now "saturat[ed]" a pad with a bloody discharge, and that Spencer could not "find a fetal heart tone," but had asked another nurse to check -- at this point, Dr. McMurray issued a verbal order to send Tanner to the hospital. See Response at 20-21 (stating this fact)(citing Spencer Depo. at 118:9-15; id. at 118:18-22; id. at 172:6-18).[157] Dr. McMurray, whose last delivery was in medical

_____

Tanner, construes them as additional material facts for the purposes of this motion. The Correct Care Defendants' proposed fact 39 states: "Dr. McMurray was called to evaluate Plaintiff. After observing Plaintiff and her blood-soaked pad, he decided to send her to the hospital." Partial MSJ ¶ 37 at 11 (citing McMurray Depo. at 202:9-202:15). The Court concludes that, despite the Correct Care Defendants' and Tanner's contradictory statements regarding whether Dr. McMurray observed Tanner on the morning of October 17, 2016, there is no genuine dispute, because the Correct Care Defendants do not adequately support their assertion with citation to the record. See Fed. R. Civ. P. 56(c)(1)(A). The Correct Care Defendants cite to the McMurray Depo. in support of their statement, but the McMurray Depo. states that Dr. McMurray examined Tanner's bloody pad but did not examine Tanner herself. See McMurray Depo. at 202:16-19 (stating that Dr. McMurray looked at a pad and did not inspect Tanner); id. at 204:25-205:1 (stating that Dr. McMurray conducted no further examination of Tanner before deciding to authorize an ambulance transport to bring her to the hospital). The Court notes that the Spencer Depo. supports the text's fact. See Spencer Depo. at 119:21-23 (stating that Dr. McMurray issued a verbal order to send Tanner to the hospital while sitting in his office). Because the record to which the Correct Care Defendants cite does not support their proposed fact, but supports Tanner's fact asserted in response, the Court concludes that there is no genuine dispute in the record and adopts the text's fact as undisputed, because the record supports it and the Correct Care Defendants do not address it in their Reply. See D.N.M.LR-Civ. 56.1(b).

[157]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 37, stating that she "dispute[s] the account of Dr. McMurray's and EMT Drummond's involvement set forth in CCS SOF No. 37 and 39." Response at 20. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court

school, was present for Tanner's delivery, while paramedic Keith Drummond, who had performed

five deliveries in the past several years, delivered the baby.  See Partial MSJ ¶ 39, at 11 (stating

this fact)(citing McMurray Depo. at 211:13-18; id. at 216:20-217:5; id. at 217:9-15).[158]  In the

---

concludes that the record supports the text's fact, because the Spencer Depo. describes Spencer's conversation with Dr. McMurray as follows:

> I just told him that Shawna's back down complaining of the same issues that the night nurse reported, even though we just saw her in the SHU, she complained -- voiced that all those symptoms and everything were gone away; she wanted to go back to her pod, feeling good.  Now she's back, saturating pad.  I can't find a fetal heart tone.  I've asked another nurse to check it.  So, they were doing that.  And so, and at that point, he just said -- that's when I got the verbal order to send her out to the hospital.

Spencer Depo. at 119:13-23.  Tanner stated:

> Rather, Nurse Spencer came to [Dr. McMurray's] office that morning and told him that "Shawna's back down complaining of the same issues that the night nurse reported," that she had "saturated" a pad with a bloody discharge, and that Nurse Spencer could not "find a fetal heart tone."  Based on what Nurse Spencer told him in his office that morning, Dr. McMurray finally gave Nurse Spencer the verbal order which authorized Ms. Tanner's emergency transport to the hospital.

Response at 20-21 (quoting Spencer Depo. at 118:9-15; id. at 118:18-22; id. at 172:6-18).  Because Tanner purports, in her fact, to describe what Spencer told Dr. McMurray -- what formed Dr. McMurray's basis for authorizing hospital transport -- the Court alters Tanner's fact to better comport with the record's description of what Spencer told Dr. McMurray, which includes the information that her symptoms had gone away and come back.  See Spencer Depo. at 119:16-17.  The Court concludes that the record supports the text's fact and the Correct Care Defendants do not address it in their Reply, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b).

[158]Tanner does not state whether she admits or disputes the text's facts, but states that she she "dispute[s] the account of Dr. McMurray's and EMT Drummond's involvement set forth in CCS SOF No. 37 and 39."  Response at 20.  Tanner, in response to the text's facts, states:

examination room, someone turned to Dr. McMurray and stated "okay, doctor, this one's yours," and in response, Dr. McMurray threw his hands up and shook his head "no." Response at 21 (stating this fact)(quoting Spencer Depo. at 31:4-16).[159]

When Drummond delivered the baby, he noted that the umbilical cord was wrapped tightly around the baby's neck. See Partial MSJ ¶ 40, at 11 (stating this fact)(citing McMurray Depo. at

---

Dr. McMurray did not come to the exam room in which they kept Ms. Tanner until later that morning, when he stood towards the back of the room and did not interact with her or participate in the delivery. While in the exam room, someone turned to Dr. McMurray and said "OK, doctor, this one's yours." Dr. McMurray responded by throwing his hands up and nodding his head in a "no" fashion.

Response at 21 (citations omitted). Tanner's response does not assert a genuine dispute whether Dr. McMurray was present, whether his last delivery was in medical school, whether Drummond delivered the baby, and whether Drummond had performed five deliveries in the past several years. See Partial MSJ ¶ 39, at 11. The Court concludes that the record supports the text's facts. See McMurray Depo. at 211:13-18; id. at 216:20-217:5; id. at 217:9-15. Because Tanner does not dispute the truth of these facts, Tanner's response implicitly acknowledges that Dr. McMurray was present in the room during the delivery, and the Court concludes that the record supports the text's facts, the Court adopts the text's facts as undisputed. See D.N.M.LR-Civ. 56.1(b).

[159]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 37, stating that she "dispute[s] the account of Dr. McMurray's and EMT Drummond's involvement set forth in CCS SOF No. 37 and 39." Response at 20. In disputing that proposed fact, Tanner lists several additional facts, of which this is one. Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion. The Court concludes that the record supports the text's facts. See Spencer Depo. at 31:4-16 (stating that someone turned to the doctor and said "okay, doctor, this one's yours," and that the "physician then threw his hands up and nodded his head in a 'no' fashion."). The Court concludes that the record supports the text's fact, and the Correct Care Defendants do not address it in their Reply, so the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b).

212:23-213:7; Ambulance Report at 5).[160]  Drummond removed the umbilical cord from around

the neck, and one of the paramedics suctioned the baby's airway with a bulb syringe.  See Response

at 22 (stating this fact)(citing Martinez Depo. at 40:16-41:14; id. at 43:8-44:5; id. at 48:22-24).[161]

---

[160]Tanner does not specifically state whether she admits or disputes the text's fact, stating that she "dispute[s] the account of Dr. McMurray's and EMT Drummond's involvement set forth in CCS SOF No. 37 and 39."  Response at 20.  In her response to the text's fact, however, Tanner states: "A paramedic employed by CCS to work in the detox unit at MDC, Keith Drummond, was the individual who actually caught Ms. Tanner's baby in his hands during the delivery.  The baby was born dead with the umbilical cord wrapped around his neck."  Response at 21-22 (citations omitted).  The Court concludes that Tanner reiterates the text's fact and therefore does not assert a genuine dispute to it.  The Court also concludes that the record supports the text's fact.  See McMurray Depo. at 212:23-213:7 (stating that Drummond delivered the baby); Ambulance Report at 5 (stating that the baby was born with its umbilical cord around its neck).

[161]Tanner asserts the text's fact not as an additional material fact, but in response to the Partial MSJ's proposed fact 37, stating that she "dispute[s] the account of Dr. McMurray's and EMT Drummond's involvement set forth in CCS SOF No. 37 and 39."  Response at 20.  In disputing that proposed fact, Tanner lists several additional facts, of which this is one.  Although Tanner did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be generous to Tanner, construes them as additional material facts for the purposes of this motion.  The Court concludes that the record supports the text's facts.  See Ambulance Report at 5 (stating that the paramedic who delivered the baby removed the cord from around the baby's neck and that one of the Albuquerque Ambulance team paramedics cleared the baby's airway with a bulb syringe).  The Court notes that Tanner states that one of the Albuquerque Ambulance paramedics suctioned the baby's airway, but the Correct Care Defendants assert that Drummond suctioned the baby's airway.  See Partial MSJ ¶ 40, at 11 (citing McMurray Depo. at 213:2-6)(stating that "Mr. Drummond got the baby and suctioned the nose out, did some stimulation, little thumps on the chest, that type of stuff.  And then, he handed the baby over to, I think it was the AA staff.").  The Court concludes that there is a genuine dispute regarding whether Drummond or an Albuquerque Ambulance paramedic suctioned the baby's airway, so the Court does not adopt either as fact, and states only that a paramedic suctioned the baby's airway, which is undisputed, because either Drummond -- a paramedic -- or an Albuquerque Ambulance paramedic suctioned the baby's airway.  See Ambulance Report at 5; McMurray Depo. at 213:2-6.  The Court concludes that the record supports the text's fact, and the Correct Care Defendants do not address it in their Reply, so the Court adopts it as undisputed.  See D.N.M.LR-Civ. 56.1(b).

The Albuquerque Ambulance staff pronounced the fetus dead at 11:28 a.m.  <u>See</u> Partial MSJ ¶ 40, at 12 (stating this fact)(citing Ambulance Report).[162]

---

Tanner also states: "No CPR or other lifesaving techniques were attempted on the baby," and that "[v]ery little amniotic fluid remained by the time of delivery."  Response at 22 (citations omitted).  The Court does not adopt these statements as fact, because the record as cited does not support them.  Although the Martinez Depo. indicates that no CPR was performed on the baby, <u>see</u> Martinez Depo. at 48:24, the McMurray Depo. indicates that Drummond did some stimulation on the baby akin to CPR ("little thumps on the chest," McMurray Depo. at 213:2-6), and the Ambulance Report indicates that the baby's airway was suctioned, and that the paramedics stated that the baby "had no signs of life, was pulseless, apneic and unresponsive to stimuli."  Ambulance Report at 5.  <u>See</u> McMurray Depo. at 213:2-6.  The Court concludes that there is a dispute regarding what techniques were used on the baby after birth to determine whether he was alive or to attempt to save his life, so the Court does not adopt this statement as undisputed fact.  The Court also does not adopt the statement that very little amniotic fluid was left at the time of delivery, because the OPS Reports at 17 nowhere states this fact or refers to amniotic fluid.  <u>See</u> OPS Reports at 17.  Concluding that the record does not support these facts, the Court does not adopt them as undisputed.  <u>See</u> Fed. R. Civ. P. 56(c)(1)(A).

[162]Tanner does not specifically state whether she admits or disputes the text's fact, stating that she "dispute[s] the account of Dr. McMurray's and EMT Drummond's involvement set forth in CCS SOF No. 37 and 39."  Response at 20.  In her response to the text's fact, however, Tanner does not address whether the Albuquerque Ambulance staff pronounced the baby dead at 11:28 a.m.  Response at 21-22.  The Court concludes that the record supports the text's fact.  <u>See</u> Ambulance Report at 3 (stating that the baby was delivered on scene and was still born).  The Correct Care Defendants propose as fact that the Albuquerque Ambulance staff declared the baby dead at 11:28 a.m., but the record as cited does not support this fact.  <u>See</u> Ambulance Report at 1-5 (not stating the time of fetal death).  The Ambulance Report states that staff arrived at the patient at 11:14 a.m., and that they began transporting Tanner to the hospital after the stillbirth at 11:38 a.m.  <u>See</u> Ambulance Report at 1.  Nevertheless, the Court adopts the Correct Care Defendants' fact as undisputed, because another portion of the record supports it.  See OPS Reports at 17 (stating "Pulse was not felt by paramedics or myself -- at approximately 1128 baby was pronounced dead.").  Tanner does not specifically controvert the text's fact in her Response, so the Court adopts it as undisputed, having no independent reason to doubt its accuracy.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

16.     **The Events After the Delivery.**

Tanner "thought [she] was having a nightmare" when paramedics said her baby was not

breathing and told her not to look.  See Response ¶ A, at 22 (stating this fact)(citing Tanner Decl.

¶ 33, at 10-11).[163]  Someone asked if Tanner wanted to hold her stillborn baby and Tanner held

_____

[163]The Correct Care Defendants reply that Tanner's "recollections of her impressions of what happened to her after the stillbirth are immaterial because they are not evidence that would support her allegations of deliberate indifference or violation of her substantive due process rights."  Reply ¶ A, at 2.  The Correct Care Defendants also contend that "[c]onclusory and self-serving affidavits must be disregarded when determining whether to grant summary judgment." Reply ¶ A, at 2 (citing Kephart v. Data Sys. Int'l, Inc., 243 F. Supp. 2d 1205, 1209 (D. Kan. 2003)(Vratil, J.)("Kephart")).  In Kephart, the Honorable Kathryn H. Vratil, United States District Judge for the United States District Court for the District of Kansas concluded that to survive summary judgment, the non-movant's affidavits must be based on personal knowledge and set forth facts that would be admissible in evidence -- conclusory and self-serving affidavits are not sufficient to survive summary judgment.  See Kephart, 243 F. Supp. 2d at 1209.  Tanner's declaration is based on her personal knowledge of how she felt after learning that her newborn baby was not breathing and Tanner can establish this fact with evidence admissible at trial, as Tanner discussed the events after her delivery in her Tanner Decl. and in the Tanner Depo. and could testify about them at trial.  See Tanner Decl. ¶ 33, at 10-11; Tanner Depo. at 271:1-20. Tanner also cites to the Martinez Depo. at 48:4-8 in support of the text's fact, but the Court, having reviewed the Martinez Depo., concludes that it states: "Well, 'cause we were responding to a medical-capable facility, and we kind of were given this scene where this mother was going to deliver a baby presumed to be stillborn because no fetal heart tones are found.  She hadn't felt him move."  Martinez Depo. at 48:4-8.  The Martinez Depo. does not support the text's fact regarding Tanner's reactions after learning that her baby was born still, so the Court cites only to the Tanner Decl. as the fact's source in the record.  See Response ¶ A, at 22.  The Correct Care Defendants do not address the text's fact, and the Court concludes that the record supports it, so the Court considers this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).  Although the Correct Care Defendants contend that Tanner's recollections of what happened after her stillbirth are irrelevant, see Reply at 2, the Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  SEC v. Goldstone, SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

him for a few seconds before staff took him back.  See Response ¶ A, at 22 (stating this fact)(citing

Tanner Decl. ¶ 33, at 11).[164]  Tanner was transferred to a gurney, buckled into its seatbelts, given

a blanket, and wheeled down the main hallway at Metropolitan Detention toward the ambulance.

See Response ¶ A, at 22-23 (stating this fact)(citing Tanner Decl. ¶ 33, at 11; Martinez Depo. at

52:15-53:13; 55:12-57:21; 60:17-61:22; Main/Releasing Video at 11:35 a.m. (dated Oct. 17,

2016), filed June 4, 2019 (Doc. 288)("Main/Releasing Video")).[165]  A corrections officer walked

---

[164]The Correct Care Defendants reply that Tanner's "recollections of her impressions of what happened to her after the stillbirth are immaterial because they are not evidence that would support her allegations of deliberate indifference or violation of her substantive due process rights."  Reply ¶ A, at 2.  The Correct Care Defendants also contend that "[c]onclusory and self-serving affidavits must be disregarded when determining whether to grant summary judgment."  Reply ¶ A, at 2 (citing Kephart, 243 F. Supp. 2d at 1209).  As discussed supra n.163, the Court concludes that the Tanner Decl. is not a conclusory, self-serving affidavit.  See supra n.163. Although the Correct Care Defendants argue that Tanner's recollections after the stillbirth are irrelevant, see Reply at 2, the Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  Tanner also asserts as an additional material fact that a "crowd of strangers had gathered around the exam room while she lay on the exam table with no pants on and her legs spread," but the Court has already adopted this fact as undisputed, so the Court does not reiterate it here.  Response ¶ A, at 22.  See supra n.150 and accompanying text.  The Correct Care Defendants do not address the text's fact, and the Court concludes that the record supports it, so the Court considers this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).  See also Tanner Decl. ¶ 33, at 11 (stating that one of the people around Tanner "was holding my baby and asked if I wanted to hold him.  I said yes, and she let me hold my baby for a few seconds before taking him back.").

[165]Tanner contends that: "Still with no pants on, Ms. Tanner was then transferred to a gurney, buckled into its seatbelts, shackled by one of the corrections officers, given a blanket, and wheeled down the main hallway at MDC toward the ambulance."  Response ¶ A, at 22-23 (stating this fact)(citing Tanner Decl. ¶ 33, at 11, Martinez Depo. at 52:15-53:13; id. at 55:12-57:21; id. at 60:17-61:22; Main/Releasing Video at 11:35 a.m.).  The Correct Care Defendants cite to a portion of the record specifically controverting this fact.  See Reply ¶ A, at 3 (disputing this fact)(citing

Spencer Depo.).  The Spencer Depo. states that staff made sure Tanner had on a clean pair of pants when she left on the gurney to go to the hospital, and that he saw her leave the examination room without any restraints on.  See Spencer Depo. at 165:12-167:9.  The Martinez Depo. states that staff buckled Tanner onto the gurney with its seatbelts, gave her a blanket to cover herself because she was not wearing pants, and shackled her, although she was not handcuffed to the gurney.  See Martinez Depo. at 56:2-7; id. at 60:17-61:22.  The Court, therefore, does not adopt this fact as undisputed.  The Correct Care Defendants aver that "a minor discrepancy of fact does not amount to a dispute of material fact."  Reply ¶ A, at 3 (citing Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1261 (10th Cir. 2008), but the Court will determine whether Tanner's proposed fact that she wore no pants and was shackled is minor and material in the analysis portion of this opinion.  See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  The Court concludes from the Correct Care Defendants' statement that the Correct Care Defendants do not assert a material dispute to Tanner's proposed additional material fact, but only minor factual discrepancies -- nevertheless, the Court conducts a thorough analysis of Tanner's and the Correct Care Defendants' proffered evidence on this fact, to determine whether a genuine dispute exists.  Accordingly, the Court removes the statements that Tanner was shackled and without pants, and adopts the remainder of Tanner's fact as undisputed, because the Correct Care Defendants do not cite to any portion of the record specifically controverting the rest of Tanner's fact.  See D.N.M.LR-Civ. 56.1(b).  The Correct Care Defendants also purport to dispute Tanner's recitation of facts as "incomplete and therefore misleading," Reply ¶ A, at 3, but the Correct Care Defendants do not dispute that Tanner was placed on a gurney, buckled into its seatbelts, given a blanket, and wheeled down the main hallway at Metropolitan Detention toward the ambulance, so the Court deems this fact undisputed.

      The Correct Care Defendants also argue that Tanner "neither authenticated nor laid a foundation for admissibility of her proffered video evidence."  Reply ¶ A, at 3 (citing Fed. R. Evid. 901(a); 801).  In the Tenth Circuit, "[i]t is well settled . . . that we can consider only admissible evidence in reviewing an order granting summary judgment.  While the party opposing summary judgment need not produce evidence in a form that would be admissible at trial, the content or substance of the evidence must be admissible."  Wright-Simmons . City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998)(quotation and ellipsis omitted; ellipsis added).  See Jay Dees Inc. v. Defense Technology Sys., Inc., 05 Civ. 6954 (SAS), 2008 WL 4501652, at *6 (S.D.N.Y. Sept. 30, 2008)(Scheindlin, J.)("Authentication is not only necessary for entry into evidence at trial; it is a precondition to consideration of documentary evidence on summary judgment.").  The Tenth Circuit reviews a district court's refusal to consider evidence at the summary judgment stage for abuse of discretion.  See Sports Racing Servs., Inc., 131 F.3d 874, 894 (10th Cir. 1997).  The Tenth Circuit has also stated that it does "not require an affidavit to authenticate every document submitted for consideration at summary judgment."  Law Co., Inc. v. Mohawk Constr. and Supply Co., Inc., 577 F.3d 1164, 1170 (10th Cir. 2009)("Law Co.")(citing Anderson v. Cramlet, 789 F.2d 840, 845 (10th Cir. 1986)).  The Tenth Circuit in Law Co. concluded that the district court abused

its discretion by summarily disregarding exhibits because no witness offered authentication for them, rather than considering each document to determine whether it was authenticated. See Law Co., 577 F.3d at 1170-71 (citing Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1252 (10th Cir. 2006)). The Tenth Circuit concluded that the exhibits in question "might be sufficiently authenticated taking into consideration the '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" Law Co., 577 F.3d at 1171 (quoting Fed. R. Evid. 901(b)(4)). Rule 901(a) states: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Even without authentication through an affidavit or deposition, a document may be authenticated by circumstantial evidence which suggests the document is what it purports to be." Bhandari v. VHA Sw. Comm. Health Corp., 2011 WL 1336512, *4 n.2 (D.N.M. March 30, 2011)(Browning, J.)("Bhandari")(citing Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1423 (10th Cir. 1991)(finding that "there was sufficient circumstantial evidence to support [an exhibit's] authenticity" when the document was prepared on letterhead and provided during discovery by a former defendant in the case)). In Bhandari, the Court concluded that documents produced during discovery in response to a request for documents and under a letter on letterhead bore sufficient circumstantial evidence of authenticity to support the Court considering them in its summary judgment determination. See Bhandari, 2011 WL 1336512, at *4 n.2.

As in Bhandari, the videos were produced during discovery in response to a request. See Plaintiffs' Surreply Regarding Defendants McMurray, Luna, and Sanchez's Motion for Partial Summary Judgment at 10, filed July 3, 2019 (Doc. 324)("Surreply")(citing Email from Nataura C. Powdrell-Moore to Nicole Moss (dated Nov. 30, 2016), filed April 22, 2019 (Doc. 225-3)("Nov. 30 Email")(confirming that Bernalillo County would produce the surveillance videos)). In her Surreply, Tanner contends that correspondence regarding Bernalillo County's production of the video exhibits "are already part of the record." Surreply at 10 (citing Plaintiff Tanner's Motion for Partial Summary Judgment on IPRA Claims Against Defendant Board of County Commissioners of Bernalillo County, filed April 22, 2019 (Doc. 225)("IPRA SJ Motion"); The County Defendants' Response in Opposition to Plaintiff Tanner's Motion for Partial Summary Judgment on IPRA Claims Against Defendant Board of County Commissioners of Bernalillo County, filed May 6, 2019 (Doc. 252)("IPRA SJ Response"); Plaintiff Tanner's Reply to County Defendants' Response to Motion for Partial Summary Judgment on IPRA Claims, filed May 20, 2019 (Doc. 273)("IPRA SJ Reply")). Tanner contends that there is "already evidence in the record that the video recordings were produced by the County . . . using a specialized software program and an automated camera system that records continuously from fixed camera positions within MDC . . . ." Surreply at 11 (citing 30(B)(6) Deposition of Bernalillo County, Faith Jo Montoya at 13:2-12 (dated April 2, 2019), filed April 22, 2019 (Doc. 225-15)("Montoya Depo."); id. at 14:18-20; id. at 15:24-17:25; id. at 24:22-25:7). See Letter from Jonlyn Martinez to Arne Leonard (dated Jan. 3, 2018), filed May 6, 2019 (Doc.252-3)("Video Exhibits Letter")(stating that Bernalillo

County enclosed a flash drive of video surveillance videos which Metropolitan Detention produced, dated October 16, 2016, and October 17, 2016). Tanner also contends that Bernalillo County "produced floor plans of MDC which can be used to identify the camera locations and viewing angles," but Tanner does not provide a citation to these floor plans in the record. Surreply at 10.

Tanner contends that she can recognize and identify each of the locations where she is depicted in the video recordings. See Surreply at 11 (citing Second Declaration of Shawna Tanner, filed July 3, 2019 (Doc. 324-1)("Second Tanner Decl.")). In the Second Tanner Decl., Tanner states:

> My attorneys submitted copies of video recordings from MDC on a flash drive labeled Exhibit 57 to Plaintiffs' Response to Defendants McMurray, Luna, and Sanchez's Motion for Partial Summary Judgment (Doc. 288). I have reviewed the portions of the video recordings cited in Paragraphs 16 and 17; 19, 20, and 21; 24; 25; 27; 31 and 32; 35 and 36; and A of Plaintiffs' response brief (Doc. 286). I see and recognize the locations in MDC shown on these portions of the video recordings. I also see and recognize where I am leaving Pod F7 at 8:32 a.m., entering the medical unit at 8:35 a.m., moving from the infirmary waiting area to the exam room at 8:56 a.m., exiting the exam room at 9:02 a.m., waiting in my cell in Pod F7 at 10:03 a.m. until medical staff responded to the "Code 43" emergency call a few minutes later, grabbing my stomach while bent over in pain against the wall in the sallyport at 10:12 a.m., walking between the waiting area, the bathroom, and the exam room in the medical unit between 10:26 a.m. and 10:34 a.m., and entering the Sheltered Housing Unit (SHU) at 10:38 a.m. on the morning of October 16, 2016. On the video recordings for the following day, October 17, 2016, I can also see where I am being escorted back from the SHU to Pod F7 at 9:07 a.m., sitting in a wheelchair being pushed by my cell mate, Ashlee Custy, and another inmate as I arrived in the waiting area of the medical unit at 10:12 a.m., going from the waiting area to the exam room between 10:27 a.m. and 10:30 a.m., and being taken to the ambulance on a gurney at 11:35 a.m. When called to testify at trial, I can identify myself, where I am located, and what is going on around me in these video recordings.

Second Tanner Decl. ¶ 4, at 2. Tanner further argues that the video recordings have "'distinctive characteristics which make [them] unique, readily identifiable, and relatively resistant to change,'" as well as "'independent date and time information'" which "'provides further indication'" of their "'reliability.'" Surreply at 11 (quoting United States v. Mills, 194 F.3d 1108, 1111-12 (10th Cir. 1999)).

The Correct Care Defendants also contend that Tanner's declarations are not proper summary judgment evidence, because they are conclusory and self-serving. See Response ¶ A, at 2-3 (citing Kephart v. Data Sys. Int'l, Inc., 243 F. Supp. 2d 1205, 1209 (D. Kan. 2003)("Kephart")(Vratil, J.); Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995)("Murray")). The Correct Care Defendants do not contend, however, that Tanner's affidavit is not based on her personal knowledge, and the cases to which the Correct Care Defendants cite state only that the Court may not rely on statements not based on personal knowledge. See Kephart, 243 F. Supp. 2d at 1209; Murray, 45 F.3d at 1422 (same). The portion of the Tanner Decl. to which Tanner cites in support of her proposed fact is based on Tanner's personal knowledge -- she describes her feelings after the paramedics relayed information to her about her baby's condition, she describes what she saw, and she describes what she felt. See Tanner Decl. ¶ 33, at 10-11. Under Kephart and Murray's guidance, the Court may and does consider the Tanner Decl. to the extent that it is based on Tanner's personal knowledge.

The Court, having reviewed the video, concludes that it depicts a hallway which both inmates and staff members used. See, e.g., Main/Releasing Video at 11:27:27 (showing inmates in orange jumpsuits lining up against one of the hallway's walls at a staff member's direction). At 11:35:24, a door on the hallway's right side opens, and several individuals help to wheel out a gurney, upon which a female patient is sitting up. Several individuals wheel the gurney across the hallway into a door on the left side of the hallway. See Main/Releasing Video at 11:35:24-50. Tanner relies on the video to support her statement that she was wheeled down the hallway in a gurney, and the Main/Releasing Video at 11:35 a.m. depicts a patient on a gurney being wheeled down a hallway. See Main/Releasing Video at 11:35 a.m. The Ambulance Report indicates that transport from Metropolitan Detention to the hospital began at 11:38 a.m. on October 17, 2016, three minutes after the patient in the Main/Releasing Video is wheeled down the hallway. See Ambulance Report at 1. Spencer stated that he knew Tanner left Metropolitan Detention at 11:37 a.m. See Spencer Depo. at 172:1-2. Martinez stated that the path from the infirmary to the ambulance required a short path backtracking across a bigger hallway. See Martinez Depo. at 57:11-21. The Martinez Depo., Spencer's statement and the Ambulance Report's indication that Tanner left Metropolitan Detention around 11:37 or 11:38 a.m. accords with her being wheeled down a hallway towards an ambulance at 11:35 a.m. -- as the Main/Releasing Video at 11:35 a.m. appears to show -- drawing all reasonable inferences in her favor.

The Court previously concluded that authentication "is not a high threshold," especially where the party objecting to the evidence's authenticity "gives the Court no evidence to question" the evidence's "genuineness." Lopez v. Delta Int'l Mach. Corp., 312 F. Supp. 3d 1115, 1154 (D.N.M. 2018)(Browning, J.)("Lopez"). In Lopez, the Court held that a purchase agreement was sufficiently authenticated where the defendants, "at least one of whom [wa]s a successor to the corporate entity that signed the contract," provided the purchase agreement, the document was entitled "Purchase Agreement between the Black & Decker Corporation and Pentair, Inc., dated as of July 16, 2004," and the agreement "appear[ed] to be what it purport[ed] to be." Lopez, 312

beside Tanner carrying the deceased baby wrapped in a blanket, with the placenta in a biohazard bag. See Response ¶ A, at 23 (stating this fact)(citing Tanner Decl. ¶ 33, at 11; Martinez Depo. at 52:15-53:13; id. at 55:25-57:21; id. at 60:17-61:22).[166] The Albuquerque Ambulance paramedics and corrections officers transported Tanner to Lovelace Women's Hospital, because Tanner told the paramedics that Lovelace Women's Hospital was "'where she had been receiving her care

---

F. Supp. 3d at 1154. Here, Bernalillo County provided the videos. See Video Exhibits Letter at 1-2. Although the videos themselves do not have time or location stamps, as explained above, other pieces of evidence in the record corroborate the times and events which the videos depict, the Court can recognize Tanner in the videos, the Correct Care Defendants do not indicate whether or why they believe the videos to not be genuine, and Tanner, in the Second Tanner Decl., declares under penalty of perjury that she can identify, recognize, and testify to the events depicted in the videos upon which she relies. See Second Tanner Decl. ¶ 4, at 2. The Court concludes that the circumstances surrounding the Main/Releasing Video's production and its contents sufficiently authenticate it for the Court to consider it in deciding whether to grant the motion for summary judgment. See Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1423 (10th Cir. 1991)(concluding that a document was authenticated under rule 901(b)(4), because it had a defendant's letterhead and was produced by a former defendant); Krystal Inc. v. China United Transp., Inc., 2017 WL 4339343, at *4 (C.D. Cal. 2017)(Lew, J.)(holding a sales contract authentic, because "it names Dalian and the Chinese buyer and appears to be what Ms. Wang claims it to be.")

[166]The Correct Care Defendants, in their reply, do not address the text's fact, either to admit or dispute it. See Reply ¶ A, at 2-3. The Correct Care Defendants raise generalized objections to Tanner's articulation of her additional material facts, contending that Tanner's facts are immaterial and irrelevant. See Reply ¶ A, at 2-3. Because the Correct Care Defendants do not specifically controvert the text's fact, and the Court concludes that the record supports the fact, the Court has no independent reason to doubt its accuracy, and the Court adopts it as undisputed. See Martinez Depo. at 52:15-53:15 (stating that someone packaged the placenta in a placenta bag to submit it for later laboratory testing); id. at 55:25-57:21 (stating that staff buckled Tanner into the gurney, and someone carried the baby and the placenta); id. at 60:17-61:22 (stating that Tanner was restrained in some way, although she was not shackled to the gurney). See also D.N.M.LR-Civ. 56.1(b).

from,'" and because Albuquerque Ambulance paramedics -- after futilely asking Dr. McMurray for guidance -- called a type of physician called an "MCEP"[167] at Lovelace Women's Hospital, who instructed them to bring Tanner and her baby there. Response ¶ B, at 23 (stating this fact)(citing Martinez Depo. at 46:24-47:19; id. at 47:20-48:20; Tanner Decl. ¶ 34).[168]

---

[167] MCEPs are Medical Control Emergency Physicians authorized by the City of Albuquerque / County of Bernalillo EMS Authority to give over-the-telephone orders to EMS providers within Bernalillo County. See Appendix B: Medical Control Emergency Physician Handbook at 1, available at https://www.acidremap.com, last accessed September 20, 2019 ("MCEP Handbook App. B"). Bernalillo County EMS protocol dictates that online / telephonic medical assistance, or MCEP, should be contacted "as soon as possible" for guidance in situations not specifically covered by written protocol, or in circumstances mandated by protocol. See MCEP Handbook App. B at 3. The Albuquerque Bernalillo County Emergency Medical Services System Guidelines, onto which Lovelace Women's Hospital has signed, require EMS personnel to contact MCEP as soon as possible if an intervention requires the use of skills outside of the EMS personnel's limited scope. See, e.g., Albuquerque Bernalillo County Emergency Medical Services System Guidelines at 2, 11, 16, 25, 26, 27, 28, 32, revised October 8, 2018, available at www.bernco.gov, last accessed September 20, 2019 ("EMS Guidelines"). In many circumstances, even when a qualified provider is available on-scene, EMS personnel must contact MCEP. See, e.g., EMS Guidelines at 135. The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion.

[168] The Correct Care Defendants do not explicitly say whether they admit or dispute the text's fact. See Reply ¶ B, at 3-4. The Correct Care Defendants contend that Tanner's facts describing events which occurred after Tanner left Metropolitan Detention are immaterial, because they have no bearing on what the Correct Care Defendants did. See Reply ¶ B, at 3. A materiality argument does not dispute the fact, so the Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants also ask the Court to disregard Tanner's "self-serving declaration," but, as explained supra n.165, under Kephart and Murray's guidance, the Court may and does consider the Tanner Decl. to the extent that it is based on Tanner's personal knowledge. See supra n.165.

The Court does not adopt the portion of Tanner's proposed additional material fact stating that "[n]o one at MDC asked her [where she had been receiving care from] until the Albuquerque Ambulance paramedics came to her side during the delivery," Response ¶ B, at 23, because the

Correct Care Defendants assert a genuine dispute supported by the record. See Reply ¶ B, at 3-4. Whereas Tanner provides no citation in the record for her assertion that no one at Metropolitan Detention asked her where she received care from until the paramedics arrived, the Correct Care Defendants attempt to specifically controvert that assertion with citation to the Deposition of Ruby Boyd, taken March 4, 2019, filed June 19, 2019 (Doc. 317-2)("Boyd Depo."). See Reply ¶ B, at 3-4 (citing Boyd Depo. at 36:10-24 (stating that Tanner told Boyd she was receiving care from a doctor before she got to Metropolitan Detention)). The Boyd Depo. does not indicate that Tanner mentioned Lovelace Women's Hospital, or that Boyd asked Tanner where she was receiving care from. See Boyd Depo. at 36:10-24. The Boyd Depo. indicates, however, that Tanner discussed receiving care from a doctor before arriving at Metropolitan Detention, so the Court concludes that the Correct Care Defendants have cited to a portion of the record specifically controverting Tanner's assertion that no one asked her where she was receiving care from -- an assertion for which she provides no source. See Boyd Depo. at 36:10-24. The Court, accordingly, does not adopt this portion of Tanner's proposed additional material fact as undisputed.

Tanner proposes as fact that Lovelace Women's hospital is a full-service prenatal and obstetric care provider with subspecialists in maternal-fetal medicine and birthing classes for patients. See Response ¶ B, at 23 (citing Lovelace Women's Hospital, filed June 3, 2019 (Doc. 287-1)("Lovelace Brochure")). The Correct Care Defendants contend that the Lovelace Brochure constitutes inadmissible hearsay, because Tanner offers it as proof of the matters asserted. See Reply ¶ B, at 3 (citing Fed. R. Evid. 801(a), (b), and (c), and 802; Kephart, 243 F. Supp. 2d at 1209). In the Surreply, Tanner contends that there is evidence in the record supporting the Lovelace Brochure's authentication and providing a foundation for its admission into evidence at trial. See Surreply at 12 (citing Tanner Decl. ¶ 34; Second Tanner Decl. ¶ 11, at 4 (stating that Tanner received the brochure from Lovelace Women's Hospital when she was receiving prenatal care there before her incarceration, and that the brochure's page 5 describes the birthing classes for which Tanner was registered). Authentication, as stated supra n.165, is not a high threshold and the Lovelace Brochure appears to be what it is purported to be. See Lopez, 312 F. Supp. 3d at 1154. The Court concludes that the Lovelace Brochure is sufficiently authenticated by its characteristics. The Lovelace Brochure's header states "Lovelace Women's Hospital," the brochure's first page features a photograph of Sheri Milone, who serves as Lovelace Women's Hospital's Chief Executive Officer, and the brochure's footer features the hospital's physical address, telephone number, and website address. See Lovelace Brochure at 1. The Lovelace Brochure also features a picture of Jeffrey M. Dorf, M.D., who serves as Lovelace Women's Hospital's Chief of Staff, as well as a map of the area, pictures of the hospital's interior, and additional telephone numbers to contact for specialty services. See Lovelace Brochure at 2-6. Further, the Second Tanner Decl. states that Tanner received the brochure from Lovelace Women's Hospital. See Second Tanner Decl. ¶ 11, at 4. Although the Court is satisfied that the Lovelace Brochure is authenticated, the Court concludes that it constitutes hearsay, because no one at Lovelace Women's Hospital makes the statements in the brochure while testifying at the current

When Tanner and her baby arrived at Lovelace Women's Hospital, nurses and medical staff at Lovelace examined Tanner, asked her questions, and created a timeline of events, which they recorded in her medical records. See Response ¶ C, at 23 (stating this fact)(citing Levy Depo. at 8:21-9:13; id. at 10:2-16; id. at 11:8-15).[169] While on a rotation for Dr. Rowe -- Tanner's

_____

trial or hearing, and Tanner offers it for the truth of what it states -- that Lovelace Women's Hospital is a full-service prenatal and obstetric care provider with subspecialists in maternal-fetal medicine and birthing classes for patients -- and it falls under none of the hearsay exceptions. See Fed. R. Evid. 801, 803. Although the Court concludes that there are more reliable ways to introduce the information in question, such as through live witness testimony, for the purposes of this MOO, the Court admits the Lovelace Brochure under the residual exception to the hearsay rule, because, as described above, it has circumstantial guarantees of trustworthiness, is offered as evidence of a material fact, is probative on the point for which it is offered -- although the Court is hesitant to say that it is more probative than any other evidence the proponent can obtain through reasonable efforts -- , and admitting it will best serve the purposes of the rule and the interests of justice. See Fed. R. Evid. 807.

The Correct Care Defendants do not specifically address any other portion of Tanner's asserted fact, and the Court concludes that the record supports the text's fact, so the Court adopts it as undisputed, having no independent reason to doubt its accuracy. See D.N.M.LR-Civ. 56.1(b); Fed. R. Civ. P. 56(c)(1)(A). See Martinez Depo. at 46:24-47:9 (stating that the ambulance paramedics transported Tanner and her baby to Lovelace Women's Hospital); Tanner Decl. ¶ 34, at 11 (stating that the paramedics asked Tanner which hospital she wanted to go to and that she told them she was registered at Lovelace Women's Hospital); Martinez Depo. at 47:20-48:20 (stating that Tanner told the paramedics she had been receiving care at Lovelace Women's Hospital, and that the paramedics called an MCEP after Dr. McMurray offered no guidance, and that the outside physician instructed the ambulance paramedics to transport Tanner and her baby to Lovelace Women's Hospital). Although Tanner does not cite to a portion of the record which states that corrections officers escorted Tanner to the hospital, the Court concludes that the record supports this fact. See Martinez Depo. at 58:18-23 (stating that corrections officers have to accompany an inmate patient to the hospital). The Court adopts the text's fact as undisputed, concluding that the Correct Care Defendants do not assert a genuine dispute to it, and that the Court has no independent reason to doubt its accuracy. See D.N.M.LR-Civ. 56.1(b).

[169]The Correct Care Defendants do not explicitly state whether they admit or dispute the text's fact, but rather contend that Tanner's description is immaterial. See Response ¶ C, at 4 (citing Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986)(stating that

prenatal care provider before her incarceration -- Certified Nurse Stephanie Levy received a 911 page summoning her to Tanner's hospital room. See Response at ¶ C, at 23-24 (stating this fact)(citing Levy Depo. at 10:2-16; id. at 11:8-15.[170] Levy briefly looked at Tanner's baby and

on summary judgment, the court will not count factual disputes that are irrelevant or unnecessary); Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999)(stating that dissatisfaction with treatment received is not a constitutional violation); Commercial Iron v. Metal Co. v. Bache & Co., Inc., 478 F.2d 39, 41 (10th Cir. 1973)("Commercial Iron")(stating that summary judgment's ultimate purpose is to expose allegations unsupported by material facts); Bolack v. Underwood, 340 F.2d 816, 819 (10th Cir. 1965)("Bolack")(stating that the court should grant summary judgment where disputed facts are irrelevant or inauthentic); Tucker v. Meyer, 165 F. App'x 590, 593 (10th Cir. 2006)(unpublished)(concluding that a detainee dissatisfied with his or her diagnosis or treatment does not state a constitutional violation)). A materiality argument does not dispute the fact, so the Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). Whether the Correct Care Defendants dispute the text's fact is a separate issue. The Correct Care Defendants do not address the text's fact, either to admit or dispute it. See Response ¶ C, at 4. The Court notes that Tanner cites to no portion of the record in support of the text's fact, but, because the Correct Care Defendants do not specifically controvert the text's fact and provide no citation controverting the text's fact, the Court adopts it as undisputed for purposes of this motion, having no independent reason to doubt its accuracy. See Fed R. Civ. P. 56(e)(2)(stating that the court may consider an improperly supported fact undisputed for a summary judgment motion's purposes). See also Levy Depo. at 8:21-9:13; id. at 10:2-16; id. at 11:8-15.

The Correct Care Defendants reiterate their position that the Court may not consider Tanner's declaration, pursuant to Kephart and Murray. The Court addressed this argument supra n.165, and concludes, pursuant to that footnote's reasoning, that the Court may consider the Tanner Decl. to the extent it is based on her personal knowledge. See supra n.165.

[170]The Correct Care Defendants do not admit or dispute this fact. Rather, the Correct Care Defendants reiterate that Tanner's allegations are immaterial to the motion. See Reply ¶ C, at 4. A materiality argument does not dispute the fact, so the Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants cite to no portion of the record specifically controverting the text's fact, and the Correct Care Defendants do not address the fact either to admit or to dispute it, so the Court considers it undisputed for this motion's purposes, concluding that the record supports the text's fact and the

concluded that it was "'definitely apparent'" that "'the baby was not deceased for a long time, that his body was that of a "healthy well-formed newborn,"'" and Levy further described the baby as "'beautiful,'" "'totally normal,'" "'average size,'" and "'fully developed for that gestation.'" Response ¶ C, at 24 (stating this fact)(quoting Levy Depo. at 28:25-29:21; id. at 85:7-17).[171]  Levy

---

Court has no independent reason to doubt its accuracy.  See Levy Depo. at 10:2-16 (stating that when Dr. Rowe is not on call, nurses including Levy covered his patients and that Tanner was Dr. Rowe's patient); id. at 11:8-15 (stating that Levy received a 911 page to Tanner's hospital room).  The Court therefore adopts the text's fact as undisputed.  See D.N.M.LR-Civ. 56.1(b).

[171]The Correct Care Defendants first object to the text's fact as immaterial.  See Reply ¶ C, at 4.  A materiality argument does not create a factual dispute.  The Court will address materiality in this opinion's Analysis section.  See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

The Correct Care Defendants also purport to dispute the text's fact as "incomplete and therefore misleading.  Plaintiff's stillborn fetus was asymmetrically growth delayed."  Reply at 4 (citing Deposition of Charles Edward Stoopack, M.D. at 37:7-38:19, taken March 25, 2019, filed June 19, 2019 (Doc. 317-3)("Stoopack Depo.")(explaining Dr. Stoopack's conclusion that Tanner's fetus has "intrauterine growth restriction," and that the placental weight was less than the tenth percentile); id. at 39:14-40:8 (stating that the baby's weight was in the sixth percentile, indicating that it was significantly underweight or "growth restricted"); id. at 44:23-46:1 (opining that Tanner's fetus' growth restriction likely began in September, before her incarceration at Metropolitan Detention, according to ultrasound results revealing abnormal femur lengths and abdominal circumferences); id. at 52:18-53:18 (explaining that to form his conclusion that Tanner's fetus suffered intrauterine growth restriction, Dr. Stoopack consulted the baby's weight, the abdominal circumference, the placental weight, and the placental pathology, all obtained from Dr. Singh's final pathology report, and explaining that all of Tanner's baby's symptoms fit an intrauterine growth restriction diagnosis); id. at 69:1-74:10 (opining that Tanner's fetus died either from a placental abruption, from uteroplacental insufficiency, or from a cord accident resulting from less amniotic fluid, and stating that in growth-restricted pregnancies there is a deficiency of amniotic fluid, and also opining that placental insufficiency can be associated with smoking and methamphetamine use); id. at 81:21-83:5 (describing Tanner's baby's stillbirth as an "insidiously-developing phenomenon," that progressed slowly and would have escaped recognition); id. at 137:5-140:7 (stating that no one knew that Tanner was smoking and likely doing meth during her pregnancy, although she stated she was not, that she had repetitive cervical trauma from her multiple prior pregnancies, and that she had a growth-delayed baby, and stating that "this was a

saw Tanner interact with her baby and described Tanner as being "'in a very obvious state of shock,'" with "'just a shocked glazed eye, off and on crying, staring out,'" and "'in distress.'" Response ¶ C, at 24 (stating this fact)(citing Levy Depo. at 30:5-13; id. at 85:2-6).[172] Tanner's

---

situation of an abnormal pregnancy that was unknown that had significant risk factors for morbidity and mortality"); Deposition Upon Oral Examination of Hugh M. Ehrenberg, M.D. at 49:23-52:18, taken January 14, 2019, filed June 19, 2019 (Doc. 317-4)("Ehrenberg Depo.")(opining that Tanner's baby suffered placental insufficiency and was asymmetrically growth delayed); id. at 65:12-66:8 (opining that Tanner's fetus' birth weight was consistent with an undergrown baby); id. at 68:13-69:8 (opining that Tanner's baby was growing asymmetrically and was at increased risk for abnormal outcomes as a result); Videotaped Deposition of Stephanie Levy at 15:16-23, taken April 23, 2019, filed June 19, 2019 (Doc. 317-5)("Levy Depo.")(stating that a woman with multiple prior pregnancies has an increased risk of bleeding).

 The Correct Care Defendants also object to Levy's "opinions being offered as expert testimony," because Levy "was not disclosed as a medical expert." Reply ¶ C, at 4. The Court does not adopt Levy's opinions as expert testimony, but rather as her observations, because the Correct Care Defendants do not dispute that Levy briefly looked at Tanner's baby or that Levy formed observations as a result of that brief look. That Tanner's fetus was asymmetrically growth delayed does not controvert the statement that Levy observed what she believed to be a normal baby. Levy does not hold herself out as a medical expert, and the Court does not adopt her as one. Rather, Levy states that she "very briefly looked at the baby, but it's not -- that's not my role there," and in response to a question whether Levy formed impressions when she looked at the baby, Levy stated: "I mean, that's hard to answer. It's difficult to not have an emotional reaction to seeing a deceased baby." Levy Depo. at 28:12-13; id. at 28:16-21. The Court notes that the Correct Care Defendants cite to several portions of the record, above, which indicate that Levy's observations were incorrect, and that Tanner's baby was asymmetrically growth delayed, which Tanner does not dispute in her Surreply. The Court nevertheless adopts the text's fact as undisputed because the Correct Care Defendants do not specifically controvert it and the Court has no independent reason to doubt its accuracy. See D.N.M.LR-Civ. 56.1(b).

 [172]The Correct Care Defendants first object to the text's fact as immaterial. See Reply ¶ C, at 4. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Court reiterates its conclusions supra n.171, that the Court does not adopt Levy's opinions as those of a medical expert but that, nevertheless, Levy testifies from her personal knowledge and the Court may consider her observations of Tanner in deciding the motion. See Kephart, 243 F. Supp. 2d at 1209 (permitting

mother was briefly allowed into Tanner's hospital room and saw Tanner "'curled up in a fetal position, just . . . shaking to death'" and "'crying,'" and she also saw Tanner's baby in its crib and noted that: "'[h]e looked fine,'" and that she "'thought he was alive for a minute.'" Response ¶ C, at 24 (stating this fact)(citing Videotaped Deposition of Sherre Smith at 69:8-25, taken April 2, 2019, filed June 3, 2019 (Doc. 286-23)("Smith Depo."))).[173] After a few hours in the hospital,

_____

a court on summary judgment to consider affidavits based on the affiant's personal knowledge). The Court concludes that the record supports the text's fact. See Levy Depo. at 30:5-13 (stating that to Levy, it was "very apparent" that Tanner was in shock, because "[h]er facial expression was just a shocked glazed eye, off and on crying, staring out, looking at me in this -- she seemed just, like, shocked."); id. at 85:2-6 (Levy stating again that Tanner "was in a very obvious state of shock. She had been crying. She was covered in blankets and clutching them really tightly. She was slender, just looked in distress to me.") The Court adopts the text's fact as undisputed, because the Correct Care Defendants do not specifically controvert it and in fact do not address the text's fact. See D.N.M.LR-Civ. 56.1(b). Tanner does not propose as an additional material fact that she was in a state of shock, but rather states that Levy described her as being in a state of shock, and the Correct Care Defendants, even if they dispute that Levy can opine as to Tanner's state from a medical perspective, do not dispute that Levy described her state as outlined in the text's fact. See Reply ¶ C, at 4. Because the Correct Care Defendants do not specifically controvert that Levy described believing Tanner to be in a state of shock, and the record supports this fact, the Court adopts the text's fact as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[173]The Correct Care Defendants first object to the text's fact as immaterial. See Reply ¶ C, at 4. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants do not state whether they admit or dispute the text's fact, but they contend that "Sheree Smith's testimony about her perceptions of Plaintiff and her stillborn son are not admissible summary judgment evidence," because belief statements must be disregarded at summary judgment, and "only statements made based on personal knowledge can create a fact issue." Reply ¶ C, at 4 (citing Lewis v. N.M. Dep't of Health, 275 F. Supp. 2d 1319, 1328 (D.N.M. 2003); Tavery v. U.S., 32 F.3d 1423, 1427 n.3 (10th Cir. 1994)). The Correct Care Defendants do not explain, however, why the Court should consider the cited portions of the Smith Depo. statements of belief rather than statements based on personal knowledge, and the Court concludes that they are statements based on personal knowledge, because Smith attests to her personal observation of Tanner and

Tanner's baby's body was taken to the Office of the Medical Investigator for an autopsy, and corrections officers returned Tanner to a cell in Metropolitan Detention's SHU, and released her from prison a few days later. See Response ¶ C, at 24 (stating this fact)(citing Tanner Decl. ¶ 35, at 11; Response at 22 (responding to the Correct Care Defendants' proposed fact 41, disputing the characterization of Dr. Singh's autopsy report).[174] Dr. Ehrenberg opined that Tanner's baby's death was preventable. See Response ¶ D, at 24 (stating that "Baby Jay's death was

---

Tanner's baby. See Smith Depo. at 69:8-25 (Smith stating that she went to the hospital, was allowed in to see Tanner, and then describing her thoughts and reactions to Tanner's condition as she observed it). The Court concludes that the portions of the Smith Depo. to which Tanner cites include only statements based on Smith's personal knowledge and observations, and the Court may consider them. Because the Correct Care Defendants do not otherwise dispute the text's fact, the Court adopts it as undisputed for the purposes of this motion. See D.N.M.LR-Civ. 56.1(b).

[174]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but reiterate that it is immaterial, and that Tanner's declaration is a self-serving statement and not proper summary judgment evidence. See Reply ¶ C, at 4. The Correct Care Defendants first object to the text's fact as immaterial. See Reply ¶ C, at 4. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants also reiterate their position that the Court may not consider Tanner's declaration, pursuant to Kephart and Murray. The Court addressed this argument supra n.165, and concludes, pursuant to that footnote's reasoning, that the Court may consider the Tanner Decl. to the extent it is based on her personal knowledge. See supra n.165.

The Court concludes that the record supports the text's fact. See Tanner Decl. ¶ 35, at 11 (stating that the Office of the Medical Investigator came to Tanner's hospital room to retrieve her baby's body, and that after a few hours, corrections officers took her back to Metropolitan Detention, kept her in the SHU overnight, and then released her from Metropolitan Detention a few days later). The Court has no independent reason to doubt the text's fact's accuracy and the Correct Care Defendants do not specifically controvert it, so the Court adopts it as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

- 127 -

preventable")(citing Ehrenberg Depo. at 166:1-5).[175]  Dr. Chiang opined that Tanner's baby might have survived had Tanner been transported to the hospital on October 16, 2016, and both Dr. Chiang and Dr. Ehrenberg opined that Tanner's baby might have survived if Metropolitan Detention had properly trained nursing staff.  See Response ¶ D, at 24 (stating this fact)(citing Chiang Depo. at 100:23-101:2; id. at 104:5-8; Ehrenberg Depo. at 95:16-97:6).[176]  Dr. Ehrenberg

---

[175]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact but begin by stating that "[w]hether Plaintiff's stillborn fetus could have survived had Plaintiff received different care is immaterial."  Reply ¶ D, at 4.  A materiality issue is not a factual dispute.  The Court will address materiality in this opinion's Analysis section.  See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

The Correct Care Defendants also aver that Tanner's "survivability argument is mere speculation and therefore inadmissible," because speculation or conjecture cannot create a genuine dispute forestalling summary judgment.  Reply ¶ D, at 4 (citing Boyer v. Bd. of Cty. Comm'rs. of the Cty. of Johnson Cty., 922 F. Supp. 476, 484 (D. Kan. 1996)(Crow, J.); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 929 (7th Cir. 1995); Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993)).  The Court agrees that, where Tanner's support for the statement that her baby's death was preventable derives from a medical expert's opinion, the statement is not fact, but rather, the expert's conjecture, especially because the cited portion of the Ehrenberg Depo. states that Dr. Ehrenberg is stating an opinion.  See Ehrenberg Depo. at 166:1-5.  The Court, for precision's sake, adopts instead that Dr. Ehrenberg opined that the baby's death was preventable.  The Correct Care Defendants do not specifically controvert that Dr. Ehrenberg opined that Tanner's baby's death was preventable, so the Court adopts this fact as undisputed for the motion's purposes.  See D.N.M.LR-Civ. 56.1(b).

[176]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact but begin by stating that "[w]hether Plaintiff's stillborn fetus could have survived had Plaintiff received different care is immaterial."  Reply ¶ D, at 4.  A materiality issue is not a factual dispute.  The Court will address materiality in this opinion's Analysis section.  See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

The Correct Care Defendants also aver that Tanner's "survivability argument is mere speculation and therefore inadmissible," because speculation or conjecture cannot create a genuine dispute forestalling summary judgment.  Reply ¶ D, at 4 (citing Boyer v. Bd. of Cty. Comm'rs. of the Cty. of Johnson Cty., 922 F. Supp. at 484; Hedberg v. Indiana Bell Tel. Co., 47 F.3d at 929;

Vega v. Kodak Caribbean, Ltd., 3 F.3d at 479). The Court agrees that, where Tanner's support for the statement that her baby "could have survived if Ms. Tanner had been transported to the hospital on October 16, 2016, as she requested, or if MDC had properly trained nursing staff," Response ¶ D, at 24 (internal citations and quotation marks omitted), derives from two medical experts' opinions, the statement is not fact, but rather, the experts' conjecture. See Chiang Depo. at 99:3-5 (referencing Dr. Chiang's opinions); id. at 100:10-19 (acknowledging the interplay of other factors in determining the fetus' survivability); Ehrenberg Depo. at 95:16-97:6 (opining that Metropolitan Detention nursing staff were not properly trained to perform a necessary pelvic exam on Tanner). The Court, for precision's sake, adopts instead that Dr. Chiang and Dr. Ehrenberg opined that the baby's death might not have occurred, had Tanner been sent to the hospital or had the nursing staff been better trained. The Correct Care Defendants also aver that Tanner's facts are incomplete and therefore misleading," because Dr. Chiang "testified that CCS personnel might not have had information regarding Plaintiff's reports to correctional officers," and because "Plaintiff's medical complaints were occurring in her housing unit, rather than in the medical unit." Reply ¶ D, at 5-6 (citing Deposition of Chun Hsien Chiang, M.D., at 79:19-81:25, taken January 18, 2019, filed June 19, 2019 (Doc. 317-6)("Chiang Depo.")(admitting that the record reflects that Tanner's healthcare information was not reported to medical staff, but rather to corrections officers); id. at 93:20-25). The facts that Tanner's medical complaints might have been reported to corrections officers only, or that they occurred in the housing unit but not in the medical unit, do not controvert Dr. Chiang's opinion, which he provided when asked. See Chiang Depo. at 99:4-5. The Correct Care Defendants do not specifically controvert that Dr. Chiang or Dr. Ehrenberg opined that Tanner's baby's death might not have occurred but for these factors, so the Court adopts this fact as undisputed for the motion's purposes. See D.N.M.LR-Civ. 56.1(b).

Tanner also cites to Dr. Ehrenberg's and Dr. Chiang's expert reports, which they attach to their declarations. See Response ¶ D, at 24. The Correct Care Defendants object to the Court's considering these expert reports, contending that they are inadmissible hearsay. See Reply ¶ D, at 5 (citing Fed. R. Evid. 801(a), (b) and (c), and 802). In her Surreply, Tanner argues:

> These objections fail to account for the fact that Plaintiffs' expert reports are attached to declarations under 28 U.S.C. § 1746, which specifically refer to portions of those reports and explain how the experts will testify about those portions at trial. (Doc. 286-3, 286-4.) Under the 2010 amendments to Rule 56, the portions of Plaintiffs' expert reports referenced in the experts' declarations may be considered at the summary judgment stage. See Humphreys & Partners Architects. L.P., 790 F.3d at 538-39. Plaintiffs also cite the deposition testimony of each expert in their response, which may be considered for summary-judgment purposes as well.

also opined that Tanner's pregnancy had "'no unusual complications,'" and that no "'fetal complication of pregnancy or maternal exposure in pregnancy'" caused Tanner's baby's death but

---

Surreply at 6. Courts may not consider unsworn expert reports in the summary judgment context. See, e.g., Winstead v. Georgia Gulf Corp., 77 F. App'x 267, 271 (5th Cir. 2003); Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir. 1989); Wittmer v. Peters, 87 F.3d 916 (7th Cir. 1996). When a party attaches an unsworn expert report along with an expert's sworn declaration, however, the unsworn report's deficiencies are cured. See, e.g., Amer. Fed. of Musicians of United States and Canada v. Paramount Pictures Corp., 903 F.3d 968, 976-77 (9th Cir. 2018)("American Federation")(stating that for rule 56(c)(4)'s purposes, "there is no meaningful distinction between an expert report accompanied by a sworn declaration and an expert report that is itself sworn," and admitting an unsworn expert report attached to a declaration in which the expert "attested under penalty of perjury that he prepared the report" and would testify consistent with its conclusions and opinions); Provident Life & Accident Ins. v. Goel, 274 F.3d 984, 1000 (5th Cir. 2001)(excluding unsworn expert report because there was no indication that the expert had attached a sworn declaration). In American Federation, the United States Court of Appeals for the Ninth Circuit concluded that the district court abused its discretion by excluding an expert report not signed under penalty of perjury, where the expert swore in an attached declaration that he would testify in accordance with the report's findings. See American Federation, 903 F.3d at 977. The Ninth Circuit concluded that the sworn declaration "satisfies the functional concerns behind Rule 56(c)(4) -- that [the expert] is competent to testify to the conclusions and opinions in the report." American Federation, 903 F.3d at 977. See also Humphreys v. Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d at 539 (stating that a court can consider an unsworn expert's report on a summary judgment motion if a party subsequently affirms or verifies it with an expert's affidavit or deposition). "The court and the parties have great flexibility with regard to the evidence that may be used on a [summary judgment] proceeding." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721 (3d ed. 1998). Here, even if their expert reports themselves are inadmissible, Dr. Ehrenberg's and Dr. Chiang signed declarations under penalty of perjury attesting that they would present "sworn testimony" according with the reports, and the Correct Care Defendants do not assert that the signed declarations are deficient or that Dr. Ehrenberg's and Dr. Chiang's testimony would be inadmissible at trial. See Declaration of Hugh M. Ehrenberg, M.D. at ¶ 5, dated May 2019 (no day provided), filed June 3, 2019 (Doc. 286-4)("Ehrenberg Decl."); Declaration of C. Hsien Chiang, M.D., at ¶ 4, dated May 3, 2019, filed June 3, 2019 (Doc. 286-3)("Chiang Decl."). Although the Court may consider Dr. Ehrenberg's and Dr. Chiang's reports, because each is attached to a sworn expert declaration, the Court need not rely on these reports, because the Dr. Ehrenberg and Dr. Chiang depositions provide sufficient support for the text's fact. See Ehrenberg Depo. at 95:16-97:6; Chiang Depo. at 100:23-101:2; id. at 104:5-8.

rather, that Tanner's baby died because Tanner went into "'unmonitored labor'" at the jail, and routine problems which would have been addressed in a hospital setting went unaddressed. Response ¶ E (stating that Tanner's pregnancy had no unusual complications, that fetal complications or maternal exposure did not cause her baby's death, and that her baby died because Tanner's labor at the jail was unmonitored and routine conditions, which would have been addressed in a hospital setting, went unaddressed)(quoting Ehrenberg Depo. at 44:18-46:6)(citing Ehrenberg Decl.).[177]

<hr/>

[177]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact but begin by stating that "[w]hether Plaintiff's pregnancy had 'unusual' complications, the etiology of Plaintiff's stillbirth, and whether Plaintiff should have been sent to a hospital sooner are immaterial." Reply ¶ E, at 6. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Court, for precision's sake, adopts that Dr. Ehrenberg opined that Tanner's pregnancy had no unusual complications, that fetal complications or maternal exposure did not cause her baby's death, and that her baby died because Tanner's labor at the jail was unmonitored and routine conditions which would have been addressed in a hospital setting went unaddressed.

The Correct Care Defendants also aver that Tanner's facts are incomplete and therefore misleading," because Dr. Stoopack and Dr. Ehrenberg indicated that Tanner's stillborn fetus was asymmetrically growth delayed. See Reply at 6 (citing Stoopack Depo. at 37:7-38:19)(explaining Dr. Stoopack's conclusion that Tanner's fetus has "intrauterine growth restriction," and that the placental weight was less than the tenth percentile); id. at 39:14-40:8 (stating that the baby's weight was in the sixth percentile, indicating that it was significantly underweight or "growth restricted"); id. at 44:23-46:1 (opining that Tanner's fetus' growth restriction likely began in September, before her incarceration at Metropolitan Detention, according to ultrasound results revealing abnormal femur lengths and abdominal circumferences); id. at 52:18-53:18 (explaining that to form his conclusion that Tanner's fetus suffered intrauterine growth restriction, Dr. Stoopack consulted the baby's weight, the abdominal circumference, the placental weight, and the placental pathology, all obtained from Dr. Singh's final pathology report, and explaining that all of Tanner's baby's symptoms fit an intrauterine growth restriction diagnosis); id. at 69:1-74:10 (opining that Tanner's fetus died either from a placental abruption, from uteroplacental insufficiency, or from a cord accident resulting from less amniotic fluid and stating that in growth-restricted pregnancies there

is a deficiency of amniotic fluid, and also opining that placental insufficiency can be associated with smoking and methamphetamine use); id. at 81:21-83:5 (describing Tanner's baby's stillbirth as an "insidiously-developing phenomenon," that progressed slowly and would have escaped recognition); id. at 137:5-140:7 (stating that no one knew that Tanner was smoking and likely doing meth during her pregnancy, although she stated she was not, that she had repetitive cervical trauma from her multiple prior pregnancies, and that she had a growth-delayed baby, and stating that "this was a situation of an abnormal pregnancy that was unknown that had significant risk factors for morbidity and mortality"); Ehrenberg Depo. at 49:23-52:18 (opining that Tanner's baby suffered placental insufficiency and was asymmetrically growth delayed); id. at 65:12-66:8 (opining that Tanner's fetus' birth weight was consistent with an undergrown baby); id. at 68:13-69:8 (opining that Tanner's baby was growing asymmetrically and was at increased risk for abnormal outcomes as a result). The Court does not adopt as fact that Tanner's pregnancy progressed without unusual complications and that no fetal complication contributed to her baby's death, because the record includes evidence controverting those statements as fact, as described in this footnote.

Nor does the Court adopt as fact Tanner's proposed fact stating that her baby died "because" she went into unmonitored labor and her routine labor complications went unaddressed, because Tanner herself offers competing hypotheses explaining why her baby's death might have occurred, including hypotheses suggesting that Tanner's baby's death would have been preventable but for circumstances existing before she went into labor -- suggesting that her in-labor complications might not have been her baby's death's true cause. See Response ¶ D, at 24 (citing Chiang Depo. at 100:23-101:2 (stating that Tanner's baby's death would not have occurred had she been transported to the hospital the day prior); Ehrenberg Depo. at 95:16-97:6 (stating that Tanner's baby's death would not have occurred had Metropolitan Detention staff been better trained)). Additionally, the portion of the Ehrenberg Depo. to which Tanner cites in support of her proposed fact states that Dr. Ehrenberg stated an opinion, opined as to what, in his mind "likely" occurred, noted that what caused Tanner's baby's death "is theoretical in my mind," and stated that the "tight nuchal cord" around Tanner's baby's neck at its birth "can" give rise to fetal heart rate abnormalities, but stopped short of attesting to the precise cause of death. Ehrenberg Depo. at 44:24-46:6. Dr. Ehrenberg then confirmed that he was not "coming to an opinion on the precise cause of death." Ehrenberg Depo. at 46:7-13. The Court, therefore, concludes that the record supports not that Tanner's baby's death definitely occurred for the text's stated reasons, but rather that Dr. Ehrenberg opined as to a possible reason for the death's occurrence, and the Court alters the proposed fact to better reflect what the record can support.

The Correct Care Defendants reiterate their hearsay objections to the Court considering the Dr. Ehrenberg and Dr. Chiang reports as evidence, and the Court concludes that, because each report is affixed to a sworn expert declaration and the cited portions of the reports are discussed in the experts' depositions, the Court may consider the expert reports as evidence. See supra n.176. The Court also notes that it need not rely on the expert reports, because other portions of the record

## 17. Correct Care's and Metropolitan Detention's Policies, Practices, and Contractual Requirements.

Correct Care is a private company which provides health-care services at correctional facilities. See Response ¶ Z, at 33 (citing Schwartzmiller Depo. at 22:16-23:7).[178] At the time of Tanner's incarceration and her baby's stillbirth, Bernalillo County operated Metropolitan Detention pursuant to a contract with Correct Care dating from December 9, 2014, incorporating a Bernalillo County-issued request for proposal ("RFP"), a Correct Care proposal, a Correct Care staffing pattern listing Correct Care personnel who would be required to work at Metropolitan Detention, and requiring that Correct Care comply with all current and future Metropolitan Detention policies and procedures, as well as with National Commission on Correctional Health Care ("NCCHC") standards. See Response ¶ F, at 25 (stating this fact)(citing Medical, Dental, Mental Health, Psychiatric, and Methadone Services Agreement, filed June 3, 2019 (Doc. 287-22)("Contract"); Bernalillo County Request for Proposal (RFP) #45-14-PL Medical, Dental,

---

support the text's fact. See supra n.176. See also Ehrenberg Depo. at 44:18-46:6 (opining that Tanner "likely" broke her water and started to labor while not being monitored for complications, and that something "happened over the course of her unmonitored labor" that resulted in in utero death, the cause of which "is theoretical" in Dr. Ehrenberg's mind). The Correct Care Defendants do not specifically controvert that Dr. Ehrenberg opined how Tanner's pregnancy progressed or why her baby's death occurred, so the Court adopts the text's fact as undisputed for the motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[178] The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact but state that "CCS's ownership, business operations, divisions, places of business, and competitors are immaterial to the matter at bar" Reply ¶ Z, at 20. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

Mental Health, Psychiatric, and Methadone Services for the Metropolitan Detention Center (MDC) Inmates, filed June 3, 2019 (Doc. 287-23)("RFP"); Bernalillo County Medical, Dental, Mental Health, Psychiatric, and Methodone Services for the Metropolitan Detention Center (MDC) Inmates Request for Proposal (RFP) #45-14-PL Binder #1: Technical Proposal, filed June 3, 2019 (Doc. 287-24)("Correct Care Proposal"); Addendum #3 Appendix H, filed June 3, 2019 (Doc. 287-25)("Correct Care Staffing Pattern"); McMurray Depo. at 231:10-232:19).[179] At the

---

[179]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact but begin by stating that the "terms of CCS's contract with Bernalillo County are immaterial because they do not support Plaintiff's allegations of deliberate indifference or violation of her substantive due process rights by the individual CCS Defendants, who are employees of CCS and not signatories to the contract." Reply ¶ F, at 6. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants also contend that "what documents the contract 'incorporated,' what terms were 'required,' and what constitutes a 'basic requirement of the contract' are merely arguments of counsel that do not constitute summary judgment evidence." Reply ¶ F, at 7 (quoting Response ¶ F, at 25). The Correct Care Defendants do not, however, specifically controvert the text's fact with citation to any portion of the record, and the Court, drawing all reasonable inferences in Tanner's favor, concludes that the record supports the text's fact. See Contract at 1 (stating that the RFP, Correct Care Proposal, and Correct Care Staffing Pattern are incorporated into the Contract); RFP at 10 (stating that the selected contractor must comply with Metropolitan Detention policies and procedures, and with NCCHC standards). The Court notes that in adopting Tanner's fact, the Court altered it slightly to omit the word "basic," because there is no indication in the cited record that the requirement to comply with Metropolitan Detention and NCCHC standards and procedures was understood to be "basic," and the Court agrees with the Correct Care Defendants' objection that the characterization of a requirement as "basic" constitutes legal argument and not summary judgment evidence, where the record itself does not support that characterization. Reply ¶ F, at 7.

The Correct Care Defendants also object that Tanner "neither authenticated nor laid a foundation for admissibility of what she contends are the contract materials," Reply ¶ F, at 7 (citing Fed. R. Evid. 901(a); 801). In her Surreply, Tanner responds that the Court previously applied rule 901's factors as articulated in Law Co., 577 F.3d at 1170, when deciding to consider contract documents submitted as exhibits at summary judgment. See Surreply at 8 (citing Lopez,

312 F. Supp. 3d at 1154 (concluding that authentication "is not a high threshold," especially where the party objecting to the evidence's authenticity "gives the Court no evidence to question" the evidence's "genuineness"). In Lopez, the Court held that a purchase agreement was sufficiently authenticated where the defendants, "at least one of whom [wa]s a successor to the corporate entity that signed the contract," provided the purchase agreement, the document was entitled "Purchase Agreement between the Black & Decker Corporation and Pentair, Inc., dated as of July 16, 2004," and the agreement "appear[ed] to be what it purport[ed] to be." Lopez, 312 F. Supp. 3d at 1154.

That Tanner did not produce an affidavit attesting to the contract documents' authenticity is no obstacle to the Court's consideration of them. See Law Co., 577 F.3d at 1170 ("We do not require an affidavit to authenticate every document.") The Court may consider whether circumstantial evidence supports the documents' authenticity. See Denison v. Swaco Geolograph Co., 941 F.3d 1416, 1423 (10th Cir. 1991)("Denison"). The Court considers each of the contract documents in term.

First, the Contract may be self-authenticating, pursuant to rule 902 of the Federal Rules of Evidence, because it bears a seal purporting to be of the County of Bernalillo, and a signature purporting to be an execution or attestation by the County Clerk. See Fed. R. Evid. 902(1); Contract at 1. Even if the Contract is not self-authenticating -- which it may not be because it is not an original or a complete copy -- circumstantial evidence supports the Contract's authenticity. In support of the Contract's authenticity the Court notes that the Contract: (i) is labeled "Medical, Dental, Mental Health, Psychiatric, and Methadone Services Agreement," Contract at 1; (ii) contains terms consistent with a medical services agreement, see, e.g., id. §§ I.A, at 1 (detailing the scope of health services the contractor would provide pursuant to the agreement); II.A, at 1 (detailing the contractor's compensation and method of payment); (iii) states that it is "made and entered into . . . by and between the Bernalillo County, New Mexico . . . and Correct Care Solutions, LLC," Contract at 1; (iv) Bernalillo County and Correct Care representatives signed it, see Contract at 4; and (v) it bears the County Clerk of the County of Bernalillo's official seal and the county clerk's signature, see Contract at 4. The Court concludes that the other factors, however, militate against the Court considering the Contract authenticated. These factors include: (i) neither of the document's signatories provide the document for purposes of this motion, but rather, Tanner provides it, see Denison, 941 F.2d at 1423 (stating that a document's authenticity is supported where the document's signatory provided the document during discovery); (ii) the document is not on a defendant's letterhead, see Denison, 941 F.2d at 1423 (stating that a document's authenticity is supported despite defendant's objection, where it is printed on a defendant's letterhead); (iii) to the extent that the Correct Care Defendants invoke the rule of completeness stated in rule 106 of the Federal Rules of Evidence, Tanner provides no evidence that the Contract on which she relies is complete, and in fact attaches as an exhibit only pages 1, 4, 12, and 13. See Contract at 1-4.

The Court notes that the rule of completeness "appears to be uniquely applicable in a trial setting. See Lopez, 312 F. Supp. 3d at 1155 (citing United States v. Lopez-Medina, 596 F.3d 716,

735 (10th Cir. 2010)).  "The purpose of Rule 106 is to prevent a party from misleading the jury."
<u>United States v. Lopez-Medina</u>, 596 F.3d at 735, but there is no jury on a summary judgment
motion.  Nevertheless, the "general principle animating the rule of completeness -- guarding
against deception -- is appropriate at the summary judgment phase."  <u>Lopez</u>, 312 F. Supp. 3d at
1155.  "A judge, just like a jury, should not be misled, especially on a dispositive motion."  <u>Lopez</u>,
312 F. Supp. 3d at 1155 (citing <u>United States v. Williston</u>, 862 F.3d 1023, 1038 (10th Cir.
2017)("[T]he rule functions as a defensive shield against potentially misleading evidence proffered
by an opposing party.").  <u>See</u> Fed. R. Civ. P. 32(b)(6) ("If a party offers in evidence only part of a
deposition, an adverse party may require the offeror to introduce other parts that in fairness should
be considered with the part introduced.").  The rule of completeness' remedy, however, is
introduction of the missing material and not exclusion of the partial material.  <u>See</u> Fed. R. Evid.
106 ("If a party introduces all or part of a writing . . . an adverse party may require the introduction,
at that time, of any other part . . . that in fairness ought to be considered.").

    Although the Court acknowledges that certain factors militate against its consideration of
the Contract as authentic, the Court nevertheless concludes that enough evidence supports its
authentication.  <u>See</u> <u>Krystal Inc. v. China Transp., Inc.</u>, 2017 WL 4339343, at *4 (C.D. Cal.
2017)(Lew, J.).  Authentication, as Tanner correctly notes in her Surreply, "may also be
established by '[e]vidence that . . . a document was recorded or filed in a public office as
authorized by law; or . . . a purported public record is from the office where items of this kind are
kept.'"  Surreply at 8 (authentications and omissions in Surreply)(quoting Fed. R. Evid. 901(b)(7)).
The Contract's page 13 bears an official seal of the county clerk of Bernalillo County, as well as
signatures from Correct Care and Bernalillo County representatives, establishing authentication
pursuant to rule 901(b)(7).  <u>See</u> Contract at 13.  <u>See also</u> <u>Ruiz-Giel v. Holder</u>, 576 F. App'x 738,
740-41 (10th Cir. 2014)(unpublished)(concluding that conviction documents were authentic
"because they bore the Nevada court's electronic file stamp and were certified by the assistant
chief    counsel    of    DHS"    as    originals    or    copies    of    DHS    records).

    Tanner correctly notes that the Correct Care Defendants do not present evidence to question
the Contract's genuineness.  <u>See</u> Surreply at 8 (citing <u>Lopez</u>, 312 F. Supp. 3d at 1154 (holding that
authentication is not a high threshold, especially when the party raising the objection to the
document's authenticity presents "no evidence to question" the document's "genuineness.").
Tanner contends that the Correct Care Defendants rely on the contract documents in their Reply
brief, but the Court notes that the Correct Care Defendants do not rely on the Contract.  <u>See</u>
Surreply at 8; Reply at 26-27.  Tanner also contends that she has offered "additional, foundational
deposition testimony regarding the contract documents," Surreply at 12, but the Court, having
reviewed the deposition testimony to which Tanner cites as authentication/foundation evidence,
concludes that the cited testimony does not establish a foundation for the Contract's admissibility.
<u>See</u> McMurray Depo. at 231:10-232:19 (referencing Bernalillo County's policies and procedures);
<u>id.</u> at 256:22-257:3 (referencing reports, but not mentioning the Contract); Chavez Depo. at
106:24-110:16 (stating that Chavez recalled looking at the contract documents after the contract's

award, but was not sure whether Chavez could tell, based on looking at contract documents, if they were complete or not); id. at 114:17-117:25 (discussing Chavez' familiarity with the contract amendments); Ruiz Depo. at 18:16-18 (stating that the Contract is the original contract Correct Care signed in December, 2014, but also admitting at 19:20-25 that Ruiz was not present at the time the Contract was entered into); Madrid Depo. at 62:2-64:1 (indicating that Madrid was not involved in the original contract's drafting). Tanner cites to no deposition evidence from an individual involved in the Contract's drafting, or who could state that the Contract is what it claims to be. See Fed. R. Evid. 901.

That the Correct Care Defendants object to the Contract's authenticity, Tanner produces non-consecutive pages of a non-complete copy of the Contract, and no witness with knowledge can testify to its authenticity, gives the Court pause. Authentication, however, is not a high bar, and the Court concludes that Tanner has met that bar, because there is some evidence sufficient to support a finding that the Contract is what she claims it to be. See Lopez, 312 F. Supp. 3d at 1154. The Contract bears an official seal of the County of Bernalillo, signatures from both Defendants and the County Clerk, and its title and terms suggest it is what it purports to be. See Contract at 1, 13. The Court will consider the Contract as evidence in deciding the motion. See Fed. R. Evid. 901; 801.

The Court next considers the RFP's authenticity. The Contract, which the Court concludes is sufficiently authenticated, incorporates the RFP by reference, referring to it as "RFP#45-14-PL." Contract at 1. The RFP contains the same number designation in its title. See RFP at 1 (titling itself "Request for Proposal (RFP) #45-14-PL."). Circumstantial evidence suggests the RFP is what it purports to be, where it: (i) bears an official seal of the County of Bernalillo, see RFP at 1; (ii) contains terms typical of a request for proposal, see, e.g., RFP ¶¶ A-C, at 1 (including a purpose of the request for proposals paragraph, a summary of the scope of work, and a procurement manager contact); (iii) is dated July, 2014, see RFP at 1; and (iv) contains a listing of its table of contents, see RFP at 2. See Lopez, 312 F. Supp. 3d at 1154-55 (stating that satisfactory authentication evidence can include a document's title, date, labeling, terms, pagination, and a listing of its table of contents, sections, schedules, and exhibits). Further, the Correct Care Defendants rely on excerpts from the same RFP in support of their Reply. See Exhibit P -- Excerpt from the July 2014 Bernalillo County RFP, filed June 19, 2019 (Doc. 317-16). The Correct Care Defendants do not state in their reply whether or why they dispute the RFP's genuineness. See Reply ¶ F, at 7. Although the Correct Care Defendants contend that "what documents the contract 'incorporated'" are "merely arguments of counsel that do not constitute summary judgment evidence," Reply ¶ F, at 7 (quoting Response ¶ F, at 25), the Contract, which the Court deems authenticated, states on its face that it incorporates by reference the RFP, and the Court may consider this statement as part of the record at summary judgment. See Contract at 1. The Court concludes that there is sufficient evidence supporting the RFP's authenticity, and the Court will consider the RFP as evidence in deciding the motion. See Fed. R. Evid. 901; 801.

time of the contract and in October, 2016, the NCCHC Standards for Health Services in Jail

("NCCHC Standards") were in effect. See Response ¶ G, at 25 (stating this fact)(citing McMurray

Depo. at 46:6-16).[180] The Metropolitan Detention Policies and Procedures in effect in October,

---

Next, the Court considers the Correct Care Proposal's authenticity. The Contract also incorporates the Correct Care Proposal by reference, stating that "the CONTRACTOR submitted its proposal, dated August 12, 2014 in response to RFP#45-14-PL, which proposal is . . . hereby incorporated into this Agreement by reference," and also states that "CONTRACTOR" refers to Correct Care. Contract at 1. Circumstantial evidence suggests that the Correct Care Proposal is what it purports to be, where it: (i) bears a seal of the County of Bernalillo and a Correct Care logo, see Correct Care Proposal at 1; (ii) contains terms typical of a contract proposal, see, e.g., Correct Care Proposal at ¶ 4 (including paragraphs detailing current experience and qualifications, past experience, a statement of compliance, and a proposed approach to tasks, as well as reporting and third-party billing); (iii) is dated August 12, 2014, see Correct Care Proposal at 1; and (iv) contains a listing of its table of contents and attached appendices, see Correct Care Proposal at 2. See Lopez, 312 F. Supp. 3d at 1154-55. Authentication is not a high bar, and the Court concludes that Tanner has met that bar, because there is some evidence sufficient to support a finding that the Correct Care Proposal is what she claims it to be. See Lopez, 312 F. Supp. 3d at 1154.

Last, the Court considers the Correct Care Staffing Pattern's authenticity. The Correct Care Staffing Pattern is on Correct Care letterhead and was produced during discovery. See Correct Care Staffing Pattern at 1. See also Denison, 941 F.2d at 1423. The Correct Care Defendants do not assert a dispute to the Correct Care Staffing Pattern's genuineness. See Reply ¶ F, at 7. Circumstantial evidence suggests that the Correct Care Staffing Pattern is what it purports to be, where it: (i) is printed on Correct Care letterhead, see Correct Care Staffing Pattern at 1; (ii) contains terms typical of a staffing pattern, see, e.g., Correct Care Staffing Pattern at 1 (including information on staffing positions and numbers); and (iii) is affixed as an addendum to the Correct Care Proposal, see Correct Care Staffing Pattern at 1 (titled Request for Proposal (RFP) #45-14-PL: Addendum #3). See Lopez, 312 F. Supp. 3d at 1154-55. Authentication is not a high bar, and the Court concludes that Tanner has met that bar, because there is some evidence sufficient to support a finding that the Correct Care Staffing Pattern is what she purports it to be. See Lopez, 312 F. Supp. 3d at 1154. The Correct Care Defendants do not specifically controvert the text's fact, so the Court adopts the text's fact as undisputed for the motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[180]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact but begin by stating that "[w]hen the National Commission on Correctional Health Care ('NCCHC') guidelines were in effect, and whether the contents of those guidelines are applicable

is immaterial." Reply ¶ G, at 7. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants also object that the NCCHC Standards are not the "medical standard of practice, which must be proved through testimony by a medical expert." Reply ¶ G, at 7. Tanner does not propose as fact, however, that the NCCHC Standards are the medical standard of practice, but rather that they were in effect at Metropolitan Detention. See Response ¶ G, at 25. That the NCCHC Standards may not be the medical standard of care does not specifically controvert the text's fact, because it does not challenge whether the NCCHC Standards were in effect or what they included.

The Correct Care Defendants also object that Tanner "neither authenticated nor laid a foundation for admissibility of the NCCHC guidelines." Reply ¶ G, at 7 (citing Fed. R. Evid. 901(a); 801). As authentication/foundation evidence, Tanner points to the McMurray Depo. at 46:6:16; id. at 53:13-22; and Correct Care Solutions, LLC's Third Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories, filed April 15, 2019 (Doc. 209-2)("CCS' Second Supplemental Answers to Interrogatory Nos. 2 and 3"). The Correct Care Defendants, as Tanner notes, admit "which versions of the NCCHC Standards and MDC Policies and Procedures produced in discovery were in effect in 2016." Surreply at 9. See also CCS' Second Supplemental Answers to Interrogatory Nos. 2 and 3, at 1-4; McMurray Depo. at 46:6-16 (stating that the 2014 NCCHC Standards were in effect in 2016). The NCCHC Standards upon which Tanner relies do not, on their face, indicate whether they are excerpted from the 2014 version or another version of the NCCHC guidelines. See NCCHC Standards at 1. The Court concludes that the evidence to which Tanner cites as authentication/foundation evidence does not provide a foundation for the admissibility of the NCCHC Standards, because her cited evidence supports only that the 2014 version of the standards were in effect in 2016, and not whether the NCCHC Standards that Tanner filed are from the 2014 version or some other version. Although authentication is not a high bar, Tanner has not met that bar, where the filed version of the NCCHC Standards does not include a title, a date, a seal, a signature, or any other circumstantial evidence of authenticity so that the Court may conclude that the NCCHC Standards are what Tanner contends they are. See Lopez, 312 F. Supp. 3d at 1154. The Court does not rely on the NCCHC Standards, because they are not sufficiently authenticated, and accordingly, the Court does not adopt the portion of Tanner's proposed additional material fact which relies on the NCCHC Standards and which states that the NCCHC Standards included

> specific standards regarding access to care, understaffing, punishing inmates for seeking care for their serious health needs, nursing performance evaluations, nursing assessment protocols, skills testing for nurses, receiving screening, obtaining medical records from community providers, counseling and care of the pregnant inmate, qualifications for clinicians who provide such counseling and

2016, included "Access to Care" and "Counseling and Care of the Pregnant Inmate" protocols,

which refer to:

> specific provisions regarding access to care, understaffing, punishing inmates for seeking care for their serious health care needs or exhibiting psychiatric symptoms, limits on fees, counseling and care of the pregnant inmate, requirements for qualified clinicians who are physicians certified/eligible in obstetrics to provide such care, immediate off-site transport of pregnant inmates who experience contractions of labor, and specific clinical protocols on pregnancy and preterm labor.

Response ¶ H, at 25-26 (stating this fact)(citing Access to Care, filed June 3, 2019 (Doc. 287-26);

Counseling and Care of the Pregnant Inmate, filed June 3, 2019 (Doc. 287-27)).[181] As the

---

care, and emergency transport to an off-site hospital in the case of obstetrical emergencies.

Response ¶ G, at 25 (citing Ex. 54 to Plaintiffs' Response, filed June 3, 2019 (Doc. 287-29)("NCCHC Standards")). The Court adopts the remainder of the text's fact as undisputed, because the Correct Care Defendants do not specifically controvert it, and the record supports it. See McMurray Depo. at 46:6-16 (opining that the 2014 version of the NCCHC Guidelines were likely in effect in 2016). See also D.N.M.LR-Civ. 56.1(b).

[181]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that "[w]hat MDC policies and procedures were in effect, and the contents of those policies and procedures, is immaterial to the motion at bar, which is about what individual CCS Defendants did, not what they might have done." Reply ¶ H, at 7. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants also assert in reply to the text's fact that "MDC policies and procedures do not define the medical standard of practice, which must be proved through testimony by a medical expert or elucidate what constitutes deliberate indifference or a violation of substantive due process." Reply ¶ H, at 7. Tanner does not propose as fact, however, that the Metropolitan Detention policies and procedures are the medical standard of practice, but rather that they were in effect, and what those standards entailed. See Response ¶ G, at 25. That the MDC policies and procedures may not be the medical standard of care does not specifically

controvert the text's fact, because it does not challenge whether the MDC policies and procedures were in effect or what they included.

The Correct Care Defendants also object that Tanner has "neither authenticated nor laid a foundation for admissibility of the cited MDC policies and procedures." Reply ¶ H, at 8 (citing Fed. R. Evid. 901(a); 801). As authentication/foundation evidence, Tanner cites to the McMurray Depo. at 243:9-244:16; id. at 248:6-14; CCS' Second Supplemental Answers to Interrogatory Nos. 2 and 3, at 1-4; and to the Reply at 26-27. See Surreply at 12.

First, the Court notes that the protocols include a Bates Number at the bottom of each page, suggesting that Tanner received the documents at issue in response to a discovery request. See Access to Care at 1-4 (Bates Numbers 000013-000016); Counseling and Care of the Pregnant Inmate at 1-5 (Bates Numbers 000273-000277). Documents produced by a party during discovery are deemed authentic when offered by the party opponent. See Orr v. Bank of Am., 285 F.3d 764, 777 n.20 (9th Cir. 2002)(citations omitted)). During discovery the Defendants provided documents to Tanner, which Tanner is now introducing as evidence against the Defendants. Accordingly, the Court deems them authenticated. See Orr v. Bank of Am., 285 F.3d at 777 n.20 (citations omitted).

Second, the Court concludes that the McMurray Depo. provides a foundation for the admissibility of the Counseling and Care of the Pregnant Inmate. See McMurray Depo. at 242:1-13 (Dr. McMurray testifying that he recognized the Counseling and Care of the Pregnant Inmate Protocol, and that he had seen it before). If Tanner intends to introduce the protocols as business records and Dr. McMurray plans to testify that the records -- the protocols -- were kept in the regular course of business, that testimony is sufficient to make the relevant portions of the protocols admissible, because "the person who actually keeps the books and records and makes the entries need not testify if a person does testify who is in a position to attest to the authenticity of the records." United States v. Dawson, 400 F.2d 194, 199 (2d Cir. 1968). In United States v. Dawson, the defendant sought to admit accounting books and records, laying the foundation for their admissibility through the testimony of a witness whose "acquaintance" with the records "was limited to knowledge that the books had been kept by an accountant in New York City." 400 F.2d at 198. The witness testified that he "knew the books and records were kept in the regular course of business of Mazra Homes and that it was in the regular course of the partnership business to keep such records." 400 F.2d at 198. Dr. McMurray, as the Metropolitan Detention's medical director during the Metropolitan Detention's contract with Correct Care, is in a position to attest to the authenticity of Correct Care's protocols. See, e.g., McMurray Depo. at 12:16-17 (Dr. McMurray expressing that Correct Care's protocols "were very similar" to the protocols of their contractor-predecessor). The Court concludes that Tanner has laid a foundation for the protocols' admissibility through Dr. McMurray's testimony.

Metropolitan Detention site medical director, Dr. McMurray had the authority to make all day-to-day clinical decisions on-site. See Response ¶ I, at 26 (stating this fact)(citing Videotape Deposition of David Jordan -- 30(b)(6) Witness at 66:22-67:12 (taken March 28, 2019), filed April 29, 2019 (Doc. 233-1)("Jordan Depo.")); Videotaped Deposition of: Lori Schwartzmiller 30(b)(6) at 44:7-19 (taken April 4, 2019), filed April 29, 2019 (Doc. 233-2)("Schwartzmiller Depo.")).[182]

---

[182]The Correct Care Defendants reply that "whether Dr. McMurray was the final decision maker for CCS -- a legal conclusion -- is merely the argument of counsel, not summary judgment evidence." Reply ¶ I, at 8 (citing Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024-25 (10th Cir. 1992); Phillips v. Calhoun, 956 F.2d 949, 952-53 (10th Cir. 1992)). In Phillips v. Calhoun, the Tenth Circuit concluded that "[w]hile an expert may not state legal conclusions, 'Fed. R. Evid. 704(a) allows an expert witness to testify in the form of an opinion or inference even if that opinion or inference embraces an ultimate issue to be determined by the trier of fact.'" 956 F.2d at 952 (quoting A.E. ex rel. Evans v. Indep. Sch. Dist. No. 25, 936 F.2d 472, 476 (10th Cir. 1991)). Here, as in Phillips v. Calhoun, Jordan and Schwartzmiller may offer their understanding of Dr. McMurray's decision-making power vested in him by his position as site medical director. Thomas v. Wichita Coca-Cola Bottling Co. states that "the nonmovant must do more than refer to allegations of counsel contained in a brief to withstand summary judgment," and here, Tanner does not rest on her counsel's bare allegations, but cites to "deposition transcript[s]," which the Tenth Circuit held constitute "sufficient evidence." Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d at 1024. The Court alters the fact slightly from Tanner's proposed fact, to better reflect what the record can support. Tanner proposes as fact: "As CCS's site medical director at MDC, Defendant McMurray was the final decision-maker for the company with respect to clinical issues in October 2016, including referral off-site." Response ¶ I, at 26. The portion of the Schwartzmiller Depo. which Tanner cites states that Dr. McMurray had decision-making authority specifically for clinical medical decisions, and specifically for "day-to-day matters." Schwartzmiller Depo. at 42:9-19. Because the cited record specifies the type of clinical decision with which Dr. McMurray was entrusted -- day-to-day -- the Court adds the "day-to-day" language to the proposed fact to avoid the inference that Dr. McMurray was the final decision maker for all clinical matters, an inference which the cited record controverts. Schwartzmiller Depo. at 42:9-19. The Court does not adopt Tanner's statement that Dr. McMurray was the final decision-maker for off-site referral decisions as fact, because the cited portion of the record contains no mention of referral decisions and does not clarify whether referral decisions constitute clinical decisions or another type of decision for which Dr. McMurray might have needed approval. See generally Jordan Depo.; Schwartzmiller Depo. For the foregoing reasons,

Part of Dr. McMurray's job responsibility at Metropolitan Detention was to assist in "'assur[ing]' compliance with NCCHC and ACA standards,'" as well as "'treatment protocols, clinical policies and procedures.'" Response ¶ I, at 26 (stating this fact)(first quoting McMurray Depo. at 53:13-22, and then quoting McMurray Depo. at 49:23-50:7).[183] Dr. McMurray expressed that he was not

_____

the Court concludes that the text's fact is not legal argument, that the Correct Care Defendants have asserted no genuine dispute to the text's fact, and that the record supports the text's fact, so the Court adopts it as undisputed for this motion's purposes.

[183]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that "NCCHC guidelines and MDC policies and procedures are immaterial to the motion at bar, which is about whether three individually named healthcare providers provided Plaintiff constitutionally adequate medical care. The Court's place is not to rule on the quality of healthcare outcomes or patient satisfaction." Reply ¶ I, at 8. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). Nor is the Court ruling on healthcare outcomes or patient satisfaction in adopting as undisputed fact, for the forthcoming reasons, that Dr. McMurray's job responsibilities included assisting in compliance efforts with NCCHC standards, ACA standards, treatment protocols, clinical policies, and clinical procedures. See Response ¶ I, at 26. The Court concludes that the record supports Tanner's proposed fact. See McMurray Depo. at 53:13-22 (stating that, in 2016, Dr. McMurray's job responsibilities included assisting "the health services administrator to establish and maintain chronic care clinics that assure compliance with NCCHC and ACA standards, as well as CCS policy/procedures."); id. at 49:23-50:7 (stating that Dr. McMurray's job responsibilities included "as needed, not less than annually, reviews and approves the treatment protocols, clinical policies and procedures, to include infection control and infirmary."). The Court concludes that the record supports the text's fact, and the Correct Care Defendants do not address the fact, apart from their materiality objection, in the Reply, so the Court adopts it as undisputed. See D.N.M.LR-Civ. 56.1(b).

Tanner also proposes as fact that Luna and Sanchez "did not even look to see what these clinical standards and protocols were, let alone abide by them." Response ¶ I, at 29 (stating this fact)(citing Sanchez Depo. at 90:16-92:4; id. at 98:14-99:10; id. at 154:5-20; Luna Depo. at 36:21-37:15; id. at 77:1-6; id. at 80:13-16; id. at 80:21-23; Response at 6-9). The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that "NCCHC guidelines and MDC policies and procedures are immaterial to the motion at bar, which is about whether three individually named healthcare providers provided Plaintiff constitutionally adequate

medical care.  The Court's place is not to rule on the quality of healthcare outcomes or patient satisfaction."  Reply ¶ I, at 8.  A materiality issue is not a factual dispute.  The Court will address materiality in this opinion's Analysis section.  <u>See</u> <u>SEC v. Goldstone</u>, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

The Court, having reviewed the record, concludes that it does not support Tanner's proposed fact that Luna and Sanchez "did not even look to see what these clinical standards and protocols were, let alone abide by them," Response ¶ I, at 29, so the Court does not adopt this fact as undisputed, having independent reason to doubt its accuracy.  In the Sanchez Depo. to which Tanner cites in support of her proposed fact, Sanchez states that she was recently provided access to Metropolitan Detention policies and procedures, but Sanchez does not state whether she had access to or reviewed Correct Care policies and procedures.  <u>See</u> Sanchez Depo. at 90:16-92:4.  Sanchez then states that she is not familiar with the "Clinical Protocol B07, Use of On-site Pregnancy Test," or with the "Clinical Protocol J04, Pregnancy," or "Clinical Protocol J05, Preterm Labor[,]" but the Sanchez Depo. does not indicate whether these protocols are the only protocols relevant to pregnant inmates, or whether Sanchez reviewed other protocols or clinical standards.  Sanchez Depo. at 98:14-99:10.  Sanchez then states that she is not completely familiar with NCCHC or ACA standards and would not have used them as a Med 1 nurse.  <u>See</u> Sanchez Depo. at 154:5-20.  Luna states that she did not have occasion to look at Metropolitan Detention policies and procedures while working for Correct Care, and that she did not know what the initials ACA or NCCHC signified.  <u>See</u> Luna Depo. at 36:21-37:15.  Luna then states that she is not familiar with "Clinical Protocol J05, preterm labor."  Luna Depo. at 77:1-6.  Luna confirms that she did not regularly use ACA or NCCHC standards as a Correct Care nurse.  <u>See</u> Luna Depo. at 80:13-16; <u>id.</u> at 80:21-23.  The Court concludes that the record does not support that Luna and Sanchez "did not even look to see what these clinical standards and protocols were, let alone abide by them."  Response ¶ I, at 29.  Nothing in the cited record suggests that Luna and Sanchez did not look to see whether there were clinical standards or protocols with which they were expected to comply, and nothing in the record supports that Luna or Sanchez did not abide by the protocols, because Tanner cites only to the arguments she raises earlier in her response, in addressing the Correct Care Defendants' proposed facts 19, 20 and 21, and, in this MOO, the Court earlier addressed Tanner's response to those proposed facts, and rejected as undisputed the notion that Luna erred in completing the nursing pathway.  <u>See</u> MOO at 41-43.  Tanner cites to no further support for her statement that Luna and Sanchez did not abide by the "clinical standards and protocols."  Response ¶ I, at 26.  Tanner invites the inference that Luna and Sanchez did not "even" look at the clinical standards and protocols, "let alone" abide by them to suggest that they did not meet a basic expectation of their positions, but the cited record does not indicate that Luna and Sanchez were, as nurses, tasked with knowing protocols that may have been relevant only at an administrative level, and not at their level of day-to-day clinical operations.  Response ¶ I, at 26.  The Court need not grapple with the propriety of inviting this inference, however, because the

familiar with specific clinical protocol documents referenced in "HCA 12.53," but stated that he speculated they "corresponded to something published by the NCCHC." Response ¶ I, at 26 (stating this fact)(citing McMurray Depo. at 243:9-244:16; id. at 248:6-14).[184]

Defendant Thomas J. Ruiz, in his official capacity as Bernalillo County's Jail Administrator at Metropolitan Detention, "reviewed, approved, and admitted factual findings from a legally authorized investigation regarding this incident contained in a report submitted by the County's Office of Professional Standards (OPS) at MDC." Response ¶ J, at 26 (stating this fact)(citing OPS Report at 54-55).[185] The OPS Report's findings included determinations based

---

record does not support Tanner's fact as she proposes it, and the Court does not, therefore, adopt it as undisputed.

[184]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that "NCCHC guidelines and MDC policies and procedures are immaterial to the motion at bar, which is about whether three individually named healthcare providers provided Plaintiff constitutionally adequate medical care. The Court's place is not to rule on the quality of healthcare outcomes or patient satisfaction." Reply ¶ I, at 8. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Court alters the text's fact slightly from Tanner's proposed fact, to replace the argumentative language in Tanner's proposed fact, which states: "Even Defendant McMurray was not familiar with the specific clinical protocol documents referenced in HCA 12.53 and could only speculate that they corresponded to something published by the NCCHC," with neutral language. Response ¶ I, at 26. See McMurray Depo. at 243:9-244:16 (stating that he did not have "Clinical Protocol B07, Use of On-site Pregnancy Test," but assumed that it referred to the NCCHC policies); id. at 248:6-14 (stating that he was not familiar with "Clinical Protocol J05, Preterm Labor," at Metropolitan Detention). The Court concludes that the record supports the text's fact, and the Correct Care Defendants do not address it in their Reply, either to admit or to dispute it, so the Court adopts it as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[185]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that "[w]hether a Bernalillo County investigator found a violation of internal standards as

a result of an administrative investigation, and whether a Bernalillo County official accepted or adopted the findings, are immaterial to whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care." Reply ¶ J, at 8. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

On summary judgment, the Court may consider only admissible evidence. See World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)). The Correct Care Defendants argue that Tanner "neither authenticated nor laid a foundation for admissibility of" the OPS Report to which she cites in support of her proposed fact J. Reply ¶ J, at 8. Tanner responds that the OPS Report is authentic per se, because it is on the "letterhead of the opposing party that produced it in discovery." Surreply at 12. Tanner also cites to depositions, expected depositions, and declarations which she contends provide a foundation for the OPS Report's admissibility. See Surreply at 12 (citing 30(B)(6) Deposition of Bernalillo County Corrina W. Cooke, at 30:19-31:8 (taken April 2, 2019), filed April 22, 2019 (Doc. 225-14)("Cooke Depo."); Plaintiffs' Motion for Leave to Take Trial Deposition of Confined Person at 1, filed June 11, 2019 (Doc. 297)("Mtn. for Malik Swayne Depo."); Second Tanner Decl.; Declaration of Ashlee Custy at 3 (dated June 24, 2019), filed July 3, 2019 (Doc. 324-2)("Second Custy Decl.")). Tanner then cites to an email from Defendant Bernalillo County's counsel, providing Tanner with portions of the OPS Report. See Surreply at 12 (citing Email from Sam Garcia to Paul Kennedy, Arne Leonard, Andrew V. Mora, Nicole Moss, Geoffrey White, Casey Kannenberg and Tobanna Barker, dated April 8, 2019, filed July 3, 2019 (Doc. 324-3)("E-mail Transmitting OPS Report"). Tanner states that, because of the E-mail Transmitting OPS Report, the OPS Report qualifies as a "public record with admissions by party opponents," under rules 801(d)(2) and 803(8) of the Federal Rules of Evidence. Surreply at 12.

First, the Court notes that Bernalillo County, and not the Correct Care Defendants, provided the OPS Report and the OPS Report appears on Bernalillo County letterhead. See OPS Report at 1; E-mail Transmitting OPS Report. Documents "produced during discovery that are on the letterhead of the opposing, producing party are authentic per se for purposes of Federal Rule of Evidence 901." Law Co., 577 F.3d at 1170. Correct Care is the opposing party, but not the producing party. See Reply ¶ J, at 8. However, in Denison, the Tenth Circuit held that a document prepared on Geolograph letterhead and which the plaintiff relied upon was properly authenticated, despite Swaco's objection, where Geolograph, a former co-defendant, was a participant in Swaco's joint venture. See Denison, 941 F.2d at 1423. The Court concludes, based on Denison, that there is sufficient circumstantial evidence to support the OPS Report's authenticity where Bernalillo County produced it during discovery to both Tanner and the Correct Care Defendants, and the OPS Report is prepared on Bernalillo County Metropolitan Detention letterhead. See E-Mail Transmitting OPS Report at 1; OPS Report at 1.

Second, the Court concludes that Tanner can admit the OPS Report for the truth of the statement that Ruiz "reviewed, approved, and admitted factual findings from a legally authorized

on a preponderance of the evidence that Dr. McMurray engaged in misconduct by "'not authorizing and ensuring an earlier transfer of inmate Tanner, to an emergency facility that could provide the specialized treatment needed;'" that Luna and other Correct Care employees "'permit[ted] unreasonable delays before Inmates are seen for treatment,'" in violation of the Access to Care protocol; that Luna and several other Correct Care employees did not provide Tanner, a pregnant inmate, with "'care from qualified physicians, i.e., physicians that are certified/eligible in obstetrics,'" in violation of the Counseling and Care of the Pregnant Inmate protocol; and that Luna and other Correct Care employees did not "'"immediately transport"'" Tanner to the hospital when she began experiencing "'contractions of labor,'" in violation of

---

investigation regarding this incident contained in a report submitted by the County's Office of Professional Standards (OPS) at MDC," Response ¶ J, at 26, through Ruiz' testimony, because Ruiz signed the OPS Report at 55, stating that he reviewed and approved it, and attesting that he, "the undersigned, do[es] hereby swear that [he has] read the foregoing document and, to the best of [his] knowledge, information and belief, the facts stated therein are true and accurate, so help [him] God." OPS Report at 55. The Court notes that Ruiz has been deposed. See Deposition of Thomas J. Ruiz (taken December 3, 2018), filed June 19, 2019 (Doc. 317-15)("Ruiz Depo."). The portions of the Ruiz Depo. filed with the Court do not mention the OPS Report, but the Court concludes that Ruiz can reasonably be expected to testify that he recognizes his signature on the OPS Report, and that in signing, he attested to having reviewed and approved the document. The Court concludes that the OPS Report is authentic and admissible, and that the Court may rely on it in considering the Motion. The Court also concludes that the record supports the text's fact. See OPS Report at 55. Because the Correct Care Defendants do not specifically admit or deny the text's fact in the Reply and the Court has no independent reason to doubt its accuracy, the Court adopts it as undisputed for the Motion's purposes. See D.N.M.LR-Civ. 56.1(b).

another protocol.  Response ¶ J, at 27 (stating this fact)(quoting OPS Report at 54-55  (alterations in Response)).[186]

A June 1, 2015 amendment to the Contract added a provision for "'bi-weekly onsite OB/GYN clinics at 4 hours per clinic.'"  Response ¶ K, at 27 (stating this fact)(quoting First Amendment at 2, dated June 1, 2015, filed May 1, 2019 (Doc. 242-3)("First Contract Amendment")).[187]  Neither Bernalillo County nor Correct Care implemented a bi-weekly onsite

---

[186]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that "[w]hether a Bernalillo County investigator found a violation of internal standards as a result of an administrative investigation, and whether a Bernalillo County official accepted or adopted the findings, are immaterial to whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care." Reply ¶ J, at 8.  A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section.  See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

[187]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that

> Specific requirements in the contract between CCS and Bernalillo County shed no light on whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care, because the question at bar is what was done, not what might have been done.  An immaterial factual dispute is no barrier to summary judgment.  British Airways Bd. v. Boeing Co., 585 F.2d 946, 952-53 (9th Cir. 1978).  A minor discrepancy of fact does not amount to a dispute of material fact.  Sturdivan, 511 F.3d at 1261.  "Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 247-48.

Reply ¶ K, at 9.  A materiality issue is not a factual dispute.  The Court will address materiality in this opinion's Analysis section.  See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  The First Contract Amendment supports the text's fact.  See First Contract Amendment at 2 (stating that the parties mutually agree to implement a bi-weekly onsite OB/GYN clinic at 4 hours per clinic at Metropolitan Detention).  The Court has no independent reason to doubt the fact's accuracy, and the Correct Care Defendants do not specifically dispute the text's fact, because they do not address it, so the Court adopts the text's fact as undisputed.  See D.N.M.LR-Civ. 56.1(b).

OB/GYN clinic at Metropolitan Detention in 2015, or 2016. See Response ¶ K, at 27 (stating this fact)(citing McMurray Depo. at 256:22-257:3; Jordan Depo. at 107:2-11; id. at 134:11-22).[188] Metropolitan Detention did not have equipment or qualified personnel on-site to perform

_____

[188]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that

> Specific requirements in the contract between CCS and Bernalillo County shed no light on whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care, because the question at bar is what was done, not what might have been done. An immaterial factual dispute is no barrier to summary judgment. British Airways Bd. v. Boeing Co., 585 F.2d 946, 952-53 (9th Cir. 1978). A minor discrepancy of fact does not amount to a dispute of material fact. Sturdivan, 511 F.3d at 1261. "Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 247-48.

Reply ¶ K, at 9. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The portions of the record to which Tanner cites support the text's fact. See McMurray Depo. at 256:22-257:3 (stating that Correct Care did not successfully recruit a part-time OB/GYN to work on-site at Metropolitan Detention in 2016, because, despite multiple efforts, it was not financially worthwhile for someone to work part-time, especially because of how variable the number of pregnant inmates is at any given time); Jordan Depo. at 107:2-11 (describing that the First Contract Amendment started the process of establishing an OB/GYN clinic at Metropolitan Detention, so that Bernalillo County would be aware of the costs and, from there, recruit an OB/GYN to work onsite); id. at 134:11-22 (stating that Bernalillo County has been trying to find an OB/GYN for a long time, but no one is willing to work at Metropolitan Detention, knowing the risks associated with working in a jail). Making all reasonable inferences in Tanner's favor, the Court concludes that if Bernalillo County and Correct Care could not successfully recruit an OB/GYN in 2015, or 2016, they were unable to establish an on-site OB/GYN clinic at Metropolitan Detention during that time. The Court has no independent reason to doubt the text's fact's accuracy, and the Correct Care Defendants do not specifically dispute it, because they do not address it in their Reply, so the Court adopts the text's fact as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

ultrasounds.  <u>See</u> Response ¶ K, at 27 (stating this fact)(citing McMurray Depo. at 102:7-14; <u>id.</u> at

150:21-151:20; Ehrenberg Depo. at 49:17-22).[189]

---

[189]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that:

> Specific requirements in the contract between CCS and Bernalillo County shed no light on whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care, because the question at bar is what was done, not what might have been done.  An immaterial factual dispute is no barrier to summary judgment.  <u>British Airways Bd. v. Boeing Co.</u>, 585 F.2d 946, 952-53 (9th Cir. 1978).  A minor discrepancy of fact does not amount to a dispute of material fact.  <u>Sturdivan</u>, 511 F.3d at 1261.  "Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Anderson</u>, 477 U.S. at 247-48.

Reply ¶ K, at 9.  A materiality issue is not a factual dispute.  The Court will address materiality in this opinion's Analysis section.  <u>See</u> <u>SEC v. Goldstone</u>, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  The portions of the record to which Tanner cites support the text's fact.  <u>See</u> McMurray Depo. at 102:7-14 (stating that UNM's university hospital orders the ultrasounds for Metropolitan Detention inmates, because Metropolitan Detention does not have ultrasound capability); <u>id.</u> at 150:21-151:20 (stating that ultrasounds are not performed at Metropolitan Detention and stating that Dr. McMurray cannot describe what a non-stress test is); Ehrenberg Depo. at 49:17-22 (stating that the clinic at Metropolitan Detention was not set up to be an obstetrical triage operation).  Tanner proposes as fact that Metropolitan Detention did not have equipment or qualified personnel to perform "biophysical profiles or non-stress tests on site," but the Court does not adopt this portion of Tanner's proposed fact, because the record to which Tanner cites does not support it.  Response ¶ K, at 27.  Although Dr. McMurray states that he cannot describe what a non-stress test entails, he does not state that one cannot be performed at Metropolitan Detention for lack of equipment or capability.  <u>See</u> McMurray Depo. at 150:21-151:20.  Neither Dr. McMurray nor Dr. Ehrenberg use the term "biophysical profile," and the cited portions of their testimony do not suggest that a biophysical profile cannot be performed at Metropolitan Detention.  <u>See</u> McMurray Depo. at 102:7-14; <u>id.</u> at 150:21-151:20; Ehrenberg Depo. at 49:17-22.  The Court adopts the portion of Tanner's proposed fact which the record supports, having no independent reason to doubt its accuracy.  The Correct Care Defendants do not specifically dispute the text's fact's accuracy, because they do not address it in their Reply, so the Court adopts it as undisputed for this motion's purposes.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

Correct Care, according to its corporate designee, does "'not consider a pregnant inmate's baby to be a patient' -- they are 'specifically excluded' from care." Response ¶ L, at 27 (stating this fact)(quoting Schwartzmiller Depo. at 58:5-14). [190] Schwartzmiller stated, "'We're not responsible for the care of infants. They're not incarcerated individuals.'" Response ¶ L, at 27

---

The Court also notes that, in Tanner's proposed fact, she states: "The official findings that Ms. Tanner was deprived of 'care from qualified clinicians, i.e., physicians that are certified/eligible in obstetrics' are further supported by several specific requirements in the contract between the County and CCS with regard to staffing the medical facilities at MDC." Response ¶ K, at 27 (quoting Response ¶ J, at 27). The Court does not adopt this statement as fact, because Tanner does not support it with citation to the record, and because it constitutes argument from counsel, which the Correct Care Defendants rightly note the Court may not consider as summary judgment evidence. See Reply ¶ K, at 9.

[190]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that

Whether Plaintiff's stillborn fetus was or was not designated a patient, whether the MDC was equipped to deliver babies, and what third-party paramedics did after Plaintiff's stillbirth are immaterial to the question at bar, which is whether the medical care the individual CCS Defendants gave Plaintiff met constitutional standards. Summary judgment should be granted where disputed facts are irrelevant or inauthentic, because the ultimate purpose of summary judgment is to expose allegations unsupported by material facts. Bolack, 340 F.2d at 819; Commercial Iron, 478 F.2d at 41.

Reply ¶ L, at 9. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The portions of the record to which Tanner cites support the text's fact. See Schwartzmiller Depo. at 58:5-14. Aside from the Correct Care Defendants' objection to the fact's materiality, the Correct Care Defendants do not state whether they admit or dispute the fact's veracity. The Court, having no independent reason to doubt its accuracy, and noting that the Correct Care Defendants do not specifically controvert the text's fact in the Reply, because they do not address it, adopts the fact as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

(stating this fact)(quoting Schwartzmiller Depo. at 58:16-17).[191]  In 2016, Correct Care had no staff at Metropolitan Detention who were certified in obstetrics, and Correct Care did not equip itself or intend to perform labor and delivery services on-site at Metropolitan Detention.  See Response ¶ L, at 27-28 (stating this fact)(citing Jordan Depo. at 28:17-22; id. at 34:6-14).[192]

---

[191]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that

> Whether Plaintiff's stillborn fetus was or was not designated a patient, whether the MDC was equipped to deliver babies, and what third-party paramedics did after Plaintiff's stillbirth are immaterial to the question at bar, which is whether the medical care the individual CCS Defendants gave Plaintiff met constitutional standards.  Summary judgment should be granted where disputed facts are irrelevant or inauthentic, because the ultimate purpose of summary judgment is to expose allegations unsupported by material facts.  Bolack, 340 F.2d at 819; Commercial Iron, 478 F.2d at 41.

Reply ¶ L, at 9.  A materiality issue is not a factual dispute.  The Court will address materiality in this opinion's Analysis section.  See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  The portions of the record to which Tanner cites support the text's fact.  See Schwartzmiller Depo. at 58:16-17.  Aside from the Correct Care Defendants' objection to the fact's materiality, the Correct Care Defendants do not state whether they admit or dispute the fact's veracity.  The Court, having no independent reason to doubt its accuracy, and noting that the Correct Care Defendants do not specifically controvert the text's fact in the Reply, because they do not address it, adopts the fact as undisputed for this motion's purposes.  See D.N.M.LR-Civ. 56.1(b).

[192]The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that

> Whether Plaintiff's stillborn fetus was or was not designated a patient, whether the MDC was equipped to deliver babies, and what third-party paramedics did after Plaintiff's stillbirth are immaterial to the question at bar, which is whether the medical care the individual CCS Defendants gave Plaintiff met constitutional standards.  Summary judgment should be granted where disputed facts are irrelevant or inauthentic, because the ultimate purpose of summary judgment is to

During 2016, Dr. McMurray, who has no specialization in obstetrics, gynecology, or maternal-fetal medicine, was a salaried Correct Care employee who worked a regular schedule at Metropolitan Detention and maintained no outside employment. Response ¶ M, at 28 (stating this fact)(citing McMurray Depo. at 9:3-7; id. at 13:2-7; id. at 14:9-13; id. at 22:1-23).[193] After nursing

_____

expose allegations unsupported by material facts. Bolack, 340 F.2d at 819; Commercial Iron, 478 F.2d at 41.

Reply ¶ L, at 9. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The portions of the record to which Tanner cites support the text's fact. See Jordan Depo. at 28:17-22 (stating that, in 2016, Correct Care had no staff certified in obstetrics at Metropolitan Detention); id. at 34:6-14 (stating that Correct Care did not have the resources to perform labor and delivery on-site at Metropolitan Detention, and did not intend to perform those services on-site, because delivering a baby is a rare occurrence, and Correct Care intended to transport a delivering inmate to a hospital, so that the hospital could perform the labor and delivery). Aside from the Correct Care Defendants' objection to the fact's materiality, the Correct Care Defendants do not state whether they admit or dispute the fact's veracity. The Court does not adopt the next sentence of Tanner's proposed fact, that "[h]ere, the Albuquerque Ambulance paramedics had to call an outside provider at Lovelace to determine what to do with Ms. Tanner and her baby at the time of delivery. See Ex. 16, Martinez Dep. at 48:16-17." Response ¶ L, at 27-28. The Court has already addressed that the Albuquerque Ambulance paramedics were required, by protocol, to call the Lovelace provider at the time of delivery and adopted that statement as fact. See supra n.167. The Court, having no independent reason to doubt the text's fact's accuracy, and noting that the Correct Care Defendants do not specifically controvert the text's fact in the Reply, because they do not address it, adopts the text's fact as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[193]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state in response:

Dr. McMurray's employment status and work schedule . . . shed no light on whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care. A detainee is entitled to adequate treatment but does not have the right to choose her medical treatment. Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000). "An inmate's claims against members of a prison medical

department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf." <u>Wood v. Russell</u>, 255 F. Supp. 3d 498, 512 (D.Del. 2017), citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 107 (1976). Thus, where a voluminous medical record showed the prisoner was treated in prison as well as off-site, no reasonable jury could find the inmate's healthcare provider deliberately indifferent. <u>Id.</u> As previously noted, "[t]he standard for evaluating a prisoner's deliberate indifference claim is highly deferential to the medical practitioners' professional judgment." <u>Lasko v. Watts</u>, 373 Fed.Appx. 196, 203 (3rd Cir. 2010)(unpublished disposition). "Courts will 'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.'" <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979)(quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 48 (4th Cir. 1977). "The fact that an inmate may prefer or believe that another course of treatment was warranted is not evidence of a constitutional violation." <u>Duran v. Curry Cnty. Adult Det. Ctr.</u>, No. 09-cv-0758 MCA/SMV, 2013 WL 12172090, *9 (D.N.M. July 29, 2013), citing <u>Perkins [v. Kan. Dept. of Corr.</u>, 165 F.3d 803, 811 (10th Cir. 1999]. Lastly, Plaintiff's recitation of facts is incomplete and therefore misleading. Dr. McMurray testified that he had experience and training delivering babies during medical school. **Exhibit G**, Deposition of Dr. McMurray, at pp.14:14 to 16. He also noted that he had experience in treating pregnant patients while at MDC and the facility has had up to 20 pregnant patients per month. <u>Id.</u> at p.99:13-23. . . . However, a minor discrepancy of fact does not amount to a dispute of material fact. <u>Sturdivan</u>, 511 F.3d at 1261.

Reply ¶ M, at 10-11 (alterations in Reply). The Court will address materiality in this opinion's Analysis section. <u>See</u> <u>SEC v. Goldstone</u>, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants' arguments that a detainee is not entitled to choose a particular course of medical treatment are inapposite here, and are better suited for the Analysis section, wherein the Court will address them. The Correct Care Defendants' contention that Tanner's proposed fact is misleading does not specifically controvert the fact's truth. The Court does not adopt as fact here, however, that Dr. McMurray "has not received any training in delivering babies since covering the topic as part of his medical school curriculum in 1985," because the Court has already adopted as fact that Dr. McMurray's last delivery was in medical school, and the Court sees no reason to repeat that fact again here. <u>See</u> <u>supra</u> at 122-23. The Court concludes that the record to which Tanner cites supports the text's fact. <u>See</u> McMurray Depo. at 9:3-7 (stating that Dr. McMurray is employed as Correct Care's medical director at Metropolitan Detention and has held that position since 2011); <u>id.</u> at 13:2-7

school, Spencer received no further specialized training in obstetrics, pregnancy, or childbirth. See

Response ¶ M, at 28 (stating that Spencer has received no specialized training in obstetrics,

pregnancy, or childbirth)(citing Spencer Depo. at 15:8-12; id. at 15:21-24).[194]

---

(stating that Dr. McMurray maintained no outside employment while working at Metropolitan Detention); id. at 14:9-13 (stating that Dr. McMurray has no specialized credentials in obstetrics, gynecology, or maternal fetal medicine); id. at 22:1-23 (stating that Dr. McMurray was a salaried Correct Care employee in 2016 and worked a regular schedule). The Court has no independent reason to doubt the text's fact's accuracy, and the Correct Care Defendants do not specifically controvert the text's fact, because the Correct Care Defendants do not address its veracity in their Reply, so the Court adopts the text's fact as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[194]The Correct Care Defendants do not specifically state whether they admit or dispute Tanner's proposed fact that Spencer has received no specialized training in obstetrics, pregnancy, or childbirth, but state that "Mr. Spencer's specialization . . . shed[s] no light on whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care." Reply ¶ M, at 10. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants also state that Tanner's "recitation of facts is incomplete and therefore misleading," where Spencer "testified that he had obstetrical training during nursing school, including both lectures and a clinical rotation." Reply ¶ M, at 10-11 (citing Spencer Depo. at 15:10-20). The Correct Care Defendants aver that "a minor discrepancy of fact does not amount to a dispute of material fact." Reply ¶ M, at 11 (citing Sturdivan, 511 F.3d at 1261).

The Court, having reviewed the record, concludes that, even drawing all reasonable inferences in Tanner's favor, the Court cannot adopt as fact that Spencer has received no specialized training in obstetrics, pregnancy, or childbirth, because the record specifically controverts that statement. See Spencer Depo. at 15:13-24 (stating that Spencer received training in obstetrics during nursing school, and asking Spencer whether he received "[a]ny other type of specialized training on pregnancy or childbirth, apart from what you got in nursing school"). The Court modifies Tanner's proposed fact to better reflect what the record can support, that Spencer received no specialized training in pregnancy, childbirth, or obstetrics beyond what he received in medical school, and the Correct Care Defendants do not address this fact, either to admit or to dispute it. See Reply ¶ M, at 11 (stating only that Spencer had obstetrical training during nursing school, but not commenting on whether he received more specialized training after nursing school). The Court, having no independent reason to doubt the text's fact's accuracy, and

Luna began work as a full-time, salaried Correct Care employee in August, 2014 -- her first job after graduating from nursing school -- and in January, 2016, she reduced her hours at Metropolitan Detention to one Sunday day shift per week, and she began a full-time job elsewhere. See Response ¶ N, at 28 (stating this fact)(citing Luna Depo. at 13:15-17; id. at 14:9-15:10; id. at 16:21-17:1).[195] Luna has no specialized training in obstetrics or midwifery, is not licensed, as an R.N., to perform vaginal or pelvic examinations, and Luna last received training on amniotic fluid testing in nursing school. See Response ¶ N, at 28 (stating this fact)(citing Luna Depo. at 17:22-25; id. at 136:18-24; id. at 172:19-24).[196] In 2016, Sanchez was a full-time, salaried Correct Care

_____

considering that the Correct Care Defendants do not specifically controvert it, adopts the fact as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[195]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state that "Nurse Luna's employment status, employment history, work schedule and lack of certain specialized training are immaterial to whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care. As noted in the prior paragraph, a detainee is not entitled to the care, or the caregiver, of her choosing." Reply ¶ N, at 11 (citations omitted). The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Court concludes that the record supports the text's fact. See Luna Depo. at 13:15-17 (stating that Luna started work at Correct Care in August, 2014); id. at 14:9-15:10 (stating that Luna reduced from full time to part time, working one Sunday day shift per week, in January, 2016, because she held a full-time schedule at Presbyterian Hospital); id. at 16:21-17:1 (stating that Luna's job as a Correct Care nurse was her first job after completing nursing school). The Court has no independent reason to doubt the text's fact's accuracy, which the record supports, and the Correct Care Defendants do not specifically controvert the text's fact, because they do not address its veracity in their Reply, so the Court adopts it as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[196]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state that Tanner's "recitation of facts is incomplete and therefore misleading," where

Nurse Luna testified that she was trained on fetal heart rate monitoring while she worked at CCS, that she was trained on counseling and care of the pregnant inmate while she worked at CCS, that she did an obstetrical rotation during nursing school, and that she was trained to test for amniotic fluid in nursing school. **Exhibit H**, deposition of Adriana Luna Trujillo, at pp. 18:1 to 5; 27:6 to 30:19; 71:6 to 72:19; 172:11 to 173:4; and 174:11 to 175:17. Nurse Luna never testified, as Plaintiff contends, that she was not "capable" of performing a vaginal inspection or pelvic examination or of telling whether a woman's water had broken. Rather, Nurse Luna testified that these actions were beyond the scope of her licensure. Id. at 136:10 to 137:5; 176:22 to 177:6; 179:8 to 179:16.

Reply ¶ N, at 11-12 (bold in original). The Court concludes that the record supports that Luna has no specialized training in obstetrics or midwifery. See Luna Depo. at 17:22-25 (stating that Luna had not training as a midwife or in obstetrics). The Correct Care Defendants correctly note that Luna did an obstetrical rotation in nursing school. See Luna Depo. at 180:13-15 (stating this fact). The Court, therefore, modifies Tanner's proposed fact that Luna "has no training in obstetrics or midwifery," and adopts instead that Luna has no "specialized" training in obstetrics or midwifery, which the Luna Depo. supports. Response ¶ N, at 28; Luna Depo. at 17:17-20 (specifying that Luna had no specialized healthcare training beyond that required for her nursing license).

Tanner proposes as fact that Luna "was not capable of performing a vaginal inspection or pelvic examination," and that she "was not capable of telling whether membranes have ruptured (i.e., whether a woman's water has broken)." Response ¶ N, at 28 (citing Luna Depo. at 17:22-25; id. at 136:18-24; id. at 134:25-135:3). The Correct Care Defendants aver that Luna never testified that she was not "capable" of performing these examinations or making these determinations, but rather that these actions were beyond her licensure's scope. See Reply ¶ N, at 12. Tanner cites to the Luna Depo. at 136:18 to 24 in support of her statement that Luna was not capable of performing a vaginal or a pelvic examination. See Response ¶ N, at 28. The portion of the Luna Depo. to which Tanner cites does not support her assertion. See Luna Depo. at 136:18-24 (stating that vaginal and pelvic examinations were outside of Luna's licensure's scope, but not stating that she was not "capable" of performing them). The Court modifies Tanner's proposed fact to better reflect what the record can support -- that vaginal and pelvic examinations were outside of Luna's licensure's scope. The Court does not adopt as fact Tanner's statement that Luna was not capable of telling whether membranes had ruptured or a woman's water had broken, because the record to which Tanner cites does not support this fact, even drawing all reasonable inferences in Tanner's favor. See Response ¶ N, at 28. The portion of the Luna Depo. to which Tanner cites in support of her statement that Luna was not capable of determining whether membranes had ruptured states only that, in Tanner's case, Luna, upon examining Tanner, was unable to tell whether her membranes had ruptured. See Luna Depo. at 134:25-135:3 (stating that Luna could not determine

employee who usually worked a regular schedule of three twelve-hour shifts at Metropolitan Detention per week. See Response ¶ O, at 28 (stating this fact)(citing Sanchez Depo. at 12:8-22; id. at 33:7-19).[197] Before working as a Correct Care employee, Sanchez had never worked in obstetrics or midwifery, and had no specialized pregnancy or childbirth training. See Response ¶ O, at 28-29 (stating this fact)(citing Sanchez Depo. at 21:12-22:1).[198] It is not within Sanchez'

---

whether Tanner's membranes had ruptured, but not stating that Luna could not generally tell upon proper examination whether membranes had ruptured). The Court adopts as undisputed fact Tanner's proposed fact that Luna last received amniotic fluid testing training in nursing school, because the record supports this fact, and the Correct Care Defendants, although they do not specifically state whether they admit or deny the fact, state in their Reply that Luna "was trained to test for amniotic fluid in nursing school." Reply ¶ N, at 12. See Luna Depo. at 172:21-173:4 (stating that Luna was trained on amniotic fluid testing in nursing school, but not thereafter). The Court concludes that the record supports the text's fact, and that the Correct Care Defendants do not specifically controvert it, and, having addressed the Correct Care Defendants' objections to Tanner's articulation of her proposed fact in this footnote, the Court adopts the text's fact as undisputed for the purposes of this motion. See D.N.M.LR-Civ. 56.1(b).

[197]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state that "Taileigh Sanchez, R.N.'s employment status, employment history, work schedule, and lack of certain specialized training shed no light on whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care." Reply ¶ O, at 12. The Court will address materiality in this opinion's analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Court concludes that the record to which Tanner cites in support of the text's fact supports the text's fact. See Sanchez Depo. at 12:8-22 (stating that, in 2016, Sanchez was employed at Metropolitan Detention, working for Correct Care); id. at 33:7-19 (stating that Sanchez worked a regular schedule of three twelve-hour shifts per week). The Correct Care Defendants, aside from asserting a materiality objection to the text's fact, do not address its veracity, either to admit or dispute it. The Court has no independent reason to doubt the text's fact's accuracy, because the record supports it, and the Correct Care Defendants do not specifically controvert it in the Reply, so the Court adopts it as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[198]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state that "Taileigh Sanchez, R.N.'s employment status, employment history, work

"'scope of practice'" to perform vaginal examinations. Response ¶ O, at 29 (stating this fact)(quoting Sanchez Depo. at 144:16-145:3).[199]

_____

schedule, and lack of certain specialized training shed no light on whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care." Reply ¶ O, at 12. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Court concludes that the record to which Tanner cites in support of the text's fact supports the text's fact. See Sanchez Depo. at 21:12-22:1 (stating that Sanchez had never worked in obstetrics or midwifery and had no specialized pregnancy or childbirth training). The Correct Care Defendants object to Tanner's recitation of facts as "incomplete and therefore misleading." Reply ¶ O, at 12. The Correct Care Defendants aver that Sanchez "testified that she received training on pregnancy care when she was in nursing school." Reply ¶ O, at 12 (citing Sanchez Depo. at 22:2-12; id. at 26:11-27:2). Although the Sanchez Depo. indicates that Sanchez had training on fetal heart tones and fetal heart rate monitors during nursing school and that she received pregnancy training during nursing school, nothing in the portion of the record to which the Correct Care Defendants cite controverts the statement that Sanchez had no "specialized" training in pregnancy or childbirth. Response ¶ O, at 29. See Sanchez Depo. at 22:20-12 (stating that Sanchez received pregnancy training in nursing school); id. at 26:11-27:2 (stating that Sanchez received fetal heart tones and fetal heart monitors training in nursing school). The Court concludes that the Correct Care Defendants do not show a genuine dispute to the text's fact, and the Court has no independent reason to doubt its accuracy, because the record to which Tanner cites supports the fact, so the Court adopts it as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

[199]The Correct Care Defendants do not address the text's fact, either to admit or to dispute it. See Reply ¶ O, at 12. The Court concludes that the record supports the text's fact. See Sanchez Depo. at 144:16-145:3 (stating that it is not in Sanchez' scope of practice to perform vaginal examinations). Tanner also proposes as fact that Sanchez "is not qualified to recognize labor contractions." Response ¶ O, at 29 (citing Ehrenberg Depo. at 104:24-106:12). The Court does not adopt this statement as fact, because the record does not support it. See Ehrenberg Depo. at 104:24-106:12 (stating that Dr. Ehrenberg does not "know how she would have had the basis to make that judgment," and remarking that "[f]eeling a contraction is not an easy thing to do," but not opining on Sanchez' ability to feel a contraction). The Court has no independent reason to doubt the accuracy of the text's fact, and the Correct Care Defendants do not specifically controvert the text's fact, because they do not address it, so the Court adopts it as undisputed for this motion's purposes. See D.N.M.LR-Civ. 56.1(b).

Pursuant to the Contract's legal requirements, the NCCHC's Accreditation Committee conducted an investigation of NCCHC Standards compliance at Metropolitan Detention for the three years preceding the report's date of April 24, 2018, and Bernalillo County adopted that report as a Request For Proposal (RFP) addendum to a contract issued later in 2018. See Response ¶ P, at 29 (stating this fact)(citing National Commission on Correctional Health Care Accreditation Report of the Health Care Services at Metropolitan Detnetion [sic] Center Albuquerque, NM (dated April 22, 2018), filed June 3, 2019 (Doc. 287-28)("NCCHC Accreditation Rpt."); Madrid Depo. at 39:4-42:3 (stating that Madrid provided a copy of the most recent NCCHC Accreditation Report, which became part of Addendum Number 2 to the RFP, and that, in turn, became an exhibit to the 2018 contract).[200]  The NCCHC Accreditation Committee issued findings concerning

---

[200]The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state:

> The report of an audit conducted in 2018 does not tend to show whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care on October 16 and 17, 2016.  This is so because the audit looked into whether CCS could prove it complied with NCCHC's voluntary continuing education and assessment guidelines in 2015, 2016, and 2017, and not Plaintiff's care, a fact Plaintiff concedes.  A party moving for summary judgment can prevail by demonstrating that the alleged factual issues are without legal significance.  Hermes [v. Federal Insurance Crop Ins. Corp, 729 F. Supp. 1292, 1294 (D.Kan. 1990)(Crow, J.)].  Plaintiff's characterization of the audit as "legally authorized," . . . [does] not change the calculus, because these characterizations are merely arguments of counsel that are not summary judgment evidence.  Thomas [v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024-25 (10th Cir. 1992)]; Phillips [v. Calhoun, 956 F.2d 949, 952-53 (10th Cir. 1992)].  Moreover, Plaintiff neither authenticated nor laid a foundation for the admissibility of the NCCHC audit, which she attached as Exhibit 53.  Fed. R. Evid. 901(a), 801.  Lastly, Exhibit 53 is inadmissible hearsay, because Plaintiff offers the out-of-court statement as proof of

Metropolitan Detention's compliance with NCCHC standards. Response ¶ P, at 29 (stating this fact)(citing NCCHC Accreditation Rpt. at 6).[201]

---

the matters asserted. Fed. R. Evid. 801(a), (b), and (c), and 802. Inadmissible hearsay testimony is not evidence for summary judgment purposes. Kephart [v. Data Sys. Int'l, Inc.], 243 F. Supp. 2d [1205,] 1209 [10th Cir. 1995].

Reply ¶ P, at 12-13. The NCCHC Accreditation Report upon which Tanner relies for the text's fact is hearsay, because no witness made the statements it contains "while testifying at the current trial or hearing," Fed. R. Evid. 801(c)(1), and Tanner relies on the report for the truth of what it asserts - that the NCCHC's Accreditation Committee investigated NCCHC Standards compliance at Metropolitan Detention for the three years preceding the report's April 24, 2018, date. While this letter is supposedly part of the Contract, and thus could be admissible hearsay, see supra n.179, Tanner has not laid a foundation for the NCCHC Accreditation Report's admissibility where it was not incorporated into the original Contract. See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)("The proponent of the document must also lay this foundation for its admission."). Tanner can establish this fact -- that the NCCHC's Accreditation Committee conducted an investigation of NCCHC Standards compliance at Metropolitan Detention for the three years preceding the report's April 24, 2018, date, and Bernalillo County adopted that report as an RFP addendum to a contract issued later in 2018 -- however, with evidence admissible at trial. Madrid recognized the report in question and discussed that it became an exhibit to the 2018 contract, and, drawing all reasonable inferences in Tanner's favor, could presumably attest to the fact that it reviewed Metropolitan Detention's NCCHC Standards compliance over a three-year period. See Madrid Depo. at 39:4-42:3 (stating that Madrid provided a copy of the most recent NCCHC Accreditation Report, which became part of Addendum Number 2 to the RFP, and that, in turn, became an exhibit to the 2018 contract). The Correct Care Defendants point to no "portions of the record upon which [they] rel[y]," in purporting to dispute the text's fact. D.N.M.LR-Civ. 56.1(b). The Court therefore deems the text's fact undisputed and will discuss its relevancy in the Analysis. See D.N.M.LR-Civ. 56.1(b).

[201] The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but challenge Tanner's assertions of those findings, stating:

The report of an audit conducted in 2018 does not tend to show whether the individual CCS Defendants provided Plaintiff constitutionally adequate medical care on October 16 and 17, 2016. This is so because the audit looked into whether CCS could prove it complied with NCCHC's voluntary continuing education and assessment guidelines in 2015, 2016, and 2017, and not Plaintiff's care, a fact

Plaintiff concedes. A party moving for summary judgment can prevail by demonstrating that the alleged factual issues are without legal significance. Hermes, 729 F. Supp. at 1294. Plaintiff's characterization of the audit as "legally authorized," . . . [does] not change the calculus, because these characterizations are merely arguments of counsel that are not summary judgment evidence. Thomas, 968 F.2d at 1024-25, Phillips, 956 F.2d at 952-53. Moreover, Plaintiff neither authenticated nor laid a foundation for the admissibility of the NCCHC audit, which she attached as Exhibit 53. Fed. R. Evid. 901(a), 801. Lastly, Exhibit 53 is inadmissible hearsay, because Plaintiff offers the out-of-court statement as proof of the matters asserted. Fed. R. Evid. 801(a), (b), and (c), and 802. Inadmissible hearsay testimony is not evidence for summary judgment purposes. Kephart, 243 F. Supp. 2d at 1209.

Reply ¶ P, at 12-13. The NCCHC Accreditation Report upon which Tanner relies for the text's fact is hearsay, because no witness made the statements it contains "while testifying at the current trial or hearing," Fed. R. Evid. 801(c)(1), and Tanner relies on the report for the truth of what it asserts - that the NCCHC's Accreditation Committee concluded that Metropolitan Detention's health care services were not in compliance with the NCCHC's Clinical Performance Enhancement and Nursing Assessment Protocols, because Metropolitan Detention conducted no "annual skills testing" or "clinical performance enhancement reviews" of its RNs. Tanner counters that the Accreditation Report's findings are public records under rule 803(8). See Response at 12. However, Tanner has not established a foundation for the NCCHC Accreditation Report's admissibility under the public records exception. See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)("The proponent of the document must also lay this foundation for its admission."). Drawing all inferences in Tanner's favor, the Court concludes Tanner can establish this foundation -- that the NCCHC's Accreditation Committee issued the report under a legal duty to do so -- with evidence admissible at trial. Madrid recognized the report in question and discussed that it became an exhibit to the 2018 contract. See Madrid Depo. at 39:4-42:3 (stating that Madrid provided a copy of the most recent NCCHC Accreditation Report, which became part of Addendum Number 2 to the RFP, and that, in turn, became an exhibit to the 2018 contract). Dr. McMurray discussed "occasionally" working to adapt to NCCHC accreditation findings and bring Metropolitan Detention into compliance. See McMurray Depo. at 259:1-21. The Correct Care Defendants point to no "portions of the record upon which [they] rel[y]," in purporting to dispute the text's fact. D.N.M.LR-Civ. 56.1(b). The Court therefore deems the text's fact undisputed and will discuss its relevancy in the Analysis. See D.N.M.LR-Civ. 56.1(b).

Bernalillo County's contract with Correct Care includes a staffing plan in which Correct Care will maintain an on-site medical director, two full-time physicians, two full-time mid-level providers, and ten RNs. See Response ¶ Q, at 30 (citing Chavez Depo. at 106:24-110:16; Correct Care Staffing Pattern, at 118.[202] In September, 2016, Bernalillo County's contract with Correct Care was amended to reduce funding levels for mid-level providers and for RNs, reducing the number of mid-level providers from two full-time positions to one, and the number of medical RNs from ten full-time positions to eight, while the number of full-time physician positions remained at two. See Response ¶ Q, at 29 (stating this fact)(citing Deposition of Virginia Chavez at 114:17-117:25 (taken March 26, 2019), filed June 3, 2019 (Doc. 286-7)("Chavez Depo.")).[203]

---

[202] The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state that "Bernalillo County's contract with CCS, the County's desired maximum staffing levels, and the number of healthcare providers on-site at different times are immaterial to what the individual CCS Defendants did during Plaintiff's October 2016 incarceration." Reply ¶ 8, at 13. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Court concludes that the record to which Tanner cites supports the text's fact. See Chavez Depo. at 106:24-110:16; Correct Care Staffing Pattern at 118.

[203] The Correct Care Defendants do not state whether they admit or dispute the text's fact, but state that "Bernalillo County's contract with CCS, the County's desired maximum staffing levels, and the number of healthcare providers on-site at different times are immaterial to what the individual CCS Defendants did during Plaintiff's October 2016 incarceration." Reply ¶ 8, at 13. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The portions of the record to which Tanner cites support the text's fact. See Chavez Depo. at 114:17-117:25 (stating that there was a reduction from two full-time employees to one and ten full-time RNs to eight).

Nonetheless, there remained periodic vacancies in the physician positions, including at the time Tanner was incarcerated. See Response ¶¶ Q-R, at 29-30 (stating this fact)(citing Chavez Depo. at 114:17-117:25).[204]

Finally, Dr. Robert Greifinger, an expert appointed by the Honorable James A. Parker, United States District Judge for the District of New Mexico, in the McLendon, et al. v. City of Albuquerque, et al., No. CV 95-00024 JAP, litigation, issued a report in April, 2016, detailing his findings from a comprehensive investigation into the quality of medical care at Metropolitan Detention. See Response ¶ U, at 31-32 (asserting this fact); McMurray Depo. at 250:18-251:6.[205]

---

[204] The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state that "what the Bernalillo County-CCS contract 'required' or its 'requirements' are mere arguments of counsel the Court may ignore." Reply ¶ Q, at 14. However, the Court concludes the record supports the fact that there were vacancies in Correct Care's physician positions at MDC in the fall of 2016. See Chavez Depo. at 114:17-117:25 (stating that Correct Care "had vacancies" in its physician positions). Tanner also proposes as fact that "the medical facility at MDC was dangerously understaffed at the time of Ms. Tanner's incarceration there in October 2016." Response ¶ Q, at 29-30. The Court does not accept this statement as fact, as "dangerously understaffed" is a characterization, and not a fact. Tanner also proposes as fact that "CCS was not meeting the staffing plan required under the contract" when its physician positions were not fully staffed in the fall of 2016. Response ¶ R, at 30. The Correct Care Defendants counter that the Court "should give no weight to what Plaintiff characterized as what is 'permitted' and what is 'required' under the Bernalillo County-CCS contract, as these characterizations are arguments of counsel, not summary judgment evidence." Reply ¶ R, at 14. The Contract, which the Court deems authenticated, however, states on its face that it incorporates by reference the RFP, which refers to the contracted-for physician positions as "requirements." RFP at 41. The Correct Care Defendants point to no "portions of the record upon which [they] rel[y]" in purporting to dispute the text's fact. D.N.M.LR-Civ. 56.1(b). The Court therefore deems the text's fact undisputed and will discuss its relevancy in the Analysis. See D.N.M.LR-Civ. 56.1(b).

[205] The Correct Care Defendants do not specifically state whether they admit or dispute the text's fact, but state:

- 164 -

The opinions of the court-appointed expert in <u>Mclendon, et al. v. City of Albuquerque, et al.</u>, CIV 95-24 JP/KBM, about quality improvement issues at MDC earlier in 2016 are immaterial to whether the three CCS Defendant whose Motion is at bar delivered constitutionally adequate medical care to Plaintiff on October 16-17, 2016.

Reply ¶ U, at 16-17. A materiality issue is not a factual dispute. The Court will address materiality in this opinion's Analysis section. <u>See</u> <u>SEC v. Goldstone</u>, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The Correct Care Defendants continue, arguing that "Dr. Robert Greifinger is not an expert witness in the case at bar, so his opinions are inadmissible and his concerns about CCS quality improvement are irrelevant. Fed. R. Evid. 402." Reply ¶ U at 17. Rule 402 provides, in part, that "[i]rrelevant evidence is not admissible." "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." <u>United States v. Gutierrez–Castro</u>, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401). Tanner asserts that Dr. Greifinger's report provides evidence of systemic deficiencies at Metropolitan Detention, which would tend to show the Correct Care Defendants' deliberate indifference in this case. <u>See</u> Response at 52. Dr. Greifinger's report could show that the Correct Care Defendants were aware of their common practices' inadequacies regarding their treatment of inmates, which could be relevant to Tanner's deliberate indifference claim. <u>See</u> <u>Response</u> at 53 (arguing that the reports "identified specific issues which increase the risk of serious harm to inmates such as Plaintiff Tanner during the time period she was incarcerated at MDC in October 2016").

Nonetheless, the question remains whether Dr. Greifinger's report is admissible. Tanner requests the Court take judicial notice of the report. <u>See</u> Surreply at 9 (citing <u>Southeast Clinical Nutrition Ctrs., Inc. v. Mayo Found. For Med. Educ. and Research</u>, 135 F. Supp. 3d 1267, 1270-71 (N.D. Ga. 2013)(Totenburg, J.). Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take judicial notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f). <u>See</u> <u>Leon v. Fedex Ground Package Sys., Inc.</u>, 163 F. Supp. 3d 1050, 1066 (D.N.M. 2016)(Browning, J.). "Adjudicative facts are simply the facts of the particular case." <u>United States v. Wolny</u>, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201). A court has discretion to take judicial notice of such facts, regardless whether requested. <u>See</u> Fed. R. Evid. 201(c). On the other hand, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory. <u>See</u> Fed. R. Evid. 201(d). Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the

Dr. McMurray reviewed Dr. Greifinger's report and was aware of its contents. See Response ¶ U, at 32 (asserting this fact); McMurray Depo. at 260:21-261:23.[206] Dr. McMurray understood the

_____

propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e). See Leon v. Fedex Ground Package Sys., Inc., 163 F.Supp.3d at 1066. Moreover, "a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial." St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979)(citations omitted). See United States v. Sinclair Refining Co., 126 F.2d 827, 830 (10th Cir. 1942)(taking judicial notice of general custom and industry procedure in the summary judgment posture); 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2723, at 408 (3d ed. 1998)("The doctrine of judicial notice applies to motions under Rule 56: thus the court may consider anything in support of or in opposition to summary judgment that it may judicially notice.").

The existence of Dr. Greifinger's report is a fact of public record that is capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned, and is appropriate for judicial notice. The Correct Care Defendants have raised no facts or issues calling the existence of the report, and Dr. McMurray's subsequent reliance on it, into question. The Court thus adopts as undisputed the fact that Dr. Greifinger conducted an investigation into the quality of medical care at Metropolitan Detention. Tanner relies on the report, however, for its conclusions and statements, as well as those statements and conclusions' effect on Dr. McMurray. See Response ¶ U, at 31-32. "Caution must also be taken to avoid admitting evidence, through the use of judicial notice, in contravention of the relevancy, foundation, and hearsay rules." American Prairie Const. Co. v. Hoich, 560 F.3d 780, 797 (8th Cir. 2009). Tanner argues that the report is not hearsay because it is offered for its effect on the listener. See Surreply, at 13. Tanner asserts, however, in Plaintiffs' Response to Sections D, F, and G of CCS Defendants' Omnibus Motions in Limine (Doc. 242), filed June 10, 2019 (Doc. 293), at 16, that she intends to use "records previously reviewed by Dr. Greifinger in the McClendon litigation to prove [her] own claims for damages in this case." Accordingly, laid Tanner has not laid the foundation for a hearsay exclusion or exception that would allow the Court to properly use the report's statements and conclusions for the truth of the matters they assert. See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)("The proponent of the document must also lay this foundation for its admission."). The Court can use, however, the report's statements and conclusions for non-hearsay purposes -- such as the effect of Dr. Greifinger's report on Dr. McMurray and the other Correct Care Defendants.

[206] The Correct Care Defendants do not specifically controvert Tanner's assertion in the Response that Dr. McMurray reviewed the report and was aware of its contents, and the Court finds support for this fact in the record, see McMurray Depo. at 260:21-261:23, so the Court deems

report to conclude, in part, that "the [Correct Care] nurses weren't documenting fully."  Response ¶ U, at 32 (quoting McMurray Depo. at 261:3-11).[207]  Finally, the Court acknowledges the existence of allegations that Luna and Sanchez "engaged in similar acts in [. . .] prior incident[s] at MDC."  Response ¶¶ V-W, at 32-33 (citing Luna Depo. at 7:20-8:2; id. at 206:10-208:24; Sanchez Depo. at 7:4-7:21).[208]

_____

this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[207] The Correct Care Defendants do not specifically controvert Tanner's assertion in the Response that Dr. McMurray was aware of the report's conclusions that the Correct Care nurses needed to improve documentation processes, see McMurray Depo. at 260:21-261:23, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[208] Tanner asserts:

Defendant Luna engaged in similar acts in a prior incident at MDC on May 13, 2015, in which she declined to provide medical care or transport to an inmate and instead sent him from the medical unit back to his cell, where he was found dead a few hours later as a result of obvious serious medical needs which she failed to address.

Response ¶ V, at 32.  The Correct Care Defendants respond:

Plaintiff's unsubstantiated characterization that Nurse Luna "engaged in similar acts in a prior incident at MDC is immaterial to whether Nurse Luna provided constitutionally adequate medical care to Plaintiff on October 16, 2016.  As stated previously, trial courts are obliged not to second-guess healthcare providers' medical judgments in most cases. . . .  In addition, evidence of other, substantially similar acts is inadmissible to prove Plaintiff's claim.  Fed. R. Evid. 404(b)(1).  Plaintiff's unverified complaint in Torres v. Bernalillo County, No. 1:18-cv-00358 JB/LF [Document 26] is not summary judgment evidence.  Fed. R. Civ. P. 56(c)(1)(A).  Lastly, Plaintiff's recitation of facts is incomplete and therefore misleading.  Nurse Luna testified that she was aware she was a defendant

in a civil lawsuit involving a detainee's death but that she has not been deposed yet. . . . Nurse Luna testified about the internal and sheriff's office investigations of the detainee's death and certification requirements that resulted. . . Nurse Luna did not describe the circumstances of the patient's care at all, much less in the lurid terms Plaintiff used.

Reply ¶ V, at 17 (citations omitted). Tanner counters that the Metropolitan Detention report on the alleged incident involving Luna was filed in <u>Torres v. Bd. Of County Commissioners</u>, No. 1:18-cv-00358 JB-LF (D.N.M. filed Jan. 18, 2017), rendering the report a public record. <u>See</u> Surreply at 13. However, the Correct Care Defendants do not lodge a hearsay objection to that report. <u>See</u> Reply ¶ V, at 17. Tanner does not, therefore, specifically counter the Correct Care Defendants' rule 404 argument. Tanner's briefing does not further clarify her proposed use of the alleged prior incident involving Luna. The Court adopts as undisputed the proffered fact that there are allegations that "Luna engaged in similar acts in a prior incident at MDC on May 13, 2015." Reply ¶ U, at 32. The Court may, however, not rely on the evidence in its Analysis section unless is sees there is a proper purpose for the evidence.

Tanner also offers as undisputed fact the allegation:

Defendant Sanchez engaged in similar acts in a prior incident at MDC on October 24, 2012, when she failed to contact a physician and delayed emergency transport of a critically ill inmate in obvious extreme medical distress from a life-threatening infection, instead keeping the inmate in the medical unit for a period of several hours without proper care, causing extensive damage to the inmate's body from the spreading infection during the time she was held there.

Reply ¶ W, at 32-33 (citing Luna Depo. at 7:20-8:2, 206:10-208:24; <u>Torres v. Bd. of Comm'rs of Bernalillo County</u>, No. 1:18-cv-00358 JB-LF, Doc. 28-1 (D.N.M. filed July 24, 2018). The Correct Care Defendants respond:

Plaintiff's unsubstantiated characterization that Nurse Sanchez "engaged in similar acts in a prior incident at MDC" is immaterial to whether Nurse Sanchez provided constitutionally adequate medical care to Plaintiff on October 16, 2016. Again, trial courts are obliged not to second-guess healthcare providers' medical judgments in most cases. . . . In addition, evidence of other, substantially similar acts is inadmissible to prove Plaintiff's claim. Fed. R. Evid. 404(b)(1). Plaintiff's unverified complaint in <u>Kellum v. Bernalillo County, et al.</u>, No. 1:14-CV-00163 RB/CG [Document 153] is not summary judgment evidence. Fed. R. Civ. P. 56(c)(1)(A). One again, Plaintiff's recitation of facts is incomplete and therefore

The Court now turns to the Procedural Background.[209]

<hr/>

misleading. Nurse Sanchez testified that she was previously deposed in connection with another civil lawsuit, and that the same law firm represented her both cases. . . . Nurse Sanchez testified that her employment status did not change because of the previous lawsuit. . . . Nurse Sanchez testified that she did not recall when the previous lawsuit was filed, that she did not recall whether the sheriff's office investigated, that Bernalillo County called her to testify at trial, and that she could not recall whether any policy and procedure changes resulted from the incident. Nurse Sanchez did not describe the circumstances of the patient's care at all, much less in the lurid terms Plaintiff used.

Reply ¶ W, at 17-18 (citing Sanches Depo. at 7:4-8:11; id. at 21:4-21:7. Tanner responds that her proffered fact derives from Sanchez' deposition testimony in Kellum v. Bernalillo County, No. 1:14-cv-00163 RB-CG (D.N.M. filed Jan. 18, 2017). See Surreply at 13. The Correct Care Defendants, however, do not lodge a hearsay objection to that report. See Reply ¶ V, at 17. Tanner does not, therefore, specifically counter the Correct Care Defendants' rule 404 argument. Tanner's briefing does not further clarify her proposed use of the alleged prior incident involving Sanchez. The Court thus adopts as undisputed the proffered fact that there exist allegations that "Sanchez engaged in similar acts in a prior incident at MDC on October 24 2012." Reply ¶ W, at 32. The Court may, however, not rely on the evidence in its Analysis section unless it sees there is a proper use of the evidence.

[209] Tanner asserts additional facts which the Court does not adopt.

First, Tanner proffers as undisputed fact the allegation that "Systemic deficiencies at MDC caused Plaintiffs' damages. Ms. Tanner 'would not have lost [her] pregnancy' if MDC had a 'regularly occurring' OB/GYN clinic on-site or if there was 'easy access' to an OB/GYN." Response ¶ Y, at 33 (quoting Chiang Depo. at 99:3-100:19.) The Correct Care Defendants respond:

> Plaintiff's allegation of "systemic deficiencies" at MDC is immaterial to whether the three individual CCS Defendants whose Motion is at bar delivered constitutionally adequate medical care to Plaintiff in October 2016. Plaintiff's dissatisfaction with the treatment she received is not a constitutional violation. . . . Plaintiff's disagreement with the treatment she received is not a constitutional violation. . . . The Court's place is not to rule on the quality of healthcare outcomes or patient satisfaction.

Reply ¶ X, at 19 (quoting Response ¶ Y, at 33). A materiality issue is not a factual dispute. The Court will address materiality in this opinion's analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.). The

## PROCEDURAL BACKGROUND

Tanner filed her original complaint on August 25, 2017.  <u>See</u> Complaint for Civil Rights Violations, Tort Claims, Statutory Violations, Damages, and Injunctive Relief, filed August 25, 2017 (Doc. 1).  Tanner filed an amended complaint on May 23, 2018.  <u>See</u> Complaint at 1.  In Count I, Tanner alleges that the Correct Care Defendants violated her rights under the Eighth and

---

Court, however, reiterates its conclusions <u>supra</u> nn. 174-176.  Tanner's support for the statement "Ms. Tanner would not have lost [her] pregnancy if MDC had a regularly occurring OB/GYN clinic on-site or if there was easy access to an OB/GYN," Response ¶ Y, at 33, (internal citations and quotation marks omitted), derives from a medical expert's opinions, and thus the statement is not fact, but rather, the expert's conjecture.  <u>See</u> Chiang Depo. at 101:25-102:1 (disavowing the notion that Dr. Chiang's report "expressly states that causal relationship"); <u>id.</u> at 104:5-9 (recognizing "likely" factors).

Second, Tanner alleges that "inadequate staffing also contributed."  Response ¶ Y, at 33 (citing Chiang Decl. at 7).  The Correct Care Defendants respond that Dr. Chiang's expert report is inadmissible hearsay.  <u>See</u> Reply ¶ Y, at 19.  The Court reiterates its conclusions <u>supra</u> n. 176, in which the Court adopts as undisputed the fact that "Dr. Chiang and Dr. Ehrenberg opined that Tanner's baby might have survived if Metropolitan Detention had properly trained nursing staff." <u>See</u> Response ¶ D, at 24 (stating this fact)(citing Chiang Depo. at 100:23-101:2; <u>id.</u> at 104:5-8; Ehrenberg Depo. at 95:16-97:6).  Although the Court may consider Dr. Chiang's report, because each is attached to a sworn expert declaration, <u>see e.g.</u>, <u>Amer. Fed. of Musicians of United States and Canada v. Paramount Pictures Corp.</u>, 903 F.3d 968, 976-77 (9th Cir. 2018),  Dr. Chiang's deposition also provides sufficient support for the text's fact.  <u>See</u> Chiang Depo. at 100:23-101:2; <u>id.</u> at 104:5-8.

Fourteenth Amendments, and in Count II, Tanner alleges that the Correct Care Defendants violated her substantive due process rights under the Fourteenth Amendment.  See Complaint at 22-24.

### 1.    **The Partial MSJ.**

On April 22, 2018, the Correct Care Defendants filed the Partial MSJ, asking the Court to grant summary judgment in their favor on the Complaint's Counts I and II.  See Partial MSJ at 1. The Correct Care Defendants first contend that Count I is facially invalid where it alleges violations under both the Eighth and Fourteenth Amendments, because the court in a District of New Mexico case previously concluded in Kretek v. Board of Commissioners of Luna County, No. CIV 11-0676 RB/GBW, 2013 WL 12039991 (D.N.M. April 29, 2013)(Brack, J.)("Kretek"),[210] that "an inmate held in a detention center pursuant to a probation violation is properly classified as a pretrial detainee," with rights under the Fourteenth Amendment but not under the Eighth Amendment.  Partial MSJ at 2.  The Correct Care Defendants argue that, in light of Chavez v. Board of County Commissioners of Sierra County, 899 F. Supp. 2d 1163, 1185-86 (D.N.M. 2012)(Browning, J.)("Chavez"), a plaintiff must plead the correct constitutional provision underlying his or her § 1983 claim to state a valid claim, and that if the plaintiff pleads two identical constitutional provisions but only one is correct, the claim is invalid on its face, even if the

---

[210]The Correct Care Defendants erroneously state that "This Honorable Court found in *Kretek* . . . ," and the Court notes for clarity that the Honorable Robert C. Brack, now-Senior United States District Judge for the United States District Court for the District of New Mexico decided Kretek, and the Court did not.

protections are the same under both provisions.  See Partial MSJ at 3 (citing Chavez 899 F. Supp. 2d at 1185-86).

The Correct Care Defendants next contend that, even if Tanner's claim is valid as pled, the undisputed facts do not establish a cause of action under either the Eighth or Fourteenth Amendment, because the "undisputed facts support that none of the moving Defendants were deliberately indifferent or committed acts that shocked the conscience when providing care and treatment to Plaintiff."  Partial MSJ at 4.  Third, the Correct Care Defendants contend that, based on the undisputed facts, they are entitled to qualified immunity.  See Partial MSJ at 4.  The Correct Care Defendants argue that a government contractor can assert qualified immunity as a defense despite not being a government employee.  See Partial MSJ at 4.  The Correct Care Defendants conclude, accordingly, that they "are entitled to summary judgment on Counts I and II . . . ." Partial MSJ at 4.

Beginning with Luna, the Correct Care Defendants argue that the undisputed facts fail to establish that she was deliberately indifferent to Tanner's needs, her actions did not rise to the level of shocking the judicial conscience, and, therefore, she is entitled to qualified immunity.  See Partial MSJ at 21.  The Correct Care Defendants contend that Luna saw Tanner twice on October 16, 2016, and that the undisputed facts indicate that, both times, Luna provided Tanner with appropriate medical care and "had no subjective knowledge of any complications or issues with" Tanner's pregnancy.  Partial MSJ at 21.  The Correct Care Defendants argue that Tanner can produce no evidence that Luna acted with deliberate indifference, where Luna evaluated her,

provided Dr. McMurray with full and accurate accountings of Tanner's status, administered tests to evaluate Tanner's and her unborn baby's conditions, and monitored Tanner's and her unborn baby's vital signs. See Partial MSJ at 21-22. The Correct Care Defendants aver that, based on these facts, Luna cannot be held liable even under a gatekeeper theory of liability,[211] and that she

---

[211]The Tenth Circuit explained the gatekeeper theory of liability in Sealock v. Colorado, 218 F.3d 1205 (10th Cir. 2000)("Sealock"):

> The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment. See, e.g., [Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)]. Ordinarily, a medical professional will not be liable for this second kind of deliberate indifference, because he is the person who provides the treatment. If, however, the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he may also be liable for deliberate indifference from denying access to medical care.

Sealock, 218 F.3d at 1211. The Tenth Circuit also clarified that gatekeeper liability only attaches "where the need for additional treatment or referral to a medical specialist is obvious." Self v. Crum, 439 F.3d 1227, 1232 (10th Cir. 2006). Where a medical professional is subjected to gatekeeper liability the Tenth Circuit explained that "in the circumstances of a missed diagnosis or delayed referral, while not subject to a precise formulation," there must be

> direct or circumstantial evidence that can arise in several different contexts: (1) a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral, e.g., a family doctor knows that the patient needs delicate hand surgery requiring a specialist but instead of issuing the referral performs the operation himself; see, e.g., [Oxendine v. Kaplan, 241 F.3d 1272, 1279 (10th Cir. 2001)]; (2) a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition, e.g., a gangrenous hand or a serious laceration; see id.; and (3) a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, e.g., a patient complains

is entitled to qualified immunity, because, if her assessment of Tanner's level of risk was incorrect, that error would "at most give rise to a State law negligence claim and not rise to the level of a constitutional violation." Partial MSJ at 22. The Correct Care Defendants further argue that none of Luna's conduct "rises to the level of shocking the conscience," where at "no point did she deny [Tanner] care or blatantly ignore her needs." Partial MSJ at 23.

Turning to Sanchez, the Correct Care Defendants similarly argue that her actions, while evaluating Tanner twice during the night of October 16-17, 2016, were not deliberately indifferent and did not shock the conscience. See Partial MSJ at 24. The Correct Care Defendants argue that, "[b]ased on Plaintiff's medical records, the report from Nurse Luna, and her personal and timely assessment of Plaintiff, Nurse Sanchez had no reason to suspect that Plaintiff was experiencing a condition that would require an escalation of medical treatment." Partial MSJ at 25. The Correct Care Defendants conclude that Sanchez, like Luna, is entitled to qualified immunity. See Partial MSJ at 25.

The Correct Care Defendants next address Dr. McMurray. See Partial MSJ at 25. The Correct Care Defendants argue that, based on the fact "that there was no indication that Plaintiff had a high-risk pregnancy, she reported that she did not have any issues and that she wanted to

---

of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell. *See*, *e.g.*, [Mata v. Saiz, 427 F.3d 745, 755-59 (10th Cir. 2005)]; *Sealock*, 218 F.3d at 1211-12.

Self v. Crum, 439 F.3d at 1232.

return to her pod," the actions that Dr. McMurray took when he saw Tanner in the Sheltered Housing Unit ("SHU") were not unreasonable. Partial MSJ at 27. The Correct Care Defendants aver that Tanner's anticipated delivery date "was four to five weeks away, she did not appear to be in labor and was not having consistent contractions," so Dr. McMurray had no reason to classify her as "an obstetrical emergency, and saw no medical reason to send [Tanner] out for additional care at that point." Partial MSJ at 27. The Correct Care Defendants argue that Dr. McMurray had no subjective knowledge of any other underlying issue that might affect Tanner's pregnancy and that he made reasonable care decisions given the information that he had. See Partial MSJ at 27. The Correct Care Defendants conclude that Dr. McMurray acted proactively, reasonably, and without recklessness, and therefore is entitled to qualified immunity. See Partial MSJ at 28.

### 2.    **The Response.**

Tanner responded on June 3, 2019, and asks the Court to deny the Partial MSJ. See Response at 1. Tanner argues that the Correct Care Defendants have not satisfied the usual test for conferring qualified immunity on a person who is not a government official and therefore have not borne their burden of pleading the affirmative defense. See Response at 34. Tanner further contends that the Correct Care Defendants "have not met their burden of establishing undisputed material facts which make them eligible to assert a defense of qualified immunity in the first place." Response at 35. Tanner avers that, even where government officials are the individuals asserting qualified immunity, the Court's review of the evidence plays an important role in determining its sufficiency, and whether there are undisputed facts which could provide a basis for

summary judgment.  <u>See</u> Response at 35.  Tanner argues that those determinations "are not subject to review via an interlocutory appeal based on a government official's assertion of a qualified immunity defense," which is limited to purely legal questions.  Response at 35.

Tanner contends that the qualified immunity defense is not available to the Correct Care Defendants, because they are nothing "other than employees of a private company that is in the business of providing medical services to inmates." Response at 36.  In her additional facts, Tanner argues that, in 2016, McMurray, Luna, and Sanchez worked as full-time salaried Correct Care employees, and that none of them had adequate training in obstetrics, pregnancy, or childbirth to adequately treat Tanner.  <u>See</u> Response ¶¶ M-O, at 28-29.  Tanner also contends that Correct Care, during the relevant time,

> was a private company with 100% of its business operations devoted to government contracting for health-care services at jails, prisons, and similar correctional facilities.  The company's jail division was working in about 200 jails in 38 states in 2016.  This is a competitive marketplace for government contracts to provide health-care services to MDC and similar facilities.  In addition to Defendant CCS, there are at least three different companies that regularly bid for such contracts: Centurion, Corizon, and Wexford.

Response ¶ Z, at 33-34 (citations omitted).  Tanner contends that, based on these facts and the evidence which Tanner cites to support them, under <u>Richardson v. McKnight</u>, 521 U.S. 399 (1997)("<u>Richardson</u>"), and its progeny, the Correct Care Defendants "may not avail themselves of a qualified immunity defense."  Response at 36.

Tanner avers that the Tenth Circuit has not decided whether qualified immunity is available to private company employees providing inmates with medical services, but other Courts of

Appeals to address the question "have determined that qualified immunity is *unavailable* under these circumstances." Response at 36 (emphasis in Response). Tanner argues that the courts of appeals that have reached this conclusion have applied <u>Richardson</u>'s precedent and methodology. <u>See</u> Response at 36. Tanner acknowledges the argument that <u>Filarsky v. Delta</u>, 566 U.S. 377 (2012)("<u>Filarsky</u>"), overruled <u>Richardson</u>, but contends that courts have rejected that argument. <u>See</u> Response at 36. Tanner contends that the Court should reject the Correct Care Defendants' suggestion that the Court follow <u>Estate of Lockett v. Fallin</u>, 841 F.3d 1098 (10th Cir. 2016)("<u>Lockett</u>"), because it addresses a situation, unlike the one here, where there is no private market for the services the contractor provided. <u>See</u> Response at 36-37. Tanner argues that the Correct Care Defendants present no evidence analogizing their situation to that of the physician at issue in <u>Lockett</u>, and "they present no other evidence to show that the fact-specific concerns which distinguish *Richardson* from *Filarsky* place them on the *Filarsky* side of the line." Response at 37.

Tanner argues that the Correct Care Defendants' qualified immunity argument has no objective, admissible evidentiary basis, but rather relies on policy arguments which "exemplify the extent to which the doctrine of qualified immunity has become a 'highly manipulable balancing test.'" Response at 37 (quoting <u>United States v. Stevens</u>, 559 U.S. 460, 473 (2010)). Tanner states that she adopts and incorporates by reference her arguments and authorities in response to the Correct Care Defendants' Health Care Defendants' Motion to Stay, filed March 20, 2019 (Doc. 169)("First Motion to Stay"), and Health Care Defendants' Second Motion to Stay, filed

May 1, 2019 (Doc. 245)("Second Motion to Stay"), "which assert that the federal common-law doctrine of qualified immunity has become so conceptually incoherent that it should be abrogated, modified, or deemed not to apply in this case." Response at 38 n.10.  See Plaintiffs' Response to Health Care Defendants' Motion to Stay, filed April 3, 2019 (Doc. 198)("First Motion to Stay Response"); Plaintiffs' Response to "Health Care" Defendants' Second Motion to Stay, filed May 15, 2019 (Doc. 269)("Second Motion to Stay Response"). Tanner contends that Herrera v. Santa Fe Pub. Schs., 41 F. Supp. 3d 1027, 1186-87 (D.N.M. 2014)(Browning, J.)(granting qualified immunity to a private company that provided security services at a public school event), and Marquez v. The Geo Group, Inc., No. CIV 16-1259 JB/SCY, Order, filed March 29, 2018 (Doc. 80)(granting defendant qualified immunity to a self-employed individual contracted to provide mental health counseling to a state-custody inmate), are factually and procedurally distinct, and "the parties therein did not cogently address the weight of authority from multiple circuit courts which better fit the facts of the present case."  Response at 37 n.9.  Tanner contends that the Court should consider that the State of New Mexico has decided not to extend sovereign immunity to private prison operators, and has not extended such immunity to the Correct Care Defendants or to other private prison contractors.  See Response at 38.  Tanner notes that "many district courts" have, in recent years, elected "to provide alternative holdings which conclude that qualified immunity is not available in this scenario but also determine that the doctrine would not apply to the specific facts of the case even if it were available."  Response at 38.  Tanner asks that the Court take a similar approach and hold that the Correct Care Defendants may not assert a

qualified-immunity defense and that, even if they could, that defense would not apply to these facts.  See Response at 38-39.

Tanner next turns to her argument that the Correct Care Defendants are not entitled to summary judgment on the Complaint's Count I.  See Response at 39.  Tanner argues that there is a split in authority regarding "whether or under what circumstances individuals taken into custody on probation violations are treated as inmates or pretrial detainees."  Response at 39 (citing Kellum v. Bernalillo Cty., 250 F. Supp. 3d 846, 850-55 (D.N.M. 2017)(Browning, J.)).  Tanner avers that, because she cannot predict how the Court will rule on that distinction, she pleaded in the alternative, which rule 8(d) of the Federal Rules of Civil Procedure expressly permits.  See Response at 39.  Tanner contends that, because the deliberate indifference standard is the same under either amendment, her alternative pleading does not unfairly prejudice the Correct Care Defendants.  See Response at 39.  Tanner argues that, even assuming she is a pretrial detainee rather than an inmate, the Correct Care Defendants are not entitled to partial summary judgment. See Response at 40.

Tanner next turns to the objective and subjective elements of a deliberate indifference claim.  See Response at 40.  Tanner avers that caselaw clearly establishes that pregnancy and childbirth satisfy the claim's objective element.  See Response at 40.  Tanner contends that the subjective element is also clearly established in cases concerning "'claims by pregnant inmates who experience medical complications while incarcerated.'"  Response at 41 (quoting Black-Polsen v. Blansett, No. CIV 04-0963 MCA/ACT, 2005 WL 8163774, at *7 (D.N.M. June 24,

2005)(Armijo, J.)).  Tanner cites to factually similar examples from caselaw wherein courts have found that a deliberate indifference claim's elements are satisfied and qualified immunity does not apply.  See Response at 41-42 (citing Havard v. Wayne County, 436 F. App'x 451, 455 (6th Cir. 2011); Pool v. Sebastian Cty., 418 F.3d 934, 944-45 (8th Cir. 2005); Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007); Boswell v. Sherburne Cty., 849 F.2d 1117, 1122 (8th Cir. 1988); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984); Herrera v. Valentine, 653 F.2d 1220, 1225 (8th Cir. 1981); Moulton v. DeSue, 966 F. Supp. 2d 1298, 1306 (M.D. Fla. 2012); Doe v. Gustavus, 294 F. Supp. 2d 1003, 1006-10 (E.D. Wis. 2003)).  Tanner argues that the Correct Care Defendants have not met "their initial responsibility of 'identifying' the objective element of a deliberate indifference claim as one on which they seek partial summary judgment," Response at 42 (quoting Fed. R. Civ. P. 56(a), where the Correct Care Defendants present no argument or evidence disputing that Tanner was "in an advanced stage of her pregnancy, or that her pregnancy and its complications presented an objectively serious medical need," Response at 42.  Tanner argues that, without "specific legal authority" or evidence "on third trimester pregnancies or their complications," the Correct Care Defendants cannot overcome the medical evidence, professional standards, and expert opinions to which Tanner cites.  Response at 42.

Tanner notes that two categories of conduct can support a deliberate indifference claim: (i) actual provision of health-care services to a patient in custody suffering from a condition which can be treated while the patient is in custody; and (ii) diagnosis or treatment the patient's condition on-site is not possible because of the staff's lack of equipment or qualifications, so staff takes on

a "gatekeeper" role in determining whether to send the patient off-site for care, typically in situations requiring emergent care. Response at 42-43. Tanner avers that pregnancy can support either claim, because, before labor, a patient may be able to receive care where she is held, but once in labor or experiencing complications, her situation becomes emergent and may require immediate transport to a hospital or off-site facility. See Response at 43. Tanner contends that the Correct Care Defendants acknowledge that a gatekeeper claim can apply either to corrections officers or to medical personnel. See Response at 43. Tanner also contends that the Correct Care Defendants do not assert that any of them were qualified or equipped to deliver babies or to treat obstetrical emergencies, so they were limited to a gatekeeper role. See Response at 43.

Tanner argues that, whether Tanner's pregnancy is categorized under either or both categories of deliberate indifference claims, the Correct Care Defendants focus solely on the claim's subjective element. See Response at 43. Tanner argues that, for the Correct Care Defendants to raise a defense that the difference between what they did and what Tanner wanted them to do is a difference of opinion within a reasonable range of alternatives, both parties "must be qualified and competent enough to reach that opinion," which the Correct Care Defendants are not, where they contend that they were not qualified to perform vaginal or pelvic examinations, or to deliver babies. Response at 43. Even if both providers are qualified to render opinions, deliberate indifference reasonably may be inferred if the adopted opinion is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the

person did not base the decision on such a judgment."  Response at 44 (quoting Petties v. Carter, 836 F.3d 722, 729 (7th Cir. 2016)(en banc)(internal citations and quotation marks omitted)).

Tanner contends that, when a provider "'says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor *did* know.'"  Response at 45 (quoting Petties v. Carter, 836 F.3d at 731).  Tanner contends, for example, that Dr. McMurray's admission that, on October 17, 2016, seeing Tanner's "blood-soaked pad" gave him "enough subjective knowledge to authorize emergency transport to a hospital," supports a reasonable inference that, if any of the Correct Care Defendants knew Tanner was bleeding the previous day, "that fact was enough to give them subjective awareness of the same need for emergency medical transport at that time."  Response at 45.  Tanner urges the Court to recognize the distinction between a "subjective awareness of a *substantial risk of harm* and subjective awareness of a *particular result* of that risk."  Response at 46 (emphasis in Response).  Tanner avers, accordingly, that she need not allege that the Correct Care Defendants knew the particular manner by which injury would occur, that the risk was personal to her, that it came from a single source, or that the officials believed the harm would actually occur -- she must show only that the Correct Care Defendants acted or failed to act despite their knowledge of the substantial risk of harm.  See Response at 46.  Tanner argues that, in determining whether she has proved deliberate indifference, the Court may consider inferences from circumstantial evidence, as well as direct evidence, viewing all evidence in the light most favorable to Tanner and drawing all reasonable inferences in her favor.  See Response at 47.

Tanner contends that some courts reasonably have inferred that deliberate indifference to a serious medical need's subjective element is met where the serious need "would be obvious to a layperson with no medical training." Response at 47 (citing Havard v. Wayne County, 436 F. App'x at 456; Carr v. El Paso Cnty., 757 F. App'x 651, 656 (10th Cir. 2018)(unpublished)). Tanner contends that courts have concluded that pregnancy and childbirth are situations where the medical needs are blatantly obvious and the risks are great. See Response at 47. Tanner argues that the Court reasonably can infer that her medical needs' seriousness was obvious where the officers stationed in her Metropolitan Detention housing unit "thought it serious enough to report the matter . . . and to call [in a] medical emergency" even after Tanner returned to the housing unit from her first medical unit visit in the morning of October 16, 2016. Response at 47-48.

Tanner submits that willful blindness can constitute constructive knowledge with respect to a deliberate indifference claim and that the Correct Care Defendants willfully blinded themselves to Tanner's condition's facts. See Response at 48. Tanner posits that the Correct Care Defendants willfully blinded themselves by: (i) ignoring Tanner's requests for medical assistance, see Response at 48; (ii) not attempting to request Tanner's prenatal records from before her incarceration, see Response at 49; (iii) ignoring deficiencies on Tanner's healthcare charts at Metropolitan Detention, see Response at 50; (iv) ignoring Tanner's follow-up requests for medical attention after she was placed in a SHU segregation cell, ostensibly for monitoring purposes, Response at 50; (v) harboring a subjective bias against inmates as inherently incredible and prone to lying, see Response at 51; (vi) not following established protocols and procedures, see Response

at 51; and (vii) being on notice of constitutional deficiencies in care because of several reports identifying systemic deficiencies at Metropolitan Detention, see Response at 52-53.

Tanner then turns to her argument that the Correct Care Defendants are not entitled to summary judgment on the Complaint's Count II. See Response at 54. Tanner explains that, unlike Count I's deliberate indifference standard, Count II is based on the undue-burden standard applicable to state action infringing "on an expectant mother's fundamental liberty interest in choosing to carry her pregnancy to term and become a parent . . . ." Response at 54. Tanner argues that the Correct Care Defendants do not attack the claims which Tanner makes in Count II, so the Court should deny their motion on that basis alone. See Response at 54. Tanner argues, nevertheless, that, although Tanner's fetus does not constitute a separate person for a § 1983 claim's purposes, the Due Process Clause's substantive component still affords protection to the mother's liberty interest in choosing to carry to term and become a parent. See Response at 55. Tanner contends that, whereas a mother's liberty interest in reproductive choice might conflict with a governmental interest in protecting a fetus' innocent life, there is no such conflict where the mother chooses to carry the pregnancy to term, as Tanner chose. See Response at 55. Tanner frames a mother's choice to carry to term as a clearly established right to procreate and also a fundamental liberty interest which the Fourteenth Amendment protects. See Response at 55.

Tanner highlights the undue burden standard which Planned Parenthood v. Casey, 505 U.S. 833, 876-77 (1992)("Casey"), sets forth and which Tanner posits applies to cases where a woman chooses to continue her pregnancy until birth. See Response at 56. Tanner posits that the undue

burden standard protects the right "'to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.'" Response at 56 (quoting Casey, 505 U.S. at 875 (Casey quoting Eisenstadt v. Baird, 405 U.S. 438, 453 (1972))). Tanner proposes that the undue-burden test asks courts to look to whether the action's purpose or effect "'is to place a substantial obstacle in the path of a woman's choice.'" Response at 56 (quoting Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2309 (2016)). Tanner avers that no Metropolitan Detention regulation existed in 2016 which would have prohibited the Correct Care Defendants from "effecting Plaintiff Tanner's transport to a hospital" and that, in fact, the Correct Care Defendants violated Metropolitan Detention policy by not transporting Tanner. Response at 57. Tanner also contends that courts "clearly recognize that a woman's interest in carrying a viable pregnancy to term and giving birth constitutes such a serious medical need." Response at 57. Tanner concludes that the Correct Care Defendants had no substantial or legitimate state interest in not taking prompt action to help Tanner protect her viable fetus' life and that they unduly burdened her reproductive choice by denying Tanner access to a qualified and properly equipped obstetrical care facility. See Response at 57-58. Tanner requests that the Court deny the Correct Care Defendants partial summary judgment on the federal civil-rights claims which Tanner asserts against them in the Complaint's Counts I and II. See Response at 59. Tanner also asks that the Court "determine that none of the [Correct Care] Defendants may avail themselves of the defense of qualified immunity for the reasons stated above . . . , while also providing an alternative holding that, based on the sufficiency of the evidence," none of the Correct

Care Defendants would be entitled to qualified immunity or otherwise to partial summary judgment even if the qualified immunity defense were available to them. Response at 59.

### 3. **The Reply.**

The Correct Care Defendants filed a Reply. <u>See</u> Reply at 1. In the Reply, the Correct Care Defendants argue that, even in the light most favorable to Tanner, "no action or inaction by these Defendants rises to the level of deliberate indifference or shocking the conscience." Reply at 1. The Correct Care Defendants remark that Tanner's Response "focuses extensively on institutional issues," but that Tanner has asserted no constitutional claims against either Correct Care or Metropolitan Detention, so their alleged conduct has no bearing on the individual Correct Care Defendants. Reply at 2-3. The Correct Care Defendants object to the Response's additional facts A-Z as immaterial, incomplete, and misleading, and lacking the support of admissible evidence. <u>See</u> Reply at 2.

The Correct Care Defendants argue that they have "furnished sufficient facts showing that they are entitled" to assert a qualified immunity defense, considering the Tenth Circuit's "emphasis on the availability of qualified immunity to all individuals carrying out government responsibilities," and the "three enumerated purposes served by qualified immunity . . . ." Reply at 20. First, the Correct Care Defendants argue that Tanner's argument asserting that the Correct Care Defendants face an "Additional Upfront Barrier" to asserting qualified immunity "Is Not Supported By Any Legal Precedent." Reply at 20 (capitalization because text appears in heading). The Correct Care Defendants contend that <u>Weise v. Casper</u>, 507 F.3d 1260, 1263-68 (10th Cir.

2007), to which Tanner cites, is inapposite. <u>See</u> Reply at 20-21. The Correct Care Defendants argue that, in <u>Weise v. Casper</u>, the Tenth Circuit "evaluated whether it had appellate jurisdiction to review a denial of a motion to dismiss on qualified immunity grounds filed in immediate response to the plaintiffs' initial complaint." Reply at 21 (citing <u>Weise v. Casper</u>, 507 F.3d at 1261). The Correct Care Defendants aver that, in <u>Weise v. Casper</u>, the Tenth Circuit held that it lacked jurisdiction to hear the appeal of the district court's denial of a motion to dismiss, because the district court's decision was not on the merits. <u>See</u> Reply at 21.

The Correct Care Defendants contrast <u>Weise v. Casper</u> with Tanner's case, wherein Tanner filed her Complaint naming the individual Correct Care Defendants, trial is set less than one month from the Reply's filing date, and discovery is closed except for limited, identified issues. <u>See</u> Reply at 21. The Correct Care Defendants argue that, therefore, there is "undoubtedly a sufficient record revealing all relevant facts to the individual Defendants' entitlement to qualified immunity," and that Tanner's statement that the Correct Care Defendants have not met their burden lacks support in the caselaw suggesting that such a burden should be imposed. <u>See</u> Reply at 21. The Correct Care Defendants argue that <u>Weise v. Casper</u> stands for the proposition that a court may deny a defendant's motion to dismiss and order limited discovery before ruling on the merits, but that, in this case, there is no dispute about the factual record's sufficiency, so such a denial is not necessary. <u>See</u> Reply at 21-22.

The Correct Care Defendants next turn to the "numerous cases" that they cite "articulating the unique analysis applied to summary judgment decisions involving qualified immunity." Reply

at 22.  The Correct Care Defendants note that, in contrast, Tanner "cites to no authority supporting their urging of this Court to first find that Plaintiff has created a genuine issue of material fact with respect to the qualified immunity claims."  Reply at 22.  The Correct Care Defendants clarify that they are not seeking to automatically shift the burden to Tanner by asserting qualified immunity, but rather that they "merely recognize that the factual record developed in this case supports their assertions of qualified immunity and acknowledge that Supreme Court and Tenth Circuit precedent mandate an initial heavy two-step burden be shifted onto Plaintiff as a result."  Reply at 22.

The Correct Care Defendants address Tanner's argument that the qualified immunity doctrine should be abrogated.  See Reply at 23.  The Correct Care Defendants contend that they rely only upon "clearly established precedent in their assertions of qualified immunity based on prior decisions from the Supreme Court and Tenth Circuit," and that the three articulated purposes of extending qualified immunity to all individuals carrying out government responsibilities urge the Court to conclude that the individual Correct Care Defendants are entitled to qualified immunity and protection from civil suit.  Reply at 23.

The Correct Care Defendants assert that, although they are private parties, they are entitled to assert a qualified immunity defense.  See Reply at 23.  First, the Correct Care Defendants contend that common law immunity principles support their right to assert the defense.  See Reply at 24.  The Correct Care Defendants argue that in Filarsky, the Supreme Court "rejected as 'invalid' the distinction that private individuals employed by the government were precluded from seeking the same qualified immunity that their public employee counterparts performing the same work

were entitled to seek." Reply at 24 (citing <u>Filarsky</u>, 566 U.S. at 384, 389). The Correct Care Defendants argue that the Supreme Court looked to common law at the time of § 1983's enactment and found that individuals serving at the highest levels of government and individuals who worked only on a part time or episodic basis for government, were equally entitled to immunity. <u>See</u> Reply at 24. Based on these findings, the Correct Care Defendants aver, the Supreme Court "unanimously held that a privately-employed attorney acting under color of state law in performing part-time investigative work for the government could seek the same qualified immunity his public-employee counterparts were entitled to seek." Reply at 24-25.

The Correct Care Defendants assert that the Tenth Circuit adopted the reasoning of <u>Filarsky v. Delia</u> in <u>Estate of Lockett</u>, 841 F.3d at 1108, "wherein it found that a privately-employed physician hired to assist government employees in performing an execution at a state penitentiary was entitled to seek qualified immunity in defense of a § 1983 claim." Reply at 25. The Correct Care Defendants argue that the Tenth Circuit concluded that the private physician was performing a traditional state function; that, if a permanent government employee performed his job, they would be entitled to qualified immunity; and that therefore it would make "no sense" to deprive him of the same protection the permanent government employee would enjoy when the common law did not draw distinctions between the two. <u>Estate of Lockett</u>, 841 F.3d at 1109. <u>See</u> Reply at 25.

The Correct Care Defendants argue that they are like the privately employed attorney in <u>Filarsky</u> and like the privately employed physician in <u>Estate of Lockett</u>, because they were hired

to work alongside government employees, including Bernalillo County corrections officers, in a public institution. Reply at 25. The Correct Care Defendants note that, of the 825 employees at Metropolitan Detention, approximately 700 were Bernalillo County employees. See Reply at 25-26 (citing Ruiz Depo. at 13). The Correct Care Defendants also contend that, after Filarsky and Estate of Lockett, there is no dispute that the individual Correct Care Defendants' Bernalillo County-employed counterparts "doing the same work would be entitled to assert qualified immunity." Reply at 26.

Turning to Tanner's argument that Tanner's case is more like Richardson than like Estate of Lockett, the Correct Care Defendants contend that "[t]his assertion misses the mark," ignores the narrowness of the Richardson decision, and ignores the fact that Richardson was not intended to foreclose all private individuals' immunity claims. See Reply at 26. The Correct Care Defendants further argue that the Richardson market forces are not present in this case "despite the presence of other healthcare contractors because the individual Defendants operated under substantial government supervision," where Bernalillo County, not Correct Care, oversaw Metropolitan Detention's operations. Reply at 26-27 (citations omitted). The Correct Care Defendants aver that Metropolitan Detention "reserves the right to review qualifications and hiring decisions within the facility as well as reserves the right to review assignments and initiate reassignments of key personnel." Reply at 27 (citation omitted). The Correct Care Defendants also argue that Correct Care "was required to provide monthly reports" to Metropolitan Detention, and that Metropolitan Detention-designated monitoring and compliance personnel oversaw

Correct Care operations. <u>See</u> Reply at 27. The Correct Care Defendants further note that Correct Care employees, including the individual Correct Care Defendants, "were required to undergo several training sessions unrelated to CCS policies." Reply at 27 (citation omitted).

For the foregoing reasons, the Correct Care Defendants conclude that the <u>Richardson</u> market forces "are much weaker here." Reply at 27. Correct Care, the Correct Care Defendants argue, "was not responsible for administering, managing, and supervising the healthcare delivery system at MDC, including the services provided to Ms. Tanner at all times relevant to this suit." Reply at 27. The Correct Care Defendants argue that, unlike the <u>Richardson</u> prison guards, the individual Correct Care Defendants "acted within a government system, not a private one[,]" when they went to work at Metropolitan Detention, because they "were required to follow government policies and procedures; meet with and provide monthly reports to government supervisors; work with their government supervisors in assigning employee roles and having to incorporate any reassignments mandated by the government; and ultimately seeking guidance in the regularly updated government policies and procedures." Reply at 27-28 (citation omitted).

The Correct Care Defendants conclude that;

> Accordingly, as in <u>Filarsky and Estate of Lockett</u> [sic], general principles of immunity at common law, *e.g.*, the absence of any distinction between public servants and private individuals, or between those working full-time "or on some other basis" for purposes of affording immunity protections from suit, support the right of the individual Defendants to assert qualified immunity in their performance of government function.

Reply at 28.

The Correct Care Defendants next argue that all three purposes underlying qualified immunity support allowing them to assert the defense. See Reply at 28. First, regarding "preventing 'unwarranted timidity' -- 'the most important special government immunity-producing concern,'" Reply at 28 (quoting Richardson, 521 U.S. at 408-09), the Supreme Court found that the timidity concern is less likely present or special when a private company subject to competitive market pressures operates a prison. See Reply at 28. The Correct Care Defendants argue that the Supreme Court explained that a government-run prison, like Metropolitan Detention, is different, because employees are subject to more restrictive institutional rules and regulations limiting their incentives and their supervisors' ability to reward and punish certain behavior. See Reply at 28. The Correct Care Defendants argue that Tanner relies primarily upon cases from the United States Court of Appeals for the Seventh Circuit, which has "adopted a broad interpretation of Richardson and found that its holding equally applies to deny immunity to employees of private corporations working at state-run facilities pursuant to a contract with the state regardless of the level of supervision employed by the government . . . ." Reply at 28 (citations omitted). The Correct Care Defendants aver that other Courts of Appeals, including the United States Court of Appeals for the Tenth Circuit, have instead insisted that each case be analyzed on its own facts. See Reply at 28. The Correct Care Defendants urge that Richardson is controlling only in the context of private employees operating a private jail, and not in the context of private employees working within a government system, and under close government supervision and control. See Reply at 32.

Second, the Correct Care Defendants urge that the purpose of ensuring that the threat of litigation and liability does not deter qualified candidates from entering public service militates in favor of extending them qualified immunity. See Reply at 32. The Correct Care Defendants contend that Luna, Sanchez, and Dr. McMurray "are talented medical professionals who do not solely rely on the government for their livelihood." Reply at 33. Further, the Correct Care Defendants note that the individual Correct Care Defendants "work in close coordination with the county corrections officers," and that denying them the ability to seek the same protection as their public counterparts leaves them holding the bag and facing full liability for actions taken in conjunction with government employees -- exactly what the Correct Care Defendants contend that the Supreme Court in Filarsky feared. Reply at 33. The Correct Care Defendants warn that, absent immunity, "it is very likely that the individual CCS Defendants, as well as any other talented private individuals considering taking a position providing medical care at the MDC, will think twice before doing so." Reply at 33.

Regarding Richardson's third articulated qualified immunity purpose, "preventing the harmful distractions from carrying out the work of government that can often accompany damages suits," the Correct Care Defendants contend that where private individuals, as here, work alongside and in coordination with government employees, protecting that purpose is particularly important. Reply at 34. The Correct Care Defendants contend that, if this case moves forward, it is "highly likely that various government employees in addition to the individually named defendants herein will be required to testify, given their roles in the instant dispute," and that this involvement will

substantially undermine "one of the important reasons immunity is accorded public employees in the first place . . . ." Reply at 34 (citations omitted).

The Correct Care Defendants next argue that the Court should dismiss the Complaint's Count I as invalid and prejudicial to the individual Correct Care Defendants, because it "brings an allegation with the wrong underlying constitutional amendment . . . ." Reply at 34. The Correct Care Defendants argue that Tanner's assertion of a constitutional violation under both the Eighth and Fourteenth Amendments has prejudiced them, because they "have been trying to defend allegations that are based on two separate and different constitutional rights." Reply at 35. The Correct Care Defendants ask the Court to reject Tanner's contention that she pled in the alternative, because "the Court is split on whether she would be designated as a pretrial detainee or prisoner," because the Correct Care Defendants contend that the Court clearly held in Chavez that "an individual being held for a probation violation is a pretrial detainee." Reply at 35. The Correct Care Defendants ask, accordingly, that the Court dismiss Count I as invalid or, in the alternative, dismiss the Eighth Amendment allegations. See Reply at 35.

The Correct Care Defendants then argue that they were not deliberately indifferent to Tanner's medical needs, and that they have "presented evidence and arguments supporting why they lacked the *mens rea* on par with criminal recklessness standard under the deliberate indifference analysis." Reply at 36. The Correct Care Defendants aver that Tanner must show more than negligent diagnosis or treatment, and that, if a medical professional is exercising his or her "considered medical judgment," the subjective component is not satisfied "absent an

*extraordinary* degree of neglect." Spencer v. Abbott, 731 F. App'x 731, 745 (10th Cir. 2017)(unpublished)(alterations in original). See Reply at 36. The Correct Care Defendants argue that Luna, Sanchez, and Dr. McMurray all "exercised their medical judgment in caring for Plaintiff and none can be said to have been in conscious disregard of her complaints," so Tanner "cannot make a showing that these Defendants displayed an extraordinary degree of neglect." Reply at 37.

The Correct Care Defendants argue that Tanner cannot prove deliberate indifference's subjective component with either of her two proposed methods of showing subjective deliberate indifference. See Reply at 38. The Correct Care Defendants state that, when courts decide to impute circumstantial knowledge on a healthcare provider/defendant, they look for context clues, none of which exist here. See Reply at 38. For instance, the Correct Care Defendants note that, in the Seventh Circuit case to which Tanner cites, the Seventh Circuit looked at

> "the existence of documents the doctor regularly consulted which advised against his course of treatment," "evidence that the patient repeatedly complained of enduring pain with no modifications in care," "inexplicable delays or departures from common medical standards," or "the doctor's own testimony that indicates knowledge of necessary treatment he failed to provide."

Reply at 38 (quoting Petties v. Carter, 836 F.3d at 731). The Correct Care Defendants argue that these context clues do not exist here, and that Tanner relies exclusively on her assertions that if any of the Correct Care Defendants knew she was bleeding, "that fact alone was enough to give them subjective awareness of the need for emergency medical transport," and that "performance of a pH test for presence of amniotic fluid proves awareness of the risk of prematurely ruptured membranes." Reply at 38 (citing Response at 45-46). The Correct Care Defendants indicate that

neither assertion suffices to satisfy the deliberate indifference test's subjective component. See Reply at 39. The Correct Care Defendants contend that Tanner has not shown that the Correct Care Defendants "willfully ignored the standard of care with full knowledge that [they] would be prolonging [Tanner's] pain and impeding recovery." Reply at 39.

The Correct Care Defendants then address Tanner's alternate proposed method of proving the deliberate indifference test's subjective component: that "it is enough to show that 'the official acted or failed to act despite his knowledge of a substantial risk of harm.'" Reply at 39 (quoting Gonzalez v. Martinez, 403 F.3d at 1183). The Correct Care Defendants state that the caselaw to which Tanner cites in support of this proposed method of proof is inapposite, because the Correct Care Defendants "were not in a role of policy making and were not decision makers or representatives of MDC or CCS in regard to the determination of how to accommodate pregnant inmates." Reply at 40. The Correct Care Defendants argue that Tanner does not even try to show what historical evidence "could give rise to the individual CCS Defendants' knowledge of such substantial risk." Reply at 40. The Correct Care Defendants further argue that, "to the extent this 'method' relies on inference from circumstantial evidence, it is also insufficient for the same lack of circumstantial 'context clues' argued above." Reply at 40 (internal quotation marks for emphasis and not for quotation).

Regarding Tanner's assertion that the Correct Care Defendants' Motion "contains no discussion of the methods of proof that the Court should apply to determine whether Plaintiff has shown a disputed issue of material fact on this element," Response at 47, the Correct Care

Defendants argue that this contention is "wholly unsupported by any legal authority and indeed

Plaintiff does not cite to any case or rule on this point," Reply at 40. The Correct Care Defendants

aver that they bear no burden to clarify a method of proof regarding the deliberate indifference

test's subjective component. See Reply at 40. In conclusion, the Correct Care Defendants state

that:

> As shown by the evidence presented in Defendants' motion, Nurse Luna, Nurse Sanchez, and Dr. McMurray were not deliberately indifferent to Ms. Tanner's medical needs. Petties [v. Carter, 836 F.3d 722 (7th Cir. 2016)(en banc)] does not support imputing knowledge of a substantial risk of harm to Ms. Tanner's pregnancy that was disregarded by the individual CCS Defendants and neither Layton [v. Board of Cty. Comm'rs of Oklahoma Cty., 512 Fed. Appx. 861 (10th Cir. 2013)] nor Plaintiff's cited prison assault cases apply here where Plaintiff points to no prior instances of insufficient medical care that the individual CCS Defendants were aware of. No jury could reasonably conclude that the individual CCS Defendants' care and treatment of Ms. Tanner showed a "*conscious disregard*" for her medical needs. Heidtke v. Corrections Corp. of America, 489 Fed. App'x 275, 281 (10th Cir. 2012)(unpublished)(emphasis in original).

Reply at 41.

Next, the Correct Care Defendants argue that Tanner's claim of deliberate indifference in

the context of pregnancy and childbirth is not clearly established, because the out-of-circuit cases

to which Tanner cites "present drastically different alleged conduct that factored into the

analysis . . . ." Reply at 41. The Correct Care Defendants contend that the medical care which

Tanner received at Metropolitan Detention does "not rise to the level of conduct in Plaintiff's cited

cases." Reply at 42. Further, the Correct Care Defendants argue that "the Tenth Circuit and

Supreme Court have never found the constitutional right alleged to be violated here to be clearly

established in any such case." Reply at 42.

Turning to Tanner's willful blindness assertion, the Correct Care Defendants aver that precedent does not support that argument, and that the argument ignores the fact that the Correct Care Defendants provided Tanner care on numerous occasions in response to her complaints. See Reply at 42-43. For instance, the Correct Care Defendants note that their Motion's facts indicate that the Correct Care Defendants, on numerous occasions, "directly observ[ed], monitor[ed], provid[ed] medicine, or perform[ed] tests on Ms. Tanner in direct response" to her requests for medical assistance. Reply at 43 (alterations added). The Correct Care Defendants note that their facts include reference to instances in which the Correct Care Defendants provided Tanner with

> prenatal vitamins; a head to toe assessment in the medical unit on October 16, 2016; observation in the medical unit for an additional hour on October 16, 2016 to listen to the fetus' heart rate; responding to a Code 43 for additional pain on October 16, 2016; testing the light pink fluid on Ms. Tanner's sanitary pad for amniotic fluid,

as well as calling "Dr. McMurray who recommended observation in the SHU following the Code 43; an offer from Nurse Sanchez to remain in the SHU due to" Tanner's reported cramping and which Tanner declined; "a visit from Dr. McMurray at Ms. Tanner's cell the morning of October 17, 2016; and immediate EMT response for the Code called on October 17, 2016." Reply at 43 (citing MSJ ¶¶ 12, 19, 21, 22, 24, 25, 26, 31, 33, 36). The Correct Care Defendants remark that the undisputed facts also show that Tanner did not communicate issues with her pregnancy to the med pass nurses, that Tanner expressed no concerns to Sanchez initially during the October 16, 2016, night shift, that Tanner declined continued observation in the SHU on October 16, 2016, that Tanner denied complaints to Dr. McMurray on the morning of October 17, 2016, and that Tanner "did not report to anyone later in the morning on October 17, 2016 that she could not feel

fetal movement . . . ."  Reply at 43 (citing Motion ¶¶ 13, 30, 31, 33-34, 35).  The Correct Care Defendants argue that Tanner's condition did not evince any obvious, underlying risk of harm to Tanner's fetus, and that, considering the foregoing facts, the Correct Care Defendants responded to the concerns which Tanner voiced, and did not consciously disregard her pregnancy, and thus did not evince a culpable state of mind.  See Reply at 43.

Regarding Tanner's argument that the Correct Care Defendants did not request Tanner's prenatal records from before her incarceration, the Correct Care Defendants remark that Tanner told Correct Care personnel about her pregnancy, but did not inform them of any complications, and that, given that at Tanner's initial screening Correct Care staff ordered her prenatal vitamins and pregnancy labs, started a pregnancy diet, and made an appointment for her at an obstetrics clinic, Tanner cannot show that their conduct in not requesting her pre-incarceration records was unlawful.  See Reply at 44.  Regarding Tanner's argument that the individual Correct Care Defendants "displayed subjective bias in not finding Ms. Tanner's complaints credible by thinking she was exaggerating her symptoms," the Correct Care Defendants note that Tanner cites to no in-circuit or Supreme Court precedent in support of her statement, and cites to nothing in the record evincing this alleged subjective bias.  Reply at 44-45.

The Correct Care Defendants also argue that they were not merely gatekeepers in Tanner's treatment and care, because "they were qualified to care for and treat pregnant patients and used their collective medical knowledge and clinical assessment skills while treating Plaintiff."  Reply at 45.  The Correct Care Defendants argue that the facts upon which Tanner relies to support her

gatekeeper theory of liability are premised on Metropolitan Detention's alleged institutional deficiencies, and on the Correct Care Defendants' alleged failure to follow policies and procedures -- both of which the Correct Care Defendants contend are "more properly directed to an institutional claim, which was not asserted by Plaintiff in her First Amended Complaint." Reply at 45. The Correct Care Defendants argue that, because they "used their medical knowledge, skills and assessment techniques to" evaluate Tanner, they were "qualified professionals" and not mere gatekeepers, and they used their professional judgment in their care and treatment of Tanner. Reply at 46-48.

The Correct Care Defendants aver that their alleged failure to follow institutional policies and procedures is circumstantial, because policies and procedures "do not define the medical standard of practice, which must be provided through testimony by a medical expert or elucidate what constitutes deliberate indifference or a violation of substantive due process." Reply at 49. Here, the Correct Care Defendants argue, "the consistent care, observation and interventions provided by the individual CCS Defendants should provide substantially more evidence that they were not deliberately indifferent to" Tanner than their circumstantial alleged failure to follow protocols and procedures. Reply at 49. Additionally, the Correct Care Defendants maintain that alleged deficiencies at Metropolitan Detention are immaterial in a summary judgment motion directed at individual Correct Care Defendants. See Reply at 49-50.

> There is no testimony from Nurse Luna and Nurse Sanchez that they reviewed any reports regarding alleged systemic deficiencies. While Dr. McMurray may have been aware of the report by Dr. Greifinger, there is no evidence that any of the purported issues in the report were directly related to the care and treatment he or

> any of the nurses provided to Plaintiff. At this juncture there are no Federal
> institutional claims. Thus, Plaintiff's backdoor approach to insert these arguments
> and "supporting facts" is improper.

Reply at 50 (internal quotation marks for emphasis and not quotation).

Turning next to Tanner's substantive due process claim, the Correct Care Defendants argue that none of them violated Tanner's right to substantive due process, and that the undue burden standard which Tanner employs is the "wrong standard for substantive due process." Reply at 50. The Correct Care Defendants argue that the correct standard requires Tanner to show that the Defendants' behavior "shocks the conscience." Reply at 50 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998)). The Correct Care Defendants aver that the Tenth Circuit adopted this standard in Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006). See Reply at 50-51. The Correct Care Defendants argue that the shocks-the-conscience test is an objective one. See Reply at 51. The Correct Care Defendants argue that, in this case, "there already exists an explicit textual source of constitutional protection against the actions alleged by Plaintiff: that of cruel and unusual punishment, which requires Plaintiff to meet a deliberate indifference standard." Reply at 51. The Correct Care Defendants caution the Court that Tanner requests that the Court "monumental[ly]" expand the substantive due process concept. Reply at 51-52. The Correct Care Defendants argue that Tanner's undue-burden argument is inapposite, because the undue-burden cases "challenged the constitutionality of legislation, rather than specific actions by the executive branch." Reply at 52-53. The Correct Care Defendants aver that both the Supreme Court and the Tenth Circuit have recognized the importance of this distinction. See Reply at 53-54 (citing Collins v. Harker Heights, 503 U.S. 115, 128 (1992); Dawson v. Bd. of

Cty. Comm'rs of Jefferson Cty., 732 F. App'x 624 (10th Cir. 2018)(unpublished)).   For the foregoing reasons, the Correct Care Defendants ask that the Court grant summary judgment in favor of the individual Correct Care Defendants as to Counts I and II.  See Reply at 54.

**4.      The Hearing.**

The Court held a hearing on this Motion and other motions on May 13, 2019.  See Tr. at 2:3-5 (Court).   After addressing other motions, which the Court does not discuss in this Memorandum Opinion and Order, the Court asked what other motions were currently pending. See Tr. at 25:7-8 (Court).  Tanner stated that she was not sure private contractors have qualified immunity available to them as a defense and that, even if they could assert that defense, the law is not clearly established in this area.  See Tr. at 63:3-11 (Leonard).  Tanner further stated that, under Richardson, "a private entity who chooses, for business reasons, in effect, to engage in certain Government activities, like running a prison," is not entitled to qualified immunity, "because the competitive market pressures, in part," distinguish that entity "from a traditional Government actor."   Tr. at 141:13-20 (Harrison).   Tanner stated that, in Richardson, the Supreme Court considered: (i) whether it was a large multistate private management firm; (ii) whether it was organized for profit; (iii) whethere its governmental contract expires; (iv) whether there were competing firms; (v) whether there was higher pay and extra benefits to offset employee liability; and (vi) whether they had an option to decline the government contract.  See Tr. at 141:21-142:6 (Harrison).  Tanner also argued that the Court may consider several financial factors in determining whether a private contractor is entitled to assert a qualified defense, but that Tanner needs access

to Correct Care's financial records to address that argument.  See Tr. at 142:10-17 (Harrison).  The parties did not extensively argue the Motion at the hearing, but the Court stated that it "would make sense for me to decide" it before turning to the other motions.  Tr. at 62:17-18 (Court).

**5.      The Surreply**

Tanner filed a surreply.  See Surreply at 1.  Tanner notes at the outset that the Surreply focuses on the admissibility and materiality of evidence already in the record rather than on proffering more facts that may delay the Court's opinion.  See Surreply at 1.  Tanner first argues that the Correct Care Defendants submit new evidence for the first time in the Reply in contravention of Local Rule 56.1(b), and so this new evidence cannot provide a basis for granting partial summary judgment in the Correct Care Defendants' favor.  See Surreply at 2.  Tanner asserts that the Correct Care Defendants submitted nineteen new exhibits with their Reply, but only cited to portions of the first ten of those exhibits in the lettered paragraphs and that other portions of those exhibits appear for the first time in the argument section.  See Surreply at 2.  Tanner argues that the Correct Care Defendants "attempt to transform their reply brief into a whole new motion" which does not comply with the Court's scheduling orders or Local Rule 56.1.  Surreply at 2.  Tanner also argues that the addition of new exhibits violates rule 56 procedure which allows Tanner, as non-movant, a fair opportunity to respond to evidence on which the initial MSJ is based.  See Surreply at 2.

Tanner then argues that, in addition to violating rule 56, the Correct Care Defendants' use of new facts in the Reply just creates more disputed issues of fact, rather than showing, as a Rule

56 movant must, the absence of genuine disputes of material facts.  See Surreply at 2, (citing Fed. R. Civ. P. 56(a)).  Tanner argues that none of the Correct Care Defendants' new exhibits afford any basis for doubting the admissibility of the evidence which Tanner submits in the Response. See Surreply at 3.

Tanner then turns to her exhibits' admissibility, and rebuts what she calls Correct Care Defendants' "boilerplate objections to the authenticity and admissibility of some of the exhibits" submitted in the Response.  Surreply at 4.  Tanner argues instead that the Response's material evidence can be presented in an admissible form at trial.  See Surreply at 4.  Tanner notes that rule 56(c) only allows admissibility objections when "the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence."  Surreply at 4, (citing Fed. R. Civ. Proc. 56(c)(2) (emphasis in Surreply)).

Tanner asserts that the Court must consider at the summary-judgment stage the exhibits which she submits with the Response.  See Surreply at 4.  Tanner argues that much of the Correct Care Defendants' evidentiary arguments ignore the 2010 amendments to rule 56.  See Surreply at 5.  Tanner argues that the 2010 amendments render the Response exhibits proper for consideration at the summary-judgment stage, because they are all "*capable* of being 'presented in a form that would be admissible in evidence' at trial."  Surreply at 7 (quoting Maurer v. Independence Town, 870 F.3d 380, 384 (5th Cir. 2017))(emphasis in Surreply).  First, Tanner disputes the Correct Care Defendants' form objections to Tanner's declaration.  Surreply at 5.  Tanner notes that "'28 U.S.C. § 1746 allows a written unsworn declaration . . . subscribed in proper form as true under penalty

- 204 -

of perjury to substitute for an affidavit.'" Surreply at 5 (quoting Fed. R. Civ. Proc. 56(c) Advisory Committee's Notes). Tanner then counters the Correct Care Defendants' hearsay objections to Tanner's declaration, asserting that many of those objections refer to statements which Tanner attributes to the Defendants as party opponents. See Surreply at 6 (citing Fed. R. Evid. 801(d)(2)). Next, Tanner argues that Court must consider the video and documentary evidence which she submits with the Response as they are all readily authenticated under the rule 56(c) standard. See Surreply at 6-7. Tanner cites to the Court's opinion in Lopez v. Delta Machinery Corp., 312 F. Supp. 3d 1115, 1154 (D.N.M. 2018)(Browning, J.), for the proposition that "'authentication is not a high threshold,' especially when, as here, the party raising the objection presents 'no evidence to questions' the documents' 'genuineness." Surreply at 8 (quoting Lopez v. Delta Machinery Corp., 312 F. Supp. 3d at 1154). Tanner argues that the Correct Care Defendants give no such evidence, and further notes that all of the Response exhibits are either "authentic *per se* because they appear on a Defendant's letterhead and were produced in discovery," or authenticating testimony accompanies the exhibits. Surreply at 9-10, (citing Law Co. v. Mohawk Const. and Supply Co., 577 F.3d 1164, 1170 (10th Cir. 2009)).

Having allegedly established admissibility for summary judgment purposes, Tanner then argues that the Response evidence is material and creates disputed issues of fact precluding summary judgment. See Surreply at 13. In the interest of allowing a timely disposition of the MSJ, Tanner focuses "the remainder of this surreply on identifying the false premises underlying [the Correct Care Defendants'] new arguments about materiality." Surreply at 14. Tanner

contends that one such false premises is the assertion that "each fact can be considered in isolation from the rest."  Surreply at 14.  Tanner analogizes to <u>United States v. Arvizu</u>, 534 U.S. 266, 274-75 (2002), a suppression case, and argues that all facts must be "'taken together' and 'considered under the totality of the circumstances.'"  Surreply at 14.

In this vein, Tanner turns to the deliberate indifference claim and quotes Justice Scalia's observation that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone . . . [,] when they have a mutual enforcing effect that produces the deprivation of a single, identifiable need."  Surreply at 15 (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 304 (1991)).  Tanner then counters the Correct Care Defendants' assertion that their care amounted to mere medical negligence:

> Even if a single interaction between an inmate and medical staff may establish nothing more than ordinary negligence when viewed in isolation, the Tenth Circuit still considers the context provided by the inmate's subsequent interactions with medical staff or requests for medical attention when drawing a reasonable inference of deliberate indifference.

Surreply at 15 (citing <u>Blackmon v. Sutton</u>, 734 F.3d 1237, 1245-46 (10th Cir. 2013)).  In this way, Tanner directs the Court to look beyond each individual interaction between Tanner and the Correct Care Defendants, and toward "the institutional context in which the [Correct Care] Defendants' [sic] operated."  Surreply at 16.

Tanner next argues that the Correct Care Defendants' Reply mischaracterizes the incident as a "mere disagreement between the parties about when to examine . . . Tanner or send her to the hospital."  Surreply at 16.  Tanner contends that "mere disagreement" cannot be used to

characterize a delay in the provision of qualified medical care when that delay causes substantial injury to an inmate. Surreply at 16. Tanner thus analogizes the delay in this case to the denial of care in Blackmon v. Sutton, 734 F.3d 1237 (10th Cir. 2013), and Oxendine v. Kaplan, 241 F.3d 1272 (10th Cir. 2001), neither of which "required factually identical precedent from the Supreme Court or the Tenth Circuit." Surreply at 15. Instead, "'denial of meaningful access to care and the delay in doing so,' is 'enough to suggest conscious disregard of a substantial risk of serious harm.'" Surreply at 17 (citing Blackmon v. Sutton, 734 F.3d at 1244-45). On this point, Tanner distinguishes Kerns v. Bader, 633 F.3d 1173 (10th Cir. 2011), by noting that Blackmon v. Sutton was decided more recently despite Kerns v. Bader's use of a more stringent test. Surreply at 18. Tanner notes that the "test for deliberate indifference articulated in Estelle [v. Gamble, 429 U.S. 97, 104 (1976)] and Farmer [v. Brennan, 511 U.S. 825, 828 (1994)] requires substantial, serious harm by definition and applies to consistently recurring fact patterns in the controlled environment of a prison or detention facility," which placed the Correct Care Defendants on notice of Tanner's constitutional rights. Surreply at 18. Tanner thus argues that the deliberate indifference claim in Count I of the Amended Complaint is "clearly established, regardless of whether the court considers her to be an inmate or a pretrial detainee." Surreply at 18.

Tanner then turns to argue against the Correct Care Defendants' entitlement to qualified immunity, which Tanner describes as "another false premise." Surreply at 18. Tanner notes that the Partial MSJ "contained a single paragraph of argument and no statements of fact regarding their assertion that they may avail themselves of the defense of qualified immunity despite being

private employees of a government contractor," while Tanner's Response "provided over three pages of argument citing extensive authority, as well as four statements of additional facts to show" that the Correct Care Defendants are not entitled to a qualified immunity defense. Surreply at 19 (citations omitted). Tanner notes with disapproval that the Correct Care Defendants elected to "raise a whole new set of arguments about privatizing the doctrine of qualified immunity" for the first time in the Reply. Surreply at 19. Tanner argues that the Correct Care Defendants add ten new exhibits in the Reply in contravention of rule 56 procedure, because they raised a new "fact specific" qualified immunity argument. Surreply at 19. Tanner agrees that "persons who are not government officials must show specific, material facts which establish they are entitled to assert the defense of qualified immunity," but argues that the Correct Care Defendants nonetheless fail to comply with D.N.M.LR-Civ. 56.1's requirement of specific enumeration. Surreply at 19. Tanner posits that such failure means that the Correct Care Defendants have "waived any fact-specific arguments" necessary for a qualified immunity defense. Surreply at 19-20. On this point, Tanner cites to <u>Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.</u>, 413 F.3d 1163, 1168 (10th Cir. 2005), for the proposition that the Court may "declin[e] to consider fact-specific arguments for privatizing qualified immunity that were not timely raised in a motion for summary judgment."[212] Surreply at 20.

---

[212] The Court does not see how <u>Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.</u> supports this contention. <u>Rosewood</u> involves, in small part, the Tenth Circuit's refusal to consider arguments that were not raised before the district court, 413 F.3d at 1167-68, rather than a district court's refusal to "consider fact-specific arguments for privatizing qualified immunity that were not timely raised in a motion for summary judgment." Surreply at 20.

Tanner argues that, even if the Court considers the Correct Care Defendants' new, unnumbered factual allegations and exhibits, "those facts are neither undisputed nor specific enough to place [the Correct Care Defendants] in the same category as the private contractors at issue in Filarsky v. Delia, 566 U.S. 377 (2012), or Estate of Lockett v. Fallin, 841 F.3d 1098 (10th Cir. 2016)." Surreply at 20. Instead, Tanner views the Correct Care Defendants' factual allegations as falling into three categories: (i) that the Correct Care Defendants occasionally worked closely with corrections officers; (ii) that Correct Care's contract with Bernalillo County allowed Bernalillo County to monitor and enforce its terms; and (iii) that the Correct Care Defendants all held other jobs before or after their employment with Correct Care. See Surreply at 20. Tanner asserts that "none of these generic factual allegations are sufficient to meet the requirements for a government contractor or its employees to avail themselves of a qualified immunity defense." Surreply at 20.

First, whether a private employee of a government contractor worked elsewhere before or after becoming that contractor's employee is too generic an inquiry to provide a "workable, objective standard for deciding which private employees may avail themselves of qualified immunity," according to Tanner. Surreply at 20. Instead, Tanner points to the Filarsky inquiry whether there are historical, common-law precedents affording immunity to similar parties. Surreply at 20 (citing Filarksy, 566 U.S. at 393-94). Tanner defines the Filarksy defendants as "private individuals who contracted *directly* with the government to perform a particular work assignment in the private sector," and argues that none of the Correct Care Defendants meet that

description.  Surreply at 20 (emphasis in Surreply).  Second, Tanner notes that all government contracts entail some government supervision of the contractor, and that such supervision often involves government officials working with the contractor's employees.  Surreply at 21.  Tanner cites to Richardson, 521 U.S. at 410, and Rosewood, 413 F.3d at 1169, both of which denied qualified immunity to private contractors despite government supervision.  See Surreply at 21.

Tanner urges the Court, instead of relying on what Tanner calls the Correct Care Defendants' "freewheeling policy arguments," to focus on whether the Correct Care Defendants have "first answered the historical question of whether immunity existed at common law." Surreply at 21.  Tanner quotes McCullum v. Tepe, 693 F.3d 696, 704 (6th Cir. 2012), which held that "there was no common-law tradition of immunity for a private doctor working for a public institution at the time Congress passed § 1983."  Surreply at 21.  Tanner then posits that the doctor from the television series "Gunsmoke," which the Court posed as a hypothetical at the June 26th, 2019, hearing, would not be immune under the common law.  Surreply at 21-22.  According to Tanner, the inquiry into common-law traditions is intended to foreclose the courts from engaging in "the type of generic, freewheeling policy arguments" the Correct Care Defendants assert in their Reply.  Surreply at 22. As support for this position, Tanner cites, among others, to Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017), in which Justice Thomas notes that federal courts "have previously disclaimed the power to make" "freewheeling policy choice[s]."  Surreply at 22.  Tanner thus argues that the Court should reject the Correct Care Defendants' policy arguments and instead solely focus on the historical common-law analogues.  See Surreply at 22.

Tanner next turns to her Fourteenth Amendment claim that the Correct Care Defendants unduly burdened the exercise of her fundamental right to carry her pregnancy to term and give birth. <u>See</u> Surreply at 22. Tanner maintains that the Correct Care Defendants "attempt to sidestep" this claim by "raising the new argument that the 'undue burden' test only applies when an expectant mother challenges legislative action and cannot apply when she instead challenges executive action." Surreply at 23. Tanner disputes the Correct Care Defendants' characterization of Tenth Circuit law on this point. <u>See</u> Surreply at 23. Tanner posits that other Tenth Circuit panels reject <u>Dawson v. Bd. of Cty. Comm'rs of Jefferson Cty,</u> 732 Fed. App'x. 624, on which the Correct Care Defendants rely to assert the legislative-executive distinction, and which is, besides, an unpublished opinion. <u>See</u> Surreply at 23. Nor does Tanner agree that the proper inquiry for executive action under an undue burden claim is whether the action shocks the conscience. <u>See</u> Surreply at 23. Tanner relies on <u>Kingsley v. Henderson,</u> 135 S. Ct. 2466, 2473-74 (2015), for this point. <u>See</u> Surreply at 23. <u>Kingsley v. Henderson</u> held that "a pretrial detainee can establish a due-process violation by 'providing only objective evidence that the challenged governmental action is not rationally related to a legitimate government objective or that it is excessive in relation to that purpose.'" <u>Colbruno v. Kessler</u>, No. 18-1056, ___ F.3d ___, 2019 WL 2751434, at *4 n.3 (10th Cir. July 2, 2019)(quoting <u>Kingsley</u>, 135 S. Ct. at 2473-74). Tanner notes that the Correct Care Defendants' shock-the-conscience argument relies on the concurring opinion of the Honorable Timothy Tymkovich, Chief Judge of the Tenth Circuit, in <u>Dawson v. Bd. of Cty. Comm'rs of Jefferson Cty</u>, 732 Fed. App'x. 624. Tanner asserts, however, that Chief Judge

Tymkovich acknowledged this test "has not been consistently followed by the Supreme Court, other circuits, or even the Tenth Circuit itself." Surreply at 23-24 (citing Dawson v. Bd. Of Cty Comm'rs of Jefferson Cty, 732 Fed. App'x. at 635-36).

Instead, Tanner urges the Court to apply the undue-burden test to executive action, and cites an Eighth Circuit decision, a published district court opinion, and two unpublished district court opinions involving reproductive choice to support this point. See Surreply at 24 (citing Planned Parenthood of Greater Iowa, Inc. v. Atchison, 126 F.3d 1042, 1048 (8th Cir. 1997); Planned Parenthood of Northern New England v. City of Manchester, No. CIV A.01-83, 2001 WL 531537, at *2 (D.N.H. April. 27, 2001)(McAuliffe, J.); Roe v. Leis, No. CIV A.00-651, 2001 WL 1842459, at *3 (S.D. Ohio Jan. 10, 2001)(Dlott, J.); Assoc. in Obstetrics & Gynecology v. Upper Merion Tp., 270 F. Supp. 2d 633, 654 (E.D. Pa. 2003)(Baylson, J.)). Tanner argues that these cases show that the "standard of judicial review for substantive due process challenges to executive action is not limited to a rigid distinction between executive versus legislative action, and the test for what shocks the conscience is subject to variation depending on context." Surreply at 24. Tanner argues, therefore, that there is no legal barrier that prevents the Court from applying the undue burden standard here. See Surreply at 24. Tanner argues that, judged under this standard, the Correct Care Defendants "have not provided any reason to dispute Plaintiffs' evidence that they violated this standard." Surreply at 24. For the foregoing reasons, Tanner requests that the Court deny the Correct Care Defendants summary judgment.

## LAW REGARDING STATING AFFIRMATIVE DEFENSES

Rule 8(c) of the Federal Rules of Civil Procedure provides:

> **(c) Affirmative Defenses.**
> **(1) *In General.*** In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:
> - accord and satisfaction;
> - arbitration and award;
> - assumption of risk;
> - contributory negligence;
> - duress;
> - estoppel;
> - failure of consideration;
> - fraud;
> - illegality;
> - injury by fellow servant;
> - laches;
> - license;
> - payment;
> - release;
> - res judicata;
> - statute of frauds;
> - statute of limitations; and
> - waiver.
>
> **(2) *Mistaken Designation.*** If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so.

Fed. R. Civ. P. 8(c). "[A] responsive pleading must set forth certain enumerated substantive defenses as well as 'any other matter constituting an avoidance or affirmative defense.'" 5 Charles A. Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1270, at 557-58 (3d ed. 2004)(quoting a prior version of rule 8(c)). Modeled after the English and New York rules in force when the Federal Rules of Civil Procedure first were drafted, <u>see</u> Judicature Act (The Annual

Practice, 1937) O.19, r. 15; N.Y.C.P.A. (1937) § 242, rule 8(c) makes no attempt to define the concept of affirmative defense. Instead, it obligates defendants to plead affirmatively any of nineteen defenses that rule 8(c)(1) lists that the defendant wishes to assert. See Fed. R. Civ. P. 8(c). If the district court or jury hearing a case accepts the defendant's affirmative defense, the defense defeats the plaintiff's claim. See Rural Water Dist. No. 2 v. City of Glenpool, 698 F.3d 1270, 1274 (10th Cir. 2012)("[O]nce the court's jurisdiction has been properly invoked in the plaintiff's complaint, the assertion of such a defense is relevant only to whether the plaintiff can make out a successful claim for relief, and not to whether the court has original jurisdiction over the claim itself." (internal quotation marks omitted)(quoting S. New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 132 (2d Cir. 2010))); 5 Wright & Miller, supra, § 1270, at 561. The burden of proof for affirmative defenses generally rests on the defendant. See Saldana-Sanchez v. Lopez-Gerena, 256 F.3d 1, 5 n.8 (1st Cir. 2001); Schleibaum v. Kmart Corp., 153 F.3d 493, 501 (7th Cir. 1998). In stating affirmative defenses, defendants do not need to provide "factual support." Lane v. Page, 272 F.R.D. 581, 594 (D.N.M. 2011)(Browning, J.). In Lane v. Page, the Court "declin[ed] to extend the heightened pleading standard the Supreme Court established in Bell Atlantic v. Twombly[, 550 U.S. 544 (2007)] and Ashcroft v. Iqbal[, 556 U.S. 662 (2009),] to affirmative defenses pled in answers, because the text of the rules, and the functional demands of

claims and defenses, militate against requiring factual specificity in affirmative defenses." <u>Lane v. Page</u>, 272 F.R.D. at 588.[213]

Although affirmative defenses generally must be pled in the defendant's answer, not argued on a motion to dismiss, <u>see</u> Fed. R. Civ. P. 8(c), there are exceptions: (i) where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, <u>see</u> <u>Glover v. Gartman</u>, 899 F. Supp. 2d 1115, 1137-41 (D.N.M. 2012)(Browning, J.)(citing <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009)); <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1249 (10th Cir. 2008)(McConnell, J.)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, <u>see</u> <u>Miller v. Shell Oil Co.</u>, 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule." (citation omitted)). The defense of limitations is the affirmative defense that the complaint's uncontroverted facts will most likely establish. <u>See</u> 5 Wright & Miller, <u>supra</u>, § 1277, at 643. If the complaint sets forth dates that

---

[213]The Court has stated that "[a] reservation of unpled defenses is not a defense of any kind, much less an affirmative one." <u>Lane v. Page</u>, 272 F.R.D. at 601 (internal quotation marks omitted)(quoting <u>Fogel v. Linnemann (In re Mission Bay Ski & Bike, Inc.)</u>, Nos. 07 B 20870, 08 A 55, 2009 WL 2913438, at *5 (Bankr. N.D. Ill. Sept. 9, 2009)). The Court has since retreated from this holding, because it does not want to encourage motions to strike such a defense. <u>See</u> <u>Tavasci v. Cambron</u>, No. CIV 16-0461 JB/LF, 2016 WL 6405896 (D.N.M. Oct. 25, 2016)(Browning, J.). A motion to strike a reservation of defenses does not advance the ball of litigation. Further, "[w]here a defendant reserves unpled defen[s]es yet also agrees to comply with rule 15, . . . a motion to strike may be appropriate." <u>Tavasci v. Cambron</u>, 2016 WL 6405896, at *18.

appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Corp., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).  The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from caselaw in Courts of Appeals, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. City of New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV-08-140-W, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this avoidance practice, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1208-09, 1234-38 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[214] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. See 184 F. Supp. 3d at 1075-78. The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided. See 184 F. Supp. 3d at 1067, 1073, 1075, 1079. The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial." 184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1). Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant

---

[214]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment. See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely

disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S.

at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of

events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty., third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands

customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economu, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 563 U.S. 692, 705 (2011). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it

must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dept. Of Corrections, 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other

courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate,'" Reichle v. Howards, 566 U.S. 658, 664 (2012)(quoting Ashcroft v. al-Kidd, 563 U.S. at 741), although a case directly on point is not required, see Ashcroft v. al-Kidd, 563 U.S. at 741. "The operation of this

standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader, 633 F.3d 1173 (10th Cir. 2011), that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183. Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does

not require a second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING THE EIGHTH AMENDMENT

When a prisoner is incarcerated after being indicted, the Eighth Amendment protects him from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as from the intentional use of excessive force. Farmer v. Brennan, 511 U.S. 825, 828 (1994)(quoting Helling v. McKinney, 509 U.S. 25, 28 (1993)). "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates." Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999). An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The second condition represents the functional application of the deliberate indifference standard. See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component."

(internal quotation marks omitted)(quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003))).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. 25, 36 (1993). Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36 (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36. The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action."). The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'" United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006). Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." United States v. LaVallee, 439 F.3d at 688. See

Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks."). Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury." United States v. LaVallee, 439 F.3d at 688.

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Courts apply this subjective inquiry to determine whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For Eighth Amendment purposes, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

In <u>Graham v. Connor</u>, 490 U.S. 386 (1989), the Supreme Court addressed whether a plaintiff could assert both Eighth Amendment violations and substantive due-process violations in the same suit against government officials alleging that they engaged in physically abusive conduct. <u>See</u> 490 U.S. at 394-95. More specifically, it held that, when a specific constitutional amendment provides "an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," courts should analyze all constitutional claims under that amendment's standards rather than under "the more generalized notion of 'substantive due process.'" 490 U.S. at 395. The Supreme Court gave as an example for this principle "the Eighth Amendment's ban on cruel and unusual punishments," because it is one of the "two primary sources of constitutional protection against physically abusive governmental conduct." 490 U.S. at 395. The Supreme Court later clarified that its holding in <u>Graham v. Connor</u> "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." <u>United States v. Lanier</u>, 520 U.S. 259, 272 n.7 (1997). To illustrate this point, the Supreme Court has recognized that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory. <u>See</u> <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. at 843-44 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . . <u>Graham</u>'s more-specific-provision rule is therefore no bar to respondents' suit.")(quoting U.S. Const. amend. IV).

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments." 83 F.3d at 1202. In determining whether to apply Eighth Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." 83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990)). Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory. See Riddle v. Monragon, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment."). See also Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *30-32.

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1. "[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression. . . . Its purpose was to protect the people from the State[.]'" DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989)(quoting Paratt v. Taylor, 451 U.S. 527, 549 (1981)). Accordingly, the substantive component of the Due Process Clause protects fundamental liberty interests from arbitrary government deprivation. See, e.g., Santosky v. Kramer, 455 U.S. 745, 753 (1982). The Supreme Court of the United States of America and the Tenth Circuit have found the Due Process Clause to protect myriad liberty interests against intrusive legislation and policy, including: familial association, see Trujillo v. Bd. Of County Comm'rs, 768 F.2d 1186, 1188-89 (10th Cir. 1985); privacy, see, e.g., Eisenstadt v. Baird, 405 U.S. 438, 453 (1972); and abortion, see Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 876-77 (1992). In addition to protecting against legislative enactments that infringe on liberty, the Supreme Court has also long held that substantive due process protects against egregious official misconduct. See Rochin v. California, 342 U.S. 165, 210 (1952).

As a consequence of such diverse substantive rights, a variety of tests have arisen to evaluate whether a substantive due process violation has occurred. Compare Kitchen v. Herbert, 755 F.3d 1193, 1218 (10th Cir. 2003)(noting the applicability of the "narrowly tailored /

compelling interest test" to infringements on certain fundamental rights), with Griffin v. Strong, 983 F.2d 1544, 1547 (10th Cir. 1993)(applying a balancing test to identify whether the state's conduct "constituted an undue burden on [the plaintiff's] associational rights"). The established test for challenges to legislation or policy concerning the right to abortion is whether the enactment poses an undue burden on a woman's right to an abortion. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. at 876-77. Alternatively, a cognizable substantive due process violation by an executive official is one that alleges behavior shocks the conscience or falls "at the ends of the tort law's spectrum of culpability." Cty of Sacramento v. Lewis, 523 U.S. at 848 ("Lewis").[215] The undue-burden and compelling-interest tests recognize that policy and legislation often follow from ordered deliberation, while the shocks-the-conscience test recognizes that executive officials are often confronted with exigent situations which required fast responses and afford little opportunity for deliberation. Accordingly, the constitutional test for determining whether executive officials violate a plaintiff's substantive due process rights will vary with the circumstances and the level of urgency with which the executive is confronted. "Rules of due process are not . . . subject to mechanical application in unfamiliar territory." Lewis, 510 U.S. at 850. What "shocks [the conscience] in one environment may not be so patently egregious in

---

[215] This test applies in a variety of contexts, including danger-creation or special-relationship claims, wherein the government may be liable for the acts of third parties. See Johnson ex rel. Estate of Cano v. Holmes, 377 F.Supp.2d 1051 (D.N.M. 2004)(Browning, J.), aff'd in part, rev'd in part, 455 F.3d 1133, (10th Cir. 2006)(affirming that the shock-the-conscience test is the standard for evaluating substantive due process claims alleging the government's failure to remedy the dangers it creates, or when it has a special relationship with the victim, when a third party directly causes the harm).

another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstance before any abuse of power is condemned as conscience shocking." Lewis, 510 U.S. at 850. The Honorable Timothy Tymkovich, then Circuit Judge -- and now Chief Judge -- of the Tenth Circuit, summarizes how courts should adapt the shock-the-conscience test to the particular facts of each case:

> Thus, the cases recognize that common-sense distinctions exist between force in one setting (say, a prison) and force in another (say, a kennel business). The case law also recognizes official conduct may be more egregious in circumstances allowing for deliberation (such as when a person is in custody or under governmental control or supervision) than in circumstances calling for quick decisions (such as police chases or prison disturbances).

Williams v. Berney, 519 F.3d 1216, 1220-21 (10th Cir. 2008). Accordingly, the proper test for gauging whether executive officials violate substantive due process is whether the official's actions shock the court's conscience, and what shocks the conscience will vary with the circumstances according to the degree of emergency the official faces.

1.      **What Shocks the Conscience**.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience. See Lewis, 523 U.S. at 849 ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)(internal quotation marks

omitted)). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.), aff'd, 511 F. App'x 742 (10th Cir. 2013)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively")).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective

action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court found that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. Apr. 30, 2010)(Browning, J.), the plaintiff alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiff's substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking" the plaintiff's son. 716 F. Supp. 2d at 1072-73. The Court concluded that the defendants' conduct did not shock the conscience. See 716 F. Supp. 2d at 1074-75. The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking[216] various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [J.H.' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

---

[216] The parties in Schaefer v. Las Cruces Public School District defined "racked" as being "kicked and/or punched in the testicles." 716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## ANALYSIS

The Court will grant the Correct Care Defendants' Partial MSJ, because the Correct Care Defendants are entitled to qualified immunity on the Complaint's Counts I and II. First, the Court considers whether the Correct Care Defendants may assert a qualified immunity defense as private contractors, and the Court concludes that they can, under <u>Filarsky</u>, assert a qualified immunity defense. Second, the Court concludes that Tanner, as a pretrial detainee, has rights under the Fourteenth Amendment, but not under the Eighth Amendment, so the Court dismisses Tanner's Eighth Amendment claims asserted in Count I. Third, the Court concludes that the undisputed evidence does not establish a genuine question whether the Correct Care Defendants violated Tanner's Fourteenth Amendment Rights asserted in Counts I and II. Fourth, the Court concludes that, even if there were a constitutional violation, the rights in question are not clearly established. Accordingly, the Court grants summary judgment in the Correct Care Defendants' favor as to Counts I and II.

# I.    THE CORRECT CARE DEFENDANTS ARE ELIGIBLE TO ASSERT THE QUALIFIED IMMUNITY DEFENSE.

As a precursory issue, the Court, before addressing the Correct Care Defendants' entitlement to qualified immunity, must determine whether they are eligible to assert the qualified immunity defense at all.  See Weise v. Casper, 507 F.3d 1260, 1264 (10th Cir. 2007)(establishing that, while ordinarily, a district court would first analyze whether a constitutional violation occurred, "this analysis can only proceed after the court determines that a defendant is entitled to assert qualified immunity in the first instance.").   Tanner contends that the Correct Care Defendants may not assert a qualified immunity defense after Richardson, because the Correct Care Defendants are nothing "other than employees of a private company that is in the business of providing medical services to inmates."  Response at 36.  Tanner also argues that, in 2016, McMurray, Luna, and Sanchez worked as full-time salaried Correct Care employees, and that none of them had adequate training in obstetrics, pregnancy, or childbirth to adequately treat Tanner.  See Response ¶¶ M-O, at 28-29.  Further, Tanner contends that Correct Care, during the relevant time,

> was a private company with 100% of its business operations devoted to government contracting for health-care services at jails, prisons, and similar correctional facilities.  The company's jail division was working in about 200 jails in 38 states in 2016.  This is a competitive marketplace for government contracts to provide health-care services to MDC and similar facilities.  In addition to Defendant CCS, there are at least three different companies that regularly bid for such contracts: Centurion, Corizon, and Wexford.

Response ¶ Z, at 33-34 (citations omitted).  Tanner argues that, although the Tenth Circuit has yet to determine whether "'employees of a private company providing medical services to inmates'"

may assert qualified immunity, other Courts of Appeals have determined qualified immunity is not available under these circumstances. Response at 36 (citing <u>Kellum v. Mares</u>, 657 F. App'x 763, 768 n.3 (10th Cir. 2016)(unpublished)). Tanner cites to <u>McCullum v. Tepe</u>, 693 F.3d 696, 704 (6th Cir. 2012)("<u>McCullum</u>"), <u>Petties v. Carter</u>, 836 F.3d 722, 734 (7th Cir. 2016)(en banc)("<u>Petties</u>"), <u>Jensen v. Lane Cty.</u>, 222 F.3d 570, 577-78 (9th Cir. 2000)("<u>Jensen</u>"), and <u>Hinson v. Edmond</u>, 192 F.3d 1342, 1347 (11th Cir. 1999)("<u>Hinson</u>"), as examples of cases applying <u>Richardson</u>'s precedent and methodology to determine that qualified immunity is not available to a private healthcare provider in a prison. Response at 36.

Tanner distinguishes her case from <u>Lockett</u>, a Tenth Circuit case which held "that a private doctor contracted by the government for the specific purpose of executing a prisoner by means of a lethal injection may avail himself of the defense of qualified immunity," because Tanner contends that there is a competitive marketplace for governmental health-care contractors such as Correct Care, whereas no private marketplace for lethal-injection-administering executioners exists. Response at 36-37. Tanner urges the Court to step away from the "free-wheeling policy analysis" upon which Tanner contends the Correct Care Defendants rely, and suggests that the Court, rather than consider the need for deterrence or market factors allowing private contractors to offset risk, look to the fact that the state of New Mexico has not extended immunity to the Correct Care Defendants or to other private prison contractors. Response at 38.

Although the Court agrees with Tanner's assertion that <u>Filarsky</u> did not overrule <u>Richardson</u>, the Court nevertheless notes that <u>Filarsky</u> defines the parameters of <u>Richardson</u>'s

narrow scope and establishes a broad rule conferring immunity on private party § 1983 defendants working for the government.  See Filarsky, 566 U.S. at 379 ("Richardson involved the unusual circumstances of prison guards employed by a private company who worked in a privately run prison facility.  Nothing of the sort is involved . . . in the typical case of an individual hired by the government to assist in carrying out its work."); id. at 393 ("Richardson was a self-consciously 'narrow[]' decision."    (alterations in Filarsky)(quoting Richardson, 521 U.S. at 413)). Accordingly, the Court concludes that Tanner's argument that the Correct Care Defendants may not assert a qualified immunity defense after Richardson, because the Correct Care Defendants are nothing "other than employees of a private company that is in the business of providing medical services to inmates," Response at 36, is not viable after Filarsky.

In Filarsky, the Supreme Court conducted a common-law analysis of the protections afforded to private citizens executing government responsibilities and concluded that, at common law, core government functions often involved private citizens' active participation and that, accordingly, "common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities."  Filarsky, 566 U.S. at 386.  The Supreme Court noted that "examples of individuals receiving immunity for actions taken while engaged in public service on a temporary or occasional basis are as varied as the reach of government itself."  Filarsky, 566 U.S at 389.  The Supreme Court concluded that, in addition to the history of immunity for citizens executing public

functions, the purposes of affording § 1983 immunity do not counsel "against carrying forward the common law rule." Filarsky, 566 U.S at 389.

Turning to qualified immunity's purposes, the Supreme Court noted:

As we have explained, such immunity "protect[s] government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158 . . . (1992). It does so by helping to avoid "unwarranted timidity" in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits. *Richardson v. McKnight*, 521 U.S. 399, 409-411 . . . (1997).

Filarsky, 566 U.S at 389-90. See Richardson, 521 U.S. at 400-411. The Supreme Court concluded that qualified immunity's purposes are equally implicated whether the individual facing suit is a state actor working full-time or an individual working for the state on some other basis. See Filarsky, 566 U.S. at 390.

We have called the government interest in avoiding "unwarranted timidity" on the part of those engaged in the public's business "the most important special government immunity-producing concern." [Richardson, 521 U.S.] at 409 . . . . Ensuring that those who serve the government do so "with the decisiveness and the judgment required by the public good," *Scheuer v. Rhodes*, 416 U.S. 232, 240 . . . (1974), is of vital importance regardless whether the individual sued as a state actor works full-time or on some other basis.

Affording immunity not only to public employees but also to others acting on behalf of the government similarly serves to "'ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" *Richardson*, *supra*, at 408 . . . (quoting *Wyatt*, *supra*, at 167 . . . .). The government's need to attract talented individuals is not limited to full-time public employees. Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. This case is a good example: Filarsky had 29 years of specialized experience as an attorney in labor, employment, and personnel matters, with particular expertise in conducting internal affairs investigations. . . . The City of Rialto certainly had no permanent employee

with anything approaching those qualifications. To the extent such private individuals do not depend on the government for their livelihood, they have freedom to select other work -- work that will not expose them to liability for government actions. This makes it more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts.

Sometimes, as in this case, private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct. . . . Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag -- facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity. Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

The public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties. *See Richardson*, *supra*, at 411 . . . . Not only will such individuals' performance of any ongoing government responsibilities suffer from the distraction of lawsuits, but such distractions will also often affect any public employees with whom they work by embroiling those employees in litigation. This case is again a good example: if the suit against Filarsky moves forward, it is highly likely that Chief Wells, Bekker, and Peel will all be required to testify, given their roles in the dispute. Allowing suit under § 1983 against private individuals assisting the government will substantially undermine an important reason immunity is according public employees in the first place.

Distinguishing among those who carry out the public's business based on the nature of their particular relationship with the government also creates significant line-drawing problems. . . . Such questions deprive state actors of the ability to "reasonably anticipate when their conduct may give rise to liability for damages," *Anderson v. Creighton*, 483 U.S. 635, 646 . . . (1987)(alteration and internal quotation marks omitted), frustrating the purposes immunity is meant to serve.

Filarsky, 566 U.S. at 390-92.

As Tanner notes, the cases to which she cites denying qualified immunity to private contractors rely heavily on Richardson. See Response at 36. Richardson's narrow decision does not foreclose qualified immunity for all private individuals that the government hires, whether directly or by contract. See Filarsky, 566 U.S. at 393. Richardson specifically addresses a "private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms." Richardson, 521 U.S. at 413. The Richardson court clarifies that it does not address "a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." Richardson, 521 U.S. at 413. In Richardson, the private prison performed its tasks independently, without ongoing direct state supervision, pursuant to Tennessee state statutes exempting private jails from monitoring to which public jails were subject. See Richardson, 521 U.S. at 409. Here, Correct Care is subject to the kind of ongoing, direct state supervision from which the prison in Richardson was exempt, because Correct Care operates pursuant to a contract with a state-run facility, subject to state standards, state monitoring, and a federal consent decree. See, e.g., Complaint ¶ 30, at 8 (alleging that Bernalillo County is required to demonstrate compliance with standards outlined in Audit Agreements pursuant to the McClendon settlement agreement); Complaint ¶ 14, at 4 (alleging that Correct Care and its employees are required to meet their obligations under its contract with Bernalillo County and applicable law).

The Court previously considered whether a private contractor supervised by the government may assert a qualified immunity defense in Herrera. Tanner contends that Herrera is factually and procedurally distinct, and "the parties therein did not cogently address the weight of authority from multiple circuit courts which better fit the facts of the present case." Response at 37 n.9. The Court concludes that its analysis in Herrera is relevant where, in Herrera, the Court considered the availability of a qualified immunity defense to private contractors after Richardson. See Herrera, 41 F. Supp. 3d at 1181. In Herrera, the Court discussed the Tenth Circuit's interpretation of Richardson's limits in Rosewood Services, Inc. v. Sunflower Diversified Services, Inc., 413 F.3d 1163, 1166 (10th Cir. 2005)("Rosewood"). Herrera, 41 F. Supp. 3d at 1180. The Tenth Circuit describes:

> In Richardson, the Supreme Court held that prison guards at a private, for-profit prison could not assert qualified immunity. The Court held that a private individual is only entitled to qualified immunity if a claim of immunity is supported by historical practice or based on public policy considerations. *Id.* at 403-04 . . . . In discussing the policy considerations, the Court recognized three purposes served by qualified immunity. First, by reducing the threat of litigation, qualified immunity "protect[s] the public from unwarranted timidity on the part of public officials." [Richardson, 521 U.S.] at 408 . . . . Second, qualified immunity helps "'to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" *Id.* (quoting Wyatt v. Cole, 504 U.S. [at 167], 112 S.Ct. 1827). Third, qualified immunity reduces the chance that lawsuits will distract officials from their governmental duties. *Id.* The Court determined that these considerations did not weigh in favor of permitting private prison guards to assert qualified immunity, and because there was no historical evidence that private prison guards were granted immunity, the Richardson Court refused to allow the defendants to claim qualified immunity. Id. at 412, 117 S.Ct. 2100.
>
> After concluding that the defendants could not claim qualified immunity, the Court narrowed the scope of its holding. *Id.* at 413, 117 S.Ct. 2100. It noted that Richardson arose in the context where "a private firm, systematically organized to assume a major lengthy task (managing an institution) with limited direct

supervision by the government, undertakes that task for profit and potentially in competition with other firms." Id. The Court then clarified that Richardson "does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essentially governmental activity, or acting under close official supervision." Id.

In light of this substantial-supervision caveat, the courts of appeals have allowed private individuals to assert qualified immunity when the defendants were closely supervised by the government. See, e.g., Bartell v. Lohiser, 215 F.3d 550, 557 (6th Cir. 2000).

Rosewood, 413 F.3d at 1166-67.

Unlike in Richardson, where the Supreme Court denied qualified immunity to private prison guards employed by a private company and working in a privately run prison, the Correct Care Defendants work in a state-run facility pursuant to a government contract. See Filarsky, 566 U.S. at 392-93. According to Tanner's Complaint,

[u]nder the Medical Services Agreement, [Bernalillo County] and [Correct Care] represented that the health care provided to inmates at [Metropolitan Detention] would comply with all current and any future standards issued by the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA). [Correct Care] further agreed to train [Metropolitan Detention] staff in accordance with these standards, including training on recognizing emergencies and procedures for referring inmates for care. Defendants Ruiz and [Bernalillo County] remained responsible for ensuring that [Correct Care] and its employees met their obligations under the Medical Services Agreement and the applicable law.

Complaint ¶ 12, at 3-4. According to the Complaint,

Defendant Thomas J. Ruiz was at all relevant times residing in New Mexico as the Administrator of the [Metropolitan Detention] in Bernalillo County, New Mexico who exercised direct supervisory control over the other Defendants during that period. Defendant Ruiz is sued in his individual capacity. At all relevant times, he was acting under the color of law and within the scope of his duties and employment as the Administrator of [Metropolitan Detention].

Complaint ¶ 7, at 2. Unlike in <u>Richardson</u>, here, a state official, Ruiz, and a governmental entity,

Bernalillo County, exercised supervisory control over the private contractor at issue.

> As the Chief of Corrections, Defendant Ruiz retained final authority under the Medical Services Agreement to decide the assignment and utilization of staff to maximize the efficiency of health care delivery at MDC, and to approve hiring of Defendant CCS's Health Services Administrator, as well as physicians and mid-level providers at MDC. Defendant Ruiz was also kept informed of contract compliance and health care issues at MDC through a number of monthly reports, matrices, logs, corrective action plans, and committee meetings required under the Medical Services Agreement. The Medical Services Agreement specifically provided Defendants BCC and Ruiz with access for inspection of detailed records indicating the date, time and nature of services provided under the agreement.

Complaint ¶ 25, at 7 (citations omitted). In <u>Perniciaro v. Lea</u>, 901 F.3d 241 (5th Cir. 2018), the

United States Court of Appeals for the Fifth Circuit reasoned:

> But the market forces assumed in *Richardson*'s reasoning are much weaker here. First, the state, not Tulane, oversees the operation of ELMHS and the services that Drs. Thompson and Nicholl provide there. ELMHS is a state-run facility, operated pursuant to state policies and overseen by a state employee. Dr. Thompson reports directly to Lea, not to anyone at Tulane. Similarly, issues pertaining to patient safety and the qualify of care provided by the Tulane psychiatrists are reviewed by state employees, including Lea. Whereas the Supreme Court in *Richardson* concluded that the private prison guards there at issue "resemble those of other private firms and differ from government employees," 521 U.S. at 410, . . . here we conclude just the opposite. When Drs. Thompson and Nicholl go to work at ELMHS, they act within a government system, not a private one. The market pressures at play within a purely private firm simply do not reach them there.

<u>Perniciaro v. Lea</u>, 901 F.3d at 253. In <u>Hinson</u>, to which Tanner cites as an example of a case

applying <u>Richardson</u>'s precedent and methodology in determining that qualified immunity is not

available to a private healthcare provider in a prison, <u>see</u> Response at 36, the private medical

provider at issue had exclusive authority to establish and implement policies and procedures for

medical care, see Hinson, 102 F.3d at 1346. Here, Tanner's Complaint alleges, for example, that Correct Care and Bernalillo County added a provision to their contract requiring "bi-weekly onsite OB/GYN clinics at 4 hours per clinic," Contract ¶ 20, at 6, and the contract

> required a staffing pattern with at least two physicians, two physician assistants or other mid-level providers, as well as the site medical director, such that a physician was on-call and available for site visits twenty-four hours, seven days per week, and daily rounds of the facility's Sheltered Housing Unit (SHU) were conducted by a physician, physician assistant, or other mid-level provider seven days a week.

Complaint ¶ 21, at 6. Correct Care could not freely change these policies and procedures, without notifying and receiving consent from Bernalillo County to amend the contract. See Complaint ¶ 11, at 3 (establishing that Bernalillo County entered into the contract with Correct Care "to fulfill its obligation to provide health-care services to inmates at [Metropolitan Detention] . . . .").

Like the private contractor in Herrera, here, Correct Care did not independently operate, but rather served as an "adjunct" to Bernalillo County "in the essential governmental activity" of providing health care to inmates "and acted under close official supervision in doing so." Herrera, 41 F. Supp. 3d at 1115. In DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 844 F.2d 714 (10th Cir. 1988)("DeVargas"), the Tenth Circuit concluded that private party defendants acted pursuant to a contract requiring them to provide services to the governmental body with whom they contracted and to do so in accordance with certain regulations. See DeVargas, 844 F.2d at 721. The private party defendants in DeVargas were entitled to qualified immunity where the functions that the private parties performed "are functions which governmental employees would perform had the government not contracted them out." DeVargas, 844 F.2d at 722. See Frazier v. Bailey, 957 F.2d 920, 928-29 (1st Cir. 1992)(holding that private agency contract employees

performing duties ordinarily statutorily required of the state could assert qualified immunity defense, because, functionally, they were equivalent to public officials).

Even if the supervisory relationship between Bernalillo County and Correct Care did not constitute close enough supervision to fall within Herrera's ambit, the policy considerations underlying qualified immunity -- regardless whether they are sound -- militate in favor of allowing private correctional healthcare providers under contract in a state-run prison to assert the defense. The Supreme Court in Richardson stated that the first policy consideration, the government interest in avoiding unwarranted timidity on the part of those engaged in the public's business, is "the most important special government immunity-producing concern." Richardson, 521 U.S. at 409. Here, Metropolitan Detention has a need for healthcare for its inmates, and hired a private contractor and private individuals to work with its staff in performing its public function of providing that healthcare. Potential suit and liability, or even the disruption associated with routine litigation, will result in unwarranted timidity on those contractors' part, and so they should share the common-law immunity which state actors would enjoy in their position, to protect the important government interest in providing healthcare to inmates. See Al Shimari v. CACI Intern., Inc., 679 F.3d 205, 263 (4th Cir. 2012)(applying the Filarsky qualified immunity analysis to military contractors under the combatant activities exception).[217]

_____

[217]The Supreme Court in Richardson rationalized that the unwarranted timidity concern is less prevalent with a private firm, because private firms are subject to ordinary marketplace pressures that incentivize vigorous performance -- at any point, a firm that fails to strike a balance between vigor and caution in the performance of its duties risks replacement by a ready competitor. See Richardson at 409-411. This reasoning is less tenable in the prison healthcare context as it

Regarding the second policy consideration, the risk that the prospect of damage suits would deter talented candidates from entering public service equally plagues private contractors. See Filarsky, 566 U.S. at 390.

> The government's need to attract talented individuals is not limited to full-time public employees. Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. . . . To the extent such private individuals do not depend on the government for their livelihood, they have the freedom to select other work -- work that will not expose them to liability for government actions. This makes it more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts.

Filarsky, 566 U.S. at 390. Here, Bernalillo County had no permanent employees capable of providing the healthcare services which it contracted with Correct Care to provide. The Correct Care Defendants could select other work, and the staffing crisis in prison medical care nationwide highlights the difficulty in retaining talented individuals within correctional health care. See, e.g., Luna Depo. at 13:8-9 (stating that she left Correct Care for a hospital, because the hospital provided

---

exists today, where few private companies dominate the market. See, e.g., Executive Briefing, A Look at the Players in Corrections Health Care, Open Minds, https://www.openminds.com/market-intelligence/executive-briefings/look-players-corrections-health-care/ (last visited June 18, 2019)(stating that four corrections healthcare providers -- Corizon Healthcare, Wexford, MHM Correctional Services, and Correct Care Solutions -- serve 45% of the corrections institutional population). "Only a few major companies dominate the industry." Corizon Needs a Checkup: Problems With Privatized Correctional Healthcare, Prison Legal News, https://www.prisonlegalnews.org/news/2014/mar/15/corizon-needs-a-checkup-problems-with-privatized-correctional-healthcare/ (last visited June 18, 2019). With few competitors in the market, it is less likely that private correctional healthcare contractors experience the marketplace pressures motivating them to perform their duties with maximal efficiency that the Richardson court contemplated. See Corizon Needs a Checkup: Problems With Privatized Correctional Healthcare.

her better opportunities for skills and advancement).  See, e.g., Josh Kovner, Crisis in Prison Medical Care Deepens as Vacancies Remain, Forced Overtime Rises, Hartford Courant, https://www.courant.com/news/connecticut/hc-news-prison-medical-care-vacancies-20190315-pjnozfz2czbghnqqwbjqo76cim-story.html (last visited September 21, 2019); Editorials, Prisons: Nursing Shortage Must be Addressed, The Parkersburg News and Sentinel, http://www.newsandsentinel.com/opinion/editorials/2018/06/prisons-nursing-shortage-must-be-addressed/ (last visited September 21, 2019).

Regarding the third policy consideration, "the public interest in ensuring performance of government duties free from the distractions that can accompany lawsuits is implicated whether those duties are discharged by private individuals or permanent government employees." Filarsky, 566 U.S. at 379.  The distractions, as the Filarsky court notes, affect not only the private contractor, but the public employees with whom they work "by embroiling those employees in litigation," for example, as witnesses who undergo depositions and may be asked to testify in open court. Filarsky, 566 U.S. at 391.  The Court concludes that the interest in ensuring that Correct Care performs the public function with which it is tasked, pursuant to its government contract and free from the desires that can accompany lawsuits, is implicated regardless of its status as a private contractor.  See, e.g., Ward v. Cty. of Mendocino, Case No. 17-cv-0911-PJH, 2017 WL 3007063, *9 (N.D. Cal. July 14, 2017)(Hamilton, J.)(recognizing that "providing medical care to inmates is a governmental function that is constitutionally mandated").  In The Estate of Lockett by and through Lockett v. Fallin, 841 F.3d 1090, 1108-09 (10th Cir. 2016), the Tenth Circuit reasoned:

Dr. Doe is entitled to assert qualified immunity because the purposes of qualified immunity support its application here: carrying out criminal penalties is unquestionably a traditional function of government, exactly the sort of activities that *Richardson* reasoned qualified immunity was meant to protect. If participants in an execution could be held liable for problems during the execution, that would necessarily implicate *Filarsky*'s concerns about "[t]he public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits," which the Court noted "is also implicated when individuals other than permanent government employees discharge these duties." *Filarsky*, 132 S.Ct. at 1666. The attorney in *Filarsky* received qualified immunity largely because a permanent government attorney doing the same acts would receive it. The *Filarsky* Court determined that denying a temporarily retained attorney the same defense as a full-time government attorney would undermine the purposes of the doctrine. The same is true here -- for instance, had a state employee performed the same duties as Dr. Doe did here, qualified immunity would apply. We see no sense in depriving a private doctor the same protection. Here, Dr. Doe stands in the same position as the attorney in *Filarsky* -- he was a private party hired to do a job for which a permanent government employee would have received qualified immunity. Thus, we conclude that qualified immunity applies to Dr. Doe.

The Estate of Lockett by and through Lockett v. Fallin, 841 F.3d at 1109-10.

The Correct Care Defendants, as private healthcare contractors performing a "discrete public service task at the express direction" of government officials, are unlike the defendants in Richardson tasked with running a private prison. Bartell v. Lohiser, 12 F. Supp. 2d 640, 646 (E.D. Mich. 1998)(Hackett, J.).

In the case of prison administration, competition may well influence private officials to zealously exercise their authority. The threat that the State would cancel its contract with the private prison if it was not efficiently administered, may well counteract any timidity the private officials would exercise in their decision-making in order to prevent prisoner initiated lawsuits. The situation presented in this case is quite different.

Bartell v. Lohiser, 12 F. Supp. 2d at 646. In deciding that private foster care workers are entitled to assert qualified immunity, the Honorable Barbara Kloka Hackett, then-United States District Court Judge for the United States District Court for the Eastern District of Michigan stated:

> In this case, the LSS defendants were charged with the difficult discretionary task of recommending to the State whether Bartell was fit to parent. Without immunity, the LSS defendants would not be free to make unbiased recommendations. Any time that they were to recommend that a parent's right to the care and custody of his or her child be terminated, they would face the risk of being sued. Faced with this threat, it would not be cost-effective for them to accept contracts with the State. Denying these individuals qualified immunity would deter them from assisting the State in performing an essential governmental function. If private non-profit foster care agencies were not available to contract with FIA, additional burdens would be placed on the State's limited budget.

Bartell v. Lohiser, 12 F. Supp. 2d at 646. Like the foster care workers in Bartell v. Lohiser, private healthcare contractors operating in a state-run prison are charged with difficult discretionary decisions -- in this case, involving recommending that the government officials undertake, support, or comply with their healthcare recommendations and treatment approaches. Without immunity, any time they recommended a healthcare plan that did not accord with an inmate's healthcare wishes, they would face the risk of being sued. It is unlikely that the state would cancel its contract if the healthcare contractor became timid in their discretionary recommendations regarding healthcare to avoid prisoner-initiated lawsuit. Faced with the threat of constant litigation, it is less cost-effective for private contractors to accept healthcare contracts with the State. In fact, the number of lawsuits prison healthcare companies already face deter investors and potentially make it more difficult for new or smaller healthcare providers to enter the correctional healthcare space, leaving state-run prisons with few options between which to choose. See Private

Prisons and Investment Risks, American Federation of Teachers, https://www.aft.org/private-prisons-and-investment-risks (last accessed June 19, 2019)(describing that prison healthcare companies face many lawsuits alleging mistreatment of prisoners, withholding of care, and wrongful death, resulting in settlements or judgments compelling the private healthcare companies to pay millions of dollars, and posing a financial risk to investors in addition to headline risks). Denying private healthcare contractors in state-run prisons qualified immunity would deter them from assisting the state in performing its essential governmental function of fulfilling its constitutional mandate to provide healthcare to inmates. If private healthcare facilities were not available to contract with state prisons, additional burdens would be placed on the state's limited budget, because the state would have to provide its own healthcare services. See Bartell v. Lohiser, 12 F. Supp. 2d at 646. For the foregoing reasons, the Court concludes that, under Filarsky, the Tenth Circuit's decision in The Estate of Lockett by and through Lockett v. Fallin, and considering the Court's opinion in Herrera and the purposes underlying qualified immunity, the Correct Care Defendants are entitled to assert the defense of qualified immunity.

## II. THE CORRECT CARE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON COUNT I, BECAUSE THEY DID NOT VIOLATE TANNER'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT TO TIMELY AND EFFECTIVE MEDICAL CARE.

When considering a defendant's motion for summary judgment based on qualified immunity, the Court views the facts in the light most favorable to the non-moving party and resolves all factual disputes and reasonable inferences in his or her favor. See Estate of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014). "Unlike most affirmative defenses, however, the

plaintiff would bear the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law." Estate of Booker v. Gomez, 745 F.3d at 411. Accordingly, the Court grants qualified immunity unless the non-moving party -- the plaintiff -- can show: (i) a reasonable jury could find facts supporting violation of a constitutional right; and (ii) the constitutional right violated was clearly established at the time of the defendant's conduct. See Saucier v. Katz, 533 U.S. at 201-02. If the plaintiff successfully carries this two-part burden, the "defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." Mick v. Brewer, 76 F.3d 1127, 1134 (10th Cir. 1996).

To establish that the defendants' actions violated a constitutional right, the plaintiff must present evidence establishing specific facts which, if true, demonstrate a violation. See Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995). The Tenth Circuit recently addressed, in the context of a § 1983 action against jail officials alleging deliberate indifference to serious medical needs, how to determine whether the law was clearly established at the time of violation:

> In determining whether the law was clearly established, we ask whether Rife has "identif[ied] an on-point Supreme Court or published Tenth Circuit decision: 'the clearly established weight of authority from other courts must have found the law to be as [he] maintains.'" *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)(quoting *Weise*, 593 F.3d at 1167). Of course, this isn't to say that Rife must direct us to a case that is *"exactly* on point." *Weise*, 593 F.3d at 1167 (emphasis added)(explaining that plaintiff can demonstrate law was clearly established even if "the very action in question" hasn't "previously been held unlawful" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 . . . (1987)). "[B]ut existing precedent must have placed the . . . constitutional question beyond debate." *Mullenix v. Luna*, __ U.S. __, 137 S.Ct. 548, 552 . . . (2017)(quoting

*Creighton*, 483 U.S. at 640 . . . )(warning courts not to define the clearly established right "at a high level of generality" (quoting *al-Kidd*, 563 U.S. at 742 . . . )).

In other words, to demonstrate the law was clearly established, Rife must identify a case in which a defendant "acting under similar circumstances" as Jefferson, Willis, and Dale "was held to have violated" the Eighth or Fourteenth Amendments. *Id.*; *see also Martin v. Bd. of Cty. Comm'rs*, 909 F.2d 402, 406 (10th Cir. 1990)(explaining that the Fourteenth Amendment entitles pretrial detainees to "the same degree of protection regarding medical attention afforded convicted inmates under the "[E]ighth [A]mendment"). Thus, our task is to examine the cases that the district court relied on below and those that Rife cites on appeal and ask whether any of those cases satisfy this test. *See Apodaca v. Raemisch*, 864 F.3d 1071, 1076 n.3 (10th Cir. 2017)(explaining that plaintiff bears burden of identifying decision that clearly establishes relevant right and declining to consider "potential sources" of authority that plaintiffs didn't rely on), *petition for cert. filed* Mar. 13, 2018 (No. 17-1284); *Cox*, 800 F.3d at 1247 (noting that because plaintiff failed to "direct[] our attention" to decision that clearly established relevant right, we could hold -- "[o]n this basis alone" -- that plaintiff failed to "properly la[y] the groundwork to defeat [defendant's] assertion of qualified immunity").

Rife v. Jefferson, 742 F. App'x 377, 381-82 (10th Cir. 2018)(unpublished).

## A. THE UNDISPUTED MATERIAL FACTS INDICATE THAT THE CORRECT CARE DEFENDANTS DID NOT VIOLATE TANNER'S FOURTEENTH AMENDMENT RIGHT TO TIMELY AND ADEQUATE MEDICAL CARE.

In the Complaint's Count I, Tanner alleges that the individual Correct Care Defendants violated her Eighth and Fourteenth Amendment rights to timely and adequate medical care by exhibiting deliberate indifference towards Tanner's serious medical needs. See Complaint ¶¶ 75-81, at 23. Preliminarily, the Correct Care Defendants argue that Count I is facially invalid because Tanner may not allege violations under both the Eighth and Fourteenth Amendments where, as a pretrial detainee, she has rights only under the Fourteenth Amendment. See Partial MSJ at 2 (citing Kretek, 2013 WL 12039991; Chavez, 899 F. Supp. 2d at 1185-86). The Correct Care Defendants

contend that, in <u>Chavez</u>, the Court held that if a plaintiff pleads two constitutional provisions but only one is correct, the entire claim is facially invalid, even if the protections are the same under both constitutional provisions. <u>See</u> Partial MSJ at 2 (citing <u>Chavez</u>, 899 F. Supp. 2d at 1185-86). Tanner responds that she pled in the alternative -- which she contends rule 8(d) permits -- because she could not predict how the Court would rule on her status as an inmate or pretrial detainee, given the spilt in authority whether or under what circumstances "individuals taken into custody on probation violations are treated as inmates or pretrial detainees." Response at 39 (quoting <u>Kellum v. Bernalillo Cty.</u>, 250 F. Supp. 3d at 850-55). Tanner also notes that the deliberate indifference standard is the same under either amendment, so her alternative pleading did not unfairly prejudice the individual Correct Care Defendants. <u>See</u> Response at 39.

Pretrial detainees are "persons who have been charged with a crime but who have not yet been tried on the charge." <u>Bell v. Wolfish</u>, 441 U.S. 520, 523 (1979). Pretrial detainees are "presumed to be innocent and held only to ensure their presence at trial." <u>Bell v. Wolfish</u>, 520 U.S. at 528. Because the Fourteenth Amendment forbids a pretrial detainee's punishment before an adjudication of guilt, it is the Fourteenth Amendment, and not the Eight Amendment, that governs pretrial detainees' constitutional rights. <u>See</u> <u>Ingraham v. Wright</u>, 430 U.S. 651, 671 n.40 (1977).

The New Mexico statute governing probation violations provides that, "at any time during probation[,]" a court "may issue a warrant for the arrest of a probationer for violation of any of the conditions of release[,]" or the director of the field services division may "arrest a probationer

without a warrant" by issuing a "written statement setting forth that the probationer has . . . violated the conditions of the probationer's release." N.M. Stat. Ann. § 31-21-15(A). The state court "shall then hold a hearing, which may be informal, on the violation charged. If the violation is established, the court may continue the original probation or revoke the probation and either order a new probation with any condition provided for in Section 31-20-5 or 31-20-6 . . . or require the probationer to serve the balance of the sentence imposed or any lesser sentence." N.M. Stat. Ann. § 31-21-15(B). An individual incarcerated for an alleged probation violation, awaiting a probation hearing, has thus not been adjudicated guilty of the violation, and therefore is a pretrial detainee.

The record establishes that Tanner was arrested and detained at Metropolitan Detention for an alleged probation violation pending a full probation violation hearing. See Tanner Depo. at 153:1-10. The Tenth Circuit has explained that, when a plaintiff is detained before an adjudication of guilt, "neither the Fourth nor Eighth Amendment applies . . . [and] we turn to the due process clauses of the Fifth and Fourteenth Amendment[s] . . . ." Porro v. Barnes, 624 F.3d 1322, 1326 (10th Cir. 2010). Tanner's status does not change her federal claims' analysis, "because the standard for a denial of medical care is the same for both pretrial detainees and incarcerated persons." Rave v. Bd. of Comm'rs for Cty. of Bernalillo, No. CIV 17-0636 RB\LF, 2017 WL 3600452, at *4 (D.N.M. Aug. 18, 2017)(Brack, J.).

The Correct Care Defendants misconstrue the Court's analysis in Chavez, in which the Court dismissed a pretrial detainee's claims as facially invalid where the pretrial detainee alleged only Eighth Amendment violations. See Chavez, 899 F. Supp. 2d at 1185-86. The Court

dismissed Chavez's Eighth Amendment claim, but allowed Chavez leave to amend to bring a Fourteenth Amendment claim. Chavez, 899 F. Supp. 2d. at 1187. The Court recognized that, "in the Tenth Circuit, the analysis of J. Chavez's right under the Fourteenth Amendment to be provided adequate medical care as a pretrial detainee is the same as that of an inmate under the Eighth Amendment." Chavez, F. Supp. 2d. at 1187. See Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir. 1999)("In determining whether appellant's rights were violated, however, we apply an analysis identical to that applied in Eighth Amendment cases.")(citing Bell v. Wolfish, 441 U.S. at 585 n.16.

> Nonetheless, when government officials hold an individual in confinement before the formal adjudication of that individual's guilt, the Eighth Amendment does not regulate the conduct of the government officials confining that individual. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 . . . (1983)("Eighth Amendment scrutiny is appropriate only after the state has complied with the constitutional guarantees traditionally associated with criminal prosecutions . . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.")(quoting Ingraham v. Wright, 430 U.S. 651, 671-[72] . . . (1977)).

Chavez, 899 F. Supp. 2d at 1186.

As in Chavez, here, the Eighth Amendment does not regulate the Defendants' conduct, and so they therefore cannot be found liable in a § 1983 action that Tanner alleges stems from violations of her rights as an inmate. In Chavez, the Court emphasized that it is important that plaintiffs allege the correct constitutional right violated. See id. at 1187. Nowhere did the Court say that, had Chavez pled the Fourteenth Amendment in the alternative, the Court would still have dismissed his claims as facially invalid because the Eighth Amendment did not apply. Rule 8(d),

as Tanner rightly notes, permits alternative pleading, and the Court has construed it to allow "expansive alternative pleading." In re Santa Fe Natural Tobacco Co. Marketing and Sales Practices and Prods. Liab. Litig., 288 F. Supp. 3d 1087, 1258 (D.N.M. 2017)(Browning, J.). The Court has recognized that rule 8(d) even permits a plaintiff to plead conflicting theories in the alternative. See In re Santa Fe Natural Tobacco Co. Marketing and Sales Practices and Prods. Liab. Litig., 288 F. Supp. 3d at 1258.

The Court concludes that rule 8(d) permits Tanner's alternative pleading in Count I and that Chavez does not counsel against it. The Court also concludes that, because Tanner's incarceration at Metropolitan Detention preceded her full probation violation hearing, Tanner had not had a formal adjudication of her guilt, and so was a pretrial detainee at the time of her incarceration at Metropolitan Detention in 2016. As a pretrial detainee, Tanner had rights under the Fourteenth Amendment, but not under the Eighth Amendment. The Court, accordingly, dismisses Tanner's Eighth Amendment claim in Count I.

A Fourteenth Amendment claim for inadequate medical attention requires that the plaintiff show "'deliberate indifference to serious medical needs.'" Estate of Houser v. Walsh, 22 F.3d 995, 998 (10th Cir. 1994)(quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Mere negligence is not enough. Farmer v. Brennan, 511 U.S. 825, 835 (1970). See also Estelle v. Gamble, 429 U.S. at 105-06 (stating that "an inadvertent failure to provide adequate medical care" does not give rise to a constitutional violation"). The test for deliberate indifference contains both an objective and a subjective component. Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006). The

objective component of the test is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause" of the Eighth Amendment. Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005)(quoting Farmer v. Brennan, 511 U.S. at 834).

In Mata v. Saiz, the Tenth Circuit held that "it is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee has contact with the prisoner.'" Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009)(quoting Mata v. Saiz, 427 F.3d at 753). Tanner argues that caselaw clearly establishes that pregnancy and childbirth satisfy the objective prong. See Response at 40. Tanner argues that the Correct Care Defendants

> present no argument or evidence to dispute that Plaintiff Tanner was in an advanced stage of her pregnancy, or that her pregnancy and its complications presented an objectively serious medical need. They present no specific legal authority on third trimester pregnancies or their complications, nor does their motion attach any exhibits which can overcome the expert opinions, professional standards, and other medical evidence that Plaintiffs have cited above in the first two sections of this response. Thus, the CCS Defendants have failed to meet their initial responsibility of "identifying" the objective element of a deliberate indifference claim as one on which they seek partial summary judgment.

Response at 42 (quoting Kaur v. City of Lodi, 263 F. Supp. 3d 947, 976-77 (E.D. Cal. 2017)(Nunley, J.)). Once a defendant asserts qualified immunity, the plaintiff bears the burden of establishing that the defendant violated clearly established law. See Hovater v. Robinson, 1 F.3d 1063, 1066 (10th Cir. 1993). Tanner, therefore, bears the burden of establishing the objective and subjective elements of her deliberate indifference claim. See Hovater v. Robinson, 1 F.3d at 1066.

The Court notes that, to satisfy the objective prong, Tanner must identify an objectively serious harm, which pregnancy and childbirth are not. See Mata v. Saiz, 427 F.3d at 753. In Count

I, Tanner identifies several harms: "Tanner's damages and injuries, including pain and suffering, psychological and emotional distress, health-care expenses, serious physical injuries, and the death of her fetus." Complaint ¶ 81, at 23. The Tenth Circuit cautioned:

> Of course, a prisoner must be careful in selecting what harm to claim. The prisoner may be better off claiming some intermediate harm rather than the last untoward event to befall her. After all, the prisoner may not be able to prove that this last event was caused by any government actor or that the actor who caused the event acted with the requisite culpable state of mind. Accordingly, the prisoner's claim may be based, for example, on intolerable chest pain rather than the subsequent heart damage. Once the prisoner selects the harm, however, the focus of the objective prong should be solely on whether that harm is sufficiently serious. Then the court can turn to causation and the subjective prong. In this case, as we set out below, both Ms. Mata's severe chest pain and her heart attack are each sufficiently serious to satisfy the objective prong.

Mata v. Saiz, 427 F.3d at 753. Although some of Tanner's alleged harms may not be sufficiently serious to establish the objective component of the deliberate indifference test, the death of her fetus, is sufficiently serious. See Martinez v. Beggs, 563 F.3d at 1088.

Having determined that the selected harm, the death of her fetus, is sufficiently serious to meet the objective component, the Court "can turn to causation and the subjective prong." Mata v. Saiz, 427 F.3d at 753. "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." Callahan v. Poppell, 471 F.3d at 1159 (internal quotation marks omitted)(quoting Mata v. Saiz, 427 F.3d at 753). The Supreme Court has cautioned that "an obvious risk cannot conclusively establish an inference that the official subjectively knew of the substantial risk of harm, because 'a prison official may show that the obvious escaped him.'"

Martinez v. Beggs, 563 F.3d at 1089 (quoting Farmer v. Brennan, 511 U.S. at 843 n.8). The subjective component also requires that the charged officials disregard the specific harm claimed by the prisoner. See Martinez v. Beggs, 563 F.3d at 1089. See also Estate of Hocker v. Walsh, 22 F.3d 995, 997-1000 (10th Cir. 1994)(holding that plaintiffs had to show detention center defendants who admitted intoxicated individuals were deliberately indifferent to the specific risk of the intoxicated decedent's suicide, and not merely to the risk of her intoxication).

The Tenth Circuit has also held that, although "denial of access to treatment for a serious medical condition" constitutes deliberate indifference, the failure to "treat a serious medical condition properly" does not. Estate of Vallina v. Petrescu, 757 F. App'x 648, 651 (10th Cir. 2018)(unpublished). The Tenth Circuit held that Mata v. Saiz' general recitation of the deliberate indifference standard for determining whether a Fourteenth Amendment violation occurred "cannot provide a source of clearly established law . . . because the statement of law is insufficiently particular to the facts at hand." Estate of Vallina v. Petrescu, 757 F. App'x at 650. "The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality." Quinn v. Young, 780 F.3d 998, 1005 (10th Cir. 2015). The Tenth Circuit reasoned that:

> The only defendant denied qualified immunity in Mata refused to provide any medical attention to the plaintiff despite the plaintiff's repeated complaints of severe and lasting chest pain, telling the plaintiff that she could raise her complaints the next morning. 427 F.3d at 756. In this case, Vallina received a court-ordered competency examination. Plaintiffs dispute the adequacy of the treatment that accompanied Vallina's examination. But the denial of all treatment in Mata does not provide a sufficiently comparable precedent to clearly establish that Petrescu's allegedly inadequate treatment violated Vallina's Fourteenth Amendment rights.

This court distinguishes "a medical professional['s] [] fail[ure] to treat a serious medical condition properly," which does not constitute deliberate indifference, from "prison officials [who] prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment," which may constitute deliberate indifference. Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000). Although Mata clearly establishes that denial of access to treatment for a serious medical condition constitutes deliberate indifference, plaintiffs' allegations in this case concern the failure to "treat a serious medical condition properly," which we have long held fails to evince deliberate indifference."

Estate of Vallina v. Petrescu, 757 F. App'x at 650-51.

Tanner contends that some courts reasonably have inferred that deliberate indifference to a serious medical need's subjective element is met where the serious need "would be obvious to a layperson with no medical training." Response at 47 (citing Havard v. Wayne County, 436 F. App'x at 456; Carr v. El Paso Cty., 757 F. App'x 651, 656 (10th Cir. 2018)(unpublished)). Tanner contends that courts have concluded that pregnancy and childbirth are situations where the medical needs are blatantly obvious and the risks are great. See Response at 47. Tanner argues that the Court reasonably can infer that her medical needs' seriousness was obvious where the officers stationed to her Metropolitan Detention housing unit "thought it serious enough to report the matter . . . and to call [in a] medical emergency" even after Tanner returned to the housing unit from her first medical unit visit in the morning of October 16, 2016. Response at 47-48. Tanner notes that two categories of conduct can support a deliberate indifference claim: (i) actual provision of health-care services to a patient in custody suffering from a condition which can be treated while the patient is in custody; and (ii) diagnosis or treatment of the patient's condition on-site is not possible because of the staff's lack of equipment or qualifications, so staff takes on a

"gatekeeper" role in determining whether to send the patient off-site for care, typically in situations requiring emergent care.  Response at 42-43.  Tanner contends that the Correct Care Defendants cannot assert that any of them were qualified or equipped to deliver babies or to treat obstetrical emergencies.  See Response at 43.  As such, Tanner contends the Correct Care Defendants were limited to a gatekeeper role, for which they may be liable as they failed to allow Tanner to receive more competent treatment for what Tanner alleges were obvious, serious medical needs.  See Response at 43.  The Correct Care Defendants acknowledge that a gatekeeper claim can apply to medical personnel.  See Partial MSJ at 18.  However, the Correct Care Defendants aver that none of the Correct Care Defendants may be held liable on a gatekeeper theory because each of them "were trained and qualified to care for obstetrical patients" and actually provided care to Tanner. Reply at 45.

### B. THE CONSTITUTIONAL RIGHT WHICH COUNT I ALLEGES THE CORRECT CARE DEFENDANTS VIOLATED WAS NOT CLEARLY ESTABLISHED.

The qualified immunity test's second prong requires that "the right which the official allegedly violated is 'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 635 (1987).  The Tenth Circuit has held that this means that "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Cortez v. McCauley, 478 F.3d 1108, 1114-15 (10th Cir. 2007)(quotation omitted).  Although "the facts of the cases compared need not be identical, they must be sufficiently analogous to satisfy the

particularized context necessary to support liability." <u>Mecham v. Frazier</u>, 500 F.3d 1200, 1206 (10th Cir. 2007)(citation omitted). The Tenth Circuit has also held, however, that "we do not always require case law on point," <u>Morris v. Noe</u>, 672 F.3d 1185, 1196-97 (10th Cir. 2012), and that "the Supreme Court has warned that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances,'" <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)(quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002)). "We have therefore adopted a sliding scale to determine when law is clearly established. 'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

Although an on-point case is not always necessary, the Tenth Circuit emphasized that "we exercise 'special care to "define the clearly established right at issue on the basis of the specific context of the case"' and, in so doing, avoid defining the "case's context in a manner that imports genuinely disputed factual propositions."'" <u>A.M. v. Holmes</u>, 830 F.3d 1123, 1135 (10th Cir. 2016)(quoting <u>Felders ex rel. Smedley v. Malcolm</u>, 755 F.3d 870, 885 (10th Cir. 2014)(quoting <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014)(per curiam))). <u>See</u> <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015)(per curiam)("'We have repeatedly told courts . . . not to define clearly established law at a high level of generality.' The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" (omission in <u>Mullenix v. Luna</u>)(quoting <u>Ashcroft v. Al-Kidd</u>, 563 U.S. 731, 742 (2011)); <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004)(per

curiam)(noting that the clearly-established law "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), <u>overruled on other grounds by</u> <u>Pearson v. Callahan</u>, 555 U.S. at 236)). The Tenth Circuit underscored that showing that the law allegedly violated was clearly established when the defendants acted is a "quite heavy" burden for the plaintiff to shoulder. <u>A.M. v. Holmes</u>, 830 F.3d at 1147.

Tanner avers that the right which is clearly established is a right for pregnant inmates or pretrial detainee's serious medical needs to be satisfied, or, alternatively, for a pregnant inmate or pretrial detainee to be free from deliberate indifference to their serious medical needs. <u>See</u> Response at 41. The Tenth Circuit concluded in <u>Estate of Vallina v. Petrescu</u> that a general recitation of the deliberate indifference standard cannot provide a source of clearly established law because "the statement of law is insufficiently particular to the facts at hand." 757 F. App'x at 650.

Tanner cites to the following cases in support of her contention that the rights which the Correct Care Defendants violated were clearly established: <u>Havard v. Wayne County</u>, 436 F. App'x 451, 455 (6th Cir. 2011); <u>Pool v. Sebastian Cty.</u>, 418 F.3d 934, 944-45 (8th Cir. 2005); <u>Goebert v. Lee Cty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007); <u>Boswell v. Sherburne Cty.</u>, 849 F.2d 1117, 1122 (8th Cir. 1988); <u>Archer v. Dutcher</u>, 733 F.2d 14, 16 (2d Cir. 1984); <u>Herrera v. Valentine</u>, 653 F.2d 1220, 1225 (8th Cir. 1981); <u>Moulton v. DeSue</u>, 966 F. Supp. 2d 1298, 1306 (M.D. Fla. 2012); <u>Doe v. Gustavus</u>, 294 F. Supp. 2d 1003, 1006-10 (E.D. Wis. 2003)). Tanner

cites to no Supreme Court or Tenth Circuit case close enough on point to make the unlawfulness of the Correct Care Defendants' actions apparent.  See McInerney v. King, 791 F.3d 1224, 1236-37 (10th Cir. 2015).  Although Tanner contends that she need not identify an on-point case because the defendant's conduct was "obviously egregious . . . in light of prevailing constitutional principles," Tanner does not specifically identify which of the Correct Care Defendants' actions she refers to as obviously egregious.  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Further, the instances in which the Tenth Circuit has concluded that conduct is so obviously egregious as to not require an on-point precedent are markedly different than Tanner's case.  See, e.g., Casey v. City of Fed. Heights, 509 F.3d at 1285 (officers tasered, knocked down, beat, and tasered again a peaceful citizen without warning or explanation, and, despite the lack of on-point precedent, the Tenth Circuit concluded that the officers violated the citizens' clearly established rights); Holland ex. Rel. Overdorff v. Harrington, 268 F.3d 1179, 1193 (10th Cir. 2001)(sheriffs who deployed a SWAT team held children at gunpoint after the officers had gained complete control over the situation conducted themselves in an obviously egregious manner not necessitating an on-point precedent for a determination that they violated clearly established rights).  By contrast, Tanner contends that the Correct Care Defendants did not provide her with appropriate care, that they delayed in responding to her requests for care, and that they did not provide her with access to particular types of treatment, such as pelvic examinations -- actions which are not so obviously egregious as to permit the Court to waive the requirement of an on-point precedent.  In Estate of Vallina v. Petrescu, for example, the Tenth Circuit stated that it has long held "the failure to 'treat

a medical condition properly,'" does not evince deliberate indifference and that <u>Mata v. Saiz</u> established only that a complete denial of access to treatment constitutes deliberate indifference. <u>Estate of Vallina v. Petrescu</u>, 757 F. App'x at 651 (quoting <u>Sealock v. Colorado</u>, 218 F.3d at 1211).

Although Tanner cites to no Supreme Court or Tenth Circuit cases, Tanner cites to a number of cases from outside of the Tenth Circuit as sources of clearly established law. <u>See</u> Response at 41-42. None of the cases to which Tanner cites presents a factually-similar situation, in which a pregnant inmate or pretrial detainee was seen repeatedly, examined, and treated by medical personnel, but was not treated in the manner which the plaintiff contends was necessary, and was not transported at the first sign of symptoms. First, Tanner cites to <u>Havard v. Wayne County</u>, 436 F. App'x 451, 455 (6th Cir. 2011)("<u>Havard</u>"). In <u>Havard</u>, the plaintiff, Chantrienes Barker, was "in active labor, crying out for help, to the knowledge of the defendants, and was left by the defendants in her cell for two hours . . . ." <u>Havard</u>, 436 F. App'x at 457. Barker was dilated two centimeters, having contractions, complaining of labor pains, told the Defendants that the baby was coming out, and the Defendants called EMS rather than the hospital, and did "nothing in the twenty-seven minutes it took for EMS to arrive." <u>Havard</u>, 436 F. App'x at 455. <u>Havard</u>, an unpublished United States Court of Appeals for the Sixth Circuit case, does not announce as clearly established law that the Eighth or Fourteenth Amendment commands that officials respond to a pregnant inmate -- who is not clearly in labor -- in any particular way, and, further, it is undisputed that, when Dr. McMurray concluded Tanner was in labor, Dr. McMurray called an ambulance to transport her to the hospital. <u>See</u> McMurray Depo. at 202:9-202:15. At no point did Dr. McMurray

subjectively believe Tanner was in labor and deny her medical treatment. See McMurray Depo. at 189:19-189:25; id. at 190:1-190:3. Instead, Dr. McMurray and the other Correct Care Defendants provided medical services to Tanner each time she complained of her condition. See Partial MSJ at 7-10; Luna Depo. at 110:10-119:9; id. at 127:22-129:24; id. at 165:15-169:25; Sanchez Depo. at 134:12-137:6; McMurray Depo. at 185:2-185:13; id. at 202:9-202:15. Because Havard concerns an inmate in labor and defendants who took no action in response, the Court concludes that it is not factually similar enough to Tanner's case to provide a source of clearly established law for the rights which the Correct Care Defendants allegedly violated.

Tanner next cites to Pool v. Sebastian Cty., a United States Court of Appeals for the Eighth Circuit case. See Response at 41. In Pool v. Sebastian Cty., a pregnant inmate asked for Tylenol and sanitary pads, and never received either. 418 F.3d at 938. Pool was too weak to shower or to perform routine daily functions. See 418 F.3d at 938, 945. Medical officials at the jail declined to see Pool and did not transport her to the medical unit. See 418 F.3d at 938. Officers who responded to Pool's requests for medical attention did not enter her cell but attempted to evaluate her through an observation window. See 418 F.3d at 938. No one entered Pool's cell until it was obvious that she had miscarried, and the defendants could see the stillborn baby on Pool's lap. See 418 F.3d at 939. Pool v. Sebastian Cty. is not factually similar to Tanner's case. According to the undisputed facts, the Correct Care Defendants responded to each of Tanner's requests for medical attention and visited her cell and brought her to the SHU for further evaluation. See Partial MSJ at 7-10. Although Luna asked Tanner to wait on the first occasion in which Tanner requested medical

attention, it is undisputed that Luna responded within an hour.  See Rodriguez-Nunez Depo. at 106:25-107:11.  Tanner did not have to wait any longer than twenty minutes after each of her subsequent requests for medical attention.  See Partial MSJ at 7-10; Response at 6-9; supra nn. 71, 88, 108, 149.  Additionally, the Correct Care Defendants provided Tanner with Tylenol and pads, examined her in examination rooms and in her own cell, and, called for emergency transport when it became evident she was in labor.  See Partial MSJ at 8-10; Luna Depo. at 154:22-157:22; McMurray Depo. at 202:9-202:15.  Such responsiveness distinguishes Tanner's case from that of Pool v. Sebastian Cty.

Tanner next cites to Goebert v. Lee Cty., a United States Court of Appeals for the Eleventh Circuit case.  See Response at 41.  In Goebert v. Lee Cty., Goebert "had been leaking amniotic fluid for eleven days" before she was taken to the hospital and gave birth to a stillborn child.  510 F.3d at 1316.  The medical officials in Goebert noted that Goebert appeared to be leaking amniotic fluid, and although Goebert requested an amniotic pH test, the medical officials declined to perform one "because it would require transporting her to the infirmary at the main jail facility."  510 F.3d at 1317.  For eleven days, Goebert continued to leak fluid, but nurses refused to take her to the doctor, refused to take her medical request forms, and, in one instance, "wadded up Goebert's written request to see the doctor and threw it back at her."  510 F.3d at 1318.  The nurses eventually refused to give Goebert additional medical request forms, telling her that there was nothing wrong with her.  See 510 F.3d at 1318.  Goebert also reported no fetal movement in days, that the fluid she leaked was yellowish, and that she leaked a "large green blob."  510 F.3d at 1318-

19.  Goebert is factually unlike Tanner's case. Tanner was seen and treated multiple times over the two days in question and underwent an amniotic pH test.  See Partial MSJ at 8-9; Response at 11; Luna Depo. at 171:16-17.  Further, the Correct Care Defendants gave Tanner medical attention each time Tanner complained.  See Partial MSJ at 7-10.

Tanner also cites to Boswell v. Sherburne Cty., another Eighth Circuit case.  See Response at 41.  Boswell was locked in a cell overnight and the supervising officer, who was not a medical professional, did not record Boswell's bleeding and discharge, did not contact any medical personnel, and did not communicate any information about Boswell's condition to the next jailer.  See 849 F.3d at 1119.  The next jailer told Boswell she could not be released from her cell until she posted bail, despite speaking to Boswell's mother-in-law, who told her that Boswell had a history of fast deliveries and needed transport to a hospital.  See 849 F.2d at 1119.  Boswell is also unlike Tanner's case. First, the Correct Care Defendants recorded Tanner's complaints and symptoms during each interaction with Tanner.  See Partial MSJ at 8; Luna Depo. at 130:8-131:9, 165:15-169:25, 171:1-176:21. Second, each of the Correct Care Defendants communicated information about Tanner's condition to other medical personnel.  See Partial MSJ at 9; Sanchez Depo. at 126:1-6.  Finally, the Correct Care Defendants did not confine Tanner in a cell for reasons unrelated to her medical condition.  See Partial MSJ at 10.

Tanner cites next to Archer v. Dutcher, a United States Court of Appeals for the Second Circuit case.  See 733 F.2d at 15.  The Honorable Henry F. Werker, United States District Judge for the United States District Court for the Southern District of New York granted summary

judgment, concluding that there was no genuine dispute of material fact whether prison officials demonstrated deliberate indifference, rising to an Eighth Amendment violation, to a then-pregnant inmate's medical needs.  See 733 F.2d at 145.  Judge Werker observed that Archer "did not claim a total denial of medical care," that the undisputed hospital records indicated that she was not denied treatment, and that her complaint really regarded the quality of care she received.  733 F.2d at 16.  Judge Werker concluded that, where prison medical staff almost daily monitored Archer's condition, no reasonable person could conclude that they displayed deliberate indifference to her medical needs.  See 733 F.2d at 16.  On appeal, the Second Circuit stated that "Archer's case may well be without merit," noting that Archer "received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care."  733 F.2d at 16.  The Second Circuit ultimately reversed the district court's summary judgment grant, however, because of its finding that the motion for summary judgment raised material factual disputes regarding whether the prison officials intentionally delayed Archer's access to care, and deliberately disregarded her condition as punishment for past breaches of the prison's disciplinary code or other invalid reasons. See 733 F.3d at 16-17.  Archer v. Dutcher is an inapposite comparison to Tanner's case, in which no undisputed facts indicate that prison officials ignored or intentionally delayed Tanner's access to care because of a retaliatory or other improper motive.  The prison officials in Tanner's case did not effect a total denial of medical care: they monitored her daily, and they provided her with medical attention after each of her complaints -- all circumstances which the Second Circuit

concluded cut against a deliberate indifference finding.  See 733 F.2d at 16 (noting that "appellant received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care," which likely rendered Archer's case "without merit").

Herrera v. Valentine, the next case to which Tanner cites, is a case concerning municipal liability, and not a case alleging individual officers' deliberate indifference.  See 653 F.2d at 1230. Further, in Herrera v. Valentine, a police officer kicked a pregnant detainee in the stomach and abdomen, threatened to shoot her, kept her handcuffed in the back of a patrol car, and drove her to a jail twenty miles away rather than driving her to a hospital a few blocks away -- her unborn child died in her womb as a result of the beating and subsequent inattention to her medical needs.  See 653 F.2d at 1222.  None of these facts find analogues in Tanner's case.  Herrera v. Valentine also further presents an unsuitable comparison, because the undisputed material facts do not suggest that the prison officials caused Tanner's health complications, as the police officer in Herrera v. Valentine did by kicking a pregnant woman in the womb.

In Moulton v. DeSue, a United States District Court for the Middle District of Florida case to which Tanner cites, Tia Marie Sloama Ritch, a then-pregnant inmate, during the period of time at issue, could not stand up, her lips were changing color, and she was "starting to look yellow." 966 F. Supp. 2d at 1302.  Several inmates began to loudly complain that no correctional officer came to see Ritch for several hours.  See 966 F. Supp. 2d at 1302.  When correctional officers finally arrived, they pushed a wheelchair into Ritch's cell to transport her to the medical unit, and

noted that her eyes rolled back in her head, her feet dragged on the floor, and her body collapsed in an uncontrolled manner.  See 966 F. Supp. 2d at 1303.  No correctional officer came to check on Ritch after she was transferred to the medical unit, and Ritch died in the night.  See 966 F. Supp. 2d at 1303.  Moulton v. DeSue is unlike Tanner's case. Corrections officers and medical personnel checked on Tanner multiple times during the period in question and responded promptly each time Tanner complained from her cell.  Further, the undisputed material facts do not indicate that Tanner was ever unconscious or unable to stand, conditions which the corrections officers willfully ignored in Moulton v. Desue, which created a viable claim for deliberate indifference. See 966 F. Supp. 2d at 1303.

Lastly, Tanner cites to Doe v. Gustavus, a United States District Court for the Eastern District of Wisconsin case.  In Doe v. Gustavus, the plaintiff produced an expert who would "testify that any nurse would have known that the plaintiff was in labor," but that the prison's nurses did not send her to the hospital despite clear signs and symptoms that her labor was progressing -- including rectal pressure, vaginal discharge with some blood, increasing pulse and pain, and vomiting.  291 F. Supp. 3d at 1009.  Although the Court acknowledges some similarities between Doe's symptoms and Tanner's, the undisputed material facts do not suggest that Tanner was obviously in labor at the time the Correct Care Defendants saw and treated her.  In Doe v. Gustavus, the nurse examined Doe and checked her contractions through the small tray door in her cell and concluded that she was in false labor.  See 291 F. Supp. 3d at 1006.  Here Correct Care Defendants did not check Tanner only through the small tray door in her cell, but examined her in

examination rooms and in her own cell.  <u>See</u> Tanner Decl. at 3, 6-7.  Although one of the nurses in <u>Doe v. Gustavus</u> performed an amniotic fluid test, he could not read the test's results and was unable to reach other medical personnel to determine the test's result, so the test indicated nothing to him.  <u>See</u> 291 F. Supp. 3d at 1006.  Here, although it is undisputed that Luna did not perform the amniotic fluid test properly, it is undisputed that the test which Luna performed indicated to her that Tanner's leaked fluid was not amniotic.  <u>See</u> Chiang Depo. at 62:22-63:24; Luna Depo. at 171:16-173:24.  <u>See</u> <u>also</u> <u>supra</u> n.100.

Asked at the hearing which cases were most factually similar to Tanner's, Tanner conceded that there were no Supreme Court cases on point.  <u>See</u> Tr. at 99:23-100:7 (Court, Hernandez). Tanner averred that the Tenth Circuit held that liability can extend in novel circumstances, and cited to <u>Blackmon v. Sutton</u>, 734 F.3d 1237 (10th Cir. 2013), <u>Mata v. Saiz</u>, and <u>Oxendine v. Kaplan</u>, 241 F.3d 1272 (10th Cir. 2001).  Outside of the Tenth Circuit, Tanner referred the Court to the cases discussed <u>supra</u> 136-140, with emphasis on <u>Pool v. Sebastian Cty.</u>, <u>Goebert v. Lee Cty.</u>, and <u>Havard v. Wayne Cty.</u> for their alleged factual similarities to Tanner's case.  The Court concludes that <u>Pool v. Sebastian Cty.</u>, <u>Goebert v. Lee Cty.</u>, and <u>Havard v. Wayne Cty.</u> are factually inapposite comparisons for the reasons cited above.  <u>Blackmon v. Sutton</u> concerns prison officials who assumed gate keeping authority over prisoner access to medical professionals.  <u>See</u> 734 F.3d at 1245.  In <u>Blackmon v. Sutton</u>, the officials did not deny that they were aware of Blackmon's "grave mental health problems, that they were aware those problems grew worse during his stay, or that their routine resort to the Pro-Straint chair wasn't helping."  734 F.3d at 1245.  <u>Blackmon</u>

v. Sutton presents a very different set of factual circumstances than Tanner's case, because Tanner's condition was not a repeated occurrence to which the prison officials regularly responded, and none of the medical professionals in Tanner's case were subjectively aware of the gravity of Tanner's health problems. Blackmon v. Sutton presented a case where the defendant-officials were indisputably aware of an excessive risk to inmate health or safety, and disregarded that risk by undertaking actions "without any penological purpose," which then exposed Blackmon to excessive force and unconstitutional punishment. 734 F.3d at 1243-44. Here, the Correct Care Defendants were unaware of any excessive risk to Tanner's safety and promptly provided care consistent with their medical judgment.

In Mata v. Saiz, the defendant-official, whom the Tenth Circuit concluded was not entitled to qualified immunity, "completely refused to assess or diagnose Ms. Mata's medical condition at all . . . ." 427 F.3d at 758. The Tenth Circuit granted qualified immunity to another medical defendant, because, at the time that defendant evaluated Mata, "no indication existed that Ms. Mata was subject to serious medical risk." 427 F.3d 745. In fact, the only defendant to whom the Tenth Circuit did not afford qualified immunity was the defendant who completely denied any medical care or treatment. See 427 F.3d at 758. Here, each Correct Care Defendant engaged Tanner to provide the medical care and treatment they deemed proper in their professional judgment. The Correct Care Defendants thus did not serve as gatekeepers to further care; they attempted to render the care themselves.

Oxendine v. Kaplan concerned prison medical professionals who performed an emergency reattachment of an inmate's finger. See 241 F.3d at 1272. In Oxendine v. Kaplan, the Tenth Circuit concluded that Oxendine alleged facts supporting an inference that the defendant-doctor knew of and disregarded a substantial risk to Oxendine's health, where:

> The complaint and attached documents demonstrate: (1) Dr. Kaplan acknowledged the delicate nature of the operation and follow-up care of Oxendine's finger by requiring daily visits by Oxendine to the infirmary; (2) Oxendine repeatedly informed Dr. Kaplan that his finger "had turned jet black," "that the amputated portion was gradually falling off from the remaining section of the finger," and that he was in considerable pain due to the decaying skin tissue; (3) decaying tissue appeared as early as March 20, 1999, and Dr. Kaplan himself recorded evidence of gangrenous tissue on March 22, 1999; and (4) Dr. Kaplan did not seek specialized medical assistance to deal with Oxendine's decaying finger until at least March 29, 1999, and quite possibly much later.

241 F.3d at 1279. Further, Oxendine's decaying finger came about as a result of a surgery which the defendant, Dr. Kaplan, himself performed. See 241 F.3d at 1279. Oxendine v. Kaplan, too, is unlike Tanner's case. First, unlike the defendants in Oxendine, the Correct Care Defendants did not bring about Tanner's condition and then decline to treat a condition they created. Second, Tanner never faced anything close to the week-long delay in receiving medical care suffered by the plaintiff in Oxendine. Finally, unlike the defendant-doctor in Oxendine, the Correct Care Defendants actually rendered medical care to Tanner; their role was not limited to deciding whether and when to send Tanner for specialized treatment.

Tanner cites to no factually similar cases from the Supreme Court or the Tenth Circuit, nor to any cases from outside of the Tenth Circuit which provide a source of clearly established law that would have placed the Correct Care Defendants on notice that their conduct violated

established law, even considering Tanner's case as novel factual circumstances.  See Quinn v. Young, 780 F.3d 998, 1005 (10th Cir. 2015).  Tanner cites to no cases suggesting that medical professionals may be deliberately indifferent where they respond to a pregnant inmate's requests for medical care and attention, assess and treat her symptoms, tell her to seek further medical attention as needed, make records of their observations, and transport her to the hospital when it is clear that labor is imminent.  Tanner cites to no cases suggesting that the defendants should have known of a duty to transport a pregnant inmate to the hospital on the first indication of blood, regardless how light or infrequent.  The Court concludes that Tanner has not satisfied her burden as to the qualified immunity analysis' second prong, and that, accordingly, the Correct Care Defendants are entitled to qualified immunity on her deliberate indifference claim in Count I.

## III.    THE CORRECT CARE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON COUNT II, BECAUSE THEY DID NOT VIOLATE TANNER'S CLEARLY ESTABLISHED FOURTEENTH AMENDMENT RIGHT TO CARRY HER PREGNANCY TO TERM.

In the Complaint's Count II, Tanner avers that the "substantive component of the Due Process Clause in the Fourteenth Amendment . . . prohibits state actors from placing a substantial obstacle in the path of a person's choice whether to procreate and give birth to a child when pregnant."  Complaint ¶ 83, at 24.  Tanner specifically defines the constitutional right in question as that of her "fundamental right to procreate and give birth to a child while pregnant."  Complaint ¶ 86 at 25.  Tanner further alleges that this right is "clearly established and actionable under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983."  Complaint ¶ 86, at 25.  Tanner contends that the individual Correct Care Defendants "placed a substantial obstacle

in the path of Plaintiff Tanner's choice to carry her pregnancy to term and give birth to a child." Complaint ¶ 85, at 24. Tanner alleges that the individual Correct Care Defendants thereby "imposed an undue burden on Plaintiff Tanner's constitutional right to decide whether the carry her pregnancy to term and give birth to a child." Complaint ¶ 85, at 24. The Correct Care Defendants counter that the undue-burden standard applies only to legislative action. See Reply at 52. The Correct Care Defendants contend that any substantive-due-process claim against executive officials in the area of reproductive freedom must show deliberate indifference or conscience-shocking behavior. See Reply at 52.

A. **THE UNDISPUTED FACTS AND ALL REASONABLE INFERENCES IN TANNER'S FAVOR FROM THE DISPUTED FACTS DO NOT SHOW A VIOLATION OF TANNER'S CONSTITUTIONAL RIGHTS UNDER THE DUE PROCESS CLAUSE.**

Tanner argues that the Court should look to Casey, which "clearly established" the "substantive component of those protections." Response at 56. Tanner contends that a pregnant woman's choice to give birth "falls under a clearly established form of constitutional jurisprudence spanning from Skinner v. Okla. ex rel. Williamson, 316 U.S. 535 (1942), to Whole Woman's Health v. Hellerstedt, 136 S.Ct. 2292 (2016)." Response at 55. Tanner, seeking to incorporate this broader jurisprudence of reproductive freedom, argues that the Casey test applies not only to a woman's decision to terminate a pregnancy, but also to cases where a woman decides to continue a pregnancy until birth. See Response at 56. Tanner contends that the important ingredient in these cases is not the right to abortion, but rather the "right 'to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether

to bear or beget a child.'" Response at 56 (quoting Eisenstadt v. Baird, 405 U.S. 438, 453 (1972)). Tanner asserts that, to determine whether state action interfering with an individual's fundamental liberty interest in deciding whether to bear or beget a child is an undue burden, "courts look to whether the purpose or effect of the action 'is to place a substantial obstacle in the path of a woman's choice.'" Response at 56 (quoting Whole Woman's Health v. Hellerstedt, 136 S.Ct. 2292, 2309 (2016)("Whole Woman's Health")). Tanner contends that this test has been applied in custodial situations in which the state maintains complete control over female reproductive decisions, because inmates cannot engage in actions to access the health-care services they need to effect their decision whether to bear or beget a child. See Response at 56-57 (citing Garza v. Hargan, 304 F. Supp. 3d 145, 163 (D.D.C. 2018)("Garza")). Prison regulations burdening a woman's right to bear and beget a child do not pass the test of being "'reasonably related to legitimate penological interests.'" Response at 57 (quoting Roe v. Crawford, 514 F.3d 789, 794-98 (8th Cir. 2008)("Crawford")).

Tanner further argues that, although there is a split in authority regarding whether a woman's interest in pursuing an elective, non-therapeutic abortion is a serious medical need for the Eighth Amendment's purposes, the "authorities . . . clearly recognize that a woman's interest in carrying a viable pregnancy to term and giving birth constitutes such a serious medical need." Response at 57. Tanner contends, accordingly, that the Correct Care Defendants violated her right to carry to term by "not taking prompt action to give effect to Plaintiff Tanner's reproductive choice," by "denying her the necessary prenatal and obstetric care when she began to experience

complications and became concerned that she could be going into labor," and by denying Tanner

"access to a qualified and equipped obstetrical care facility." Response at 57-58.

No genuine issue of material fact exists whether the Correct Care Defendants violated

Tanner's Due Process Clause reproductive rights. This conclusion follows regardless whether the

Court uses the undue-burden test, as Tanner argues, or the shocks-the-conscience test, as the

Correct Care Defendants argue.[218] Tanner wants to rest her Due Process Clause claim on a "clearly

---

[218] The Court acknowledges that all substantive due process claims against executive officials must be analyzed under a shock-the-conscience standard. See supra. The Correct Care Defendants argue that each of Plaintiff's cited undue-burden cases pertain to legislation, policy, or custom, rendering that test inapposite here. See Reply at 52-53. Instead, the Correct Care Defendants point to Cnty of Sacramento v. Lewis, 523 U.S. 833 (1998)("Lewis"), and Camuglia v. City of Albuquerque, 448 F.3d 1214 (10th Cir. 2006). See Reply at 50. Under this standard, a cognizable substantive due process violation by an executive official is one that alleges behavior "at the ends of the tort law's spectrum of culpability." Lewis, 523 U.S. at 848. Justice Souter's opinion in Lewis notes that the shock-the-conscience standard properly takes into consideration the complicated calculus executive officials must balance when addressing an ongoing or unfolding emergency. 523 U.S. at 853-55. Accordingly, something more akin to intent or motive to harm is necessary for a substantive due process claim against an executive official, but even then the degree of fault necessary to establish a violation will vary with the gravity of the circumstances with which the official is confronted. See Lewis, 523 U.S. at 853-54 (noting that, "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed'" (quoting Daniels v. Williams, 474 U.S. 327, 332 (1986))). Chief Judge Tymkovich summarizes the proper test for alleged substantive due process violations involving executive officials:

> What differentiates a constitutional transgression from an ordinary common law tort is a "level of executive abuse of power ... that ... shocks the conscience." [Lewis, 510 U.S. 846.] In other words, the executive abuse represents "arbitrary action of government" and requires a showing of government officials "abusing their power, or employing it as an instrument of oppression." [Lewis, 510 U.S. at 845-46] (quotations and brackets omitted). While recognizing "no calibrated yard stick," [Lewis, 510 U.S. at 847], the Supreme Court instructs that the "constitutional

---

established form of constitutional jurisprudence spanning from *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942)," to Whole Woman's Health. Response at 55. Tanner argues that this line of jurisprudence evidences the Supreme Court's recognition that freedom of personal choice in family life matters is a Fourteenth Amendment fundamental liberty interest. See Response at 55. Tanner argues that Casey establishes that liberty interest's substantive protections,

---

concept of conscience shocking duplicates no traditional category of common-law fault," [Lewis, 510 U.S. at 848].

The Supreme Court has also explained, "[r]ules of due process are not ... subject to mechanical application in unfamiliar territory." [Lewis, 510 U.S. at 850]. What

> shocks [the conscience] in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstance before any abuse of power is condemned as conscience shocking.

[Lewis, 510 U.S. at 850]. Thus, the cases recognize that common-sense distinctions exist between force in one setting (say, a prison) and force in another (say, a kennel business). The case law also recognizes official conduct may be more egregious in circumstances allowing for deliberation (such as when a person is in custody or under governmental control or supervision) than in circumstances calling for quick decisions (such as police chases or prison disturbances).

Williams v. Berney, 519 F.3d 1216, 1220-21 (10th Cir. 2008).

Under this standard, no genuine issue of material fact exists whether the Correct Care Defendants violated Tanner's Due Process Clause reproductive rights. The Correct Care Defendants' actions do not shock the Court's conscience. Tanner has offered no evidence that the Correct Care Defendants intended to harm her or thwart her intent to carry her pregnancy to term, and nor has she offered any evidence that the Correct Care Defendants' behavior approaches the kind of "precipitate recklessness" that Lewis, 523 U.S. at 853, contemplates. The Court, nonetheless, drawing all inferences in Tanner's favor, concludes that, even under Tanner's proffered undue-burden standard, no genuine issue of material fact exists whether the Correct Care Defendants violated Tanner's Due Process reproductive rights.

namely, by establishing the undue burden test.  <u>See</u> Response at 56.  Tanner acknowledges that "there is no regulation at MDC which would have prohibited the CCS Defendants from effecting Plaintiff Tanner's transport to a hospital," but contends that her cited authorities nevertheless "clearly recognize that a woman's interest in carrying a viable pregnancy to term and giving birth constitutes such a serious medical need" under the Eighth and Fourteenth Amendments.  Response at 57.  Tanner contends that the Correct Care Defendants must produce a compelling, substantial, or legitimate state interest to justify that they did not take prompter action or pursue the "necessary prenatal and obstetric care."  Response at 57.

Although the Court acknowledges the broad statements about reproductive rights in <u>Skinner v. Okla. ex rel. Williamson</u>, <u>Casey</u>, <u>Whole Woman's Health</u>, <u>Garza</u>, and <u>Crawford</u>, the Court cannot conclude that a reasonable official would understand those cases as clearly establishing a woman's right to prompt action to effect their choice to carry to term, or to specific prenatal and obstetric care interventions "when she began to experience complications and became concerned that she could be going into labor."  Response at 57-58.  Further, <u>Casey</u> confines itself to state regulations with the purpose or effect of placing an undue burden on a woman's reproductive choice:

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.  A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it.  And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

. . .
> What is at stake is the woman's right to make the ultimate decision, not a right to
> be insulated from all others in doing so. Regulations which do no more than create
> a structural mechanism by which the State, or the parent or guardian of a minor,
> may express profound respect for the life of the unborn are permitted, if they are
> not a substantial obstacle to the woman's exercise of the right to choose.

Casey, 505 U.S. at 877. Casey thus does not clearly establish a right to specific prenatal and obstetric care interventions for an incarcerated individual "concerned that she could be going into labor." See Response at 58. Tanner contends, however, that the proper inquiry, in the context of prison officials' treatment of pregnant inmates, is whether the Correct Care Defendants' actions were "reasonably related to legitimate penological interests." Response at 57. However, the case Tanner cites as support for this contention refers to policies which impinge on inmates' constitutional rights, rather than on medical decisions as to the best course of treatment for a pregnant individual. See Roe v. Crawford, 514 F.3d 789, 794-95 (8th Cir. 2008)(addressing a prison's policy of transporting pregnant inmates off-site for abortions only if necessary to save the life of the mother or pursuant to a court order); Roe v. Leis, No. CIV A.00-651, 2001 WL 1842459, at *3 (S.D. Ohio Jan. 10, 2001)(Dlott, J.)(same).

Tanner's other cited authorities are also inapposite. Garza, to which Tanner cites, involves certification of a class of pregnant inmates challenging a federal policy of imposing significant barriers to abortion. See 304 F. Supp. 3d at 150. Such regulations prohibiting female inmates from making the decision whether to abort their pregnancy prior to viability were the crux of Casey's constitutional question. See Garza, 304 F. Supp. 3d at 162. As such, the limitations of Casey's applicability to Tanner's claims, discussed supra at 282, apply equally to Garza.

The Court concludes that no genuine issue of material fact exists regarding the existence of a state regulation or law placing an undue burden on Tanner's right to choose to carry her pregnancy in term. Tanner admits no regulation posed an undue burden on her choice. The line of jurisprudence to which Tanner cites does not establish a constitutional violation where an individual's actions, not undertaken in the process of effectuating state policy or regulation, by purpose or effect imposed a burden on a woman's right to carry a pregnancy to term. Further, the undisputed facts indicate that Tanner carried her pregnancy to term -- none of the Correct Care Defendants' alleged actions, none of the undisputed facts, none of the reasonable inferences taken in Tanners favor, and none of Tanner's proposed facts suggest that are adopted that any individual Defendant placed an undue burden on Tanner's choice to continue her pregnancy until birth. The Court concludes that there is no genuine dispute of material fact whether the Correct Care Defendants violated Tanner's reproductive rights under the Due Process Clause of the Fourteenth Amendment.

## B. TANNER'S ALLEGED SUBSTANTIVE DUE PROCESS RIGHT WAS NOT CLEARLY ESTABLISHED

Even if Tanner has articulated an established Due Process Clause violation, the constitutional right allegedly violated is not clearly established.[219] "Ordinarily, in order for the

---

[219] Typically, "[if] no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Cortez v. McCauley, 478 F.3d 1108, 114 (10th Cir. 2007)(en banc). Only when the plaintiff proves a constitutional violation will courts ask whether the constitutional right was clearly established. See Williams v. Berney, 519 F.3d 1216, 1220 (10th Cir. 2008). The Court, nonetheless, drawing

law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. See Medina v. City & Cty. of Denver, 960 F.2d at 1498. Tanner has identified no Tenth Circuit, Supreme Court case, or out-of-Circuit case addressing a similar factual circumstance or concluding that there exists a constitutional right to be free from unwarranted individual -- not State -- intrusion on the choice to carry a pregnancy to term, or that a non-policy-driven delay in care or failure to pursue particular obstetric interventions imposes an undue burden on a woman's right to choose, such that the Correct Care Defendants would have been on notice that their conduct violated established law. Quinn v. Young, 780 F.3d at 1005.

Perhaps acknowledging the lack of specific, analogous authority establishing Tanner's right to specific prenatal and obstetric care, Tanner argues that "the burdens effected by the CCS Defendants' acts and omissions are so undue that their unconstitutionality reaches the level of obviousness discussed in United States v. Lanier, 520 U.S. 259, 271." Response at 58. See Response at 58. United States v. Lanier involved a state judge's challenge, on vagueness grounds, to 18 U.S.C. § 242's applicability to his sexually assaulting several women in his judicial chambers. See 520 U.S. at 261-262. Acknowledging § 242's sweeping language concerning "the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or

all inferences in Tanner's favor, concludes that even if Tanner has articulated an established Due Process Clause violation, the right allegedly violated is not clearly established.

laws of the United States," Justice Souter nonetheless wrote that the constitutional standard of fair warning requires that unlawfulness be "apparent" and give "reasonable warning," which he equated with the clearly established prong of qualified immunity. United States v. Lanier, 520 U.S. at 265, 269-271. The Court acknowledged that in some "instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" United States v. Lanier, 520 U.S. at 269 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Conversely, the Court noted that, in some cases, "a very high degree of factual particularity may be necessary" when "an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue." United States v. Lanier, 520 U.S. at 269. United States v. Lanier is thus inapposite here, where no authority has established that the general rule of undue burden applies to individual prison officials' specific decisions in their provision of prenatal and obstetric care, and so "a very high degree of factual particularity" is necessary to clearly establish Tanner's claim. See United States v. Lanier, 520 U.S. at 260.

The Court concludes that there is no dispute of material fact that the Correct Care Defendants did not violate Tanner's clearly established constitutional Due Process rights to reproductive choice. The Court concludes, therefore, that the Correct Care Defendants are entitled to qualified immunity on Count II.

## IV. THE COURT WILL DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS IN THE CASE.

Based on the Court's grant of the Partial MSJ, no federal claims now remain in this case. 28 U.S.C. § 1367(c)(3) provides: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Tenth Circuit reviews a district court's decision not to exercise jurisdiction under 28 U.S.C. § 1367(c) for abuse of discretion. See Nielander v. Bd. of Cty. Comm'rs, 582 F.3d 1155, 1172 (10th Cir. 2009). The Tenth Circuit held: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims." Koch v. City of Del. City, No. 10-6105, 2011 WL 5176164, at *14 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).

Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. United Mine Workers of Amer. v. Gibbs, 383 U.S. 715, 726 (1966). The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies. See Armijo v. N.M., No. 08-0336, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it."). Additionally, the Tenth Circuit has recognized that a district

court does not commit an "abuse of discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'" Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

The Court concludes that dismissal of the remaining state law claims without prejudice is proper in this case. The Court has reviewed whether any federal claims remain in the case. It has concluded that the holdings the Court has made in this Memorandum Opinion and Order result in the entry of summary judgment on all of the federal claims in the case. Given the Tenth Circuit's guidance that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims," the Court concludes that dismissing the remaining state law claims without prejudice is the appropriate resolution of this matter. Koch v. City of Del. City, 2011 WL 5176164, at *14 (quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d at 1156). Further, the Civil Cover Sheet, filed August 25, 2017 (Doc. 2)("Civil Cover Sheet") establishes that this case was originally filed in federal court based on federal question jurisdiction, and was not removed, which gives rise to a situation where the Court should dismiss the remaining state law claims without prejudice as it cannot remand the case to state court. See Civil Cover Sheet at 1.

**IT IS ORDERED** that: (i) the Defendants Timothy I. McMurray, M.D., Adriana Luna, R.N., Taileigh Sanchez, R.N[.]'s Motion for Partial Summary Judgment and Memorandum in Support, filed April 22, 2019 (Doc. 220), is granted; and (ii) there being no federal claims

remaining in the case, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims and will dismiss the remaining state law claims without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*

Nicole Moss
The Law Office of Nicole W. Moss
Albuquerque, New Mexico

--and--

Paul J. Kennedy
Jessica M. Hernandez
Arne Leonard
Elizabeth Harrison
Kennedy, Hernandez & Associates, P.C.
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Alfred A. Park
Geoffrey D. White
Park & Associates, L.L.C.
Albuquerque, New Mexico

   *Attorneys for Defendants Timothy I. McMurray, Adriana Luna, Audrey Leber, Taileigh Sanchez, Elisa Manquero, Correct Care Solutions, LLC, Christopher Mercer, and Ed Kossman*

Jonlyn M. Martinez
Law Firm of Jonlyn M. Martinez
Albuquerque, New Mexico

*Attorney for Defendants Board of County Commissioners of Bernalillo County, Thomas J. Ruiz, Claudia Rodriguez-Nuñez, Martina Sanchez-Filfred, and Tina M. Muñoz*