## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SHAWNA TANNER,**

**Plaintiffs,**

v.                                                          No.   **17-cv-876 JB-JFR**

**TIMOTHY I. MCMURRAY, M.D.,**
**ADRIANA LUNA, R.N., TAILEIGH**
**SANCHEZ, R.N., and CORRECT CARE**
**SOLUTIONS, LLC (n/k/a WELLPATH, LLC),**

**Defendants.**

## SECOND AMENDED COMPLAINT
## FOR CIVIL RIGHTS VIOLATIONS

Plaintiff Shawna Tanner, through her attorneys of record, Kennedy, Hernandez & Associates, P.C. and the Law Office of Nicole W. Moss, LLC, brings this Second Amended Complaint for violations of her civil rights under the Eight and Fourteenth Amendments to the United States Constitution.

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

2.      Venue is proper in this District as the Plaintiff and, upon information and belief, the individual Defendants are residents of New Mexico under 28 U.S.C. § 1391 and all of the acts complained of occurred in New Mexico. The cause of action arose in New Mexico.

### PARTIES

3.      Plaintiff Shawna Tanner was at all relevant times a New Mexico resident. During the period of her incarceration at the Metropolitan Detention Center ("MDC") in October 2016, Ms. Tanner was a pretrial detainee. She brings this lawsuit individually on her own behalf. Her son, Jay Hinton, Jr. ("Baby Jay"), was a viable fetus of approximately 36 weeks' gestational age

1

and able to survive outside his mother's womb at the time the Defendants' wrongful conduct caused his death.

4.      At the time of the events described herein, Defendant Correct Care Solutions, LLC, n/k/a Wellpath, LLC (hereafter "CCS") was a Kansas Limited Liability Company doing business in New Mexico as a private for-profit medical contractor exclusively dedicated to providing healthcare services in government correctional facilities. Nationwide, it operated in approximately 200 jails in 38 states. At the time of the events described herein and of the filing of Ms. Tanner's original complaint in 2017, Defendant CCS maintained a home office in Nashville, Tennessee, and a site office located at MDC in Bernalillo County, New Mexico. Upon information and belief, Defendant CCS subsequently changed its corporate form and/or incorporated under a different name (Wellpath, LLC) in Delaware. At all relevant times, Defendant CCS employed and exercised direct supervisory control over Defendants McMurray, Luna, and Sanchez, who were acting under the color of law within the scope of their duties and employment as agents of CCS.

5.      Defendant Timothy I. McMurray, M.D., was at all relevant times residing in New Mexico and employed by Defendant CCS as the Site Medical Director at MDC, responsible for providing medical services to MDC inmates, including Ms. Tanner, and exercising direct supervisory control over the other medical staff at MDC as the "ultimate decision-maker" on clinical issues. Defendant McMurray is sued in his individual capacity. At all relevant times, he was acting under the color of law within the scope of his duties and employment as Site Medical Director at MDC.

6.      Defendants Adriana Luna, R.N., and Taileigh Sanchez, R.N., were at all relevant times residing in New Mexico and employed by Defendant CCS as Registered Nurses (RNs) at MDC, responsible for providing healthcare services to MDC inmates, including Ms. Tanner.

Defendants Luna and Sanchez are sued in their individual capacities. At all relevant times, they were acting under the color of law within the scope of their duties and employment.

## FACTUAL BASIS

7.     On October 4, 2016, in her third trimester of pregnancy, Ms. Tanner was taken into MDC custody as a pretrial detainee pending a probation-violation hearing.

8.     At the time of Ms. Tanner's incarceration, Defendant CCS was providing medical care in MDC pursuant to a December 9, 2014 written contract with Bernalillo County, entitled "Agreement for Medical, Dental, Mental Health, Psychiatric and Methadone Services for the Metropolitan Detention Center" (hereafter "Medical Services Agreement"). That agreement remained in effect, as amended, for a four-year term. Defendants McMurray, Luna, and Sanchez were employed in MDC pursuant to Defendant CCS's agreement with Bernalillo County.

9.     Before Ms. Tanner entered MDC custody, she was receiving prenatal care for her pregnancy. At the time of her arrest, she was performing a 24-hour urine collection to monitor protein in her urine. Her advanced pregnancy was obvious from the size of her belly, but she also explicitly informed CCS personnel of her condition, prior care, and known risks to her pregnancy (including her substance-abuse history) during her intake on October 4, 2016.

10.     Upon learning of Ms. Tanner's pregnancy during her intake, Defendant CCS's employees did not contact her doctors, request or obtain any of her medical records, arrange for her transport to her previously-scheduled prenatal appointment on October 11, 2016, or permit her to complete the proteinuria testing already ordered by her other prenatal providers.

11.     When a urinalysis on October 12, 2016 again revealed protein in Ms. Tanner's urine, Defendant CCS did not treat her or perform follow-up testing. No one answered her repeated questions about her prenatal care. She never saw an OB/GYN while she was in MDC custody.

3

12.     On or about October 14, 2016, CCS Nurse Elisa Manquero spent approximately five minutes conducting an "assessment" of Ms. Tanner for the purpose of filling out a "Medical History and Physical Assessment with Mental Health" form. This assessment did not include any physical examination, referral for prenatal care, review of medical records or history, or treatment plan. Nurse Manquero did not review CCS's own intake form on Ms. Tanner and neglected even to note that Ms. Tanner was pregnant. Defendant McMurray reviewed this form without correcting any of its obvious errors. No one followed up with Ms. Tanner or allowed her to see an OB/GYN.

13.     Early in the morning on October 16, 2016, Ms. Tanner's water broke (also called "rupture of membranes") and clear fluid began gushing from her vagina. At around 7:00a.m., she told an MDC corrections officer that she was having contractions, bleeding, and that she believed her water had broken. The cramping and pressure in her pelvic area was so intense that at times she was screaming in pain in her cell.

14.     An MDC corrections officer informed Defendant Luna of Ms. Tanner's condition at around 7:36a.m. on October 16, 2016. Defendant Luna nonetheless made Ms. Tanner wait for almost an hour and a half because she was "busy."

15.     Eventually, Defendant Luna saw Ms. Tanner in the medical unit of MDC. By 9:00am, she had learned that Ms. Tanner was pregnant, bleeding, cramping and in pain, gushing an unidentified clear fluid, and begging to go to the hospital. She refused to look at Ms. Tanner's vagina, call a doctor, or arrange transport to a hospital. She did not test any of the fluid. She spent only five minutes with Ms. Tanner.

16.     Defendant CCS provided its employees with "nursing pathways," computer-based forms that conveyed protocols for emergent transport or provider involvement. Nurses like Defendants Luna and Sanchez understood these to be the main clinical guidance Defendant CCS

gave them. The nursing pathway for pregnant inmates described the following "emergent" scenario that would require calling a doctor or ambulance: "Multigravida"—i.e., second pregnancy or more—"with any associated symptom or event such as loss of mucous plug or bloody show, pain or cramping, any evidence of amniotic fluid (water breaking)." "Urgent" scenarios included "[p]resenting with bleeding, pain and/or cramping" and also required contacting a doctor.

17.     Defendant Luna did not use the pregnancy-related pathway as she interacted with Ms. Tanner, instead choosing to complete it from memory twenty minutes later. She knew that it was not Tanner's first pregnancy, and that Tanner had bleeding, pain, cramping, and clear fluid described as broken water. Defendant Luna nonetheless did not select the "emergent" pathway for "[m]ultigravida with any associated symptom or event such as loss of mucous plug or bloody show, pain or cramping, any evidence of amniotic fluid (water breaking)." She also did not select "urgent," as required for patients "[p]resenting with bleeding, pain and/or cramping," which called for immediate provider involvement. She marked Ms. Tanner's symptoms "routine," but failed to take even the "routine interventions" indicated on the pathway (like requesting Ms. Tanner's prenatal records). She made no attempt to contact Defendant McMurray, who was not at the facility at the time, and did not "activate EMS" as the pathway directed.

18.     Deliberately ignoring Ms. Tanner's visible and reported symptoms as well as the applicable protocols, Defendant Luna gave Ms. Tanner sanitary napkins for her bleeding and sent her back to her cell. A corrections officer walked Ms. Tanner slowly back to her pod, during which Ms. Tanner was forced to stop and lean against the wall multiple times because she was in such pain and felt acute pelvic pressure.

19.     Within an hour of Ms. Tanner returning to her cell, a corrections officer called the medical unit again because Ms. Tanner was still bleeding, had begun to experience closer

5

contractions, and believed her baby was crowning. Defendant Luna did not answer. At about 10:05am, the officer called a "Code 43" medical emergency to force CCS personnel to respond.

20.     Defendant Luna and a CCS EMT went to Ms. Tanner's cell in response to the Code 43. Defendant Luna saw multiple large blood clots in the toilet and a blood-soaked pad in the trash can, which she picked up and questioned Ms. Tanner about. Ms. Tanner described her symptoms while hyperventilating and begging, "I don't want to have this baby here." She told Defendant Luna that she could feel her baby's head, again asking that someone perform an examination to see whether the baby was crowning. Defendant Luna said, "No, we don't do that," and—in the presence of multiple witnesses—berated and belittled Ms. Tanner for being "a drug addict" who "didn't care about her baby," accusing her of "faking" and "lying."

21.     As Ms. Tanner returned to the medical unit for the second time that morning, she grabbed her stomach and doubled over in pain in Defendant Luna's presence. She was copiously leaking amniotic fluid down the hallway floor as she walked. Her pants were soaked. Once she arrived in the medical unit, Defendant Luna again made her sit and wait in her wet pants before she could be seen.

22.     By about 10:30a.m. on October 16, 2016, Defendant Luna knew that Tanner had been bleeding, in pain, and leaking clear fluid from her vagina for hours. Suspecting that the clear fluid was amniotic fluid, Defendant Luna attempted to test it with a nitrazine strip, which turns blue to indicate an elevated pH level. From the color, the user determines the numeric value of the pH level; higher levels are consistent with amniotic fluid. Defendant Luna improperly attempted to test the fluid on discarded items rather than on fluid from Ms. Tanner's vagina (which she still refused to look at). That is not a valid method for performing a nitrazine test and violated the applicable federal Clinical Laboratory Improvement Amendments ("CLIA") standards, as any

nurse qualified to perform such testing would know. Despite its improper use, the strip turned blue, indicating a pH consistent with amniotic fluid. No provider was present to evaluate the results and no other testing was available on-site. No one preserved the nitrazine strip.

23.     Defendant Luna called Defendant McMurray following the Code 43 and notified him that she had seen Ms. Tanner twice already that morning, describing Ms. Tanner's symptoms. Defendant McMurray was not at MDC and knew there were no other providers there, either. He did not attempt to assist with Ms. Tanner's care in any way, not even speaking to her directly. He just told Defendant Luna to put Ms. Tanner in segregation in the Sheltered Housing Unit ("SHU") and that he would not see Ms. Tanner until he returned to the facility the next day.

24.     Defendant Luna refused Ms. Tanner's continued requests to go to the hospital. She offered Ms. Tanner only water, Tylenol for the pain of her contractions, and sanitary napkins for her vaginal bleeding. She confirmed that Ms. Tanner's baby had a detectable heartbeat. She repeatedly told Ms. Tanner that she could not have any other drugs, even though Ms. Tanner had not requested any (and is allergic to certain painkillers, as her medical records would have shown if they had been reviewed). Defendant Luna then moved Ms. Tanner into a segregation cell in the SHU because she believed that corrections officers would continue to report Code 43 medical emergencies if Ms. Tanner returned to her pod.

25.     Defendant McMurray knew on the morning of October 16, 2016 that Ms. Tanner was being segregated in the SHU. He also knew that there were no providers available to monitor Ms. Tanner due to the facility's short staffing, and that she would not see any provider on-site unless and until he returned to MDC himself. He nonetheless agreed to segregate Ms. Tanner rather than send her to a hospital, thereby leaving her without any access to a physician of any kind until the next day.

26.     After the Code 43, Defendant Luna left Ms. Tanner segregated in the SHU for about seven hours without checking on her at all. When she finally did look in on Ms. Tanner again, Ms. Tanner was anxious, crying, still leaking amniotic fluid, and continuing to experience pelvic pressure and contractions. Defendant Luna waved goodbye and went home without helping Ms. Tanner any further.

27.     While Ms. Tanner was laboring alone in a segregation cell, Defendant McMurray reviewed documentation of the Code 43 from several hours before. He read the EMT's report stating that the nitrazine strip had a 7.0 pH result (indicative of amniotic fluid), that Ms. Tanner was bleeding "bright red" blood, and that she claimed to feel her baby's head crowning. He signed off on the report and did nothing. He made no attempt to order Ms. Tanner's transport to a hospital. He did not return to the facility at any point on October 16, 2016, even though he knew he was the only provider available.

28.     Defendant Sanchez took over when Defendant Luna's shift ended. Defendant Luna told her about Ms. Tanner's condition during the shift change, so she knew that Ms. Tanner had complained of contractions, broken water, bleeding, fear for her baby's safety, and anxiety that she would give birth in an MDC cell.

29.     Defendant Sanchez did not see Ms. Tanner until her rounds later that evening, at about 7:28pm. Ms. Tanner showed Defendant Sanchez her sanitary napkin, which had blood and fluid on it. Defendant Sanchez took no action whatsoever. She did not utilize the pregnancy pathway for guidance, call Defendant McMurray, call an ambulance, or provide Ms. Tanner any medical treatment. She left Ms. Tanner in her segregation cell.

30.     Ms. Tanner continued asking for help until Defendant Sanchez agreed to see her in the medical unit. Ms. Tanner again complained of bleeding, cramping, and pressure from a round,

hard object she believed might be her baby's head. She was still leaking amniotic fluid from her ruptured membranes, but the fluid was beginning to have a strange odor after gushing since the early morning hours without antibiotics. She asked Defendant Sanchez to look at her vagina because she felt that something was hanging out, but Defendant Sanchez refused. While Ms. Tanner was in the medical unit, Defendant Sanchez witnessed Ms. Tanner's contractions and attempted to time them; Ms. Tanner reported contractions lasting for ten seconds. Defendant Sanchez confirmed that the baby still had a heartbeat. She did not test the clear fluid, did not refer to the pregnancy pathway, did not call Defendant McMurray or any other provider, and did not allow Ms. Tanner to go to a hospital. She gave Ms. Tanner some Tylenol for her visible pain and sent her back to her segregation cell, where she left the laboring woman alone and unmonitored for the rest of the night shift.

31.     Defendant McMurray saw Ms. Tanner in her segregation cell while on his med-pass rounds the next morning. She had been housed in the SHU since 10:38am the day before. Ms. Tanner reported her ongoing labor symptoms, including cramping and pelvic pressure so intense she had difficulty sitting or using the toilet. She had suffered through these symptoms all night without any medical care and did not even have enough sanitary napkins for her bleeding and broken water. She was distressed and fearful for her baby, asking once again for Defendant McMurray to examine her to see if the child was safe. Defendant McMurray did not check her abdomen, look at her vagina, give her any pain relief, check whether her baby's heart tones were within normal limits, or provide any other medical treatment whatsoever. He also did not refer her to an OB/GYN or other specialist or call an ambulance. For the second day in a row, he said he would see her the next day instead.

32.     Defendant McMurray released Ms. Tanner back to her general-population pod on

the morning of October 17, 2016. Within 45 minutes, a corrections officer in that pod once again called for emergency medical help. Ms. Tanner was bleeding heavily, in severe pain from the cramping and pressure, and had realized that she could no longer feel any fetal movement. None of Defendant CCS's employees, including Defendant McMurray, responded to her pod to help her.

33.     At about 10:13am on October 17, 2016, Ms. Tanner returned to the medical unit for a final time. She was in a wheelchair, unable to walk because of intense pressure from the baby's head and body. Visibly bloody, terrified, and in pain, frequently wiping tears from her face, she reported that she could not feel her baby move. Still no one called for an ambulance.

34.     Other inmates in the waiting area demanded that someone help Ms. Tanner, but a CCS nurse told them to "pipe down." No one brought Ms. Tanner into the examination room until about 10:27am. No doctor was attending and no ambulance had been called. Defendant McMurray, the only physician in the building, was sitting at his desk elsewhere in the medical unit.

35.     Defendant McMurray continued sitting at his desk for over 30 minutes. During that time, Ms. Tanner soaked through about three separate sanitary napkins with her heavy bleeding and multiple CCS nurses tried and failed to find the baby's heartbeat. Finally, after a nurse brought Defendant McMurray a pad saturated with Ms. Tanner's blood and reported the inability to find a fetal heart tone, he ordered Ms. Tanner to go to the hospital—as she had been begging to do for over 24 hours.

36.     The ambulance crew arrived for Ms. Tanner at approximately 11:12am on October 17, 2016. They found her spread on a table with her pants still on, obviously in pain and suffering labor contractions without any pain relief or monitoring equipment. Paramedics removed her pants to find the baby's head already crowning. Ms. Tanner could not be transported for the delivery because it was already underway.

10

37.     The paramedics turned to Defendant McMurray, now present in the room with Ms. Tanner. He was the Site Director and the only physician at the facility. He nonetheless stood in the corner and refused to help, throwing his hands up and shaking his head 'no.' A detox paramedic delivered Jay Hinton, Jr. just minutes later, without anesthetic and without any assistance from Defendant McMurray.

38.     Baby Jay was stillborn, with the umbilical cord wrapped around his neck. The ambulance paramedics once again turned to Defendant McMurray for guidance and he again offered no help.

39.     Someone in the crowded room told Ms. Tanner that her baby was not breathing and was dead. She was told not to look. She was shackled to a gurney with no pants on and transported to Lovelace Women's Hospital while a stranger followed carrying her dead son swaddled in a blanket.

40.     Ms. Tanner remained at Lovelace Women's Hospital for a few hours, under guard, before she was forced to return to MDC. She was placed back in a segregation cell in the SHU, where she received inadequate postpartum care from the same individuals responsible for her son's death. Baby Jay's body was ultimately released to the Office of the Medical Investigator for an autopsy, which revealed that he was well-developed but had died during delivery after prolonged premature rupture of the amniotic sac.

41.     At the time of her baby's stillbirth, Ms. Tanner had been losing amniotic fluid for well over 24 hours without monitoring or antibiotics, as a result of which she had developed an infection. At least one nurse present during delivery observed that there was little or no amniotic fluid left by the time the baby was born.

42.     Baby Jay died on October 17, 2016 of routine complications of labor, which would

have been readily preventable in a hospital setting. He had been alive the day before, when Defendants Luna, Sanchez, and McMurray refused to let his mother go to the hospital or see a doctor; he only died during the latter part of delivery. He would have survived if Ms. Tanner had been provided with basic, easily accessible medical care rather than left to labor unmonitored for 30 hours in a cell.

43.     In October 2016, Defendant McMurray was empowered to make off-site referrals and to transfer patients who needed specialized or emergent medical care, including pregnant patients. Defendants Luna and Sanchez were likewise able to activate emergency medical services for their patients in case of any emergency on their shifts. They did not do so, at the cost of a baby's life and extraordinary physical and emotional harm to his mother.

44.     All the Defendants knew that Defendant CCS's staffing plan for MDC had multiple provider vacancies in 2016. By October 16, 2016, Defendant McMurray was the only physician at MDC and there was only one physician's assistant. At times—as on that day, including during the Code 43—a nurse staffed the medical unit without any providers on site at all. All the Defendants knew that the staffing vacancies caused delays in providing acute medical care.

45.     Although Defendant CCS agreed in June of 2015 to add a bi-weekly on-site OB/GYN clinic at MDC, it had failed to provide one by October 2016. There was no one at all certified in obstetrics at the facility, and Defendant CCS had no equipment or qualified personnel on-site to perform basic monitoring services, like ultrasounds or non-stress tests; it therefore had to refer all prenatal and obstetric appointments off-site, even for the most routine prenatal care. Defendant CCS certainly was not equipped to handle labor and delivery at MDC and any inmates who required medical attention of that kind thus had to be transported off-site. Further, as a matter of corporate policy, Defendant CCS specifically excluded pregnant inmates' unborn babies from

the scope of the healthcare it would provide at its facilities. The company has stated that is "not responsible for the care of infants," including those still being carried by inmates in custody.

46.     All the Defendants knew in October 2016 that the facility could not provide adequate on-site medical care for labor, delivery, or obstetric emergencies. Defendants McMurray, Luna, and Sanchez each also knew of their own inability to treat pregnancy-related conditions or emergencies. Defendants Luna and Sanchez both expressly acknowledged to Ms. Tanner on October 16, 2016 that even looking at a pregnant woman's vagina was outside their scope of practice.

47.     On October 16 and 17, 2016, Defendants McMurray, Luna, and Sanchez all had access to several types of guidance material and standard procedures for treating pregnant inmates or handling medical emergencies. One of these was the pregnancy pathway that Defendant CCS provided to its employees, which counseled nurses to call for an ambulance if faced with certain symptoms (like a pregnant inmate's water breaking). Defendants McMurray and Sanchez never consulted the pathway at all, and Defendant Luna completed it incorrectly and still failed to follow any of its guidance.

48.     Another source of guidance is the Medical Services Agreement, which contained specific provisions regarding referral of pregnant inmates for prenatal care as part of the inmate receiving and diagnosis function (Section 4.1.1.2.7), as well as identification of patients in need of hospitalization or other off-site services and the facilitation, prioritization, and coordination of such off-site services (Section 4.1.2.2), and making referral arrangements with specialists for the treatment of those inmates with health care problems that may extend beyond the urgent care threshold and specialty services provided on-site (Sections 4.1.3.1 and 4.1.4.7). The agreement tasks Defendant McMurray personally with developing programs for inmates who require special

care, including pregnant inmates. Defendants CCS and McMurray did not comply with the terms of the Medical Services Agreement with respect to the chronic care program for pregnant inmates, including by failing to create a patient-specific treatment plan for Ms. Tanner, failing to give her regular clinic visits during her incarceration, failing to request or review needed laboratory and diagnostic results, and failing to refer her for appropriate and necessary off-site care.

49.     Facility-specific policies issued by Bernalillo County set specific protocols for handling pregnancy and labor, including that when a pregnant inmate "experiences contractions of labor, whether or not she is at her due date, she will be immediately transported to the University of New Mexico Hospital for further evaluation and the Responsible Physician will be notified." None of the Defendants complied with this policy. Defendants McMurray, Luna, and Sanchez all ignored Ms. Tanner's contractions for a full day prior to her son's stillbirth.

50.     In addition to internal and facility policies and procedures, Defendant CCS agreed to provide MDC inmates with healthcare that complied with the standards issued by the National Commission on Correctional Health Care ("NCCHC") and the American Correctional Association ("ACA"). It further agreed to train MDC staff in accordance with these standards, including training on recognizing emergencies and procedures for referring inmates for care.

51.     The 2014 edition of the NCCHC Standards for Health Services in Jails, which was in effect at the time Defendant CCS entered into the Medical Services Agreement and available to personnel at MDC in 2016, contains an essential standard entitled "Counseling and Care of the Pregnant Inmate," which requires that: "Pregnant inmates receive timely and appropriate prenatal care, specialized obstetrical services when indicated, and postpartum care. Pregnant inmates are given comprehensive counseling and assistance in accordance with their expressed desires regarding their pregnancy."

52.     The Compliance Indicators for this NCCHC Standard specifically require that:

Counseling and assistance are provided in accordance with the pregnant inmate's expressed desires regarding her pregnancy, whether she elects to keep the child, use adoptive services, or have an abortion.

Prenatal care includes: (a) Medical examinations by a clinician qualified to provide prenatal care; (b) Appropriate prenatal laboratory and diagnostic tests; (c) Advice on appropriate levels of activity, safety precautions, and alcohol and drug avoidance; (d) nutritional guidance and counseling.

Restraints are not used during active labor and delivery.

There is documentation of appropriate postpartum care.

A list is kept of all pregnancies and their outcomes.

All aspects of the standard are addressed by written policy and defined procedures.

53.     The "Discussion" section of this NCCHC Standard further explains that:

This standard intends that the health of the pregnant inmate and her fetus is protected and that pregnant inmates receive services as they would in the community.

The responsible health authority should ensure that pregnant inmates and their fetuses are provided every opportunity for healthy outcomes, and that the pregnant inmate is afforded supportive comprehensive counseling and is not coerced into making any decision contrary to her expressed desires.

An arrangement should be made with a community facility as the site for delivery. Documentation of the patient's prenatal history should accompany her to the hospital.

Before incarceration, many female inmates have unhealthy lifestyles, including a history of extensive tobacco, alcohol, and other drug use, and lack prenatal care. Therefore, many pregnancies can be classified as high risk.  Other factors also complicate high-risk pregnancies, such as a positive HIV status; other sexually transmitted diseases; malnutrition; obesity; adolescence; and increased anxiety, stress, and depression.   As a result, specialized obstetrical staff and other resources are often needed.   Current medications should be reviewed in consideration of fetal risk.   Prenatal vitamins contain important nutrients such as folic acid and should be given to all pregnant women.

...

Pregnant women have physical and physiological changes throughout gestation that increase their risk of falls.   In addition, obstetrical emergencies such as hemorrhage, eclamptic seizures, and preterm labor can arise at any point in pregnancy.   During labor and delivery, these and other emergencies may arise and require immediate medical intervention and/or movement of the mother.   The postpartum period can involve exhaustion, dehydration, difficulty in urination or defecation, and complications such as hemorrhage.

54.     The Fourth Edition of the ACA Performance-Based Standards for Adult Local Detention Facilities available to personnel at MDC in 2016 similarly requires that:

If female inmates are housed, access to pregnancy management services is available.     Provisions of pregnancy management include the following: pregnancy testing, routine and high-risk prenatal care, management of chemically addicted pregnant inmates, comprehensive counseling and assistance, appropriate nutrition, and postpartum follow up.

55.     When conducting an accreditation survey of MDC's medical unit, the NCCHC found that the facility was not in compliance with several NCCHC standards during 2015 and 2016. In particular, the facility was not in compliance with NCCHC Standard J-C-02 or NCCHC Standard J-E-11 because there was no annual skills testing and no annual performance evaluations for registered nurses during those years. During the same survey, the NCCHC also found that the facility was not conducting its initial health assessments in compliance with the NCCHC Standard J-E-4, because the registered nurses performing the assessments did not complete an abdominal assessment.

56.     When it entered into the Medical Services Agreement, Defendant CCS represented to Bernalillo County that, as a result of acquiring MDC's former medical contractor, Correctional Healthcare Companies (CHC), "CCS truly understands the complexities of McClendon." This indicated that Defendant CCS and its employees would be familiar with the requirements imposed by *McClendon v. City of Albuquerque*, No. CV 95-24 JAP/KBM, a class-action lawsuit involving conditions of confinement and inmate medical care at MDC and its predecessor facilities. By court

order, Defendant CCS was required to have notice of the terms of the *McClendon* settlement agreement posted in its medical unit in both English and Spanish.

57.     Under the terms of the *McClendon* settlement agreement as approved on June 27, 2016, court-appointed expert Dr. Robert G. Greifinger, M.D., monitors the provision of medical services and, specifically, "[w]hether MDC inmates who complain orally or in writing of serious acute illness or serious injury are given immediate medical attention."

58.     According to Dr. Greifinger's report on April 22, 2016, his site visit at MDC that month revealed "there are continuing problems with the quality of nursing evaluations, judgments, and nursing decisions for acute problems," as well as "a continuing problem with nursing documentation[.]" The quality improvement process during that time period was also "insufficient in regard to data collection, qualitative and quantitative analysis, documentation, implementation of remedies, and re-measurement with tracking," and these deficiencies resulted in committee reports that "are vacuous, lacking presentation of data, analysis, plans for remedy, and follow-up." Dr. Greifinger opined that "the process is not integrated and the minutes are deficient. There is no documentation of analysis, re-measurement, and trending. Grievances are not analyzed, nor are grievance data available for committee review. Mortality reviews do not appear to be discussed at committee meetings. There is no documentation that policy is considered. There is no documentation that the committee is measuring performance in areas noted deficient by the medical monitor, such as the quality of nursing care and documentation."

59.     The monthly reports and committee records for 2016 also show that Defendant CCS had staffing vacancies and high turnover in the Director of Nursing and Charge Nurse positions, which were responsible for training, supervising, and scheduling the rest of the nursing staff. These staffing problems were reported on a monthly basis to Defendants CCS and McMurray, and

they appear as agenda and discussion items for committee meetings that Defendant McMurray attended.

60.     According to Dr. Greifinger's report on November 21, 2016, practitioner staffing at MDC "was reduced to one physician and one physician assistant" due to several practitioner resignations in July 2016, and this "substantially reduced staffing continued for 3.5 months"—including the period of Ms. Tanner's incarceration. Dr. Greifinger found "the waiting time for access to practitioner care" increased during that period, and there was "a substantial lag time to the practitioners for acute care"; "These staff vacancies put MDC patients at risk of serious harm." There were serious failings in the chronic care program and "no progress" made toward recruiting an on-site OB/GYN. Defendants CCS and McMurray already had been made aware of these deficiencies prior to receiving Dr. Greifinger's report.

61.     Defendants CCS and McMurray received monthly statistical reports summarizing the volume and frequency of work that the personnel staffing the medical facility at MDC were handling each month, underlining the staffing deficiencies. The reports showed there were zero physician clinic visits for August, September, and October 2016, as well as zero on-site specialty consultations for OB patients during each month in 2015 and 2016.

62.     When Ms. Tanner entered the facility on October 4, 2016, all the Defendants knew of the serious risks to inmate health—especially inmates who required specialized care, like pregnant women—that the conditions in the facility posed. They also knew of their shortcomings in handling pregnancy and obstetric care in particular. Ms. Tanner and her baby were nonetheless forced to rely on Defendant CCS and its personnel, including Defendants McMurray, Luna, and Sanchez, for access to timely and adequate medical care.

63.     The systemic deficiencies in the Defendants' provision of medical care to inmates,

and in particular the known deficiencies caused by Defendant CCS's policies with respect to pregnant inmates and their babies, resulted in Ms. Tanner and her son being deprived of essential prenatal and obstetric care during virtually the entire period of Ms. Tanner's incarceration in October 2016. All the Defendants knew of these shortcomings in the facility, and Defendants CCS and McMurray specifically were notified and informed of the risks involved at multiple points prior to Baby Jay's stillbirth. The effects on Ms. Tanner and her baby were both reasonably foreseeable and preventable.

64.     During the period of Ms. Tanner's incarceration at MDC in October 2016, Defendants McMurray, Luna, and Sanchez all knew that she was in an advanced state of pregnancy and had serious medical needs. They further had specific information about her symptoms and condition on both October 16 and 17, 2016 that clearly indicated she required specialized or emergent medical care that they were not competent or qualified to provide. Even a layperson would (and repeatedly did) identify her condition as requiring emergency care. All three individual Defendants consistently violated policies, procedures, clinical guidance, applicable contractual provisions, *McClendon* requirements, and widely-accepted standards of correctional healthcare in order to avoid transporting Ms. Tanner off-site.

65.     The Defendants demeaned, dismissed, and diminished Ms. Tanner's complaints, ignoring and minimizing her symptoms even when they personally observed some of them. Their conduct underlines their deliberate indifference to her medical needs.

66.     The pattern of conduct the individual Defendants exhibited with respect to Ms. Tanner resulted from Defendant CCS's broader policies and customs of failing to staff the facility adequately, failing to provide for pregnant inmates, minimizing off-site transports, and other deficiencies with respect to caring for patients like Ms. Tanner.

67.     Ms. Tanner suffered damages and injuries from the Defendants' refusal and failure to provide prompt, adequate medical treatment for her serious medical needs as described above. Her damages include pain and suffering, extreme psychological and emotional distress, medical expenses, serious physical injuries, including injury to her own reproductive system and the death of her baby, and the loss of her baby's affection, society, companionship, and support.

### COUNT I – CRUEL AND UNUSUAL PUNISHMENT CLAIMS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS AGAINST DEFENDANTS MCMURRAY, LUNA, SANCHEZ, AND CCS

68.     Plaintiff Shawna Tanner incorporates by reference all other paragraphs of this Complaint as though fully set forth herein.

69.     The Eighth Amendment prohibits cruel and unusual punishment against prisoners serving their sentences in state custody. The Fourteenth Amendment's Due Process Clause provides similar protections to pretrial detainees like Ms. Tanner, and creates constitutional duties to provide such detainees with timely access to necessary medical care and not to unnecessarily and wantonly inflict pain on them.

70.     Ms. Tanner's medical needs as described above, as well as the harms she suffered, were sufficiently serious and obvious to warrant protection under the Eighth Amendment and the Fourteenth Amendment's Due Process Clause.

71.     Through their acts and omissions as described above, Defendants McMurray, Luna, Sanchez, and CCS were deliberately indifferent to Plaintiff Tanner's serious medical needs, and they unnecessarily and wantonly inflicted severe pain upon her.

72.     The systemic deficiencies in Defendant CCS's staffing, training, supervision, and retention of medical staff at MDC and its systemic refusal to permit pregnant inmates and their babies access to adequate medical care and resources, including specialized or emergent care,

amounted to customs, policies, training, and programs of the company and its command staff that directly caused the constitutional violations by its employees alleged herein. Defendant CCS continued to adhere to these constitutionally deficient customs and policies despite receiving repeated notice that they would lead to violations just like those that materialized on October 16 and 17, 2016. Ms. Tanner's injuries and damages as alleged herein were an entirely predictable consequence of Defendant CCS's failure to equip its medical unit and employees at MDC and elsewhere with the skills, tools, resources, training, staffing levels, and supervision necessary to handle medical emergencies with an obvious potential to result in constitutional violations, including those involving pregnant inmates and their babies. Defendant CCS and its command staff had notice that its customs, policies, training and programs at MDC did not prevent—and indeed were highly likely to lead to—such constitutional violations, but they nonetheless continued to adhere to them.

73.     By engaging in the acts and omissions described above, Defendants McMurray, Luna, Sanchez, and CCS's command staff violated Ms. Tanner's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments.   The constitutional violations committed by these Defendants are actionable under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

74.     The acts and omissions of Defendants McMurray, Luna, Sanchez, and CCS above were intentional, malicious, sadistic, willful, wanton, obdurate, and in gross and reckless disregard of Ms. Tanner's constitutional rights as described above.

75.     The acts and omissions of Defendants McMurray, Luna, Sanchez, and CCS's command staff described above proximately caused Ms. Tanner's damages and injuries, including pain and suffering, psychological and emotional distress, healthcare expenses, serious physical

injuries, and the death of her son. In addition, Defendant CCS's constitutionally deficient policies, customs, training, and programs as described above were a moving force behind those damages and injuries.

WHEREFORE, Plaintiff Shawna Tanner prays for compensatory and punitive damages against Defendants McMurray, Luna, Sanchez, and CCS, together with an award of reasonable attorneys' fees and costs.

## **JURY TRIAL DEMAND**

76.     Plaintiff Tanner hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

KENNEDY, HERNANDEZ & ASSOCIATES, P.C.

 */s/Elizabeth A. Harrison*
Paul J. Kennedy
Jessica M. Hernandez
Elizabeth A. Harrison
201 Twelfth Street Northwest
Albuquerque, New Mexico 87102
(505) 842-8662
pkennedy@paulkennedylaw.com
jhernandez@paulkennedylaw.com
eharrison@paulkennedylaw.com

Nicole W. Moss
THE LAW OFFICE OF NICOLE W. MOSS, LLC
514 Marble Avenue Northwest
Albuquerque, New Mexico 87102
(505) 244-0950
nicole@nicolemosslaw.com

*Attorneys for Plaintiff Shawna Tanner*

I hereby certify that a true copy of the foregoing was filed and served electronically to all counsel of record via CM/ECF on the date indicated on the notice of electronic filing.


  _/s/Elizabeth A. Harrison_____
Elizabeth A. Harrison